122

1    coach, right? He has the certification and
2    the education for that; is that right?
3  A.  Yes. As long as he has certification in
4    elementary education or reading -- and/or
5    reading.
6  Q.  And your testimony is you don't recall
7    Mr. Abrams approaching you about a position at
8    his school in the summer or late summer of
9    2004?
10  A.  That's my position.
11  Q.  Do you know that was one of the things that
12    Mr. Lowe complained about in his EEOC
13    complaint was not being hired for that
14    position?
15  A.  I don't recall Mr. Abrams making a
16    recommendation for Mr. Lowe, no.
17  Q.  Did you ever investigate to see, with
18    Mr. Abrams, if he made that recommendation to
19    somebody without your knowledge?
20  A.  I asked Mr. Abrams if he made the
21    recommendation of Mr. Lowe. He told me that
22    he did not.
23  Q.  Did he ever indicate to you he wanted to hire

123

1       Mr. Lowe for any positions at his school?

2    A.   No, he did not.  The only -- Mr. Abrams

3        approached me to my recall.  I was at Capitol

4        Inn having lunch.  Mr. Abrams and another

5        principal came out of Capitol Inn.  He stopped

6        me and asked me, Mr. Barker, Mr. Lowe has been

7        by my school to inquire about a special

8        education position that I have available; is

9        he a viable candidate for that position.  I

10       told him in no uncertain terms as long as he

11       meets the certification requirements for that

12       position, he is a viable candidate and he can

13       be selected and recommended for that

14       position.  I told him I could not talk off the

15       cuff and determine whether or not he met those

16       certification requirements, that I would check

17       when I got back to school and that I would --

18       back to the office and that I would give him a

19       call.

20            I subsequently checked.  I subsequently

21       inquired of Mr. Lowe if he had certification

22       along the lines of special education.

23       Mr. Lowe gave me a bunch of fast talk saying

1    that I have taken these courses and that these

2    courses meet the requirements.  I can get an

3    emergency certification.  Mr. Lowe, show me

4    proof that you have these courses that you say

5    that you've taken.  Mr. Lowe presents to me a

6    transcript that does not have a single special

7    education heading on it.  I'm told all the

8    time in my position that I qualify for this.

9    I'm told by applicants all the time that I can

10   teach math.  I review their transcripts, and

11   they've got one single math course on it.  Yet

12   they can teach math.  Desire alone does not

13   qualify you to teach a particular position.

14        To this date Mr. Lowe has not shown me any

15   special education courses that he has taken by

16   way of a transcript that would qualify him to

17   teach special education.  Sure he's given me a

18   lot of dialogue that says this will count for

19   that and this will count for that, but it's

20   his responsibility, not mine, to go to some

21   state department and say that these courses

22   are substitutable for these particular courses

23   and I can get certified in this particular

125

1    area.  Until he shows me that, I'm not going

2    to step out on a line and allow him to assume

3    a position that I have high suspicion that he

4    is not certified for.

5    Q.   Does the school system ever obtain emergency

6    certification for employees who don't have

7    their full certification in an area?

8    A.   Yes, we do.

9    Q.   In the summer of 2005, did you obtain any

10    emergency certification for teachers?

11    A.   Yes, I did.

12    Q.   Can you name any of those?

13    A.   Can't name them specifically, but I can give

14    you the circumstances.

15    Q.   Let me ask you this before you give me the

16    circumstances.  Did they have teaching

17    certificates before you hired them with an

18    emergency certificate?

19    A.   Not necessarily a teaching certificate, but

20    they would have a degree.

21    Q.   Does the school hire people who don't have

22    education degrees but obtained emergency

23    teaching certificates while they work for a

1      timely manner for them to get into an

2      alternative program, but we're going to get

3      them by.  The State is not going to honor it

4      if you just arbitrarily send in a person for a

5      an emergency certification based upon desire.

6      You can't do that.

7   Q.  Did you check with anyone at the State

8      Department of Education to see if Mr. Lowe

9      would qualify -- his courses would qualify?

10  A.  For special education?

11  Q.  Emergency certificate.

12  A.  No, I didn't, because the first rule of thumb

13     there is to have the proper departmental

14     indication by the courses that you take.  When

15     you get a person's transcript, Bill, it's

16     going to say, SPE or SP, special education,

17     SPED.  Every course that is considered as

18     special education is going to have some type

19     of indication that it is a special education

20     course.

21         Am I sitting here saying that Mr. Lowe

22     hasn't had any courses that would qualify for

23     that?  No, I'm not.  I'm sitting here saying

1      that Mr. Lowe has never presented to me any

2      evidence that any of the courses that he has

3      taken qualify for special education, which is

4      his responsibility.

5  Q.  Were you aware that his work and his school

6      work on his doctorate degree was in special

7      education administration?

8  A.  I'm aware that I had that conversation with

9      him, but I'm not aware of it by way of a

10     transcript.

11  Q.  Is that the reason Mr. Lowe was not hired for

12     the job that Mr. Abrams had in special ed?

13  A.  We never got to the recommendation stage

14     because when I called him back, I said

15     according to my research I cannot document

16     Mr. Lowe has had the special education courses

17     that he discussed with you and that he

18     ultimately discussed with me.

19  Q.  Did Abrams say, I want to hire Mr. Lowe, or

20     did he put it just like, what do you know

21     about Mr. Lowe?  How did he say that to you?

22  A.  Basically what he asked of me was, if I'm

23     entertaining Mr. Lowe for a special education

1          position at my school, does he meet minimum

2          qualifications.

