IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MELVIN LOWE,                                )
                                            )
         Plaintiff,                         )
                                            )
-vs-                                        )         Case No. 2:05-cv-495-WKW
                                            )
MONTGOMERY COUNTY BOARD                     )
OF EDUCATION, et al.,                       )
                                            )
Defendants.                                 )

## MEMORANDUM BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Montgomery County Board of Education, the individual Board members and the Superintendent, Defendants in the above-styled cause, and submit the following Memorandum Brief and Evidentiary Materials in Support of their Motion for Summary Judgment.

**I.    SUMMARY OF PLAINTIFF'S ALLEGATIONS**

This is a race, sex and retaliation case.  Plaintiff Melvin Lowe (hereinafter "Lowe") alleges that the Montgomery County Board of Education,  (hereinafter "the Board"), the Superintendent and the individual Board Members (in their official capacities only), discriminated against him in violation of Title VII by not granting him tenure, by not properly compensating him for the position  he held, and by not promoting him for jobs that he was qualified to perform.  Lowe further alleges that pursuant to Title VII and against his First Amendment rights, Defendants retaliated against him for exercising his right to free speech, for filing an EEOC charge, for filing this lawsuit and for his association with his mother, also a Board employee.  Plaintiff seeks injunctive relief, back pay, reinstatement of employment and benefits, compensatory damages, punitive damages, attorney's fees, expenses and costs and other relief that the Court may deem appropriate.

The individual Defendants assert that all claims against them in their official capacities are due to be dismissed as a matter of law.  Defendants further assert that Lowe was not subjected to any form of discrimination or retaliation and that all employment decisions made in regard to Lowe were based on legitimate, nondiscriminatory and non-retaliatory reasons.

1

## II.    SUMMARY OF UNDISPUTED FACTS

### A.    BACKGROUND

Melvin Lowe became a teacher for the Board in August 1999. (See Exhibit "1" - Deposition of Melvin Lowe p. 34 at lines 2-7).  He received a Bachelor's Degree in Elementary Education in 1999.  (Lowe Depo. p.  14 at lines 6-10; See Exhibit "2" - Professional Certificate for Melvin Lowe). He later received his Master's Degree in Educational Administration in 2001.[1]  (Lowe Depo. p.  14 at lines 14-19; Lowe Certificate).  At all times during his employment with the Board, Lowe was a probationary, nontenured employee. (See Exhibit "3" - Affidavit of Jimmy Barker ¶3).

At the time of Lowe's hire, Dr. Clinton Carter was Superintendent of the Board.  (Barker Aff. ¶4).  Following Carter's retirement, Dr. Carlinda Purcell became Superintendent of the Board effective December 1, 2004.  (Id.)  She has served in that capacity since that time.  (Id.)  Jimmy Barker has been Assistant Superintendent of the Board since 1998 and has served continuously in that capacity since that time.  (Id. at ¶2).[2]

#### 1.    LOWE'S EMPLOYMENT HISTORY

##### a.    1999/2000 School Year

During the 1999/2000 school year, Lowe was assigned to teach at Daisy Lawrence Elementary School in the R.I.S.E. program.  (Lowe Depo. p. 34 at lines 8-10; See Exhibit "4" - August 9, 1999 Letter of Appointment).  He was hired through the Office of Student Support, which was headed by Assistant Superintendent Lois Johnson.  (Lowe Depo. p.  34 at line 13-p. 35 at line 16).  The principal was Erodean Jeter, a black female.  (Lowe Depo. p. 40 at lines 6-13; Barker Aff. ¶5).

---

[1]In November 2005, Lowe received an Educational Specialist degree after the filing of his Amended Complaint in this action.  (Lowe Depo. p. 14 at line 20-p. 15 at line 18).

[2]Carter is a white male, Barker is a black male and Purcell is a black female.  (Barker Aff. ¶¶1, 4).

During that school year, Jeter reported to Barker that Lowe was paddling children without permission.  (See Exhibit "5" - Deposition of Jimmy Barker. p. 92 at lines 11-20).  Barker counseled Lowe and went over the corporal punishment policy with him.  (Barker Depo. p. 92 at line 11-p. 94 at line 17).  Lowe gives a somewhat qualified denial that allegations were made against him at Daisy Lawrence:

> Q.    When you were at Daisy Lawrence the first time, was there ever an incident where you were accused of paddling children without permission?
> **A.    No.**
> Q.    Okay.
> **A.    And may I go on Record to finish answering your question. I said no, because I never from Ms. Jeter or a central office person or any other person in authority or capacity ever chastened [sic] me, because I never did such without the sanctions of a parent and/or an administration, never.**

(Lowe Depo. p. 127 at lines 3-16).

Lowe was nonrenewed at the end of the 1999/2000 school year.  (Lowe Depo. p. 40 at lines 20-21).  According to Lowe, the alternative program was being restructured and all nontenured personnel were nonrenewed.  (Lowe Depo. p. 40 at lines 14-19).  Lowe does not allege that his nonrenewal that year was the result of discrimination or retaliation.  (Lowe Depo. p. 81 at lines 1-15, p. 82 at lines 6-11).

### b.    2000/2001 School Year

Lowe reapplied for a teaching position with the Board and was rehired for the 2000/2001 school year.  (Lowe Depo. p. 40 at line 22-p. 41 at line 7).  He was assigned to Fitzpatrick Elementary School as a fourth grade teacher.  (Lowe Depo. p. 41 at lines 6-12; See Exhibit "6" - June 20, 2000 Letter of Appointment).  Vera Thompson, a black female, was his principal.  (Lowe Depo. p. 43 at lines 3-12; Barker Aff. ¶5).

Allegations of improper physical handling of a child arose that year as well.[3] (Lowe Depo. p. 128 at line 1-p. 129 at line 7; Barker Depo. p. 93 at lines 7-20). In response to the concerns raised by Thompson, Barker called Lowe to the Central Office and again reminded him of the Board's policy regarding corporal punishment. (Barker Depo. p. 93 at lines 7-20).

Lowe had other difficulties with Thompson that year. (Lowe Depo. p. 44 at line 20-p. 56 at line 14). He felt she was "over exerting [sic] her authorities [sic]" and that her verbal communications to him had nothing to "do with [his] academic – academia [sic] performances". (Lowe Depo. p. 45 at lines 11-17, p. 47 at lines 2-8). According to Lowe, Thompson accused him of "keeping a disturbance among the faculty." (Lowe Depo. p. 48 at line 18-p. 49 at line 2). He documented his problems with Thompson in a chronology. (See Exhibit "7" - Complaints Regarding Vera Thompson).

Lowe requested a transfer to another school and that request was approved by the Board. (Lowe Depo. p. 43 at lines 19-23, p. 44 at lines 13-19; See Exhibit "8" - June 28, 2001 Letter Confirming Transfer). Lowe does not make any allegations of discrimination or retaliation for that school year. (Lowe Depo. p. 82 at line 12-p. 83 at line 6).

### c.    2001/2002 School Year

For the 2001/2002 school year, Lowe was transferred to teach at Southlawn Middle School where Tina Minott, a black female, was his principal. (Lowe Depo. p. 56 at lines 20-22, p. 57 at lines 4-6; Barker Aff. ¶5). According to Lowe, he had a "good year" at Southlawn and had no problems with Minott. (Lowe Depo. p. 58 at line 18-p. 59 at line 1, p. 83 at lines 7-11).

Again, during this school year, Lowe was accused of improper physical confrontation with a student.[4] (Lowe Depo. p. 126 at lines 8-15; Barker Depo. p. 82 at lines 7-23). Minott advised

---

[3]Lowe denies any wrongdoing but admits awareness of the allegations. (Lowe Depo. p. 128 at line 1-p. 129 at line 7).

[4]Lowe claims that this was the first time allegations of improperly handling a child were made against him. (Lowe Depo. p. 126 at lines 8-15). This testimony is in direct contradiction to
(continued...)

Barker of the allegations.  (Barker Depo. p.  80 at lines 8-16).  Lowe was placed on administrative leave and arrested.    (See Exhibit "9" - February 21, 2002 Letter of Administrative Leave; See Exhibit "10" - February 25, 2002 Investigation Memorandum).  School authorities investigated the incident extensively.[5]  (Lowe Depo. p.  129 at lines 8-21; See Exhibit "11" - Investigative Packet).

As to the three allegations of misconduct against him at Southlawn, Barker determined that one was verified, one was inconclusive and one was unfounded.  (Lowe Depo. p.  133 at line 18-p. 134 at line 11; Barker Depo. p. 82 at line 7-p. 83 at line 6; See Exhibit "12" - March 18, 2002 Letter of Reprimand).  Lowe appears to suggest that he was cleared by both the municipal court and the Board and put back to work.  (Lowe Depo. p.  130 at line 20-p. 131 at line 8).  While he was acquitted of the criminal charges, Lowe concedes that he was, in fact, not cleared by the Board and that he was suspended without pay for five days as a result of the incident.[6]  (Lowe Depo. p.  129 at line 22-p. 130 at line 7, p. 134 at lines 3-11).

Lowe was nonrenewed at the end of that school year.  (Lowe Depo. p.  59 at lines 20-23, p. 83 at lines 12-14; See Exhibit "13" - May 27, 2002 Letter of Nonrenewal).  He claims that Minott cried and said "Melvin, you know I didn't do this, because you knew who was getting the nonrenewals."  (Lowe Depo.  p. 76 at line 13-p. 77 at line 14).  This 2002 nonrenewal was his "first notation of some discriminatory practice and possibly retaliation."  (Lowe Depo. p.  77 at line 9-p. 80 at line 23, p. 84 at lines 2-7).  Lowe claims this nonrenewal was based on his race and sex.

---

[4](...continued)
his testimony that he was aware of allegations against him made the previous year while he taught at Fitzpatrick.  (Lowe Depo. p.  128 at line 22-p. 129 at line 7).

[5]Lowe took issue with Carter's decision to order a further investigation of the matter following Minott's initial investigation that "exonerated" him.  (Lowe Depo. p.  135 at line 17-p. 137 at line 7). In reality, Minott's investigation did not clear Lowe, nor was that its purpose; rather, Minott was providing information to Barker so that an investigation could be conducted and appropriate discipline could be determined.  (Barker Depo. p.  80 at line 8-p. 81 at line 15).

[6]One of the reasons Barker felt the punishment was appropriate was because this was the third time he had been confronted with Lowe and the mishandling of children.  (Barker Depo. p. 83 at lines 2-6, p. 196 at line 19-p. 197 at line 8).

(Lowe Depo. p. 84 at line 23-p. 85 at line 20).  He also believes that Carter was retaliating against

him because of his success in proving his "innocence" regarding the allegations that year:

> Q.      What about retaliation? What type of retaliation are you
>         talking about?
> **A.      Retaliation can take on a number of hats.  Some of the
>         retaliation I denoted was my position with Mr. Barker,
>         my position with Clinton Carter.  And you did not
>         mention, but I have to give you the background for the
>         foreground, there was an incident that took place at
>         Southlawn.  I was – I don't want to use the word
>         "victorious," but I was successful in proving my
>         innocence.  I did not voice the opinion that Mr. Barker
>         positioned me nor the school board investigator or the
>         indirect position of Mr. Carter. Because I did not do that,
>         I am denoting that all of those factors played into the
>         retaliation of me being given a nonrenewal outside the
>         sanctions of the principal at the end of that year.**
>                       *    *    *
> Q.      And you felt like they were retaliating against you because of
>         that?
> **A.      Well, they didn't do this with everybody.[...]**

(Lowe Depo. p. 86 at line 15-p. 88 at line 5, p. 109 at lines 16-20).

Following his nonrenewal, Lowe sought to be reassigned at Southlawn or another school

for the coming year, but did not receive a position with the Board.  (Lowe Depo. p. 60 at lines 1-

16).  He claims Minott again cried on his shoulder that summer telling him, "Melvin, they won't let

me hire you."  (Lowe Depo. p. 131 at line 22-p. 132 at line 4). He claims he could not get an

interview for anything that summer.  (Lowe Depo. p. 76 at lines 6-12).  He applied with other school

systems and subsequently took a job in Bullock County.  (Lowe Depo. p. 60 at lines 17-21).

### d.      2002/2003 School Year

Lowe worked for the Bullock County Board of Education as an elementary teacher during

the 2002/2003 school year. (Lowe Depo. p. 60 at line 22-p. 61 at line 10).  He was nonrenewed

at the end of that school year.  (Lowe Depo. p. 62 at line 21–p. 63 at line 2).

During the summer of 2003, Lowe asserts that he again sought employment with the Board,

but he does not recall any specific position he sought.  (Lowe Depo. p. 65 at lines 1-15).  He

claims he was not interviewed because of his race and sex, but has no evidence to support this contention:

> Q.    Okay.  And tell me, if you would, what evidence you have that you were not given interviews during the course of that summer because of your race or your sex?
>         MR. PATTY:   Object to the form.
> **A.    What other reason?  I mean, you have a string of jobs here that I didn't even get an interview for, so what other reason? I mean, I'm throwing that as a rhetorical, but what other reason?  I was certified.  I wasn't a convict.**

(Lowe Depo. p.  212 at line 22-p. 213 at line 16).

Lowe denies that his failure to secure interviews had anything to do with the abuse allegations made against him during the previous years since "what happened at Southlawn was privileged information.  It was not public knowledge."   (Lowe Depo. p.  213 at line 17-p. 214 at line 18). However, he believes that at least one principal who interviewed him was aware of the allegations. (Lowe Depo. p.  214 at lines 3-18).  Additionally, there is no dispute that Lowe was arrested and tried following the allegations nor is there any dispute that the Board's investigation involved a victim and witnesses, both students and employees.  (Board Investigative Packet).  He was not hired by the Board during the summer of 2003.  (Lowe Depo. p.  65 at lines 16-19).

Lowe claims that Barker and Johnson advised him and his mother that  he should apologize to Carter in hopes of getting rehired by the Board.[7]  (Lowe Depo. p.  70 at lines 14-23).  Lowe claims he did not know why he needed to apologize to Carter, but does not believe that it was related to the Southlawn incident in 2002.  (Lowe Depo. p.  71 at line 6-p. 72 at line 7).  Lowe claims Barker said he should apologize for "[a]ny embarrassments that [Lowe] might have caused the school system and any hard feelings." (Lowe Depo. p.  72 at lines 5-13).  Lowe claims Barker said that if Carter approved, Barker could "have [him] in a job within an hour or a couple of

---

[7]Lowe's mother is a longtime Board employee who works in the Central Office, Dr. Mary Lowe.  (Lowe Depo. p. 393 at line 15-p.  394 at line 1).

hours...It's not me, it's him."[8]  (Lowe Depo. p.  70 at line 14-p. 71 at line 5). Lowe and his mother

attempted to meet with Carter together, but Carter only meet with them separately.  (Lowe Depo.

p. 68 at line 17-p. 69 at line 2). Lowe's mother subsequently met with Carter in an attempt to get

Lowe rehired by the Board.  (Lowe Depo. p. 101 at line 2-p. 102 at line 17).  She told Lowe that the

conference with Carter was very polite.  (Lowe Depo. p. 124 at line 8-p. 125 at line 11). Following

the conference with Lowe's mother, Carter indicated that he would call Barker and "tell Mr. Barker

to see what he could do."[9]  (Lowe Depo. p. 102 at line 18-p. 103 at line 22).  The results of the

meeting were not as immediate as Lowe would have liked since he did not receive an interview until

the day before school started.[10] (Lowe Depo. p. 104 at lines 2-21). Lowe claims that he was "given

the runaround about receiving interviews, what jobs were available" and that Barker told Lowe's

mother that Carolyn Hicks said that she had checked with seven principals and "none of them

wanted Melvin".[11]  (Lowe Depo. p.  75 at lines 11-23, p. 264 at line 20-p. 265 at line 10).  Lowe

does not know why principals would not hire him.  (Lowe Depo. p. 265 at lines 11-19).

###        e.        2003/2004 School Year

        Lowe was rehired by Bullock County for the 2003/2004 school year.  (Lowe Depo. p.  63

at lines 3-23, p. 65 at lines 20-22).  He continued to seek employment in Montgomery and was

---

[8]Barker denies telling Lowe that Carter was blocking Lowe from employment with the Board. (Barker Depo. p. 106 at lines 6-9, p.107 at lines 2-6).  Carter never expressed any hostility towards Lowe to Barker.  (Barker Depo. p.107 at lines 7-13).

[9]Lowe has never spoken or otherwise communicated with Carter regarding getting a second chance in the system or any other matter.  (Lowe Depo. p.  100 at line 9-p. 101 at line 1, p. 122 at lines 8-12).

[10]Lowe does not indicate when the meeting took place between his mother and Carter, other than to complain that he did not receive a job in the "hour" or "couple of hours" that Barker had indicated.  (Lowe Depo. p.  125 at lines 6-11).  Lowe recalls interviewing with one principal the day before the start of the school year who told him, "I'm not going to hire you because you're too educated.  I think your concentrations need to be toward administration, and I just can't have you on my faculty."  (Lowe Depo. p. 73 at line 20-p. 75 at line 1, p. 75 at lines 11-17).  Lowe also testified that this principal had agreed to interview him despite the fact that he had already decided who to recommend for the position.  (Lowe Depo. p. 74 at lines 3-21).  This was Lowe's only interview that summer.  (Lowe Depo. p. 75 at lines 11-14).

[11]Carolyn Hicks is the Director for Certified Personnel. (Barker Depo. p. 79 at lines 15-16).

8

eventually interviewed and rehired in the Fall of 2003. (Lowe Depo. p. 65 at line 23-p. 66 at line 11, p. 67 at lines 11-16; See Exhibit "14" - October 22, 2003 Letter of Appointment; See Exhibit "15" - November 12, 2003 Corrected Letter of Appointment)[12]. He was assigned to Daisy Lawrence Elementary Alternative School. (Lowe Depo. p. 68 at lines 3-8). James Owens, a black male, was his principal. (Lowe Depo. p. 68 at lines 9-10; Barker Aff. ¶5).

### (1)     Reading Coach vs. Teacher-Tutor Position and Pay

Lowe claims that he was interviewed and hired for the position of reading coach.[13] (Lowe Depo. p. 67 at line 11-p. 68 at line 2, p. 104 at line 22-p. 106 at line 3). According to Lowe, Owens called Hicks and told her that he wanted Lowe as his reading coach. (Id.) Owens advised Lowe to resign his position with Bullock County. (Lowe Depo. p. 106 at lines 3-6). Because Lowe was under contract with Bullock County, Barker consulted with Bullock County's Assistant Superintendent Arthur Lee Ballard as is customary between Boards during the school year.[14]

---

[12]The initial letter was corrected because it listed Lowe as a part time teacher, rather than a full time teacher. (Lowe Depo. p. 92 at lines 1-20).

[13]Lowe claims Barker made mention of the reading coach position during the summer when Lowe was seeking employment. (Lowe Depo. p. 104 at line 22-p. 105 at line 17).

[14]Lowe claims that Boards only release contracted employees to pursue promotions. (Lowe Depo. p. 108 at lines 4-13). Barker, who actually works in Human Resources, testifies differently regarding how an employee can be released from his contract:

Q.     When he came back to Daisy Lawrence in the fall of '03, he was coming from Bullock County. Did you have any conversations with any officials at Bullock County about him coming back to Montgomery, what he was going to do?

**A.     I had a conversation with Mr. Lee Arthur Ballard, which is protocol among HR circles. I did not discuss with him any specific assignment that he was to have with Montgomery Public Schools. Merely that conversation was along the lines of, Mr. Lowe has applied for a position with Montgomery Public Schools. We have a gentleman's agreement that we do not raid each other for talent. If Mr. Lowe is offered a position with Montgomery Public Schools, are you going to perceive it as tampering with regard to our entertaining the possibility of hiring him. That basically is the**

(continued...)

(Barker Depo. p. 101 at line 9-p. 102 at line 1; Lowe Depo. p. 106 at line 6-p. 107 at line 11). This was the only conversation Barker had about Lowe with anyone in Bullock County. (Barker Depo. p. 75 at lines 14-18, p. 169 at lines 8-18). Lowe, who was not involved in any of the conversations between Ballard and Barker, testifies that Barker confirmed to Ballard that Lowe was being hired for the reading coach position. (Lowe Depo. p. 106 at line 5-p. 107 at line 11).

According to Owens, Lowe was interviewed for the reading coach position, but his school did not have the funds for a Title I reading coach. (See Exhibit "16" - Deposition of James Owens p. 29 at line 16-p. 31 at line 15). Owens did not discuss Lowe's contract terms with him, but rather referred him to Central office for those details. (Owens Depo. p. 30 at line 18-p. 31 at line 15). According to Owens, Central Office determines the official title of an employee. (Owens Depo. p. 48 at line 15-p. 49 at line 6).

When Lowe went to Central Office to complete his paperwork for the position, he was told, "Oh, no, it was a mistake. You are not going – it's a teaching position." (Lowe Depo. p. 96 at lines 1-5). Lowe told Barker that Owens had interviewed him for a reading coach position and that an agreement had been reached with Bullock County to that effect. (Lowe Depo. p. 96 at lines 6-11). Lowe claims that Barker responded that Carter said Lowe "will only be a teacher in this school district."[15] (Lowe Depo. p. 94 at line 22-p. 97 at line 9). According to Barker, Lowe did question the assignment and Barker told him that the position available was a nine-month teacher-tutor

---

[14](...continued)

**conversation – That was the essence of it, which is a conversation that happens between me and other HR directors throughout the contiguous counties all the time. We just don't raid each other.**

(Barker Depo. p. 74 at line 10-p. 75 at line 10).

