1    what else am I to think, that the

2    principals initiate -- excuse me -- who

3    you want to return and who you do not

4    want to return.  And I clearly knew.  We

5    sat down.  I clearly knew who was

6    provided -- who was to be given a

7    nonrenewal.  Just as I sat with her on

8    numerous occasions and did teacher

9    evaluations, I knew.

10  Q.  Okay.  So your evidence that that was

11      discriminatory is that Tina Minott, the

12      principal, was not the one who asked for

13      your nonrenewal?

14              MR. PATTY:  Object to the

15                  form.

16                  Go ahead.

17  A.  To answer your question, Ms. Minott told

18      me very clearly on several occasions --

19  Q.  Mr. Lowe.

20  A.  Yes.

21  Q.  I'm not questioning that she told you

22      that.  It's your testimony --

23  A.  Okay.

1  Q.  -- and I'm with you.

2  A.  Yes.

3  Q.  My question is:  Is that the evidence

4      that you have that it was discriminatory

5      to nonrenew you at this Spring or Summer

6      of 2002?

7                    MR. PATTY:  Object to the

8                    form.

9                    Go ahead.

10 A.  That is in a series of events that have

11     lead me to feel that I have been

12     discriminated against and retaliated

13     against.  That is in a series.  That is

14     among other events.

15 Q.  Okay.  Well, I thought you said that was

16     the first.  Tell me what --

17 A.  That was the -- yes, ma'am, I'm sorry.

18 Q.  Okay.  Hang on.  Let me finish my

19     question.

20 A.  Yes.  Your question?

21 Q.  And I'm not trying -- I mean, that's

22     what I need to know, because we're going

23     through some background stuff, and we're

1    really not quite finished doing that.

2    But obviously, to me, the coconut today

3    is your claims and what you believe was

4    discriminatory.  And one of the things I

5    need to try to do is weed out or focus

6    in on what employment actions that you

7    are saying were discriminatory or

8    retaliatory against you.

9          And my question is, first of

10    all:  Am I clear that you believe that

11    being nonrenewed that year was an act of

12    discrimination and/or retaliation

13    against you?

14  A.   Yes, I do.

15  Q.   And was that the first time that you

16    believe that you had been discriminated

17    against or retaliated against?

18  A.   That is one of the first events.  That

19    is the first event that I can almost

20    without a shadow of a doubt say yes,

21    this was direct discrimination and

22    retaliation.  As far as being the first,

23    that is the first in a series.

1  Q.  Right.  And we'll get to that.  And

2      maybe I should ask the question a

3      different way:  You worked for them the

4      first year at Daisy Lawrence?

5  A.  Yes.

6  Q.  Was there anything that occurred that

7      year or your nonrenewal at the end of

8      that year that you maintain here today

9      was retaliatory or discriminatory?

10 A.  No, I do not.  In fact, Ms. Johnson

11     clearly communicated to me, We are --

12     and this is public record --

13     restructuring Daisy Lawrence, and all of

14     the nontenured teachers are being

15     terminated, pink-slipped.

16              MR. PATTY:  Liz, when we get

17                   to a good point, it's

18                   been an hour and five

19                   minutes, so let's take

20                   a break.

21              MRS. CARTER:  Okay.  Let me

22                   kind of get though

23                   this --

1    A.    Yes.

2    Q.    And so it's your testimony that you feel

3          like that was an act of discrimination

4          or retaliation when you were nonrenewed

5          in the Spring of 2002?

6    A.    It was both discrimination and

7          retaliation.

8    Q.    Okay.  And what type of discrimination

9          against you was it?

10   A.    When you --

11                   MR. PATTY:  Object to the

12               form.

13                       But go ahead.

14   A.    Look at best practice.  And the

15         authorities there are provided, the

16         administrators in Montgomery County as

17         with other districts, but we're talking

18         about Montgomery County.  If the

19         principal did not order the nonrenewal,

20         is this normal practice for whatever

21         reasons, nonrenewals are given without

22         the sanctions of the administrator.

