1       that?

2   A.  There was a conversation that Dr. Carter

3       had with a person not associated with

4       the school district that related to my

5       teaching at Southlawn, that later

6       provided me with the premise that he's

7       discussing you with other people and he

8       has a problem with you.

9   Q.  And he was talking to this person about

10      your teaching at Southlawn?

11  A.  He was talking to this individual about

12      the incident that happened, and that he

13      didn't blame me, he would have slapped

14      the shit out of that child, too.  Which

15      I was highly outraged, because I did not

16      hit the child.  And I resent the fact

17      that it was communicated outside of the

18      central office to other individuals who

19      could or could not have been

20      impressionable at that time towards me.

21  Q.  Who did he tell that to?

22  A.  Mr. Bill Mann (phonetic), who's a

23      salesperson at Buckelew's Clothing for

1    Men.

2  Q.  Okay. But has anybody relayed any

3      conversations where he talked about your

4      mother's past grievances or your

5      lawsuits? I guess you hadn't filed one

6      at the time he was there --

7  A.  No.

8  Q.  -- so let's focus on your mother. Okay.

9           All right. I mean, when your

10     mother went in to talk to him, what did

11     your mother tell you that Dr. Carter

12     said?

13 A.  Mother told me they had a conversation

14     about their children and how you want

15     the best for your children. And Mom

16     talked to him about how hard that her

17     and my father worked to educate us, my

18     brother and I, and things of that nature

19     and that there's a lot of maturity that

20     has taken place with Melvin. There's a

21     lot more maturity to take place. And I

22     just need you, if you will, to consider

23     allowing him to be rehired. And the

1    conversation, her meeting, her

2    conference with him, it wasn't even an

3    hour.  It was not even an hour.  She

4    said it was very, you know, polite, and

5    it was -- she said when she left and

6    she -- we talked.  We were both under

7    the assumption that, you know, if what

8    Barker said was true about he can get

9    you hired in an hour or a couple of

10   hours, you know, you're getting ready to

11   come back to Montgomery County.

12  Q.  So did you feel like at that point that

13      Dr. Carter did a favor for you or did

14      something to help you out?  He certainly

15      could have said no, correct?

16  A.  I want to go on the Record and say, when

17      you're doing what's right and what's

18      fair and what you do to all employees, a

19      favor shouldn't have anything to do with

20      it.  If allowing me to be rehired was a

21      practice that you followed with all

22      employees, wonderful.  But if it was a

23      special consideration you were having to

1   give to me for whatever reason, I don't

2   see where I should consider that as a

3   favor.  We can count it as a

4   professional courtesy, but I won't go on

5   Record and say it was a favor.

6   Q.   Okay.  That's fair enough, Mr. Lowe.

7   A.   Thank you.

8   Q.   Let's clarify this for the Record:   I

9   understand that you deny that you hit a

10  child at Southlawn, but it's true, is it

11  not, that those allegation were made

12  against you, and that was not the first

13  time that a student had complained about

14  your treatment of them?

15  A.   Now, that is not true.

16  Q.   Okay.  So you would say that was the

17  first time?

18  A.   The first time I ever had a complaint,

19  written or oral, that a child alleged

20  that I hit he or she or it was this

21  Southlawn incident.  I have never been

22  reprimanded by a principal, a site

23  administrator, or a central office

1    administrator of any misconduct,

2    verbally or physically, towards a child.

3  Q.  When you were at Daisy Lawrence the

4    first time, was there ever an incident

5    where you were accused of paddling

6    children without permission?

7  A.  No.

8  Q.  Okay.

9  A.  And may I go on Record to finish

10    answering your question.  I said no,

11    because I never from Ms. Jeter or a

12    central office person or any other

13    person in authority or capacity ever

14    chastened me, because I never did such

15    without the sanctions of a parent and/or

16    an administrator, never.

17  Q.  So if someone said that there was an

18    issue with you paddling children without

19    permission at Daisy Lawrence, you would

20    just say that's not true?

