1   for the position of System Reading

2   Specialist at the Office of Curriculum

3   and Instruction.  You were interviewed

4   for that job.  Who interviewed you?

5   A.  Teresa Nichols.  Teresa Jackson.  I want

6   to say -- and I may stand corrected,

7   but, I guess, the interview panel would

8   have to be poled -- I want to say

9   Margaret Allen.  And I know Mr. Barker

10   sat in on that interview, because we

11   had -- at this point, he and I were

12   having some serious discussions about

13   these jobs.  And he told me, I'm going

14   to sit in on yours.  And he sat in on my

15   interview.

16   Q.  Mr. Barker did?

17   A.  Yes.  And we talked after the interview.

18   Because Mr. Barker showed me, and we

19   discussed the four women who were being

20   given -- the recommendation were given

21   to him, to whom he was going to

22   recommend to the superintendent.

23   Q.  To be hired in the position?

1  A.  To be hired for two positions that were

2      advertised.  But you were hiring four.

3      And all were women, two white and two

4      black.

5  Q.  Okay.  And in your conversations with

6      him, did he share with you why you were

7      not recommended for those jobs?

8  A.  And I asked him, because --

9  Q.  And he had nothing to offer?

10 A.  The reading -- the system-wide reading

11     coach positions were new, as were the

12     reading coach positions being new, so

13     what more qualifications would any of

14     those persons have had, other than

15     practical teaching experiences?  Because

16     knowledge of the special curriculum for

17     the interventions, we all started

18     learning and fumbling and making the

19     trial-and-error mistakes at the same

20     time.

21 Q.  Do you know how you interviewed as

22     compared to the other individuals or how

23     well your interview went as compared to

1      them?

2   A.   Well, I knew questions that were going

3        to be asked.  So I think I would have

4        known how to prepare for those

5        questions.

6   Q.   And my only question is:  Do you know

7        how you did in comparison to the people

8        that were awarded the job?

9   A.   The only thing I can say is I knew all

10       the information and I still know all the

11       information.

12  Q.   Okay.  When you had this big

13       conversation with -- first of all, did

14       Mr. Barker sit in on this interview

15       because you wanted him to?

16  A.   No.  I think we had been talking about

17       me and some of these other jobs that I

18       had not gotten.  And he told me, I'm

19       going to sit in on yours.  Because I

20       think I had communicated to him, I'm

21       being blocked somewhere.  And he sat in

22       on mine.

23            But the question I had, I know

1    personnel makes the decision on the

2    interview panel.  But one of those

3    persons at that time was retired from

4    the school system.  And all of those

5    women were conducting those interviews.

6    No representative from Human Resources,

7    other than when Mr. Barker sat in on

8    mine.  And I didn't feel comfortable

9    with that, a recommendation given to you

10   to make a recommendation to the

11   superintendent, when you or your office

12   should have been the one conducting the

13   interview to be able to answer to what

14   he said or what he didn't say.

15   Q.  Well, that's just really your opinion,

16       right --

17   A.  Yeah.

18   Q.  -- about who's doing the interview?

19   A.  But when we look at better practice and

20       Best practice and policy and procedure.

21   Q.  Okay.  That's fine.  The next one was

22       for System-wide Math Specialist.  And

23       you were interviewed.  Who interviewed

1    for that job?

2  A.  I can't -- I'd have to go back.  I can't

3    even recall who interviewed me for that

4    position, but it wasn't anybody from

5    Human Resources.

6  Q.  Do you know who got the job?

7  A.  I'd have to go back and look at the

8    personnel minutes.

9  Q.  So you can't tell us about their

10    qualifications as compared to yours?

11  A.  Well, I know one was a white woman.

12  Q.  Do you know what her qualifications were

13    compared to yours?

14  A.  No, I don't.

15  Q.  Let's go to the next one, Title I

16    School-wide Instructional Assistant at

17    various school locations.  Were the

18    Title I School-wide Instructional

19    Assistants interviewed at the variation

20    schools, or was that done in central

21    office?

22  A.  It was some confusion about that,

23    because one interview I took part in, we

1    were told that we were interviewing for

2    administrative assistants at various

3    schools and SIA positions.  Then we came

4    back, and we had this separate -- there

5    were separate interviews for the SIA

6    positions.  So, I mean, it was kind of

7    like you interviewed twice.  But on this

8    one here, the second time, I never

9    interviewed.

