1  Q.  Okay.  And how do you know that?  Did

2      you talk to him about it?

3  A.  He told me that -- after receiving the

4      notice where it was declined, he then

5      told me that Mr. Looney said that he

6      didn't see where a classroom teacher was

7      sufficient enough to present and

8      represent the school district at a

9      national conference, which I said

10     contradicts what he told me and e-mailed

11     me.

12 Q.  Contradicts what Mr. Looney told you and

13     e-mailed you?

14 A.  Contradicts what Mr. Barker said

15     Mr. Looney said.

16 Q.  Okay.  I've got -- let's see.  Let me

17     see if I can find it real quick.  I have

18     a copy of an e-mail that Mr. Looney sent

19     you when you inquired of him or asked

20     for his help.  Is there more than one

21     e-mail that you know of?

22 A.  No, there was just the one, I believe.

23 Q.  Okay.  Were there any other occasions

1    Q.   Do all the documents that you're looking

2         at refer to that professional

3         development request?

4                        (Witness reviewed document.)

5    A.   Yes.

6    Q.   We'll make that Exhibit 39.

7                        (Whereupon Defendants'

8                         Exhibit No. 39 was marked

9                         for identification and

10                        attached hereto.)

11   Q.   Who said no to that one?

12   A.   This one here, Dr. Owens approved.  But

13        then he came back and told me that he

14        couldn't approve it, because Mr. Barker

15        said it wasn't in line with my job

16        description.

17   Q.   Do people's request for professional

18        development get approved or disapproved

19        based on certain factors regarding

20        whether it fits in their job

21        description?

22   A.   As with all.  As with all.

23   Q.   I mean, that's the common practice; is

1      as to whether or not you should be

2      employed?

3  A.   No.

4  Q.   Have you ever had any conversations with

5      any of the school board members about

6      your employment or your nonrenewal with

7      the Board?

8  A.   No.

9  Q.   Have you ever been told, or has your

10     mother or anyone else been told, that

11     told it to you, anything that the school

12     board has said about your employment for

13     any of these jobs that would relate to

14     your race, your age -- excuse me, your

15     race or your sex?

16 A.   No.

17 Q.   Have you ever been told by anybody that

18     the Board has said anything about your

19     lawsuit or your mom's charges against

20     the Board?

21 A.   No.

22 Q.   When did your mom make charges against

23     the Board?

1   A.   I would -- I really don't know.  I

2        was -- I was, I think, maybe in

3        elementary or junior high school.  It's

4        been awhile.

5   Q.   It's been a long time ago, hasn't it?

6        In fact, your mom is still employed with

7        the Board, isn't she?

8   A.   Yes.

9   Q.   And your brother, Marvin, is employed

10       with the Board?

11  A.   Yes.

12  Q.   And what is his job?

13  A.   He's Director of Guidance at Jeff Davis

14       High School.

15  Q.   Okay.  Is he of the opinion that he has

16       suffered retaliation as a result of his

17       relationship with your mother?

18  A.   Yes.

19  Q.   He does?  Are there jobs that he has not

20       received, that he believes he deserved,

21       because of his relationship with your

22       mother -- I say relationship -- because

23       of his mother?

1   A.   There was one.

2   Q.   And what was that?

3   A.   It was an administrative assistant's

4        position, I think at Houston Hill.  And

5        some kind of way it was twisted that the

6        job wasn't available or you were not

7        supposed to interview.  It was some --

8        he and Mr. Barker had some dialogue

9        about it.  Later to find out a principal

10       said to me, Well, I wanted to hire him.

11       I didn't know you from him.  I just saw

12       the last name.  I wanted to hire him.

13       When I found out who he was, I wanted to

14       hire him, but, you know, they told me I

15       had to hire somebody else.

16  Q.   Was he ever given any information that

17       that was because of his mother?

18  A.   If it's been said to him, he hasn't

19       relayed it to us.

20  Q.   Okay.  Has he had a successful career

21       with the Board?

