

1

COPY

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4   MELVIN LOWE,

5          Plaintiff,

6   Vs.                              CIVIL ACTION NO.
                                     2:05-CV-0495
7   MONTGOMERY COUNTY BOARD OF
    EDUCATION; VICKIE JERNIGAN,
8   MARK LABRANCE, TOMMIE MILLER,
    MARY BRIERS, DAVE BORDEN,
9   HENRY A. SPEARS and BEVERLY ROSS,
    in their official capacities as
10  members of the Montgomery County
    Board of Education; and DR. CARLINDA
11  PURCELL, in her official capacity as
    Superintendent of the Montgomery County
12  Board of Education,

13         Defendants.

14               * * * * * * * * * * * *

15     **DEPOSITION OF JIMMY BARKER**, taken pursuant to

16  stipulation and agreement before Pamela A. Wilbanks,

17  Registered Professional Reporter and Commissioner for

18  the State of Alabama at Large, in the Law Offices of

19  Hill, Hill, Carter, Franco, Cole & Black, 425 South

20  Perry Street, Montgomery, Alabama, on Monday, January

21  23, 2006, commencing at approximately 1:10 p.m.

22

23               * * * * * * * * * * * *

5

1    because the HR department has no authority

2    over the superintendent.

3    Q.   Sure.  But what if it's a complaint?  Who is

4    going to investigate the complaint if the

5    complaint is against the HR department?

6    A.   Generally we will assure those to whom we

7    report, such as the superintendent, the

8    validity -- from our perspective the validity

9    of the claims against us, whether or not it

10   has any validity -- the complaint has any

11   validity and show them and tell them what our

12   particular position is on whatever the issue

13   is that is being complained about.

14   Q.   Is there any policy by the school system to

15   provide for somebody else outside the HR

16   department to investigate a complaint relative

17   to the HR department?

18   A.   There's no policy, no.

19   Q.   Now, the superintendent described hiring

20   processes with regard to certified personnel.

21   While you have been at the Montgomery County

22   School System, has that been -- is she correct

23   in the way she's described those hiring

1      processes?

2  A.  By and large -- I don't remember what her

3      exact testimony was, but by and large the

4      process goes like this:  If a person applies

5      for a particular position, HR department's

6      first responsibility is to check to see

7      whether or not that person meets the minimum

8      qualifications for that particular position.

9      Then the supervisors who are going to

10     interview that person, whether they be a

11     principal, whether they be an assistant

12     superintendent or specialist, are given a list

13     of the individuals who applied for the

14     position in your department who meet minimum

15     qualifications.  Then they are encouraged to

16     interview a representative sample based upon

17     review of resumes and make a recommendation

18     back to HR of your top candidates for that

19     position.  Generally we do not allow them to

20     rank order on paper saying this is my first

21     choice, this is my second choice, this is my

22     third choice.  These are my top three choices

23     for this particular position.

1    However, there are generally follow-up

2    conversations wherein you might make it known

3    to someone in HR, well, I really prefer this

4    person.  I understand that, but give me your

5    top three choices so that I may submit them to

6    the superintendent along with their resume,

7    and then the superintendent may very well get

8    back with you and find out, well, who is your

9    first choice or who is your second choice.

10   That does happen in an informal process, but

11   on paper, these are my top three choices.

12   Q.   Would it be correct to say that the hiring

13        practices of Montgomery County dictate making

14        every effort to follow the recommendations of

15        department heads, supervisors and/or any

16        interview panel for positions posted with the

17        school system?

18   A.   Unless there are mitigating circumstances,

19        yes.

20   Q.   What kind of mitigating circumstances?

21   A.   Such as there are screening panels on occasion

22        that are used to say, well, this category of

23        applicant here is highly recommended as

29

1     opposed to this category here is recommended

2     with some concern to make sure that they meet

3     certain specificities.  They very well may

4     meet the overall posted qualifications.  A

5     screening committee may very well be necessary

6     in order to separate them into tiers of highly

7     recommended, not highly recommended,

8     recommended with concern, things of that

9     nature.  That's not out of the ordinary.

10   Q.   What job classifications use screening panels

11     and what do not?

12   A.   Most recently the reading coaches and the math

13     coaches in the school district.

14   Q.   When did the reading coaches start using

15     screening panels?

16   A.   Let's see.  Our ARFI grant application, which

17     is Alabama Reading First Initiative, started

18     in the late summer of '03.  Thereafter, in an

19     effort to control the quality level of the

20     applicants --

21             (Brief interruption.)

22   Q.   I'm sorry.  Go ahead.

23   A.   In an effort to control the quality level of

1    not required to do so because that was a

2    distinctively different function than the

3    reading coach.

4    Q.    How is a reading tutor different from a

5    reading coach?

6    A.    Both are clinical in nature.  The reading

7    tutors were designed primarily to pull out

8    students who were at-risk students at a given

9    school site and work with them on an

10    individual basis to try to bring them from one

11    level, maybe intensive, up to another level.

12    They were encountering some difficulties.

13    The reading coaches worked with teachers

14    in order to bring about the same desired

15    change.  They worked individually

16    prescriptively with the teachers to bring

17    about the necessary changes to bring larger

18    groups of students along from an area of being

19    at risk to one that is not at risk or to make

20    academic gains with larger groups of

21    students.  But that was the distinct

22    difference.  The coaches worked with the

23    teachers, tested, gave feedback, that type of

1          thing, and the teacher-tutors worked with

2          students by definition.

3    Q.    You said something -- You mentioned something

4          about a requirement that was not there for

5          reading tutors but was for reading coaches for

6          panels.  Whose requirement are you referring

7          to that the screening panel be used?

8    A.    This is Montgomery Public Schools's --

9    Q.    This is no federal --

10   A.    No.

11   Q.    -- mandate that you do that for reading

12         coaches?

13   A.    No.

14   Q.    No state department mandate?

15   A.    No.

16   Q.    And so it's your testimony reading coaches

17         have gone -- all the reading coaches then

18         would have gone through this screening process

19         from the fall of 2003?

20   A.    In one form or another.  The composition of

21         the screening committee may not have been the

22         same.  For example, when you were selecting

23         system-wide reading coaches, the initial ARFI

1    application had basically the assistant

2    superintendent for curriculum and instruction

3    in place and the ARFI grant had an

4    administrative officer for that particular

5    program.  Teresa Nichols assumed that.

6        In the early stages of selecting the next

7    system-wide reading coach, those were the two

8    individuals who had any position of knowledge

9    as it related to the program.  They

10   constituted the screening committee.  Then

11   they brought on the first system-wide reading

12   coach, Teresa Jackson.  They participated in

13   that process.  Once she came aboard, she sat

14   in on the subsequent committee to select the

15   system-wide reading coaches that were to

16   report to her.  After they got on, then we had

17   the specialists within curriculum.  For

18   example, the committee that Mr. Lowe was to

19   submit to to interview with was comprised of

20   specialists from curriculum and instruction

21   department.

