# DEPOSITION OF JAMES C. OWENS

## January 24, 2006

## Pages 1 through 100

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Blumberg No. 5137

16

Page 21

1    Owens in this area. You consider the
2    south, which -- how extensive?
3  Q. Well, I'm trying to figure out for the
4    middle district. So instead of trying to
5    list all the counties in the middle
6    district, just if you think of Elmore
7    County south.
8  A.  That would be it, then.
9  Q. Okay. Could you tell me where they're
10    employed?
11  A. Okay. Michael does body and paint shop for
12    himself. John is medically retired.
13  Q. Okay.
14  A. Carolyn works -- I want to say for KIM2HM.
15    She does that water testing.
16  Q. Okay.
17  A. And Ethel, she is retired.
18  Q. Okay. Would that cover your wife's
19    siblings, too?
20  A. Okay. South. Okay. That would -- you
21    would take --
22  Q. We don't have to go as far as Mobile.
23  A. Okay. John Williams, he is a brickmason,

Page 22

1    self-employed, as is Richard Williams,
2    self-employed. Eli Williams, he's a truck
3    driver.
4  Q. Okay. If you can think of either
5    relatives' last names -- I don't want to go
6    through all cousins and everything, but
7    last names of relatives either by blood or
8    marriage just generally so we'll know kind
9    of that's in that area.
10  A. Most of my cousins, they live out of town.
11  Q. Okay. So not in this --
12  A. No, not in this area.
13  Q. What about with your wife?
14  A. She has a host of them in Ramer, and I
15    would hate to try to remember all those
16    names. Just the last names --
17  Q. Just last names.
18  A. Williams and Perrys. That would just about
19    take into account.
20  Q. Are you a member of any clubs or
21    organizations or churches in the Montgomery
22    area or south Alabama?
23  A. Yes.

Page 23

1  Q. Okay.
2  A. Organizations, CLAS, AEA. Montgomery East
3    Neighborhood Association. And churchwise,
4    I'm a pastor of a church.
5  Q. What church are you a pastor of?
6  A. Second Baptist Church.
7  Q. Here in Montgomery?
8  A. Yes, sir.
9  Q. All right. Have you pastored any other
10    churches besides Second Baptist?
11  A. One, First Baptist Church in Hope Hull,
12    about five years.
13  Q. All right. When you have had to hire
14    folks for positions in your schools, what
15    process have you -- or procedure have you
16    followed in hiring teachers and certified
17    employees?
18  A. Generally there is a list of names that you
19    can select from. You call an individual
20    in. You'll set up an interview time for
21    them to come. You talk with them and you
22    basically rank them in terms of one, two,
23    or three. One in my case would be the one

Page 24

1    that I would like to have. If for some
2    reason sometimes they're employed, you
3    write in a second or third choice.
4  Q. Okay.
5  A. And then you send the recommendation to the
6    elementary person in charge of hiring at
7    central office.
8  Q. In your years as a principal, how many
9    certified employees have you hired to work
10    at your schools?
11  A. Somewhere in the neighborhood of maybe five
12    to ten.
13  Q. Okay. Have you had anybody who was --
14  A. Need to say not hired, but recommended.
15  Q. Sure. I understand.
16  A. Because the board...
17  Q. Have you had anybody who is your first
18    choice to be hired not get hired?
19  A. Well, not so much not get hired, but I
20    think someone else had employed them prior
21    to me recommending their name. I've had
22    that to happen
23  Q. Okay. Have you had any situation where the

6 (Pages 21 to 24)

Case 2:05-cv-00495-WKW-SRW    Document 18-23    Filed 04/04/2006    Page 3 of 17

Deposition of James C. Owens                    Lowe vs. MCBOE                         January 24, 2006

Page 29

1    right?
2    A.   No, sir.
3    Q.   That school system has to let them out,
4         don't they?
5    A.   Yes, sir.
6    Q.   And if they just walk away, their
7         certificate is subject to discipline, isn't
8         it?
9    A.   Well, something can happen at the state
10        level.
11   Q.   Okay.  And so Mr. Lowe's school system that
12        he was at was going to have to release him
13        from that school system in order for him to
14        take the employment here in Montgomery?
15   A.   That would be correct.
16   Q.   Now, I think you said you got a list of
17        names for individuals for a reading coach
18        position.  Was that the way that position
19        was advertised was for a reading coach
20        position?
21   A.   Well, what it was, there were great talk --
22        and you have to understand, we go to
23        meetings all the time, and terminology and

Page 30

1    names are thrown around.  The schools were
2    supposed to have a reading coach, and you
3    can get a reading coach through several
4    means.  Title I, the state actually hires
5    coaches and puts them at the schools, and
6    central office has a lot to do with it
7    now.
8         My method at that time, Mr. Lowe's
9    moneys came through the general fund.  It
10   was not Title I.  We did not have a budget
11   that was sufficient to get a reading coach
12   at Daisy Lawrence.
13   Q.   But the position that he and the others
14        were being interviewed for was for a
15        reading coach position?
16             MS. CARTER:  Object to the form.
17   A.   Yes, sir.  To my knowledge, yes, sir.
18   Q.   Okay.  And was this going to be -- did you
19        know whether or not that would be a
20        nine-month or ten-month position?
21   A.   I told him that when he went down to the
22        central office that they would talk to him
23        about the length and term of the contract.

Page 31

1    Q.   Okay.  Were you -- were you not aware at
2         the time of whether it would be a nine or
3         ten?  Is that --
4    A.   I was looking at a nine-month contract.
5    Q.   You were thinking it would be nine months?
6    A.   Yes.
7    Q.   Okay.  Did y'all discuss at that point when
8         you were interviewing Mr. Lowe whether it
9         would be nine or ten months?
10   A.   We didn't.  Like I said, again, I told him
11        when he goes down to fill out the final
12        papers, fill out the papers, they would
13        discuss it better with him.  Then that way
14        it would only be monogamous in terms of
15        answer.
16   Q.   And I looked at an evaluation you did which
17        we have in the documents of Mr. Lowe, but
18        it lists him as a reading coach.  Is that
19        the duties he performed while at Daisy
20        Lawrence?
21             MS. CARTER:  Object to the form.
22   A.   He performed reading tutor duties.  Once
23        the clarification of the title -- Mr. Lowe

Page 32

1    and I talked when he came back, once he
2    met, had met with Mr. Barker in the central
3    office or whomever he met with, and said
4    that he was hired on for a reading tutor.
5    And I asked him at that time was he
6    satisfied with that, and he said that that
7    was the reason he left the other county for
8    a reading coach.  And I thought it was,
9    too, to be honest.
10   Q.   Okay.  Mr. Lowe had said that he left the
11        other county and turned his resignation in
12        because he thought he was coming to be a
13        reading coach?
14   A.   That's correct.
15   Q.   But he told you that he -- I guess
16        subsequent to resigning from that position,
17        he goes and meets with someone at the
18        central office, and they told him, no, he's
19        going to be a reading tutor; is that right?
20   A.   Reading tutor.  Yes, that's what he
21        reported.
22   Q.   But the actual duties or the job that
23        Mr. Lowe did, was it a reading coach job?

