1

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

MELVIN LOWE,

    Plaintiff,

Vs.

MONTGOMERY COUNTY BOARD OF
EDUCATION; VICKIE JERNIGAN,
MARK LABRANCE, TOMMIE MILLER,
MARY BRIERS, DAVE BORDEN,
HENRY A. SPEARS and BEVERLY ROSS,
in their official capacities as
members of the Montgomery County
Board of Education; and DR. CARLINDA
PURCELL, in her official capacity as
Superintendent of the Montgomery County
Board of Education,

    Defendants.

CIVIL ACTION NO.
2:05-CV-0495

* * * * * * * * * * * * *

**DEPOSITION OF DR. CARLINDA PURCELL**, taken pursuant to stipulation and agreement before Pamela A. Wilbanks, Registered Professional Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Hill, Hill, Carter, Franco, Cole & Black, 425 South Perry Street, Montgomery, Alabama, on Monday, January 23, 2006, commencing at approximately 9:10 a.m.

* * * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

```
 1            conversations back and forth.
 2    Q.      Mr. Barker apprising you of the conversations
 3            back and forth?
 4    A.      Yeah.  Between he and Mr. Looney.
 5    Q.      Was it your impression that Mr. Looney based
 6            on your conversations with Mr. Barker was not
 7            in favor of Mr. Lowe going to the seminar?
 8    A.      That's what I understand.
 9    Q.      So you were not aware that Mr. Looney thought
10            it was something that Mr. Lowe could do or
11            should do?
12                    MS. CARTER:  Object to the form.
13                    When I say that -- I should have
14                    told you.  When I say that, you
15                    can still answer his question.
16                    You can always answer his
17                    questions unless you hear me
18                    scream "don't answer that".  You
19                    don't have to worry about it.
20                    It's no hidden message.  It's
21                    just lawyer stuff.
22    A.      Ask your question again.
23                    MS. CARTER:  I'm sorry.  I messed
```

46

1           you all up.
2  Q.  It was never communicated to you by anyone
3      that Mr. Looney was in favor of Mr. Lowe going
4      to this seminar?
5  A.  It was never communicated to me by anyone that
6      Mr. Looney was in favor?
7  Q.  Yes.
8  A.  It was communicated to me that he was not in
9      favor.
10 Q.  The opposite?
11 A.  The opposite, yeah.
12 Q.  But you never spoke directly to Mr. Looney?
13 A.  No. And I suspect also that the staff, they
14     were pretty understanding that I was on the
15     job I guess three days there, and they were
16     not necessarily protecting me from things, but
17     they were trying to give me time to get boxes
18     unpacked and get on with an agenda that I had
19     to deal with.
20 Q.  So would it be fair to say that your
21     information that you received regarding this
22     leave denial came solely through Mr. Barker?
23 A.  I believe so.

1  Q.  And the reason again that Mr. Lowe was not
2      allowed to go to it is what now?
3  A.  Well, the district had a series of reading
4      coaches on board, and I think this was about a
5      reading program that we were using and
6      discussing in our district. And Mr. Looney
7      was well abreast of this area, too. And I
8      think in any school district that I've worked
9      in that typically the people you're sending to
10     a conference to represent the district -- and
11     obviously if he was asking for leave he was
12     going to be representing Montgomery Public
13     Schools -- that it ought to be someone who is
14     familiar, who is working with the program and
15     the initiative and who can, in fact, share
16     that. And we do have a policy to talk about
17     who is the spokesperson for the district. And
18     on the one hand you think of that as it's the
19     superintendent or another staff that you
20     really want to be engaged in some of those
21     conversations.
22 Q.  Was it your understanding that Mr. Lowe had
23     not performed any duties in the area of being

     from the superintendency in Warren County to go to another job, and I was on the National Staff Development Council agenda, which is a huge conference, a national conference. And we had done some great work that I wanted to share, but it was just a simple matter of just saying I would love to come, but I'm in transition between two jobs and I regret that I won't be able to attend. All they do is they're going to print a flier agenda that says these topics have been deleted; there's not going to be a session in this room; presenter cancelled or whatever. I don't think it has any reflection on the district per se.