3    Q.    That's the first time Abrams ever approached

4          you about a job for Mr. Lowe?

5    A.    First time.

6    Q.    Or as you're here as a representative of the

7          school, as far as the school system knows,

8          that's the first time Mr. Abrams approached

9          the school system about hiring Mr. Lowe?

10   A.    It is.

11   Q.    Now, what about Mr. Sikes?

12   A.    Mr. Sikes had a similar conversation with me.

13         It was not -- I don't want you to think I'm at

14         every buffet in town, but he called me up and

15         asked me basically does Mr. Lowe -- I have a

16         vacancy in special education; Mr. Lowe has

17         been on my doorsteps with regard to that

18         position; does he meet the posted

19         qualifications for special education.

20              I had already done the research at that

21         particular time because I think that was

22         subsequent to Mr. Abrams asking me.  And I

23         told him I do not have any documentation that

1       he is certified in special education.

2   Q.  Did Mr. --

3   A.  It may have been before, but I think it was

4       after.

5   Q.  Did Mr. Sikes indicate that he wanted to hire

6       Mr. Lowe?

7   A.  No.  He just told me he had a couple of

8       vacancies -- I think he had two in special

9       education -- and that he was looking.  And he

10      and I both were desperate for certified

11      applicants at that particular time because

12      there was a shortage for special education

13      teachers the entire summer going into the

14      school year after the school year had

15      started.  So there would have been absolutely

16      no reason to deny him the right to hire him if

17      we could get him certified.  It would have

18      been a glorious moment in my cap to find

19      someone whom I could get certified to place in

20      those positions.  We couldn't do it.

21  Q.  Did you ever say anything discouraging to

22      Abrams or Sikes about Mr. Lowe?

23  A.  No.

132

1   Q.   Nothing disparaging about him?

2   A.   No.

3   Q.   Nothing to intimate that you didn't think he

4        was a good candidate for them to hire?

5   A.   Absolutely not.  The only subsequent

6        discussion that I had with Mr. Sikes was -- He

7        said, Mr. Barker, who is this man; he is on my

8        doorsteps every day; you have told me that he

9        does not meet the qualifications for special

10       education.  I just said he is an aspiring

11       teacher.  He's a teacher without a job, and

12       he's looking for a job, to kind of appease the

13       process with him.

14  Q.   Did Sikes talk to you about Lowe teaching

15       science or English or any other courses?

16  A.   Not to my knowledge.  Special ed is all we

17       talked about.

18  Q.   Did he talk to you about Lowe applying for an

19       assistant principal or administrative

20       assistant's position?

21  A.   Not to my knowledge.

22  Q.   Did you ever become aware of a Ms. Starks that

23       wanted to hire Mr. Lowe?

133

```
 1    A.    I know Ms. Starks.  I'm not aware that she
 2          wanted to hire Mr. Lowe.
 3    Q.    She never expressed to you any desire to hire
 4          him?
 5    A.    Ms. Starks, if I recall correctly, recommended
 6          three individuals consistent with the pattern
 7          that I outlined to you earlier for her
 8          administrative assistant's position.  Among
 9          those three individuals was Mr. Marvin Lowe,
10          but not Mr. Melvin Lowe.
11    Q.    And who was chosen for the position?
12    A.    A science teacher, black male, from a middle
13          school magnet school in the district, Floyd
14          Middle Magnet School.
15    Q.    Were you aware of a position that was filled
16          by a lady named Karen Vann that Mr. Lowe
17          included in his concerns in his EEOC charge?
18    A.    I know Karen Vann and the position that she
19          ultimately filled with the school district.
20    Q.    Was that position advertised?
21    A.    Yes, it was.
22    Q.    And she's a white female?
23    A.    That's correct.
```

138

1   Melvin Lowe has applied for that they had to

2   hire a woman?

3 A. No, sir.

4 Q. You would not say that?

5 A. No.

6 Q. That would be inappropriate, would it not?

7 A. It would be, definitely.

8 Q. That you had to hire a woman --

9 A. No.

10 Q. -- as opposed to -- based on their gender?

11 A. No, definitely not.

12 Q. During the '04-'05 years, did you have any

13   conversations regarding Mr. Lowe?

14 A. '04-'05?

15 Q. Second year at Daisy Lawrence.

16 A. No.

17 Q. Did you have any conversations with Mr. Lowe

18   during that time?

19 A. I don't recall any other than, you know, maybe

20   during the time when he was -- Well, I just

21   don't recall any.

22 Q. When his leave requests were denied, were

23   those -- was that after you were aware of his

1          EEOC complaint?

2     A.   I don't think so.

3     Q.   And what was the reason that his leave was

4          denied?

5     A.   Mr. Lowe is not lacking in ambition at all.

6          He is fully confident in his abilities and the

7          things that he wants to do, whether for the

8          school district, within the school district.

9          He submitted a detached duty request to

10         represent the school district in a

11         conference -- I think if I recall in

12         California -- related to our reading program.

13              Well, we had all kind of ambassadors for

14         our reading program that were further up the

15         chain that Mr. Lowe.  Mr. Lowe was a

16         teacher/tutor.  He had no official capacity,

17         even as a reading coach, within the school

18         district.  And we had all kind of individuals

19         who had the proper credentials.  So I inquired

20         of his -- the person who would have been

21         giving that authority, Mr. Looney.  I said,

22         Mr. Looney, I have a request from Mr. Lowe to

23         go out and represent the school district and

1    make a presentation about our reading program

2    in a workshop-type setting; did you authorize

3    this.