[15]Barker denies Carter making any such statement to him or relaying such a statement to Lowe or his mother. (Barker Depo. p. 105 at lines 19-22, p. 106 at lines 3-5). According to Barker, he never had a conversation with Carter about Lowe becoming a reading coach. (Barker Depo. p. 107 at lines 14-17).

position.  (Barker Depo. p.  102 at line 2-p. 103 at line 13).  Lowe claims he was forced to sign the

teacher-tutor contracts:

> **A.    [...]So that is the reason the contracts and the appointment letters have teacher on it.  That is the reason the contract that Mr. Barker – I'm probably sure you have – that I had to sign has teacher or tutor-teacher on it, because that was the ulterior motive that manifested once after I was advised to resign, and we're going to hire you, and the superintendents agree on what the title was.**
> **And when I got here to Montgomery County, there was a big cross-up.  And my back was against the wall, because I didn't have a job.  I did what I was told to do by the authorities who make those decisions, and I didn't have a job.**

(Lowe Depo. p.  96 at line 15-p. 97 at line 9).

Lowe concedes that there was no trickery or fraud at play to lure him back to Montgomery

County, but rather that he wanted to return to Montgomery and obtain a job with the Board.  (Lowe

Depo. p.  99 at line 1-p. 100 at line 8).  He concedes that he knew that he was not employed as a

reading coach when he signed his contract:

> Q.    At the time that you actually got the job and began to be paid for the job, you understood, though, that it wasn't a reading coach position, correct?
> **A.    Once I got back to Mr. Barker's office to sign the contract—**
> Q.    Right.
> **A.    — it was clear that it was changed, and it wasn't a reading coach position.**

(Lowe Depo. p.  216 at lines 13-21; See also Exhibit "17" - Position Announcement for Teacher-

Tutor; See Exhibit "18" - October 13, 2003 Personnel Action Report).

Lowe claims he performed the duties of a reading coach during the 2003/2004 school year

at Daisy Lawrence.[16]  (Lowe Depo. p.  89 at lines 2-17, p. 216 at lines 8-13).  Lowe concedes that

---

[16]Defendants concede that Owens performed an evaluation of Lowe as a reading coach. (Lowe Depo. p. 396 at lines 8-13; Barker Depo. p. 54 at lines 2-15; Owens Depo. p. 31 at line 16-32 at line 9; See Exhibit "19" - PEPE Evaluation).  However, Owens testified that Lowe performed the duties of a reading tutor:

(continued...)

the letters of appointment governing his position have him listed as a teacher and do not list him as a reading coach.[17]  (Lowe Depo. p. 92 at lines 1-23, p. 94 at lines 3-6; October 22, 2003 Letter; November 12, 2003 Letter).

The reading coach program began in the 2003/2004 school year.  (Barker Depo. p. 67 at line 13-p. 68 at line 8).The length of the reading coach contract depends on the source of their funding.  (Barker Depo. p. 65 at line 2-p. 66 at line 3).  Reading coaches funded by the Alabama Reading First Initiative (ARFI) are ten month positions, reading coaches funded by the Montgomery Public Schools Reading Initiative (MPSRI) are ten month positions and those funded federally by Title I are nine month positions.  (Id.)  There was no reading coach assigned to Daisy Lawrence

---

[16](...continued)

> Q.    And I looked at an evaluation you did..., but it lists him as a reading coach.  Is that the duties he performed while at Daisy Lawrence?
>
> **A.    He performed reading tutor duties.  Once the clarification of the title – Mr. Lowe and I talked when he came back, once he met, had met with Mr. Barker in the central office or whomever he met with, and said that he was hired on for a reading tutor.  And I asked him at that time was he satisfied with that, and he said that that was the reason he left the other county for a reading coach.  And I thought it was, too, to be honest.**
>                          ...
> Q.    But the actual duties or the job that Mr. Lowe did, was it a reading coach job?
>
> **A.    Well, we didn't have one, and Mr. Lowe came in.  His duties – he had a list of students that he would tutor.  That would be the phase of a reading tutor, to work with students that teachers have identified as struggling readers.**

Owens discussed the discrepancy in title with Lowe after Lowe returned from Central Office and asked Lowe if he would still accept the position and Lowe started working thereafter. (Owens Depo. p. 87 at lines 7-23). Owens continues on to explain that he had Lowe assist with other duties to "enhance [his] duty or bring [him] along as a leader." (Owens Depo. p. 31 at line 16-p. 33 at line 22).  Owens testified that even if he had Lowe perform some reading coach duties, whether on his own initiative or at Owens' suggestion, Lowe could not attend meetings for the reading coaches. (Owens Depo. p.  33 at lines 15-22, p. 88 at line 8-p. 89 at line 9).

[17]According to Barker, a teacher-tutor is technically a teacher, both of whom are on nine month contracts.  (Barker Depo. p. 111 at line 9-p. 113 at line 19). Teacher-tutors can focus on math or reading.  (Barker Depo. p. 104 at line 8-p. 105 at line 18).

during the 2003/2004 school year.[18]  (Barker Depo. p.  66 at lines 1-3; Owens Depo. p. 30 at lines 1-12).

Lowe claims that the salary difference between a reading coach and a teacher amounts to one month's salary because reading coaches work for ten months while teachers work for nine months.  (Lowe Depo. p.  93 at lines 1-15).  The reading coach has summer responsibilities that a teacher-tutor does not have.  (Barker Depo. p. 103 at line 14-p. 104 at line 7).  The practical difference between the two positions is that the teacher-tutor works primarily with at-risk students on an individual basis, while the reading coaches work "prescriptively with the teachers to...make academic gains with larger groups of students."  (Barker Depo. p. 31 at line 4-p. 32 at line 2, p. 104 at line 8-p. 105 at line 18).

Lowe's position was advertised as a Teacher-Tutor vacancy.  (Barker Depo. p. 70 at lines 11-15).  Lowe does not allege that he was discriminated against with respect to this position because of his sex, but rather offers a different rationale:

> Q.    Is it your contention that you were given a reading coach job, but actually paid as a teacher-tutor or tutor-teacher because you were a male?
>
> **A.    No.  Because I was Melvin Lowe.**

---

[18]Barker explained why Daisy Lawrence was not eligible for a reading coach in 2003/2004:

> **A.    ...The key issue with Title I is that there could be no supplanting.  By that I mean this: If a school wanted a Title I reading coach and was not already allocated a reading coach from one of these other two sources, they could not have that individual because Title I cannot be the first kid on the block.  It has to be in addition to.  It has to be supplemental.   And therefore if a school requested and they already had one of the other two, I could give them that Title I – let them use that Title I money for that purpose.  If they requested that and did not have one of these other two, they could not because it was a clear supplanting violation.**
>
> **Daisy Lawrence did not have a coach from the other two funds.  They would not qualify for a Title I reading coach because it would be supplanting.**

(Barker Depo. p.  68 at line 11-p. 69 at line 11).

(Lowe Depo. p. 220 at lines 5-9).

### (2)    Attempted Nonrenewal

Lowe received notification of nonrenewal at the end of the 2003/2004 school year. (Lowe Depo. p. 94 at lines 7-9; See Exhibit "20" - May 19, 2004 Letter of Nonrenewal). Because of a clerical error, Lowe's nonrenewal was not presented to the Board in a timely manner and the nonrenewal was ineffective. (Lowe Depo. p. 141 at lines 9-23; Barker Depo. p. 115 at line 3-p. 116 at line 19).

The summer of 2005, Lowe was hired, paid and served as lead reading coach for the Board. (Lowe Depo. p. 248 at line 8-p. 249 at line 4; Owens Depo. p. 35 at lines 11-13).

### f.    2004/2005

Following the failed attempt to nonrenew Lowe for the 2004/2005 school year, Lowe was returned to Daisy Lawrence, again as a teacher-tutor. (Lowe Depo. p. 235 at lines 9-18; Barker Depo. p. 116 at line 20-p. 118 at line 9; See Exhibit "21" - August 17, 2004 Letter of Appointment). Lowe denies that he was placed in the same position, and testifies that he was "more confused than what I did the first year. I don't know what I was the second year." (Lowe Depo. p. 142 at line 3-p. 143 at line 16). Lowe claims he was moved out of the front office into a classroom/office as punishment. (Lowe Depo. p. 143 at line 17-p. 144 at line 19). Lowe said he was humiliated and that he did not know what to do all day. (Lowe Depo. p. 144 at lines 13-19). Lowe concedes that his lack of discernable duties could have been because his job no longer existed with the Board which was one of the reasons for his attempted nonrenewal. (Lowe Depo. p. 144 at line 20-p. 145 at line 7).

During the spring of 2005, the decision was made to close Daisy Lawrence. (Barker Depo. p. 147 at lines 4-11). Lowe concedes that there was an overhaul of the alternative program and that Daisy Lawrence would not be open for the 2005/2006 school year. (Lowe Depo. p. 313 at lines 8-13). Purcell and Barker met with the faculty at the school to "allay any concerns and fears that the faculty and staff may have had there as to what was going to transpire with the closing of Daisy

Lawrence." (Barker Depo. p. 147 at line 12-p. 148 at line 2). They told the staff that a concerted

effort would be made to place all tenured personnel in comparable positions. (Barker Depo. p. 147

at line 21-p. 149 at line 6; See Exhibit "22" - Deposition of Carlinda Purcell p. 66 at line 8-p. 68 at

line 13, p. 69 at lines 8-12). Nontenured personnel like Lowe "were given no assurances other than

they could apply for positions which came open in the district and that they would be given due

consideration for those positions." (Id.) When Lowe inquired about this after the school closed,

Barker confirmed this with via email. (Id.; See Exhibit "23" - June 23, 2005 Email from Jimmy

Barker). Of the three nontenured, certified personnel, the other two persons nonrenewed

interviewed and were eventually hired at other schools.[19] (Barker Depo. p. 149 at line 7-p. 150 at

line 3).

Daisy Lawrence in fact did close at the end of the 2004/2005 school year. (Lowe Depo. p.

146 at line 23-p. 147 at line 4). Lowe does not make a claim regarding his nonrenewal. (Lowe

Depo. p. 313 at line 23-p. 314 at line 9). His claim of discrimination and retaliation relates to his

not being reassigned for the 2005/2006 school year. (Id.) Lowe asserts that he was the only

employee not reassigned for the 2005/2006 school year.[20] (Lowe Depo. p. 313 at lines 14-22).

Lowe sent Purcell an email claiming that he was being blocked from positions. (See Exhibit

"24" - June 22, 2005 Email to Carlinda Purcell). Purcell passed the email on to Barker who

contacted the Board's attorney because of the pendency of Lowe's charges against the Board.

(Barker Depo. p. 160 at line 15-p. 161 at line 16, p. 200 at lines 10-15). Barker did not investigate

the allegations Lowe made in that email any further because he knew the comments Lowe claimed

Owens attributed to Barker were untrue. (Barker Depo. p. 161 at line 20-p. 162 at line 8). Barker

was not angry about the allegations made against him in the email, but he did have some concerns

about the document:

---

[19]Daisy Lawrence had a small staff of approximately 25. (Owens Depo. p. 55 at lines 20-22).

[20]Besides Lowe, a classified (non-teacher) employee was also not reemployed for the 2005/2006 school year. (Owens Depo. p. 55 at lines 1-13).

> A.      **I didn't interview anyone. I talked back with the superin-
> tendent. My comments to the superintendent were have
> you looked at the structure of this e-mail. It makes a
> mighty bad point for a professional in the field to e-mail
> the superintendent of education a document of this
> nature that is barely coherent, and that same person is
> asking me to allow them to go out and represent the
> school district and you send a document of this nature
> to the superintendent of education whom you would
> think you would be on your Ps and Qs. I remember
> making those comments to her.**

> Q.      You were pretty mad about that document?

> A.      **No, sir, not mad about it. Disappointed that Mr. Lowe,
> who had proven himself to be a reputable teacher in the
> school district, would take such carelessness in sending
> this type of documentation to the superintendent of
> education. I cannot make a case for him when he is
> sending that. If you have taken the time to read it, it's
> barely coherent. It despicable in terms of a professional
> corresponding with the superintendent.**

(Barker Depo. p. 162 at line 11-p. 163 at line 11).

### 2.      RETALIATION

#### a.      Lowe's Mother

Lowe's mother, Mary Lowe, is an attendance officer for the Board. (Lowe Depo. p. 393 at lines 15-20.[21] Lowe alleges that his mother made some sort of complaint or asserted some charges against the Board when he was in elementary or junior high school.[22] (Lowe Depo. p. 344 at line 22-p. 345 at line 4):

> A.      **...And it was also some retaliation because years past
> my mother had – she filed an EEOC complaint through
> AEA. AEA litigated some complaints she had towards
> employment discrimination with the same school district
> while Mr. Carter, at that time, I think he was the
> associate superintendent. All of these were factors that
> caused me to think and still feel very strongly that this
> is some retaliation.**

---

[21]Lowe's brother, Marvin Lowe, is also employed by the Board as Director of Guidance at Jefferson Davis High School. (Lowe Depo. p. 345 at line 5-p. 347 at line 9).

[22]Lowe's date of birth is May 13, 1973. (Lowe Depo. p. 13 at lines 7-8). His elementary and junior high school terms would have presumably been in vicinity of the years of 1978 and 1987.

> **And then this has been communicated to me since then, which further validates your premise was not invalid; it was very valid. Because there have been several individuals since that will state when they look at you, they see your mother. That's why people don't want to hire him, and that's the problem Melvin is having. So, yes. Yes, I do.**

(Lowe Depo. p. 110 at line 4-p. 111 at line 2).

Lowe's mother remains employed by the Board, as does his brother, both of whom have attained tenure. (Lowe Depo. p. 345 at line 5-p. 347 at line 9). Lowe's brother is Director of Guidance at one of the high schools, but Lowe said his brother's career "could have been better". (Id.)

Lowe's mother has often interceded on Lowe's behalf with respect to his problems in the school system. (Lowe Depo. p. 133 at lines 5-14). Lowe alleges that both Owens and Johnson told him that the problems he was having with the Board was because "they don't like your mother" because she "filed her grievances". (Lowe Depo. p. 113 at lines 1-18, p. 233 at line 6-p. 234 at line 7). Lowe also alleges that in the summer of 2003, his mother walked in on Barker having a conversation with another person in which Barker stated "that [Lowe's] problem is he's just like her, and his reputation supersedes him. People know what he's going to do and what he's going to say before he gets there. He's just like her." (Lowe Depo. p. 113 at lines 1-18, p. 233 at line 6-p. 234 at line 1, p. 271 at lines 10-22). Lowe also alleges that Owens shared additional concerns with him during his last year at Daisy Lawrence in 2004/2005:

> **A.    ...[Dr. Owens] said, Melvin, I'm having to defend you. I'm having to defend hiring you the first time. I'm having to defend you being here every day. And I said, To who? Who have I killed, murdered, molested, or raped? What have I done? You know, Jimmy Barker, they don't like you. He's always talking about your situation with your mother. You're just like your mother. You filing this lawsuit. Your mother filing her lawsuit. See, Melvin, you shouldn't have done all of that. You shouldn't drive that Mercedes, you shouldn't live in that house that you live in. You shouldn't wear the type of clothes that you wear. You need to get you a little truck. See, people don't like these things. And, you know, they feel that you were born with a silver spoon in your mouth. And, you know, Brother Lowe, I just think maybe, you know,**

17

> **you might need to just leave the school district and maybe wait four or five years, because Jimmy Barker will be gone, Carter is already gone, and this new Dr. Purcell won't be here.  Because, Brother Lowe, you know, you and your momma, they're not going to let up on you.**

(Lowe Depo. p. 116 at line 22-p. 118 at line 8, p. 272 at lines 4-22).[23]

Owens, who denies making such statements[24], allegedly attributed these statements to Barker, purportedly made during a conversation between Owens and Barker the day before.[25]  (Lowe Depo. p. 119 at lines 10-15; Owens Depo. p. 83 at line 4-p. 84 at line 20).  According to Lowe, those statements were "the opinions that Dr. Owens conveyed based on his conversation that he told me he had with Mr. Barker."  (Lowe Depo. p. 273 at lines 6-14).  He does not know what, if anything, Barker actually said other than what Owens allegedly told him.  (Lowe Depo. p. 273 at line 15-p. 274 at line 11).  Owens also allegedly reported that Barker said that Daisy Lawrence was being closed because Lowe filed his lawsuit.  (Lowe Depo. p. 119 at line 16-p. 121 at line 9).[26]

According to Lowe, Johnson allegedly told Lowe's mother twice:

> **A.    ...[y]ou know, Melvin's problem, Mary, is you.  Every time they look at him, they see you and all that you've done in the past.  You know, that registers.  You know how Carter feels about you, Mary.  Melvin is just like you.  And I'm not saying it's right or wrong, but Mary, I'm just telling you.**

---

[23]Lowe's second recounting of this conversation is slightly different than his initial recitation of Owens' alleged statements.  (Lowe Depo. p. 272 at lines 4-22).

[24]Additionally, Owens testified that had he known Lowe had told such lies, he may not have recommended him for the reading coach job the following school year.  (Owens Depo. p. 84 at line 21-p. 85 at line 5).

[25]Assuming Lowe's recounting of this conversation is accurate and Owens was attributing those statements to Barker as opposed to expressing his own opinion, Barker denies making such statements.  (Barker Depo. p. 166 at lines 13-18).

[26]Owens denies being aware of Lowe's EEOC Charge or lawsuit during the 2004/2005 school year, denies talking with Lowe about the charges, the lawsuit or the Board's feelings about him, denies knowing of Lowe's mother's lawsuit and otherwise denies making the statements attributed to him by Lowe.  (Owens Depo. p. 36 at line 6-p. 38 at line 6).

(Lowe Depo. p. 118 at line 15-p. 119 at line 1).

Johnson allegedly made such a statement to Lowe's mother for the first time in July 2004 and then again during the 2004/2005 school year. (Lowe Depo. p. 266 at lines 5-19, p. 268 at line 6-p. 269 at line 18). Johnson allegedly made a similar comment to Lowe directly. (Lowe Depo. p. 266 at line 20-p. 267 at line 21). Lowe later relates a fourth conversation between Johnson and his mother that predates those noted above in the Summer of 2003 in which Johnson told Lowe's mother that "you know how people sometimes get back at your children, you know, get back at you through your children." (Lowe Depo. p. 270 at line 7-p. 271 at line 4).

Hicks allegedly told a secretary in Human Resources that Lowe was "very belligerently arrogant", that Lowe "took over the interview, and he's just like his mother, and nobody's going to hire him." (Lowe Depo. p. 188 at line 18-p. 190 at line 18). This statement was then purportedly related by this secretary to Lowe's mother who related it to Lowe. (Id.)

These are the only statements Lowe is aware of by Barker, Owens or Johnson. (Lowe Depo. p. 121 at line 10-p. 122 at line 7, p. 268 at lines 2-5, p. 374 at lines 7-13). He had no conversations with Carter and does not know of any similar statements made by him. (Lowe Depo. p. 122 at lines 8-19). Barker did not know of any possible lawsuit by Lowe's mother until Lowe filed his charges against the Board. (Barker Depo. p. 90 at line 23-p. 91 at line 10).

### b.    EEOC Charge Filed

On November 15, 2004, Lowe filed an EEOC Charge relating to receiving improper pay for his position as a teacher-tutor, his rescinded May 2004 nonrenewal, his failure to obtain "numerous [unspecified] positions" over successful white and/or female candidates or employees not associated with his mother, being placed in a position with no job description and being told to move from his office.[27]  (See Exhibit "25" - EEOC Charge of Discrimination).

---

[27]Lowe clarifies that the "earliest date of discrimination" listed on his EEOC charge should be 1999 instead of 1997. (Lowe Depo. p. 161 at line 6-p. 162 at line 3, p.169 at lines 2-6).

Barker became aware of Lowe's EEOC Charge prior to Purcell arriving in December 2004. (Barker Depo. p. 62 at lines 4-10). He spoke with Carter about the charges, but did not talk with Owens until it was time to set up Owens' deposition in this matter. (Barker Depo. p. 62 at line 2-p. 63 at line 4, p. 107 at line 20-p. 108 at line 7).

Lowe claims Owens said he was aware of the charge. (Lowe Depo. p. 148 at line 11-p. 149 at line 11). He claims this statement was made the day before or the day after the nonrenewal letters were distributed in 2005. (Lowe Depo. p. 149 at line 12-p. 150 at line 4).

### c.    Professional Development Leave Denied

Lowe claims that he filed two grievances with the Alabama Education Association because Barker disallowed his leave for professional development. (Lowe Depo. p. 317 at lines 5-13). Lowe applied for professional development leave in October 2004 to speak at a conference. (Lowe Depo. p. 320 at line 19-p. 321 at line 17; See Exhibit "26" - October 15, 2004 Request for Professional Leave). He claims that he had a conversation with Assistant Superintendent for Curriculum and Instruction Mike Looney who encouraged him to go. (Lowe Depo. p. 321 at line 18-p. 323 at line 4, p. 330 at line 20-p. 331 at line 23). Owens approved Lowe's request, but Barker subsequently denied it telling Lowe that "Looney said that he didn't see where a classroom teacher was sufficient enough to present at a national conference."[28] (Id.) According to Lowe, this statement Barker attributed to Looney was contradictory to an email Looney sent Lowe. (Id.; See Exhibit "27" - December 3, 2004 Email from Mike Looney). Lowe also claims to have communicated with Purcell and she "felt that it was a wonderful opportunity to have representation from Montgomery County at this event." (Lowe Depo. p. 323 at lines 5-15; See Exhibit "28" -

---

[28]Barker testified that professional leave requests have to be scrutinized for various reasons, including preventing abuse (i.e. co-employee spouses using professional development leave as a method of funding a family vacation), as well as keeping inappropriate persons from representing the school district at national conferences. (Barker Depo. p. 141 at line 13-p. 142 at line 22). Purcell echoed this sentiment in testifying that she put limits on the number of conferences employees can attend because of the money, manpower and education costs associated with personnel being absent from school. (Purcell Depo. p. 50 at line 16-p. 52 at line 6).