23   Q.    Okay.  And I think that I understand

1   your testimony, that you did not find

2   that to be best practice or normal

3   practice.  How is that discriminatory

4   against you?  How is that discrimination

5   against you?

6  A.  Do you do this with all of your

7   employees?

8  Q.  I know.  What form of discrimination was

9   it?

10  A.  Well --

MR. PATTY:  Object to the

11   form.

12

Go ahead.

13

14  A.  You didn't do it to all of the other

15   nontenured black male teachers at

16   Southlawn or at large in the district.

17  Q.  So do you believe it was race

18   discrimination and sex discrimination

19   based on your race and your sex?

20  A.  Yes.

21  Q.  Were there other black male nontenured

22   employees in the district who were not

23   treated like that?

1   A.  Yes, there were.  In fact, there was one

2       that I taught next door to who was a

3       nontenured, African-American --

4       Afro-American male, who the

5       administrator did not request a

6       termination for.  And he did not get

7       one.  Mr. Pedro Lewis (phonetic).

8       Taught the same subject, same grade that

9       I taught, different subject.  Less years

10      of experience and less education than I.

11  Q.  So you were treated differently than

12      somebody who was just like you as far as

13      your race and your sex?

14  A.  Yes.

15  Q.  What about retaliation?  What type of

16      retaliation are you talking about?

17  A.  Retaliation can take on a number of

18      hats.  Some of the retaliation I denoted

19      was my position with Mr. Barker, my

20      position with Clinton Carter.  And you

21      did not mention, but I have to give you

22      the background for the foreground, there

23      was an incident that took place at

1    Southlawn.  I was -- I don't want to use

2    the word "victorious," but I was

3    successful in proving my innocence.  I

4    did not voice the opinion that

5    Mr. Barker positioned me nor the school

6    board investigator or the indirect

7    position of Mr. Carter.  Because I did

8    not do that, I am denoting that all of

9    those factors played into the

10   retaliation of me being given a

11   nonrenewal outside the sanctions of the

12   principal at the end of that year.

13  Q.  Because you felt like that because --

14   that you had been successful over them

15   in some type of investigation regarding

16   allegations of misconduct against you?

17  A.  And some allegations with a particular

18   student, yes.

19  Q.  That a student made against you?

20  A.  Yes, that a student made against me.

21  Q.  And you felt like they were retaliating

22   against you because of that?

23  A.  Well, they didn't do this with

1    everybody.  All of the other teachers

2    who were nontenured, including the ones

3    that were on faculty who were of male

4    gender and of Afro-American dissent,

5    this did not take place with them.

6  Q.  At that point in your career, had you

7    ever made a complaint of race

8    discrimination or sex discrimination to

9    the school system?

10  A.  No, I had not.

11  Q.  Had you ever gone to the EEOC and made

12    the kind of complaint at that point in

13    your career, in the Spring of 2000?  I'm

14    saying spring.  I guess by then it was

15    Summer of 2000.

16  A.  No.  No, I did not.

17  Q.  Okay.

18              MRS. CARTER:  All right.

19              Let's -- if you want to

20              stop now, that's fine.

21              (Whereupon a brief recess

22              was taken.)

23

**BY MRS. CARTER:**

Q. We got a little off track talking about the claims. Let's back up for a second, if you don't mind, Mr. Lowe, and finish your history. Because you came -- you went to Bullock -- you started Bullock County, but we finally figured out that you came back to Montgomery County in October of 2003, went to Daisy Lawrence Alternative School where Dr. Owens was the principal?

A. Yes, we did stop there.

Q. So you taught the '03-'04 school year as a teacher at Daisy Lawrence?

A. I did not teach.

Q. Okay. What did you do?

A. I was the reading coach.

Q. Reading coach. Okay. Why do you say that you were a reading coach as opposed to a teacher?

A. Dr. Owens interviewed me for a reading coach position. He informed central office that he wanted to hire me as the

MR. PATTY:  Sure.

MRS. CARTER:  -- so I don't

get confused about it.

MR. PATTY:  Right.

BY MRS. CARTER:

Q.  Okay.  And so the answer is no, there was no discrimination or retaliation that you're aware of that occurred at the end of that first year that you taught?