21  A.  They never -- it was never communicated

22    to me, yes, ma'am.  No, so that's not

23    true.

1   Q.   Okay.  What about at Fitzpatrick, were

2        you ever accused of an incident

3        regarding physically handling a child or

4        being overly physical with a child?

5   A.   No.  And I can elaborate on the

6        Fitzpatrick situation.  There was a

7        situation when I physically removed a

8        child from a seat in the lunchroom.  And

9        Ms. Thompson never reprimanded me,

10       because she was present when I moved the

11       child.  I picked the child up and moved

12       the child.  And I went to her and told

13       her what happened and the reason I moved

14       him.  And I even phoned the parents, the

15       father and informed him of what I did

16       and why I did it.  No, there was never

17       any reprimand, verbally or written, that

18       I inappropriately handled a child.

19  Q.   And I wasn't asking if you were

20       reprimanded, I was just trying to --

21  A.   Yes, ma'am.

22  Q.   So if there was -- if there is any kind

23       of information regarding the handling of

1    a child at Fitzpatrick, you would know

2    what they were referring to, but you

3    would just disagree that you handled the

4    situation inappropriately?

5  A.  I know exactly.

6  Q.  What they're referring to?

7  A.  What they're referring to.

8  Q.  Okay.  So when you went your third year

9    to Southlawn, and if you'll look at the

10   documents that are marked as Defense

11   Exhibit 3 and glance over those, I

12   believe that these are the documents

13   that refer to the incident that we've

14   been referring to?

15                (Whereupon Defendants'

16                Exhibit No. 3 was marked

17                for identification and

18                attached hereto.)

19                (Witness reviewed

20                documents.)

21  A.  Yes.

22  Q.  I guess my question to you is that

23   regardless of what your position is as

1          to whether or not that you acted

2          inappropriately, it's certainly

3          undisputed that a child said you did,

4          and there was an investigation, and you

5          were actually suspended as a result of

6          it, correct?

7    A.    Yes.  With pay, yes.

8    Q.    Okay.  And the year that you were

9          nonrenewed followed this Southlawn year?

10   A.    Yes, it did.

11   Q.    Okay.  And you were then told that you

12         needed to apologize or made amends with

13         Dr. Carter to get a job back with the

14         school system, and your mother went on

15         your behalf to speak with him, and after

16         that conference, you were eventually

17         hired back in the Fall of 2003; is that

18         correct?

19   A.    I need to answer that in detail.

20   Q.    Okay.

21   A.    With those charges that took place at

22         Southlawn, those are charges that when

23         you read what Mr. Barker scribed, they

1        were unfounded.  And I was found, not

2        only by the investigation of the school

3        board, but the City of Montgomery found

4        me not guilty and dismissed those

5        charges.  And I was placed back in my

6        position as a teacher, not only at the

7        request of the central office, but the

8        principal requested that I return.

9   Q.   But -- I'm sorry.  Go ahead.  I

10       apologize.

11  A.   At the end of the year, that school

12       term, the nonrenewal came from

13       central -- well, all of them are

14       generated out of the central office, but

15       Ms. Tina Minott did not issue one for

16       me.  My termination letter came the day

17       after all of the other teachers'

18       termination letters came.  And she

19       admitted to me on several -- on more

20       than one occasion, Melvin, I didn't do

21       this.

22            Even after I got the

23       nonrenewal and I applied following the

1    procedures to be rehired at Southlawn

2    Middle, she then again cried on my

3    shoulder.  And she said, Melvin, they

4    won't let me rehire you.

5                Ms. Minott wrote me letters of

6    recommendation for other school

7    districts to attain employment.  I then

8    went to Bullock County, because I had no

9    other choice.  I was forced.  I couldn't

10   gain employment in Montgomery County.