10   Q.  And do you know who got that job, those

11       jobs?

12   A.  I don't even know how many it was.  No,

13       I don't.

14   Q.  The next one says that you've applied

15       for the District Resource/Attendance

16       Officer of Office of Student and

17       Community Services, and that you didn't

18       get an interview?

19   A.  At the time I wrote this, I didn't get

20       an interview.  But I did interview.

21   Q.  Who did you interview with?

22   A.  Mr. Barker and Lois Johnson.

23   Q.  And were you recommended for the

1   position?

2   A.   To my knowledge, the position hasn't

3        been filled.

4   Q.   Do you know why it hasn't been filled?

5   A.   No, I don't.  Ms. Johnson just

6        communicated to me, she said, Melvin,

7        you had an excellent interview.  And

8        from my mother, she said, I don't know

9        where you get your smarts from, which

10       was an insult, because it could possible

11       be innate capability.  But she said that

12       Mr. Carter said that they weren't going

13       to fill the position at that time.

14  Q.   Okay.  Do you know whether that's true

15       or not?

16  A.   Whether what is true?

17  Q.   Whether it was just an executive

18       decision to not fill the position at

19       that time.

20  A.   Well, that's what she told me.  I have

21       no way of knowing if it was true or not,

22       unless the position has been filled or

23       hasn't.

248

1    Q.    Okay.   And you performed that job?

2    A.    That Summer of '04.

3    Q.    Of '04?

4    A.    Yes.

5    Q.    Before you came back for your final year

6          in '04-'05?

7    A.    Yes.   And this was the summer when I

8          questioned Mr. Barker about certain

9          principal -- summer school principal

10         positions for -- see, at this point, we

11         were having ongoing conversations.

12         There were such persons as Denita

13         Easterling, who served as summer school

14         principal, who wasn't even certified.

15         Because she was borrowing information

16         from me to get certified.   And she was

17         interviewing for administrative

18         positions, and she wasn't certified.

19         This was also during the time when I

20         questioned Mr. Barker about jobs that

21         other persons were being recommended for

22         and being hired in and the announcement

23         never surfaced.   And I said, Well, how

1     it was Mr. Looney made this -- I said,

2     But when was the job posted, and when

3     did the interviews take place?  And --

4  Q.  Who were the people that you say got --

5  A.  Karen Vann is one.  Karen Vann --

6  Q.  You don't know what I'm going to ask.

7  A.  Oh, I'm sorry.  I'm just --

8  Q.  I was going to say --

9  A.  Okay.

10 Q.  -- who were the people that you say who

11    got jobs that were not qualified or not

12    certified in those fields?

13 A.  At the time that -- when I interviewed

14    for one of the group interviews for

15    administrative assistant and SIA, a

16    Denita Easterling is one individual in

17    particular, a black female, who

18    interviewed, who was in the process of

19    getting certified in administration.

20    And she was allowed that summer to act

21    as a summer school principal, and she

22    was not certified.

23 Q.  Did you interview for a summer school

1    principal position?

2  A.  They were never advertised.  And when I

3    questioned Mr. Looney about it,

4    Mr. Looney directed me to Ms. Johnson,

5    Sophia Johnson, who was the principal of

6    that school a full year.  And

7    Ms. Johnson suggested that Mr. Barker

8    referred Denita Easterling to her.  And

9    I said, Well, are you-all aware that

10    she's not even certified in

11    administration, but she's your summer

12    school principal?  And the reason I had

13    such a hands-on working relationship

14    with her, there was an issue with a

15    child and some records we had to get

16    from Daisy Lawrence, and I would come

17    from Southlawn, as lead reading coach,

18    to Daisy Lawrence across the street to

19    drop this information.  And it just

20    began to be a slap in the face, because

21    I never knew the summer school positions

22    were available.

23        The second one, Karen Vann,

1   she went from a classroom teacher to a

2   reading coach and then to assistant

3   reading coach and then a reading

4   specialist.  And I said, Mr. Barker,

5   where is this advertised, because I

6   would have liked to -- when Teresa

7   Jackson left, the next thing we know

8   Karen Vann is in the position.  In fact,

9   Karen told me in a sarcastic tone.  And

10  I'm asking, Well, when was it posted,

11  and when can -- or why can't people

12  interview for it?  So those are two in

13  particular, one black female and one

14  white female.