22  A.   It could have been better.

23  Q.   In what way?

1  A.  It could have been better.

2  Q.  And what do you mean by that?

3  A.  There have been jobs that he has applied

4      for that he possibly could have

5      attained.

6  Q.  Do you have any idea about the

7      qualifications of the people who did get

8      those jobs?

9  A.  No, I don't.

10  Q.  Has he gained tenure with the Board?

11  A.  Yes, he has.

12              MRS. CARTER:  All right.

13              Let's take a short

14              break.

15          (Whereupon a brief recess

16              was taken.)

17  BY MRS. CARTER:

18  Q.  In looking at your amended Complaint or

19      your Complaint, because some of my

20      questions will come from your Complaint.

21      It appears that the initial claim that

22      you make -- well, it doesn't appear in

23      your lawsuit that you allege that you

1    were nonrenewed in 2002 based on

2    discrimination or retaliation.  And

3    you've testified today that that is part

4    of your lawsuit.  So I'll just ask if

5    you've already told us everything about

6    any evidence or information you have

7    that you were nonrewed at the end of

8    your Southlawn tenure as a result of

9    discrimination or retaliation?

10   A.   Ask that again.

11   Q.   Is there any other information or

12   evidence that you haven't already told

13   us that you were nonrewed after teaching

14   at Southlawn because of discrimination

15   or retaliation?

16   A.   No, there's no new information.

17   Q.   Okay.  Because in looking at your

18   Complaint, it says that in the Summer of

19   2003, that you sought positions and were

20   eventually hired as a reading coach, and

21   then it goes into the details that we've

22   already kind of hashed out regarding

23   that position not really being a reading

1    that would identify that he felt my

2    qualifications outranked or outweighed

3    this other person.

4    Q.   Okay.

5    A.   And --

6    Q.   Do you personally know what her -- it

7    was a female, correct?

8    A.   Yes.

9    Q.   Do you personally know what her

10   qualifications were?

11   A.   No, I don't.

12   Q.   Do you know whether she'd ever been an

13   administrative assistant in a school

14   system before?

15   A.   I don't know.

16   Q.   Okay.  You further allege that after

17   having filed your charge, that you were

18   not granted professional development

19   even though your principal approved the

20   leave, correct?

21   A.   Yes.

22   Q.   And it's your belief that if Mike Looney

23   was asked, he would say that he agreed

1   that you should go on this professional

2   development?

3 A.   Yes.

4 Q.   Are you speaking here in particular

5   about the October 2004 request -- or I

6   guess both, because you had another one

7   before this was filed?

8 A.   Yes.

9 Q.   And then February 2005?

10 A.   Yes.

11 Q.   In Paragraph 9, it says that in one

12   instance the Montgomery County Board of

13   Education hired an administrative

14   assistant over you, who was not

15   currently certified in administration as

16   Lowe was.  Are you talking about Denita

17   Easterling?

18 A.   Yes.

19 Q.   And you've told us all about that?

20 A.   Yes.

21 Q.   It says here that the problem was that

22   the superintendent and management of the

23   Board would not allow you to take jobs

1    (phonetic) asked me was I available to

2    teach, could I teach Special Education.

3    And he told me that a friend recommended

4    me to him, and he was waiting -- I've

5    been waiting for two weeks for you to

6    call me, and do you want science or

7    English?  And I told him, I said, Well,

8    let me take the English since I've

9    taught science at secondary level.  And

10   he told me to go and see Mr. Barker.

11              He then called me that

12   afternoon, early evening, and he assured

13   me, Don't you do anything until you see

14   Mr. Barker.  I still want you over here.

15   I need you to go and see Mr. Barker.

16   Don't do anything, but see Mr. Barker.

17   Q.  Okay.  Did you not tell me earlier that

18       you're not certified to teach Special

19       Education?

20   A.  I am eligible for emergency

21       certification.  I can't say I'm not

22       certified, because I do qualify for

23       certification.  We have just never

1      applied for certification.