22   Q.   Who was the committee that he --

23   A.   I may leave somebody out, but there was Connie

1       Mizell.  There was Sharon Sewell.  There was

2       Tom Toleston.  There was Ms. Days (phonetic),

3       Sherry Days.  And myself and Mike Looney were

4       in and out on those.  We would -- We may not

5       have sat through the entirety of all of them,

6       but we sat in just to ensure that proper

7       procedure was being followed.

8   Q.  Which committee are you referring to where

9       Looney would have been on?

10  A.  The committee wherein possible reading coaches

11      for the school district were being screened.

12  Q.  What time frame is that?

13  A.  For schools -- Let me retract that.  Not for

14      the reading district, for schools -- for

15      individual schools.  This was -- Let's see.  I

16      would say at the end of -- during the summer

17      of '03 going into '04 or the summer of '04

18      going into '05.  The summer of '04 going into

19      '05.

20  Q.  Would --

21              MS. CARTER:  Summer of '04 going

22                  into '05?

23  A.  The summer of '04 going into '05, when

1    Mr. Lowe applied for the position of reading

2    coach -- No.  It was '04 -- It would have been

3    the summer of '05, the summer of '05, the one

4    wherein he applied for the position for

5    consideration with Paterson Elementary School.

6  Q.  Well, Looney wasn't an employee of the school

7    system then, was he?

8  A.  Mr. Looney left us at the end of that same

9    summer.  Mr. Looney just left us at the end of

10    the '04-'05 school year just after Dr. Purcell

11    came aboard.  If you recall, she came aboard

12    in December of '04.  Mr. Looney left leaving

13    for another county during that following

14    summer.

15  Q.  Well, when did Lowe go through this -- you say

16    he went through in the summer of '05 this

17    Paterson position with Dr. Owens.  Do you

18    remember when that was in the summer of '05?

19  A.  No, I can't remember.  I'm sure that they have

20    documentation.

21  Q.  But you remember Looney was on that committee?

22          MS. CARTER:  Object to form.

23  A.  I remember that Mike Looney participated in

36

1   that screening process in and out just as I

2   was because I sat in with him on many

3   occasions, yeah.

4   Q.   The committee's interviews, do they take

5        notes?  Do they keep those notes in a file on

6        what they found in that interview process?

7   A.   They took notes.  They had a grading rubric

8        and everything.  I'm sure that they may even

9        still have those notes.  Connie Mizell headed

10       up that committee, so I would just have to

11       touch bases with her to see whether or not she

12       actually had them.  I can't speak for her, but

13       they had a grading rubric.  That was my

14       purpose of being there, to make sure we were

15       asking the exact same questions of all of the

16       applicants, that we were following protocol as

17       it relates to good interview procedures.

18  Q.   So the questions they were asking were

19       standardized questions?

20  A.   They had them scripted.

21  Q.   Do y'all still have a copy of those questions?

22  A.   I would check with them just to be sure.  I

23       would say -- I would expect them to, yes.

37

1    Q.    Do they make documentation of how they scored

2          everything?

3    A.    I'm quite sure they probably do.

4    Q.    Does the school system keep that?

5    A.    Yes.  They would not have been kept in my

6          department, in HR.  It would have been kept by

7          the committee, which was headed by Connie

8          Mizell, so it would be a matter of my touching

9          bases with her and asking her to reproduce

10         those individual grade sheets for all of the

11         applicants.

12   Q.    I'm jumping a little bit ahead, but since

13         we're there I'm going to ask you.  What did

14         Mr. Lowe score?  Do you know?

15   A.    I don't recall specifically his score.  They

16         didn't give me -- I didn't say, well, what did

17         this particular individual make and what did

18         that particular individual make.  Basically

19         what I assured the principals of was this:  If

20         you want to interview for a reading coach, the

21         screening committee has already placed certain

22         categories of individuals -- certain

23         individuals in certain categories based upon

1    how well they faired in that screening

2    process.  Touch bases with them to ensure that

3    you know whether or not this particular

4    individual comes in a highly recommended

5    position or whether they are recommended with

6    some concerns, did not do as well as some of

7    the other applicants in that overall screening

8    process, and then interview from among those

9    individuals who have been approved and then

10    make the recommendation back to HR in terms of

11    the person whom you might want based upon your

12    interview.

13  Q.  Do you remember where Mr. Lowe fell in that?

14    Was he highly recommended?

15  A.  He was not.

16  Q.  Recommended with concerns?

17  A.  When I -- As was standard with me, if a person

18    was recommended as a reading coach, my first

19    thing was to check with the screening

20    committee and see is this person among those

21    individuals who were recommended highly by the

22    committee.  They couldn't control the

23    selection of that person, but I wanted to

1    ensure that we had someone who had a basic

2    knowledge of what was expected of them once

3    they got in a reading coaching position who

4    had demonstrated in a screening process that

5    they were high in the order of selectivity by

6    that screening committee. And that's all I

7    would assure with them.

8        And if they said, well, yes, this is one

9    of our top performers, then, of course, I

10   would take that for what it was worth. If

11   they said, no, then I would get back in touch

12   with that principal and say, well, this person

13   was okay. He passed -- He or she passed the

14   initial requirements for this particular job;

15   however, they are not in the highly

16   recommended position; do you need a list. Do

17   you need a modified list of the individuals

18   who were in there. That was my standard

19   procedure.

20   Q.   Did Lowe pass?

21              MS. CARTER:  Did he what?

22   Q.   Did he pass?  You said some individuals may

23        pass, but they may not be highly recommended.

1    Did Lowe pass?

2  A.   I may have used that out of context, the

3       passed and the not passed.  Whether or not

4       they were highly recommended or whether they

5       were recommended with concern.  When I touch

6       bases with Connie Mizell, for example -- When

7       Mr. Lowe's name was submitted to me, I got

8       with Connie Mizell.  My next thing was,

9       Connie, these are the individuals who have

10      been recommended for the coaching position at

11      Paterson.  You know what our concerns are with

12      regard to getting the very highest quality for

13      Paterson Elementary because they did not

14      perform well last year.  There was some

15      concern.  Is this an individual who was in the

16      top echelon of your screening process.  No,

17      Mr. Barker, for this reason, this reason, that

18      reason, et cetera.

19           I get on the phone and I call up Dr. Owens

20      and I tell him, this is the feedback that I've

21      gotten from the screening committee; will you

22      consider some of the other applicants who

23      are -- faired better in that grading rubric

1    when the applicants were screened. Yes,

2    Mr. Barker, I'll do so; have Ms. Mizell get in

3    touch with me and give me the names of some of

4    those individuals who were in the upper

5    echelon of that grading rubric.

6        I had Ms. Mizell get in touch with

7    Dr. Owens, give him those names. He

8    rescreened those particular applicants,

9    according to what he told me.

10  Q.  And did he at the end of that want Mr. Lowe to

11       be his employee?

12  A.  At the end of that, he e-mailed me or sent me

13       a hard copy -- something to the effect that I

14       still want Mr. Lowe as my top choice for that

15       coaching positive.