8 (Pages 29 to 32)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 33

1   A.  Well, we didn't have one, and Mr. Lowe came
2       in.  His duties -- he had a list of
3       students that he would tutor.  That would
4       be the phase of a reading tutor, to work
5       with students that teachers have identified
6       as struggling readers.  Plus, we had
7       another program there that Mr. Lowe
8       assisted with, and his duties -- and part
9       of the way that I operate as administrator,
10      as other principals helped me along, we try
11      to enhance another person's duty or bring
12      them along as a leader.  And that's
13      basically what Mr. Lowe and I tried to work
14      out.
15          There was a lot of things that he knew
16      about reading already.  Either he did the
17      duties or I would have to -- had to do the
18      duties, so we kind of worked together.  But
19      basically, he did everything except attend
20      the meetings.  He could not attend the
21      meetings when they had a reading coach
22      meeting.
23  Q.  Okay.  So he basically was performing those

Page 34

1       duties of a reading coach and a reading
2       tutor, but he couldn't go to the reading
3       coach meetings?
4   A.  No.
5   Q.  Was that --
6   A.  By virtue of his title.
7   Q.  But I've accurately summarized it; is that
8       right?
9   A.  Yes.
10  Q.  Is that correct?
11          MS. CARTER:  Object to the form.
12  A.  Yes.
13  Q.  Now, do you know if the central office
14      would send him materials or e-mails as if
15      he was a reading coach?
16  A.  Yes, sir.
17  Q.  Okay.
18  A.  He would get those.  He would come in, we'd
19      discuss it as to the best route to approach
20      it.
21  Q.  Did you ever speak with anyone in central
22      office or the superintendent about why they
23      would want to call him a reading tutor

Page 35

1       instead of a reading coach?
2   A.  No, sir, I never did get into that.  He
3       was -- after he came back from the meeting,
4       I thought maybe it was satisfactory, what
5       they had discussed.  I did not usurp
6       anyone's authority and I didn't get into
7       Mr. Lowe's affairs after that.  And later I
8       think he was hired as a reading coach at
9       Southlawn Elementary, I think, or something
10      if I'm not mistaken.
11  Q.  Okay.  So he did some summer duty at
12      Southlawn as a reading coach position?
13  A.  Yes, sir.
14  Q.  Okay.  Did anybody -- I know you didn't
15      inquire, hey, why didn't y'all -- why did
16      y'all call him this if he's doing that, but
17      did you ever get any kind of information
18      from anyone in administration or the
19      superintendent or from human resources
20      about why he was being treated -- going to
21      be called a reading tutor rather than a
22      reading coach?
23          MS. CARTER:  Object to the form.

Page 36

1   A.  No, sir.
2   Q.  Okay.  Did you have any conversations with
3       Bullock County before Mr. Lowe came over?
4       Did you talk to any of the officials there?
5   A.  No, sir.
6   Q.  In 2004-2005, did you become aware that
7       Mr. Lowe had filed an EEOC complaint
8       against the Montgomery County Board of
9       Education?
10  A.  No, sir.
11  Q.  All right.  Did you ever learn that he had
12      filed an EEOC complaint?
13  A.  I did.
14  Q.  All right.  When was that?
15  A.  That was late.  I can't exactly remember
16      the exact date, but school was -- I can't
17      even remember whether school was in or
18      school was out, it was so late.
19  Q.  Okay.  Did you ever learn during the
20      2004-2005 school year that Mr. Lowe had
21      filed a lawsuit?
22  A.  No, sir.
23  Q.  Did you ever talk to Mr. Lowe about a

9 (Pages 33 to 36)

Page 37

1     lawsuit that he had filed with Montgomery
2     County Board of Education or an EEOC
3     complaint?
4  A.  No.
5  Q.  Never came up?
6  A.  No, sir.
7  Q.  Did you ever discuss with Mr. Lowe that --
8     or say anything, words to the effect that
9     he should not have filed a lawsuit against
10    Montgomery County Board of Education?
11 A.  No, sir.  I would be crossing a line.  No,
12    sir.
13 Q.  Or did you ever say anything to him that
14    anyone in administration had informed you
15    that he shouldn't have filed a lawsuit --
16 A.  No, sir.
17 Q.  -- or an EEOC complaint?
18 A.  No, sir.
19 Q.  Did you ever say anything to him that you
20    felt like that there were persons in the
21    administration of the school system that
22    had negative feelings about him?
23 A.  No, sir, I don't know that.  No, sir.

Page 38

1  Q.  Okay.  You never relayed anything to him
2     about either Mr. Barker was -- didn't like
3     him for some reason or that some other
4     school personnel may not like him for some
5     reason?
6  A.  No, sir.
7  Q.  In 2004-2005, did Mr. Lowe apply for leave
8     to attend a conference?
9  A.  I believe it was one down in Biloxi, I
10    believe it was.
11 Q.  Yes, sir.  And -- I was going to see if I
12    could find it quickly and let you take a
13    look at it.
14    Did you approve that leave?
15 A.  Yes, sir, that's my signature.
16 Q.  That's Exhibit 13.  All right.  And what
17    date did you approve it on?
18 A.  On -- according to this, 10/18/04.
19 Q.  10/18/04?
20 A.  Yes, sir.
21 Q.  Was this leave denied?
22 A.  It was by Mr. -- I think Mr. Barker signed
23    it.

Page 39

1  Q.  Okay.  Did you talk to Mr. Barker about the
2     denial of the leave?
3  A.  I did.
4  Q.  All right.  Did you get an explanation for
5     the denial?
6  A.  Mr. Barker is my superior, and if he writes
7     something, if he says something, I'm going
8     to pretty much follow that.
9  Q.  Sure.  I didn't mean to imply that you were
10    questioning or challenging him on it.  I
11    was just wondering if he ever said why he
12    denied it.
13 A.  No, he didn't.
14 Q.  Okay.  I guess you felt that it was an okay
15    thing for Mr. Lowe to do if you approved it?
16 A.  Yes.
17 Q.  And this was to speak at a function, a
18    seminar.  Did you feel like Mr. Lowe was
19    knowledgeable and could present himself
20    well enough at that seminar to speak at
21    that seminar?
22 A.  Yes, sir.  I'm trying to recall.  I think
23    it was in conjunction, too, with some class

Page 40

1     he was taking.  I can't remember exactly
2     all of the specifics of it, but that's --
3     that's basically it.
4  Q.  Okay.  Did Mr. Lowe apply for additional
5     leave for another seminar or conference?
6  A.  Yes, sir.  That's my signature there.
7  Q.  Okay.  And you approved that leave as well?
8  A.  Yes, sir.
9  Q.  But that leave was also denied, is that
10    right, by central office?
11 A.  Yes, sir.
12 Q.  Were you ever told why that leave was
13    denied?
14 A.  No, sir.
15 Q.  Did you have any other employees request
16    professional leave and development that
17    school year?
18 A.  Yes, sir.
19 Q.  All right.  Who would normally approve
20    or -- from the central office or deny that
21    leave?
22 A.  Mr. Barker or Ms. Hicks.
23 Q.  Okay.  Did you have any other employees