Q. Were you aware that his principal had approved him for this seminar?

A. I was not aware of that, no. But, again, because I've looked at what we're doing in our district and the number of requests that are made for attending conferences and meetings -- I haven't gotten down into the school level, but I've put a limit on the number of days

that even principals can go to conferences since I've been in place. That went in place the beginning of this school year. And then I've also said how many meetings could they attend outside the state of Alabama in terms of looking at what they are attending and the amount of time you're away from your school and the amount of money that we don't have to attend some of these conferences.

Now, in my mind I also say -- when people say, well, what about the teachers; aren't you going to do that for the teachers, I say, well, if I were a principal in a building and I knew I could only travel so many days, I would be as principal setting some parameters for my teachers if you know you've got a problem with that. I'm going to control the principals because that piece does report directly to me. What a principal does in a school -- Of course, some of these things were put in place August of this school year as we started the new school year. And part of that came because I could look back at how many

```
 1              days our teachers were out of schools and so
 2              forth in the beginning to figure out when is
 3              it that we're teaching children if we have all
 4              these absences.  They are not absences
 5              necessarily but these many requests for leave
 6              out of the building.
 7         Q.   Were you aware that other leave requests for
 8              seminars had been denied Mr. Lowe?
 9         A.   This is one that I'm familiar with.  I'm
10              not familiar with others.
11                        (Brief off-the-record discussion
12                         followed by a brief recess.)
13         Q.   (Continuing by Mr. Patty)  When Mr. Lowe
14              applied to teach this seminar, do you know if
15              there were any district level reading coaches
16              at that point?
17         A.   I knew that there were district level reading
18              coaches.
19         Q.   Didn't district level reading coaches come on
20              later and there were not any at that
21              particular time that Mr. Lowe wanted to go to
22              the seminar?
23         A.   I don't know what they called them, but I do
```

      and staff and asked Dr. Owens to convene his staff in a location that would hold all them and that they could still have oversight of the children because school was still in session but felt it was important to address the issues of the closing of the school with the personnel involved.

Q. And what did you tell the faculty and staff about the closing of the school?

A. That all personnel who were certified would be reassigned and Mr. Barker would work through those assignments based upon vacancies in other locations. In addition, that assistance would be provided to them through Mr. Adams, our operations director, to relocate and move their items and belongings and that we were going to make this a smooth transition. I probably espoused my views that young children typically in an alternative setting needed to be integrated back into a traditional school setting and not separated, and that was the reason for the move. I recall talking a little bit about the savings of monies that

were going to be involved. We had a very small number of students with a multiple number of faculty.

I think then after that maybe some of the staff might have come and asked me questions one on one.

Q. Did you talk to Mr. Lowe one on one?

A. I think Mr. Lowe did come up and ask questions one on one as well as a couple other people.

Q. What do you recall about your conversations with him?

A. I can't recall specific conversation, but probably just reiterating the fact that the certified personnel would be addressed and reassigned and any other concerns would have to come through Mr. Barker's office in terms of reassignment.

Q. And did you talk to any -- What do you recall about the one-on-one conversations with other persons there at the meeting? Do you remember who you talked to or any of the substance of those conversations?

A. Pretty much I think when people came and asked

those questions, those who were not classroom teachers, what would happen to them if they were certified and/or had tenure with the district, I told them a position would be not necessarily created for them, but we would look and do our very best to reassign all those who were certified tenured individuals as well as those who were classified and tenured.

Q. So you had -- you said that the people who were classified tenured you would try to reassign those --

A. As well, yes.

Q. And do you recall who -- Do you recall if all the certified employees were reassigned?

A. I'm going to sit here and say I don't know all the people who were at Daisy Lawrence. I guess the four people who stand out in my mind who were reassigned are those three individuals who are the teachers of the new alternative sites that we have at three different elementary schools and a counselor who was reassigned. I do recall those four,