4        Mr. Looney looked at me and gave me a

5    facetious laugh.  He said no, I did not

6    authorize this.  I turned down that

7    recommendation based upon my conversation with

8    Mr. Looney.  I don't know what anybody else

9    told Melvin Lowe.  I know that I had that

10   conversation with Mr. Looney, and I know what

11   his response was.

12   Q.   Are you saying that Mr. Looney said that he

13        was against Melvin Lowe going to this

14        convention?

15   A.   He didn't say he was against him.  He laughed

16        at me and said, no, I did not authorize him to

17        go out and represent Montgomery Public

18        Schools' reading program.

19   Q.   Did Mr. Looney ever come to you and ask that

20        you let Melvin Lowe go to this program?

21   A.   No, he did not.

22   Q.   Or tried to abdicate Melvin Lowe going to the

23        program?

141

1   A.   No, he did not.

2   Q.   Did he ever say he was against Melvin Lowe

3        going to the program?

4   A.   He did not say.  He inferred that it was

5        absurd that Mr. Lowe was going to go out and

6        represent the school district just by his body

7        language when he laughed at me and said, of

8        course I did not.

9   Q.   The principal at the school approved this

10       leave on October 18, and then it was denied by

11       you November 5th.

12  A.   Sounds reasonable.

13  Q.   What was the reason on the delay of the

14       denial?

15  A.   It's -- Generally most of the requests for

16       detached duty would go through one of the

17       specialists in my office, Carolyn Hicks.  If

18       there was one that was of some concern -- and

19       there were often ones of concern -- she would

20       bring it to my attention and say, well,

21       Mr. Barker, what are your feelings about this

22       particular request.  She just recently came to

23       me on one that is totally dissimilar, but the

1  reason -- the line of logic goes to say --

2  This is what happens, Bill, and you're not

3  naive enough to not identify with this.

4      A principal, say, for example, will get

5  ready to go to the National Association of

6  School Principals in Las Vegas.  Three days

7  later I'm going to get a request for her

8  spouse or his spouse in the school district to

9  go to that same conference, whether they are a

10  school principal or not.  I'm forever on the

11  alert to little things such as that to make

12  sure that we're not funding vacations for our

13  employees.  That's my responsibility.  I have

14  to look at those things to see if they make

15  walking-around sense before I sign my name to

16  them and say that this -- I approve this

17  particular request.

18      Well, in my mind, it made no sense for a

19  person who was not associated with the reading

20  program of the school district to be making a

21  presentation on behalf of the school

22  district.  It just didn't make sense.

23  Q.  Were you aware of the posting on the school's

1    who the superintendent gave his approval to

2    go.  I could only assume Mr. Lowe's name was

3    not on that submittance that was made by MCEA

4    or AEA and as a consequence -- I can think of

5    no other reason why it would have been denied.

6    Q.  If Mr. Looney had been for this National

7        Reform Conference, if he had said, yeah,

8        I think Melvin Lowe is the guy to go to that,

9        would you have approved that leave?

10   A.  Mr. Looney's position is on a parallel with

11       mine with the school district.  I would have

12       respected him making that particular

13       recommendation and allowed him to go because

14       then the responsibility of accountability

15       would have rested with Mr. Looney, not with

16       me.

17                (Off-the-record discussion.)

18   Q.  Let me ask you one other question.  Do you

19       know if Mr. Looney would have written Mr. Lowe

20       and said, I've exhausted everything I could do

21       to help with this matter; you can cancel your

22       trip or you can take sick leave?  Do you know

23       why he would have written him that?

1    A.    I have no idea why he would have.

2    Q.    That's not consistent with what he related to

3          you, is it?

4                    MS. CARTER:   Object to form.

5    A.    That's not his reaction to me.   His reaction

6          to me, as I said before, was to laugh and say,

7          of course I did not authorize this.   But let

8          me put it this way:   I'm not accusing

9          Mr. Looney of anything.   It is not uncommon

10         for principals, supervisors in the school

11         district, to make the bad guy to be HR.   They

12         just don't want to face personnel with the

13         fact that this is my decision on it.   They'll

14         say, well, I submitted this to HR and HR says

15         this or says that.   It's not uncommon.   I'm

16         not saying that Mike would have wimped out

17         that way.   He probably would have gone ahead

18         and told him if he did not, but I know what my

19         conversation was with him and I've testified

20         to it accurately.

21                    MR. PATTY:   We can take a break.

22                    (Brief recess.)

23    Q.    (Continuing by Mr. Patty) Do you recall if a

1    emergency certification.  Now, under what

2    context, I have no idea.  I'm not privy to the

3    conversation between the two of them.

4  Q.  Would there be documents that would show when

5    Daisy Lawrence was going to be closed, when

6    that decision was made to close it?

7  A.  I don't know that there will be documents

8    officially, but it would have had to have been

9    presented to the board, the proposal for

10    closing during the spring of '05, somewhere

11    between January of '05 and the spring of '05.

12  Q.  Do you recall the meeting -- The

13    superintendent testified about a meeting that

14    was held with all the faculty at Daisy

15    Lawrence about the closing and how different

16    folks would get moved to different positions.

17    Do you remember that?

18  A.  I recall, yes.

19  Q.  What do you recall of that meeting?  What was

20    said?