December 3, 2004 Email to Carlinda Purcell).  It is unclear when Purcell would have made such

a comment inasmuch as Lowe testified that he neither spoke with Purcell nor did she respond to

his email.  (Lowe Depo. p. 334 at lines 5-13).  It was Purcell's understanding that Looney was not

in favor of Lowe presenting at the conference and permitted her staff to handle the matter as she

had only been on the job three days.  (Purcell Depo. p. 45 at line 2-p. 46 at line 19).  However, she

did agree that there were more appropriate employees actually involved with the reading program

to present at such a conference.  (Purcell Depo. p. 47 at lines 1-21).

At the time Barker denied this request, Lowe had not yet filed his EEOC Charge. (Barker

Depo. p. 138 at line 22-p. 139 at line 2; Leave Request).  Barker explained why he denied the

request:

> Q.    And what was the reason that his leave was denied?
> A.    **...[w]e had all kind of ambassadors for our reading program that were further up the chain that [sic] Mr. Lowe.  Mr. Lowe was a teacher/tutor.  He had no official capacity, even as a reading coach, within the school district.  And we had all kind of individuals who had the proper credentials.  So I inquired of his – the person who would have been giving that authority, Mr. Looney. I said, Mr. Looney, I have a request from Mr. Lowe to go out and represent the school district and make a presentation about our reading program in a workshop-type setting; did you authorize this.**
>
> > **Mr. Looney looked at me and gave me a facetious laugh.  He said no, I did not authorize this.  I turned down that recommendation based on my conversation with Mr. Looney.  I don't know what anybody else told Melvin Lowe.  I know that I had that conversation with Mr. Looney, and I know what his response was.**
>
> Q.    Are you saying that Mr. Looney said that he was against Melvin Lowe going to this convention?
> A.    **He didn't say he was against him.  He laughed at me and said, no, I did not authorize him to go out and represent Montgomery Public Schools' reading program.**
> Q.    Did Mr. Looney ever come to you and ask that you let Melvin Lowe go to this program?
> A.    **No, he did not.**
> Q.    Or tried to abdicate [sic] Melvin Lowe going to the program?
> A.    **No, he did not.**
> Q.    Did he ever say he was against Melvin Lowe going to the program?

> **A.** **He did not say. He inferred that it was absurd that Mr. Lowe was going to go out and represent the school district just by his body language when he laughed at me and said, of course I did not.**

(Barker Depo. p. 139 at line 3-p. 141 at line 8).

Had Looney wanted Lowe to go to the program, Barker would have approved it because Looney's authority is parallel with his and Barker would have respected Looney's decision and opinion. (Barker Depo. p. 144 at lines 6-16). Barker knows of no reason Looney may have indicated in the email that he had done all he could do except to place the blame on the Human Resources Department, as is routine. (Barker Depo. p. 144 at line 18-p. 145 at line 20).

Lowe claims that he again sought professional development leave in February 2005. (Lowe Depo. p. 334 at lines 14-23; See Exhibit "29" - February 22, 2005 Request for Professional Leave). According to Lowe, Owens initially approved the request and then denied it because Barker said it was not in line with Lowe's job description. (Lowe Depo. p. 335 at lines 6-16). Lowe presumably testified that such was a valid factor to consider:

> **Q.** Do people's request for professional development get approved or disapproved based on certain factors regarding whether it fits in their job description?
> **A.** **As with all. As with all.**

(Lowe Depo. p. 335 at lines 17-22).

Lowe believes the denial of his leave was retaliation or discrimination. (Lowe Depo. p. 323 at lines 5-7). He believes it is common for teachers to present at such conferences because he has "seen it in other districts, and [he's] almost certain that it has been done in our district." (Lowe Depo. p. 331 at lines 4-9). He could not give any example of such a case. (Lowe Depo. p. 331 at lines 10-20). According to Owens, he does not know if other employees have been denied leave, but he has had his own requests denied at times. (Owens Depo. p. 40 at line 15-p. 41 at line 6).

### d.  Filing of Lawsuit

Lowe filed the instant suit on April 27, 2005.  (See Complaint).  Lowe claims that Owens told him in May 2005 that Barker said Lowe was not liked by the school system and that he should not have filed the lawsuit.  (Lowe Depo.  p. 297 at lines 1-9; June 22, 2005 Email to Carlinda Purcell).

### e.  Free Speech[29]

On December 3, 2004, Lowe sent Purcell an email regarding Barker retaliating against him by denying his professional leave time.  (See Exhibit "30" - December 3, 2004 Email to Carlinda Purcell).

On February 16, 2005, Lowe wrote Purcell a letter advising her of  "legal pressures that have been placed on [him] regarding [his] employment discrimination suit."  (See Exhibit "31" - February 16, 2005 Letter to Carlinda Purcell).

On June 22, 2005, Lowe contacted Purcell via email to ask for her help in securing a position.  (Lowe Depo. p.  296 at lines 10-23; June 22, 2005 Email to Carlinda Purcell).   In response, Purcell called Lowe and told him that she would see if there was anything she could do to help.  (Lowe Depo. p.  296 at lines 10-23).   There was no discussion or mention of Lowe's lawsuit during that phone call.  (Lowe Depo. p. 302 at lines 7-21).

On June 23, 2005, Lowe sent Barker an email seeking his assistance in securing a position for the coming school year, despite any "uncommunicated disagreements" between them.  (Lowe Depo. p.  311 at lines 2-18; See Exhibit "32" - June 23, 2005 Email to Jimmy Barker).

### 3.  POSITIONS PROPERLY BEFORE THE COURT

Lowe claims that he was not hired for certain positions because of his race and sex and in retaliation for his association with his mother.

---

[29]Lowe does not specifically identify what free speech he was retaliated for in his Complaint or Amended Complaint as required and therefore this count is insufficiently plead. However, Defendants will assume, without waiving its sufficiency argument, that Lowe is speaking of complaints he made in emails and other communications with administrative staff.

a.      **Thelma Smiley Morris Elementary School-Summer School Principal**

Lowe claims he questioned Barker during the Summer of 2004 regarding the summer school principalship at Thelma Smiley Morris Elementary School.[30]  (Lowe Depo. p. 249 at lines 5-18).  According to Lowe, Denitta Easterling, a black female, was serving as a summer school principal, but was not appropriately certified to hold the position.  (Id., p. 250 at lines 6-22, p. 252 at lines 12-14).  He further claims he did not interview the position because it was not posted. (Lowe Depo. p. 250 at line 23-p. 251 at line 22).

In reality, Easterling was not a summer school principal at Morris Elementary during the Summer of 2004.  (See Exhibit "33" - Affidavit of Sophia Johnson ¶4).  She was hired by the Alabama Reading Initiative (ARI), a state funded program run by the Department of Education, that was using Morris Elementary as the site for their summer session.  (Id. at ¶¶3-4).  The Board had no control over the personnel hired for this program and Johnson did not recommend Easterling or any other personnel for any position with ARI that summer.  (Id. at ¶¶3-4).

Lowe also complained that Easterling was permitted to interview for administrative positions during the summer, prior to completing her certification in July of 2004.  (Lowe Depo. p. 255 at lines 10-21, p. 256 at line 20-p. 257 at line 3).  During the summer of 2004, Johnson, who met Easterling that summer while working with ARI, witnessed Easterling's skills in the areas of organization and communication and felt she would be an excellent candidate for the administrative assistant position coming available for the 2004/2005 school term.  (Johnson Aff. at ¶¶4-5). Following the interview process, Easterling, who was appropriately certified, was recommended and subsequently hired by the Board for the administrative assistant position at Morris.  (Id. at ¶5). Johnson, a black female, does not recall Lowe being interviewed or applying for the position.  (Id.

---

[30]This is one of two positions Lowe claims were filled without being properly posted.  (Lowe Depo. p. 254 at line 23-p. 255 at line 9).  The other is a Reading Specialist position discussed infra.

at ¶¶1, 6).  No one told Johnson she could not hire Lowe and she was unaware of any an EEOC Charge or lawsuit filed by him or his mother.  (Id. at ¶¶6-7).

          **b.**       **Southlawn Middle School - Schoolwide Instructional Assistant**

A vacancy was posted for a Schoolwide Instructional Assistant position at Southlawn Middle on November 29, 2004.  (See Exhibit "34" - Position Announcement for Schoolwide Instructional Assistant).  Lowe alleges that Principal Tina Minott wanted to hire him for a position at Southlawn Middle School during the summer of 2004.  (Lowe Depo. p. 425 at line 10-p. 426 at line 15).  According to Lowe, Minott told him, "Melvin, I really wanted you...but there's a legal issue with Pam Cloud, and I have to hire her."[31]  (Lowe Depo. p. 427 at lines 1-8).  Cloud is a white female.  (Lowe Depo. p. 426 at lines 6-13).  Lowe knows Cloud, but had no further conversations with anyone regarding the matter.  (Lowe Depo. p. 427 at lines 9-13).  He believes Cloud has a Specialist degree and is certified in Administration.  (Lowe Depo. p. 427 at lines 14-19).  Cloud held Bachelor's Degrees in Early Childhood Education and Elementary Education, Master's Degrees in Early Childhood Education and Administration and an AA Certification in Administration.  (See Exhibit "35" - Professional Certificate for Pamela Cloud).  She was hired effective January 3, 2005.  (See Exhibit "36" - December 16, 2004 Personnel Action Report).

According to Minott, the interview committee interviewed every applicant for the Schoolwide Instructional Assistant position at Southlawn.  (See Exhibit "37" - Affidavit of Tina Minott ¶4).  Following the interview process, the committee selected the top two candidates, with their top selection being Pam Cloud.  (Id. at ¶¶5-6).  Minott denies ever recommending Lowe for the position, discussing race or sex in relation to the position or being told or telling Lowe that she could not hire him for the position.  (Id. at ¶¶7-9).  Minott was aware of some rumor regarding Lowe's mother making some sort of claim against the Board at some point, but knew no details and never

---

[31]At the time, Cloud had a reverse discrimination claim pending against the Board.  (Barker Depo. p. 194 at lines 6-8).  Barker neither blocked nor encouraged her efforts to receive a promotion based on the fact that she had filed a lawsuit.  (Barker Depo. p. 194 at lines 9-15).

let such rumor affect any personnel decision she made.  (Id. at ¶10).  Barker testified that he did

not and knows of no one telling Minott that she had to recommend Cloud:

> Q.    ...Have you or has anyone with Montgomery Public Schools
> to your knowledge ever instructed Tina Minott that she had
> to recommend Pam Cloud?
>
> **A.    No.  We definitely did not.  As a matter of fact in that
> regard, Tina recommended Pam for that particular
> position, and later on I inquired of Tina once we received
> the notification from Mr. Lowe if she even was aware of
> the fact that Pam Cloud had any type of legal proceeding
> against the board, and she said her recommendation
> was made totally oblivious to that. She did not know she
> had any action.**

(Barker Depo. p. 193 at line 15-p. 194 at line 5).

### c.    McKee Junior High School - Administrative Assistant

A vacancy was posted for Administrative Assistants at various schools on February 25,

2004.  (See Exhibit "38" - Position Announcement for Administrative Assistants).  Lowe alleges that

Bobby Abrams, a black male, recommended him for the administrative assistant position at McKee,

but that he was not subsequently hired for the position.  (Lowe Depo. p. 282 at line 14-p. 283 at

line 20, p. 284 at lines 6-8; Barker Aff. ¶5):

> **A.    Mr. Barker told me that Mr. Abrams asked for me.  And
> Mr. Abrams told me he asked for me.**
>
> Q.    Bobby Abrams?
>
> **A.    Bobby Abrams. And Mr. Looney was aware that Bobby
> Abrams asked for me.  Because Mr. Looney said if
> there's a problem when you see Mr. Barker, come back
> to me.  If you want Melvin Lowe, you can have him.**
>
> Q.    Who told him that?
>
> **A.    Mr. Looney.  Because in that same conversation that I
> had with Mr. Barker, Mr. Barker told me that Mr. Carter
> said – Mr. Barker told me I had a good interview, and
> that Mr. Carter said that you will either be in one of the
> – you'll either be an administrator or you will either be in
> one of these reading positions. I rest – I took rest,
> because I assumed that to be true.  And when –**
>
> Q.    Dr. Carter said that?
>
> **A.    That's what Mr. Barker said he said.**
>
> Q.    So this was the year after he said you would only be a
> teacher?
>
> **A.    Yes.**

(Lowe Depo. p. 282 at line 22-p. 284 at line 2)[32].

Lowe alleges that Abrams told him that Barker said a female had to be hired for this position.[33]  (Lowe Depo. p. 284 at lines 14-23, p. 374 at line 14-p. 375 at line 14).  Lowe did not talk with Barker about this alleged statement.  (Lowe Depo. p. 285 at lines 1-3).  This is the only time that someone told Lowe that gender was a consideration in a hiring decision.  (Lowe Depo. p. 375 at lines 15-20).

Lowe testified that a woman received the position, but that he does not know her qualifications or whether she had prior administrative assistant experience.  (Lowe Depo. p. 284 at lines 22-23, p. 353 at lines 6-15).  Lowe believes he was more qualified because Abrams allegedly initially selected him for the position:

> A.    **Mr. Abrams initially selected me, so that would identify that he felt my qualifications outranked or outweighed this other person.**

 (Lowe Depo. p. 352 at line 16-p. 353 at line 3).

Abrams testified that he and Abrams are friends, that they often talk on the phone, that he is a friend of Lowe's brother and that he and Lowe took classes at Alabama State University together.  (Abrams Depo. p. 24 at lines 8-22, p. 47 at lines 2-22, p. 58 at lines 11-13).  Despite this familiar relationship, Abrams completely contradicted Lowe's version of events regarding this position.  According to Abrams, he participated in a group interview of potential administrative assistant candidates with other principals at Central Office.  (Abrams Depo. p. 13 at line 12-p. 14 at line 20).  While Abrams was considering candidates for his staff, he did mention Lowe to Barker.  (Abrams Depo. p. 29 at lines 7-16).  Barker told Abrams that Lowe was qualified.  (Abrams Depo. p. 29 at lines 17-19).  Barker did not say anything else regarding Lowe, neither personally nor

---

[32]Abrams denies telling Looney that he wanted to hire Lowe for any position.  (See Exhibit "39" - Deposition of Bobby Abrams p. 43 at lines 13-20).

[33]Abrams denies telling Lowe that Barker gave any such directive.  (Abrams Depo. p. 67 at line 23-p. 68 at line 4).

professionally, or express any opinion of Lowe to Abrams.  (Abrams Depo. p. 29 at line 20-p. 30 at line 2).  Abrams did not speak with Carter regarding the position.  (Abrams Depo. p. 30 at lines 3-6).  Abrams invited four of those candidates to a second interview with him at McKee.  (Abrams Depo. p. 26 at line 2-p. 27 at line 10).  Abrams did not invite Lowe for a second one-on-one interview.  (Abrams Depo. p. 27 at lines 16-18).  Abrams did not have any criticism of Lowe, but felt that he was not one of the top candidates.  (Abrams Depo. p. 42 at line 15-p. 43 at line 3, p. 45 at lines 10-15, p. 57 at line 22-p. 58 at line 10).  Barker did not have any input into who Abrams invited back for the second interview.  (Abrams Depo. p. 67 at lines 14-18).  Barker never told Abrams that he needed to hire a woman for this position or try and balance out the male-female ratio at McKee.  (Abrams Depo. p. 30 at line 18-p. 31 at line 5).

Abrams spoke with Lowe several times after the group interview.  (Abrams Depo. p. 27 at lines 19-21). He told him that he interviewed well.  (Abrams Depo. p. 27 at line 22-p. 28 at line 11). Abrams told Lowe that he was going a different route and that Lowe would not get the position. (Abrams Depo. p. 68 at line 16-p. 69 at line 11).   He did not tell Lowe why he was not hired for the position nor did he tell Lowe why he was looking at the other candidates.  (Abrams Depo. p. 68 at line 7-p. 69 at line 7).  Abrams ultimately selected Sonya Floyd, a black female, for the position. (Abrams Depo. p. 30 at lines 10-17).  She was hired effective August 4, 2004. (See Exhibit "40" - June 24, 2004 Personnel Action Report).

Abrams denies that Barker ever asked him to reconsider recommending Lowe for a position.  (Abrams Depo. p. 54 at lines 13-19).  Abrams got the impression that Lowe was bitter or angry and that Lowe felt the Central Office was out to get him. (Abrams Depo. p. 69 at line 8-p. 70 at line 16).  Abrams' impression was based on his past contact with Lowe.  (Id.)  Abrams never told Lowe that the Central Office was blocking his appointment.  (Abrams Depo. p. 70 at lines 17-20). Abrams does not know of any negative feelings towards Lowe from Barker, Human Resources or the Board.  (Abrams Depo. p. 70 at line 21-p. 71 at line 2).

**d.    Lee High School - Special Education Teacher**[34]

Lowe applied and was interviewed for a Special Education Teacher with principal David Sikes, a white male, at Lee High School during the summer of 2005.  (Lowe Depo. p.  358 at line 10-p. 359 at line 16; Barker Aff. ¶5).  Lowe claims that Sikes wanted to hire him, but that Lowe would need to see Barker.  (Lowe Depo. p.  359 at lines 11-16).   Sikes did not recommend Lowe for the position because he learned Lowe was not certified to teach special education.  (See Exhibit "41" - Deposition of David Sikes p. 16 at line 21-p. 19 at line 18, p. 20 at lines 15-17). Sikes contacted Lowe and told him that there was nothing he could do until Lowe got certified.  (Sikes Depo. p.  18 at lines 5-15). Lowe alleges that Sikes did not tell him why he could not have the position, but that Sikes "avoided" him.  (Lowe Depo. p. 360 at lines 11-20).  Sikes never mentioned anything to him about the lawsuit.  (Lowe Depo. p. 373 at lines 3-6).  Lowe does not know who received the position.  (Lowe Depo. p.  372 at line 23-p. 373 at line 2).

Sikes confirms that he interviewed Lowe for the position and stated that Lowe had a good interview.  (Sikes Depo. p. 16 at lines 12-20).  However, when Sikes checked with Barker and Human Resources to ensure that Lowe was certified, he discovered that Lowe did not have the proper certification to teach special education.  (Sikes Depo. p. 16 at line 21-p. 19 at line 18).  This was the only conversation Sikes had with Barker about Lowe.  (Sikes Depo. p. 23 at line 20-p. 24 at line 5).

Lowe admits he has no special education certification.  (Lowe Depo. p.  23 at lines 4-7).  However, he adamantly argued that he was eligible for emergency certification, but that Hicks and Barker disagreed because he did not have the proper classes.  (Lowe Depo. p.  359 at line 17-p. 360 at line 20, p.  364 at line 2-p. 366 at line 17).   According to Sikes, he had only one teacher in the past apply for a nontraditional certification, but in that circumstance, the person had the proper

---

[34]In his Amended Complaint at ¶30, Lowe references four jobs that he did not get during the summer  of 2005.  He confirms that the following four positions (d)-(g) are the ones to which he refers.  (Lowe Depo. p.  373 at lines 11-21).

courses, the school was in desperate need of a teacher for the class and there were no other teachers available.  (Sikes Depo. p. 27 at line 4-p. 28 at line 22, p.  50 at line 2-p. 51 at line 15). He also testified that, all things being equal, he would hire a teacher with the proper certification over one without.  (Sikes Depo. p. 53 at line 10-p. 54 at line 2).

Lowe's lack of certification was the reason Sikes did not recommend him for the position. (Sikes Depo. p. 25 at lines 3-6).  Sikes testified that, subject to a reference check, he would have likely recommended Lowe because the school was in need of special education teachers at the time.  (Sikes Depo. 16 at line 21-p. 17 at line 15, p. 29 at lines 2-14).  Sikes eventually hired seven people to fill special education positions at the school, all of whom were certified to teach special education and six of whom had special education experience.  (Sikes Depo. p. 20 at line 18-p. 23 at line 19).  However, the one teacher who did not have special education teaching experience had previously worked at Lee as a special education aide. (Sikes Depo. p. 51 at lines 16-22).

Following the interview, Lowe repeatedly called Sikes and his secretary and even sat outside the door of his office several times while Sikes was tending to other matters.  (Sikes Depo. p. 30 at line 18-p. 31 at line 8).  When Sikes was later seeking an administrative assistant, Sikes testified that Lowe contacted him to express his interest in the position.  (Sikes Depo. p. 34 at lines 17-22).  Sikes cancelled Lowe's interview for that position:

> **A.**    **Yes, ma'am.  He contacted my secretary and said he wanted to be considered for the position.**
> Q.    Did he ever set up an interview with you?
> **A.**    **I think he did, but I canceled it.**
> Q.    And why was the interview canceled?
> **A.**    **Because during the time of the opening for the special ed, not trying to be rude towards Melvin, but he badgered the crap out of me and my secretary.  And it was obvious to me he could not follow directions, what I had told him to do, so I did not want him as an administrator at my school.**

(Sikes Depo. p. 34 at line 20-p. 35 at line 10).

Barker testified that he never said anything disparaging to Sikes regarding Lowe.  (Barker Depo. p.  131 at line 21-p. 132 at line 13).  Sikes never talked with Barker or Hicks about Lowe and

this position. (Sikes Depo. p. 38 at lines 6-11). He never spoke with anyone at the Central Office regarding the candidates for this position. (Sikes Depo. p. 37 at lines 1-4). Sikes did not have a conversation with Purcell regarding Lowe. (Sikes Depo. p. 24 at lines 20-22). Barker never mentioned Lowe's lawsuit to Sikes. (Sikes Depo. p. 49 at lines 14-17). Barker never told Sikes that he had to hire a particular sex or a particular race. (Sikes Depo. p. 23 at line 20-p. 24 at line 12). Sikes knows Lowe's mother but knows nothing of any lawsuit she may have had. (Sikes Depo. p. 49 at lines 18-22). No one told Sikes that he could not hire Lowe. (Sikes Depo. p. 50 at lines 4-8).