A.  No, there was not.

Q.  Okay.  So then you teach the next year at Fitzpatrick.  Do you believe that anything that occurred to you during the course of that year was discriminatory or retaliatory towards you?

A.  To answer that, I did not get a pink slip.

Q.  Okay.  Anything else that you'd like to tell us about today that you believe was retaliatory or discriminatory against you in regards to your job at Fitzpatrick?

1   A.   To answer that again, my only sole

2         purpose at that time was to teach.  I

3         did not get -- Ms. Thompson did not

4         issue me a pink slip.

5   Q.   So the answer is no, there's --

6   A.   So no, I was free and clear that year.

7   Q.   And then you get transferred to

8         Southlawn, and you work with Tina

9         Minott.  I think you've testified you

10        had a good year there?

11  A.   Yes.

12  Q.   But at the end of that year, you were

13        nonrenewed?

14  A.   Yes, I was.

15  Q.   And Ms. Minott represented to you that

16        that was not her doing?

17  A.   Exactly.

18  Q.   And based on that, you felt like

19        something was wrong or that something --

20        I don't know what your testimony was,

21        but that that wasn't normal, that she

22        didn't request your nonrenewal, but that

23        you were yet nonrenewed, correct?

1     reading coach, which was a position he

2     had available. That was the reason I

3     was allowed to leave Bullock County,

4     because I was returning as a reading

5     coach. And that is the job that I

6     performed.

7   **Q.**  How do you know what Dr. Owens told

8     central office?

9   **A.**  I was present when he communicated to

10    Ms. Hicks.

11  **Q.**  By phone?

12  **A.**  By phone. By speakerphone.

13  **Q.**  Let me show you what we'll mark as

14    Defense Exhibit 1. And it's titled

15    Montgomery Public Schools Personnel

16    Change Form. I'm going to put this

17    where there's -- it's kind of blurred

18    where that's been filled in there. And

19    this looks to be the personnel action

20    sheet they fill out when they get a hire

21    or they have them for nonrenewals or

22    when they're transferred. Are you

23    familiar with that document?

(Whereupon Defendants'

Exhibit No. 1 was marked

for identification and

attached hereto.)

(Witness reviewed document.)

A.   I've heard of such, but I've never seen

it.  Well, when I say I've never seen

it, I saw it in the documents that

Attorney Patty received.  I was never

informed that any such was being done.

And, of course, a correction, because

I'm not a female.  But I've never seen

this.

Q.   Okay.  I'm going to show you what I'll

staple as two documents and label as

Defense Exhibit 2, which is the Specific

Letter of Appointment dated in October,

and it says for re-hire.  And then

you'll see on the second letter, and

I'll hand this to you in a second, where

it says Re-hire Correction Letter.  And

it looks like to me they were correcting

that this first one inadvertently said

1 you were part-time.  When you came back

2 in October of 2003, you were a

3 full-time?

4 A. I brought that to their attention.

5 Q. Okay.  And then, I guess they corrected

6 that then; is that right?

7 A. Let me look at this.

8 Q. Yeah, just take a look at those two

9 letters.

    (Whereupon Defendants'

    Exhibit No. 2 was marked

    for identification and

    attached hereto.)

    (Witness reviewed

    documents.)

16 A. This is.  Because I remember I brought

17 it to their attention that I was not

18 part-time, that I was full-time.  I

19 still reiterated that I am a reading

20 coach and not a teacher.

21 Q. But both of those letters have you

22 positioned as a teacher?

23 A. Uh-huh (affirmative response).

1   Q.   Do you maintain that there would be a

2        salary difference if you had been a

3        reading coach?

4   A.   Yes, I do.

5   Q.   Okay.  And what's the difference in that

6        salary?

7   A.   There's an extra month of employment

8        that reflects a different salary.  The

9        jobs for reading coaches are advertised

10       as ten-month positions, as with teacher

11       positions are advertised as nine-month

12       positions.  There is clearly a salary

13       differentiation in work terms.

14  Q.   Because it's a ten-month contract?

15  A.   Yes, ma'am.

16  Q.   Okay.  But you would agree with me that

17       the documents which are reflected in

18       your personnel file regarding what your

19       job assignment was, do not reflect that

20       it was a reading coach position?