11               And when I returned to

12   Montgomery County, it was a year and

13   some months after I was retaliated

14   against and also discriminated against

15   with the nonrenewal, the pink slip.  My

16   mother spoke to Dr. Carter on my behalf,

17   because he would not meet with us

18   together.

19   Q.  Why didn't you meet with him by

20       yourself?

21   A.  Well, when we initially asked for a

22       conference and he said that he wouldn't

23       meet with us together, Mother was then

1      the first person they offered a

2      conference to.  And then after Mother

3      met with him, I was never extended a

4      conference.

5  Q.  Is it fair to say that during your

6      career with Montgomery public schools,

7      that your Mother often made

8      communications with people for you or on

9      your behalf or with you?

10 A.  My Mother does or did and will do what

11     any other mother would do.  She

12     communicated with persons with reference

13     to me, my brother, for whatever reason

14     needed.

15 Q.  Let's look at this real quick, because I

16     want to clarify something.

17 A.  Okay.

18 Q.  This letter actually says that the

19     findings were inconclusive as to Count

20     I.  That Count II was verified, which is

21     where you were accused of using

22     profanity and demeaning language in

23     addressing students.  And I'm not asking

1      you to say you did that.

2  A.   Yes.

3  Q.   But that the conclusions of the

4      investigation says that it found you did

5      that, and that you were suspended for

6      five days.  And these documents reflect

7      that you signed an agreement that as

8      part of your punishment, there was going

9      to be this letter of reprimand in your

10     file and a five-day suspension?

11 A.   Yes, ma'am.

12 Q.   And so, I mean, do you disagree with

13     that's what the resolution of this was?

14     I mean, you're saying that you were

15     found clear and put back to work.  I

16     didn't see any documentation where this

17     was undone or changed.  It appears to me

18     that you were given a letter of

19     reprimand and a five-day suspension for

20     your conduct in that incident.

21 A.   To answer that, you can't unchange the

22     charges.  The charges are -- I mean,

23     it's documented with the city that the

1       charges were thrown out of city court.

2       That merely suggests that an

3       investigation -- in my terminology, was

4       suggesting that an investigation was

5       done, and that on two of the charges, we

6       were inconclusive.  That's a nice way of

7       saying, we think you did it, but we

8       can't prove you did it.  The last charge

9       is saying that we feel that you did it,

10      and we have evidence or we have some

11      tangible documentation that you did do

12      it.  The only thing, me signing that, is

13      agreeing to that going into my personnel

14      folder and accepting the five-day

15      suspension.  I did not admit to any of

16      that.

17  Q.  Do you disagree that there were

18      witnesses that said you acted like that

19      towards the children?

20  A.  I still disagree.

21  Q.  Okay.  So you just believe that those

22      witnesses gave false information?

23  A.  The witnesses -- because an -- the

1       initial investigation was conducted --

2       it was conducted by Ms. Tina Minott.

3       And she communicated to me, Melvin, I

4       think you will be back to work the next

5       week.  Then when that investigation did

6       not satisfy Mr. Carter, he then had

7       Mr. Barker to reinvestigate, which was

8       where you had conflicting stories with

9       the students.

10 Q.  Do you agree that as the superintendent,

11       that he would be -- that he would take

12       allegations like this very seriously and

13       that he would make sure there was a

14       thorough investigation?  Do you disagree

15       with how he handled that?

16 A.  I disagree.  And being that I'm also

17       certified in administration and I know

18       policy and procedure, I disagree with --

19       if you have your competent administrator

20       that you appointed and placed in the

21       school as the instructional leader, and

22       you ask -- that person provided you with

23       an investigation, it just appears odd

1   that you would then on the same breath

2   order another investigation.  And then

3   when you order another investigation,

4   your findings are a little different on

5   two -- I mean, the same on two of the

6   charges, but a little bit different on

7   the other.