15              MR. PATTY:  It's been an

16              hour and fifteen

17              minutes now.

18          MRS. CARTER:  All right.

19              That's fine.

20          (Whereupon a brief recess

21              was taken.)

22  BY MRS. CARTER:

23  Q.  I asked you before we took a break about

1   any jobs -- or there's two categories of

2   things, and instead of going line per

3   line for this, I read this a little bit

4   more, Defense Exhibit 5.  The two

5   things, from what I can tell that you're

6   saying, in addition to the specific jobs

7   that you have listed here, another of

8   your complaint was that there were

9   people getting jobs that you believe

10  weren't even posted, so you didn't know

11  to interview for them.  An example you

12  gave was Karen Mann getting kind of

13  promoted through the ranks, so to speak,

14  in the reading specialist category --

15  might not be the right word.

16          Can you give me any other

17  examples of individuals who you felt

18  like were receiving promotions or

19  getting jobs that you think, you know,

20  that you would have interviewed for, but

21  you didn't know that the job was open,

22  that wasn't properly posted?

23  A.  You just answered it.  If it wasn't a

255

1    where we're referring to.

2                        (Witness reviewed document.)

3                        (An off-the-Record

4                        discussion was held.)

5             MRS. CARTER:  All right.  We

6                        can get back on.

7    BY MRS. CARTER:

8    Q.  The questions that I was asking you

9        about also came from Defense Exhibit 7

10       where you supplemented to the EEOC to

11       give them some more specific examples.

12       And you gave the example of Karen Vann,

13       which you had testified about, and also

14       Ms. Easterling.  Would you like to refer

15       to that for me to ask you some more

16       questions?  That's what I was getting my

17       questions from.  And I'm showing you

18       page 4 of Defense Exhibit 7.

19   A.  Okay.

20   Q.  Oh, that's where I was getting that from

21       that she had her certification in July

22       of 2004.

23   A.  That's what she told me.

256

1  Q.  Okay.  So what you're saying is you

2      don't really know?

3  A.  I'm telling you that's what she told me.

4  Q.  Okay.  Just to wrap up with Defense

5      Exhibit 5, you say in here at the bottom

6      of the second page, that in making this

7      claim of race and gender discrimination,

8      that the majority of the individuals who

9      have filled the positions listed above,

10     that we just went over --

11 A.  Uh-huh (affirmative response).

12 Q.  -- are either of the opposite race or

13     gender or are not qualified.  Have you

14     already given me any information you

15     have about these individuals, sitting

16     here today?

17 A.  All that I'm able to.

18 Q.  Right.  Okay.  And I know that other

19     information might exist somewhere, but I

20     just mean that you can provide to me.

21 A.  Uh-huh (affirmative response).

22 Q.  Okay.  All right.  And looking back at

23     Defense Exhibit 7, we stopped here at J

1  when we were going over jobs you had
2  been interviewed for.  And I'm going to
3  pick back up where we are, but real
4  quickly just wanted to say:  Can you
5  tell us what jobs you were offered in
6  Macon County?
7  A.  I was offered a teaching job in Macon
8      County.
9  Q.  And who offered you that job?
10 A.  In fact, that was a Special Education.
11     Ms. Fannie Adams (phonetic).
12 Q.  And why did you turn it down?
13 A.  Because I had gotten the job in Bullock
14     County.  See, those jobs, actually they
15     were not calling me saying you've got
16     the job; we're going to give you the
17     job.  It was very close to school
18     starting, and I was going into Bullock
19     County at that time.
20 Q.  You had already gotten the job in
21     Bullock County when you got offered a
22     job in --
23 A.  See, I went on a string of interviews.

265

1    strators view Melvin, they see Mary

2    Lowe, and they aren't favorable about

3    hiring him at that point.

4  A.  That is true.

5  Q.  And that she made that -- Ms. Johnson

6    made that communication to your mother

7    in July of '04?

8  A.  Yes.  That was the first time she made

9    the statement.

10  Q.  Okay.  And that was going to be my

11    question that we have not clarified yet

12    from my little notes here:  That's the

13    first time Lois Johnson said something

14    like that -- and I think we were getting

15    into that before the break -- which was

16    the Summer of '04, which is what this

17    document reflects?