2  Q.  Okay. And I understand that. My

3      question is: At that time, were you

4      presently certified to teach Special

5      Education?

6  A.  No. I did not hold an endorsement in

7      Special Education.

8  Q.  Okay. Did Mr. Sikes -- that's David

9      Sikes, right?

10 A.  Yes.

11 Q.  Did Mr. Sikes ever tell you why he could

12     not give you the job?

13 A.  No. He avoided me. Because he was

14     fully aware that we would have to apply

15     for an emergency certificate. Because I

16     had all of the coursework and everything

17     from an accredited institution that we

18     were going to go through. He clearly

19     knew everything and was satisfied with

20     it.

21 Q.  All right. What was the second job?

22 A.  The second one was --

23 Q.  And it doesn't have to be in

1    chronological order.  I just want to get

2    the four.

3  **A.**  -- with Mr. Quesha Starks at BTW Magnet.

4    And after the interview with me -- we

5    had a very lengthy interview -- she

6    called me late one evening to tell me

7    that she was getting ready to make her

8    recommendation, and I need to get your

9    phone numbers, because -- and I need to

10    give you my phone numbers, because we

11    will be working closely together next

12    year.  And I need to be able to get in

13    touch with you after, you know, the

14    Board meeting.  But I'm getting ready to

15    make my recommendation, and I just have

16    one other interview I need to conduct

17    over the phone.  But I've already made

18    my decision, and I'm getting ready to

19    call Ms. Hicks with my recommendation.

20  **Q.**  Did she tell you that she was going to

21    recommend you?

22  **A.**  Why would she call me to tell me that --

23  **Q.**  Did she tell you that she was going to

1    recommend you?

2  A.  No.  She suggested that we would work

3    closely together next year, and I need

4    to be able to get in touch with you

5    after the Board meets, and we need to

6    get in touch with each other.

7  Q.  And she still had an interview to do?

8  A.  She had a phone interview that she said

9    she was going to do.  But she had

10    already made up her mind on who she was

11    recommending.

12  Q.  Do you know how that phone interview

13    went or whether she changed her mind

14    after she had the phone interview?

15  A.  She interviewed my brother.

16  Q.  On the phone?

17  A.  Yes.

18  Q.  Okay.  And did you have any

19    communications with her about whether

20    she recommended you for the job?

21  A.  She avoided me.  After the announcement

22    came out, she avoided me.

23  Q.  What was the third job?

1   then nothing happened.

2  Q.  Did you have conversations with Jimmy

3      Barker about the fact that you did not

4      have a Special Education certification

5      in conjunction with Bobby Abrams wanting

6      to hire you for that position?

7  A.  We had that conversation earlier.  I

8      don't remember when we had it.  Because

9      Ms. Hicks interjected to tell me that I

10     didn't qualify for -- and I contradicted

11     her with the State Department.  And I

12     clearly do meet the requirements.  And I

13     do have the coursework, shy of three

14     courses, to be certified in Special

15     Education, shy of an internship.  I even

16     gave Mr. Barker the same information

17     that I gave Mr. Sikes, with the courses

18     on an accredited section of approved

19     schools curriculum, the courses that

20     came from all of my transcripts.

21     Mr. Barker said, Well, Melvin, these

22     courses don't read a prefix with Special

23     Education.  But they don't have to.

1        Certain courses will read prefixes, the

2        others will not.

3    Q.  Okay.  Let me ask you this.

4    A.  Okay.

5    Q.  Have you even completed, sitting here

6        today, the classes that you have to take

7        to be certified in Special Education?

8    A.  Yes.  The additional three, no.

9    Q.  Okay.  So you would still today -- and

10       I'm not talking about emergency

11       circumstances --

12   A.  Uh-huh (affirmative response).

13   Q.  -- but today you would have to complete

14       additional coursework to get your

15       certification in Special Education?

16   A.  If somebody offered me a job.

17   Q.  Did you ever tell Jimmy Barker that you

18       were certified in Special Education, you

19       just needed to get --

20   A.  I already told him -- oh, I'm sorry.

21   Q.  -- that you just needed to get him the

22       paperwork?