16  Q.  And then what happened after that?

17  A.  At that particular point, then Mr. Lowe's name

18       was submitted along with two others, the

19       person who ultimately ended up with that

20       particular position, because a comparative

21       analysis was done of their academic strengths

22       and weaknesses. Basically what happened was

23       this: Ms. Freeney -- Eleanor Freeney, who was

42

1    selected for that position, was about a

2    15-year -- she was hired by the school

3    district back in the '80s -- the late '80s.  I

4    don't remember the exact year.  She had an

5    excellent screening score from the screening

6    committee.  She had worked exclusively with

7    grades four through six at Brewbaker

8    Intermediate School for the past four or five

9    years, the exact grade levels that was being

10   filled for that particular position.  She had

11   a master's degree.  She was highly qualified

12   in reading, highly qualified in elementary

13   education.  She met all the criteria.  She was

14   among those three who were being recommended

15   by Dr. Owens.  She obviously was our top

16   candidate, having all of those things that I

17   just mentioned to you.

18        Dr. Owens came back and said, well, if I

19   can't have Mr. Lowe, Ms. Freeney is the next

20   person I would like to have.  That's when we

21   exercised that option.

22   Q.  Did you ever tell Connie Mizell that Dr. Owens

23       wasn't getting who he wants this time --

44

1      teacher?

2  A.  She had taught as an elementary schoolteacher

3      for -- She had worked consecutively with the

4      school district from the late '80s.  I want to

5      say maybe '87, the time that she was hired, up

6      until that particular time -- She had 15 years

7      experience at the time.  Fifteen plus.

8  Q.  And you say there were -- Your testimony is

9      that you took two names and Mr. Lowe's name.

10     And then I didn't understand.  Did you make

11     the decision that Ms. Freeney was a successful

12     candidate or how did -- When you got these two

13     names and Mr. Lowe's, where did it go from

14     there?  I didn't --

15 A.  Three names from Mr. Lowe -- I mean, three

16     names from Dr. Owens.  Once I received those

17     back -- Well, when I initially received the

18     recommendation from Dr. Owens, I discussed

19     with Dr. Purcell because she had mentioned to

20     me when she placed Dr. Owens there at that

21     particular position that she wanted to put

22     together the strongest possible academic team

23     that she could for that school because they

1  had been at risk and their test scores were

2  down from the previous year.

3      Well, it's my job as HR director or the

4  assistant superintendent for HR to be as

5  familiar with the personnel that's out there

6  as I possibly can.  Dr. Owens came from a

7  secondary background, secondary history, never

8  having taught an elementary subject.  He had

9  been principal of an alternative site whose

10  primary focus was behavior modification, not

11  academics -- you didn't keep kids long enough

12  to focus on academics -- whose total

13  population average daily attendance was ten.

14  So he couldn't effect any real, meaningful,

15  outstanding academic program.  The kids aren't

16  there.  The focus is not there.

17      Mr. Lowe came from this same setting most

18  recently, his familiarity with Dr. Owens.

19  Dr. Owens in good faith recommended him for

20  the position, but it's my position as

21  assistant superintendent to have enough

22  oversight to know whether there's wisdom in

23  your recommendation process.  You may very

1    well feel that you're recommending the very

2    best person for it.  But from my knowledge

3    base, it's my responsibility to say, well, the

4    background is not there.  Dr. Owens, you don't

5    have the academic background in elementary

6    education; let's get somebody who has some

7    extensive background in elementary education

8    as your second person in charge so that we can

9    try to staff this school as effectively as we

10   possibly can.

11   Q.  Why did y'all pick Dr. Owens as a principal?

12   A.  Dr. Owens is a contract principal who had just

13       come from an elementary setting, be it not the

14       most pronounced academic setting, but he had

15       just come from an elementary setting, and the

16       law requires that we place him -- that we

17       place him in some similar setting as he was

18       the prior year.  Not to say that he could not

19       do the job but that he had not had the

20       demonstration of that simply because he hadn't

21       been placed in that type setting before.  If

22       you're going to place him there, as the law

23       required that we do, place him in some type

47

1     setting, at least give him the benefit of your

2     knowledge in terms of trying to ensure that

3     he's going to be successful there.

4   Q.  I guess I'm reading what you're saying.

5     You're not saying Dr. Owens was not qualified

6     to act as a principal?

7   A.  No, I'm not.  He had the certification, K

8     through twelve for principalship, supervision

9     and administration K through twelve.  So he

10    was definitely qualified to do that job.

11  Q.  Certainly if y'all didn't think he could do

12    the job, y'all could have terminated him?

13  A.  Yeah.

14  Q.  That's an option?

15  A.  We could have.

16  Q.  Now, let's back up a little bit.  I still

17    didn't get from you -- You said at some point

18    this committee -- you get some names from

19    them, and you talk back to Dr. Owens.  He

20    still says he wants Lowe, and you take Lowe's

21    name and two other names.  I didn't get where

22    you went from that.

23  A.  I go back to the superintendent at that

48

1    particular point, and I discuss the pros and

2    cons of the individuals who were on that three

3    recommendation.  This is my recommendation as

4    assistant superintendent to you, Dr. Purcell,

5    in line with your philosophy of trying to

6    place the strongest academic team there that

7    you possibly can.

8  Q.  So you recommended Eleanor Freeney?

9  A.  I did.

10  Q.  So it didn't happen like this, that Mr. Lowe

11     was brought up as recommended by the principal

12     and that was presented to the superintendent,

13     but you've notified the superintendent that

14     they had not gone through the process, and

15     then you came back after that process with

16     names of people who were generated from that

17     process, not Mr. Lowe, and the superintendent

18     picked from that group?

19  A.  Let me clarify what I think you said, now.

20  Q.  Yeah.

21  A.  When he was recommended -- When Mr. Lowe was

22     among the three individuals recommended to me,

23     it was clear -- I don't want to give any

1    distortion of that.   It was clear to me that

2    he was the preferred candidate by Dr. Owens.

3    I then go to the superintendent and say I have

4    a recommendation on my desk for Mr. Lowe,

5    among two others, and this is the person who

6    Dr. Owens wants for the position.

7        The superintendent inquires of me, is

8    there anything that would prevent us from

9    offering that position to him -- to Mr. Lowe.

10   And then I say, well, there are some

11   problems.   The problem is he's not in the

12   upper echelons of the individuals who were

13   recommended by the screening committee.

14       Mr. Barker, have you talked extensively

15   with the screening committee, something along

16   that line.   I'm not quoting her.   Yes, I've

17   talked with Connie Mizell; I've gotten her

18   down in my office, and we have talked about

19   the pros and cons; she has pulled his

20   evaluation sheet and told me that he is not

21   the strongest candidate.   There are some other

22   candidates that faired better than he in this

23   particular process.

1      Then Dr. Purcell said, well, have you made

2   Dr. Owens aware of this.  Yes, I've made him

3   aware, and I've had Connie Mizell to get in

4   touch with him and give him the names of some

5   of the these stronger candidates.  Then at

6   that particular point, of course, he

7   reinterviewed and he came back with this

8   recommendation.  And, of course, consistent

9   with what we've done in the past, we can

10  choose from among these three.  Based upon my

11  feelings with regard to who is best qualified,

12  then I'm recommending Ms. Freeney for this

13  particular position.  That's the way it

14  basically goes -- it went.