10 (Pages 37 to 40)

Page 41

1   whose leave was denied that year?
2   A.  It's hard to remember that. It would be
3       hard to remember it because you're
4       generally talking about 25 to 30 per year.
5   Q.  Anything stand out as you sit here today?
6   A.  No.
7   Q.  Okay. Did you have any leave that was not
8       approved that year for you personally?
9   A.  I don't think that year, but I've had some
10      denied, yes, sir.
11  Q.  Okay. What situations were denied for
12      leave you wanted to take, do you remember?
13      Was it to speak at conferences or --
14  A.  I think I was going to attend a workshop on
15      mediation at the bar association.
16  Q.  And that got denied?
17  A.  Yes.
18  Q.  Okay. Any others you can think of?
19  A.  I think that that's the most recent one.
20  Q.  Did you have any discussions with Mr. Lowe
21      about the denial of these leaves? Do you
22      recall any of that?
23  A.  Any time they would send the information

Page 42

1   back to me, I would have two methods of
2   communicating with them: One, I would
3   xerox a copy of the request, the initial
4   request form, and tell them that it was
5   approved or denied. If they needed a sub,
6   it was approved, they would go ahead and
7   get a sub. If it was denied, then I would
8   just tell them they can refer that to the
9   person that basically denied it.
10  Q.  All right. Do you recall if any leave was
11      approved for Mr. Lowe in 2004-2005?
12  A.  I can't remember.
13  Q.  Do you recall ever any employees that went
14      a whole year and didn't get any kind of
15      leave of this nature for seminars approved?
16          MS. CARTER:  That worked for his
17          school?
18          MR. PATTY:  Well, that he knows
19          of, has personal knowledge.
20  A.  A whole year?
21  Q.  Yes, sir.
22  A.  No, sir, I couldn't recall that.
23  Q.  Okay. Did you ever receive in the pony

Page 43

1   some documents regarding Mr. Lowe and a
2   reprimand at Southlawn Middle School?
3   A.  I did.
4   Q.  How did that come about? How did you get
5       that? Did you request it or --
6   A.  No, sir. I don't know. I just opened an
7       envelope. It was no name on it. Just --
8   Q.  Just showed up?
9   A.  Just addressed. That was it.
10  Q.  So you had made no request for that
11      information?
12  A.  No, sir. I was not aware of it.
13  Q.  Was that the first you had seen of that
14      letter of reprimand?
15  A.  Yes, sir.
16  Q.  Okay. Did that surprise you to get that,
17      something from somebody's personnel file
18      just in the mail anonymously like that?
19  A.  It's kind of unusual.
20  Q.  I wouldn't expect that happens very often,
21      right?
22          What did you do regarding that?
23  A.  We had maintained a personnel folder on the

Page 44

1   faculty, and we put that in it.
2   Q.  Okay. Did you ask Mr. Lowe about it, I
3       mean, why were you getting this?
4   A.  I didn't get into it. I mentioned to him,
5       but we didn't discuss it. I didn't want to
6       hear anything concerning that. I was just
7       interested in him doing the work that he
8       was hired to do.
9   Q.  Did you talk to anyone at human resources
10      about your receiving those documents?
11  A.  No, sir.
12  Q.  Did anyone ever come to you and say, I'm
13      the one that sent it to you? Do you have
14      any idea who sent it to you?
15  A.  I didn't -- I didn't go parading that
16      around. I just put it in the file and I
17      just --
18  Q.  Sure.
19  A.  -- left it there.
20  Q.  But you had not requested anything like
21      that from the central office?
22  A.  No, sir.
23  Q.  Do you remember roughly when that was that

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 45

1    you got those documents?  It was in his
2    first year working with you, his second
3    year?
4  A.  It was in his first year.
5  Q.  Okay.  Middle of the year, beginning, end?
6  A.  I can't remember the exact period in the
7    year, but it was -- I want to say about two
8    months after he was on board the first year.
9  Q.  Okay.  Have you had any discussions with
10    Mr. Lowe about his lawsuit or EEOC
11    complaint at all?
12  A.  No, sir.  I don't know the contents of it
13    or anything.  No, sir.
14  Q.  Okay.  And you've never said to him that
15    the board or Dr. Purcell is not going to
16    like that lawsuit or that EEOC complaint?
17  A.  No, sir.
18  Q.  Never said that he shouldn't have filed
19    it?
20  A.  No, sir.
21  Q.  Did you give Mr. Lowe a letter of
22    recommendation to --
23  A.  Yes, sir.  He has requested I want to say

Page 46

1    one or two letters of recommendation from
2    me.
3  Q.  And you wrote those?
4  A.  Of course.  Sure.
5  Q.  Okay.  Now, during the summer of 2005, did
6    you have any contacts with Mr. Lowe?
7  A.  During the summer?
8  Q.  Yes, sir, this past summer.
9  A.  Only time I talked with him is after I got
10    on board at Paterson, and I found that the
11    reading scores were low, and I found out
12    that he was not working.  I talked to him
13    to see -- to find out whether he was
14    working, and if so, would he be interested
15    in working there because I had that
16    position.  I was trying to get it approved,
17    and once I got it approved, I was going to
18    call him in for an interview.
19  Q.  Did you contact Mr. Lowe for that position?
20  A.  I did.
21  Q.  Okay.  And it was a reading coach position?
22  A.  Yes, sir.  We created one for four through
23    six.

Page 47

1  Q.  And this was a job that the duties he had
2    satisfactorily carried out for you for two
3    years; is that right?
4        MS. CARTER:  Object to the form.
5  A.  Yes.
6  Q.  Okay.  Based upon his performance in that
7    job previously, you felt like he would be a
8    good candidate for this job at Paterson?
9  A.  Yes.
10  Q.  Okay.  And tell me what happened.  Did you
11    contact him first, or did you go to the
12    board and say, I want to contact Mr. Lowe,
13    or how did that work?
14  A.  Well, first what you have to do is
15    determine your needs.  You have to go
16    through Title I.  You have to sit down with
17    the person that works with your school.
18    You go through your budgetary concerns.
19    You see whether or not you can entertain
20    the motion of having a reading coach.
21        There was three positions that I was
22    looking for at that time:  Reading coach,
23    math tutor, and a writing tutor.  Those