1   might have been in the pool and had not been
2   given an opportunity.
3   Q.  So your understanding is that he had not gone
4   through the interviewing process with this
5   committee?
6   A.  That's my understanding. And, quite frankly,
7   Dr. Owens may not have been as a new principal
8   at that school aware of that screening process
9   because he had been in an alternative school.
10  Q.  Well, since this was somebody Dr. Owens
11  wanted, was Mr. Lowe told to go back and go
12  through the screening committee --
13  A.  I'm not sure what was communicated to him.
14  Q.  Let me back up again.
15      Do you know if Mr. Lowe is certified for
16  that position or that he had the certification
17  for it?
18  A.  I'm not sure. I would need to look at the
19  file.
20  Q.  Were you told if he was qualified for that
21  position?
22          MS. CARTER: Object to form.
23  A.  I was told that there were other applicants

1  racial as some other things, and I'm going to
2  let Mr. Barker -- because he has sat in on
3  that and it was at the administrative level,
4  and it was not anything that has been actually
5  filed I don't think.
6  Q. Do you know when that allegation came up?
7  A. That seemed to have come up within, I would
8  say, the early fall of this school year.
9  Q. Fall of 2005?
10 A. Yes.  2005.  Maybe late fall.
11 Q. Are you aware of any other positions that a
12    principal recommended to hire Mr. Lowe and he
13    was not hired in the summer of 2005?
14 A. I can't recall any.
15 Q. Tell me again, in making -- Who would be the
16    decisionmaker of whether or not Mr. Lowe was
17    hired in the summer of 2005?
18              MS. CARTER:  Object to form.
19 A. In regard to which position?
20 Q. Well, the one position you say you were aware
21    that he had been recommended by the principal
22    for.
23 A. The only discussion that I've been involved in

       and know something about is Paterson. And there have been other situations I guess that have come up in discussion since all of this has been going on, but I'm not familiar with the details of all those. But the details of Paterson I've really been more familiar with.

Q.  Who would have made the decision on Paterson?

       MS. CARTER: Object to form.

A.  The final decision itself still rested -- came through Mr. Barker and others involved, but it was pretty much my feelings because I've had conversations with teachers in that building, conversation with the last principal who was there, conversation with volunteers who were extremely concerned that perhaps our most needed children in the district were not receiving the quality and the caliber of personnel that they needed that other schools were receiving and asked that I certainly be aware of that as we placed new leadership there as we looked at that school, and probably that the school was not performing at a high level and so we needed the most

1   qualified people there we could place.
2  Q. And when was it you took that type of concern
3     with Paterson?
4  A. Probably in March '05 I want to say. The
5     principal retired quite suddenly. She was an
6     only child, and her father was very ill and
7     she needed to go home. And we placed an
8     interim person there. And as we came to the
9     end of the school year, then we had to assign
10    a principal. And it was in between that time
11    that I met with teachers, teachers who shared
12    with me that many people thought that perhaps
13    because of the way Paterson looked and what
14    perceptions people had, that there were
15    teachers who were very committed to wanting to
16    be in that school but they just needed the
17    right people there to help them to do the work
18    that they were very much committed to doing.
19    They didn't want to go to other schools, but
20    they felt they could have success with this
21    population of children.
22       The principal shared some of the concerns
23    as she was leaving quite suddenly to resign,

|   |   |   |
|---|---|---|
| 1 |   | and then we have some active volunteers in |
| 2 |   | that school who likewise shared concerns that |
| 3 |   | there was potential there with the children |
| 4 |   | but only if we had a very highly qualified |
| 5 |   | staff to come in and do some of the things in |
| 6 |   | the areas they needed to have focused on. |
| 7 |   | So as a superintendent, I would take |
| 8 |   | interest in any school that you hear those |
| 9 |   | kind of concerns as well as the fact the |
| 10 |   | school is on the state school improvement list |
| 11 |   | along with several of our others. |
| 12 | Q. | And to that end, you ended up hiring Dr. Owens |
| 13 |   | to be the principal of the school? |
| 14 | A. | At that point where we were in the school |
| 15 |   | year, we had to assign individuals who had |
| 16 |   | tenure, and so Dr. Owens was that person. And |
| 17 |   | then I certainly was concerned that other |
| 18 |   | people added to that building would be highly |
| 19 |   | qualified. |
| 20 | Q. | You wanted -- I'm sure you -- Dr. Owens is a |
| 21 |   | contract principal, right? |
| 22 | A. | Yes. |
| 23 | Q. | And when you made your assignment of him to |