21  A.  The superintendent and I visited the campus to

22    allay any concerns and fears that the faculty

23    and staff may have had there as to what was

148

1    going to transpire with the closing of Daisy

2    Lawrence.  We spoke to the faculty and staff.

3    And to my recall and to my later clarification

4    with Mr. Lowe, we assured the faculty and

5    staff that all tenured persons would be placed

6    in positions to their liking if they were

7    available.  We were going to make every

8    concerted effort to place them in a comparable

9    position to the one which they held there at

10   Daisy Lawrence.  All non-tenured persons --

11   there were three of whom -- were given no

12   assurances other than they could apply for

13   positions which came open in the district and

14   that they would be given due consideration for

15   those positions.  I later reaffirmed that

16   position in writing by way of e-mail to

17   Mr. Lowe at his request roughly a month or so

18   later when he inquired -- I guess he was

19   growing some concern about whether or not he

20   was going to land a position, although it was

21   rather early on.  I think it was in June.  I

22   reaffirmed that position that I could give him

23   no assurances with regard to placement as I

1  could give no non-tenured personnel, but that

2  I encouraged him to keep applying and that

3  surely something would come about before the

4  school year -- the next school year started.

5  And that was the extent of it.  That's what I

6  recall about it.

7  Q.  Did the other two non-tenured teachers get

8  positions with the school?

9  A.  They ultimately did.  Yes, they did.

10  Q.  When did they get positions?

11  A.  Bill, to be absolutely honest with you, when

12  this came up, I checked.  All it says is

13  August of that subsequent school year.  If

14  they had been hired in July, it would say

15  August.  If they had been hired in June, it

16  would say August.  If they had been hired in

17  August, it would say August.  So at some

18  subsequent point, they interviewed for

19  teaching positions at other schools and

20  received them.  One of them was a credentialed

21  special education teacher.  And as I told you,

22  there was a supply/demand situation that

23  favored them drastically.  The other was an

150

1      elementary ed teacher who interviewed with

2      some school and got on with them.  But to tie

3      it down to exactly when, I can't say when.

4  Q.  Were there any -- All the tenured teachers got

5      positions, right?

6  A.  All the tenured persons got positions, the

7      last of whom was the guidance counselor that

8      was referred to earlier by the superintendent.

9  Q.  And the principal, who was a contract

10      principal, got a position?

11  A.  That's correct.

12  Q.  What about classified employees?

13  A.  I would have to check to make sure in that

14      case.  I assume -- As best I recall, there was

15      a building custodian who was ultimately picked

16      up by another of the elementary schools after

17      having done a temporary stint for a person who

18      was on sick leave at central office, because

19      she used to keep that building over there

20      very, very clean, immaculately clean, and she

21      interviewed for a position -- an interim

22      position.  She was brought on on an interim

23      basis, and then she was hired well after the

160

1      they filled that out when they

2      first got hired, which was silly

3      because I guess some of those

4      people could have been new

5      hires.  But we can pull the aps

6      for those people.  I just said

7      send their credentials.  I

8      haven't looked at the stuff yet,

9      but I think it was resumes or

10     their certification sheets.

11          MR. PATTY:  Mostly it looks like

12              it's certifications.

13          MS. CARTER:  So we can pull the aps

14              and copy those too.

15  Q.  I showed Dr. Purcell an e-mail she received on

16      June 22, 2005.  It's Exhibit 5.  Do you recall

17      seeing that document?

18  A.  Yes.  This looks very much like the document

19      that was shared with me by Dr. Purcell.

20  Q.  What did you do after receiving that document?

21  A.  There were some rather serious allegations in

22      there with regard to what Mr. Lowe felt was

23      things that had been said to him by Dr. Owens

1    and by various people, and all of them were

2    alluding to the fact that he thought that

3    there was evidently some block of his

4    assignments by the HR office.  And so since we

5    had just finished the EEOC complaint or the

6    EEOC complaint may still have been unresolved

7    at that particular point, I remember getting

8    this memo, calling Elizabeth Carter here

9    and --

10              MS. CARTER:  Don't go into anything

11                   we --

12              MR. PATTY:  Yeah, don't --

13              MS. CARTER:  Once it was referred to

14                   me, you don't go past that.

15  A.   But I did not want to take a chance that this

16       could impact anything else, so I called her.

17  Q.   Don't tell me what you talked about with

18       Elizabeth, but I would like to know if you

19       talked to Owens about it.

20  A.   At that particular time, I did not because I

21       knew the allegations on there were totally out

22       of kilter.  The things that he said that

23       Dr. Owens told to him, I knew that I had had

1      no conversation with Dr. Owens -- I haven't

2      discussed Mr. Lowe in an unprofessional manner

3      with Dr. Owens at any time.  So I knew that

4      this was totally unfounded.  Not saying that

5      it -- the conversation did not happen between

6      the two of them, but I didn't follow up on it

7      because I knew there was no possibility for it

8      to be true.

9   Q.  So did you interview anybody with regard to

10      that Exhibit 5?

11   A.  I didn't interview anyone.  I talked back with

12      the superintendent.  My comments to the

13      superintendent were, have you looked at the

14      structure of this e-mail.  It makes a mighty

15      bad point for a professional in the field to

16      e-mail the superintendent of education a

17      document of this nature that is barely

18      coherent, and that same person is asking me to

19      allow them to go out and represent the school

20      district and you send a document of this

21      nature to the superintendent of education whom

22      you would think you would be on your Ps and

23      Qs.  I remember making those comments to her.

1   Q.   You were pretty mad about that document?

2   A.   No, sir, not mad about it.  Disappointed that

3       Mr. Lowe, who had proven himself to be a

4       reputable teacher in the school district,

5       would take such carelessness in sending this

6       type of documentation to the superintendent of

7       education.  I cannot make a case for him when

8       he is sending that.  If you have taken the

9       time to read it, it's barely coherent.  It's

10      despicable in terms of a professional

11      corresponding with the superintendent.