        **e.**    **Booker T. Washington Magnet School - Administrative Assistant**

A vacancy was posted for Administrative Assistants at various locations on June 20, 2005. (See Exhibit "42" - Position Announcement for Administrative Assistants). Lowe applied and was interviewed for the administrative assistant position by Principal Quesha Starks, a black female, at BTW Magnet. (Lowe Depo. p. 360 at line 21-p. 361 at line 19; Barker Aff. ¶5). Starks was seeking an administrative assistant during the summer of 2005 for the upcoming school year. (See Exhibit "43" - Deposition of Quesha Starks p. 18 at lines 19-23). She participated in a group interview of candidates with other principals at Central Office and Lowe was one of the candidates. (Starks Depo. p. 32 at lines 10-12). After the group interview, Starks did not consider Lowe a top candidate because of his limited exposure to magnet performing arts and other factors related to his background and experience. (Starks Depo. p. 32 at line 13-p. 33 at line 1). However, Starks gave Lowe a second interview nonetheless. (Starks Depo. p. 31 at line 20-p. 32 at line 9, p. 33 at line 23-p. 35 at line 2). Starks testified that she intended the interview to be structured so she could elicit certain information, but that Lowe "took charge" of the interview. (Starks Depo. p. 35 at line 3-p. 37 at line 8, p. 62 at line 8-p. 64 at line 6):

      **A.**    **....So I heard mostly about Mr. Lowe during the interview, not the questions. My questions weren't being answered. And then after a certain point, if you're halfway through the interview, then as an administrator**

> **who is hiring, you're thinking, okay. If I give you a job assignment, it's going to be about you and not about what the task is about. So it's more so to this is who I am, this is what I've accomplished. And my questions weren't answered, and I gave up pretty much midway. It moved into just conversational, this is what I've done in my lifetime.**

(Starks Depo. p. 62 at line 8-p. 64 at line 2).

> Q.    Right. Did you walk away from that interview with any kind of opinion that you can recall?
> A.    **Nothing other than, okay, at least he can entertain us with a lot of good conversation. But nothing as to this is going to be the person who I want for the job.**
> Q.    Okay.
> A.    **No.**

(Starks Depo. p. 37 at lines 14-23).

Lowe claims Starks wanted to recommend him:

> A.    **...And after the interview with me – we had a very lengthy interview – she called me late one evening to tell me that she was getting ready to make her recommendation, and I need to get your phone numbers, because we will be working closely together next year. And I need to be able to get in touch with you after, you know, the Board meeting. But I'm getting ready to make my recommendation, and I just have one other interview I need to conduct over the phone. But I've already made my decision, and I'm getting ready to call Ms. Hicks with my recommendation.**
> Q.    Did she tell you that she was going to recommend you?
> A.    **Why would she call me to tell me that –**
> Q.    Did she tell you that she was going to recommend you?
> A.    **No. She suggested that we would work closely together next year, and I need to be able to get in touch with you after the Board meets, and we need to get in touch with each other.**

(Lowe Depo. p. 361 at line 3-p. 362 at line 9).

Starks recalled the conversation differently:

> Q.    Okay. Did you have any conversations with Melvin Lowe with regard to you recommending him for this position?
> A.    **I didn't say that – and one reason why I want to say this clearly is that we cannot tell an applicant that they've been hired. It's just unprofessional. Because what's**

> **going to happen if an issue comes up and their qualifications don't match?  Because it can happen. Anybody can make mistakes.  Human resources, they make the final call. We submit the recommendations, they make the call. So I have to be very careful, because you can get some people really excited: I know I got the job. But you don't want people leaving upset: Well, I know she's already just excluded me from the interview. So I didn't leave him with that impression, but I did leave him like I leave all of my applicants: I'm impressed with your resume, what you've done.  You know, you will go very far.  But not, you're going to get this job. It's just not professional to do that without following protocol.**

(Starks Depo. p.  48 at line 20-p. 49 at line 23).

Starks readily admits that she asked for Lowe's contact information because "you just never know what networking can take place after an interview or when you may have to work with a person in the future.  But that's information I get from everyone."  (Starks Depo. p.  50 at lines 1-15).  The person Starks had to interview by phone was Lowe's brother, Marvin.  (Lowe Depo. p. 362  at lines 7-17; Starks Depo. p. 38 at line 19-p. 39 at line 7, p. 39 at lines 15-17).  Starks recommended Lowe's brother Marvin as one of her top three choices to Barker.  (Starks Depo. p. 45 at lines 1-12; Barker Depo. p. 133 at lines 3-10).  She never told Lowe that her decision was already made.  (Starks Depo. p. 43 at lines 17-21).  Starks never considered Lowe as one of her top candidates:

> Q.   Was there ever any question or ever a time that Melvin Lowe would have been in your top three picks out of those interviews?
> **A.   No, because the candidates were so strong.  And I hate compare Melvin to Marvin, you know, siblings.  My parents did that, you know.   But they were – the candidates that I recommended, they were organized. They knew what they were talking about.  When you gave them a question, they responded to it and provided examples as to how they would solve these problems, and they would draw from their previous experience.  So that is what guided it because you don't know these individuals...**

(Starks Depo. p.  64 at lines 7-21).

Lowe had no further communication with Starks, who, like Sikes, "avoided" him. (Lowe Depo. p. 362 at lines 18-22). Starks discussed her top three candidates, Marvin Lowe, Ron Ashley and John Johnston with Barker. (Starks Depo. p. 45 at lines 1-12, p. 46 at line 1-p. 48 at lines 12-19). Ron Ashley, a black male, was subsequently hired for the position effective August 10, 2005. (Starks Depo. p. 41 at lines 3-7; Barker Depo. p. 133 at lines 1-14). He was a veteran teacher from Floyd Middle Magnet School. (Id.) Starks did not discuss Melvin Lowe with Barker because he was not one of her top picks and she was not interested. (Starks Depo. p. 47 at line 23-p. 48 at line 5, p. 55 at lines 8-18). Barker did not tell Starks that she had to hire a man or a woman and told her specifically that they could not discriminate either way. (Starks Depo. p. 52 at line 23-p. 54 at line 19). Starks did not know Lowe until he came for the group interview and no one in Human Resources discussed Lowe with her. (Starks Depo. p. 65 at line 15-p. 66 at line 6). Starks knew Lowe's mother, but knew nothing of her lawsuit. (Starks Depo. p. 66 at line 11-p. 67 at line 5). Starks had no contact with Barker or anyone regarding Lowe's EEOC Charge or lawsuit until the day she received her deposition notice for this matter. (Starks Depo. p. 65 at lines 3-9, p. 65 at line 15-p. 66 at line 6).

### f.    McKee Junior High School - Special Education Teacher

A vacancy was posted for the position of Special Education Teacher at McKee Junior High on May 4, 2005. (See Exhibit "44" - Position Announcement for Various Teaching Positions). Lowe interviewed with Abrams for a special education teacher position. (Lowe Depo. p. 362 at line 23-p. 363 at line 16). Lowe claims that Abrams called him the next day upset. (Lowe Depo. p. 363 at lines 5-9). According to Lowe, Abrams had been told by Hicks that Lowe had "changed [his] mind" about taking the position so Abrams selected someone else for the position. (Lowe Depo. p. 363 at lines 1-16). Lowe does not know who received the position. (Lowe Depo. p. 372 at lines 12-14).

According to Abrams, Lowe expressed an interest in the position. (Abrams Depo. p. 31 at lines 20-22). Abrams checked with Barker about the position and Barker told Abrams, "you can certainly talk to him. I have to check and see if he's certified special ed." (Abrams Depo. p. 32 at

lines 1-18).  Barker reported that he told Abrams that as long as Lowe was certified, he was a viable candidate and that he would check on Lowe's certification.  (Barker Depo. p.  122 at line 23-p. 123 at line 19, p. 129 at line 19-p. 130 at line 2).  Again, Lowe was not certified to teach special education.  (Lowe Depo. p. 23 at lines 4-7).  Barker asked Lowe about his certification and Lowe tried in vain to convince Barker that he had the appropriate courses for certification or emergency certification.  (Barker Depo. p.  122 at line 17-p. 125 at line 4).  Lowe never presented Barker with the evidence sufficient to warrant pursuit of an emergency certification in special education based on the classes on his transcript.  (Barker Depo. p.  128 at line 7-p. 129 at line 10).  According to Barker, it was the responsibility of the employee to obtain the paperwork demonstrating the appropriate coursework to qualify for emergency certification.  (Barker Depo. p.  194 at line 16-p. 195 at line 8). Barker testified that had Lowe been certified, he would have recommended him to be a special education teacher, because the system was in desperate need of special education teachers.  (Barker Depo. p. 195 at lines 13-19).

Abrams recommended Carlos Cherry, a black male, who was certified in and had experience teaching special education.  (Abrams Depo. p. 35 at lines 2-7; Barker Depo. p.  176 at lines 2-23).   He was hired effective August 1, 2005.  (See Exhibit "45" - September 20, 2005 Personnel Action Report).

Because of his friendship with Lowe, Abrams was aware of Lowe's history with teaching:

> Q.    Are you aware of anything in Mr. Lowe's history, his teaching history that may have reflected negatively on your opinion of him?
> **A.    Other than what I have talked a little about in the past.**
> Q.    And what is that?
> **A.    Well, different situations, different schools. I felt Mr. Lowe had bounced around to different schools within the school system. And I know he went to Bullock County.  I think then he came back. So it seemed to me that Mr. Lowe was always receiving a pink slip at the end of the year or being nonrenewed at the end of the year, but then somehow, some way, being able to secure a position for the next year.**
> Q.    Did y'all ever discuss any of the situations where he was nonrenewed at any of his prior teaching assignments?

> **A.**    **Not in depth.  I guess maybe just as a motivating thing, you know, in talking with him as a friend, you know, I would say, well, you know, you'll pick something up or, you know, it's always a job somewhere or you'll get on somewhere.  I'll keep my ears open or my eyes open, if I find out something, I'll call you and let you know type conversation.**

(Abrams Depo. p. 43 at line 21-p. 45 at line 4).

Lowe never discussed his EEOC Charge with Abrams.  (Abrams Depo. p. 45 at line 23-p. 46 at line 11).  Lowe did not mention or discuss his lawsuit with Abrams and Abrams never indicated that he could not hire Lowe because of his lawsuit.  (Lowe Depo. p. 371 at line 23-p. 372 at line 7).  Abrams did not learn of Lowe's EEOC Charge or lawsuit until he received notice that his deposition would be taken for this matter.  (Abrams Depo. p.  45 at line 16-p. 46 at line 11).

### g.    Paterson Elementary School - Reading Coach

A vacancy was posted for the position of Reading Coach on May 9, 2005.  (See Exhibit "46"-Position Announcement for Reading Coach).  Owens interviewed Lowe for the reading coach position at Paterson Elementary.  (Lowe Depo. p.366 at lines 18-21).  This interview followed Lowe's interview with a committee consisting of Connie Mizell, Sherry Dice and Sharon Sewell.  (Lowe Depo. p. 366 at line 21-p. 367 at line 1).  According to Barker, the committee was composed of specialists from the Office of Curriculum and Instruction and that he and Mike Looney were in and out of the interviews to ensure the proper procedures were being followed.  (Barker Depo. p. 33 at line 6-p. 34 at line 19).

Owens told Lowe that he wanted to hire him for the position, but that he was having trouble getting in touch with Barker.[35]  (Lowe Depo. p. 306 at line 22-p. 307 at line 1, p.  367 at lines 1-15):

---

[35]One of Lowe's assertions has been that the Superintendent always follows the principals' recommendations in personnel decisions.  However, Abrams testified that while he has received his top choices since his employment in 2004/2005, he is aware that a variety of reasons could prevent him from receiving his top choice.  (Abrams Depo. p. 9 at lines 11-21, p. 22 at line 13-p. 23 at line 9).  For instance, Abrams testified that if two administrators are interested in the same candidate, a Title I school such as his would be given priority in hiring. (Abrams Depo. p. 54 at line 20-p. 55 at line 9).  Starks testified that HR sought the top three candidates and that she would be
(continued...)

Q.     And did you have any communication with him about why you did not receive the job?

**A.     Yes, I did.**

Q.     And what did [Owens] say to you?

**A.     It was a string of events.  He first told me he had to talk to Mr. Barker.  After he told me he talked to Mr. Barker, it was still up in the air, because Mr. Barker had to communicate with Connie Mizell, who interviewed me for the position.  And when I approached Mr. Barker, Mr. Barker told me that Connie Mizell said I had a poor interview.**

Q.     Mr. Barker said you had a poor interview?

**A.     He said that Connie Mizell stated I had a poor interview.**

Q.     Okay.

**A.     That's who interviewed me. And we kept going back and forth until Dr. Owens finally positioned [sic] the school board again and told me that Ms. Carla Winborne told him, You're going to have to pick somebody else, because we're not hiring Melvin Lowe.**

(Lowe Depo. p.  307 at line 2-p. 308 at line 5).

Lowe does not know why Winborne, an assistant in Human Resources, made the alleged statement to Owens or who was keeping him from being hired.  (Lowe Depo. p.  308 at lines 6-19).

Regarding Mizell's assessment of Lowe's interview skills, Lowe testified:

**A.     You had a poor interview. I had been doing this job for the past two years.  I hardly believe I had a poor interview.  And then I wrote a dissertation on reading instruction. I don't think I had a poor interview with something as competent as I would have been with it.**

---

[35](...continued)
fine with either of the three, even if she did not get the person she considered her top choice. (Starks Depo. p. 19 at line 11-p. 20 at line 23). Owens testified that he has submitted persons as his top picks, but they may have been already hired somewhere else by that time.  (Owens Depo. p.  24 at lines 17-22).  Barker testified regarding the process for hiring certified personnel as well. (Barker Depo. p. 26 at line 19-p. 29 at line 12).  Barker testified that he prefers to receive the principals top three recommendations unranked so the applicants are on an even playing field. (Id.)   He also noted that Carter and Purcell differed in whether to accept a principal's recommendation in that Carter was a longtime employee of the Board and familiar enough with the personnel to use his discretion, while Purcell was new to the system and often had to rely more heavily at times on the recommendations because she did not know the personnel.  (Barker Depo. p. 58 at line 22-p. 60 at line 1).  Either way, Owens concedes that he cannot approve Lowe for any position as that is the province of the Board.  (Owens Depo. p.  62 at lines 2-8).  He further accepts that his recommendations are simply recommendations and that Human Resources can make adjustments where necessary.  (Owens Depo. p. 76 at line 21-p. 77 at line 23).

(Lowe Depo. p. 368 at lines 6-12, p. 369 at lines 4-13).

Barker testified regarding the interview process for these position and Lowe concedes that was aware of it and he interviewed with the committee prior to interviewing with Owens.  (Lowe Depo. p.  368 at line 13-p. 369 at line 13; Barker Depo. p. 32 at line 16-p. 38 at line 12).  Following that interview process, Lowe was not one of the candidates who was highly recommended by the committee.  (Barker Depo. p. 38 at line 13-p. 40 at line 18).  Owens had no contact with the Office of Curriculum and Instruction selection committee prior to recommending Lowe for the position.  (Owens Depo. p.  81 at lines 10-14; Barker Depo. p. 33 at lines 17-21).  He also concedes this was his first time hiring a reading coach.  (Owens Depo. p. 86 at lines 3-19).  Barker asked Owens to consider the committee's highly recommended candidates.  (Barker Depo. p. 40 at line 19-p. 41 at line 9).  Owens again recommended Lowe.  (Barker Depo. p. 41 at lines 10-15).

Because of Owens' background with alternative programs and Paterson's "at-risk" status, Purcell had particular concerns that Paterson be staffed with the strongest academic team possible.[36]  (Barker Depo. p. 44 at line 8-p. 50 at line 22; Purcell Depo. p. 75 at lines 3-9, p. 78 at line 15-p. 81 at line 19).  Lowe does not know whether or not Purcell determined that principals were not to hire reading coaches who were not highly recommended by the selection committee stating, "I would have no idea what Dr. Purcell said to the administrative staff." (Lowe Depo. p. 369 at lines14-21).   In making his recommendation to Purcell, Barker exercised his wisdom and discretion to overrule Owens.  (Barker Depo. p. 45 at line 3-p. 46 at line 10).  He never told Owens that he had to hire a woman or that the Board was getting back at Lowe for his lawsuit.  (Barker Depo. p. 166 at lines 13-18, p. 169 at lines 19-21).

Lowe has no information or evidence that anyone of the selection committee based their ratings on Lowe's race or sex or his association with his mother.  (Lowe Depo. p.  369 at line 22-p.

---

[36]Purcell testified regarding her concern that Owens came from an alternative background as opposed to a traditional structured educational background.  (Purcell Depo. p. 81 at line 12-p. 85 at line 12).

370 at line 8).  He alleges one of the three members of the committee was aware of his lawsuit, but that she was not negative about it:

> Q.    How do you know Ms. Sewell knew?
> **A.    She communicated to me that she knew, because she**
> **had discussed her legal situation with me.**
> Q.    She communicated to you that she knew about your lawsuit.
> Was she negative about it?
> **A.    No.**
> Q.    Did she have her own lawsuit?
> **A.    I don't know if she had a lawsuit.  I know she was in**
> **some – it was some legal combatery [sic].**

(Lowe Depo. p.  371 at lines 1-12).

Lowe then testifies that he did not discuss the matter with Sewell:

> Q.    So she never made you feel like or indicated to you that she
> looked negatively on the fact that you had a lawsuit?
> **A.    She never discussed it.  We never had a discussion.**

(Lowe Depo. p.  371 at lines 17-22).

Lowe does not know whether Sewell communicated any information regarding his lawsuit to the other members of the interview committee.  (Lowe Depo. p.  371 at lines 13-16).

Eleanor Freeney, a black female, was hired for this position, effective September 26, 2005. (Barker Depo. p.  172 at line 5-p. 173 at line 1; See Exhibit "47" - October 18, 2005 Personnel Action Report).  Owens designated her as his second choice behind Lowe. (Owens Depo. p.  67 at lines 9-20).  Freeney was a veteran teacher with the Board, had taught reading for several years and held a Bachelor's Degree and Master's Degree in Elementary Education.  (Owens Depo. p. 93 at lines 1-22).   She was also highly recommended by the selection committee.  (Barker Depo. p. 41 at line 10-p. 42 at line 21).

### 4.    Positions Not Properly Before the Court[37]

Lowe asserts that for the subject positions, while not being able to testify specifically as to who was hired, "I can almost tell you there were not that many black men, and there probably were not that many black women." (Lowe Depo. p. 200 at line 5-p. 201 at line 7).

#### a.    Peter Crump Elementary - Administrative Assistant

A vacancy was posted for the position of Administrative Assistant at Peter Crump Elementary on August 18, 2003.  (See Exhibit "48" - Position Announcement for Administrative Assistant). Lowe alleges discrimination and retaliation as to this position.  (Lowe Depo. p. 196 at lines 5-23).  He was not interviewed.  (Id.)  He does not know whether all who applied received interviews.  (Lowe Depo. p. 197 at lines 1-8).  He has no evidence that he failed to get an interview because of his race or sex.  (Lowe Depo. p. 197 at line 9-p. 198 at line 17).  He does not know who received the position, what his or her race or sex was or what his or her qualifications were.  (Lowe Depo. p. 198 at line 18-p. 199 at line 10).  Rhonda Oates-Tucker, a black female, was hired for this position. (Barker Depo. p. 173 at lines 2-10).

#### b.    Brewbaker Junior High School - Administrative Assistant

A vacancy was posted for the position of Administrative Assistant at Brewbaker Junior on August 18, 2003. (Position Announcement for Administrative Assistant).  Lowe alleges discrimination and retaliation as to this position.  (Lowe Depo. p. 196 at lines 5-23).  Lowe was not interviewed for this position.  (Id.) He does not know who was hired for the position or what their qualifications were for the position.  (Lowe Depo. p.199 at line 21-p. 200 at line 4).  Jessietta Crawford, a black female, was hired for this position effective August 4, 2004.  (Barker Depo. p. 173 at lines 2-10; See Exhibit "49" - August 18, 2003 Personnel Action Report).  She holds a Bachelor's Degree in Elementary Education, Master's Degrees in Elementary Education and

---

[37]Defendants assert that the following positions are not properly before the Court as they exceed the scope of both Lowe's EEOC Charge and his Complaint.  Further, Lowe cannot expand the scope of his action by introducing new claims in his deposition testimony.

Administration and an AA certification in Elementary Education.  (See Exhibit "50" - Professional Certificate for Jessietta Crawford).

<p style="text-align:center;">c.    <strong>Educational Specialist</strong>[38]</p>

A vacancy was posted for the position of Educational Specialist in the Office of Curriculum & Instruction on June 4, 2004.  (See Exhibit "51" - Position Announcement for Educational Specialist). Lowe claims he applied for but was not interviewed for this position.  (Lowe Depo. p. 202 at lines 4-7).  He believes that he should have been afforded an interview.  (Lowe Depo. p. 203 at line 18-p. 204 at line 2).  He does not know who determined who would be interviewed for the position, but assumes it would be "a Human Resource issue".  (Lowe Depo. p. 204 at lines 3-9, p. 204 at line 21-p. 205 at line 6).  He does not know who conducted the interviews.  (Lowe Depo. p. 205 at lines 7-12).  He does not know if all applicants received an interview.  (Lowe Depo. p. 205 at lines 13-18). He does not know who was hired for the position.  (Lowe Depo. p. 202 at lines 12-20).  Accordingly, he cannot compare his qualifications to those of the selected candidates. (Lowe Depo. p. 205 at line 19-p. 206 at line 5).  He does not know what qualities or characteristics the Board was looking for when filling the position other than what is contained in the announcement.  (Lowe Depo. p. 206 at lines 6-11).  Connie Mizell, a white female, was hired for this position effective July 1, 2004.  (Barker Depo. p. 175 at line 1-p. 176 at line 1; See Exhibit "52" - June 4, 2004 Personnel Action Report).  She holds Bachelor's Degrees in Elementary Education, Early Childhood Education, Master's Degrees in Elementary Education, Early Childhood Education and Administration and AA Certification in Administration.  (See Exhibit "53" - Professional Certificate for Connie Mizell).