21            MR. PATTY:   Object to the

22            form.

23  Q.   Or the two -- the three documents that

1       you're looking at now?

2    A.  Re-ask your question.

3    Q.  That these documents do not reflect that

4       you were hired that year as a reading

5       coach?

6    A.  No, they do not reflect that.

7    Q.  Okay.  At the end of the 2003-2004

8       school year, were you nonrenewed?

9    A.  Yes, I was.

10           And may I go back to

11      re-answer -- to finish answering your

12      question about the documents reflecting

13      me being employed as a reading coach?

14      They reflect that because they were --

15      when I say "they were," it was advised

16      that they reflect this.  As opposed to

17      stating reading coach for the job that I

18      did, it was advised that the reason

19      those letters state teacher --

20   Q.  It says teaching position.

21   A.  Teaching position.

22   Q.  Yes, sir.

23   A.  Mr. Carter advised Mr. Barker, because

1  Mr. Barker told me, that you will only

2  be -- Mr. Carter said, You will only be

3  a teacher in this school district.  And

4  I think I have that in some of the EEOC

5  documents.

6  Q.  Well, we're going to go through that.

7  A.  Yes, ma'am.

8  Q.  Mr. Barker told you that Dr. Carter

9  said, You will only be a teacher in this

10  school system?

11  A.  In this school district.  This was after

12  Mr. Barker assured me and my mother that

13  I can get you -- I can get you hired as

14  soon as Dr. Carter -- Mr. Carter says

15  it's okay.  I can get you hired in an

16  hour or a couple of hours.  And he was

17  the -- Mr. Barker, was the person who

18  positioned me with, I can get you in a

19  reading coach job.  I didn't know what a

20  reading coach job was, but it was a job.

21  And then the next thing after

22  Dr. Owens offered me the job,

23  interviewed me, as he interviewed, I

1    think, three other woman for the same

2    position for reading coach, until I got

3    to central office, they're telling me,

4    Oh, no, it was a mistake.  You are not

5    going -- it's a teaching position.

6              When I again questioned

7    Mr. Barker, I said, This is not what

8    Dr. Owens interviewed me for.  This is

9    not the agreement that you had with the

10    superintendents in Bullock County for

11    releasing me.  Well, Melvin, it's just

12    simple, Mr. Carter says you're only

13    going to be a teacher in this school

14    district.

15              So that is the reason the

16    contracts and the appointment letters

17    have teacher on it.  That is the reason

18    the contract that Mr. Barker -- I'm

19    probably sure you have -- that I had to

20    sign has teacher or tutor-teacher on it,

21    because that was the ulterior motive

22    that manifested once after I was advised

23    to resign, and we're going to hire you,

1    and the superintendents agree on what

2    the title was.

3           And when I got here to

4    Montgomery County, there was a big

5    cross-up. And my back was against the

6    wall, because I didn't have a job. I

7    did what I was told to do by the

8    authorities who make those decisions,

9    and I didn't have a job.

10 Q.  So if you had only had a teaching -- if

11    you had known it was just a teaching

12    job, would you not have left Bullock

13    County?

14 A.  I would have remained in Bullock County,

15    because I would have been doing the same

16    thing. And if it were a teaching job,

17    according to Alabama law, after the

18    first forty-five days of your contract

19    beginning, at the beginning of your

20    contract, you can only be released from

21    that contract if the superintendent

22    allows it, because you are being

23    promoted or going to a job of higher

1   status.  The ten-month reading coach job

2   was of that caliber.

3                  And it was communicated

4   between Mr. Barker and Mr. Lee Arthur

5   Ballard, who was, and still is, the

6   Assistant Superintendent in Bullock

7   County, as with the Superintendent in

8   Bullock County, along with Attorney

9   Theron Stokes, who was present and --

10  give me a second.  He's now one of the

11  new UniService directors.  I'm trying to

12  think of his name right now.  He's

13  UniService director --

14  Q.  I don't know who you're talking about.

15  A.  -- or works with Ms. Ann Sippial.  The

16  new one, Darrell --

17  Q.  I know his name and can't call it.

18              MR. PATTY:  Darrell

19                  Singfield.

20  A.  Darrell Singfield (phonetic).  All of

21  those, they were there when I resigned.