8              And I asked that, because

9   during that same incident, there was a

10  female teacher, a white female teacher

11  at Harrison Elementary School who was

12  found guilty, who admitted to slamming a

13  child's head on a desk.  One

14  investigation was done by the principal,

15  and that teacher was placed on leave, as

16  I, brought back off of leave, but that

17  teacher did not receive a nonrenewal at

18  the end of the year.  That teacher was

19  advised the same as I was, to admit to

20  what you did.  But in my situation, I

21  was advised, Just admit to what you did.

22  And, Melvin, just let them curse you --

23  let Mr. Carter and Dr. Barker curse you

1    and yell at you and, you know, it will

2    be over with.  Now, this was the advice

3    I was given --

4  Q.  Did Dr. Carter and Mr. Barker curse and

5    yell at you about this?

6  A.  Well, I think if they'd been given the

7    opportunity, they might.  Dr. Carter --

8  Q.  Okay.  That's not my question.

9  A.  No.  No, they did not.

10  Q.  Okay.  Thank you.

11  A.  Mr. -- may I finish?  I'm sorry.

12                    MR. PATTY:  Were you

13                         finished with

14                         your . . .

15                    THE WITNESS:  No.  I wasn't

16                         finished with it.

17  Q.  And go ahead.  I apologize.  I just

18    heard that and wanted to get a

19    clarification of --

20  A.  Under the advice of the attorney that I

21    had at that time --

22  Q.  Who was your attorney?

23  A.  Attorney Brenton Dean.

1  Q.  Okay.  Go ahead.

2                      MR. PATTY:  Don't get into

3                         what Brenton Dean's

4                         told you.

5                  THE WITNESS:  Oh, okay.

6                  MRS. CARTER:  Yeah, I

7                         didn't --

8  A.  Okay.  Well, there was --

9  Q.  I've never heard of that person.

10 A.  It was a similar, very similar

11     situation, an altercation with a

12     student.  But the outcome, she was not

13     nonrenewed at the end of the year; I

14     was.

15 Q.  Okay.  So the bottom line is that you

16     just disagree with how they handled

17     that?

18                  MR. PATTY:  Object to the

19                         form.

20 A.  Yes.

21 Q.  All right.  Let me back up for a second

22     and get something that we don't have

23     here on the Record:  After the 2003-2004

1    I did not go back into the same

2    position.

3  Q.  Okay.  Let me show you what I've marked

4    as Defense Exhibit 4.

5                    (Whereupon Defendants'

6                      Exhibit No. 4 was marked

7                      for identification and

8                      attached hereto.)

9                    (Witness reviewed document.)

10  A.  Okay.  And the reason I said I did not

11    go back in the same position, I am

12    categorizing the position as far as the

13    job that I was charged or tasked,

14    T-A-S-K-E-D, to do.  The first year at

15    Daisy Lawrence, I was on paper hired to

16    do one thing, but I was tasked and

17    evaluated doing something else.  The

18    second year, I was tasked to do

19    something else, still in opposition to

20    what was on the contract.

21  Q.  Okay.  Look at Defense Exhibit 4 for me.

22    And it says there that you're being

23    placed back at the -- it says same

1    have any students to teach.  The

2    prescribed curriculum for reading

3    intervention that we were to implement

4    never materialized.  It never

5    manifested.  There was never any full

6    implementation of the program.  It was

7    communicated to me that part of your

8    punishment, Brother Lowe, is I got to

9    move you.  I have to.  I've got to move

10   you out of the front office, where my

11   office was.  I was moved into a

12   classroom, which I set up like a

13   classroom, slash, an office.  And what

14   did I do every day all day?

15   Q.  I don't know.

16   A.  I don't either.  That is -- I mean,

17   that's just how humiliating -- the first

18   year was whatever it was, but the second

19   year was very humiliating.

20   Q.  Isn't that partly because your job no

21   longer existed at the school which is

22   why they tried to -- one of the reasons

23   they tried to nonrenew you.  And then

1    when they messed up your nonrenewal and

2    had to put you back at work, there,

3    quite frankly, wasn't an exact job for

4    you to go into?  Wasn't that part of the

5    problem?