18  A.  That was the first time she said it to

19    Mother.

20  Q.  Did she ever say that to you?

21  A.  She said it to me once.

22  Q.  Okay.  And what did she say?

23  A.  She just -- and this was in her office

1    one afternoon during the first year at

2    Daisy Lawrence.  And she said -- she

3    said, Melvin, she said, you know the

4    problem you're having, she said, you

5    know when people look at your momma,

6    they look at you.  She said, You know,

7    that's what we always say, you know, he

8    is Mary.  And --

9  Q.  And this is -- I'm sorry, when did you

10      say she said that to you?

11 A.  This was the first -- my first full year

12      at Daisy Lawrence, back at Daisy

13      Lawrence.

14 Q.  Back in '99?

15 A.  No.  The first full year after

16      Southlawn.

17 Q.  When you came back.  You're saying back,

18      I'm sorry.

19 A.  This was on -- and I don't even have the

20      date.  But it was during that school

21      year one afternoon in her office.

22 Q.  When they look at you, they look at your

23      momma?

1  A.  They see Mary.

2  Q.  They see your momma.  Anything else that

3      Ms. Johnson has said directly to you of

4      that nature?

5  A.  No.

6  Q.  Anything else that Ms. Johnson has said

7      to your mother of that nature, that your

8      mother subsequently relayed to you?

9  A.  This last year that I was at Daisy

10     Lawrence, Ms. Johnson made that

11     statement again to my mother, and it

12     kinda got hot.  It was heated at that

13     time.

14 Q.  Did you put down the statements -- at

15     the time that you wrote this document,

16     Defense Exhibit 7, did you put down the

17     statements of anything said like that,

18     to the best of your recollection?

19 A.  Are you asking did I do this at a later

20     date?

21 Q.  No.  I asked a horrible question.

22          When you wrote Defense Exhibit

23     7, did you relate -- because these

1     statements that we just asked you about,

2     there were three of them.  Did you

3     reflect what was actually said during

4     those alleged conversations, to the best

5     of your ability or memory, at that time?

6  A.  Yes.

7  Q.  Okay.  Any other -- Summer of '04,

8     Ms. Johnson said something to your

9     mother; during the school year of

10     '04-'05, Ms. Johnson said something to

11     your mother --

12  A.  Yes.

13  Q.  -- and then you've told us about the

14     time Ms. Johnson said something to you?

15  A.  Yes.

16  Q.  Those are three occasions that I'm

17     recalling.

18  A.  Yes.

19  Q.  Any other time that you can think of

20     that Ms. Johnson said anything about

21     your mother to you or to your mother?

22  A.  Right before -- while Mr. Carter was

23     still superintendent, right before I

1    came back to Montgomery County, I was

2    still in Bullock County.  My mother

3    called Ms. Johnson, it may have been on

4    a Saturday or a Sunday, to ask her what

5    did she think she needed to do to help

6    me get back in Montgomery County.

7  Q.  So that would have been the Summer of

8    '03, then?

9  A.  Yes.  And they had a long conversation.

10    And Momma -- my Mother told me, she

11    said, Melvin, Lois just said that you

12    know how people sometimes get back at

13    your children, you know, get back at you

14    through your children.  And she just

15    told me what we needed to do.  At that

16    time, my mother informed her, she said,

17    Well, I'm just telling you Melvin and I

18    are going to see if we can sit with

19    Mr. Barker and talk to Mr. Barker and

20    see if we can -- whatever we need to

21    work out, can we work it out?  That was

22    the first time my mother and Ms. Johnson

23    had a conversation, to my knowledge,

1    about any of these proceedings.  And

2    then we have two to me, then three to

3    Momma, then four to her again, the

4    fourth time something was said.

5  Q.  Oh, oh, oh, I thought you were saying

6    three times -- yeah.  Okay.  Any other

7    that you can think of today?

8  A.  No, that is it.  That is all that I'm

9    aware of.

10  Q.  Okay.  And I asked you about Mr. Barker,

11    and you told me that he said -- first

12    that your mother walked in on a

13    conversation he was having with Ann

14    Sippial, where he said words to the

15    effect that he's just like his momma,

16    his reputation --

17  A.  His personality supersedes him.

18  Q.  His personality supersedes him.  And

19    that allegedly occurred also in the

20    Summer of '03, I think.  I'm not trying

21    to change your testimony.