23   A.  No.  I always told Mr. Barker I'm

1    eligible for the emergency certificate.

2    It never came up.

3  Q.    Did Mr. Barker ever say fine, with you

4    being a Special Ed teacher for

5    Mr. Abrams, but you've got to be

6    certified in the position?

7  A.    We didn't talk, I don't think, after the

8    situation with Mr. Abrams.  After Carol

9    Hicks told Mr. Abrams that I changed my

10    mind, I don't think I talked to

11    Mr. Barker after that.

12  Q.    So your conversations with Mr. Barker

13    about your Special Education

14    certification, based on your testimony,

15    would have been related to Sikes,

16    Principal Sikes?

17  A.    Yes.

18  Q.    Okay.  What was the fourth job?

19  A.    Dr. Owens, at Patterson, interviewed me

20    for the reading coach position, grades

21    four through six.  And after I

22    interviewed with -- I interviewed with

23    Connie Mizell, Sherry Dice (phonetic),

1    and Sharon Sewell initially.  And then

2    Dr. Owens called me and said, you know,

3    I've got your name on the list, you've

4    been cleared to interview for reading

5    coach positions.  He called me in about

6    maybe two days.  I thought it would have

7    been the first, but he called me two

8    days later to tell me that, I'm going to

9    go ahead and send in I want you.  And we

10    were sitting back, you know,

11    anticipatory that everything would

12    unveil.  And the problem was, Dr. Owens

13    kept saying he needed to talk to

14    Mr. Barker, he couldn't get in touch

15    with Mr. Barker.

16              Finally, because the school

17    year was constantly moving ahead, Dr.

18    Owens talked to Carla Winborne, who

19    said -- before he talked to Carla

20    Winborne, Ms. Mizell positioned him with

21    two women to hire.  And after he didn't

22    select either one of those women and

23    kept submitting my name, it was then the

1  **A.**   Mr. Abrams had -- at McKee Junior High,

2       I think it was a Special Ed, a B.I.P.

3       unit, Behavior Intervention Program

4       unit.  And he asked me -- we

5       interviewed.  And after we had

6       interviewed, he told me -- it was like

7       this, I'm going to call you the next

8       day.  When he called me, he was kind of

9       upset, because he said, Melvin, why

10       didn't you tell me you changed your

11       mind?  I said, What are you talking

12       about?  I didn't change my mind.

13       Ms. Hicks said that she spoke with you

14       and you just didn't want it, you changed

15       your mind, and I had to pick somebody

16       else.

17            And, you know, we went back to

18       the initial incident.  And I said to

19       myself, Bobby -- Mr. Abrams, the same

20       thing again, you know, I didn't tell you

21       that, just like when you told me before

22       you recommended me.  And Mr. Barker told

23       me that he had a recommendation.  And

1    statement, Well, you had a poor

2    interview. I've been doing -- I'm

3    sorry.

4  Q.  Go ahead. I apologize. I was just

5    breathing.

6  A.  You had a poor interview. I had been

7    doing this job for the past two years.

8    I hardly believe I had a poor interview.

9    And then I wrote a dissertation on

10    reading instruction. I don't think I

11    had a poor interview with something as

12    competent as I would have been with it.

13  Q.  Were you ever told by Dr. Owens that

14    Mr. Barker had explained to him that you

15    had to go through the interview process

16    with curriculum instruction, who rates

17    the interviewees and then sends them out

18    to the schools?

19  A.  We did that.

20  Q.  And you went through that process?

21  A.  Yes.

22  Q.  After being told that you had to go

23    through it? He sent you back through

1        that process, correct?

2   A.   No.  I went through the process first,

3        and then I was sent to Dr. Owens.

4   Q.   Okay.  All right.  Do you know whether

5        the people who interviewed you at

6        curriculum instruction, whether they

7        rated you high or recommended you to the

8        principals for hire?

9   A.   Mr. Barker told me that Connie Mizell

10       stated I had a poor interview which --

11  Q.   Was she one of the people that

12       interviewed you?