15  Q.  So you did go to the superintendent twice with

16      this --

17  A.  I went to her initially to make her aware that

18      his name had been submitted among two others,

19      and I went back to her after Dr. Owens

20      resubmitted and said that this is the person I

21      still want for that position.  So I made her

22      aware of the fact.

23  Q.  Well, where did the two names come from the

1        identification.)

2    Q.    I'll show you what I'll mark as Exhibit 7.

3          Are you familiar with that document?

4    A.    Yes, I'm familiar with this document.

5    Q.    What is that?

6    A.    This seems to be a professional development

7          plan which is one of the instruments that goes

8          along with our PEPE evaluation which is the

9          adopted method of evaluating personnel

10         throughout the school district.

11   Q.    Does it indicate the position that Mr. Lowe

12         has in that document?

13   A.    It does.

14   Q.    What does it indicate his position is?

15   A.    It says reading coach.

16   Q.    And the principal, Dr. Owens, would have been

17         the one preparing that document, evaluating

18         him?

19   A.    It says the evaluator is Dr. James Owens, yes.

20   Q.    Now, your meetings with the superintendent

21         where you give her the rankings or you give

22         her your recommendation, is that in writing?

23   A.    Sometimes they would be in writing.  Sometimes

1    the principals that agony of having to select

2    and interview someone and they may not meet

3    the qualifications.  But we don't always know

4    ahead of time.

5  Q.  It's not uncommon for a principal to say, I'd

6    really like to hire this person here or that

7    person for a particular job, is it?

8  A.  It's not.  It's not.

9  Q.  Now, once the principal comes back and says, I

10    like this person or that person, do you still

11    take a sample of persons to the superintendent

12    or do you just take the principal's choice?

13  A.  We take a sampling for most positions.  If

14    they are teaching positions and teaching

15    positions are going to be multi over a given

16    period of time, we generally won't require

17    that you give me three people for this fifth

18    grade position that you have.  These are

19    generally positions that are contested-type

20    positions, ones that are above the teaching

21    level.

22  Q.  Can you think of any situations or any other

23    incidences where a principal's recommendation

59

1        for an employee was not followed through?

2   A.   Since Dr. Purcell -- I'll put that in two

3        tiers. Since Dr. Purcell has been here,

4        roughly a little over a year ago, I can't

5        remember a specific position wherein I did not

6        recommend to her the person -- one of the

7        three people who were recommended by the

8        committee.

9        When Dr. Carter was superintendent, there

10       were occasions wherein -- I can't remember the

11       specifics of them, but I know that there were

12       occasions wherein these are the three people

13       recommended for the position; these are the 15

14       applicants who meet the minimum

15       qualifications, and Dr. Carter might exercise

16       the option of recommending one of those people

17       who were not among the top three. But the

18       rationale in my mind as to why that happened

19       was because Dr. Carter was familiar with the

20       rank and file even better than I was and knew

21       basically the qualifications of the various

22       individuals, so he felt comfortable in going

23       outside those three. Dr. Purcell basically

62

1    I try to discourage any of them from doing

2    so.  But Dr. Owens was explicit that he wanted

3    Mr. Lowe as his first choice for the position.

4  Q.  When did you first learn of the EEOC charge

5    that Mr. Lowe filed?

6  A.  It's hard for me to say exactly to put it in a

7    time frame.  It was prior to the

8    superintendent getting here, and she got here

9    in December of '04.  So I guess it must have

10   been fall of '04 or late summer of '04.

11 Q.  And did you talk to Dr. Owens about that at

12   all?

13 A.  About the EEOC charge?

14 Q.  Uh-huh (positive response).

15 A.  Absolutely not.

16 Q.  When did you find out that Mr. Owens -- Lowe

17   had filed a lawsuit in this case?

18 A.  This lawsuit?

19 Q.  Yes, sir.

20 A.  I don't remember specifically.  I just don't.

21   The chronology of it just doesn't register

22   with me.

23 Q.  Did you ever talk to Dr. Owens about this

1      lawsuit?

2  A.   Yes, I did.  I talked to Dr. Owens when I

3      called him up to set up times with him to

4      appear for depositions.

5  Q.   I'm not -- I'm really more talking about,

6      let's say, prior to June 22, 2005.

7             MS. CARTER:  Let me say something

8                for the record because we don't

9                mind -- I don't mind you knowing

10               this.  I think that I told

11               Mr. Barker that Mr. Lowe's

12               lawsuit had been filed because we

13               knew he had an EEOC charge.  So

14               it would have been right after it

15               was filed.  I just don't know

16               when that is.

17              MR. PATTY:  That's fine.

18  Q.   Did you ever talk to Dr. Owens prior to June

19      22, 2005 about Mr. Lowe's lawsuit?

20  A.   Definitely not.

21  Q.   Did you ever tell Dr. Owens that Mr. Lowe

22      shouldn't have filed a lawsuit?

23  A.   Absolutely not.

65

1    Q.    Is the reading coach a ten-month position?

2    A.    There's no cut-and-dry answer to that.

3          Reading coaches -- The evolution of reading

4          coaches in our school district came in three

5          tiers primarily.  With the original

6          application for the ARFI grant, there were, if

7          I recall, ten reading coaching positions that

8          were ten-month reading coaching positions

9          because the coaches had to be trained.

10              Shortly thereafter the next year or within

11         the next year, MPSRI sponsored reading

12         coaches.  Montgomery Public Schools Reading

13         Initiative reading coaches were authorized.

14         Those were ten-month positions.  Then there

15         were reading coaches who were sponsored

16         through the individual Title I budgets of

17         Title I schools who were brought aboard as

18         nine-month reading coaches because they didn't

19         have the resources to pay them ten months.  So

20         there were some that were nine months and some

21         that were ten months based upon the fund

22         source and the resources available to fund

23         those units.  All of the ARFI and all of the

1    MPSRI were ten months.  There was not a

2    reading coach assigned to Daisy Lawrence where

3    Mr. Lowe was assigned.

4  Q.  Ever?

5  A.  There was not a reading coach assigned there

6    by MPSRI or by ARFI.  There may have been

7    coaches who were -- There was not anyone

8    assigned permanently to that campus.  There

9    may have been someone who may have been

10   providing partial services, but there was not

11   a reading coach assigned there.

12      Mr. Lowe's position that he received there

13   as a teacher/tutor was a federally funded

14   Title I type position, and it was a nine-month

15   position.  It was not a reading coach position

16   but a teacher/tutor position.

17      Let me clarify something for you, Bill.

18   When Mr. Lowe initially sought out that job,

19   he went to Dr. Owens, according to what

20   Dr. Owens said to me, and inquired about a

21   reading coach position.  Dr. Owens told him I

22   do not have a reading coach position --

23   according to what he told me, I do not have a

1  reading coach position available; I do have a

2  teacher/tutor position available; are you

3  interested in that teacher/tutor position.