Page 48

1    were the primary concerns of Paterson at
2    that time.  And you have to do a hire form,
3    and from there the persons in Title I would
4    go through Dr. Gwinn, which is director,
5    and from there we have an office downtown
6    in the federal programs.  Mr. Dobbins is
7    over that.  And sometimes -- I'm not real
8    sure when it gets downtown whether it's --
9    when it's coming from Title I, whether it
10    goes through Mr. Barker or just the general
11    fund and the AR coaches.  It gets kind of
12    funny down in there where -- when it comes
13    down to that, so I don't want to go too far
14    on that one.
15  Q.  When Mr. Lowe worked with you previously,
16    y'all have to -- don't y'all have to code
17    jobs for your funds and stuff?  Don't you
18    have to code what job each employee is
19    doing so that you get the moneys back from
20    the state?
21  A.  Well, that would be done downtown.
22  Q.  Okay.  Well, did you know when Mr. Lowe
23    worked with you at Daisy Lawrence how he

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of James C. Owens                Lowe vs. MCBOE                January 24, 2006

Page 49

1  was coded, if he was coded a reading coach,
2  reading tutor, teacher? Do you know how he
3  was coded at all?
4  A. No. Once he came on board, his official
5     title would have to be what he discussed
6     with the person downtown.
7  Q. Right.
8  A. And it was reading tutor, and that's what
9     that had to be.
10 Q. But do you know how he was coded for budget
11    purposes with the school system?
12 A. No, sir. That would have been coming from
13    out of finance.
14 Q. All right. Now, let's back up or go back
15    where we were. After you had I guess
16    gotten the positions approved, did you have
17    a reading coach, math tutor, and writing
18    tutor all approved? All three of those
19    slots approved?
20 A. Yes, sir.
21 Q. And did you hire personnel for all three of
22    those slots at your school?
23 A. Yes, sir.

Page 50

1  Q. Now, did you consider Mr. Lowe for the
2     writing tutor or math tutor positions?
3  A. Generally, when I looked at those
4     positions, I was looking at a part-time
5     person that would come in. I specifically
6     asked about the reading coach position.
7  Q. Okay. So the math tutor and writing tutor
8     are part-time jobs?
9  A. Right.
10 Q. All right. Now, going to the reading coach
11    position, once that -- when was that
12    position approved for filling by the school
13    system?
14 A. I want to say in September, early September.
15 Q. In early September?
16 A. Prior to the 15th.
17 Q. Okay. You say you contacted Mr. Lowe.
18    When did you contact him about filling that
19    position?
20 A. I want to say around the 25th of August,
21    somewhere near the end of August, somewhere
22    down there at the end.
23 Q. Did you keep a file regarding that

Page 51

1  position, like the people you talked to,
2  your conversations with Mr. Lowe,
3  conversations with central office, just
4  anything you had relative to that position?
5  A. I generally will keep the information that
6     the person will bring in to me.
7  Q. Sure.
8  A. I have his folder.
9  Q. Okay. Do you keep notes of your contacts?
10    Say, if you talk to Mr. Lowe or if you talk
11    to someone at central office regarding that
12    position, do you keep notes on those?
13 A. I think only -- I contacted central office
14    once or twice, and I think I did it via
15    e-mail.
16 Q. Would you still have copies of those
17    e-mails?
18 A. Sure.
19 Q. Okay. Did you ever write the central
20    office a letter or anything regarding
21    Mr. Lowe? Not just an e-mail, but a --
22 A. No.
23 Q. Okay. So any written materials you would

Page 52

1  have for that job would either be your
2  e-mail that you sent to the central office
3  or materials that a candidate might have
4  brought in to give you?
5  A. Right.
6  Q. Okay. You say you contacted Mr. Lowe
7     August 25th?
8  A. Somewhere in that neighborhood. The last
9     weekend after I had looked at the budgetary
10    concerns and assessed the problems there
11    with a team of people at the school, we
12    found those would be the greatest needs and
13    the best ways to spend those moneys.
14 Q. Did you ask the central office if they had
15    a list of people for possible -- for that
16    possible position prior to contacting
17    Mr. Lowe?
18 A. No, I didn't.
19 Q. Okay. In handling personnel hirings in the
20    system before, if a principal knows about a
21    particular candidate being available or
22    someone who may be qualified for that
23    position, is there anything wrong with that

13 (Pages 49 to 52)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Case 2:05-cv-00495-WKW-SRW    Document 18-23    Filed 04/04/2006    Page 9 of 17

Deposition of James C. Owens                    Lowe vs. MCBOE                        January 24, 2006

Page 53

1   principal contacting that individual to see
2   if they've got any interest in the
3   position?
4           MS. CARTER: Object to the form.
5   A.  Well, basically, what you try to do, and
6       the reason I contacted him primarily is
7       because he had worked with me previously.
8   Q.  Sure.
9   A.  And I was trying to make sure that the
10      individuals that worked with me previously
11      had a job if I could help them in any way.
12  Q.  Sure.
13  A.  And that's why I called him up.
14  Q.  Okay. But there was nothing inappropriate
15      in your working here at Montgomery County
16      Board of Education for you to do that?
17  A.  No, sir. Because if he was on the list
18      once, they had not taken him off the list.
19  Q.  Sure. Okay.
20          Now, you met with -- you called
21      Mr. Lowe. Can you tell me about that
22      conversation, what you recall.
23  A.  I just asked him, I said, are you working

Page 54

1   now? And he said, no. I said, well, I may
2   have something available if the board
3   approves it. So I said, you need to get
4   your resume and any other materials. I
5   treated him just like -- even though I had
6   worked with him, I treated him just like a
7   first-time candidate.
8   Q.  Do you know if all the other folks that
9       worked at Daisy Lawrence with you got
10      employed?
11  A.  I'm not real sure of everyone. There was
12      one person that still had not been hired in
13      August, Mr. Brown, and I wrote the
14      superintendent a letter trying to get him
15      hired for behavior person. I did not know
16      at the time that Mr. Lowe was not hired.
17  Q.  What position did Mr. Brown have?
18  A.  He was a behavior interventionist.
19  Q.  Is he certified?
20  A.  Yes, sir, he was certified.
21  Q.  Certified?
22  A.  Yes. But he was ultimately hired at
23      Lanier, and that's why I couldn't --

Page 55

1   Q.  To your knowledge, is there anybody on
2       staff, that was on your staff at Daisy
3       Lawrence other than Mr. Lowe that has not
4       been rehired by the school system?
5   A.  Only one, and I ran into her lately. She
6       works with the school system as a
7       part-time, Chastity Williams. She was an
8       aide. She did not get full time. But
9       certified, I think that he may be the only
10      one that's not hired.
11  Q.  So all certified folks except for Mr. Lowe
12      got rehired; is that correct?
13  A.  To my knowledge, yes.
14  Q.  And the only person in the noncertified
15      category would be a lady who's an aide --
16      who was an aide; is that right?
17  A.  Yes.
18  Q.  And she's now working part time?
19  A.  Right.
20  Q.  Okay. How many folks did you have work
21      with you at Daisy Lawrence?
22  A.  I want to say it was about 25.
23  Q.  Okay. At the end of the school year, is it