1  that school, then I take it you wanted to make
2  sure you had who you felt like was the best
3  principal of that school given your concerns
4  for that school?
5  A.  The best principal that we could place there
6     and/or the best principal or person that we
7     could assign to that school and have all
8     personnel assigned who were entitled to
9     positions.
10 Q.  Is there anything with regard to Dr. Owens
11    that would negatively impact your opinion as
12    to his judgment for personnel that he wanted
13    to hire?
14 A.  I don't know a lot about all of the individual
15    principals in the district. I'm still
16    learning them. I recall reviewing his PEPE
17    evaluation, and that seemed to have had the
18    required score to continue on as a principal.
19 Q.  So you don't know anything that would -- does
20    that mean that you don't know anything that
21    would lead you to have a negative opinion as
22    to his ability or his opinions of who to hire
23    for his school?

1  A.  I'm not sure that it's a negative opinion, but
2      I think principals who are typically in
3      alternative schools have not had the full
4      array of programs to work with and as detailed
5      programs to work with as principals in
6      traditional grade level structured schools.
7      So perhaps that concern only, and becoming
8      familiar with the full curriculum that
9      probably was not a total part of an
10     alternative school setting and also the size
11     of the schools. While Paterson is not a large
12     school -- I mean, we're talking about a school
13     that while it had a multiple number of
14     children, at any given time you're talking
15     about maybe 25, 30 kids in the building at one
16     time versus 200 plus kids.
17         MS. CARTER: You said Paterson, and
18         I think when you meant 25 kids
19         you're talking about Daisy
20         Lawrence.
21  A.  Daisy Lawrence, yes. I'm sorry.
22  Q.  I guess my question is this: Is there any
23      reason or what would be the reason, other than

|  |  |  |
|---|---|---|
| 1 |  | this about the committee selection process, |
| 2 |  | for not giving the deferment to a principal |
| 3 |  | like Dr. Owens when he wanted to hire |
| 4 |  | Mr. Lowe? |
| 5 | A. | I suspect mainly that if you had a process in |
| 6 |  | place like that for screening a reading coach |
| 7 |  | in the district and you ignore the process |
| 8 |  | that we wouldn't just be sitting here dealing |
| 9 |  | with this issue today.  We would be dealing |
| 10 |  | with some other issues from people who feel |
| 11 |  | they have just been ignored and have not gone |
| 12 |  | through the process, and they are very |
| 13 |  | familiar with the fact that the structure is |
| 14 |  | in place for the hiring and recommendation |
| 15 |  | process -- recommendation and then hiring. |
| 16 | Q. | But my question is, is there anything about |
| 17 |  | Dr. Owens that is unique to him that would -- |
| 18 |  | that you would not give his opinion as to who |
| 19 |  | to hire the same weight as another principal? |
| 20 |  | MS. CARTER:  Other than what she's |
| 21 |  | already testified to? |
| 22 |  | MR. PATTY:  Well, that's what I'm |
| 23 |  | trying to get. |

| | | |
|---|---|---|
| 1 | A. | No. I pretty much said it. I had the |
| 2 | | feedback from teachers, from the volunteers in |
| 3 | | that school that are very committed and their |
| 4 | | concerns about wanting to create the kind of |
| 5 | | school that the children there deserved. And |
| 6 | | so I think that when you have a school like |
| 7 | | that that you will tend to dibble and dabble |
| 8 | | to some extent as the superintendent. At the |
| 9 | | end of the day, the ownership is going to be |
| 10 | | on my shoulder whether we can pull that school |
| 11 | | out of the situation it's in, so I need to |
| 12 | | have some concerns and interest in it. |
| 13 | Q. | These communications with teachers, though, |
| 14 | | that wasn't about Dr. Owens, was it? |
| 15 | A. | The communication with teachers? |
| 16 | Q. | You said you had some communication -- I'm |
| 17 | | sorry. Not with teachers but with people |
| 18 | | about the type of school they wanted to create |
| 19 | | and everything. But that wasn't indicative of |
| 20 | | Dr. Owens? |
| 21 | A. | No, that wasn't about Dr. Owens, but obviously |
| 22 | | that weighed into my decisions. |
| 23 | Q. | Well, I guess I'm just not -- would there be |