12   Q.   Was Carla Winborne told to go -- I'm jumping

13      around a little bit.  Was she told to go tell

14      Dr. Owens that he could not hire Mr. Lowe?

15   A.   Carla Winborne consulted me, and I told her

16      basically the process that was going on.  I

17      told her that I had asked Connie Mizell to get

18      Dr. Lowe some additional applicants as it

19      related to the reading coach position and that

20      she could not accept his recommendation as a

21      reading coach until that issue was resolved.

22      So her response I assume was, I cannot hire

23      Mr. Lowe at this particular time, because I

166

1   job for Dr. Owens.  It was just --

2  Q. Before --

3  A. Go ahead.  I'm sorry.

4  Q. No.  Before --

5     MS. CARTER:  You can finish your

6       answer.

7  Q. Yeah.  I would -- Before June 22, 2005, did

8   Dr. Owens say to you or your office that he

9   would like to get y'all to give Mr. Lowe

10   something, some kind of job?

11 A. Not to my recall.  He didn't make the

12   statement to me.

13 Q. Did Dr. Owens or did you ever say anything to

14   Dr. Owens or did anyone in your presence in

15   administration say anything to Dr. Owens that

16   the board was getting back at Melvin Lowe

17   because he filed his lawsuit?

18 A. Definitely not.

19     (Plaintiff's Exhibit 15 marked for

20      identification.)

21 Q. What is Exhibit 15?

22 A. Exhibit 15?  This is the results of our having

23   done -- when I say our -- HR having done

1    A.    No, I do not.

2    Q.    How about Janice Harvey?

3    A.    No, I do not.

4                    MS. CARTER:   What was the first name

5                        you said, Bill?   Those are not

6                        names I've heard.

7                    MR. PATTY:   Pat Carnagie.

8    Q.    And you had no conversations with the

9          superintendent of Bullock County about

10         Mr. Lowe?

11   A.    Other than to clear the fact when he was

12         considering a return to the school district

13         that we would not be looked at as tampering.

14   Q.    That was with the assistant superintendent?

15   A.    Right.

16   Q.    But nothing with the superintendent?

17   A.    No, nothing with the superintendent.   That's

18         correct.

19   Q.    And you never told Abrams or Owens that they

20         need to hire women?

21   A.    No.

22   Q.    Were there any problems with Mr. Owens' work

23         or did you get any complaints regarding his

172

1    16, and then I'll refer to the individual

2    document by its Bates number.

3                    (Plaintiff's Exhibit 16 marked for

4                        identification.)

5    Q.   What I'm trying to do is understand which

6         announcements and positions these go with.

7              Let me show you the first one, which is

8         Bates numbered 1508.  And it looks like the

9         way I'm reading this is the successful

10        candidate has got their certificate attached

11        to the announcement, which is Bates number

12        1509.  Can you tell me what position that goes

13        with?

14   A.   Position of reading coaches, and this is May

15        9, 2005.  So I would assume that this was for

16        positions of reading coaches at various school

17        sites throughout the school district entering

18        the summer of 2005, positions that might come

19        open.

20   Q.   Would that have covered the -- Ms. Freeney is

21        the person's name attached.  Does that

22        announcement cover the position with

23        Dr. Owens?

173

1    A.    It does.  It would have.

2    Q.    Now let's look at Bates number 1319.  It says

3          applications accepted for position of

4          administrative assistants at Crump Elementary

5          and Brewbaker, and that's August 18, 2003.

6          And then there's attached two people, Rhonda

7          Oates-Tucker and Ms. Crawford.

8               Do you remember if those are white

9          females?  Black females?

10   A.    Both of those are black females.

11   Q.    Do you know -- I'll tell you what I'm going to

12         do.  I don't know if I necessarily want to

13         mark this, but it may be helpful if you can --

14               MS. CARTER:  Are you looking at the

15                    list of teachers?

16               MR. PATTY:  Right.

17               MS. CARTER:  Let me tell you how we

18                    put this together.  We took

19                    y'all's list from the corporate

20                    rep deposition notice, and then I

21                    added one that I thought y'all

22                    had missed and I added the four

23                    from this past summer.  So if he

175

1   Q.   Let's look at Bates number 1323.

2   A.   Educational specialist, office of curriculum

3        and instruction.  That was dated June 4 of

4        2004.  Educational specialist, June 4, 2004,

5        that's 16-H.

6   Q.   Would Mr. Lowe have the educational and

7        certification qualifications to be an

8        educational specialist?

9   A.   Generally the posted notice would read

10       something like at least three years successful

11       teaching experience and endorsement in

12       administration and supervision.  That is to

13       attract a full scale of applicants.  Ed

14       specialist positions in many instances have

15       gone to individuals who have prior

16       administrative certification -- I mean

17       administrative experience, but we leave it

18       open so that we might get a diamond in the

19       rough.

20  Q.   So he meets the minimum --

21  A.   Yes, he does.

22  Q.   Let's go on, then.

23            Connie Mizell, white female?

1   A.   White female.

2   Q.   The next document is 1506.

3   A.   That is May of 2005, special education

4        teachers, so that's relative to the --

5                MS. CARTER:  It's not on that list.

6                Those are the ones I added.

7   A.   That is basically the special education

8        teacher positions that you inquired about at

9        Robert E. Lee High School -- we're still under

10       that -- and at McKee Junior High School.

11  Q.   There's one --

12               MR. PATTY:  It looks like there's

13                    only one certification with

14                    that.