---

[38]Lowe's answers to counsel's questions refer to Positions (c)-(e) jointly.  (Lowe Depo. p. 201 at line 15-p. 202 at line 3).

### d.    Educational Technology Professional Development Program Coordinator

A vacancy was posted for the position of Educational Technology Professional Development Program Coordinator on July 16, 2003.[39]    (See Exhibit "54" - Position Announcement for Educational Technology Professional Development Program Coordinator).  Kevin Culpepper, a white male, and Angela Mangum, a black female, were hired for these positions.  (Barker Depo. p.  177 at lines 1-17).    Culpepper held Bachelor's Degrees in Secondary Education with endorsements in English and History and was previously the technology director at Lee High School.  (See  "55" - Professional Certificate for Kevin Culpepper; See Exhibit "56" - Letter of Interest from Kevin Culpepper).  Mangum held a Bachelor's Degree in Elementary Education, Master's Degrees in Elementary Education and Administration and an AA Certification in Elementary Education.  (See Exhibit "57" - Professional Certificate for Angela Mangum).

### e.    Title I Schoolwide Instructional Assistants

A vacancy was posted for the position of Title I Schoolwide Instructional Assistants on August 18, 2003.[40]  (See Exhibit "58" - Position Announcement for Title I Schoolwide Instructional Assistants). The persons hired for these positions were as follows: Lovell Seales, a black male who held a Bachelor's Degree in Secondary Education and a Master's Degree in Administration, Darryl Washington, a black male who held Master's Degrees in Secondary Education and Administration, Deidre McRay, a black female who held a Master's Degrees in Secondary Education, Virginia Browder, a black female who held a Bachelor's Degree in Elementary Education, Master's Degrees in Elementary Education and Administration and an AA certification in Administration, Mona Green, a black female who held a Bachelor's Degree in Elementary Education and Master's Degrees in Elementary Education and Administration, Tara Carr, a black female who held a Bachelor's Degree in Elementary Education and a Master's Degree in Administration, Dierdra Ramsey, a black female

---

[39]See discussion of Educational Specialist position, supra, and Footnote 38.

[40]See discussion of Educational Specialist position, supra, and Footnote 38.

who held a Master's Degree in Secondary Education, Barbara Sankey, a black female who held AA certifications in Secondary Education and Administration, Orlean Baldwin, a black female who held a Bachelor's Degree in Secondary Education and Special Education and Master's Degrees in Special Education and Administration, Anissha Officer, a black female who held a Bachelor's Degree in Elementary Education and a Master's Degree in Administration, Patrick Nelson, a black male who held a Master's Degree in Administration, Lakisha Stokes, a black female who held a Bachelor's Degree in Elementary Education and Master's Degrees in Elementary Education and Administration and Tamara Winston, a black female who held a Master's Degree in Elementary Education. (Barker Depo. p. 180 at lines 2-20; See Composite Exhibit "59" - Professional Certificates for Schoolwide Instructional Assistants).

### f.   Lee High School - Administrative Assistant

A vacancy was posted for the Administrative Assistant position at Lee High School on August 25, 2003. (See Exhibit "60" - Position Announcement for Administrative Assistant). Lowe applied for this position, but did not receive an interview. (Lowe Depo. p. 206 at lines 12-16). He does not know who received the position, but he believes it may have been a white female. (Lowe Depo. p. 206 at line 17-p. 207 at line 4). He has no information regarding the person's qualifications, but testified that he personally and "clearly met the qualifications". (Lowe Depo. p. 207 at lines 5-10). He concedes that he had never held an administrative position nor had he worked in a high school. (Lowe Depo. p. 207 at lines 11-17).

Gloria Odutola, a black female, was hired for this position effective August 7, 2002. (Barker Depo. p. 180 at line 21-p. 181 at line 7; See Exhibit "61" - July 23, 2002 Personnel Action Report). She held Master's Degrees in Elementary Education and Administration. (See Exhibit "62" - Professional Certificate for Gloria Odutola).

### g.   Brewbaker Intermediate School - Teacher

A vacancy was posted for Elementary Teachers at Brewbaker Intermediate on September 15, 2003. (See Exhibit "63" - Position Announcement for Elementary Teachers). Lowe alleges he

applied for and was interviewed for a teaching position at Brewbaker Intermediate School. (Lowe Depo. p. 208 at line 23-p. 209 at line 19). According to Lowe, he received "negative verbal feedback" from the principal who told him that she "didn't think that [he] would work out at Brewbaker." (Id.) Later that afternoon, Lowe alleges that a woman told his mother than the principal "wasn't going to hire Melvin, because she didn't want her students beat." (Id.) While Lowe objected to the principal apparently being aware of his past incidents, he concedes that she was likely referring to the prior incidents involving his contact with students. (Lowe Depo. p. 209 at line 200-p. 210 at line 8). The principal did not make any comment about Lowe's sex, race or mother. (Lowe Depo. p. 210 at lines 5-15). Jennifer Turner, a black female, was hired for this position, effective August 6, 2003. (Barker Depo. p. 181 at lines 14-22; See Exhibit "64" - September 25, 2003 Personnel Action Report).

### h.    McKee Elementary School - Teacher

A vacancy was posted for Elementary Teachers at McKee Elementary on September 15, 2003. (Position Announcement for Elementary Teachers). Lowe claims he applied for a teacher position at McKee Elementary School, but that he was not given an interview. (Lowe Depo. p. 201 at lines 16-21). Lowe claims that the principal Lillian Sanders ran into him and his mother at some point during the summer of 2003 and told him that "I don't want y'all mad with me, but Ms. Hicks kinda talked me out of hiring Melvin when I was at Hayneville Road [in 1999]." (Lowe Depo. p. 211 at lines 4-21). Lowe does not know what Hicks allegedly said to Sanders other than Sanders' purported characterization of being "talked out of" hiring Lowe. (Lowe Depo. p. 211 at line 22-p. 212 at line 4). Sussie Prater, a black female, was hired for this position, effective August 10, 2005. (Barker Depo. p. 181 at lines 14-22; See Exhibit "65" - August 16, 2005 Personnel Action Report).

### i.    Various Locations-Administrative Assistants

A vacancy was posted for Administrative Assistants at various locations on February 25, 2004. (See Exhibit "66" - Position Announcement for Administrative Assistants). Lowe applied, but did not receive any interviews. (Lowe Depo. p. 236 at line 20-p. 237 at line 4). He does not know

who was interviewed or whether all applicants received interviews.  (Lowe Depo. p.  237 at lines 5-9).  As previously stated, Denitta Easterling, a black female, was hired at Morris Elementary, Hosea Addison, a black male, was hired at Loveless Academic Motivational Program and held a Bachelor's Degree in Secondary Education and Master's Degrees in Secondary Education and Administration, Exzealia Baptiste, a black female, was hired at Fews Alternative and held a Bachelor's Degree in Elementary Education and a Master's Degree in Administration, Jeri Brown, a white female, was hired at Goodwyn and held Bachelor's Degrees in Elementary and Secondary Education and a Master's Degree in Administration, Antoine Richardson, a black male, was hired at Lee High School and held Master's Degrees in Secondary Education and Administration,, Rodrick James, a black male, was hired at Chisholm Elementary and held a Bachelor's Degree in Elementary Education and a Master's Degree in Administration, Emily Little, a white female, held Bachelor's Degrees in Early Childhood and Elementary Education and Master's Degrees in Early Childhood Education and Administration, Bobby Lowe, a black male, was hired at Floyd Elementary School and held Master's Degrees in Elementary Education and Administration and held an AA certification in Elementary Education, Mary Markham, who held Master's Degrees in Administration and Counseling and Ferlisa Ross, who held Master's Degrees in Secondary Education and Administration, both black females, were hired at Lanier High School, Mary Norman, a white female, was hired at Floyd Middle School and held Master's Degrees in Administration and Secondary Education, Shanetha Patterson, who held Master's Degrees in Elementary Education and Administration and Dionne Woody, who held a Bachelor's Degree in Elementary Education and a Master's Degree in Administration, both black females, were hired at E.D. Nixon Elementary, Durwood Wilson, a black male, who held Master's Degrees in Elementary Education and Administration, was hired at Brewbaker Junior, and as previously stated Sonya Floyd, a black female, who held a Bachelor's Degree in Secondary Education and a Master's Degree in Administration was hired at McKee Junior. (Barker Depo. p. 182 at line 2-p. 185 at line 1; See Composite Exhibit "67" - Professional Certificates for Administrative Assistants).

45

**j.      Office of Student and Community Services - Educational Specialist**

A vacancy was posted for the position of Educational Specialist in the Office of Student and Community Services.  (See Exhibit "68" - Position Announcement for Educational Specialist in Office of Student and Community Services). Lowe alleges he applied for an Educational Specialist position in the Office of Student and Community Services, but that he did not receive an interview. (Lowe Depo. p.  207 at lines 18-23). He does not know who received interviews for the positions, but alleges that two white women were hired.  (Lowe Depo. p.  237 at lines 10-23). According to Lowe, Susan Terrell, a white female, was hired.  (Lowe Depo. p.  207 at line 18-p. 208 at line 4). She took the position effective July 1, 2005.  (Barker Depo. p.  181 at lines 8-13; See Exhibit "69" - June 28, 2005 Personnel Action Report).  He does not know what her qualifications were or who decided to interview her. (Lowe Depo. p.  208 at lines 5-13). She held a Bachelor's Degree in Elementary Education and Master's Degrees in Counseling, Supervision and Administration. (See Exhibit "70" - Professional Certificate for Susan Terrell).

**k.      Title I Educational Specialist in Professional Development**

Lowe claims he applied for the Title I Educational Specialist position.  (Lowe Depo. p.  238 at lines 12-17).  He believes a woman was selected, but he does not know her qualifications, who interviewed for the position or who determined who would be interviewed. (Lowe Depo. p.  238 at line 12-p. 239 at line 1).

**l.      Title I Program Evaluator**

A vacancy for a Title I Program Evaluator position was posted on June 11, 2004.  (See Exhibit "71" - Position Announcement for Title I Program Evaluator).  Lowe claims he applied for the position in June 2004, but he did not receive an interview.  (Lowe Depo. p. 239 at lines 5-10). According to Lowe, the position was not filled and he has no information as to why.  (Lowe Depo. p. 239 at lines 5-20).  The position was not filled because the funding fell through.  (Barker Depo. p. 185 at lines 10-15).

**m.      Houston Hill Junior High School - Teacher-Tutor**

A vacancy was posted for a Title I Teacher Tutor at Houston Hill Junior High on June 24, 2004.  (See Exhibit "72" - Position Announcement for Title I Teacher Tutor).  Lowe claims he applied for the position, but was not interviewed.  (Lowe Depo. p. 240 at lines 1-15).  Lowe claims the principal told him the position was already filled before the job announcement had come out.  (Lowe Depo. p. 240 at lines 1-15).  Lowe does not believe such was because of his race or who he was as everyone would have been adversely affected by not having the opportunity to interview.  (Lowe Depo. p. 240 at lines 16-22). The position was filled by Essie Baker, a black female, who held a Bachelor's Degree in Secondary Education and a Master's Degree in Elementary and Secondary Education with an endorsement in Reading, effective November 18, 2004.  (Barker Depo. p. 185 at lines 16-20; See Exhibit "73" - Professional Certificate for Essie Baker; See Exhibit "74" - December 16, 2004 Personnel Action Report).  Again, the position was posted.

**n.      Office of Curriculum and Instruction - Reading Specialists**[41]

Lowe complains that Karen Vann, a white female, received a position as a Reading Specialist that was not posted.  (Lowe Depo. p. 249 at line 19-p. 252 at line 5, p. 251 at line 23-p. 252 at line 14). Perhaps, because of the number of positions and Lowe was usually unaware of who received positions, Lowe did not realize that he testified about this position earlier and alleged that he applied for and was interviewed for the job. (Lowe Depo. p. 240 at line 23-p. 241 at line 22). He claims two white women and two black women were hired for the available positions. (Lowe Depo. p. 241 at line 16-p. 242 at line 4).  Lowe testified that Barker decided to sit in on his interview, apparently out of concern that Lowe had not been getting jobs. (Lowe Depo. p. 241 at line 4-p. 244 at line 14).  Lowe could not testify regarding how he interviewed compared to other candidates, other than to say that "I knew all the information and still know all the information." (Lowe Depo. p. 242 at line 21-p. 243 at line 11).

---

[41]This is the second position Lowe claims was not properly posted in his Amended Complaint.

In fact, this position was posted on June 25, 2004.  (Barker Depo. p. 133 at lines 15-21; See Exhibit "75"-Position Announcement for Reading Specialists).  Karen Vann, Gloria Odutola, a black female, and Annette Sikes received these positions.  (Barker Depo. p.  186 at lines 7-13).  Vann held Bachelor's Degrees in Early Childhood and Elementary Education and a Master's Degree in Administration, Odutola held Master's Degrees in Elementary Education and Administration and Sikes held Bachelor's Degrees in Secondary and Elementary Education and a Master's in Reading Education. (See Exhibit "76" - Professional Certificate for Karen Vann; Odutola Certificate; See Exhibit "77" - Professional Certificate Inquiries for Annette Sikes).

### o.      Math Specialists

A vacancy for Title I Math Specialists positions was posted on June 25, 2004.  (See Exhibit "78" - Position Announcement for Math Specialists).  Lowe claims that he applied for the Math Specialist position, and received an interview.  (Lowe Depo. p. 244 at line 22-p. 245 at line 5).  He does not recall who interviewed him. (Id.)  He does not know who was hired in the positions, but believes that one was a white woman.  (Lowe Depo. p.  245 at lines 6-11).  He does not know her qualifications compared to his.  (Lowe Depo. p.  245 at lines 12-14).  Lamecha James, a black female, who held Master's Degrees in Secondary Education with an endorsement in Math and Administration was hired effective January 3, 2005, Cathy Simmons, a white female, who held a Bachelor's Degree in Elementary Education was hired August 10, 2005 and Sheila Helms, a white female, who held a Bachelor's Degree in Secondary Education with endorsements in Math and Biology was hired January 3, 2005.  (Barker Depo. p.  188 at lines 17-23; See Exhibit "79" - January 27, 2005 Personnel Action Report; See Exhibit "80" - May 16, 2005 Personnel Action Report; See Composite Exhibit "81" - Professional Certificates for Math Specialists).

### p.      Title I Schoolwide Instructional Assistants

A vacancy was posted for Title I Schoolwide Instructional Assistants on July 25, 2004.  (See Exhibit "82" - Position Announcement for Title I Schoolwide Instructional Assistants). Lowe claims he applied for this position and was interviewed, but he does not know who received the position

or how many people were hired.  (Lowe Depo. p.  245 at line 15-p. 246 at line 13).  Annisha Officer,

a black female, was hired at Harrison Elementary, Patrick Nelson, a black male, was hired at

Bellingrath, Lakisha Stokes, a black female, was hired at Seth Johnson, and Tamara Harvey, a

black female, who held a Master's Degree in Administration and Elementary Education was hired

at McIntyre.  (Barker Depo. p.  189 at line 8-p. 190 at line 2; See Composite Exhibit "83" -

Professional Certificates for Schoolwide Instructional Assistants).

> **q.    Office of Student and Community Services - District Resource/Attendance Officer**

Lowe claims he applied and was interviewed for the District Resource/Attendance Officer

position posted July 21, 2004.  (Lowe Depo. p.  246 at lines 14-20; See Exhibit "84" - Position

Announcement for District Resource/Attendance Officer).  He was interviewed by Barker and

Johnson, but the position was not filled. (Lowe Depo. p.  246 at line 21-p. 247 at line 13; Barker

Depo. 189 at lines 1-7).  With respect to position and why it was not filled, Lowe testified as follows:

> Q.    Do you know why it hasn't been filled?
> **A.    No, I don't.  Ms. Johnson just communicated to me, she said, Melvin, you had an excellent interview.  And from my mother, she said, I don't know where you get your smarts from, which was an insult, because it could possibly be innate capability.  But she said that Mr. Carter said that they weren't going to fill the position at that time.**

(Lowe Depo. p.  247 at lines 4-13).

## B.    OTHER FACTS

Lowe does not testify that he should have actually been awarded each of these positions,

but asserts that he "could have been given the opportunity to interview."  (Lowe Depo. p.  203 at

line 18-p. 204 at line 2).  He does not know who determined who would be interviewed or who did

the interviewing.  (Lowe Depo. p.  204 at lines 3-9).  He has no information or evidence that

everyone received an interview but him.  (Lowe Depo. p.  205 at lines 13-18).  Lowe concedes that

the fact that a white person may have received a position over him does not automatically mean

he was discriminated against because of his race.  (Lowe Depo. p.  201 at lines 8-14).  There is

no requirement that the person with the most education automatically be hired.  (Barker Depo. p. 198 at lines 14-18).  As Abrams testified regarding his selection of an administrative assistant, subject to the minimum qualifications, the selection is subjective to some degree:

> Q.    Now, was this based on their answers to interview questions?
>
> **A.    Based on answers to interview questions, based on the vibe that I personally got from them, you know, based on the group that I sat and listened to, I felt that one of the four would or could do the job.**

(Abrams Depo. p.  57 at lines 2-21).

Lowe also concedes that there are "probably quite a few" other people with similar certifications to his in Montgomery County that have not achieved administrative positions.  (Lowe Depo. p.  408 at line 20-p. 409 at line 2).  Barker expounded on the subject:

> **A.    We generally on the average run anywhere from 30 to 50 applicants through that general screening process each of the last two or three years.  So probably a tenth of those actually or maybe as many as 20 percent of them actually get placed, and then the next year we go through the same process. So I would venture to say there are numerous individuals with the certification out there who have not been placed in an administrative-type position.**

(Barker Depo. p. 197 at line 18-p. 198 at line 13).

As Starks testified, "...it took a long time because I certified in 1998 as an administrator, and I did not make it as soon as I certified."  (Starks Depo. p.  11 at line 23-p. 12 at line 11).

As head of Human Resources, Barker was familiar with the subject positions and testified as follows:

> As I testified in my deposition, I am familiar with the positions at issue in this matter, including all the jobs Mr. Lowe referenced during his testimony that were not part the Complaint he filed in federal court.  In my position as Assistant Superintendent, personnel recommendations are funneled to me and after reviewing those recommendations, I make those reports to the Superintendent and we discuss the recommendations and what selections are most appropriate for each position.  From that point, the Superintendent makes a final decision regarding what employee will be recommended to the Board.  I am familiar with Lowe's credentials

> and the credentials of those who were selected for the subject positions. For each position, the most qualified person was recommended for the position.

(Barker Aff. ¶7).

No one ever told Lowe that a white person had to be hired for any position but Lowe claims that Barker once said to Abrams that a female had to be hired for an administrative position. (Lowe Depo. p. 284 at lines 6-23, p. 374 at line 14-p. 375 at line 20). Barker denies having told anyone to hire a woman or a particular race over Lowe or anyone and Abrams previously confirmed such. (Barker Depo. p. 137 at line 23-p. 138 at line 11, p. 200 at lines 1-9). Lowe believes that there are a "limited number of black men in leadership or administrative positions", but has no evidence to support his claim. (Lowe Depo. p. 285 at line 6-p. 287 at line 1).

Lowe had very limited contact with the Board following his nonrenewal from Southlawn during the summer of 2002. (Lowe Depo. p. 228 at lines 5-13). Neither Carter, Barker nor Hicks nor anyone else had any conversation with Lowe regarding his race, sex or mother's complaint during the summer of 2003. (Lowe Depo. p. 224 at line 21-p. 227 at line 22, p. 229 at lines 2-22).

Lowe has no evidence or information that Purcell kept him from receiving positions or that she had felt he should not be employed by the Board. (Lowe Depo. p. 343 at lines 12-21). Lowe has no evidence or information that the members of the Board had an opinion as to whether he should be employed. (Lowe Depo. p. 343 at line 22-p. 344 at line 3). Lowe has never had a conversation with a Board member about his employment and/or his nonrenewal. (Lowe Depo. p. 344 at lines 4-8). Lowe's mother has never told him that a Board member made a comment regarding Lowe's race, sex, lawsuit or association with his mother. (Lowe Depo. p. 344 at lines 9-21).

III.   **ARGUMENTS AND CONCLUSIONS OF LAW**

    A.   **STANDARDS GOVERNING SUMMARY JUDGMENT**

"The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material

fact." *Gonzales v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. Rule 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case as to which [she] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; see also *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574,586,106 S.Ct. 1348, 89 L.Ed.2d. 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue.  Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated.  Where the movant did the latter, the non-movant must respond in one of two ways.  First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence.  *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting).  Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

*Fitzpatrick*, 2 F.3d at 1116.

### B.    OFFICIAL CAPACITY CLAIMS

Lowe's "official capacity" claims against the individual Board members and Superintendent Purcell are due to be dismissed as redundant since the MCBOE has also been sued as a Defendant.  Suing these individuals in their official capacity is simply another way of bringing an action against an entity of which an officer is an agent.  See *Kentucky v. Graham*, 473 U.S. 159-165 (1985) quoting *Monell v. Department of Social Serv. of the City of New York,* 436 U.S. 658, 690 n. 55 (1978).  Accordingly, the claims brought against these individuals in their official capacity are due to be dismissed as a matter of law.