22  They knew the reason I was resigning.

23  They knew into --

1  year had started?  Were you still trying

2  to get a job here?

3  A.  Yes.

4  Q.  And you wanted to come back to this

5  school system?

6  A.  Yes, I did.  Because this is where I

7  live, and I pay my taxes in Montgomery

8  County.

9  Q.  Did you ever have any communication with

10  Dr. Carter when you asked for him to

11  give you a second chance and let you

12  come back here?

13  A.  I never asked Mr. Carter to give me a

14  second chance, because I never had the

15  opportunity to talk to him.

16  Q.  So you've never had any kind of

17  conversations with Dr. Carter?

18  A.  I can testify today I've never had any

19  conversations with Mr. Carter or

20  acknowledgments, other than in church

21  I'll say hi.  I never met with, spoke

22  with, communicated verbally, written

23  communications with Mr. -- Dr. Clinton

100

1    Carter.

2  Q.  Did your mother ever speak to him on

3    your behalf?

4  A.  Yes, she did.

5  Q.  Okay.  And did your mother ask him to

6    give you a second chance after you had

7    been nonrenewed, after Southlawn?

8  A.  My mother asked Mr. Carter to consider

9    allowing me to be rehired.  The second

10    chance, she never communicated a second

11    chance.  Because a second chance for

12    what?  But to allow me to be rehired.

13    Because Mr. Barker and Ms. Lois Johnson

14    indicated that it was all up to

15    Mr. Carter.  And Mr. Barker said that if

16    he lets up, Melvin, I can do it.  But if

17    he doesn't, you know, I don't know.  You

18    know, I don't know why he doesn't like

19    you, but if he says I can hire you, I

20    can hire you.

21  Q.  And the conversation you're talking

22    about would have happened in the Summer

23    of '03 after you taught in Bullock

1    County for a year?

2  A.  It was during the summer. I'd have to

3    look back and see. I don't mean to get

4    rough with you. I need to see what the

5    dates --

6  Q.  I don't think you're being rough.

7  A.  -- you know, because the dates are kind

8    of running back to back.

9  Q.  Okay. We'll go -- because your --

10  A.  But it was before I came back to

11    Montgomery County.

12  Q.  Okay.

13  A.  It was that summer before. Right

14    before --

15  Q.  And that was in '03, I believe. That's

16    why I'm suggesting.

17  A.  Yes. Yes, I'm thinking it is.

18  Q.  Okay. All right. So according to Lois

19    Johnson and Jimmy Barker, and you don't

20    remember the exact dates, but it would

21    have been that summer, you were kind of

22    being told, the issues with Dr. Carter,

23    you've got to make amends with

1    Dr. Carter.  And at some point during

2    that time, isn't it true that your

3    mother went to speak to Dr. Carter on

4    your behalf, and you weren't present for

5    that meeting?

6  A.    Yes, ma'am, that is true.  She went to

7    speak with him.  Because he said that he

8    would not speak with us together, so

9    therefore, my mother elected to go.  A

10   second conference was never extended

11   towards me, because Mr. Carter stated

12   that he would call Mr. Barker and tell

13   Mr. Barker to see what he could do.

14  Q.   After your mother spoke with

15   Dr. Carter --

16  A.   After, yes, ma'am.

17  Q.   -- he was going to talk to Mr. Barker

18   and see what he could do?

19  A.   Mr. Carter, after conversing with my

20   mother, said that he would call

21   Mr. Barker and tell Mr. Barker to see

22   what he could do.

23  Q.   Meaning placing you in a job somewhere?

1  A.  Hopefully, that's what it meant, yes.

2  Q.  I mean, isn't it fair to say then, when

3      your mother left that meeting, that

4      Dr. Carter basically said, I'm going to

5      try to work something out for him?

6  A.  We were under the assumption that those

7      were his intentions.