6  A.  That could have been.  It was never

7    relayed to me that way.

8  Q.  Did you get paid?

9  A.  I did.  But I was being paid to perform

10    a particular duty.  And what I thought I

11    was supposed to do was what I did the

12    previous year, which was I was the

13    reading coach.

14          When the curriculum changed, I

15    still knew what to do.  I knew the

16    program, because I had implemented that

17    program the prior summer in the summer

18    program.  And I made complaints to the

19    central office, the students are not

20    being serviced.  And I think a lot of

21    that, my complaints to the central

22    office, we need the material, the

23    students are not being serviced, I'm not

1          going to turn this -- I'm not going to

2          lie about this assessment.  You know, a

3          lot of that I feel played into some of

4          the other -- the string of retaliations.

5                    Because the second year with

6          twenty-five students, we never received

7          the curriculum, the teachers were never

8          trained on the program.  I was certified

9          to train them.  I was never given an

10         opportunity to train them.  And it

11         was -- you know, what did I do, anything

12         Dr. Owens asked me to do, but it wasn't

13         teaching and instruction.  And the

14         central office was very aware of this,

15         because I communicated this to quite a

16         few people.  All of the superintendents

17         knew.

18    Q.   Did you ever talk to Jimmy Barker about

19         what was going on there the last year?

20    A.   I talked to Mr. Jimmy Barker, Ms. Lois

21         Johnson, Mr. Mike Looney.  I even

22         conferenced with Dr. Purcell.

23    Q.   Daisy Lawrence is gone now, right?

1   A.   The building is still there, but the

2        program that it housed --

3   Q.   That's what I mean.

4   A.   Yes, ma'am.

5   Q.   In the summer between -- in the Summer

6        of '04, before you started that last

7        year, just to give you your bearings,

8        the summer before your last year with

9        the school system --

10  A.   Gotcha.

11  Q.   -- did you have any conversations with

12       Jimmy Barker or Mike Looney or Carolyn

13       Hicks or Lois Johnson, any of those

14       people, about what your placement was

15       going to be or where you were going to

16       go or what jobs you wanted to work, as

17       opposed to going back to Daisy Lawrence,

18       any of those conversations -- any

19       conversations with those people?  Excuse

20       me.

21  A.   Yes.  May I elaborate on those

22       conversations?

23  Q.   Yes, yes.

147

1  A.  The conversations stemmed anywhere from,

2      will I be going back to Daisy Lawrence;

3      what is the outcome of some of these

4      other jobs I have applied for; what are

5      the outcomes of some of these jobs that

6      I have interviewed for.  So the

7      conversations were -- yes.  They were

8      very direct with specific meaning, with

9      specific concern.  And they were lengthy

10     in some situations.

11 Q.  Do you know on -- do you know when

12     anybody with the Montgomery public

13     school system would have learned that

14     you'd filed an EEOC charge?

15 A.  The first person who mentioned it to me,

16     and it blew me out of the water that

17     this person would know about it -- my

18     mother, of course, knew.  When Dr. Owens

19     mentioned to me that Mr. Barker informed

20     him of what I did -- now, Dr. Owens

21     didn't tell me when he mentioned it.  He

22     said, Brother Lowe, you didn't think I

23     knew that.  I was knocked out of the

1      water, because I had not mentioned that

2      under directions of AEA.  That had not

3      been communicated to anyone.

4  Q.  And was that during your last year of

5      teaching there?

6  A.  That was that last year.

7  Q.  So the first you would have known about

8      Montgomery public schools knowing, is

9      Dr. Owens telling you during your last

10     year of school there?

11  A.  That he knew.

12  Q.  That he knew.  How many weeks or months

13     into the school year before you had that

14     conversation with him?