22  A.  Yes.

23  Q.  It'll speak for itself.  I might be

1    asked him, Defend me about what and for

2    what? And then he went into all of

3    this.

4  Q.   Okay. So you're not exactly sure what

5    was said in their conversation?

6              MR. PATTY:  Object to the

7                   form.

8  A.   I'm just telling you that -- I'm telling

9    you what Dr. Owens told me. I wasn't a

10   fly on the wall. That's just -- that's

11   what he told me.

12 Q.   Okay. And I'm not trying to be

13   difficult, I promise. And I might just

14   be getting confused. But I'm trying to

15   ascertain what he said Mr. Barker said

16   or what he was just saying. Like

17   Dr. Owens was saying -- was he the one

18   saying you shouldn't drive a Mercedes

19   and things of that nature, as opposed to

20   did he tell you that he was repeating

21   something that Jimmy Barker allegedly

22   said to him?

23             MR. PATTY:  Object to the

1                    form.

2  Q.  And I'm sorry if I'm not --

3  A.  He told me that he had to defend me

4      today.  And he talked with Mr. Barker,

5      and these are some of the things that,

6      Brother Lowe, you need to do.  Because

7      these are the opinions that are out

8      there about you, and this is why people

9      don't take you seriously as far as the

10     jobs that I was trying to attain.

11     That's what he told me.

12 Q.  Okay.  Dr. Owens told you that at what

13     time, in your first or second year at

14     Daisy Lawrence after you came back?

15 A.  That was the second year.

16 Q.  Oh, I'm sorry.  You've already -- that

17     was either right before or right after

18     you got pink-slipped you said?

19 A.  It was either a day before or a day

20     after.

21 Q.  You said that already, okay.

22          Okay.  We've talked about Lois

23     Johnson, we've talked about Dr. Carter,

1      for me.

2   Q.  Bobby Abrams (phonetic)?

3   A.  Bobby Abrams.  And Mr. Looney was aware

4      that Bobby Abrams asked for me.  Because

5      Mr. Looney said if there's a problem

6      when you see Mr. Barker, come back to

7      me.  If you want Melvin Lowe, you can

8      have him.

9   Q.  Who told him that?

10   A.  Mr. Looney.  Because in that same

11      conversation that I had with Mr. Barker,

12      Mr. Barker told me that Mr. Carter

13      said -- Mr. Barker told me I had a good

14      interview, and that Mr. Carter said that

15      you will either be in one of the --

16      you'll either be an administrator or you

17      will either be in one of these reading

18      positions.  I rest -- I took rest,

19      because I assumed that to be true.  And

20      when --

21   Q.  Dr. Carter said that?

22   A.  That's what Mr. Barker said he said.

23   Q.  So this was the year after he said you

1    would only ever be a teacher?

2  A.  Yes.

3  Q.  Okay.

4  A.  There was some disbelief, but Mr. Barker

5      told me that's what he said.

6  Q.  What was the job that Bobby Abrams was

7      recommending you to take?

8  A.  Administrative assistant.

9  Q.  It had nothing to do with Special

10     Education?

11  A.  That comes later.  That's the next year.

12  Q.  Okay.

13  A.  May I finish?

14  Q.  Go ahead.  Yes, I apologize.

15  A.  And Mr. Abrams told me that Mr. Barker

16     told him that he'd have to hire a

17     female.

18  Q.  That he had to hire a female for the

19     administrative assistant position at

20     McKee?

21  A.  Yes.

22  Q.  Did a female get that job?

23  A.  Yes.

284

1   Q.   Did you ever talk to Mr. Barker about

2        it?

3   A.   I don't think I did, not after that.

4   Q.   Okay.  Because this again is in the

5   .    Summer of '04.

6             All right.  And then you go on

7        to talk about the limited number of

8        black men in leadership or

9        administrative positions.  And I would

10       just ask in general to any of these

11       statistics or anything that y'all

12       provided, do you have any information,

13       sitting here today, where a white

14       individual was hired over a black

15       individual who was less qualified than

16       the black applicant?

17             MR. PATTY:   Object to the

18                  form.

19  A.   You would have to poll the rubrics, the

20       assessment rubrics that were used to

21       weigh one applicant against another.

22  Q.   I'm just asking --

23  A.   Okay.

285

Q.   -- if you can tell me about today an
     example of where a white applicant was
     hired where you believe or have
     information that the black applicant had
     better qualifications?