13  A.   Yes.

14  Q.   Do you know whether or not Dr. Purcell

15       had determined that principals were not

16       going to hire reading coaches unless

17       they were strongly recommended out of

18       the curriculum and instruction interview

19       process?

20  A.   I would have no idea what Dr. Purcell

21       said to the administrative staff.

22  Q.   Do you know whether anybody who

23       interviewed you with curriculum and

1      instruction based their rating process

2      on your race or sex?

3  A.  I have no idea.

4  Q.  Do you know whether anybody who was

5      rating you in curriculum and instruction

6      knew that your mother had ever filed a

7      claim?

8  A.  I have no idea of knowing.

9  Q.  Do you know whether the people who rated

10     you or interviewed you with curriculum

11     and instruction knew that you had filed

12     a lawsuit?

13  A.  One individual knew.

14  Q.  Okay.  And who was that?

15  A.  Sharon Sewell.

16  Q.  She was one of the people that

17     interviewed you?

18  A.  Yes.

19  Q.  And how many people were interviewing

20     you?

21  A.  Three.

22  Q.  She was one of three?

23  A.  Yes.

371

1    A.   I didn't tell him.

2    Q.   Did you discuss it with him?

3    A.   No.

4    Q.   Did he ever indicate to you that he was

5         told he couldn't hire you because of

6         your lawsuit?

7    A.   No.

8    Q.   There was, I guess, a female, you said,

9         got that job -- oh, no, no, that was the

10        year before.

11   A.   Yes.

12   Q.   Do you know who got the Special

13        Education job?

14   A.   No, I don't.

15   Q.   Okay.  What was the job at BTW Magnet

16        with Ms. --

17   A.   Administrative assistant.

18   Q.   Administrative assistant.  Do you know

19        who got that job?

20   A.   No, I don't.

21   Q.   So you don't know their race or sex?

22   A.   No.

23   Q.   What about David Sikes.  Who got that

372

1       Special Ed job?

2   A.   I don't know.

3   Q.   Did Mr. Sikes talk to you about your

4        lawsuit?

5   A.   He didn't know -- if he knew about it,

6        he didn't mention it to me.

7   Q.   Okay.  Did he ever tell you that's why

8        he couldn't hire you?

9   A.   He avoided me.  He didn't have any other

10       discussions with me.

11  Q.   Are there any other jobs that you

12       would have -- that you could have been

13       hired for in the -- for the fall 2005,

14       for the school year that we're in now,

15       upon which you base your claim?  Those

16       are the four jobs that you reference in

17       your lawsuit as it relates to the jobs

18       that you didn't get that summer?

19  A.   Yes.

20  Q.   There are other jobs?

21  A.   No, those are the -- those are the ones.

22  Q.   Those are the four, okay.

23              Have you told me about any

1    conversations that you personally have

2    had with anybody that would reflect that

3    you're being nonrenewed or not getting

4    additional jobs with the Board had to do

5    with your lawsuit?

6  A.  No more than we've already discussed.

7  Q.  Okay.  And I know we've talked about

8    Dr. Owens.  And have you told me about

9    any conversation or anything that you

10    can remember, sitting here today, where

11    reference to your mother was made?

12  A.  None other than the ones we have

13    mentioned.

14  Q.  Okay.  Have there been any conversations

15    that you have not told us about where a

16    person was placed in a job, instead of

17    you, that regarded your race or where

18    you were told we needed a white person

19    in that job or anything of that nature?

20  A.  None other than those we've already

21    discussed.

22  Q.  Okay.  And refresh my memory.  There was

23    one occasion that I remember where I

1  think you've said in something written

2  that Mr. Barker or somebody said that a

3  white person had to be hired.  Was there

4  more than one time that that happened?

5  A.  I don't recall being called by race.

6  Q.  Was it female?

7  A.  That a female had to be hired.

8  Q.  A female, okay.  The incident in regards

9  to a female having to be hired, was that

10  where Bobby Abrams said he wanted you as

11  his administrative assistant, and Jimmy

12  Barker allegedly told Bobby that he had

13  to hire a female?