4  That clarification was made prior to Mr. Lowe

5  accepting that position.  He knew fully well

6  that that was a teacher/tutor position,

7  according to the conversation that I had with

8  his principal.  He said he told him this is

9  not a reading coach position; this is a

10  teacher/tutor position; are you still

11  interested.  And the feedback he gave to me,

12  yes, I am.

13  Q.  When were the dates of the ten-month -- the

14  RC ten-month reading -- well, the ten reading

15  coach positions that were ten-month positions,

16  the first level you said?

17  A.  ARFI?

18  Q.  Yes.

19  A.  This was at the end of the summer of '03 going

20  into '04, the '03-'04 school year.  This was

21  the first year of our reading program.

22  Q.  The MPS reading coach authorized ten-month

23  positions, that second level you said, when

68

1       did they start?

2   A.   Sometime during that same year when funds were

3        solicited from the county commission,

4        Montgomery Public School Reading Initiative.

5        Those funds came throughout that particular

6        year.

7                   MS. CARTER:  What year?  I'm sorry.

8                   THE WITNESS:  '03-'04.

9   Q.   The individual Title I budget nine-month

10       positions, when did that start?

11  A.   The nine-month positions -- There were always

12       Title I funds that were allocated to various

13       schools.  I couldn't give you a definitive

14       time frame as to when that initially started

15       because the schools had been getting Title I

16       funds all along.  The key issue with Title I

17       is that there could be no supplanting.  By

18       that I mean this:  If a school wanted a Title

19       I reading coach and was not already allocated

20       a reading coach from one of these other two

21       sources, they could not have that individual

22       because Title I cannot be the first kid on the

23       block.  It has to be in addition to.  It has

1    to be supplemental.  And therefore if a school

2    requested and they already had one of the

3    other two, I could give them that Title I --

4    let them use that Title I money for that

5    purpose.  If they requested that and did not

6    have one of these other two, they could not

7    because it was a clear supplanting violation.

8        Daisy Lawrence did not have a coach from

9    the other two funds.  They would not qualify

10    for a Title I reading coach because it would

11    be supplanting.

12  Q.   Well, would there be a -- when did Title I

13    start using, though, for these nine-months --

14    when did that begin, using the Title I for

15    those?

16  A.   As early on as when ARFI started.  Some of the

17    ARFI schools would have more --

18  Q.   '03?

19  A.   -- than one.

20        Yeah.  They would have an ARFI coach and

21    they would have a Title I coach.  And they

22    might very well make that Title I coach in

23    addition to the ARFI.  And the Title I may be

1      a nine-month and the ARFI may be a ten-month.

2      And they would pay the Title I supplemental

3      funds for the summer in order to get the

4      training and that type thing.

5   Q. Was Lowe ever -- Was his name ever listed on

6      any documents regarding the financial payments

7      the school was receiving for his position as a

8      reading coach?  Was he ever designated as a

9      reading coach?

10  A. I couldn't say.  Not to my knowledge.

11  Q. Do you know how the position that he applied

12     for in the fall of -- and received in the fall

13     of 2003 at Daisy Lawrence, do you know how

14     that was advertised?

15  A. It was advertised as a teacher/tutor position.

16  Q. We've received a number of documents from

17     y'all with job descriptions.  Was that

18     advertisement in that material we received?

19  A. It was.  It was listed as a Title I

20     teacher/tutor at various Title I sites.  It

21     was not listed specifically to Daisy Lawrence.

22  Q. How would I know that that's the job

23     advertisement for that position?  Is there

1 Q. Back before Mr. Lowe came back as a

2   teacher/tutor, did you have a conversation

3   with him and his mother where you informed him

4   about the reading coach positions being open?

5 A. I don't recall. I remember having an audience

6   with Mr. Lowe and his mother on a different

7   occasion. I remember them coming to my

8   office, but the specifics of that conversation

9   just escapes me to tell you the truth.

10 Q. When he came back to Daisy Lawrence in the

11   fall of '03, he was coming from Bullock

12   County. Did you have any conversations with

13   any officials at Bullock County about him

14   coming back to Montgomery, what he was going

15   to do?

16 A. I had a conversation with Mr. Lee Arthur

17   Ballard, which is protocol among HR circles.

18   I did not discuss with him any specific

19   assignment that he was to have with Montgomery

20   Public Schools. Merely that conversation was

21   along the lines of, Mr. Lowe has applied for a

22   position with Montgomery Public Schools. We

23   have a gentleman's agreement that we do not

75

1        raid each other for talent.  If Mr. Lowe is

2        offered a position with Montgomery Public

3        Schools, are you going to perceive it as

4        tampering with regard to our entertaining the

5        possibility of hiring him.  That basically is

6        the conversation -- That was the essence of

7        it, which is a conversation that happens

8        between me and other HR directors throughout

9        the contiguous counties all the time.  We just

10       don't raid each other.

11  Q.  But do you recall telling him that you were

12       hiring Mr. Lowe as a reading coach?

13  A.  I don't.

14  Q.  Do you recall telling anyone else with Bullock

15       County Board of Education that Mr. Lowe is

16       being hired as a reading coach?

17  A.  I spoke with no one else from Bullock County

18       other than Mr. Ballard.

19  Q.  Do you recall putting together a copy of

20       Mr. Lowe's personnel file for Ann Sipial,

21       director?

22  A.  By and large that's not something I would do.

23       That's something I would delegate to my

79

1      about that past situation when it's not asked

2      for by the principal?

3    A.   I don't know if it's a violation of a written

4      policy, but it's definitely not good business

5      to share that with another principal, no.

6    Q.   Are you aware of the reprimand letter that was

7      written to Mr. Lowe regarding Southlawn being

8      sent unsolicited to Dr. Owens?

9    A.   No, I'm not.

10    Q.   Who would have access to that personnel file?

11    A.   HR department primarily would have access to

12      it, the specialist within the department.  Of

13      course, myself being the assistant

14      superintendent.  The specialist within that

15      department.  We have a director for certified

16      personnel, Carolyn Hicks.  We have ed

17      specialists within that determine, and we have

18      various clerical support individuals in that

19      office.

20    Q.   Do you ever recall Dr. Owens making any

21      inquiries through your office for information

22      regarding Melvin Lowe, that he wanted to know

23      something about his employment background or

80

1    his work there in the school system or

2    anything of that nature?

3    A.   I don't.

4    Q.   Now, we were provided during discovery some

5         investigation documents regarding Southlawn.

6         Did you conduct that investigation?

7    A.   I did.

8    Q.   Did Tina Minott conduct an investigation as

9         principal prior to you conducting your

10        investigation?

11   A.   One of the requirements for any type of action

12        of that nature is that the principal sends an

13        investigative summary of what the allegations

14        are and what they have been able to discern

15        prior to making the recommendations to the

16        board.

17   Q.   Did Tina Minott's investigation clear Melvin

18        Lowe?

19   A.   No.  Her purpose is not to clear or to

20        corroborate the charges.  Her purpose is to

21        provide all the information to my office so

22        that a determination can be made as to the

23        guilt or innocence of the person.