Page 56

1   the practice that the principal will turn
2   in names to the superintendent of the
3   nontenured teachers that they think should
4   be renewed or nonrenewed for the upcoming
5   year?
6   A.  Yes, sir, we have such a practice.
7   Q.  If Daisy Lawrence had not closed, would you
8       have had a recommendation regarding
9       Mr. Lowe, either to nonrenew him or renew
10      him?
11  A.  I would not have offered to tender a
12      nonrenewal notice to him, no, sir.
13  Q.  You would not have nonrenewed?
14  A.  Would not have, no, sir.
15  Q.  You would not have nonrenewed him?
16  A.  No, sir.
17  Q.  Okay. I was just trying to make sure.
18          Now, going back to -- you have a
19      meeting with -- you have a conversation
20      with Mr. Lowe, talk to him. Do you
21      remember anything else in that conversation
22      that y'all talked about?
23  A.  No, sir, that was basically the extent of

14 (Pages 53 to 56)

Page 61

1   A.   No, not at that time.
2   Q.   All right. At the time you submitted
3        Mr. Lowe's name, had you interviewed
4        anybody else?
5   A.   I hadn't interviewed anyone else. I had a
6        couple of people in mind, but I hadn't
7        interviewed them yet. And when I sent his
8        nomination in, Mr. Barker ultimately called
9        me and said that he would like for me to
10       talk to some other candidates. Of course,
11       I was cordial. I said sure.
12  Q.   Okay.
13  A.   And I was sent three names -- not real sure
14       whose name was on the e-mail, but sent
15       three candidates. I contacted them
16       personally or my secretary contacted them,
17       and from there we scheduled them to be
18       interviewed.
19  Q.   Did Mr. Barker tell you why you needed to
20       talk to these other three candidates?
21  A.   No, not to my knowledge, he didn't. He
22       just said that he wanted me to talk to some
23       more candidates.

Page 62

1   Q.   When you were having the --
2        Now, to get the reading coach position
3        approved, you couldn't do that on your own,
4        right?
5   A.   No, sir.
6   Q.   Somebody --
7   A.   The board has to approve all personnel
8        action.
9   Q.   Once that position was approved, did
10       anybody instruct you that you had to go
11       through any special process or unique
12       process for hiring reading coaches?
13            MS. CARTER: Object to the form.
14  A.   No, sir.
15  Q.   When you hired Mr. Lowe and interviewed him
16       before back in 2003, did anybody tell you
17       when you -- that you needed to go through
18       any kind of special process to interview
19       and hire reading coaches?
20            MS. CARTER: Object to the form.
21  A.   No, sir.
22  Q.   Okay. And have you hired any other -- have
23       you hired reading coaches before this or --

Page 63

1        have you had any other reading coaches
2        besides these two positions that you've
3        hired?
4   A.   Well, the reading coach actually is a new
5        position.
6   Q.   Okay.
7   A.   It's -- I mean, it's only been out maybe
8        three or four years in this area.
9   Q.   Okay.
10  A.   So it's not something that's been long
11       standing.
12  Q.   Okay. Did anyone at any point tell you
13       that in order to hire a reading coach, a
14       reading coach must have a certain rating or
15       ranking from a committee?
16  A.   No, sir.
17  Q.   Okay. All you were told by Mr. Barker was,
18       here, talk to these three other candidates?
19  A.   Not by him specifically. Ms. Mizelle would
20       be tendering some names.
21  Q.   Okay.
22  A.   She tendered some names, three of them.
23  Q.   Okay. So Mr. Barker told you that

Page 64

1        Ms. Mizelle would be tendering some names
2        to you?
3   A.   Yes.
4   Q.   Okay. Did you feel like anything that you
5        did in that process up to that point was
6        inappropriate or wrong?
7   A.   No, sir.
8            MS. CARTER: Or what?
9            MR. PATTY: Or wrong.
10  Q.   Did you feel like anything that you were
11       doing in interviewing Mr. Lowe and
12       recommending his name was out of line with
13       what your experiences had been in the
14       Montgomery school system?
15            MS. CARTER: Object to the form.
16  A.   Well, you know, a little bit. Generally,
17       you know, didn't get that much static
18       behind it. You either do it and they --
19       meaning the board -- approves it. The
20       person you send the name in to, they would
21       tender it up to the superintendent, the
22       superintendent then would put it on the
23       personnel action, the board vote it up or

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of James C. Owens
Lowe vs. MCBOE

Page 65

1    down.
2    Q.  Okay.  So normally you would submit a name
3        like Mr. Lowe's, and he would go to the
4        board and the board would vote it up or
5        down, basically, is how it worked; is that
6        correct?
7    A.  That's correct.
8    Q.  And in this situation, instead, you got
9        told you need to talk to these other
10       people; is that right?
11   A.  That's correct.
12   Q.  And Connie Mizelle would let you know --
13           MS. CARTER:  Can you answer
14              out loud?  I'm sorry.  I don't
15              want to stare at you when
16              you're talking, and I can't
17              hear what you're saying.
18           THE WITNESS:  I'm sorry.
19   Q.  Three additional names that you got from
20       Connie Mizelle were -- Strike that.
21           The three names you got from Connie
22       Mizelle, was Mr. Lowe's name in that list?
23   A.  His name was not in that list.

Page 66

1    Q.  All right.  Did they mention Mr. Lowe in
2        that list of three names at all?
3    A.  No, sir.
4    Q.  When you got that list, did you interview
5        those three people?
6    A.  Yes, sir.
7    Q.  And did you subsequent to interviewing
8        those three people make a recommendation as
9        to who you wanted to hire?
10   A.  Yes, sir.
11   Q.  All right.  Who did you recommend?
12   A.  I recommended Mr. Lowe again.
13   Q.  Okay.  And was that based upon your years
14       of experience and training and work as a
15       principal and administrative assistant that
16       you felt like he was the best candidate for
17       that job?
18           MS. CARTER:  Object to the form.
19   A.  Yes, sir.  In looking at the material that
20       was brought and the questions that had been
21       put forth, I thought he was.
22   Q.  And based upon the interviews you
23       conducted, was that part of your

Page 67

1    consideration?
2    A.  Yes, that was.  Yes.
3    Q.  Now, after you made -- Did you make that
4        recommendation in writing?  Was it an
5        additional form that you submitted?
6    A.  E-mail.
7    Q.  E-mail?
8    A.  Yes.
9    Q.  Did you say in that e-mail, I want to -- I
10       still would like to hire Mr. Lowe, or what
11       did you --
12   A.  I can't remember the exact wording, but
13       Mr. Lowe was the first choice.  And I think
14       subsequent to that, I said that my second
15       choice would be another person.
16   Q.  Okay.  Who was your second choice, do you
17       remember?
18   A.  Yes.
19   Q.  Who was that?
20   A.  Ms. Freeny.
21   Q.  Ms. Freeny.
22           Now, in this e-mail that you sent, did
23       you put your first and second choice in