15               MS. CARTER:  There is.

16  A.   This is Carlos Cherry.  This was McKee Junior

17       High School, so that probably -- This is the

18       one that we put in here for McKee.  I'm sure

19       we have another one in there for --

20               MS. CARTER:  For Mr. Abrams.

21  A.   This is McKee Junior High School.  That's the

22       individual who filled that position, black

23       male.

1    Q.    Bates number 1329.

2    A.    Educational technology professional

3          development program coordinator, June of 2003.

4                        MS. CARTER:  It's July of --

5    A.    Yeah, that's July of 2003.  This has to be it

6          here, the September 1 position that he alluded

7          to as 2003 educational specialist and

8          educational technology professional

9          development program coordinator and Title I

10         school-wide instructional -- There's several

11         on here.  That's 16-B.

12   Q.    Is it Kevin Todd Culpepper?

13   A.    Uh-huh (positive response).

14   Q.    White male?  Black male?

15   A.    White male.

16   Q.    Angela Mangum?

17   A.    Angela Mangum, black female.

18   Q.    Will there be -- Just so I understand

19         document-wise, will there be anything that

20         will show -- I think you've talked about this

21         a little bit.  Will there be anything to show

22         how their interviews went for these different

23         positions, who the three top candidates were,

1                   number 1362.

2    A.   School-wide instructional assistants,

3         instructional assistants -- Yeah, all of

4         those.

5    Q.   Would an instructional assistant position be

6         one that Mr. Lowe would have the

7         qualifications of education certification for?

8    A.   Yes.  I can give you the race and -- I

9         recognize --

10   Q.   Go ahead.

11   A.   Lovell Seals is a black male.  Darryl

12        Washington is a black male.  Deidra McRay is a

13        black female.  Virginia Browder is a black

14        female.  Mona Green is a black female.  Tara

15        Carr is a black female.  Dierdra Ramsey is a

16        black female.  Barbara Sankey is a black

17        female, and Orlean Baldwin, black female.

18        Anissha Officer, black female; Patrick Nelson,

19        black male; Lakisha Stokes, black female;

20        Tamara Winston, black female.

21   Q.   Now, looking at Bates 1363 --

22   A.   Administrative assistant, specifically at

23        Robert E. Lee High School.

181

                MS. CARTER:  When you read off

                documents, speak more clearly

                because she's trying to take it

                down.

A.   Administrative assistant at Robert E. Lee,

     16-C.  This person who received the position

     was Gloria Odutola, who is a black female.

Q.   I'll show you Bates number 1367.

A.   Educational specialist, office of student and

     community services, September 10, 2003.

     That's 16-D, and the person receiving that

     particular position was Susan Terrell, which

     is a white female.

Q.   I'll show you Bates number 1371.

A.   Positions of elementary teachers at Brewbaker

     Intermediate and McKee Elementary Schools,

     September 15, 2003.  That would be 16-E and

     16-F, and the individuals who received those

     were Jennifer Turner, and I'm not sure whether

     she's black or white, suzie Prater, who is a

     black female.  I'm not absolutely sure on

     Jennifer Turner.

Q.   I'll show you Bates number 1374.  There may be

182

1       some stuff that --

2  A.  Administrative assistant and assistant

3       principals as positions become available for

4       the 2004-2005 school year, and this is to

5       begin to accumulate all interested parties in

6       administrative placements during the late or

7       the early spring of 2004.  This is dated

8       February 25, 2004, and this is indicative that

9       the position at Thelma Morris -- Let me see

10      which one that may be.  Administrative

11      assistant at TS Morris, that's 16-O.  And

12      let's see who the other one is.  That's the

13      one.  That's just one, 16-O, administrative

14      assistant at TS Morris, who is a black female.

15  Q.  I've got a stack here that goes 1378 through

16      1446 -- 7 -- 1447.  I don't know if those go

17      with the ones you just had there or not.

18  A.  Let's see.  These are probably administrative

19      assistants throughout the school district.  G

20      up here.  So she's probably included in --

21      That's the one specifically for TS Morris, but

22      all of these are 16-G, the administrative

23      assistants position at -- beginning May 14,

1    2004, and any and all administrative positions

2    that were available.  And these are Hosea

3    Addison who went to Lanier Academic Magnet

4    Program, black male; Exzealia Baptiste, who

5    went to the alternative education program at

6    Fews, black female; Jeri Brown, who went to

7    Robert E. Lee High School, white female;

8    Rodrick James who was hired at Chisholm

9    Elementary School, black male; Emily Little,

10   who was hired at -- Let's see if the school is

11   on here.  I'm not absolutely sure on the

12   school she was placed.  She's a white female,

13   Emily Little.

14        Ronald Ashley, black male, hired as the

15   administrative assistant at Booker T.

16   Washington High School; Bobby Lowe, black

17   male, hired at Floyd Elementary School; Mary

18   Markham, black female, another one that I'm

19   not absolutely sure on the school so I need to

20   make a note and let you know where she was.

21        Mary Norman, who was hired as an

22   administrative assistant at Robert E. Lee High

23   School and ultimately transferred to Floyd

1    Middle School, white female, in both

2    capacities as the administrative assistant or

3    the assistant principal.  Shanetha Paterson,

4    black female, was hired at Nixon Elementary

5    School as the assistant principal; Antoine

6    Richardson, black male, hired at Robert E. Lee

7    High School as administrative assistant;

8    Ferlisi Ross, black female -- Ferlisa Ross,

9    black female, hired at Robert E. Lee High

10   School as the assistant principal, before that

11   hired as administrative assistant at Lanier

12   High School.  Both of them would probably fall

13   within this time frame.