### C.    TITLE VII ANALYSIS - RACE AND SEX DISCRIMINATION

*Title VII of the Civil Rights Act of 1964*, as amended, prohibits an employer from discriminating "against any individual with respect to his compensation, terms, condition, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2000(a)(1)(as amended).   In the present case, Lowe asserts that he was nonrenewed, denied several jobs (whether they be considered a promotion or hire) and paid

unfairly for one of the jobs that he held because of his race <u>and</u> his sex, male.[42]  In order to support his Title VII claims, Lowe must establish that these actions were the result of intentional discrimination.  <u>See</u> *Merriweather v. Alabama Dept. of Public Safety*, 17 F.Supp.2d 1260, 1267 (M.D. Ala. 1998)(<u>citing</u> *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).  He may prove intentional race or sex discrimination through either direct or circumstantial evidence.  <u>See</u> *Shuford v. Alabama State Bd. of Educ.*, 978 F.Supp. 1008, 1015 (M.D. Ala. 1997).

 "[E]vidence is direct when it is sufficient to prove discrimination without inference or presumption.  Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." <u>Id.</u> (<u>quoting</u> *Clark,* <u>supra</u>, 990 F.2d at 1223).  Lowe offers no direct evidence of intentional race or sex discrimination in regards to the jobs alleged in his Complaint other than an allegation that the Principal of McKee, Bobby Abrams, said Mr. Barker told him (Abrams) that he had to hire a female for the assistant principal position.  ( Lowe Depo. p. 284 at lines 14-23, p. 374 at line 14-p. 375 at line 14).  This assertion is inadmissible hearsay and therefore is not relevant to the Court's analysis.[43]   Pursuant to Rule 56(e) of the *Federal Rules of Civil Procedure*, evidence submitted in opposition to a motion for summary judgment must be admissible in order to be considered:  "Bald conclusions, opinions and hearsay without supporting specific facts are not admissible and do not create genuine issue of material fact to defeat summary judgment." *Williams v. Hager Hinge*, 916 F.Supp. 1163 (M.D. Ala. 1995) (<u>citing</u> *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).  While Plaintiffs may rely upon hearsay for purposes of summary judgment in some circumstances, Plaintiffs may not rely upon testimony that contains inadmissible hearsay if such evidence cannot be reducible to admissible

---

[42] Lowe also claims that he was not allowed to do professional development consistent with the typical practice of the Board but it appears that this factual claim is based on retaliation.  To the extent said claim relates to a race or sex claim, the same analysis would apply.

[43]  Abrams denies that Barker ever told him that he needed to hire a female.  (Abrams Depo. p. 30 at line 18-p. 31 at line 5).

form at trial.  See *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir. 1996); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), reversed on other grounds, 101 F.3d 1363 (11th Cir. 1996)(en banc).  Here, because Abrams and Barker deny that such a statement was ever made from Barker to Lowe and Abrams denies ever having told Lowe such, this evidence is inadmissible and not relevant to the summary judgment analysis.  Accordingly, Lowe's claim regarding the administrative assistant position at McKee Jr. High School can only be based on circumstantial evidence, which is discussed more fully below.

Absent direct evidence, Lowe must prove his claims of race and sex discrimination by circumstantial evidence through a framework of shifting burdens of proof.  In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court created a framework of the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination.  See *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184, *reh'g denied*, 747 F.2d 710 (11th Cir. 1984) (noting that the *McDonnell Douglas* framework is a valuable tool for analyzing disparate treatment cases).  To prove discriminatory treatment through circumstantial evidence, the plaintiff must first make out a *prima facie* case. If a *prima facie* case is not established, summary judgment is due to be granted.  If a *prima facie* case is established, the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the alleged adverse employment action.  When legitimate, nondiscriminatory reasons are proffered, the burden then shifts back to the plaintiff to establish that those reasons are pretextual.  *McDonnell Douglas*, supra, 411 U.S. at 802-04.  Defendants need only produce, not prove, the nondiscriminatory reasons, the burden is "exceedingly light".  See *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); see also *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered nondiscriminatory reasons, summary judgment should be granted.  *Holifield v. Reno*, 115 F.3d 1555, 1565-66 (11th Cir. 1997).

Lowe's Complaint is very broad and at one point makes reference to "numerous positions". However, it is the responsibility of the Plaintiff to designate the discrete discriminatory act to which he refers. The law is clear that a promotion or original hire is a discrete act constituting a separate action.  See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Lowe has only arguably met the administrative prerequisite for certain jobs[44]: (1) TSM Summer School Principal (2) Schoolwide Instructional Assistant at Southlawn, (3) Administrative Assistant at McKee Jr. High School, and (4) compensation as a teacher-tutor.  To that end, in an attempt to be thorough in addressing all evidence that Lowe presented during his deposition, the pertinent facts about who was hired for positions he testified about, but did not include in an EEOC Charge or his Complaint, were set out in the Statement of Undisputed Facts above and will be briefly addressed herein.  Additionally, it should be noted that in his Amended Complaint, Lowe refers to four additional positions that he believes he was not awarded in retaliation for his lawsuit, but also makes the identical reference of race and sex discrimination along with First Amendment and Equal Protection claims.  While it is not necessary to return to the EEOC to make an allegation of retaliation for having filed the EEOC Charge or lawsuit, such would not be true if Lowe is alleging that he suffered sex or race discrimination about those positions. *National*, supra.  As such, any claims of race or sex discrimination as it relates to the four positions he did not receive in the summer of 2005 after his lawsuit was filed, are due to be dismissed as a matter of law for failure to meet administrative prerequisites.  In the alternative in an abundance of caution, Defendants address those positions separately in this section of the brief.

Because of the vast nature of Lowe's allegations, it is prudent to point out that to the extent Lowe attempts to make claims regarding any job that we was not awarded more than 180 days

---

[44]Lowe references promotions in general in his EEOC charge and then sets out the facts surrounding specific jobs to which he was allegedly referring in his Complaint.  Even in his Complaint it was not necessarily clear as to what job he was referring but the information was ascertained through questioning of Lowe during his deposition.

prior to the filing of his EEOC charge, those claims are time barred as it relates to any claim pursuant to Title VII. See *Cooper v. Southern Co.,* 390 F.3d 695, 734 (11th Cir. 2004) (failure to promote cause of action began to accrue on date employee got voice mail that she would not get position).

Lowe's claims regarding the compensation for the reading coach position, the jobs he was not awarded and his nonrenewal fail because he cannot establish a *prima facie* case of said claims and/or present evidence of pretext.

### 1.    COMPENSATION AS A TEACHER-TUTOR VS. READING COACH

Lowe's initial complaint is that he was lured away from Bullock County (which completely contradicts his admission that he was trying to see Carter and sent his mother in to see Carter because he wanted to come back to Montgomery) with the promise of a reading coach position but was ultimately hired as a teacher-tutor. Lowe says this difference cost him one month's salary. Lowe's Title VII claim regarding this position is barred by the 180-day statute of limitations in that he signed the contract for this position in October 2003 and his EEOC charge was filed in November 2004. As such, the claim is due to be dismissed as a matter of law. See *Mohasco Corp. v. Silver*, 447 U.S. 807, 815, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). Exhaustion of administrative remedies is a condition precedent to the filing of a Title VII action. *Green v. Elixir Industries, Inc.,* 407 F.3d 1163, 1167 (11th Cir. 2005) citing *Gregory v. Georgia Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). Regardless, Lowe cannot maintain a cause of action based on the teacher-tutor position.

To prove a disparate pay claim, Lowe must prove that he is in a protected class and occupied a position similar to employees who are not in his protected class that were compensated at a higher rate than him. *Blount v. Alabama Cooperative Extension Service,* 869 F.Supp. 1543, 1550 (M.D. Ala. 1994). To establish that he was treated in a discriminatory manner, Lowe must prove that he was treated adversely as a result of discrimination.

This claims fails for numerous reasons.  First, it is undisputed that Lowe knew it was a teacher-tutor position when he signed the contract and he was paid appropriately for that job. Second, it is undisputed that if he had been hired as a reading coach, it would have been a 9 month position and therefore the pay would have been the same.[45]   As such, Lowe cannot establish an adverse employment action as to this claim because he did not suffer a loss of an employment benefit.  See Benefield v. Fulton Co., Ga., 130 Fed.Appx. 308 (11th Cir. 2005). Accordingly, Lowe cannot establish a prima facie case and his claim must fail.

Even if this was an adverse employment action, Lowe cannot establish that he was treated differently than similarly situated individuals.  Lowe cannot compare himself to a similarly situated individual in order to establish that he was paid unfairly.  There was no reading coach at Daisy Lawrence.  A reading coach at a different school could not be compared to a reading coach (or similar position) at the alternative school.  The comparator must be almost identical.  Under Eleventh Circuit precedent, if two employees are not similarly situated, different application of workplace rules does not constitute illegal discrimination.  Lathem v. Department of Children and Youth Services, 172 F.3d 786, 793 (11th Cir. 1999).  Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (holding that similarly situated individuals are those who "have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating ... circumstances that would distinguish ... the employer's treatment of them").

Even if Lowe can establish a prima facie claim, he cannot present evidence of pretext regarding the legitimate, nondiscriminatory reasons articulated for why he was hired as a teacher-tutor.  At most, there was a misuse of words.  It is undisputed that there was NO position of

---

[45] It is undisputed that teacher-tutors and reading coaches make the same salaries but some reading coaches are 10-month positions which Lowe says would have yielded another month's salary.  However, Daisy Lawrence was a Title I school and if there had been a reading coach at that school, it would have been a Title I nine month position and therefore no compensation difference between a reading coach job and a teacher-tutor job.

reading coach at Daisy Lawrence the year in question.  (Barker Depo. p. 66 at lines 1-3).  The obvious is also worth stating here: (1) even if it were true that Defendants had negative feelings toward Lowe, there is no evidence that it was because of his mother, his race or his sex, rather, he was accused three times of mishandling children in three different schools, and (2) if Defendants had wanted to keep Lowe out of the school system for whatever reason, they certainly did not have to give him a second chance.  The idea that Defendants tricked him into a job different than the one he believed he was getting is disingenuous based on the facts surrounding his return to The Board in the fall of 2003.  Defendants could have legitimately let Lowe stay gone. There can be no evidence of discrimination surrounding his return to The Board.

Absent a showing of pretext, Lowe's claim regarding the teacher-tutor position fails as a matter of law.

### 2.    THE JOBS LOWE PLEAD IN HIS COMPLAINT

To make a *prima facie* case of failure to promote or hire due to race or sex discrimination, Lowe must establish, by a preponderance of the evidence, "(1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion (or hire); (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted."  *Barron v Federal Reserve Bank of Atlanta*, 129 Fed.Appx. 512, 516 (11th Cir. 2005) (quoting *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001)).

Defendants addressed each position individually here as set out in the Complaint.

### a.    Thelma Morris Elementary School - Summer Position

Lowe makes the allegation that he should have been given a chance to interview for a summer principal position at Morris Elementary but instead a black female (Easterling) was given the job.  (Lowe Depo. p. 249 at lines 5-18).  He says he did not interview for the position because it was not posted.  However, it is undisputed that there was not a principal at Morris Elementary hired by the Board in the summer of 2004.  Rather, the state department hired the individual for the summer session of its state funded program.  Lowe simply misunderstood the arrangement

to which he was not a party.  It is undisputed that Defendants did not hire Easterling for a position in the summer of 2004.  As such, Lowe cannot establish a *prima facie* case regarding this position. No such position existed and therefore no one received the job "instead of Lowe".

Lowe has not properly asserted a claim as it relates the administrative assistant position at Morris Elementary for the 2004/05 school year because said job constitutes a discrete act and was not listed in the EEOC charge or Lowe's lawsuit.  In the alternative, to the extent he is considered to have made a claim through his testimony such is addressed here.  Lowe asserts that Easterling should not have been allowed to interview for the administrative position for the 2004/05 school year when she was not certified.

Easterling was certified for the position when she took the job.  Johnson makes clear why Easterling was her choice for the position.  Lowe cannot establish that he applied for the position or was equally qualified for the position in order to establish a *prima facie* case of sex discrimination.  Even so, he presents no evidence that the legitimate, nondiscriminatory reason for Johnson's recommendation of Easterling is pretextual for sex discrimination.  Lowe's only assertion is that he was certified before her in that she was allegedly not certified when she interviewed for the job in question.  Even if such is true, there is no evidence that Defendants did not consider candidates that were going to be certified by the time the job was awarded.  Lowe provides no evidence about what were important qualifications to Johnson in order to contradict her testimony regarding same.  Lowe's opinion is not relevant.  <u>See</u> *Gamble,* <u>supra,</u> 132 Fed.Appx. at 266 (holding that plaintiff's assertions about the "successful 'candidates' alleged inferior qualifications are insufficient to demonstrate pretext" because the plaintiff "may not substitute his opinion - that job experience within the company renders an applicant more qualified" - for that of the employer) <u>citing</u> *Chapman,* <u>supra</u>*,* 229 F.3d at 1030-31 "rejecting plaintiff's claims that because he had certain qualifications that successful candidate lacked, employer's rationale - based on other criteria - was pretextual"; <u>also</u> <u>citing</u> *Combs,* <u>supra</u>, 106 F.3d at 1543.  Even if seniority of certification or number of degrees were a relevant consideration to

the decisionmakers, Lowe cannot establish "a qualification disparity of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [the successful candidate] over [the plaintiff] for the job." *Hithon v. Tyson Foods Inc.*, 2005 WL 1820041 at *4 (11th Cir.); *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001)(holding that disparities in qualifications must be so apparent that they "jump off the page and slap you in the face.")(citations omitted).   Again, Lowe's unsubstantiated opinions are irrelevant to this analysis. *Barrow v. Georgia Pacific Corp.*, 2005 WL 1926420 at * 3 (11th Cir.)(holding that plaintiffs claim failed when he presented only his own unsubstantiated opinion that he was qualified for the position in question).

As such, even if Lowe had preserved a claim as it relates to Easterling being awarded the administrative position for the 2004/05 school year, said claim would be due to be dismissed as a matter of law.

### b.    Southlawn - Schoolwide Instructional Assistant

Lowe claims the Principal of Southlawn recommended him for the position of SIA in the summer of 2004 but was not allowed to hire him.  (Lowe Depo. p. 425 at line 10-p. 426 at line 15). However, Minott clarifies that such is not the case.  (Minott Affidavit).   Arguably, Lowe can establish a *prima facie* case regarding this job if he is considered to have done so by meeting the minimum qualifications for the position.  However, there is no evidence of pretext. The interview process was held and the top choice was Cloud, a white female.  Cloud was the most qualified for the job.  Lowe states that Minott had to hire Cloud because of a lawsuit.  However, Minott did not even know about Cloud's lawsuit. (Barker Depo. p. 193 at line 15-p. 194 at line 5). Regardless, even is such were true, that is not evidence of race or sex discrimination.  To that end, Lowe is left with asserting that he was more qualified than Cloud in order to establish pretext. As is set more fully in the Undisputed Statement of the Facts, Cloud's qualifications and experiences were not inferior to that of Lowe's. However, the Eleventh Circuit has made clear that absent other evidence of discrimination, a claim based on the circumstantial evidence of

comparative qualifications, will not survive absent a showing that the plaintiff's qualifications were so superior to the successful applicant that the difference was so glaring that no reasonable, impartial person could have chosen the candidate selected for the position.  See *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000).  The case authority discussed in section b. above is adopted and restated herein.

Lowe's claim regarding the Southlawn job is due to be dismissed as a matter of law.

### c.      McKee Junior High School - Administrative Assistant

Lowe also claims that Abrams recommended him for the administrative assistant position in the summer of 2004 but he was not given the job.  (Lowe Depo. p. 282 at line 14-p. 283 at line 20, p. 284 at line 6-8).  For the sake of argument, Defendants assume Lowe can establish a *prima facie* case regarding this position.  However, much like the Southlawn position, Lowe's assertions are based on inadmissible hearsay and are far fetched based on what actually occurred.  Lowe was not even one of the top four candidates invited back for a second interview by Abrams. Abrams plainly states that he participated in the central office interview process and then invited four individuals back for on-site interviews.  Lowe did not make the cut.  (Abrams Depo. p. 13 at line 12-p. 14 at line 20, p. 26 at line 2-p. 27 at line 10).  Abrams did not feel that Lowe was one of the four best candidates based on the central office interviews.  (Abrams Depo. p. 42 at line 15-p. 43 at line 3, p. 45 at lines 10-15, 57 at line 22-p. 58 at line 10).  Moreover, Barker never discouraged Abrams or told him he could not hire Lowe.  (Abrams Depo. p. 29 at line 17-p. 30 line 2).  Barker had no input into who Abrams recommended for the job.  He never asked Abrams to reconsider recommending Lowe because Abrams never recommended Lowe for the position. Abrams simply did not feel that Lowe was one of the four top candidates for the job.  Defendants adopt and incorporate herein the discussion of comparative qualifications.  As such, he can show no evidence of pretext.

Lowe claims that Barker said that Abrams had to hire a woman but this evidence is inadmissible hearsay and cannot be consider for this court's analysis.  Even if the evidence was

admissible and even if it was considered direct evidence, such does not create a question of fact for the jury because it is undisputed that Lowe would not have been hired anyway. That is, if Lowe can establish such direct evidence, the Defendants must prove "that it would have made the same employment decision in the absence of discriminatory motivation." *Wall v. Trust Co. of Ga.*, 946 F.2d 805, 809 (11th Cir. 1991); *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774-76 (11th Cir. 1982); *Wilson v. City of Aliceville*, 779 F.2d 631, 634 (11th Cir. 1986). Lowe was not the second, third or fourth choice. One of the four individuals was a man. (Abrams Depo. p. 27 at lines 11-15). Lowe was not the most qualified for the job. As such, Lowe would not have received the job even absent the alleged intentional discriminatory motive. Summary judgment is therefore due regarding this position as a matter of law.

### 3.    Nonrenewals

Lowe admits that Daisy Lawrence closed in the summer of 2005 and does not make a claim regarding his nonrenewal. (Lowe Depo. p. 146 at line 23-p. 147 at line 4, 313 at line 23-p. 314 at line 9). Even if he did, based on the undisputed facts as set out above, Lowe could not present evidence of pretext regarding the decision to close Daisy Lawrence and therefore any such claim would fail.

Lowe was nonrenewed in the summer of 2002 after working at Southlawn. He claims this was his first sign of discrimination and retaliation. However, such a claim cannot be maintained because it occurred more than 180 days before he filed his EEOC Charge. As such, no Title VII claim can be maintained.    The rule of law is that  "[e]ach incident of discrimination and . . . adverse employment decision constitutes a separate actionable 'unlawful employment practice." *Thomas v. Alabama Council on Human Relations*, 248 F.Supp.2d 1105, 1115 (M.D. Ala. 2003) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 s.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002)).    The *Thomas* court further held that the "180-days begins to run when the

challenged employment decision is made and the employee received notice of it." Id. Moreover, to the extent that a §1983 claim is made based on this (or any prior non-renewals), said claims are barred by the two-year statute of limitations as well.

The attempted nonrenewal in the summer of 2004 is irrelevant because it never constituted an adverse employment action in that it did not take place due to a clerical error and Lowe was reassigned to work the 2004/2005 school year. See Stavropoulos v. Firestone, 2004 WL 345864 (11th Cir.) (holding in a retaliation case that the conduct the plaintiff complained of was not an ultimately employment action in order to constitute an adverse employment action because she did not lose a job, suffer lessening in pay or benefits and did not present evidence to reach the level of substantiality necessary to constitute an adverse employment action).

Even if Lowe argues that he was assigned with no real direction or what to do and that he was "confused" about his responsibilities, such does not rise to the level of an adverse employment action.   In the case of Azoy v. Miami Dade County, 2002 WL 22135963 (S.D. Fla.) the court found that the plaintiff failed to prove a serious and material change in the term and condition of her employment based on a transfer. In holding such, the court explained there was no evidence that the plaintiff received a demotion with the transfer, that she received a decrease in pay, that she received a decrease in classification or otherwise received a demotion with the transfer. Azoy at *5. In fact, the court specifically noted that the transfer resulted in nothing more than a change in location. Id. The court said that it "is reluctant to find this transfer as a serious and material change to the terms of plaintiff's employment, where there is not objective evidence that the transfer was a demotion." Id. It is without question that Lowe was not demoted but simply reassigned to Daisy Lawrence.

Based on the foregoing, Lowe cannot establish a case of race or sex discrimination regarding his nonrenewals with the Board.

4.    **The four summer of 2005 jobs referenced in Amended Complaint**

Again, Defendants reiterate that any claim for race or sex discrimination as it relates to these jobs was not preserved through the proper administrative steps as it relates to Title VII. The jobs in question arose *after* Lowe's filing of an EEOC Charge. Regardless, Lowe cannot create a question of fact regarding the positions as it relates to sex or race discrimination as a matter of law.

a.    **Lee High School - Special Education Teacher**
       **McKee Jr. High School - Special Education Teacher**

Lowe claims that the special education teacher positions at Lee High School and McKee are two of four jobs in the summer of 2005 (after Daisy Lawrence closed) wherein Lowe was recommended by the principal but central office would not recommend him for hire and/or the Board would not hire him. Lowe cannot state a claim for race or sex discrimination regarding the McKee job because the successful applicant was a black male. (Abrams Depo. p. 35 at lines 2-7). However, the job is discussed herein as it relates to the Lee job in the summery of 2005.

Lowe's opinion about these positions is misplaced. It is undisputed that Lowe was not certified as a special education teacher and that the individuals who received the jobs were. Although both principals spoke to Barker about Lowe in regards to a special education teaching position, Lowe was not certified. (Lowe Depo. p. 23 at lines 4-7). Neither was told he could not hire Lowe. Lowe seems to argue that he should have been allowed to get an emergency certification but there was no reason for such to occur. He provides no evidence that those similarly situated were allowed to obtain emergency certification. Barker explains that even if such was the case, Lowe never presented documentation to establish that he had the class work to obtain certification. Lowe simply cannot state a *prima facie* case as to these two positions as a matter of law because he cannot not establish that he was equally or more qualified than the individuals who received the jobs.