8  Q.  And they did?  And that is the fall that

9      you came back to Montgomery public

10     schools?  Aside from what you believed

11     your job should have been or whatever,

12     that's the fall that you got brought

13     back as an employee into the school

14     system?

15 A.  I will not say that it was an immediate

16     action, because after that initial

17     conference, I still had not received any

18     interviews.  I only received one

19     interview, which was with Mr. Michael

20     Linhart the day before school was to

21     open.

22 Q.  And you've told us what he said.

23 A.  So there was -- I mean, as far as you

BAKER & BAKER REPORTING AND VIDEO SERVICES, INC.
Certified Court Reporters and Certified Legal Video Specialists
334.262.3332 - 1.888.253.DEPS (3377)
www.baker-baker.com

1  would think, if he said I'm going to

2  call Mr. Barker, and Mr. Barker having

3  already promised me and my mother I can

4  do it within an hour or a couple of

5  hours, I can get you somewhere.  And

6  Mr. Barker was the person who made

7  mention of a reading coach position.

8  Mr. Barker never mentioned a teaching

9  position until I returned to Montgomery

10  County in October.

11          When I questioned him why are

12  you telling me I have to accept this

13  tutor-teacher, teacher-tutor, reading

14  teacher position, when you first

15  mentioned to me a reading coach

16  position.  And that was during the

17  summer.

18          And then we went August,

19  September, and October.  I didn't hear

20  from any of you-all, and you-all did not

21  hear from me.  Then when Dr. Owens

22  interviews me for a reading coach

23  position, after interviewing four women

1    before me, and he calls Ms. Hicks, and

2    says, Ms. Hicks, I want Melvin Lowe as

3    my reading coach.  Mr. -- Dr. Owens

4    advised me, Go ahead and resign from

5    Bullock County.  I placed my

6    resignation.  Before my resignation was

7    accepted, the superintendents, both

8    Mr. Keith Stewart and Mr. Lee Ballard,

9    both talked with Mr. Barker repeatedly,

10   more than once, to assure that I was

11   returning as a reading coach, which is

12   clarified by posted announcements as a

13   ten-month position, which the salary is

14   different from a nine-month teaching

15   position.  Mr. Barker confirmed this.

16   Dr. Carter asked Mr. Barker, go back and

17   make sure he did not have any problems

18   in Bullock County.  Because Mr. Lee

19   Arthur Ballard communicated with my

20   mother and I.  He said, Hold on, I

21   have -- Barker is on this line.  Hold on

22   and let me get finished with him.

23   Clicked back over.  I just told him that

106

1    Carter wanted to know were there any

2    problems.  Melvin, they're still trying

3    not to hire you, but Barker knows that

4    the only reason we're releasing you

5    after the first forty-five days is

6    because this is a promotion for you.

7    This is the only reason, because now we

8    have to apply to the state department

9    for additional funds to fund another

10   teaching unit, because your salary has

11   already started.

12   Q.   Well, you didn't keep getting paid by

13        Bullock County, did you?

14   A.   No.  But the -- I'm sorry.

15   Q.   That's okay.

16   A.   When you said I didn't get -- I wasn't

17        continuously paid by Bullock County, no,

18        I wasn't.  The funds stopped at the end

19        of that particular pay period and the

20        days that had exasperated by my

21        working -- but because the funds had

22        been allocated by the state for a

23        particular teacher unit, to bring

1    another teacher in after the first

2    forty-five days, special permission has

3    to be approved from the state

4    department.  That is the reason the

5    superintendents had to really make sure

6    that we know the reason we're releasing

7    him.  Because then other teachers would

8    want to leave their contract to go to

9    another county during the school year

10   after the first forty-five days, which

11   is not the practice of school districts.

12   It's only when a job is presented as a

13   promotion.

14   Q.  You've told us about that summer and

15       having conversations with Lois Johnson

16       and Jimmy Barker, and I guess words to

17       the effect of, You need to apologize to

18       Dr. Carter or made amends with

19       Dr. Carter.  And you've said -- I think

20       I've understood your testimony to be

21       that you don't know what they were

22       talking about?  Yes or no?