15  A.  As you go back and look at one of those

16     documents with the e-mail I sent to

17     Dr. Purcell, it was -- the day we

18     received the pink slip notifications at

19     Daisy Lawrence, it was -- I don't want

20     to say the wrong thing.  It was either

21     the day before or the day after.  It was

22     right there.  It was --

23  Q.  So it was at the end of your last --

1  A.  The end of that last year.  It was

2      either the day before or the day after.

3      I would have to look back at the notes,

4      but it was right there.

5  Q.  But you had actually filed something at

6      the beginning of, I guess, the Summer of

7      '04?

8  A.  Those were grievances, AEA grievances, I

9      believe.  They were on the PR&R form.

10                MR. PATTY:  Yeah, but

11                     that -- she's talking

12                     about something you

13                     filed with Montgomery

14                     County, not something

15                     you filed with AEA.

16             THE WITNESS:  I would have

17                     to look at the dates.

18                MR. PATTY:  Yeah.

19  A.  I would have to look at the dates.

20  Q.  Okay.  That's fine.

21  A.  I'm sorry.

22  Q.  Let me show you what I'll mark as

23      Defense Exhibit 5, and ask if that's a

1    to put words in your mouth -- would your

2    Complaint then not be -- it's not about

3    the nonrenewal so much as not

4    reassigning you somewhere?

                    MR. PATTY:  Object to the

5

6                            form.

7                        Go ahead.

8   A.  The nonrenewal was just a process.  Not

9       assigning me anywhere was the action.

10  Q.  Let me show you Defense Exhibit 30.

11      This seems to be an application for a

12      summer school program, what a blank

13      application looks like, and then the

14      general information on the program of

15      2005.  Is part of your claim that you

16      were also discriminated against by not

17      getting the summer school job in the

18      year of 2005?

19                    (Whereupon Defendants'

20                     Exhibit No. 30 was marked

21                     for identification and

22                     attached hereto.)

23                    (Witness reviewed document.)

1  A.  Yes.

2  Q.  Do you have any jobs in particular that

3      you allege to have not received in the

4      Summer of 2005 as a result of race or

5      sex in retaliation, and, I guess, now

6      retaliation for the lawsuit that you

7      filed, the EEOC charge lawsuit?

8  A.  Yes.

9  Q.  Okay.  What particular jobs in the

10     summer school program do you make that

11     claim about?

12  A.  In the summer school program, or in the

13     entire program?  Now, summer school

14     program is one.  There are four others.

15  Q.  What do you mean?  I'm sorry, I don't --

16  A.  This was the first after the lawsuit was

17     filed and Daisy Lawrence was closed.

18  Q.  Right.  And that's where I want us to go

19     now --

20  A.  Okay.

21  Q.  -- is the grouping of jobs --

22  A.  During that summer.

23  Q.  Right.  In each summer job and then

110

1    that's the problem Melvin is having.

2    So, yes.  Yes, I do.

3  Q.  Okay.  So when you were nonrenewed and

4    you were not hired back and you went to

5    Bullock County that year, and then we

6    get into the next summer about the

7    conversations that went on with the

8    superintendent, between your mother, or

9    your conversation with Barker and

10    Johnson, it's your testimony that all of

11    that happened, in part, because of the

12    complaint against you at Southlawn, but

13    also, in part, because of your mother

14    suing the school board in the past?

15            **MR. PATTY:**  Object to the

16                form.

17                    Go ahead and

18                answer.

19  A.  Yes and no.  Yes, out of retaliation

20    because Mother filed a grievance against

21    the school board in years past.  Not for

22    what happened at Southlawn, because what

23    happened at Southlawn, I was vindicated.

1       I was not found guilty.  I was targeted

2       because of my disposition that I took

3       with Mr. Barker, one of the

4       investigators, one of the lawyers that I

5       had at that time.  And Mr. Carter did

6       not agree with my position.  I did not

7       admit to doing what I knew I did not do.

8  Q.  Well, that's what I meant, just

9       something to do with that complaint?

10  A.  Yes.

11  Q.  I didn't mean that --

12  A.  Yes.  But I just wanted to be able to

13       elaborate and lay everything for you.