            MR. PATTY:  Object to the

                   form.

                   Go ahead.

Q.   In any of these positions that you're
     referring to?

A.   I would have to know what qualifications
     were in the rubric, the assessment
     rubric, or whatever form of assessment
     was being used.  And then I could
     balance it out and then say, Well, look,
     this is the reason I feel this way.

Q.   Is your statement here, then, that you
     just believe there's discriminatory
     practice, because there should be more
     black people in these positions you've
     listed?

A.   When you survey each department and you
     look at who holds the leadership

1    positions, it's evident.

2  Q.  You say in the next paragraph that

3    Dr. Carter told Mr. Barker in June of

4    2003, that you would be in a reading

5    position or administrative position for

6    the upcoming school year. And that

7    Mr. Barker told you that your interviews

8    were excellent, and that he had heard a

9    lot of great things regarding your

10   knowledge of curriculum and instruction,

11   and thus, the implementation of

12   policy/procedures in an educational

13   administration?

14 A.  Yes, that is true.

15 Q.  When did Mr. Barker tell you that?

16 A.  That was during the summer, that last

17   summer right after Mr. Abrams informed

18   me that he made a recommendation for me

19   for the Assistant Principal's

20   position -- administrative assistant's

21   position at McKee. And that was right

22   before Mr. Abrams came back to tell me

23   that Mr. Barker said he would have to

287

1    hire a female.  That was what Mr. Barker

2    told me shortly after we had the large

3    group of interviews.

4  Q.  And Mr. Barker was a part of those

5      interviews?

6  A.  Yes.

7  Q.  And then through the course of your next

8      few paragraphs of this document, it

9      appears that you are addressing the

10     issue of your assignment to Daisy

11     Lawrence that last year and whether you

12     should have been assigned there and what

13     your job duties were?

14  A.  Yes.

15  Q.  And so I guess my question was:  Have

16     you told us -- I think you testified

17     about that earlier.  Is there anything

18     that you would like to add to that in

19     regards to your assignment at Daisy

20     Lawrence that last year or what your

21     job --

22              MR. PATTY:  Object to the

23              form.

296

1  Q.   On this document, it says that Dr. Owens

2       told you on May 19th, 2005, that Jimmy

3       Barker said that you were not liked by

4       the school system and you should have

5       never filed your lawsuit?

6  A.   That is true.

7  Q.   Dr. Owens told you that Jimmy Barker

8       said that?

9  A.   Yes.

10 Q.   Okay.  Because you had not told us about

11      that earlier.  And it might be that I

12      just limited my question to the time

13      period, and I apologize.

14 A.   Okay.

15            MR. PATTY:  Object to that.

16            I think he did mention

17            that -- that the very

18            first time you asked

19            him about that

20            conversation, he said

21            he -- that Barker had

22            said that he shouldn't

23            have filed his lawsuit.

1      MRS. CARTER: Okay.  Maybe

2          so.

3      THE WITNESS:  I think I did.

4      MR. PATTY:  We've covered

5          this conversation twice

6          before, I think.

7      THE WITNESS:  Yeah.  I'm

8          almost certain that I

9          did.

10  BY MRS. CARTER:

11  Q.  It's just confusing, because sometimes

12      when -- and I don't mean this bad, but

13      sometimes when you refer to summers or

14      dates, they've been -- but I think we

15      have it all clear now.

16          And this is not the

17      conversation we discussed earlier.  It

18      can't be, because of when you said that

19      happened.  And so I guess -- I mean,

20      have you had more than one conversation

21      with Dr. Owens where he told you that

22      Mr. Barker had said words to that

23      effect?

1    that is -- if you recognize that as an

2    e-mail that you sent to Mr. Barker and

3    copied Dr. Purcell with?

4                        (Whereupon Defendants'

5                        Exhibit No. 20 was marked

6                        for identification and

7                        attached hereto.)

8                  (Witness reviewed document.)

9  A.   I do.

10 Q.   Okay.  Let me show you what I'll mark as

11   Defense Exhibit 21, and ask you what

12   this is and how it came about?

13                        (Whereupon Defendants'

14                        Exhibit No. 21 was marked

15                        for identification and

16                        attached hereto.)

17                  (Witness reviewed document.)