14  A.  Yes.

15  Q.  Were there any other occasions that you

16  know of where a woman got the job

17  instead of you, and you were told or

18  heard that that happened because the

19  person was a female?

20  A.  No.

21  Q.  Where have you worked since you were

22  nonrenewed in May of 2005?

23  A.  I've done some consulting, but no

1    full-time work.

2  Q.  Where have you consulted?

3  A.  For the Southern Women's Leadership

4    Development Institute, SWLDI.

5  Q.  Southern Women's --

6  A.  Women's Leadership Development

7    Institute.  And Exploratorium Academy.

8  Q.  I apologize.  Is that one name like and

9    Exploratorium Academy, or is that a

10    different entity?

11  A.  That's a different entity.

12  Q.  Okay.  What have you done for Southern

13    Women's Leadership Development

14    Institute?

15  A.  Program planning, development policy,

16    development policy implementation.

17  Q.  Where is that located?  What is it?

18  A.  It's right across the street from the

19    train building, close to the old Union

20    Station.

21  Q.  And who runs it?

22  A.  Doris Crenshaw (phonetic).

23  Q.  And what type of program planning do you

1   Q.   And what did you teach?

2   A.   I will be teaching reading in the

3        content area.  Reading in the content

4        area.

5   Q.   What does that mean?

6   A.   It's a secondary reading instructional

7        course.

8   Q.   And you'll be teaching --

9   A.   It's a methods course.

10  Q.   And you'll be teaching college-age

11       students?

12  A.   Yes.

13  Q.   And when do you start that job?

14  A.   Next -- next week.  The semester starts,

15       I think, next week.

16  Q.   Is that a full-time position or just one

17       class?

18  A.   Just one class.  And I just thought --

19       Northcentral University.

20  Q.   Okay.

21  A.   You want the name of the course or

22       just . . .

23  Q.   That's fine.  That your teaching?

1    just at eleven.

2              MRS. CARTER:  All right.  If

3         y'all will give us a

4         minute, or I can leave.

5         It doesn't matter.

6         MR. PATTY:  Yeah.  I just

7         have a couple of

8         follow-ups.  Do you

9         want me to do that real

10        quick?

11             MRS. CARTER:  Sure.

12             MR. PATTY:  And that way --

13             MRS. CARTER:  Sure.  I'll be

14        looking at my stuff.

15             MR. PATTY:  Yeah.  There may

16        be something that

17        you'll want to come

18        back and ask.

19                 EXAMINATION

20   BY MR. PATTY:

21   Q.  Mr. Lowe, you have a -- and I don't know

22        if you mentioned this when you were

23        going over your degrees -- you have an

1        Ed.S./AA certification degree with a

2    concentration in Special Ed

3    collaborative training, if I said that

4    right?

5   A.  Collaborative teaching.

6   Q.  Collaborative teaching?

7   A.  Most of my extra coursework and

8    electives were Special Ed classes.  And

9    I just filed at the state department for

10   that upgrade on my certificate.

11  Q.  Okay.  All right.  So that was in the

12   Fall of 2004 when you obtained that

13   degree that I just --

14  A.  It was prolonged.  So I just filed -- I

15   just sent the state department

16   information for the upgrade.

17  Q.  But did you have the degree in the Fall

18   of 2004?

19  A.  I think I had completed it.  We were in

20   a university problem, but it was

21   completed.

22  Q.  And that was with Alabama State?

23  A.  Yes.

1                    just objecting.

2   A.   The last conversation I had with her,

3        that was what she -- that was her

4        position.

5   Q.   Okay.  And that you had not been

6        recommended by a principal, so,

7        therefore, you were not hired; is that

8        basically what she was telling you?

9   A.   Yes.

10  Q.   Now --

11  A.   Her exact question was:  Have you been

12       recommended?  And my reply was, Yes.

13  Q.   Okay.  But she had previously told you

14       that people who are recommended by a

15       principal, the standard operating

16       procedures for that, that's the person

17       they choose to hire?