81

1    Q.    Do you remember if Tina Minott was supportive
2          of Melvin Lowe?
3    A.    I don't recall specifically.
4    Q.    Did she believe the allegations true or
5          untrue?  Do you recall?
6    A.    I just don't recall.
7    Q.    Did Tina Minott recommend that Mr. Lowe
8          receive any discipline?
9    A.    That's not her purpose to recommend whether or
10         not.  The disciplinary end of it generally
11         will come from after I have reviewed all the
12         information, all of the student statements,
13         looked into it.  I make a recommendation to
14         the superintendent based upon those
15         observations.
16   Q.    But often is it not true -- We've had some
17         termination cases before that you and I have
18         been involved in that the principal will
19         recommend particular action take place.
20   A.    Oh, yeah.  There's an exuberance on behalf of
21         our principals in a lot of cases that breach
22         protocol.  I mean, we have to --
23   Q.    I'll have to remember it breaches protocol.

1    The last time it didn't breach protocol.

2         Anyway, did Tina Minott make any

3    recommendation disciplinary-wise in this case?

4    A.   I'd have to review it.  I have it in his file

5    at my office, but I don't remember the

6    specifics.

7    Q.   What was the result of that investigation?

8    A.   If I recall correctly, there was a

9    preponderance of circumstantial evidence.

10   There was evidence in which we watched the

11   videotape recordings, and it showed Mr. Lowe

12   confronting a particular student.  It showed

13   him hovering over that particular student.  It

14   didn't show specifically his hitting or

15   pushing that student up against a wall.  But

16   it was in three-second segments, and there

17   were little breaks there.  You would see here

18   and you would see there.  There were a lot of

19   circumstantial-type evidence with regard to

20   that.  I recommended to the superintendent

21   that I could not say with 100 percent

22   certainty that the things Mr. Lowe had been

23   accused of that he had done, but I felt sure

1    to a degree from observation on there that
2    something had transpired.  And I recommended a
3    five-day suspension without pay because this
4    was the third time that I had spoken to
5    Mr. Lowe over the past several years with
6    regard to possibly mishandling a child.

7  Q.   Let me show you what I'm going to mark as
8    Plaintiff's Exhibit 8 and ask you if this is
9    the complete investigative file regarding the
10   Southlawn matter.

11            (Plaintiff's Exhibit 8 marked for
12              identification.)

13  A.   This seems to be rather comprehensive.  This
14   seems to be the file that I would have on file
15   in that school file there at my office, yes.

16  Q.   As you sit here today, can you think of any
17   documents that are not in this file?

18  A.   It was so long ago, I couldn't say with any
19   degree of certainty whether there were any
20   other witness statements or anything of that
21   nature.

22  Q.   Did Tina Minott want to rehire Mr. Lowe for
23   the next school year?

90

Q.   Do you have any knowledge or information about
     this incident that's outlined in Exhibit 8
     other than what we've got before us?  Are
     there any facts or information that you know
     about that is not in the memos and the
     letters?

A.   Not that I'm aware of.

             MS. CARTER:  I was just going to say
                  I think he said he viewed a
                  videotape, and it's not part of
                  Exhibit 8.

Q.   Right.  Other than the videotape?

             MS. CARTER:  I was just going to
                  clarify.

A.   Not to my knowledge.

Q.   Who has the videotape?

A.   I don't know whether there are any -- what the
     storage capacity -- whether those are erased
     at the end of each year and they start over or
     whether they keep those in storage.  I don't
     know enough about it, Bill, to answer with any
     degree of certainty.

Q.   Were you ever aware that Mr. Lowe's mother had

1    made an EEOC complaint or had ever filed any

2    EEOC lawsuit in the past?

3  A.  As I sit here before you now, I cannot say

4    that I'm not aware of it. I was not aware of

5    it until Mr. Lowe filed his complaint and

6    referenced that as one of the reasons of

7    retaliation against him. It was totally

8    unbeknownst to me. I was not aware his mother

9    had ever filed any action against the school

10    district at that time.

11  Q.  What about have you and Mr. Carter --

12    Superintendent Carter ever talked it?

13  A.  No.

14  Q.  Have y'all ever talked about, that you can

15    recall, Mr. Lowe or his mother?

16  A.  Well, obviously we talked about Mr. Lowe from

17    the standpoint when I would make a

18    recommendation to him like disciplinary

19    actions, those types of discussions. And I'm

20    sure that I mentioned it to him with regard to

21    when he was assigned to the RISE program, his

22    first assignment with us, when he was cited

23    for paddling kids inappropriately. It was

1        routine for me to discuss any type of proposed

2        disciplinary action or conference that I was

3        going to have of that magnitude where there

4        may be some job action incurred with the

5        superintendent.

6    Q.  What about with regard to the summer before

7        Mr. Lowe returned to Daisy Lawrence?  Did you

8        have any conversations with Superintendent

9        Carter then about Mr. Lowe?

10   A.   Not to my recall.  Not to my recall.

11   Q.   Tell me about the -- You said there were two

12       other complaints besides Southlawn.  What are

13       the other two complaints?

14   A.   Well, Mr. Lowe was assigned as a teacher at an

15       alternative education site that was referred

16       to under the acronym of RISE at the time.

17       There was an administrator assigned there by

18       the name of Mrs. Erodean Jeeter.  Complaints

19       came to us relative to Mr. Lowe paddling

20       students without just authority.  I talked, if

21       I recall correctly, with Mrs. Jeeter, and I

22       talked with Mr. Lowe concerning these

23       particular allegations.  He assured me that it

1    was not taking place, and that was the

2    documentation with regard to that counseling.

3    You cannot paddle unless you are an

4    administrator or you're an agent of that

5    administration.  Go over the particulars with

6    him, review the policy.

7         On the next year when he was assigned to

8    Fitzpatrick Elementary School, I received a

9    complaint that was from his principal,

10    Mrs. Vera Thompson, saying that she had

11    received complaints from parents that he was

12    rough handling their children in his

13    classroom.  Mrs. Thompson asked that I get

14    Mr. Lowe down and talk to him concerning this

15    particular matter, which I did, once again

16    reminding him of what is proper procedure and

17    what constitutes physically handling a

18    particular child and what safeguards you must

19    follow.  Those were the other two situations

20    that I recall.

21    Q.   I did not see anything in the nature of a

22         written warning or reprimand or anything in

23         his personnel file regarding the situation

94

1          with Jeeter and the RISE program.  Do you

2          recall if there was anything of that nature?

3    A.    I don't think that there was any written

4          reprimand in that case.  It sufficed for me to

5          have the conversation with him and tell him

6          basically what is acceptable and what is not

7          acceptable.  If you are paddling children

8          without proper authority, cease and desist.  I

9          am not, Mr. Barker, paddling children.  I had

10         no proof other than the allegations on behalf

11         of the complaining parent.

12   Q.    Was there any documentation of your meeting

13         with him or your investigation?