Page 68

1    that e-mail or did you just put Mr. Lowe
2    and then later gave them Ms. Freeny's
3    name?
4    A.  I want to think that I put both on the --
5        I'm not absolutely sure on that.
6    Q.  Okay.  Would you still have that e-mail, do
7        you think?
8    A.  I think, yes.
9    Q.  Now, what was the response you received
10       from that e-mail?
11   A.  I didn't get a response.  It was a few
12       weeks, couple of weeks.
13   Q.  Did you make inquiries about what was going
14       on?
15   A.  I called to Ms. Winborne and called
16       Mr. Barker once or twice.  And after
17       about -- I want to say a couple of weeks, I
18       went down just to see where we were because
19       time was of essence, especially with your
20       student population.  And I didn't talk to
21       Mr. Barker, but I talked to Ms. Winborne.
22       She works with the elementary.  And she
23       didn't elaborate, but she just said -- I

17 (Pages 65 to 68)

Page 73

1  Q.  Go ahead.
2  A.  You have -- she was already employed by the
3      board, so you're talking about two to three
4      weeks.
5  Q.  Okay.  How long did it take her to come on
6      board as a reading coach?
7  A.  Two to three weeks.  She was holding down a
8      teaching slot at another school, and they
9      had to advertise her position first before
10     she could be released.
11 Q.  All right.  Did they let you know, though,
12     when she was cleared to be hired for that
13     position after you said, okay, I'll take
14     Ms. Freeny if I can't have Mr. Lowe?
15 A.  Well, my conversation with Ms. Winborne,
16     that she would be hired.
17 Q.  Okay.
18 A.  I didn't know a specific date.
19 Q.  Okay.  You just -- you were just told that
20     she would get it.  I guess immediately
21     after you said, I'll take Ms. Freeny if I
22     can't have Mr. Lowe, you were told, okay,
23     Ms. Freeny would be hired?  Is it basically

Page 74

1      how --
2  A.  Not quite that way.
3  Q.  Okay.
4  A.  I had to send the name in, so you're
5      talking about two or three days afterwards.
6  Q.  Okay.
7  A.  And that she would contact Ms. Freeny to
8      see if she was still interested in the
9      job.
10 Q.  So it was in two or three days after you
11     said you'd take Ms. Sweeney that you were
12     told she would be hired?
13 A.  Not that she would be hired, but that she
14     would contact her to see if she was still
15     interested in the job.  Because you're
16     looking at maybe three weeks in between
17     that.
18 Q.  Okay.  How long after Ms. Sweeney said she
19     was interested and would take the job was
20     it that she was -- that you were told that
21     she would be hired?
22 A.  As soon as possible.
23 Q.  Okay.

Page 75

1      MS. CARTER:  What's her name?
2      THE WITNESS:  Eleanor Sweeney --
3          Freeny.
4      MR. PATTY:  Freeny.  I'm sorry.
5      MS. CARTER:  Freeny.  Well, I
6          started reading something, and
7          I thought we were either on a
8          different job --
9      MR. PATTY:  I'm sorry.
10 A.  Eleanor Freeny.
11 Q.  All right.  Have you ever had someone that
12     you hired who had to obtain an emergency
13     certificate or alternative certificate?
14 A.  No, sir.
15 Q.  Okay.  Never had that come up?
16 A.  No, sir.  I wouldn't do that.  No, sir.
17 Q.  Did anyone try to say anything directly to
18     you to try to dissuade you from hiring
19     Mr. Lowe?
20 A.  No, sir.
21 Q.  Just told you, you can't hire him?
22      MS. CARTER:  Object to the form.
23          I don't think he testified

Page 76

1      that he was told that.
2      THE WITNESS:  No.
3  Q.  You couldn't hire him.
4      MS. CARTER:  Object to the form.
5          I don't think he testified to
6          that either.
7  A.  No.  I just asked again whether I could
8      hire Mr. Lowe, and she said no, and that
9      was it.
10 Q.  Okay.  You asked if you could hire
11     Mr. Lowe.  She said no.  Okay.  Did
12     anybody -- other than that comment, did
13     anyone try to dissuade you from hiring
14     Mr. Lowe?
15 A.  No, sir.
16 Q.  Okay.  Has anyone at the board ever
17     expressed any -- with administration --
18     any negative feelings about Mr. Lowe to
19     you?
20 A.  Not to my knowledge, no, sir.
21 Q.  Okay.  Do you think you were qualified to
22     make the decision about whether or not to
23     hire Mr. Lowe for the reading coach?

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 77

1    MS. CARTER: Object to the form.
2  A.  I wouldn't approach it in that way. It has
3     to do with the chain of command, and you
4     have to make your recommendation.
5  Q.  Sure.
6  A.  And the central office through Mr. Barker's
7     office can make adjustments.
8  Q.  Okay. And I guess I'm -- I understand
9     that chain of command, and I'm not really
10    asking who has the authority. But in doing
11    what you were doing, in making interviews
12    and making decisions about what employees
13    to recommend for hiring, do you feel like
14    your experience and training and your work
15    in the school system, you had the
16    qualifications to make that kind of
17    recommendation?
18    MS. CARTER: Object to the form.
19  A.  Only thing I can say is inherent with the
20    authority as principal, you can make
21    recommendations for personnel.
22  Q.  Sure.
23  A.  But whether they be hired or not...

Page 78

1  Q.  I understand. I understand.
2     Have you ever been told by Mr. Barker
3     or anyone in human resources that you
4     needed to hire a woman?
5  A.  No, sir.
6  Q.  Have you ever been told that you needed to
7     have more diversity in your staff or get
8     more women involved in your staff, you had
9     too many men, anything like that?
10  A.  No, sir.
11    MR. PATTY: I may be just about
12     done.
13    MS. CARTER: Take a little break?
14    (Brief recess.)
15    EXAMINATION
16  BY MS. CARTER:
17  Q.  Dr. Owens, when you were the principal at
18    Daisy Lawrence, did you have more women or
19    male teachers there?
20  A.  Had more female teachers.
21  Q.  Okay. You wouldn't have needed to hire
22    women to balance your staff, would you?
23  A.  No.

Page 79

1  Q.  If you were trying to balance or the
2     Montgomery public school was trying to
3     balance, they would have told you to hire
4     men?
5     MR. PATTY: Object to the form.
6  A.  More men.
7  Q.  But you were never told that you had to
8     hire one gender or another under any
9     circumstance; is that correct?
10    MR. PATTY: Object to the form.
11  A.  That's correct.
12  Q.  I think Mr. Patty asked you about this. Is
13    it your recollection that you never were
14    told by Jimmy Barker that the reason that
15    you needed to re-interview candidates was
16    because Mr. Lowe had not been highly
17    recommended out of the committee?
18    MR. PATTY: Object to the form.
19  A.  That's correct.
20  Q.  You just don't remember that?
21  A.  I do not remember him saying that.
22  Q.  Do you know for a fact that he didn't tell
23    you that, or are you just saying you don't