14       Durwood Wilson, black male, hired as the

15   administrative assistant at Davis Elementary

16   School and ultimately transferred to Brewbaker

17   Junior High School.  Dionne Woody, black

18   female.  I think she was hired at Nixon

19   Elementary School to replace Shanetha Paterson

20   when she left, black female.  And Sonya Floyd,

21   the black female who was hired for the

22   assistant position -- administrative

23   assistant's position at McKee Junior High

185

1      School.  I know my people.

2   Q.  Did you say Sonya Floyd was a black female?

3   A.  Black female.

4   Q.  Bates number 1448.

5   A.  June 4, 2004, educational specialist, office

6      of curriculum and instruction.  June 4, 2004

7      educational specialist, that's 16-H.  And the

8      person who received it was Thomas Toleston,

9      black male.

10  Q.  1450, it looks like at the bottom it says the

11     position was not filled.

12  A.  Right.  This is Title I program evaluator, and

13     it went unfilled.  It was posted and we got

14     applicants, and then the funding for it fell

15     through so it was not filled.

16  Q.  1452.

17  A.  Title I teacher/tutor, skills lab at Houston

18     Hills Junior High School.  That was 16-J, and

19     the person who filled it was Essie Baker,

20     black female.

21  Q.  Would it be unusual for a position to be

22     filled without the principal having any input

23     into who is being selected?

1    A.    No.  We try diligently not to do that.

2    Q.    So that would be out of the ordinary if a

3          position was filled before a principal was

4          consulted about who was going to have that

5          position?

6    A.    Generally that is, yes.

7    Q.    Let me show you Bates 1454.

8    A.    1454 is two-system reading specialist, office

9          of curriculum and instruction, June 25, 2004.

10         That's 16-K, and the individuals were Karen

11         Vann -- that's the one I alluded to in earlier

12         testimony -- Karen Vann, white female, and

13         Gloria Odutola, black female.

14   Q.    The recommendations file you keep, will it

15         show why someone was picked?

16   A.    Usually there's a rubric if there's a

17         committee that -- and they will generally rate

18         that individual based on the questions.

19         That's why we're so insistent that the same

20         questions are asked of everybody so they can

21         be rated.  And there's --

22   Q.    Do y'all keep the -- They ask the questions

23         and they take notes as to what the response is

1       I might sit in just to make sure that accepted

2       protocol is being followed.

3   Q.  Does that mean that there's not a specific

4       training that goes into this is how you should

5       evaluate on this rubric?

6   A.  No.  I mean, there's some subjectivity to it

7       as to what you hear.

8   Q.  Like with the PEPE, I remember everybody who

9       had to learn how to do the PEPE, they had to

10      go to classes for PEPE and they had to take

11      tests on PEPE, and they had to see how they

12      evaluated compared to other people who

13      evaluated.

14          Is there anything of that nature done with

15      this process?

16  A.  No.

17  Q.  Let me show you 1469.

18  A.  System-wide math coach specialist, Title I,

19      June 25, 2004.  That's 16-L.  We had math

20      specialists and reading specialists:  Lamecha

21      James, black female; Cathy Simmons, white

22      female; Sheila Helms, white female.  That's

23      it.  Those were the three.

189

1    Q.    Let me show you Bates 1475.

2    A.    District resource/attendance officer, office

3          of student and community services.  That's

4          16-M, and that position wasn't filled,

5          although it was -- It was interviewed for, but

6          it was not filled because the funds were not

7          there.  The resources were reallocated.

8    Q.    Bates 1476.

9    A.    Title I school-wide instructional assistants

10         at various school locations.  That's 16-N.

11   Q.    Was Mr. Lowe qualified for that position?

12   A.    That's correct.  Now, the vast majority of

13         these -- I called them out a moment ago when I

14         was going through the list.  The vast majority

15         of these were already covered in a previous

16         one, and then there were several -- the four

17         at the bottom after 2004.  And I'll go over

18         those four if it's okay with you.

19   Q.    That's fine.  That will work.

20   A.    Anissha Officer is a black female, and she's

21         at Harrison.  She was at Harrison.  Patrick

22         Nelson, black male, at Bellingrath.  Lakisha

23         Stokes was a black female at Seth Johnson.

1           Here's Tamara Harvey. She's a black female

2           and she was at McIntyre.

3    Q.     Bates number 1492.

4    A.     Administrative assistant and assistant

5           principal positions as they become available

6           for the 2004-2005 school term, and we have

7           Denitta Easterling as a -- This must be one

8           particular to Thelma Morris. Yes. That's O,

9           administrative assistant at TS Morris

10          Elementary School, which is 16-O, black

11          female.

12   Q.     Bates number 1494.

13   A.     All right. This is Sonya Floyd, so this is

14          the administrative assistant at McKee Junior

15          High School, black female. That's 16-P. The

16          same posted notice but 16-P, different school.

17   Q.     Okay. 1496.

18   A.     Title I school-wide instructional assistant at

19          Southlawn Middle School, and that was Pamela

20          Cloud, white female. And I don't think that

21          one is listed on here. Let's see. Southlawn

22          Middle School.

23                  After you requested all of the school-wide

193

1       for.

2    Q.   This is -- I want to just --

3                    MR. PATTY:  Why don't we go off the

4                    record for just a second.

5                    (Brief off-the-record discussion

6                    followed by a brief recess.)

7                            EXAMINATION

8    BY MS. CARTER:

9    Q.   Mr. Barker, I don't know if -- I know you were

10        present for part of Mr. Lowe's deposition, but

11        he testified that Pam Cloud had been hired at

12        Tina Minott's school at Southlawn Middle

13        School because she was made to hire her

14        because Pam Cloud had a lawsuit.