Even if Lowe could have established a *prima facie* case, he has no evidence of pretext regarding why other individuals were hired. The successful candidates had certification and special education experience. Lowe did not. To the extent that a comparative qualifications analysis applies, Defendants adopt and incorporate as if restated herein the legal case authority cited above regarding comparative qualifications. when attempting to establish pretext evidence.

Summary judgment is due to be granted on any race or sex discrimination claim as it relates to the special education teaching positions in the summer of 2005 at Lee High School and McKee Jr. High School.

### b. Booker T. Washington Magnet School - Administrative Assistant

A black male was awarded this position so there can be no race or sex discrimination claim. (Starks Depo. p. 41 at lines 3-7).

### c. Paterson Elementary School - Reading Coach

If Lowe could maintain such claim, he establishes a *prima facie* case regarding the reading coach position at Paterson in the summer of 2005 as it relates to a sex claim[46]. It is undisputed that the principal twice recommended him to human resources for the position. However, Lowe cannot offer evidence of pretext regarding the legitimate nondiscriminatory reasons that Barker and Purcell did not accept the principal's recommendation. Other than his opinion, Lowe offers no evidence to contradict the process by which reading coaches were hired through the interview process with the Office of Curriculum and Instruction. He also does not offer any evidence to contradict that he was not highly recommended after the committee interviewed him. He simply disagrees. Moreover, Lowe does not offer any evidence to contradict the explanation provided by Barker regarding why Lowe was not hired. (Barker Depo. p. 44 at line 8-p. 50 at line 22; Purcell Depo. p. 75 at lines 3-9, p. 78 at line 15-p. 81 a line 19). In short, Lowe has no evidence that (1)

---

[46]The successful candidate was black.

the committee considered race, sex, his association with his mother or his lawsuit, (2) he was not highly recommended by the committee, and (3) to contradict that because of the principal's background and because of the "at-risk" status of the school, Defendants wanted and needed a reading coach highly recommended from the interview committee.  Moreover, Lowe cannot offer evidence to contradict the superior qualifications of the successful applicant.  The idea that human resources and the superintendent simply recommend whoever the principal wants is completely contrary to the evidence presented (as more fully discussed in the statement of facts).

As such, Lowe's claim regarding the reading coach position in the summer of 2005 fails as a matter of law.

### 5.    Positions Not Properly Before The Court

Defendants maintain that the positions that Lowe testified about but that are not stated in his EEOC Charge, his Complaint or his Amended Complaint are not claims properly before the Court.  A plaintiff cannot simply say, "I have been discriminated against and retaliated against in every way regarding every job I have ever applied for. "  See e.g. *Cooley v. Great Southern Wood Preserving*, 138 Fed. Appx. 149 (11th Cir. 2005)(holding that Title VII plaintiff could not raise issue for first time in opposition to defendant's motion for summary judgment); *Williamson v. International Paper Co.*, 85 F.Supp.2d 1184, 1199 (S.D. Ala. 1999)(holding that one unclear statement in a complaint that was not consistent with other statements in the complaint, was insufficient to state a cause of action). This is especially true since Lowe could not testify about necessary qualities considered when hiring for the positions in question, the individuals who were awarded the positions or any evidence that the individuals were awarded the positions as a result of race or sex discrimination, a result of First Amendment violations or retaliation.  Because of the extreme length of this memorandum brief, Defendants address the positions summarily here in the event Lowe is considered to have made a claim regarding same:

Several of the positions were never filled, were filled by black and male applicants and otherwise do not have the factual basis to support a claim of any form of discrimination.  To the

extent that such claims are recognized and assuming Lowe could establish a *prima facie* case, Defendants have asserted that all the individuals hired in the subject positions were the most qualified individuals for the particular jobs based on the facts surrounding each one of the positions. Lowe repeatedly testified that he could not provide information that would contradict Defendants' legitimate, nondiscriminatory reasons for hiring other individuals. In many instances, he was unaware of who was given the position. In fact, he did not testify that he should have actually been awarded the positions, but that he could have been given opportunity interview. (Lowe Depo. p. 203 at line 18-p. 204 at line 2). To that end, he has no information about who selected the individuals to be interviewed. (Lowe Depo. p. 204 at lines 3-9). He also concedes that simply because a person of a different race was chosen, does not mean he was discriminated against. (Lowe Depo. p. 201 at lines 8-14).

To the extent that Lowe challenges any of the jobs in question based on his level of education as opposed to the successful applicant or that he has been certified for administration for some time, said evidence is irrelevant in light of the uncontradicted evidence that the person with the most education is not automatically hired and many, many The Board employees are certified in various fields for years before receiving relevant positions. (Barker Depo. at 198 at lines 14-18, p. 197 at line 18-p. 198 at line 13; Abrams Depo. p. 57 at lines 2-21; Lowe Depo. p. 48 at line 20-p. 409 at line 2; Starks Depo. p. 11 at line 23-p. 12 at line 11).

In short, Lowe ultimately presents no evidence of race or sex discrimination as it relates to the jobs stated in his Complaint, Amended Complaint or the other jobs he talks about in his deposition. If he in fact was ever not hired because of his history of problems with The Board as it relates to children, such is not an impermissible consideration. See *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 770 (11th Cir. 2005)(holding that plaintiff's negative focus on the department's problems as opposed to creating strategies for change was a legitimate, non-discriminatory reason for adverse employment action). See *Ritter v. Harvey,* 2005 WL 1868734 *5-6 (M.D. Ala.) (quoting *Garcia-Cabrera v. Cohen*, 81 F.Supp.2d 1272, 1280-81

(M.D. Ala. 2000) holding that "[i]t is beyond question that an inability to get along with co-workers and demonstrated caustic or rude behavior is a legitimate, non-discriminatory reason for an employment decision")).

To the extent that Lowe argues that it is not permissible to hire another applicant based on interview responses, such position is misplaced.  See *Rogers-Liberty v. Miami-Dade Cty.*, 184 F.Supp.2d 1273 (S.D. Fla. 2001)(holding that superior interview scores was a legitimate reason for a hiring decision and that the analysis of pretext evidence must be focused on the employer's beliefs, not the employee's own perceptions of his performance)(citing *Holified,* 115 F.3d at 1565)).

To the extent that Lowe argues that he was a strong performer and well-deserving of many if not all the jobs he ever applied for, this too is not evidence of intentional discrimination.  See *Moore v. Sears,* 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (noting"[i]t is well settled in employment discrimination cases ... that for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance[.]" (citing *Texas Dep't. Of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (other citations omitted).  Defendants' preference of any other candidate over Lowe is simply not alone evidence of race discrimination even if Lowe believes he was more qualified "on paper" or otherwise.  The Eleventh Circuit has stated, "[A] reasonable employer could prefer a person, like [successful candidate], who had served in a supervisory position with a competitor, rather than an individual within the company with some experience serving in the available position." *Gamble v. Aramark Uniform Services,* 132 Fed.Appx. 263, 266 (11th Cir. 2005) (citing *Chapman,* supra, 229 F.3d at 1030-31, *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir 1997)).

As it relates to all jobs discussed herein and if Lowe presents evidence of a *prima facie* case as to some of the jobs, he cannot present evidence of pretext.  Because Defendants have met their burden of production, Lowe must come forward with evidence:

> sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. (citations omitted). This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'"

*Vessels*, supra, 408 F.3d at 771 (citing *Cooper,* supra, 390 F.3d at 725).  Moreover, each of the race (or sex)-neutral reasons must be sufficiently rebutted.  *Chapman,* supra, 229 F.3d at 1037, n.30 (citing *Combs*, supra, 106 F.3d at 1543).

Summary judgment is due to be granted on all Lowe's race and sex discrimination claims.

### D.    RETALIATION - TITLE VII

Lowe asserts a retaliation claim against Defendants pursuant to Title VII. Specifically, Lowe alleges that he was retaliated against in regards to the all the employment decisions complained of because of his association with his mother who filed a lawsuit against the Board long ago when he was a young boy.  (Lowe Depo. p. 344 at line 22-p. 345 at line 4).  This claim would relate to the jobs he did not receive prior to the filing of his EEOC charge.

Lowe further complains that he suffered retaliation when he complained of race/sex discrimination in his EEOC charge (filed November 15, 2004) by being denied professional development and, by Amended Complaint, Lowe claims he was further retaliated against for filing a lawsuit (April 27, 2005) against the Board when he was not hired for four positions in the summer of 2005.

 In order to establish a cause of action for retaliation, Lowe must demonstrate that:

 (1) [he] participated in an activity protected by Title VII;
 (2) [he] suffered an adverse employment action; and
 (3) there is a causal connection between the participation in the protected activity and the adverse employment action.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) )citing *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999)).  The employee must prove intent. Here, Plaintiff cannot establish evidence regarding any element of this claim regarding any

conduct other than the EEOC charge and lawsuit, but even there, no "causal connection" can be established.  See also *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997); *Mangum v. West*, 2000 WL 206618 *3 (S.D. Ala. 2000).

The burden is the same as with a disparate treatment claim, if an employee establishes a *prima facie* case of retaliation, the employer carries the burden of offering a non-retaliatory reason for its acts.  See *Burdine,* 450 U.S. 248.  If the employer offers a legitimate reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the explanation was a pretext and that the employer took adverse action because of his protected activities.  *Burdine,* 450 U.S. at 256; *Mangum,* supra, 2000 WL 206618; *Combs,* supra, 106 F.3d at 1528.  The Board has articulated a legitimate non-retaliatory reason for each of its employment decisions as to Lowe.

### 1.    MOTHER'S LAWSUIT

Lowe claims that his mother filed a lawsuit that caused The Board to retaliate against him.  Such is not the case.  First, the relevant decisionmakers did not know about a lawsuit filed by his mother until Lowe filed his EEOC charge.[47].   Even then, the fact was only confirmed for Defendants when asking Defense counsel if any such case ever existed.   Because Barker and other relevant individuals accused of the wrongdoing that are central to the decision-making process had no knowledge of the protected activity (and therefore association therewith)[48], Lowe's association to his mother is irrelevant and a retaliation claim cannot be maintained based on said

---

[47]Minott said she heard rumors at some point but did not know anything about the claim or when it occurred.  Nevertheless, it is Lowe's position that Minott wanted him for the job but was not allowed to hire him.  Again, Minott confirms that she did not recommend Lowe for the administrative position at Southlawn and never communicated with central office about her decision.  She was not told she had to hire Cloud.

[48] Defendants adopt the facts set out as if restated herein regarding the various individuals' denial of knowledge regarding Lowe's mother's lawsuit with the exception of Minott who said that she heard, at some point, about charges but she did not know what the matter was about.  Regardless, Minott's action cannot be the focus of a retaliation case because Lowe alleges that she wanted to hire him.

evidence.  See  Clover, supra, 176 F.3d at 1354-1355 (holding that in the face of an affirmative denial from the decision-maker that he knew of plaintiff's alleged protected activity, plaintiff could not establish the causal connection element of a retaliation *prima facie* case); see also *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) (holding that to establish a causal connection in a retaliation case, plaintiff must demonstrate "that the person taking the adverse action was aware of the protected expression."); *Brochu v. City of Riveria Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002)(noting that "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge").

Moreover, even if the mother's lawsuit was known to the decisionmakers, it is undisputed that Lowe was given his first job with The Board *after* his mother's lawsuit.  In fact, he was hired numerous times thereafter.  There is simply no evidence to connect employment decisions regarding Lowe to the lawsuit of his mother filed many years before.  See *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001)(holding that even "very close" proximity between the protected activity and adverse employment action will not suffice in creating evidence of a "causal link"); see also *Wascua v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001)(three and one-half month gap between protected conduct and termination insufficient); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999)(transfer and termination, fifteen and  twenty months, respectively, after protected conduct too long to establish causality).

It is also relevant to note that Lowe's brother, Marvin Lowe, was hired after the lawsuit and has since enjoyed a prosperous career with the school system in a tenured position, as has Lowe's mother.  There is simply no evidence to connect the lawsuit of Lowe's mother to any employment decision made regarding Lowe.

Defendants note that Lowe makes several allegations about what has been said about his mother which are based on hearsay and double hearsay.  Such evidence would be inadmissible to the Court's analysis.  Morever, several of the allegations are based on things Lois Johnson

allegedly said.  There is no evidence that Johnson had any influence over any job Lowe applied for or discussed Lowe with any of the relevant person involved in making recommendations to the Board about Lowe.  Comments from nondecisionmakers are basically irrelevant to the court's analysis.  Remarks by nondecision-makers or remarks unrelated to the decision-making process are not direct evidence of discrimination.  See *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citing *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990); see also *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987)).  As it relates to Carolyn Hicks, the same would be true.  There is no evidence that Hicks played a decision-making role in Lowe's employment regarding any position in question.  Even if she could be considered a decisionmaker for the purpose of this Court's analysis, what she allegedly said is irrelevant. There is no evidence that if she in fact discouraged anyone from hiring Lowe that said "discouragement" had anything to do with his mother's lawsuit as opposed to his prior problems with the school system or for other reasons.  Again, Lowe's mother and brother are tenured employees with the Board.

The comments about Lowe's mother walking in on a conversation Barker was allegedly having is again inadmissible hearsay.  Moreover, saying that Lowe is "just like his mother" does not in any way mean that Lowe is being treated unfairly because of his mother's lawsuit.  Again, Barker did not know Lowe's mother filed a lawsuit against the Board until conducting discovery in this case which was not initiated until April 2005.

In the alternative, even if the allegations regarding these alleged comments create a *prima facie* case regarding Lowe's retaliation claim as it relates to his mother, Lowe is still unable to overcome the legitimate, nondiscriminatory reasons provided in the discrimination portion of this brief regarding the reasons he was not awarded certain positions.  To that end, all said argument and discussion as it relates to the *prima facie* case and pretext evidence regarding each job in question is adopted and incorporated herein for efficiency purposes.

### 2.    Other Alleged Complaints

To the extent that Lowe refers to any other complaints he might have made during the course of his employment or interviewing phase with The Board, he has not established that such complaints were "engaging in protected activity.  The law plainly states that it is an unlawful employment practice to discriminate against an individual if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing ..." § 704(a) of Title VII.  See *Clover v. Total System Services, Inc.,*176 F.3d 1346, 1350 (11th Cir.1999).   See also *Clark County School District v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 140 L.Ed.2d 509 (2001).  Lowe cannot establish that he had a good faith, reasonable belief that the employer was engaged in a unlawful discriminatory employment practice.   See *Harper v. Blockbuster Entertainment Corporation*, 139 F.3d 1385, 1388 (11th Cir. 1998) (citing *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997)).

Even if Lowe had made complaints about his pay based on what he believed to be race or sex discrimination, his retaliation claim still fails because said claims were not contained in his EEOC charge.  Title 42 U.S.C. § 2000e(5)(e)(1) dictates that a plaintiff must file a charge with the EEOC within 180 days after the alleged unlawful employment practice.  See *Mohasco,* supra 447 U.S.at 815.  Exhaustion of administrative remedies is a condition precedent to the filing of a Title VII action.  *Green v. Elixir Industries, Inc.,* 407 F.3d 1163, 1167 (11th Cir. 2005) citing *Gregory v. Georgia Dep't of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004).

Accordingly, Lowe's claim for retaliation based on alleged internal complaints that were not contained in his EEOC charge (except for those claims based on adverse employment action after his charge was filed discussed below) fails because he has failed to exhaust his administrative remedies regarding said claim.  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan,* supra, 536 U.S. 114.  "[D]iscrete discriminatory acts are not actionable if time barred, even when

they are related to acts alleged in timely filed charges." Id. at 102.  Regardless of the foregoing, Lowe does not present "connection" evidence as is discussed more fully herein.

### 3.    Filing of EEOC Charge

The Board concedes that Lowe can establish the first two elements of the retaliation cause of action regarding his EEOC Charge: he filed an EEOC charge and was sometime later non-renewed[49] and not hired for subsequent positions for which he applied.  However, Lowe cannot establish the final element of causation.  To that end, as stated above, even if any activity for which Lowe now attempts to argue was "engaging in protected activity" and was properly stated in a timely EEOC charge, causation cannot be established for the *prima facie* case.

Even if Lowe could establish causal connection evidence, he cannot present evidence of pretext as it relates to the legitimate, non-retaliatory reason for not being allowed to pursue his professional development request (which also does not constitute an adverse employment action as is discussed below) and his not being hired in a position for the 2005/2006 school year.   A plaintiff "cannot recast the reason but meet it head on and rebut it."  See *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004).

### a.    Professional Development

Lowe alleges that he was denied professional development after he filed an EEOC charge in retaliation for said protected activity.  Lowe's cannot present a *prima facie* case because (1) he did not suffer an adverse employment action, and (2) there is no causal connection.

Not attending the professional development conference in question is not an adverse employment action because it did not affect the terms or conditions of Lowe's employment.  The facts regarding same are adopted and incorporated herein as if stated in full.   In *Benefield v. Fulton Co., Ga.*, 130 Fed.Appx. 308, (11th Cir. 2005), the plaintiff employee complained that her

---

[49]  Again, Lowe does not make a claim regarding his non-renewal in the summer of 2005 because it is undisputed that Daisy Lawrence was closed and all non-tenured teachers were non-renewed.

employer took away her company car, pager, staff and duties, denied her reimbursement for cell phone calls and a work-related conference, transferred her from headquarters and took other action against her following a complaint. The Eleventh Circuit held as follows:

> None of these actions...constituted an ultimate employment action because [she] neither lost her job, nor suffered a lessening of pay, position, or benefits.
>
> ***
>
> In determining "substantiality," "not everything that makes an employee unhappy is an actionable adverse action." An adverse employment action, instead, involves conduct that "alters an employee's compensation, terms, conditions, or privileges of employment."

Id. at 313 (internal citations omitted). As such, any claim based on the denial of professional development is due to be dismissed as a matter of law. Alternatively, there is no evidence that the decision to deny the professional development request was because of Lowe's EEOC charge. Even if such a *prima facie* case could be made, Lowe presents no evidence to dispute the reasons given by Barker for the denial. Lowe also fails to dispute the evidence presented that other professional development requests are denied. He can present no appropriate comparator evidence. Defendants adopt and incorporate the facts as if restated here regarding other denials of professional development and Barker's reason for said denials.

Based on the foregoing, any claim regarding the denial of professional development is due to be dismissed as a matter of law.

### b.    Nonrenewal - Daisy Lawrence Closing

Lowe does not make a claim regarding his nonrenewal even though there is general reference thereto in his Complaint. Even so, Lowe has to present evidence that the reason provided for his nonrenewal is simply marked with inconsistencies and impossibilities such that a jury could not believe it. *Vessels*, supra, 408 F.3d at 771 (citing *Cooper,* supra, 390 F.3d at 725). It is undisputed, even by Lowe, that Daisy Lawrence closed and all non-tenured teachers were nonrenewed. There is no evidence of pretext regarding same.

### c.    Four jobs for the 2005/2006 school year

Lowe was not recommended for three of the four jobs in question.  There is no evidence, beyond Lowe's belief, that he was recommended for these positions except for the position of Reading Coach at Patterson Elementary School.  For brevity purposes, Defendants adopt and incorporate herein the discussion above as it relates to the Lee High School job and McKee Jr. High School job.  He was not recommended by either of these principals because he was not certified to teach special education.  As such he cannot maintain a *prima facie* case of retaliation. Moreover, both Sikes (Lee High School) and Abrams (McKee Jr. High School) deny having any knowledge of Lowe's EEOC charge or lawsuit at the relevant time in question.  Defendants adopt and incorporate herein the discussion about failure to establish a *prima facie* case if the decision-makers did not know of the protected activity.  Even though Sikes and Abrams were not the final decisionmakers, it is undisputed that they did not recommend Lowe to human resources for consideration.  To the extent that Lowe claims Barker knew of his EEOC charge and "blocked" his being hired as a special education teacher, such argument is also misplaced.  It is undisputed that Lowe was not certified as a special education teacher and it is undisputed that Barker told Sikes and Abrams that they could hire Lowe for said position if he was certified.  Lowe has no information to contradict this evidence.  In short, Lowe cannot create a *prima facie* case of retaliation as it relates to the special education teaching positions in the summer of 2005.

Lowe also fails to create a *prima facie* case of retaliation as it relates to the BTW job.  As is explained in detail in the Undisputed Statement of Facts, Lowe was not one of the top three choices recommended by the BTW principal, Starks, to human resources for consideration.  It is undisputed that she did not know about Lowe's EEOC charge or lawsuit.  As such, Lowe cannot establish the "causal link" regarding the BTW job as it relates to a retaliation claim.  *Bass*, 256 F.3d at 1119.

Defendants further assert that a *prima facie* case cannot be maintained regarding the reading coach position at Paterson.  Although it is undisputed that the principal recommend Lowe

for the job and Lowe was not hired, Lowe fails to present any evidence that would "connect" the decision to not hire him with his protected activity.

Even if *prima facie* cases existed for any of these four positions, summary judgment would still be due to be granted because Lowe cannot present evidence of pretext regarding the legitimate-nondiscriminatory reasons for hiring other individuals - - more qualified[50]. To that end, all pertinent legal authority discussed herein regarding comparative qualifications and legitimate reasons for employment actions is adopted and incorporated herein for the purposes of efficiency. Because Lowe cannot present evidence of pretext regarding the legitimate, nondiscriminatory reasons offered regarding his not being hired for the positions in question, summary judgment is due to be granted in favor of the Board on all his Title VII retaliation claims.

### D.    SECTION 1983 CLAIMS REGARDING EQUAL PROTECTION

Lowe  asserts a claim of race and sex discrimination under 42 U.S.C. §1983 pursuant to the Fourteenth Amendment.  Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 534, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).  Liability under §1983 is personal in nature, requiring intentional discrimination and cannot be imposed vicariously. See *Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995).