23   A.  Yes and no.  I understood what they were

1    saying.  They wanted me to apologize.

2    But as far as understanding for what?

3  Q.  Yes.  That's what I mean.

4  A.  Okay.  Yes, ma'am.  I wanted to make --

5    you know, to have it clear.  For what,

6    Lois Johnson could never give me -- she

7    didn't even try to say you need to

8    apologize for stepping on his toes.

9    Mr. Barker never said you need to

10   apologize for spilling your Coke in his

11   lap.  You just need to apologize, you

12   know, just for any embarrassment or any

13   hard feelings that you may have caused

14   the school district or between you and

15   him.

16  Q.  Did you ever for any period of time

17    believe that your problem with

18    Dr. Carter was the issues you had had at

19    Southlawn with the student complaint?

20  A.  Yes, I did.  After the pink slip

21    notification was issued to me, and

22    Ms. Minott was not allowed to rehire me

23    that particular year after she stated, I

1    want to hire you; they won't let me hire

2    you. I could clearly see that it was

3    retaliation.

4            And it was also some

5    retaliation because years past my mother

6    had -- she filed an EEOC complaint

7    through AEA. AEA litigated some

8    complaints she had towards employment

9    discrimination with the same school

10   district while Mr. Carter, at that time,

11   I think was the associate

12   superintendent. All of these were

13   factors that caused me to think and

14   still feel very strongly that this is

15   some retaliation.

16           And then this has been

17   communicated to me since then, which

18   further validates your premise was not

19   invalid; it was very valid. Because

20   there have been several individuals

21   since that will state when they look at

22   you, they see your mother. That's why

23   people don't want to hire him, and

113

1    traits about you?

2  A.  Repeat that question.

3  Q.  How do you know that his comment, that

4     you're just like your momma, had

5     anything to do with her filing a lawsuit

6     as opposed to you just being like your

7     mother in other ways, good, bad, or

8     ugly, whether it be work habits,

9     personality traits?  I mean, how did she

10    know what he was talking about?

11 A.  Well, when you look at the issues before

12    us, if it wasn't an issue, why did he

13    even bring it up?  Why would he and

14    others constantly communicate it?  If it

15    was just a situation or a circumstance

16    or just a passing incident, why do you

17    keep making a mention of it?  Why are

18    you equating the problems that I'm

19    having to a past situation that Mother

20    experienced?  Why is that a constant

21    correlation?

22 Q.  Well, was Jimmy Barker talking about a

23    past situation or experience that she

1    defend hiring you the first time.  I'm

2    having to defend you being here every

3    day.  And I said, To who?  Who have I

4    killed, murdered, molested, or raped?

5    What have I done?  You know, Jimmy

6    Barker, they don't like you.  He's

7    always talking about your situation with

8    your mother.  You're just like your

9    mother.  You filing this lawsuit.  Your

10   mother filing her lawsuit.  See, Melvin,

11   you shouldn't have done all of that.

12   You shouldn't drive that Mercedes, and

13   you shouldn't live in that house that

14   you live in.  You shouldn't wear the

15   type of clothes that you wear.  You need

16   to get you a little truck.  See, people

17   don't like these things.  And, you know,

18   they feel that you were born with a

19   silver spoon in your mouth.  And, you

20   know, Brother Lowe, I just think maybe,

21   you know, you might need to just leave

22   the school district and maybe wait four

23   or five years, because Jimmy Barker will

BAKER & BAKER REPORTING AND VIDEO SERVICES, INC.
Certified Court Reporters and Certified Legal Video Specialists
334.262.3332 - 1.888.253.DEPS (3377)
www.baker-baker.com

117

1    be gone, Carter is already gone, and

2    this new Dr. Purcell won't be here.

3    Because, Brother Lowe, you know, you and

4    your momma, they're not going to let up

5    on you.

6              Now, this was communicated to

7    me my last year at Daisy Lawrence by

8    Dr. Owens.  And I was very offended.

9    And I felt that there are some more

10   retaliations that are going to occur

11   from this, and I almost begged for help.