14  Q.  Well, what evidence do you have that

15       being nonrenewed at Southlawn, and then

16       these issues about being hired back

17       later, what evidence do you have that

18       that had anything to do with your

19       mother?

20               MR. PATTY:  Object to the

21           form.

22               Go ahead and

23           answer.

1    interviews, and because of a statement

2    Ms. Hicks made about my initial

3    interview with her, that I was very

4    belligerently arrogant, I took over the

5    interview, and he's just like his

6    mother, and nobody's going to hire him.

7    That is my reason for feeling that that

8    particular job with Ms. Sexton, that she

9    was influenced.

10   Q.   I gotcha.

11   A.   Ms. Sexton later communicated to me,

12   Melvin, what happened?  I thought you

13   wanted to come to Vaughn Road with me.

14   Q.   When did Ms. Hicks tell somebody that

15   you were arrogant, took over the

16   interview, and just like your mother?

17   A.   She made that statement to one of the

18   secretaries in Human Resources, who

19   relayed that message to my mother.

20   Q.   And who's that secretary?

21   A.   The secretary that relayed it to my

22   mother was Ms. Bessie Townsend

23   (phonetic).

1   Q.   Betsy?

2   A.   Bessie Townsend.

3   Q.   And she told your mother, who told you?

4   A.   That Ms. Patricia Holden (phonetic) said

5        that that's what Carolyn Hicks stated.

6                **MR. PATTY:**  It's . . .

7                **MRS. CARTER:**  I know.  I

8                just realized I skipped

9                a step.

10  BY MRS. CARTER:

11  Q.   Okay.  Bessie Townsend told your mother

12       that Pat . . .

13  A.   Stated that Ms. Hicks stated that I was

14       belligerently arrogant during the

15       interview, that I took over the

16       interview, and that's why nobody is

17       going to hire him, because he's just

18       like his mother.

19  Q.   Okay.  And what evidence do you have

20       that that comment had to do with your

21       mom filing a claim?

22                **MR. PATTY:**  Object to the

23                form.

1                    Go ahead.

2  A.  Well, she hadn't murdered or killed

3      anybody, so I mean, why would she keep

4      making mention of something, quote, just

5      like her.  I mean, is that in a negative

6      manner, positive manner?  But when you

7      constantly repeat it over and over,

8      negative connotations kind of tend to

9      cap it.

10 Q.  Okay.  The next one is Tina Minott, and

11     you were actually hired by Tina Minott?

12 A.  Yes.

13 Q.  The next one is Bullock County, so I

14     guess now we've skipped forward to the

15     Summer of '02?

16 A.  Yes.

17 Q.  And Julius Thomas was the principal,

18     Keith Stewart, the superintendent, Lee

19     Ballard, the assistant superintendent,

20     and Saint T. Thomas, the superintendent,

21     and then Ms. Octavia Miles.  When you

22     refer to all of those people, you're

23     talking about the one job you got,

1    Q.   Okay.  Tell me, do you know whether or

2         not all applicants received an interview

3         for those jobs?

4    A.   Well, I have no way of knowing that.

5    Q.   So you don't know who out of the

6         applicant pull was interviewed for those

7         positions?

8    A.   No, I don't.

9    Q.   Okay.  What evidence do you have that

10        you weren't interviewed for those

11        positions based on your race?

12                   MR. PATTY:  Object to the

13                   form.

14   A.   Again, this is showing a series of

15        events leading to the last couple of

16        incidents that were very -- that were

17        more vivid than these.

18   Q.   Okay.  And that's fine.  And we'll get

19        there, but I have to --

20   A.   Okay.  I understand.

21   Q.   Your attorney will explain to you.  I

22        have to trudge through it.

23                   What evidence do you have that

1    you didn't get either one of those jobs

2    or get interviewed for those jobs

3    because of your race?

4                MR. PATTY:  Object to the

5                form.

6  A.  Well, it kind of stopped with me not

7    even getting an interview.