18 A.   This is a letter of recommendation from

19   Dr. Owens that he provided me.  After my

20   lawsuit was filed, he then suggested to

21   me that a number of reasons I probably

22   wouldn't be able to get a job back in

23   Montgomery County based on conversations

306

1   A.  Yes, he did.

2   Q.  And did you have any communication with

3       him about why you did not receive the

4       job?

5   A.  Yes, I did.

6   Q.  And what did he say to you?

7   A.  It was a string of events.  He first

8       told me he had to talk to Mr. Barker.

9       After he told me he talked to

10      Mr. Barker, it was still up in the air,

11      because Mr. Barker had to communicate

12      with Connie Mizell, who interviewed me

13      for the position.  And when I approached

14      Mr. Barker, Mr. Barker told me that

15      Connie Mizell said I had a poor

16      interview.

17   Q.  Mr. Barker said you had a poor

18      interview?

19   A.  He said that Connie Mizell stated I had

20      a poor interview.

21   Q.  Okay.

22   A.  That's who interviewed me.  And we kept

23      going back and forth until Dr. Owens

1    finally positioned the school board

2    again and told me that Ms. Carla

3    Winborne told him, You're going to have

4    to pick somebody else, because we're not

5    hiring Melvin Lowe.

6  Q.  Carla Winborne told Dr. Owens that?

7  A.  Yes.

8  Q.  And what is Carla Winborne's position?

9  A.  She, I think, is an AA Specialist, a

10    Human Resource Specialist in Human

11    Resources.

12  Q.  And do you know why she said she was not

13    going to hire you or that the school

14    board wasn't going to hire you?

15  A.  I don't know.  She told me that --

16    Dr. Owens told me that's what she told

17    him, that they, whoever "they" the

18    pronoun is, that they were not going to

19    hire me and to pick somebody else.

20  Q.  Let me show you what I've made kind of

21    as a composite exhibit instead of going

22    to each one of these individually, and

23    what I would characterize as what

1        appears to me to be correspondence that

2        you had with central office or various

3        principals in regards to jobs that you

4        were interested in, administrative

5        positions, coaching positions.  And if

6        you want to flip through that and make

7        sure I characterized that right.

8   A.   No coaching positions.  Reading coach.

9   Q.   I mean -- that's what I meant to say.

10       I'm sorry.  Hey, my dad's a football

11       coach, so I made a slip on that.  All

12       right?

13  A.   Right here what you have are the e-mail

14       communications for the principals that I

15       was unable to contact via fax.

16  Q.   And we're fixing to mark that.  But what

17       I'll mark as Defense Exhibit 27, it

18       looks like to me -- and if we've made a

19       mistake, it was on accident -- it seems

20       to be verification of good transmission

21       to the various school locations where

22       you sent faxes.  So what you're telling

23       us is if we compared 27 to 26, a lot of

311

1                    attached hereto.)

2              (Witness reviewed document.)

3   A.   This was after Dr. Purcell and

4        Mr. Barker spoke to the entire faculty

5        at Daisy Lawrence about the school being

6        closed due to reorganization and funding

7        and some deficiencies in those areas.

8        The question was posed by a teacher,

9        Will everyone be placed?  And

10       Dr. Purcell stated that everyone will be

11       placed, however, tenured people would

12       have first choice and they will be

13       placed first.  And Mr. Barker seconded

14       that.  Which is my reason in here I

15       revisited -- I'm not putting words in

16       your mouth, but this is what she said.

17       And everybody has been placed, tenured

18       and nontenured, except Melvin Lowe, and

19       I need some help.  And this was where he

20       provide me with his explanation.

21  Q.   Now, Defense Exhibit 19 refers to a

22       woman by the name of Zara Brown, who you

23       say in here was not reassigned?

1   Q.   I'm just kind of -- I guess I'm not

2        exactly sure what you're talking about.

3   A.   AEA felt that because all of this was

4        getting ready to take place, that would

5        tie into this.  It was all a joint.

6                       MR. PATTY:  He seeks the

7                       UniServe or whoever's

8                       assistant to intervene,

9                       and the UniServe person

10                      would make the contact.

11                  MRS. CARTER:  Would

12                      intervene, right.

13                  MR. PATTY:  Right.

14                  MRS. CARTER:  Right.  That's

15                      what I thought.