18                    MRS. CARTER:  Object to the

19                    form.

20  A.   Yes.

21  Q.   Now, you have also been potentially out

22       of work for this -- what will be the

23       2005-2006 school year; is that right?

1  A.  There are probably quite a few.  More

2      than we could mention today.

3  Q.  Right.  That have certifications to be

4      administrators and things of that

5      nature, but they've not been given those

6      type jobs yet?

7  A.  Then I don't know who has applied and

8      who hasn't applied either.

9  Q.  I'm confused.  Your lawyer was asking

10     you some questions about this issue

11     about Special Education, and you said it

12     was a university problem.  When did the

13     university -- when did you graduate or

14     get the degree for Special Education

15     from Alabama State?

16 A.  I never said we had one.

17              MR. PATTY:  She's talking

18                  about the Ed.S./AA.

19 A.  The Ed.S. and double A certification

20     is -- the double A is a certification.

21     The Ed.S is a degree.

22 Q.  Right.

23 A.  This is just -- this is January.  We had

1    some problems, but it was just conferred

2    in November.

3  Q.  Of 2005?

4  A.  '04 -- '05, '05.  The extra courses that

5    I took as electives were Special

6    Education courses --

7  Q.  Right.

8  A.  -- towards collaborative teaching.

9              MRS. CARTER:  All right.  I

10             jumped right into that.

11             If you'll give me three

12             minutes.

13           MR. PATTY:  Okay.

14           (Whereupon a brief recess

15             was taken.)

16  BY MRS. CARTER:

17  Q.  I'm not trying to beat a dead horse, but

18    it's real important that we're clear on

19    something and that I make sure that I

20    haven't misunderstood.  Do you recall

21    ever having a conversation with Jimmy

22    Barker in the Summer of '05 about a

23    Special Education position when he said

1        something that was in a grouping,

2        but . . .

3   A.   I'll have to go back and look.  I think

4        I know exactly which one that is, but

5        I'll have to look back through my notes.

6   Q.   Tell me what you think that one is.  It

7        sounds like it was in that same time

8        frame or summer --

9   A.   That one was Southlawn Middle School.

10       And Tina Minott told me that there was a

11       legal issue with Pam Cloud (phonetic),

12       who was a white woman, and she had to

13       hire her.

14  Q.   In '04?

15  A.   If I stand corrected, yes.

16  Q.   That's what it looks like it is here,

17       but I could be . . . well, to your

18       memory, did that happen the same summer

19       or about the same time that Bobby Abrams

20       was trying to hire you as administrative

21       assistant?

22  A.   I believe that was the same year.

23  Q.   It sounds like it in your Complaint,

1    okay.  And tell me again what -- and

2    Tina Minott wanted to hire you?

3  A.  Yes.

4  Q.  And tell me what she was told.

5  A.  She told me, she said, Melvin, I really

6    wanted you, she said, but there's a

7    legal issue with Pam Cloud, and I have

8    to hire her.

9  Q.  Any other conversations you had with

10   anybody about that?

11 A.  No.

12 Q.  Do you know Pam Cloud?

13 A.  Yes.

14 Q.  Do you know what her qualifications

15   were?

16 A.  I think she has a Specialist degree.  I

17   don't know.  She has to be certified in

18   administration, so I'm assuming she at

19   least has that.

20 Q.  Any other jobs?  Those are the ones that

21   I found in your Complaint.  Any other

22   job that you can tell us about today

23   that you feel you should have received?

1    A.    No.

2    Q.    All right.

                    MRS. CARTER:   I'm going to

3                       say I'm finished,

4                       because I'm too tired

5                       from thinking about it.

6            (Whereupon an off-the-Record

7                discussion was held.)

8            (The deposition of

9            MELVIN ALONZA LOWE, III,

10              concluded at 5:45 p.m.)

11

12        *   *   *   *   *   *   *   *   *   *   *

13

14            FURTHER DEPONENT SAITH NOT

15        *   *   *   *   *   *   *   *   *   *   *

16

17

18

19

20

21

22

23