14   A.    There may be a calendar indication if I were

15         to pull out a calendar back that far, if I

16         have a calendar back that far, but no other

17         documentation.

18   Q.    What about with Fitzpatrick?  Is there any

19         written reprimand there?

20   A.    I don't think that there's any written

21         reprimand.  I would have documented it in his

22         personnel file.  There was just dialogue back

23         and forth between his principal and myself

1       ten-month position, is that considered to be a

2       promotion?

3   A.  It is because there's a pay increase

4       associated with it.

5   Q.  Does that mean they have to -- If they are

6       going to move from that position to a higher

7       one, does that position have to be advertised?

8   A.  That position has to be advertised, right.

9   Q.  Let's move into the fall of 2003.  Do you

10      recall any conversations with Mr. Lowe or

11      about Mr. Lowe during that time?

12  A.  Fall of 2003?  This is the time that he was

13      hired for the position at Daisy Lawrence; is

14      that correct?

15  Q.  Right.

16  A.  No, other than the fact of clarifying the

17      position that he was applying for.  When

18      Mr. Lowe came down and approached me with

19      regard to that particular position, of course

20      I told him that he was under contract with

21      Bullock County and that I would have to touch

22      bases with them because we have a gentleman's

23      agreement that we don't raid each other for

1    talent.

2         Mr. Lowe went over to talk with -- After

3    getting assurances from Bullock County that it

4    was not going to be tampering, then we got

5    back in touch with Dr. Owens, and he went over

6    to talk with Dr. Owens about that particular

7    position, according to the conversation that

8    Dr. Owens had with me.  I cannot say that he

9    did this.  I'm going strictly by Dr. Owens'

10   words to me.  Dr. Owens' words to me were

11   along the line that Mr. Lowe inquired about a

12   reading coach position and that he told him

13   that he did not have a reading coach position

14   available, that he had a teacher/tutor

15   position available.  And before he called me

16   back, he said that he had had the discussions

17   with Mr. Lowe that he was interested in the

18   teacher/tutor position, that he told him

19   explicitly that he did not have a reading

20   coach position and asked him if he was still

21   interested, and he said that he was.  And I

22   told him to make sure that he had that

23   clarification.  And according to Dr. Owens,

1    that's what he told him, that he was still

2    interested in that particular position.

3        And I had the same type conversation with

4    Mr. Lowe, that we had a teacher/tutor

5    position.   Later on that very same year,

6    Mr. Lowe sought by way of e-mail clarification

7    as to what his duties and responsibilities

8    would be leading into the summer.   I reminded

9    him again that he was on a nine-month

10    teacher/tutor position, that he had no

11    responsibilities beyond the 182-day teacher

12    calendar so that there would be no

13    misunderstanding of it.

14  Q.   What would a reading coach do that a

15    teacher/tutor would not?

16  A.   Reading coaches had responsibilities for some

17    training during the summer.   If they were on

18    the nine-month reading coach position, if they

19    had no contract beyond nine months, then there

20    must be some understanding between that person

21    and the program that's going to work with them

22    as to how they were going to be paid, whether

23    they are going to be paid some type of

104

1          supplemental contract for those particular

2          days.  If they were on a ten-month reading

3          coach position, there was already an

4          allocation.  Their year extended beyond the

5          regular school year, beyond the 182 days, and

6          began before the 182 days so that that

7          training could be taken care of.

8      Q.  I was really more interested in if I was to

9          look at a reading coach and a teacher/tutor,

10         what would they be doing that would tell me

11         this is a reading coach and this is a

12         teacher/tutor?

13                    MS. CARTER:  Different than what he

14                        already explained today?

15                    MR. PATTY:  Well, I haven't quite

16                        heard it other than nine-month

17                        and ten-month.

18                    MS. CARTER:  He --

19                    MR. PATTY:  Let him explain it.

20                    MS. CARTER:  I don't care, but he

21                        told us all about that earlier.

22     A.  The primary difference, Bill, once again, was

23         the teacher/tutor was responsible for working

1    with students.  You were to be diagnostic from

2    the standpoint of finding what students were

3    struggling with particular reading programs or

4    math programs.  Teacher/tutors were not

5    exclusively reading.  They could be math

6    teacher/tutors.  You would pull those students

7    out and work with them on an individual basis

8    to try to get them to move from point A to

9    point B.  Nothing in terms of any clinical

10   analysis of what teachers were doing.  The

11   reading coaches were supposed to diagnose

12   deficiencies as they related to the teachers

13   themselves and work with them in improving

14   their skill level so that everybody is

15   teaching the same thing basically and

16   everybody is being as effective as they

17   possibly can.  The focus was different.  One

18   was on students and the other was on teachers.

19  Q.  Did Mr. Carter ever say to you that all Melvin

20       Lowe is going to be in this system is a

21       teacher?

22  A.  No, he did not.

23  Q.  Did you ever tell Mr. Lowe or his mother

1      that's what Mr. Carter said to you?

2  A.   No, I did not.

3  Q.   Did you ever tell Mr. Lowe, you know what

4      Clinton Carter thinks about you?

5  A.   No, I did not.

6  Q.   Or indicate to him or his mother that Clinton

7      Carter was blocking him getting certain

8      positions in the school?

9  A.   No, I did not. Mr. Carter had the ultimate

10     authority to make the recommendation as to

11     whether or not Mr. Lowe received employment in

12     the school district. It would be awfully

13     suppositious on my behalf to make a statement

14     such as that. On the other hand, when

15     Mr. Lowe would come to my office, he would

16     invariably want to go off on a tangent in

17     terms of what this person is not doing and

18     what this person is not doing; but,

19     Mr. Barker, I know that you are all right by

20     me, and I know that you're doing all that you

21     can to get me this job, but I know that

22     so-and-so doesn't want me to have it. It was

23     a common ploy on his behalf to try to go off

1    on a tangent in a direction.

2  Q.  But you never said anything to him that

3    Superintendent Carter was blocking anything or

4    had anything --

5  A.  No, sir.  I did not fall off the turnip truck

6    this morning.  I assure you.

7  Q.  Did Superintendent Carter ever express any

8    hostility toward Melvin Lowe to you?

9  A.  No, he did not.

10  Q.  Or any give you any kind of indication that he

11    did not want to employ Melvin Lowe, that he

12    had reservations about Melvin Lowe?

13  A.  No, he did not.

14  Q.  Before Melvin Lowe was brought in as a reading

15    coach, do you remember any conversations with

16    Mr. Carter about it?

17  A.  No.

18            MS. CARTER:  Object to form.

19  A.  No, I do not.  I remember none.

20  Q.  How about afterwards?  Do you remember any

21    conversations with Superintendent Carter after

22    Melvin Lowe was hired at Daisy Lawrence?

23  A.  No.  I imagine if Mr. Carter was on board when

1    the EEOC complaint was filed that I made him

2    aware of it, of the fact that we had the EEOC

3    complaint from Mr. Lowe, as was routine with

4    me with the sitting superintendent at that

5    particular time, if I recall.  That complaint

6    arrived before Mr. Carter abdicated the

7    position and before Dr. Purcell came aboard.