Page 80

1     remember that conversation?
2     MR. PATTY: Object to the form.
3  A.  I just don't remember that part of the
4     conversation.
5  Q.  Okay. Did you communicate with Mr. --
6     Mr. Barker was the person who told you
7     that you needed to talk to additional
8     people, correct?
9  A.  That's correct.
10  Q.  But he's not the person who gave you the
11    names of those people to talk to?
12  A.  I can't be sure who sent the e-mail out. I
13    don't want to say that -- I don't think his
14    name was on it. I believe it was Connie
15    Mizelle.
16  Q.  Okay. And she forwarded the names of
17    individuals?
18  A.  Via e-mail.
19  Q.  So it's your testimony that you just don't
20    know where they got those three names of
21    people, then?
22    MR. PATTY: Object to the form.
23  Q.  Those three names? That there was no

20 (Pages 77 to 80)

Page 81

1  communication with you about who those
2  people were?
3  A. No. I didn't know either one until I
4  interviewed them.
5  Q. And just to be clear or so I'm clear, when
6  you recommended -- when you initially
7  recommended Mr. Lowe, you didn't interview
8  anybody else for the job?
9  A. That's correct.
10 Q. And you did not have any communication with
11 the office of curriculum and instruction
12 about individuals that had been interviewed
13 for coaching positions?
14 A. No, ma'am.
15 Q. Okay. So you had -- so I guess at that
16 point, isn't it fair to say that you didn't
17 know whether Melvin Lowe had even been
18 interviewed by them?
19      MR. PATTY: Object to the form.
20 A. Well, his name was on a list. Reading
21 coaches were interviewed, and his name had
22 not been taken off the list
23 Q. From the year before?

Page 82

1  A. Yes, ma'am.
2  Q. Okay. All right. Is it correct that
3  professional development budgets are based
4  on per school? For example, if I worked
5  for you as a teacher and I get to go on a
6  professional development trip, it comes out
7  of that school's budget?
8  A. That's correct.
9  Q. And is it also true that that budget is
10 based on the number of teachers the school
11 has?
12 A. That's correct.
13 Q. And is it fair to say that Daisy Lawrence
14 had a very, very small staff of teachers
15 compared to other schools?
16 A. Right. That would be around 13 or 14
17 certified staff.
18 Q. Okay. I want to show you what's been
19 marked by the plaintiff's attorney or by
20 Mr. Lowe's attorney as Plaintiff's Exhibit
21 5.
22      MS. CARTER: I'll represent on the
23 record that during the break,

Page 83

1      I showed Mr. Owens that
2      Plaintiff's Exhibit 5 and
3      asked him to review it.
4  Q. When I showed you that exhibit during the
5  break, is that the first time you had ever
6  seen that e-mail?
7  A. It is.
8  Q. Okay. And this e-mail is dated June 22nd,
9  2005; is that correct?
10 A. 22nd, yes, 2005.
11 Q. And in your review of this e-mail, were
12 there any statements made by Mr. Lowe in
13 this e-mail about you or about
14 conversations he had with you that you
15 believe are untrue?
16 A. Yes. I don't know why they are there, but,
17 you know, they are. It's a written
18 communication.
19 Q. Did you ever tell him that he was never
20 going to have a chance in the school system
21 unless he got rid of his Mercedes and
22 changed his dress code?
23 A. No, ma'am.

Page 84

1  Q. Did you ever tell him that you had been
2  told by Mr. Barker or anybody else that he
3  was not going to be hired back in the
4  school system because he filed his lawsuit?
5  A. No, ma'am.
6  Q. Did you ever tell Mr. Lowe that Daisy
7  Lawrence was closed because of him?
8  A. No, ma'am.
9  Q. Did you tell him that he had caused your
10 career to suffer?
11 A. No, ma'am.
12 Q. Did you ever have any conversations with
13 Mr. Lowe wherein you questioned his
14 credibility or self-worth to him?
15 A. No, ma'am. I think he's a very nice
16 person.
17 Q. Okay. In reviewing this e-mail, sitting
18 here today, are you surprised that he said
19 these things about you?
20 A. Somewhat, yes, ma'am.
21 Q. If you had been aware that he had written
22 these things on June 22nd, 2005, with the
23 opinion that they are untrue, would that

21 (Pages 81 to 84)

Page 85

1  have affected your decision to recommend
2  him for the job as reading coach?
3      MR. PATTY: Object to the form.
4  A.  It would have stained it somewhat, yes,
5  ma'am.
6  Q.  Do you know anything that you've ever done
7  to Mr. Lowe to make him say things about
8  you that were not true?
9  A.  No, ma'am.
10  Q.  Did you ever have any conflict with him?
11  A.  No, ma'am.
12  Q.  And just to be clear on the record today,
13  have you ever had any conversations with
14  him about his lawsuit or telling him that
15  his lawsuit had messed up his career in any
16  way with Montgomery public schools?
17  A.  No, ma'am.
18  Q.  You've testified that after you recommended
19  Melvin Lowe that you had not interviewed
20  anybody else, and that you were then told
21  you had to interview some other people.  I
22  think your testimony is you believed that
23  Connie Mizelle sent you those three names;

Page 86

1  is that correct?
2  A.  That's correct.
3  Q.  Do you know, sitting here today, whether
4  it's -- whether or not it's true that those
5  three names were people that ranked very
6  high during the interviews for reading
7  coaches?
8      MR. PATTY: Object to the form.
9  Q.  I mean, do you know one way or the other?
10  A.  I couldn't be sure of that.
11  Q.  When you hired -- when you went to
12  Paterson this year and hired a reading
13  coach, is it correct that this is the first
14  school that you've been principal of or
15  worked at that was hiring a reading coach?
16      MR. PATTY: Object to the form.
17  A.  If we hold true to that Mr. Lowe's position
18  at Daisy Lawrence was a reading tutor, then
19  that statement would be true.
20  Q.  Okay.  Well, is there any question that
21  Mr. Lowe was hired as a reading tutor?
22  A.  Not now.  It wasn't after he left the
23  central office.  I think that was clear.

Page 87

1  Q.  And let's be clear on the time line about
2  that.  You -- and we're skipping back to
3  the fall of 2003.  You interviewed
4  Mr. Lowe, and after the interview he went
5  to central office; is that correct?
6  A.  That's correct.
7  Q.  When he came back from central office, is
8  that when he told you that the position
9  they were offering was a tutor position?
10      MR. PATTY: Object to the form.
11  Q.  I'm sorry.  Did I say it wrong?
12  A.  A reading tutor position.
13  Q.  Okay.  Is that when he told you that?
14      MR. PATTY: Object to the form.
15  A.  Yes.
16  Q.  And did you ask him if he was okay with
17  that or if he was going to accept the job
18  under those circumstances?
19  A.  Right.  I asked him that at that time.
20  Q.  And did he say yes, he was going to take
21  the job?
22      MR. PATTY: Object to the form.
23  A.  He worked.