15             Have you or has anyone with Montgomery

16        Public Schools to your knowledge ever

17        instructed Tina Minott that she had to

18        recommend Pam Cloud?

19    A.   No.  We definitely did not.  As a matter of

20        fact in that regard, Tina recommended Pam for

21        that particular position, and later on I

22        inquired of Tina once we received the

23        notification from Mr. Lowe if she even was

194

aware of the fact that Pam Cloud had any type

of legal proceeding against the board, and she

said her recommendation was made totally

oblivious to that.  She did not know she had

any action.

Q.   Pam Cloud has sued y'all claiming race

discrimination; isn't that correct?

A.   That's correct.

Q.   Did you block her efforts to get that

promotion after she sued you?

A.   No, I did not.

Q.   Is it a policy of you or the Montgomery Public

Schools to provide special consideration to

someone simply because they have sued you?

A.   No, absolutely not.

Q.   Have you to your knowledge ever undertaken

gathering the paperwork or doing the

investigative work for an individual when they

were trying to get an emergency certification?

A.   No, I did not.  Basically they would have to

already come to me with the necessary

coursework requirements, and then we would

have to be looking for an alternative

1     certification for those individuals.  But

2     that's their responsibility to present the

3     coursework requirements to us, the proof of

4     coursework requirements.

5  Q.   And y'all help them do the applications and so

6     forth once they've provided that proof to you;

7     is that correct?

8  A.   That is correct.

9  Q.   And isn't it -- did you ever tell David Sikes

10     or Bobby Abrams that they could not hire

11     Melvin Lowe?

12  A.   No.

13  Q.   If Melvin Lowe had the coursework for the

14     certification or if he had just simply been

15     certified, would you have recommended that he

16     be hired for those positions?

17          MR. PATTY:  Object to the form.

18  A.   Gladly, because we had an extreme need in that

19     particular area.

20  Q.   There is -- I don't know how we're going to

21     get through this, but there are a lot of jobs

22     that we've talked about in regards to just the

23     list of job postings and successful applicants

1    that you went through today that have in some

2    way or another been referenced in Mr. Lowe's

3    EEOC charge, information he's given the EEOC,

4    his complaint in this lawsuit or in his

5    deposition.  And so my question to you is

6    this.

7        You've testified here today that Dr. Owens

8    recommended him for the reading coach position

9    at Paterson; is that correct?

10   A.   That's correct.

11   Q.   And there was no question in your mind that

12   Dr. Owens wanted him?

13   A.   That is correct.

14   Q.   Is there any other job that you can recall

15   wherein a principal recommended to you or

16   asked you to hire Melvin Lowe wherein that

17   recommendation was not followed?

18   A.   No, there is not.

19   Q.   When you recommended or were involved in the

20   disciplinary matters of Mr. Lowe in 2002 when

21   he was a teacher at Southlawn, was it a

22   consideration of yours that it was the third

23   year in a row that you had had to deal with

1     Mr. Lowe in regards to allegations and how he

2     handled children?

3                    MR. PATTY:   Object to the form.

4     A.   It was.  I knew that I had investigated two

5     previous charges with regard to mishandling of

6     students, and it factored into my decision

7     with regard to the recommendation that I made

8     to the superintendent.

9     Q.   After he was non-renewed at the end of that

10    year, he worked in Bullock County a year; is

11    that correct?

12    A.   Yes.  To my understanding, yes.

13    Q.   And then Dr. Carter recommended to the board

14    that he be hired back at Montgomery Public

15    Schools, correct?

16    A.   Yes.  After school had started in the 2003

17    school year.

18    Q.   This might be an unfair question, and I should

19    have warned you about it.

20         Give us an idea of how many people or

21    teachers in the school system you would say,

22    if you can, that have administrative or

23    supervision certifications but are not serving

1        in administrative or supervisory capacities.

2    A.  It would be a guess, but there are numerous

3        ones.  We generally on the average run

4        anywhere from 30 to 50 applicants through that

5        general screening process each of the last two

6        or three years.  So probably a tenth of those

7        actually or maybe as many as 20 percent of

8        them actually get placed, and then the next

9        year we go through the same process.  So I

10       would venture to say there are numerous

11       individuals with the certification out there

12       who have not been placed in an

13       administrative-type position.

14   Q.  Is there any type of requirement on behalf of

15       Montgomery Public Schools that the person

16       interviewing for a job with the most education

17       must be hired?

18   A.  No, there's no such requirement.

19   Q.  You've been asked questions today about

20       Denitta Easterling who, if I understand the

21       testimony correctly, served as a summer school

22       principal one summer when her certification

23       was not actually completed until August of

200

1   Q.   Have you ever told anybody that they had to

2        hire a woman or a female in an administrative

3        position at their school or at any position at

4        their school?

5   A.   No.

6   Q.   Have you ever told anybody that they had to

7        hire a white or black applicant at their

8        school?

9   A.   No.

10   Q.   When you got word in the summer of 2005 that

11       Mr. Lowe had communicated with Dr. Purcell

12       that he felt like there were some issues of

13       retaliation, did you immediately contact us to

14       seek advice about how to handle that?

15   A.   Yes, I did.

16   Q.   Did you make any special efforts on behalf of

17       the non-tenured teachers that left Daisy

18       Lawrence with Mr. Lowe -- I think there were

19       two other -- did you make any special requests

20       of principals to hire them or tell principals

21       they had to recommend that they be hired?

22   A.   No, I did not.  Those individuals were advised

23       that they were to apply for any position in