Section 1983 provides, in relevant part, that "every person who subjects or causes to be subjected any citizen of the United States....to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party in an action at law, suit in equity or other proper proceedings to redress."  Local governmental bodies such as school boards are "persons" within the meaning of §1983. See *Monell*, 436 U.S. at 690.  "Local governments are directly liable under §1983 . . . for constitutional deprivations resulting from (1) an unconstitutional

---

[50] And, Defendants specifically adopt as if quoted herein the factual citations regarding why Barker and Purcell insisted that a "highly recommended" employee receive the reading coach position at Paterson.

act taken pursuant to an officially promulgated policy, statement, decision, regulation or ordinance; or (2) governmental custom, even though not authorized by written law." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992).  However, a local governmental body such as the Board, cannot be found liable under §1983 on a *respondent superior* theory. *Oklahoma City v. Tuttle*, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985).  The Board is not liable for the acts of its employees unless Lowe establishes a constitutional violation caused by the Board pursuant to an official policy or custom of the Board. *City of Canton v. Harris*, 489 U.S. 378, 389-92, 109 S.Ct. 1197, 1205-1206, 103 L.Ed.2d 412 (1989).  Lowe must prove that an official policy or custom of the Board was the moving force behind the alleged constitutional deprivation. *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990).

An analysis of §1983 liability must begin with a determination of whether the plaintiff was deprived of any right protected by the Constitution. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452, 461 (1986) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); See also *Hope v. Pelzer,* 536 U.S. 730, 736, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002).

In the instant case, there is no evidence that Lowe was deprived of his right to equal protection under the Fourteenth Amendment of the United States Constitution.  Based upon the arguments and authorities presented above in the *McDonnell Douglas* analysis wherein it is clear that there is an absence of a deprivation of a constitutional right, Lowe's §1983 claims must necessarily fail against the Board.

Moreover, Lowe cannot point to an official policy or custom of the Board authorizing race discrimination against black employees, sex discrimination against male employees, or retaliation against employees for participation in a protected activity.  The United States Supreme Court recognized in *Monell*, that local governmental entities may be sued for constitutional deprivations pursuant "to governmental 'custom' even though such a custom has not received formal approval

through the body's official decision-making channels." *Monell*, supra, 436 U.S. at 690-91, 98 S.Ct. at 2035-36. However, the Eleventh Circuit Court of Appeals has held that random acts or isolated events are insufficient to establish custom. See *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Therefore, Lowe must show that his alleged constitutional injuries resulted from a "permanent and well settled" practice in order to rely on allegations of official custom. Id. There is no evidence of an official custom of the Board to discriminate against Lowe or any other individual on the basis of his race, sex or to retaliate against employees. See *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir. 1995)(holding that plaintiff's §1983 claim and Title VII claims for disparate treatment and hostile environment must fail because, among other problems with the case, the plaintiff failed to present evidence of 'practices' of discrimination). Although Lowe makes conclusory allegations regarding practices of the Board, there is no evidence to support such a claim. The Statement of Undisputed Facts provide numerous examples of male and black employees receiving various jobs with the Board.

Lowe cannot show by competent evidence that he suffered a constitutional violation on the basis of race, sex or in retaliation for protected activity. In the absence of any evidence of either a constitutional deprivation or a constitutional deprivation pursuant to Board official policy or custom, Lowe's §1983 claims must fail and the Board is entitled to summary judgment as a matter of law.

Assuming arguendo that some evidence of custom was presented against the Board, again, the *McDonnell Douglas* discussion above establishes that there was no constitutional violation here. (See p.24, ¶4, infra).

To the extent that Lowe makes a claim that the setting of his salary as a teacher-tutor was "arbitrary and capricious" said claim fails. (Complaint ¶19). First, Lowe fails to properly plead a substantive due process claim such that an "arbitrary and capricious" analysis is applicable. Second, as a non-tenured teacher Lowe cannot establish a property interest in his job.

*Carmichael v. Chambers Cty Bd. Of Ed.*, 581 F.2d 95 (5th Cir. 1978).  Therefore, he is not due to be afforded substantive due process protections in relation to his job or compensation for that job. Regardless, based on the undisputed evidence, Lowe signed a contract to be a teacher-tutor and he was paid like all other teacher-tutors.  Barker explained the differences between a teacher-tutor and a Reading Coach which cannot be consider arbitrary or capricious.  Defendants adopt and incorporate herein all facts stated in the brief regarding compensation for teacher-tutors and Reading Coaches.  In short, the two positions have an identical pay scale.  Some, but not all, Reading Coaches are paid for 10-months because they have an additional month of responsibilities pursuant to their job description.  Lowe did not work this additional month without compensation.  He did not suffer a constitutional violation based on the manner in which he was paid as a teacher-tutor.  Regardless, under the standard for establish §1983 liability, Lowe cannot establish that there was a policy or well-settled custom or practice of classifying jobs and compensation for those jobs in an "arbitrary and capricious" manner.  Lowe does not even assert such.

     **E.**     **SECTION 1983 - FIRST AMENDMENT**

     Lowe attempts to state a claim pursuant to §1983 in arguing that The Board retaliated against him for exercising his First Amendment rights and for his association with his mother.

     **1.**     **Retaliation Pursuant to First Amendment**

     First, Lowe's claim fails because he does not establish in his Complaint what free speech he undertook.  If one is to assume that he refers to any alleged voicing of disagreement regarding employment decisions made regarding him, the claim still fails because such complaints do not meet the standards necessary to maintain a First Amendment retaliation case.  That is, Lowe cannot establish a constitutional violation based on alleged First Amendment violation.  In cases

where an employee has suffered an adverse employment action[51] allegedly in retaliation for exercise of the right to free speech, the United States Supreme Court has applied a four-part test that was first enunciated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). First, the court determines the threshold issue of whether the employee's speech may be fairly characterized as constituting "speech on a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987). If the speech is of public concern, the court then applies a balancing test which weighs "the interest of the state as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, supra, 391 U.S. at 568. The context and circumstances of the employee's speech must be considered. *Rankin, supra,* 483 U.S. at 388. If the employee prevails, the question becomes whether the employee's speech played a "substantial part" in the decision to discharge the employee. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Fourth, if the employee prevails by demonstrating that the speech was a substantial factor in the discharge, the employer must prove that "it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, supra,429 U.S. at 286. The employer must show that it had a legitimate business reason for the employment decision. *Vista Community Serv. v. Dean*, 107 F.3d 840, 844-45 (11th Cir. 1997).

### a.    Matter of Public Concern

Again, in determining whether there has been a First Amendment violation, the Court must first determine whether Lowe's speech may be fairly characterized as constituting speech on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 75 L.Ed.2d 708, 103 S.Ct. 1684 (1983). Lowe bears the burden of proof on this issue and must "state with precision and detail all of the incidences of speech that [he] considers to be protected." *Kurtz v. Vickery*, 855

---

[51] For purposes of summary judgment, Defendants admit that the occasions referenced in the Complaint as failures to hire would be considered adverse employment actions  Defendants do not concede that any other alleged conduct, including the issues surrounding his attempt to speak at a professional development conference, constitute adverse employment action. Even if it were, Lowe cannot maintain a First Admendment claim regarding such.

F.2d 723, 730, n.4 (11th Cir. 1988).  See also, *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988), *cert denied*, *sub nom Leon v. Avino*, 489 U.S. 1013, 103 L.Ed.2d 187, 109 S.Ct. 1124 (1989).  Lowe does not set out in his Complaint his alleged speech on a matter of public concern. In fact, in the context of his deposition, he never references any speech that would fall within this category.  As such, Lowe's First Amendment claim is due to be denied as a matter of law. Assuming for the sake of argument that Lowe's First Amendment claim is based on the alleged protest of certain employment decisions as they related to him, his claim still fails because said protest does not rise to the level of speech of public concern.   In determining whether Lowe's speech can be fairly characterized as speech on a matter of public concern, the Court must examine the content, form, and context of Lowe's speech, as found in the record, to determine whether the speech addresses a matter of public concern.  *Rankin,* supra, 438 U.S. at 385.

The Eleventh Circuit recognizes that the most important factor in analyzing whether speech addresses a matter of public concern is the content of the statement at issue.  *Deremo v. Watkins*, 939 F.2d 908, 910-11 (11th Cir. 1991).  The Eleventh Circuit also emphasizes consideration of whether the speaker is in pursuit of purely private interests.  *Deremo*, supra, 939 F.2d at 911, n.3. The aforementioned considerations were part of the public interest test enunciated in *Connick v. Myers*, 461 U.S. 138, 75 L.Ed.2d 708, 103 S.Ct. 1684 (1983).  As demonstrated in the case authority discussed below, the content of Lowe's statements were personal complaints regarding whether he was hired for particular jobs and/or whether he should be allowed to participate professional development of his choosing.

The Eleventh Circuit has held under the *Connick* test that "a public employee may not transfer a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986).  Under the Eleventh Circuit analysis, the Court should consider the employee's efforts to communicate his concerns to the public, the content of the speech, and the employee's motivation in speaking.  *Deremo,* supra, 939 F.2d at 910-11.

The Eleventh Circuit on numerous occasions has determined that an employee's speech represented a personal grievance rather than a matter of public concern.  In *Ferrara,* supra, 781 F.2d at 1516, the Eleventh Circuit considered a teacher's free speech claims in light of their content.  The teacher was complaining about collegiant registration and out-of-field teacher placement of physical education teachers and athletic coaches.  He also complained that a physical education teacher who was not certified in the field of social studies had been assigned to teach the course.  He suggested that out-of-field placement of teachers contributed to "civic illiteracy." The Eleventh Circuit agreed with the teacher that "the question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum." (citations omitted).  *Ferrara,* supra, 781 F.2d at 1515.  However, it nonetheless held that it was clear from the context within which the teacher's speech arose that the speech did not relate to a matter of public concern. *Id*.

Likewise, in *Williams v. Alabama State University*, 102 F.3d 1179 (11th Cir. 1997), the Court held that a professor's criticism of a textbook was not a matter of public concern.  The Court held that the plaintiff's activities in *Williams* more closely "concerned internal administration of the educational system and personal grievances."  (citations omitted).  *Williams*, 102 F.3d at 1182.

The Seventh Circuit Court of Appeals considered a speech psychologist's claims that her First Amendment right to free speech under 42 U.S.C. § 1983 was violated in *Khuans v. School Dist. 110*, 123 F.3d 1010 (7th Cir. 1997).  The plaintiff, a public school psychologist, had complained about the departure of her supervisor from what the plaintiff and other special education employees believed were proper legal procedures governing special education services.  She continued her complaints about her supervisor and spoke with the superintendent of education.  During that meeting, she discussed the propriety of some changes in special education services that the supervisor had planned and that the superintendent had approved.  The Seventh Circuit Court of Appeals in reviewing the plaintiff's speech indicated that her speech concerning the supervisor's failure to follow the Individuals with Disabilities Education Act mandates would

have involved a matter of public concern. The Court held that if that had been the only expression or complaint made by the psychologist, then the defendants would not have been entitled to qualified immunity. However, the Court noted that "this tidbit of speech on a matter of public concern was only one of a bagful of complaints" regarding the supervisor about whom the plaintiff spoke. *Khuans*, supra,123 F.3d at 1016. The plaintiff complained to the superintendent that her supervisor was often not found on the campus and that the supervisor had a tendency toward hostility and argumentation. The Court held that the plaintiff's comments, except for the few concerning the Individuals with Disabilities Education Act violations, concerned solely private employment matters. The plaintiff was not whistle blowing with regard to the Individuals with Disabilities Education Act compliance, but rather was airing her strong conflict with her supervisor. Because *Khuans* was analyzed under the *Pickering* test when the employee was terminated, it is instructive in the present case. Lowe's complaints and voicing of protest (assuming such occurred) without question arose as a result of his personal grievance regarding his employment status with the The Board. To the extent that Lowe's complaints related to his employment status, such analysis is appropriate pursuant to a Title VII retaliation claim. Such a claim is designed specifically to handle matters wherein a Plaintiff is treated adverse because of engaging in protected activity. The Board maintains that to the extent that retaliation is relevant, it is not pursuant to a First Amendment claim because Lowe's complaint did not meet the pertinent standard of matter of public concern. See *Akins v. Fulton Cty*, 420 F.3d 1293 (11th Cir. 2005). As such, any claim Lowe makes pursuant to the First Amendment is due to be dismissed as a matter of law.

### b.   Lowe Was Not Nonrenewed or Not Hired *but for* His Alleged Complaints

Assuming *arguendo* that any of Lowe's complaints rose to the level of public concern, Lowe's First Amendment retaliation claim should still be dismissed as a matter of law. For the sake of argument, even if one assumes that Lowe established a free speech exercise and

prevailed in regards to the balancing test, Lowe cannot overcome the substantial evidence that his nonrenewal and/or non-hiring in any incident were wholly unrelated his to complaints.

Lowe fails to establish the underlying issue – that he was ever nonrenewed or not hired in any way **based on the fact** that he made complaints regarding various job decisions. There is no evidence that any complaint Lowe made to Barker, the Superintendent or anyone else was a *substantial factor* in the decision to nonrenew him or to not hire him for a certain position. To avoid being redundant, The Board adopts and incorporates herein the 'legitimate, non-discriminatory - failure to prove pretext' argument articulated above as it relates to Lowe's Title VII discrimination and retaliation claims. Based on the foregoing, Lowe fails to establish a question of fact regarding a constitutional violation as it relates to The Board.

To that end, even if Lowe could create a genuine issue of fact regarding the "substantial factor" part of the *Pickering* analysis, it still remains true that Lowe would nevertheless have been nonrenewed and not re-hired after making any complaint he alleges to have made.

As it relates to his non-renewal in 2005, it is undisputed that the school was closing. All personnel were dismissed from that school. Lowe was not recommend for hire for any other position, other than for Reading Coach at Patterson Elementary. Barker and Purcell explained why the decision was made to hire a different person other than Lowe. Lowe does not provide any evidence to contradict this explanation. The fact that he disagrees with the decision is irrelevant and not pertinent to the Court's analysis.

The same evidentiary problem exists for Lowe regarding any other position he did not receive. There is simply no "connecting evidence" between Lowe's voicing of complaints and the adverse employment actions alleged by Lowe. The complaints cannot be seen as a *substantial factor* in the employment decisions complained of by Lowe.

### 2.   Association Claim Pursuant to First Amendment

Lowe also makes general reference that his First Amendment rights were violated because of his association with his mother. This claim is analyzed under the *Mt. Healthy* and *Pickering*

framework as discussed above.  Thus, under the applicable test, Lowe must establish that his "association with his mother" was a constitutionally protected activity and a substantial or motivating factor in his failure to be hired for the positions in question.  See <u>Wilson v. Taylor</u>, 733 F.2d 1539 (11th Cir. 1984).  <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1124 (11th Cir. 2001) sets out a three prong test in which to evaluate an association claim such as Lowe's: (1) plaintiff must demonstrate a constitutional right to an association, (2) the plaintiff must establish that he or she "suffered an adverse employment action for exercising that right", and (3) if both elements are satisfied, the Court used the *Pickering* balancing test to determine whether the adverse employment action was permissible.  <u>Id.</u>

Lowe's claim fails first because he cannot establish that association with his mother falls under the "certain circumstances" that must arise for a plaintiff to be afforded constitutional protection of association.  <u>See</u> <u>Brew v. School Bd. Of Orange Cty</u>, 626 F.Supp. 709, 717 (M.D. Fla. 1985) <u>citing</u> *Wilson,* <u>supra</u> at 1542-44.  Even if the Court finds that he has sufficient pled such a claim and that Lowe has a constitutional right of association with his mother, Lowe cannot establish that his relationship with his mother is in any way related to any of the adverse employment actions that he complains about.  As is discussed more fully in the Title VII retaliation portion of this brief regarding Lowe's mother's lawsuit, much of what Lowe offers about Defendants' feelings toward his mother and his likeness to her is based on inadmissible hearsay that cannot be considered opposition to the motion for summary judgment (such as Barker's alleged statements to Owens which Owens denies).  None of the statements allegedly made were made by relevant decisionmakers in the matters properly before the Court.  Barker was allegedly taking about Lowe's mother on one occasion (again this is hearsay evidence) but that conversation cannot be linked to any decision to not hire Lowe for a position discussed herein. The only job wherein a principal recommended Lowe, and he was not hired, was the Reading Coach position at Paterson.  Defendants adopt and incorporate herein all discussions regarding that job and why the decision was made to not hire Lowe as if restated herein.  The alleged

87

comment by Barker was not made in connection with the job.  It is not clear when the alleged statement was made.  He was hired initially long after Defendants were sued by her.  By Lowe's own admission, it was his mother's conversation with Carter that allowed in entry back into the school system.  His brother, Marvin, was enjoyed a successful career as Director of Guidance with the school system.  Obviously Marvin's association with his mother is equal to that of Lowe's.  In short, there is no evidence to establish that Lowe's association with his mother was a substantial factor in the decision to not hire Lowe for the Reading Coach position or any other position in question.  It has no connection to the nonrenewals (if the nonrenewals were a basis for any claim), denial of professional development or Lowe's compensation for the position he held with Defendants.

### 3.    No §1983 Liability for Alleged First Amendment Violations

Alternatively, as it relates to the retaliation for free speech and association claims pursuant to the First Amendment, the Board cannot be held liable based on §1983 because Lowe does not identify an official policy, or pervasive and well-settled custom or practice, or a final policymaker responsible for the allegedly adverse employment actions.  See *Caruso v. City of Cocoa*, 260 F.Supp.2d 1191, 1209 (M.D. Fla. 2003).  Lowe does not even plead that there is a policy and custom of First Amendment violations of free speech and association.  He does not allege that the actions of one person created policy of the Board.  Regardless, no evidence exist to establish such.  To that end, Lowe never even attempted to complain to the Board - - the undisputed ultimate decisionmaker in any employment action.  It had no opportunity to correct a free speech or association problem even if one existed.  It is impossible to establish a policy or custom of the Board based on the evidence before the Court.  As such, regardless of whether there is a question of on the merits of a First Amendment claim, Lowe's claims fail because he cannot establish liability pursuant to §1983 standards.

F.    STATE LAW POLICY CLAIM

Lowe claims that Defendants violated its policy by not paying Lowe as a Reading Coach because he performed the same job as a Reading Coach. Pursuant to *McCord-Baugh v. Birmingham City Board of Education*, 2002 WL 228056 Ala.Civ.App. 2002, *reversed on other grounds*, a school board employee may make a claim of implied contractual terms of employment between themselves and the school board based on the school board's policies and procedures, only under certain circumstances. However, the *McCord-Baugh* Court makes clear that the question turns on traditional contract law principles of offer, acceptance and consideration. Id. at *3. That is, the cases in Alabama involving whether an implied contract could be enforced against the Board pursuant to its own policies all regard whether employment can be terminated under circumstances that the employee argues are a violation of Board policies. See i.e. *Belcher v. Jefferson County Bd. of Educ.*, 474 So.2d 1063 (Ala. 1985); *Baker v. Oneonta City Bd. Of Educ.*, 519 So.2d 1350 (Ala.Civ.App. 1995). However, none of the case authority "creates an independent, per se cause of action in favor of an employee against a school board merely for violations of a school board's policies and procedures. The claims against Alabama school boards that have been upheld in this regard have been based upon some other underlying theory . . . " *McCord-Baugh v. Birmingham City Bd. of Educ.*, 2002 WL 228056 at *5.

First, Lowe does not present a policy that was allegedly violated other than to generically say that there are policies involving "schedule placement". (Complaint ¶21). While Lowe asserts a discrimination claim that he should have been awarded a position as Reading Coach, it is undisputed that he accepted a job as a teacher-tutor and paid pursuant to the scale for said position. In fact, as discussed throughout, the salary schedule for a Reading Coach and teacher-tutor is identical. Some Reading Coaches are 10 month positions and are therefore paid during the additional month of work. However, the salary schedule does not differentiate between the *responsibilities* of the two positions. Therefore, even if it is true that Lowe had similar or even the same responsibilities as Reading Coaches, there is no basis for asserting that he was paid

89

improperly pursuant to policy unless he was required to work for 10 months, as opposed to 9, without compensation for the work.  Such is undisputably not the case.

Defendants assert that the Court should not exercise supplement jurisdiction over this claim and if the Court chooses to do so, summary judgment is due to be granted in favor of Defendants in that there has been no policy violation to base a claim upon which relief can be granted based on the undisputed facts of this case.

## IV.    CONCLUSION

Lowe cannot present evidence that any employment decision was ever made based on an impermissible reason.  Summary judgment is due to be granted in favor of all Defendants on all claims brought by Lowe and this case dismissed as a matter of law.

Respectfully Submitted this the 3rd day of April 2006.

MONTGOMERY COUNTY BOARD OF EDUCATION, VICKIE JERNIGAN, MARK LABRANCHE, TOMMIE MILLER, MARY BRIERS, DAVE BORDEN, HENRY A. SPEARS, BEVERLY ROSS, and DR. CARLINDA PURCELL, Defendants,

By: /S/  James R. Seale
    James R. Seale (3617-E-68J)
    Elizabeth Brannen Carter (3272-C-38-E)
    Jayne L. Harrell (6544-Y-85H)
    HILL, HILL, CARTER,
        FRANCO, COLE & BLACK, P.C.
    Post Office Box 116
    Montgomery, Alabama 36101-0116
    (334) 834-7600
    (334) 263-5969 - fax
    E-mail: jrs@hillhillcarter.com
    E-mail: ecarter@hillhillcarter.com
    E-mail: jharrell@hillhillcarter.com
    Counsel for Defendants
    wwm/6630.0157/f:Brief.wpd

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this date electronically filed the foregoing *Memorandum Brief in Support of Motion for Summary Judgment On Behalf of Defendants Montgomery County Board of Education, Vickie Jernigan, Mark Labranche, Tommie Miller, Mary Briers, Dave Borden, Henry A. Spears, Beverly Ross, and Dr. Carlinda Purcell* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: William F. Patty, Esquire (bpatty@beersanderson.com) this the 3rd day of April, 2006.

/S/   James R. Seale