12   And I put it to Dr. Purcell's attention,

13   you know, that this is more than, you

14   know, too much to say to someone

15   repeatedly.  This is after Lois Johnson

16   had said at least twice, you know,

17   Melvin's problem, Mary, is you.  Every

18   time they look at him, they see you and

19   all that you've done in the past.  You

20   know, that registers.  You know how

21   Carter feels about you, Mary.  Melvin is

22   just like you.  And I'm not saying it's

23   right or wrong, but Mary, I'm just

1  telling you.  You know, and this has

2  just been communicated over and over,

3  which you can't help but look at it and

4  say, Well, okay, if it's not true, let's

5  look at the treatment that he has

6  gotten.  He has gotten some very rotten

7  treatment, so there might be some

8  validity to some of this, if not all of

9  it.

10 Q.  When Dr. Owens was talking to you about

11     this, was he saying that Jimmy Barker

12     said these things to him, or was he

13     telling you how he, Dr. Owens, felt?

14 A.  Dr. Owens told me that Mr. Barker said

15     this to him the previous day.

16 Q.  Did Mr. Barker say anything to Jimmy

17     Owens -- excuse me, to Dr. Owens about

18     your previous -- you filing any kind of

19     lawsuit or your mother filing any kind

20     of lawsuit or charges?

21 A.  Yes.  Dr. Owens made mention of all of

22     it.  Because at that point, I didn't

23     even know Dr. Owens knew about my mother

1   filing a lawsuit. I hadn't -- I mean, I

2   don't know how he would have known it,

3   because it wasn't like it was public

4   knowledge. And when he communicated to

5   me and said Mr. Barker, I told myself

6   Barker had to tell him, because who else

7   would have told him? I surely didn't

8   tell him.

9   Q.   Well, did he tell you that, or did you

10       think that Barker told him?

11  A.   He told me Barker told him, and that the

12       reason Daisy Lawrence was being closed,

13       it had something to do with all of the

14       complaints from the teachers. And then,

15       Brother Lowe, as he calls me, Brother

16       Lowe, you filed your lawsuit. And

17       Brother Lowe, I mean, you kind of

18       brought all of this on yourself. I

19       don't know what you're going to do.

20  Q.   I understand that --

21  A.   Yes, yes.

22  Q.   -- Dr. Owens said that to you. But did

23       he tell you that Jimmy Barker said --

1   A.   Yes, he did.

2   Q.   -- Melvin Lowe brought this on himself

3       because of his lawsuit, or words to that

4       effect?

5   A.   Yes.  Yes, Dr. Owens said that.  Because

6       he constantly made sure that I

7       understood, Brother Lowe, this is not

8       me; you know, I hired you.  I'm just

9       telling you what he told me.

10   Q.   Okay.  So those are the two times your

11       mother walks in on a conversation with

12       Mr. Barker, and you've told us about

13       that.  You've told us about what

14       Dr. Owens said that Jimmy Barker said.

15       Any other -- and I know you've talked

16       about Lois Johnson, but let's stick on

17       Jimmy Barker so I can cover it.  Any

18       other conversations that you've had with

19       Barker or that's been relayed to you

20       that he allegedly said about your

21       lawsuits?

22   A.   Those were the only ones that I'm aware

23       of.  Now, if there were others, I

1    wouldn't know.  But these are the ones

2    that --

3  Q.  That's all I'm asking for is what you

4    know.

5  A.  -- I can say I was there or it was said

6    to me, or, as I said before, I was

7    there.

8  Q.  Okay.  All right.  Any conversations

9    where Dr. Carter has said that to you or

10    to anybody else that was relayed to you?

11  A.  Again, Mr. Carter -- Dr. Carter and I

12    have never, ever talked.

13  Q.  Has Dr. Carter ever said anything to

14    anybody that was then relayed to you

15    that mentioned your mom's past

16    grievances or lawsuits and any lawsuit

17    of yours?  Was Dr. Carter still the

18    superintendent when you initially sued?

19  A.  No.

20  Q.  I can't even remember.  He wasn't?

21  A.  No.

22  Q.  Dr. Purcell was the superintendent by

23    then, okay;  Any conversations like