8  Q.  That's what I said, that you weren't

9    interviewed for those jobs because of

10   your race?

11               MR. PATTY:  Object to the

12               form.

13 Q.  What evidence do you have?

14 A.  I'm not even clear on -- what evidence

15   do I have?  I don't have any.  I'm just

16   showing a frequency of the events that

17   lead up to the current events.

18 Q.  Okay.  Do you know who was awarded the

19   job that you wanted at Crump Elementary?

20 A.  I would have to go back through

21   personnel minutes to see who was

22   afforded that job.

23 Q.  So sitting here today, you don't know

1    who got that job?

2  **A.**  I couldn't call all of these off the top

3    of my head.

4  **Q.**  So do you know, sitting here today, what

5    the qualifications were of that person?

6  **A.**  Not off the top -- that's privileged

7    information.  I wouldn't have that.

8  **Q.**  Do you know what the race or the sex was

9    of that person?

10  **A.**  Not without looking at the personnel

11    minutes.

12  **Q.**  All right.  What about at Brewbaker

13    Junior High School, who got that job?

14  **A.**  I'm not sure.  I would have to look at

15    the personnel minutes.

16  **Q.**  So sitting here today then, do you

17    maintain that you were more qualified

18    than either of those two individuals?

19  **A.**  In some instances, I probably would have

20    been.

21  **Q.**  Okay.  And I understand that.  But do

22    you maintain or can you tell us here

23    today that you were more qualified than

1    those two individuals?

2  A.  I would have to know who those persons

3    were and then rank their qualifications

4    to mine.

5  Q.  Well, when you sent this letter on

6    August 2nd saying that you had been --

7    that you were a victim, or you don't use

8    the word "victim," but the

9    discriminatory practice of racial and

10    gender discrimination, what jobs on this

11    document were you referring to?

12  A.  We can go through a series of them.

13    When I sent this in, I either

14    had already reviewed or had reviewed the

15    personnel report to see if it

16    was either -- I can almost tell you

17    there were not that many black men, and

18    there probably were not that many black

19    women.  And the documents will prove it.

20    If we go back to the personnel report --

21  Q.  When you say "not that many" -- I

22    apologize, I'm not sure what -- not that

23    many meaning in reference to the jobs

200

1      that are on here?

2   A.   When you look on here, the ones that I

3      did list who -- you know, the white

4      female or white person received that

5      job, just rule out there was a white

6      person, it wasn't a black one.  It was a

7      white female.  It wasn't a black female.

8   Q.   Well, do you feel like that if it was a

9      white person, that that means you

10     automatically were discriminated against

11     based on your race?

12  A.   No, I'm not.  That would be a factor.

13     If I was, that would be an additional

14     factor.

15  Q.   The September 1st, 2003, it says you

16     applied for Educational Specialist,

17     Educational Technology Professional

18     Development Program Coordinator, in

19     Title I School-wide Instructional

20     Assistant position.  Did you group those

21     together because they're similar in --

22     and excuse my ignorance -- but like

23     they're similar in type or . . .

201

```
1   A.   They were -- and if I stand corrected, I
2        think they were advertised at the same
3        time.
4   Q.   Okay.  Oh, for that date.  I gotcha.
5        And you were not granted an interview
6        for any of those positions?
7   A.   No, I wasn't.
8   Q.   Is it your testimony that you had the
9        qualifications and certifications to
10       fill any of those positions?
11  A.   Yes, it is.
12  Q.   Okay.  Do you know, sitting here today,
13       who was awarded those positions?
14  A.   I would have to look at the personnel
15       minutes.  Because if you look at the
16       year on here -- I would have to go back
17       and look at the personnel minutes.  But
18       whatever I was looking at when I wrote
19       this, it was substantial enough for me
20       to be able to validate this.
21  Q.   Well, let me ask you this:  Were there
22       any jobs that you applied for that
23       summer that you didn't include in this
```