16   BY MRS. CARTER:

17   Q.   And so then, because you went on and

18        filed with the EEOC, or whatever, that

19        kind of, I guess, usurps that process or

20        whatever --

21                       MR. PATTY:  I think the EEOC

22                      was already filed when

23                      the leave issue came

1    professional leave -- I mean,

2    professional development time or leave

3    to go on professional development to

4    speak or to present at Nova in October

5    of 2004.  Do you know what I'm talking

6    about?

7   A.  Correction.  That was to present at the

8    national -- what is that?  Yeah, the

9    National Schools for Reform Conference.

10    It was not Nova.  I don't want anyone to

11    think that it had anything to do with my

12    doctorial program.

13  Q.  Oh, it was sponsored by Nova.

14  A.  It was sponsored.

15  Q.  Okay.  That's where I got it.  Well, I

16    wasn't trying to throw you a curve ball.

17  A.  I know you're not.

18  Q.  And I think that some of this stuff is

19    just repetitive, but tell me -- I'll try

20    to flip through real quick -- tell me

21    about that.  I mean, you requested to go

22    for this professional development, and I

23    guess you did not hear back initially;

1     is that fair to say?

2  **A.**  I requested to go.  I held a verbal

3     conversation with Mike Looney, who

4     encouraged me to go, along with Judy

5     Wardoff (phonetic) and Linda Sexton, who

6     encouraged me to go.  I compiled my

7     information, filed it with Dr. Owens.

8     Dr. Owens approved it.  If you look at

9     the date of when I gave it to him and

10     how long it sat before I was notified

11     that I would not be allowed to go, as

12     opposed to some of the other

13     professional development activities from

14     other persons in the same school who

15     applied to go different places and the

16     turnaround time.  When I asked

17     Mr. Barker, Why was mine denied by you

18     and all of my other professional

19     development activities had been approved

20     by Carol Hicks, but like all of mine all

21     of a sudden are being denied by you,

22     Mr. Barker told me that Mr. Looney said

23     that he didn't see where a classroom

1    teacher was sufficient enough to present

2    at a national conference, which

3    conflicts with what Mr. Looney provided

4    me in a written e-mail.

5  Q.  Okay.  So you feel like this was some

6      type of retaliation or discrimination --

7  A.  Yes, I do.

8  Q.  -- the way you were treated about this

9      professional development?

10 A.  Yes, I do.  And being that I had

11     communicated with Dr. Purcell about it,

12     and she even felt that it was a

13     wonderful opportunity to have

14     representation from Montgomery County at

15     this event.

16 Q.  How did it come about that you were

17     asked to present?  Did you ask them if

18     you could present?

19 A.  I received the correspondence in the

20     mail.  And I did, I initially registered

21     as a presenter.  And everything from

22     there began to develop.  And they asked

23     me to send in a scoping sequence of what

1      I was going to present.  I did, which

2      you see my itinerary and everything that

3      is listed that I was going to present,

4      the time framing --

5  Q.  Yeah.  Let me show you, this is Defense

6      Exhibit 32, which is just a grouping of

7      documents that seems to be -- and I know

8      some of it is repetitive, but I was just

9      scared not to mark it all -- I guess in

10     regards to who you corresponded with,

11     where you have the program, a copy of

12     the program, your application, your

13     request to speak.  The request to speak

14     was dated in October, and it says, Dear

15     Colleague.  It seemed to be they were

16     responding to a request from you.  And

17     that's what I was asking is:  Did you

18     request?

19           (Whereupon Defendants'

20             Exhibit No. 32 was marked

21             for identification and

22             attached hereto.)

23           (Witness reviewed

1          it; it sounds good?

2    A.    And then I wrote the initial request and

3          presented it to Dr. Owens.

4    Q.    Is it common for a teacher to take off

5          time like this and get this kind of

6          expenses to go present at a conference?

7    A.    I've seen it in other districts, and I'm

8          almost certain that it has been done in

9          our district.

10   Q.    Can you give me any examples of anybody

11         who's allowed to go off on a trip like

12         this to present that works in our

13         district?

14   A.    I would actually have to sit and go --

15         that's privileged information.  I would

16         have to actually go and look through

17         some of the professional development.

18         But it wasn't something that was so

19         farfetched, because Mr. Looney would

20         have said nay or yea.  And he said yea.

21   Q.    So who put the kibosh on it?  Who said

22         no?

23   A.    Mr. Barker.