8  Q.  Do you know from personal knowledge of what

9    kind of duties Melvin Lowe was performing at

10    Daisy Lawrence?

11  A.  I do not.  I cannot honestly say what kind of

12    duties he was performing because Mr. Lowe in

13    conversations with me would say, well -- later

14    on, well, Dr. Owens had me doing this and he

15    had me doing that, and he know that I was

16    saving his bacon as far as the requirements of

17    this program and that program.  But those were

18    after-the-fact observations by Mr. Lowe in

19    terms of what he was required to do there at

20    Daisy Lawrence.  Since we had had the explicit

21    conversation what his duties and

22    responsibilities were as a teacher/tutor when

23    he was sent there, I assumed that Dr. Owens

1        discrepancy here was in regard to whether he

2        should have been on step 3, which establishes

3        your pay level and have four years experience,

4        or step 3 and have five years experience,

5        which would have meant the next year would

6        have affected whether or not he went to that

7        sixth year and whether subsequently he would

8        have gotten a pay raise.

9    Q.   Now, it listed him -- the first one lists as a

10        teacher/tutor and the second one lists as a

11        teacher.

12    A.   Right.

13    Q.   Why was that changed?

14    A.   On the first one, all of that information was

15        filled in by Mr. Lowe himself, it seems as

16        though, from the writing.  We generally would

17        have them to fill out the top of the sheet,

18        and then we would fill out the bottom of the

19        sheet.  Unless something seems out of the

20        ordinary, then we're not going to catch it if

21        they misname themself or something of that

22        nature.  But that pronouncement with regard to

23        being a reading tutor was Mr. Lowe himself.

1    Q.    So y'all changed it to a teacher?

2    A.    Huh?

3    Q.    Y'all changed it to a teacher?

4    A.    Yeah.  He was a teacher/tutor, which is still

5          technically a teacher.

6    Q.    And that's different from a reading tutor?

7    A.    Right.  Exactly.  He was a teacher/tutor.  If

8          you recall, I said earlier teacher/tutor does

9          not make you work exclusively with reading.

10         You may be given assignments within reading.

11         You may be given assignments within

12         mathematics.  You're just designated to pull

13         students out and work with them on an

14         individual basis.

15   Q.    Why wouldn't you call a reading tutor a

16         teacher?

17   A.    A reading tutor?

18   Q.    If a teacher/tutor is a teacher, why isn't a

19         reading tutor a teacher?

20   A.    "Teacher" seems to generally infer to me that

21         you're on that nine-month teacher salary

22         schedule.  Now, when this was filled out, this

23         was filled out -- if you'll notice, it didn't

1    require Mr. Lowe's signature or anything, so

2    this was filled out probably exclusively by my

3    office, by me seemingly, by the person who

4    signed it.  It says, see attached.  And it

5    just goes go and changes and places him on the

6    right step.  But the difference between the

7    two is what I would call him is what we hired

8    him as, and what he would call himself is what

9    he perceived himself as being, I guess.

10   Q.   So he was hired as a teacher/tutor which is

11        treated as a teacher, not a reading tutor?

12   A.   Yeah.  The technical name for a teacher/tutor,

13        a reading tutor or math tutor is

14        teacher/tutor, and they are on the exact same

15        salary schedule as a 182-day teacher.

16   Q.   Is that how it's advertised?

17   A.   Yes, sir.

18   Q.   As teacher/tutor?

19   A.   As teacher/tutor, yes.

20                 (Plaintiff's Exhibit 12 marked for

21                      identification.)

22   Q.   Let me show you Exhibit 12 and ask you if you

23        can identify that document for me.

115

Q.    Anybody.

A.    Not to my knowledge.

Q.    What was the reason that -- or if you recall
      that there was an attempt of a non-renewal of
      his teaching position at the end of 2004?

A.    Our alternative education program was one that
      was seemingly in continual transition.  At the
      end of each calendar year -- school year,
      there was always a reassessment with regard to
      the effectiveness of that program.  It was
      very commonplace that there would be an
      overhaul -- a programatic overhaul with that
      program at the end of a given year going into
      another year.

          If you were a non-tenured personnel
      assigned to that program, in order to
      facilitate the programatic overhaul, those
      individuals would be routinely non-renewed to
      allow that process to take place.  So
      Mr. Lowe, along with -- I think at that
      particular time there was one other person who
      was non-tenured -- were included for
      non-renewal, sent letters.  Everything was

116

1    done according to the way that it should have

2    been done except that it was not put in the

3    board minutes to confirm that they had been

4    non-renewed to facilitate this process.

5       Once we realized that that particular

6    error had been made, these individuals were

7    called back in because the deadline had come

8    and gone in order to notify them by the end of

9    the school year that their particular position

10   would be retained. Although it might be

11   contrary to our reorganization and

12   restructuring efforts, their position would be

13   retained because they were not notified --

14   They were notified in a timely manner, but the

15   board had not acted in a timely manner because

16   we had not presented it. And that's what

17   Mr. Lowe was told, and that's what the other

18   individual was told and that he was entitled

19   to the position he held the previous year.

20  Q.  And so Mr. Lowe returned to Daisy Lawrence the

21   next year?

22  A.  Yes. After he milked it for all that it was

23   worth. Mr. Lowe came in that summer, and we

1    had a discussion that he had that particular

2    position. I need to get your name back on a

3    contract saying that you are still employed

4    there at that school. Mr. Lowe said at that

5    particular point, I would like to wait and see

6    if I get another position. Mr. Lowe, I'm

7    telling you that you are entitled to a

8    position; at least get your name on the line

9    so that that particular position cannot be

10    filled by anybody else. He kept telling me,

11    well, let's wait and see; let's wait and see;

12    let's wait and see and see if I can get

13    something else. Nothing would preclude you

14    from applying for other positions, Mr. Lowe,

15    if you get your name back on the position that

16    you held on last year.

17    Right up to the very end of the summer, he

18    finally came in. I guess he recognized at

19    that particular point that his opportunities

20    were growing fewer with regard to being placed

21    elsewhere, and then he consented to being

22    reassigned to that same position.

23  Q.  Do you remember any other conversations you

118

1      had with Mr. Lowe other than what you've

2      talked about just now?

3   A. No, I don't remember.  I did tell him that I

4      was disappointed in the fact that he would not

5      facilitate that process of getting his name on

6      the line with reassurances that he could apply

7      for any other positions that came open.  But

8      it was his right to do so, so I went along

9      with it.

10  Q. Do you recall talking to anyone about Mr. Lowe

11     during the summer of 2004?

12  A. No, I do not.

13  Q. Do you remember a position coming open at

14     McKee that Mr. Lowe applied for where

15     Principal Abrams was the principal that

16     summer?

17  A. No, I do not.

18  Q. Do you remember Principal Abrams recommending

19     Lowe for this position?  An administrative

20     assistant position, I believe.

21  A. No, I do not.

22  Q. Would Mr. Lowe have the certification and

23     education for that kind of position?