Page 88

1  Q.  Okay.  So in your mind, from that day
2  forward, was there any question that his
3  contract with Montgomery public schools was
4  for a reading tutor position?
5      MR. PATTY: Object to the form.
6  A.  I brought closure to it after he started to
7  work, yes, as a reading tutor.
8  Q.  Okay.  You've said that he performed the
9  duties of a reading coach or some of the
10  duties --
11  A.  Yes, ma'am.
12  Q.  -- as a reading coach in your school?
13  A.  Yes, ma'am.
14  Q.  How were you aware of what reading coaches
15  were doing in other schools?
16  A.  Well, basically, by the nature of the job.
17  If you regulate a person being a teacher
18  tutor, they will only tutor certain
19  students that the teachers have found to be
20  struggling.  Mr. Lowe had developed and
21  worked direct instruction, interventionist
22  funding for reading, and he was actually
23  able to assist the teachers.  And that's

22 (Pages 85 to 88)

Page 89

1  how you draw the distinction between a
2  reading tutor and a reading coach.
3  Q.  Okay.  Was he required to do that while he
4  worked for your school?
5          MR. PATTY:  Object to the form.
6  A.  He did -- he performed those duties and
7  e-mails, whatever the school needed.  If he
8  did not do it, then I had to do it.  That's
9  the way it worked.
10  Q.  What was your average student attendance
11  the last year Daisy Lawrence was open?
12  A.  The last year, Daisy Lawrence enrollment
13  peaked at about I want to say about 55 or
14  60.
15  Q.  So any given day, you would have 55 or 60
16  students there?
17  A.  Well, that's not the way that alternative
18  school works.  There are students coming in
19  and going out.
20  Q.  Okay.  So on a day, what did y'all
21  average -- during that last school year,
22  average a day for student attendance?
23  A.  The first part of the year, you're

Page 90

1  talking about maybe 35, 40, and the
2  latter months you're talking about --
3  February, March, just say March and
4  April when the talk began to swirl about
5  closing, we were averaging somewhere
6  between 13 and 15 because a lot of them had
7  been -- had exited the program after
8  December.
9  Q.  Okay.  Bill might have already asked you
10  this.  If he did, I apologize.  Did you
11  know Mr. Lowe's mom or anything about a
12  lawsuit she's ever filed against the school
13  system?
14  A.  No, ma'am.
15  Q.  That's it.
16          EXAMINATION
17  BY MR. PATTY:
18  Q.  Did anybody ever tell you anything about
19  needing to contact a curriculum and
20  instruction committee about reading coach
21  interviews?
22  A.  Mr. Barker contacted me and told me to
23  contact Ms. Mizelle.

Page 91

1  Q.  Yes, but before that had anybody told you
2  that?
3  A.  No, sir.
4  Q.  Okay.  And Ms. Freeny.  Where had she
5  worked prior to coming to work with you as
6  reading coach?
7  A.  Brewbaker Intermediate School.
8  Q.  And what was her position there?
9  A.  She was a classroom teacher.
10  Q.  What did she teach?
11  A.  Basic social.
12  Q.  All right.  Was it a block type thing where
13  she was teaching basic social to different
14  grades, or was it -- did she have one grade
15  or do you know?
16  A.  A school that size, you're probably going
17  to be departmentalized probably.
18  Q.  All right.  And do you know if she had
19  taught reading before?
20  A.  Yes, sir.
21  Q.  All right.  Where had she taught that?
22  A.  At --
23  Q.  Brewbaker?

Page 92

1  A.  -- Brewbaker, yes, sir.
2  Q.  Do you know how long she had taught
3  reading?
4  A.  She told me she had been teaching reading a
5  long time.  Exact number of years, I
6  couldn't say.
7  Q.  Okay.  Was she teaching reading, though, at
8  the time she moved from Brewbaker to your
9  school?
10  A.  Yes, sir.  All teachers are reading
11  teachers in that block.  We have a block of
12  time.
13  Q.  Okay.  Would she be -- would it be a
14  self-contained class she was teaching
15  or --
16  A.  Well, that depends on the assessment and
17  the placement of students.
18  Q.  All right.  Had she been through any
19  reading coach training program as far as
20  you know?
21  A.  Not to my knowledge.
22  Q.  And what was her last degree, highest
23  degree?

23 (Pages 89 to 92)

Page 93

1   A. She has a master's degree.
2   Q. What's it in, do you know?
3   A. Elementary education.
4   Q. And where is that degree from?
5   A. I can't remember that.
6   Q. All right. Do you remember her
7       certification?
8   A. Her certification was in elementary
9       education.
10  Q. Teaches elementary ed?
11  A. Right.
12  Q. And do you remember if it was K through 12
13      or just K through six?
14  A. I think it's K through six. Sometimes you
15      can get reading that would go up to maybe
16      ninth grade in elementary school.
17  Q. Okay. And how long had she worked as a
18      teacher?
19  A. Nineteen years.
20  Q. And how long had she worked in this
21      particular system?
22  A. Nineteen.
23  Q. Nineteen? She's always been in

Page 94

1       Montgomery?
2   A. Yes.
3   Q. Okay. Did you know her prior to this, her
4       coming on board with you?
5   A. No, sir.
6   Q. Do you know if she had worked in any
7       reading coach position prior to her coming
8       to work for you at Paterson?
9   A. No, sir. That was one of the questions I
10      asked them during the interview. No.
11  Q. Do you know if her master's degree would
12      have any specialized courses regarding
13      reading?
14  A. No, sir.
15  Q. Do you know --
16          MS. CARTER: No, it doesn't, or
17      no, you don't know?
18          THE WITNESS: I'm not sure of
19      that.
20  Q. Do you know if she has any specialized
21      reading training or course work or --
22  A. Other than working at a school, teaching
23      reading, no, sir.

Page 95

1   Q. Other than on-the-job training, so to
2       speak?
3   A. Right.
4   Q. Okay. Had she ever had a position where
5       she would have dealt with teachers in the
6       type -- in a role similar to what a reading
7       coach does?
8   A. No, sir.
9   Q. Okay. That's all I have.
10          MS. CARTER: I remembered what I
11      forgot to ask him.
12          EXAMINATION
13  BY MS. CARTER:
14  Q. You testified that some stuff was --
15      something was mailed to you about a
16      reprimand that Melvin got at Southlawn, and
17      it was just in an envelope?
18  A. Yes.
19  Q. Is that right? And it just showed up?
20  A. Yes.
21  Q. Was it mailed to you at school?
22  A. At school.
23  Q. Okay. What did it contain? What was it?

Page 96

1       Was it just a copy of his reprimand or was
2       there additional information?
3   A. Just a copy of the reprimand.
4   Q. Do you have any idea where it came from?
5   A. No, I do not.
6   Q. Do you know if it was a mad parent who
7       was mad that Melvin got a job back with
8       MPS?
9   A. I certainly hope that a parent wouldn't
10      have that, but I --
11  Q. Do you know?
12  A. I have no earthly idea where it came
13      from.
14  Q. Do you know if it was from a teacher?
15  A. I have no earthly idea.
16  Q. Okay. Did anybody ever tell you that
17      somebody in HR sent that to you?
18  A. No, ma'am.
19  Q. And that came to you a couple months after
20      he started back work with you at Daisy
21      Lawrence, right?
22  A. About two months. The first -- not after
23      he started back work, but that year, the

24 (Pages 93 to 96)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455