**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **MELVIN LOWE,** ) | |
| ) | |
| **Plaintiff/Petitioner,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO: 2:05-CV-495WKW** |
| ) | |
| **MONTGOMERY COUNTY BOARD** ) | |
| **OF EDUCATION; VICKIE JERNIGAN,** ) | |
| **MARK LaBRANCHE, TOMMIE** ) | |
| **MILLER, MARY BRIERS, DAVE** ) | |
| **BORDEN, HENRY A. SPEARS and** ) | |
| **BEVERLY ROSS, in their official** ) | |
| **capacities as members of the** ) | |
| **Montgomery County Board of Education;** ) | |
| **and DR. CARLINDA PURCELL, in her** ) | |
| **official capacity as Superintendent of the** ) | |
| **Montgomery County Board of** ) | |
| **Education,** ) | |
| ) | |
| **Defendants/Respondent.** ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiff Melvin Lowe (hereinafter "Lowe"), by and through counsel, and

submits this Response to Defendants' Motion for Summary Judgment. For the reasons set forth

herein, Plaintiff submits that summary judgment is due to be denied.

**STATEMENT OF FACTS**

Lowe graduated from Alabama State University in 1999 with a bachelor's degree in

elementary education. (Lowe Depo., attached hereto as Ex. "A," p.13, L. 2-7). He later earned his

master's degree in educational administration and supervision. (Ex. "A," p. 13, L. 18-19). He has

received a specialty degree and certification with special education, administration and collaborative teaching concentrations. (Ex. "A," p. 14, L. 13-16). He is currently enrolled at Troy State University, Montgomery campus, to pursue a Master's of Science in adult education and holds a Superintendent certification. (Ex. "A," p. 17 L. 10-14; p. 18 L. 3-5). Lowe is in the process of obtaining a doctorate degree in educational leadership and special education administration. (Ex. "A," p. 18, L. 1-5). Lowe was employed by Defendant Montgomery County Board of Education (hereinafter "the Board") from 1999 to 2002. (Lowe Affidavit, ¶ 2, attached hereto as Ex. B). At all times, Lowe was a non-tenured teacher, as that term is used in ALABAMA CODE § 16–24-1, *et.seq.* (Ex. "B," ¶ 2).

Lowe was a teacher with the alternative/special education program at Daisy Lawrence Alternative Elementary School (hereinafter "Daisy Lawrence") for the 1999-2000 school year. (Ex. "A," p. 33, L. 5-10, 21-22). Lowe's Principal was Ms. Erojean Jeter. (Ex. "A," p. 39, L. 7-8). Lowe received satisfactory performance evaluations while at that school. (Evaluations by Owens at Daisy Lawrence 2000-2002, attached hereto as Ex. "C"). Also, Lowe did not receive any written reprimands or warnings, and there is nothing in his personnel file which would indicate that the Board had any concerns regarding his suitability as a teacher.[1] (Barker Depo., attached hereto as Ex. "D," p. 94, L. 3-11). Lowe was non-renewed at the close of the 1999-2000 school year due to a restructuring of the program. (Ex. "A," p. 80, L. 10-15).

---

[1] Barker claims there was an incident regarding unauthorized paddling of a student; however, Lowe testified that he was not counseled or made aware of any such allegation while at Daisy Lawrence and there is nothing to the contrary in Lowe's personnel file. (Ex. "D," p. 92, L. 14-23; p. 94, L. 3-11). Since this claim is not proffered by Defendants in their Motion for Summary Judgment as a legitimate reason for any employment action taken by them, it is irrelevant and inadmissible under Rules 401, 402, and 404 of the FEDERAL RULES OF EVIDENCE.

Lowe applied for and was assigned a forth-grade teaching position at Fitzpatrick Elementary School the following school year (2000-01). (Ex. "A," p. 40, L. 6-9). Lowe's Principal was Vera Thompson. (Ex. "A," p. 42, L. 4-9). Lowe submitted a written request for transfer to Barker indicating that he felt the personal disagreements between him and Thompson hindered his performance. (Ex. "A," p. 43, L. 13-23; p. 44, L. 1-2; Lowe's written request for transfer, attached hereto as Ex. "E"). There was no written reprimand or any kind of written warning or criticism given to Lowe, or placed in his file, regarding his work in this position. (Ex. "D," p. 95, L. 1-5; Ex. "A," p. 127, L. 16-18).

For the 2001-02 school year, Lowe was employed as a teacher at Southlawn Middle School. (Ex. "A," p. 55 L. 20-22). His Principal was Tina Minott (hereinafter "Minott"). (Ex. "A," p. 56, L. 4-6). Lowe testified that he had a good working relationship with Minott. (Ex. "A," p. 57, L. 18-21). However, during this year, there was an allegation by a student that Lowe had improperly handled and spoken to a student.[2] (Investigation, attached hereto as Ex. "F"). The student did not make the administration aware until after he had hired an attorney and pressed criminal charges against Lowe. (Ex. "F") . Once aware, Minott conducted an investigation into the allegations and submitted her findings to Barker. (Ex. "D", p. 80, L. 8-16). After Minott conducted her initial

---

[2] In Defendants' Brief, Barker claims he spoke to Lowe with regard to a complaint that he had improperly handled a student; however, there is no mention of this purported incident in Lowe's deposition nor any record of it in Lowe's personnel file. (Ex. "D", p.93, L. 7-19). For the same reasons contained in fn. 1, these allegations are inadmissible. The Board makes repeated references to disciplinary actions against Lowe; however, there is no indication in Lowe's personnel file of any reprimand except this one. Furthermore, this evidence is irrelevant under FED.R.EVID. 401 and 403 because it is not one of the legitimate non-discriminatory reasons proffered by the Board for any of Lowe's discrimination claims. This has been included and emphasized by the Defendants for the sole purpose of clouding the issues and creating prejudice against Lowe.

investigation, she told Lowe she thought he would be back to work the next week. (Ex. "A," p. 135, L. 1-5). When the investigation did not satisfy Carter, he had Barker re-investigate. (Ex. "A," p. 135, L. 1-9; Ex. "F"). Lowe denied any wrongdoing. (Ex. "A," p. 134, L. 17-20; Ex. "F"). Consistent with Minott's investigation, Lowe was acquitted of the criminal charges. (Ex. "A," p. 130, L. 3-5). Barker conceded that he could not prove the allegations against Lowe. (Ex. "D," p. 82, L. 18-23). However, Barker recommended, and the Board approved, Lowe be placed on five days suspension without pay. (Ex. "D," p. 83, L. 1-6).

In the Spring of 2002, Lowe was non-renewed. (Ex. "A," p. 58, L. 20-23). Dr. James Owens (hereinafter "Owens") testified that in his experience as a Principal, it is customary for the Principal at a school to submit a list of all non-tenured personnel to Barker indicating which individuals he or she would like the Board to renew and which she would like the Board to non-renew. (Owens Depo., attached hereto as Ex. "G," p. 56, L. 1-6). Lowe was present in Minott's office when his notice of non-renewal was delivered from the Central Office. (Ex. "A," p. 76, L. 1-2). Lowe's notice was delivered separate and independent of the others. (Ex. "A," p. 130, L. 16-18). Upon receipt, Minott advised Lowe that she had not recommended him for non-renewal, and that it came from someone at the Central Office. (Ex. "A," p. 76, L. 1-9; p. 82, L. 15-17). Minott further indicated to Lowe that it was her request that his contract be renewed. (Ex. "A," p. 75, L. 12-34; p. 76, L. 1).

Lowe applied for multiple positions with the Board throughout the Summer of 2002, but was not offered a position. (Ex. "A," p. 59, L. 1-4 and14-16). Therefore, he accepted a position in Bullock County for the 2002-03 school year. (Ex. "A," p. 59, L. 17-23). Lowe had a successful 2003-03 school year and he was reassigned to the same school for the 2003-04 school year. (Ex.

"A," p. 61, L. 16-23; p. 62, L. 13-19). While teaching in Bullock County, Lowe had continued to apply for positions available in Montgomery County because he owns a house in Montgomery County. (Ex. "A," p. 63, L. 22-23; p. 64, L. 4-6; p. 99 L. 4-8).

During the summer, Mary Lowe, Plaintiff's mother, had a conversation with the Assistant Superintendent of Human Resources who informed her that Superintendent Clinton Carter stated that Lowe "would only be a teacher in this school system." (Mary Lowe Affidavit, attached hereto as Ex. "H"). Furthermore, Mary Lowe was told by Lois Johnson, Assistant Superintendent of Human Resources, that when administrators view Melvin, they see her, Mary, and are not favorable about hiring him at that point. (Ex. "H," ¶ 6). Ms. Johnson also told Mary Lowe in '03 that people can sometimes get back at you through your children. (Ex. "H," ¶ 7). Lowe's mother filed an EEOC Complaint against the Board several years ago while Clinton Carter was the Associate Superintendent. (Ex. "H," ¶ 4). Several individuals have stated to Lowe, on more than one occasion, that the discrimination he's experienced is retaliation for the lawsuit his mother filed. (Ex. "B," ¶ 7). Lowe has been told that people associate his mother's lawsuit with him and when the administrators look at Lowe they see his mother. (Ex. "B," ¶ 7). Additionally, Mary Lowe overheard Barker state that Lowe's "problem is that he's just like his mother." (Ex. "H," ¶ 9).

Lowe applied for multiple positions throughout the Summer of 2003 and was allowed one interview for a teaching position at Brewbaker; however, the Principal told him that he was overqualified for the position and he was more suitable for administration. (Ex. "A," p. 208, L. 1-14). Lowe was not allowed to interview for any other position with the Board, despite exceeding the required qualifications. (Ex. "A," p. 195, L. 7-12; p. 201, L. 5-11; p. 204, L. 9-12). The positions for which Lowe applied are: Administrative Assistant - Crump Elementary School, position

filled by **black female**; Administrative Assistant - Brewbaker Junior High, position filled by **black female**; Educational Specialist, position filled by **white female**; Educational Technology Professional Development Program Coordinator, position filled by **black female** and **white male**; Title I, School Wide Instructional Assistant, position filled by **ten black females** and **three black males**; Administrative Assistant at Robert E. Lee High School, the position was filled by a **black female**; Educational Specialist in the Office of Student and Community Services, position was filled by a **white female**; Teacher - Brewbaker Intermediate School, position was filled by a **black female**; Teacher - McKee Elementary School, position was filled by a **black female;** various Administrative Assistant positions available throughout the district, positions were filled by **seven black females, three white females,** and **five black males**.    In June 2003, Lowe submitted a letter of intent to Barker to be reactivated in the Montgomery Public School System and to be considered for any position for which he was qualified; however, Lowe was not allowed to interview for a single position. Of the thirty-seven positions filled, **thirty-three** were filled by females. (Ex. "D," pp. 182-185, L. 1-23; See Defendant Exhibits 50-83, Professional Certificates for Administrative Assistants).

Shortly after beginning the 2003-04 school year in Bullock County, Lowe was contacted by Owens to fill a position at Daisy Lawrence in Montgomery County. (Ex. "A," p. 66, L. 14-16; p. 67, L. 6-10; Ex. "G," p. 46, L. 19-23).  Owens advised Lowe that the position would be that of "reading coach." (Ex. "G," p. 30, L. 13-17; p. 32, L. 6-14; p. 46, L. 19-23).  Lowe interviewed with Owens and was offered the position; Owens believed the position he was hiring for was a reading coach position. (Ex. "A," p. 88, L. 21-22; Ex. "D," p. 30, L. 13-17).  Because the school year had already begun, it was necessary for Barker to obtain permission from Lowe's then Superintendent of Schools, Lee Ballard, in order for Lowe to be released from his contract with the Bullock County

Board of Education. (Ex "__," p. 95, L. 2-8). Lowe was granted permission to leave Bullock County to pursue this elevated position in Montgomery. (Ex. "B," ¶ 2). Lowe was permitted to cancel his contract with Bullock County because the reading coach position constituted a promotion to an administrative position, with a higher salary and a ten-month contract, as well as increased prestige. (Ex. "B," ¶ 2).

When Lowe arrived in Montgomery County, Owens advised Lowe to report to the Central Office to complete the necessary paperwork. (Ex. "G," p. 30, L. 21-23; p. 31, L. 10-13). When Lowe went to the Central Office, the position had been changed, unbeknownst to either Lowe or his Principal. (Ex. "A," p. 95, L. 1-5). It was not until this time that Lowe first learned that the position he had accepted in Montgomery County was a teacher-tutor position and not a reading coach position. (Ex. "A," p. 95, L. 2-8). Owens testified that he too was advised that Lowe was to be hired for a "reading coach" position. (Ex. "G," p. 50). Lowe had already relinquished his position in Bullock County and had no alternative but to accept the lesser position and sign the contract offered. (Ex. "A," p. 96, L. 5-6; p. 222, L. 9-14). Lowe testified that he would not have left his position in Bullock County for a lateral transfer to Montgomery County. (Ex. "A," p. 96, L. 14-16). Furthermore, when Lowe was non-renewed at the end of the 2003-04 school year, Carolyn Hicks, in the Human Resources Department, completed and signed the non-renewal which listed Lowe's position as "reading coach." (Ex. "D," p. 114, L. 1-18).

Despite the "teacher-tutor" label placed on Lowe's position, Lowe performed the duties as a "reading coach" at Daisy Lawrence. (Ex. "A," p. 89, L. 5-6). Lowe attended the reading coach meetings, received the requisite materials for reading coaches and continues to receive email from

the Board directed exclusively at reading coaches. (Ex. "B," ¶ 3). Additionally, Lowe was evaluated as a reading coach by Owens and received a good evaluation. (Ex. "D," p. 54, L. 6-19; Ex. C).

In December 2003, Pam Cloud brought an EEOC charge against the Board alleging race discrimination and stated that she was told by administrative personnel that "the MCBE has a policy or carries out a practice of racially balancing administrative staffs at individual schools." Cloud further stated that she was advised by Carolyn Hicks (an individual in the Human Resources Department) that "when the Principal of a school is white, MCBE attempts to fill the Administrative Assistant position with a Black applicant." She states that she was advised by two Principals that "there is an unwritten policy to racially balance the administrative staffs of MCBE schools." She further noted that based upon her personal observations, the racial balancing policy is carried out more with regard to schools in the predominately "white areas" of town, whereas the schools in the predominately "black areas" tend to have both a black principal and a black administrative assistant. (Cloud's EEOC Complaint and lawsuit, attached hereto as Ex. "J").

During the Summer of 2004, Lowe was hired by Mike Looney and Teresa Nichols to perform the job of lead reading coach for the summer reading camp. (Ex. "A," p. 247, L. 9-23). Lowe performed the job. (Ex. "A," p. 248, L. 1-4). Lowe was not required to go through a reading committee hiring process to obtain this position. (Ex. "B," ¶ 4).

In the Summer of 2004, Lowe applied for an administrative position at McKee Junior High. This position would have constituted a promotion and an increase in pay. Lowe was interviewed by the Principal, Bobby Abrams (hereinafter "Abrams"). Abrams told Lowe that he intended to recommend him for the administrative assistant job.[3] (Ex. "A," p. 283, L. 6-8). As has been

---

[3] Abrams denied this statement in his deposition testimony.

established through the testimony of both Dr. Carlinda Purcell (hereinafter "Purcell") and Barker, it is the custom and practice of the Board to hire the person recommended by the Principal. (Ex. "D," p. 28, L. 12-19; Purcell Depo., attached hereto as Ex. "K," p. 29, L. 8-13; p. 31, L. 15-21; p. 32, L. 2-6). However, Abrams was not allowed to hire Lowe because, according to Abrams, he was told he had to hire a female, to balance out the staff. (Ex. "A," p. 283, L. 15-23). Importantly, the person who was actually hired to fill the position was a female. (Ex. "A," p. 283, L. 15-23).

In the Summer of 2004, Lowe applied for the following positions: All Administrative Positions within the Montgomery Public School System, Lowe was not allowed to interview, fifteen positions were filled, **ten** of these positions were filled by **females**. (Ex. "D," p. 180, L. 2-20; Ex. "A," p. 236, L. 20; p. 237, L. 4); Educational Specialist (Office of Curriculum and Instruction), Lowe was not allowed to interview, this position was filled by a **white female** (Ex. "D," p.175, L. 1; p.176, L. 1); Title I Educational Specialist (Professional Development), Lowe was not allowed to interview, this position was filled by a **female**. (Ex. "A," p. 238, L. 12-17); Title I Program Evaluator, Lowe was not allowed to interview, this position has never been filled. (Ex. "A," p. 239, L. 5-10; p. 239, L. 5-20); Title I Teacher Tutor (Houston Hills Junior High School), Lowe was not allowed to interview, this position was filled by a **black female**. (Ex. "D," p. 239 L. 5-20); System Reading Specialist (Office of Curriculum and Instruction), although Lowe was interviewed, the position was filled by **two black females and a white female**. (Ex. "D," p. 186, L. 7-13); Title I System Wide Math Specialist, Lowe was interviewed (Ex. "A," p. 244, L. 22; p. 245, L. 5); however, the three positions were filled by **two white females and a black female**; Title I Schoolwide Instructional Assistant at various locations, Lowe was not allowed to interview and the positions were filled by **three black females** and a **black male** (Ex. "A," p. 245, L. 245; Ex. "D,"

p. 189, L. 8; p. 90, L. 2);  District Resource/Attendance Officer (Office of Student and Community Services): Lowe was interviewed for this position; however, it was never filled. (Ex. "A," p. 246, L. 14-21; p. 247, L. 13).

Of the thirty posted positions for which Lowe applied during the Summer of 2004, he was afforded the opportunity to interview for only three, and of the three interviews Lowe was actually granted, not a single male was hired to fill the positions and one of the three positions has never been filled.  The Board filled twenty-eight positions with **twenty-two females**.  Lowe had the requisite qualifications for each of the above listed positions and is as qualified, if not more, than the persons who were ultimately offered the position, but was not allowed to interview for the vast majority of the positions.  The Board did not contend that Lowe was not qualified for any of these positions. (Defendants' Brief, pp. 40-47).

During the Summer of 2004,  there was an administrative position available at Thelma Smiley Morris School.  This position was advertised but Lowe was not selected for an interview, despite being currently certified for the position.  The Principal recommended Denita Easterling for the position based on observation of Easterling's performance during the summer.[4] (See Defendants' Ex. 33, ¶ 5).  Easterling was not certified in administration during this period. (Ex. "D," p.135, L.20-22).  The Board accepted the Principal's recommendation, despite the fact that this individual had circumvented the Board's prescribed policy. (Ex. "A" p. 249, L. 13-19).

On August 3, 2004, Lowe filed a Complaint with the EEOC alleging discrimination and retaliation due to his race and gender. (Lowe Letter to EEOC, attached hereto as Ex. "I").  On

---

[4] Easterling was the summer school Principal during the summer of 2004.  (See Defendants' Ex. 33, ¶ 4 ) She was hired by the State Department of Education. (See Defendants' Ex. 33, ¶ 3).

November 15, 2004, Lowe filed an official EEOC charge using EEOC charge form complaining of discrimination and retaliation and received his right to sue letter.   (Lowe EEOC Complaint and Right to Sue Letter, attached hereto as Ex. "L").

In August 2004, a few days prior to the start of the school year, Barker phoned Lowe and advised that he would be reassigned to Daisy Lawrence to perform the same duties outlined in his 2002-03 teaching contract, since the Board failed to timely consider the non-renewal rendering it moot. (Ex. "D," p. 116, L. 16-19).  Lowe was not provided the materials by the Board, there was never any full implementation of the program, and he was moved from his office to a classroom. (Ex. "A," p. 143, L. 1-13).  During the 2004-05 school year, Owens received unsolicited documents from Lowe's personnel file in the interoffice mail system, commonly referred to as the "pony." (Ex. "G," p. 43, L. 1-3; p. 95, L. 14-18; p. 97, L. 10-21).  Owens testified that he did not know who sent the information, which contained disparaging comments about Lowe, to him. (Ex. "G," p. 43, L. 4-12; p. 95, L. 19-20).   Only school personnel has access to this mail system and only persons from the Central Office have access to an individual's personnel file, not for the general public. (Ex. "D," p. 79, L. 10-14; Ex. "G," p. 97, L. 13-22).

In November 2004, a position was posted at Southlawn Middle School for a Schoolwide Instructional Assistant.  Lowe applied for the position; however, he was told by the school's Principal, Tina Minott, that she had to hire Pam Cloud,[5] a white female, as a result of a lawsuit Cloud had filed against the Board.  (Ex. "A,"  p. 425, L. 9-14).  The Board produced a copy of Cloud's EEOC Complaint pursuant to a 30(b)(5) request for documents.  Interestingly enough, Cloud's EEOC Complaint was filed in December 2003 and her corresponding lawsuit was filed in

---

[5] Referenced in previous paragraph.

September, 2004, a mere month prior to Minott's comment to Lowe. (Ex. "J"). Minott's Affidavit states that the hiring committee interviewed applicants for this position and selected their top **two** candidates and Cloud was the top candidate. (See Defendants' Ex. 37, ¶¶ 5-6). Curiously, this is yet another example of someone who did not follow the Board's purported "requirement" that three candidate names be submitted to Barker with no indication of preference as the Superintendent makes the final decision, and a clear indication of "pretext."

After filing his EEOC Complaint, Lowe made two distinct requests for professional leave. In October 2004, Lowe was asked to present at a National Conference and he was asked to lecture on materials he had prepared regarding best practice. (Ex. "A," p. 320, L. 3-14). He approached both Principal Owens and the Superintendent of Curriculum and Instruction, Mike Looney, and obtained their permission to attend the conference. (Ex. "A," p. 321, L. 8-11). Looney encouraged Lowe to attend the conference. (Ex. "A" p. 321, L. 2-4). However, the official approval of Lowe's request took an inordinately long period of time. (Ex. "A", p. 321, L. 8-11). Lowe repeatedly inquired of Looney whether permission would be granted. (See Email between Lowe and Looney-request for professional leave approval, attached hereto as Ex. "M"). Looney advised Lowe via email that he was trying to get approval. (See Email to and Response from Barker, attached hereto as Ex. "N"). However, the request was eventually denied, with Barker's signature on the denial. (See Request for Leave - Conf. - Denied by Barker, attached hereto as Ex. "O"). Barker, of course, testified that Looney never approved Lowe to attend this conference. (Ex. "D," p. 140, L. 5-6). Barker also testified that Looney was authorized to approve such a request and that Lowe would have been permitted to present at the convention if Looney had in fact approved it. (Ex. "D," p. 139, L. 19-21; p. 144, L. 6-16). Purcell testified that Lowe was not allowed to attend the conference

-12-

because he was not one of the top people within the district for reading presentations. (Ex. "K," p. 47, L. 1-21).

Lowe was also denied the opportunity to pursue professional development in February 2005. (February Request for Professional Leave, attached hereto as Ex. "P") Owens approved Lowe's request. (Ex. "G", p. 40, L. 6-8). Again, Lowe's request was denied by Barker which was contrary to Board practice and policy whereby Hicks approved or denied requests for professional leave. Barker told Lowe that Owens had not approved the leave because it was not in line with Lowe's job duties. (Ex. "A," p. 334, L. 11-16).

On December 3, 2004, Lowe sent an email to Defendant Purcell advising that Barker had denied his request for professional leave to present at a National School Reform Conference. Lowe informed Purcell that he suspected this denial was Barker's retaliation against Lowe for filing both his EEOC charge and his lawsuit. (See 12/3/04 email to Purcell, attached hereto as Ex. "Q"). Purcell ignored the allegations against Barker and stated she did not get involved. She only responded to say that she received his email but did not do anything to look into it. (Ex. "L", p 44, L. 11-16). On February 16, 2005, Lowe wrote Purcell requesting a private conference to discuss the pressures being placed upon him due to the lawsuit he had filed against the Board. Purcell received the email, but doesn't think she did anything to investigate his complaint. (Ex. "K," p. 62, L. 1-3).

The Board decided to close the Daisy Lawrence in the Spring of 2005 and Barker and Purcell advised the current Daisy Lawrence employees, including Lowe, that all employees would be placed but tenured people would be assigned first. (Ex. "A," p. 311, L. 9-13).

This lawsuit was initiated on April 27, 2005 and Defendants received service on May 2, 2005. (See Certified Notice of Process and Complaint, attached hereto as Ex. "R"). On May 18,

2005, Lowe received his non-renewal letter from Daisy Lawrence. (See 6/22/05 Email to Purcell, attached hereto as Ex. "S," ¶1). On May 19,2005, Owens called Lowe into his office and advised that he would be writing a letter of recommendation for Lowe. (Ex. "S," ¶ 2). Owens suggested to Lowe that Barker stated Lowe would not be rehired in Montgomery County because he should not have filed his lawsuit. (Ex. "S," ¶ 2). Owens informed Lowe that his non-renewal and the closing of Daisy Lawrence was the Board's way of "getting back at" Lowe for filing the lawsuit." (Ex. "S," ¶ 5).

When Lowe expressed concern to Barker that he had not been placed as of June 22, 2005, Barker responded to Lowe's email by stating: "I can assure you that you will be given full consideration for any position for which you are qualified." (See 6/22/05 Email to Barker, attached hereto as Ex. "T"). Lowe continued to apply for every available position throughout the system and noted that every other tenured and non-tenured, certified and non-certified employee from Daisy Lawrence had been placed by the start of the 2005-06 school year except Lowe. (Ex. "A," p. 312, L. 18-22). Barker admits that Lowe was the only employee from Daisy Lawrence who was not rehired by the Board the following year. (Ex. "D," p. 151, L. 3-5). Barker also admits that there were 200-250 positions for hire within the Montgomery Public School System for which Lowe was qualified. (Ex. "D," p. 152, L. 9-11). However, Lowe was not offered a single job.

Lowe reiterated his interest in obtaining employment with the Board through multiple letters and emails to Barker and Purcell requesting consideration for any position available. (See emails and letters re: Apply all positions, collectively attached hereto as Ex. "U"). When asked why Lowe was not placed during the Summer of 2005, Purcell testified that no Principal recommended him for hire. (Ex. "K", p. 78, L. 11-14).

On June 22, 2005, Lowe sent an email to Defendant Purcell expressing concern that Barker was actively preventing him from obtaining a position at another school, and reiterating Owens' May 19, 2004 statements regarding the retaliation that would be forthcoming from Barker and the Board as a result of Lowe filing suit. (Ex. "S," ¶ 5). Lowe advised Purcell that he felt Barker was retaliating against him for filing his EEOC Complaint and subsequent lawsuit and asked Purcell to intercede on his behalf. (Ex. "S," ¶ 5). However, not only did Purcell fail to respond to Lowe's Complaint, her attempt to resolve the issue consisted of giving the Complaint to Barker and asking him to look into the allegations made against himself. (Ex. "K," p. 96, L. 14-17; p. 97, L. 1-4) . Purcell admits that she did nothing to investigate the allegations of Lowe's Complaint; rather, she trusted Barker would handle the matter. (Ex. "K," p. 96, L. 14-17; p. 97, L. 1-4). Barker claims that he was not angered by the Complaint but that he did not conduct any investigation because he knew the allegations against him contained therein were false. (Ex. "D," p. 161, L. 20-23; p. 162, L. 1-8; p. 163, L. 1-2). Barker did not conduct any interviews to determine the basis for Lowe's complaints nor did he contact Owens to inquire whether Owens had actually made any of the comments attributed to him. (Ex. "D," p. 162, L. 1,  9-11).  Barker did nothing in response to Lowe's Complaint. Not surprisingly though, he cleared himself of any wrongdoing. Purcell did nothing to follow-up on Barker's investigation and the Complaint went no farther than Purcell and Barker. (Ex. "K," p. 96 L. 10-11, p. 97 L. 1-6, p. 100 L. 19-21). Purcell also admits that in order to initiate an employee grievance, it should be submitted to the Superintendent. (Ex. "K," p. 98, L. 7-10; p. 99, L. 1-2; p. 100, L. 1-2). Board policy dictates that a grievance against the Human Resources Department should be submitted to and investigated by the Superintendent. (Ex. "D," p. 25, L. 18-21).

Contrary to Purcell's testimony that Lowe received no job in 2005 because no Principal had recommended him, Dr. James Owens[6] (hereinafter "Owens"), Principal at Patterson Elementary School (hereinafter "Patterson") interviewed Lowe in the Summer of 2005 for the position of reading coach. (Ex. "G," p. 53, L. 23). Owens contacted Lowe to determine if he had a job for the 2005-06 school year. (Ex. "G," p. 54, L. 1-3). Lowe informed Owens that he did not. (Ex. "G," p. 54, L. 1). Owens advised Lowe that he would not be given preferential treatment and would still be required to go through the interview process. (Ex. "G," p. 57, L. 1-4). Owens conducted a formal interview with Lowe and determined Lowe would be a good fit for his school. (Ex. "G," p. 58, L. 4-12). Owens felt Lowe was a good candidate for the position as it was the same job Lowe had performed successfully for two years at Daisy Lawrence. (Ex. "G," p. 47, L. 1-5). Additionally, Lowe had received very favorable evaluations from Owens during his two years handling the reading coach position at Daisy Lawrence. (Ex. "C; Ex. "G," p. 27, L. 1-9). Owens submitted the hire form to the Central Office and indicated that he sought to have Lowe hired for his school. (Ex. "G", p. 58, L. 12-14; p. 61, L. 7-8). Owens did not submit the names of any alternates. (Ex. "G," p. 61, L. 5). When Barker received Owens' recommendation, Barker called Owens and advised that he would like Owens to talk to other candidates and Connie Mizell would provide a list of candidates. (Ex. "G," p. 61, L. 8-11) Owens received the list of three names from the Central Office and he interviewed each of the three. (Ex. "G," p. 61, L. 13-18). After interviewing Barker's candidates,

---

[6] Owens served as Lowe's Principal for the two years Lowe was employed at Daisy Lawrence as a reading coach.

Owens submitted two names[7] to Barker and again indicated that Lowe was his top choice and recommendation for hire. (Ex. "G," p. 66, L. 11-12).

Owens did not get a response to his email requesting Lowe a second time. (Ex. "G," p. 67, L. 6; p. 68, L. 11-12). He called Barker and Carla Winborne (hereinafter "Winborne") a couple of times to determine if Lowe would be approved; neither returned his call. (Ex. "G," p. 68, L. 11-16). Eventually, Owens went to the Central Office in person to find out if he would be allowed to hire Lowe or not. (Ex. "G," p. 68, L. 17-19). Owens asked Winborne if he could hire Lowe. (Ex. "G," p. 69, L. 1-2). Winborne responded by saying "no." (Ex. "G," p. 69, L. 2). Owens was never given an explanation for this decision and does not know of any reason why he could not hire Lowe. (Ex. "G," p. 69, L. 5-8). Owens felt Lowe was the right candidate for the position, because he had effectively performed the same job for Owens for two years. (Ex. "G," p. 47, L. 1-9). Owens was never told that he needed to go through a special hiring process to interview and hire a reading coach. (Ex. "G," p. 62, L. 16-21). Owens was not told that he needed to consider specific traits with regard to the person recommended. (Ex. "G," p. 61, L. 8-23; p. 63, L. 12-16). Owens testified that the delay in the response and the fact that Barker suggested Owens interview additional candidates after recommending Lowe was unusual. (Ex. "G," p. 70, L. 8-11). Owens testified based on his experience as a Principal for several years, it is the policy and practice that he make a recommendation one day and would have an answer the next day. (Ex. "G," p. 70, L. 11-14). Owens further testified that it is Board practice that the Principal's recommendation is followed.

---

[7] Owens submitted a second choice as well, from the three persons Barker requested he interview, and she was subsequently hired. However, she was unable to start for two to three weeks because she was currently under contract with the Board teaching at another school and a replacement had to be found before she was permitted to leave. (Ex. "G," p. 73, L. 7-9).

(Ex. "G," p. 26, L. 5-10). This is the only recommendation Owens has made as Principal which has been denied by the Board. (Ex. "G," p. 70, L. 15-16). Three other Principals also testified Board policy and practice is to follow the recommendation of the Principals and that their recommended candidate was always hired by the Board. (Sikes Depo., p. 14, L. 1, attached hereto as Ex. "V"; Starks Depo., p 19, L. 11-20, attached hereto as Ex. "W"; Abrams Depo., p 21, L. 13-17, attached hereto as Ex. "X").

Purcell and Barker testified that the hiring process is unique for the position of a reading coach. Barker testified there has been a hiring committee in existence for all reading coach positions since 2003. (Ex. "D," p. 30, L. 15-20). They further testified that all reading coaches must be screened by this committee. (Ex. "D," p. 32, L. 16-20; Ex. "K," p. 73, L. 1-2). Contrary to Purcell's testimony, that all Principals were aware of this committee, as of their January 2006 depositions, neither Owens nor Abrams was aware that the hiring process for reading coaches was distinct from other positions or that there was a committee in existence for screening reading coaches. (Ex. "G," p. 62, L. 16-21; Ex. "X," p. 18, L. 1-4). Lowe did not go through such a committee to be hired as a reading coach in prior years at Daisy Lawrence and did not go through such a committee to be hired for a summer reading coach job. (Ex. "B," ¶ ¶ 4, 5). Lowe did go through a committee for schoolwide instructional assistant positions and was cleared for hire by that committee[8]. (Ex. "D," p. 167, L. 18-22; Ex. "A," p. 249, L. 13-15).

---

[8] The qualifications for a Schoolwide Instructional Assistant as well as the duties involved therein, are completely different from the qualification and duties of a reading coach. Since the reading coach hiring committee is unique for that position, per the testimony of Barker and Purcell, the recommendation of a wholly independent committee would be irrelevant.

Purcell testified that Lowe was not suitable for hire because he did not go through the requisite committee. (Ex. "K", p. 75, L. 3-6). Contrary to Purcell's stated reason, Barker, on the other hand, testified that Lowe did go through the committee process, but was not "highly recommended" by the committee. (Ex. "D," p. 35, L. 15-20; p. 38, L. 13-15). However, Owens was not told that Lowe was not suitable for hire as a reading coach because he was not approved by this committee. (Ex. "G," p. 69, L. 12-15). Initially, Owens was only told that Barker wanted him to consider other candidates. (Ex. "G," p. 61, L. 8-10). And again, when Owens recommended Lowe for hire, determining that he was the superior candidate, Owens was not given an explanation why Lowe would not be hired. (Ex. "G," p. 69, L. 5-8, 12-15). Never has Owens been told that Lowe did not perform well in some committee interview. (Ex. "G," p. 69, L. 12-15). There has been no document produced which would support the existence of this committee or its findings. There have been no documents produced which outline the criteria considered or required by this committee. There is nothing to indicate upon what the committee bases its decisions. Barker did admit that these committees keep notes and there are records which would indicate the employee's scores and committee comments. (Ex. "D," p. 36, L. 7-9). However, there has never been a single document produced, despite repeated requests, which would corroborate the existence of this committee. Barker testified, as the 30(b)(6) witness of the Board, that there were no documents setting out the policy and procedure for hiring and use of committees. (Ex. "D," p. 168, L. 12-19).

Barker and Purcell claim that Patterson's reading coach position hiring process was unique because of the school's "at-risk" status which would require hiring someone who was "highly recommended" by this committee. (Ex. "D," p. 44, L. 18-23; p. 45, L. 1-2; Ex. "K," p. 81, L. 8-11). This situation was unique only to the position Lowe sought and for the position Owens insisted Lowe

be hired. Lowe was not told that he needed to be interviewed by this committee until after Owens recommended him for hire. (Ex. "B," ¶ 6). To date there has been nothing produced which would support the existence of this committee.

In the Summer of 2005, Lowe applied for a special education teaching position at Lee High School with Principal Sikes and at McKee Junior High with Principal Abrams. (Ex. "V," p. 16, L. 12-20; Ex. "X," p. 32, L. 1-3). Sikes testified that Lowe had a good interview and he sought to hire him. (Ex. "V," p. 19, L. 2-18). However, both also testified that when they called the Board/Barker to inquire about Lowe's certification, they were told that he was not certified and therefore not a viable candidate. (Ex. "V," p. 19, L. 2-18; Ex. "X," p. 34, L. 1-5). Unlike Easterling, Lowe was not allowed to continue with the hiring process in order to afford him the opportunity to obtain proper certification.

In August 2005, counsel for Lowe wrote to counsel for the Board to advise that Lowe was having difficulty being placed. (Ex. "K," p. 103, L. 2-9). The letter indicated that Lowe had been recommended for different positions by Principals who wanted to hire him but was not being hired and Lowe felt that someone at the Central Office was blocking his placement. (See August 2005 Letter from WFP, attached hereto as Ex. "Y"). Purcell admits that she was aware of that letter and that she and Barker may have discussed it. (Ex. "K," p. 103, L. 12-15). However, she did not investigate the allegations contained therein because it did not come in the form of a formal grievance. (Ex. "K," p. 106, L. 4-5). Furthermore, Purcell justified the fact that she ignored Lowe's pleas for help because she didn't get a "sense" that the people working in the HR department would have retaliated against anyone. (Ex. "K," p.105, L. 16-18). The Board's formal grievance policy would require a complaint about Human Resources to be directed to and investigated by Purcell.

-20-

(Ex. "K," p. 25, L. 18-21). Purcell admits that she is familiar with the Board's formal grievance process. (Ex. "K," p. 100, L. 9-11). She testified that she could have followed Board procedure if Lowe's complaint had been filed as an official grievance, but Lowe's complaint was not an official grievance. (Ex. "K," p. 100, L. 1-2). Purcell concedes she did nothing to investigate Lowe's claims, she thought he was just "venting" his feelings and not seeking intervention. (Ex. "K,", p. 96, L. 14-17; p. 107, L. 7-8). Yet, she admits that she never told Lowe that he needed to file a formal grievance in order for her to investigate. (Ex. "K," p. 100, L. 16-18).

**Board Policy and Practice**

The Board's general hiring process is that they follow the recommendation of the department head or Principal. (Ex. "D," p. 28, L. 12-19). Purcell testified that the Principals make recommendations for teacher positions and that she routinely and customarily accepts the Principals' recommendations. (Ex. "K," p. 29, L. 8-13; p. 31, L. 15-21; p. 32, L. 2-6). According to Purcell, the process for teacher hiring is different than for Assistant Principal. (Ex. "K," p. 23, L. 13-23). For teacher positions, the Principals conduct interviews, and make their recommendations to Barker, who verifies certification, then provides the names to her to present to the Board. (Ex. "K," p. 22 L. 13-23). Barker claims that he does not allow the supervisors to rank the candidates in order of preference, only to submit their top three candidates. (Ex. "D," p. 27, L. 19-23). Barker submits the top three candidates' résumés to the Superintendent to make the final determination. (Ex. "D," p. 28, L. 5-6).

## STANDARD OF LAW

Pursuant to Rule 56(c), FED.R.CIV.P., the moving party is entitled to a judgment as a matter of law where no genuine issues as to any material fact exist. The moving party bears the initial burden of proof of showing the absence of any genuine issue of material fact on the matters covered by the Motion for Summary Judgment, but, once the moving party has sustained its burden, the burden then shifts to the non-moving party to demonstrate by "substantial evidence that genuine issues of material fact do exist to warrant the matter being submitted to the finder of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988). *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994), opinion modified on rehearing 30 F.3d 1347 (11th Cir. 1994).

In interpreting the substantial evidence rule, the United States Supreme Court has held that "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249; citing *Adickes v. S.H. Kess & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Dombrowski v. Eastling*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

To successfully defeat a motion for summary judgment, the non-moving party must offer evidence of specific facts showing a genuine issue of material fact for trial. *United Steelworkers of Am., AFL-CIO v. Univ. of Alabama*, 599 F.2d 56, 61 (5th Cir. 1979). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome

of the case. *Anderson,* 477 U.S. at 248; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Allen,* 121 F.3d at 646; *Mize v.Jefferson City Bd of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996).

On a motion for summary judgment, the Court must view all of the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex Corp.,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) at 322-23; *Allen,* 121 F.3d at 646. It is the non-moving party's responsibility to present evidence in order to defeat the summary judgment motion, and such evidence must be more than conclusory allegations. *Anderson,* 477 U.S. at 252.

In determining whether to grant summary judgment or judgment as a matter of law, the Court must take into consideration certain factors including "the strength of the Plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109 (2000); see generally *Chapman v. A. I. Transport,* 229 F.3d 1012 (11th Cir. 2000) (*en banc*). See *Hinson v. Clinch County Georgia Bd. of Educ.,* 231 F.3d 821, 832 (11th Cir. 2000). Having done that, the Court may conclude that a "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Hinson v. Clinch County Georgia Bd. of Educ., supra* at 832.

## ARGUMENT OF LAW

### I.     PROPER PARTIES

Lowe only brings one count that makes allegations against individual Board members in their official capacity. There are no claims made against Board members in their individual capacity. Claims alleged in Counts I under Title VII, Count II under Section 1983, Count IV under Title VII, and Count V under Section 1983, are all alleged against the Board as an entity. Count III states a claim against the Board and the individual Board members and the Superintendent in their official capacity only. That count is brought under State law as more specifically addressed herein. State law allows such claims as asserted against Defendants, *i.e.*, against the Board as an entity and the individuals of the Board and the Superintendent in their official capacities. *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000).

### II.     TITLE VII

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (1988). *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Title VII further provides, in pertinent part:

> **it shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment**...because [the employee] has opposed any practice made an unlawful employment practice by this subchapter or **because he has made a charge**, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

-24-

42 U.S.C. § 2000e-3(a) (1982) (emphasis added). Furthermore, the Eleventh Circuit has held that statutorily protected expression includes the filing of EEOC complaints and lawsuits, as well as complaints made to superiors about harassment. *Barnes v. Tuskegee Univ.,* 2006 WL 1071870 (M.D. Ala., Apr. 24, 2006), citing *Rollins v. State of Fla. Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989).

### A.    DIRECT EVIDENCE OF DISCRIMINATION

It has been established that a plaintiff may use either direct or circumstantial evidence in an effort to establish a claim of discrimination or retaliation under Title VII and the analysis differs depending upon which type of evidence plaintiff presents. Direct evidence of discrimination is defined as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004). "Direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption. As our precedent illustrates, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor, constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson* at 1086 (citations omitted). In *Caban-Wheeler v. Elsea,* 71 F.3d 837 (11th Cir. 1996), the Court held that a statement by a decisionmaker that he wanted a black person to have a white employee's job was direct evidence that the white employee was terminated for racially motivated reasons. The Court also found direct evidence in *Haynes v. W. C. Cayce & Co, Inc.*, 52 F.3d 928 (11th Cir. 1995), where the decisionmaker stated that women were simply not tough enough to do the job from which the

plaintiff had been removed. Direct evidence creates a presumption of discrimination and the burden

shifts to the defendant to offer evidence to rebut same. *Wilson* at 1086. If the "[n]onmovant presents

direct evidence, that, 'if believed by the jury, would be sufficient to win at trial, summary judgment

is not appropriate, even where the movant presents conflicting evidence.'" *Hamilton v. Montgomery*

*County Bd of Educ.*, 122 F.Supp.2d 1273, 1280 (M.D. Ala. 2000) citing *Merritt v. Dillard Paper*

*Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997).

### B.    CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION AND DISPARATE TREATMENT

If the plaintiff is unable to meet his burden of showing discriminatory or retaliatory intent

through direct evidence, then he must turn to circumstantial evidence. When plaintiff points to

circumstantial evidence in support of his claim for discrimination, the *McDonnell Douglas* analysis

is called into play.   Under this analysis, "the plaintiff must first establish a prima facie case of

discrimination.  'Once the plaintiff has made out a prima facie case of discrimination, the employer

must articulate some legitimate, non-discriminatory reason for the [employment action].'  If the

employer meets this burden of production, the presumption of discrimination is eliminated and the

plaintiff must then establish that each of the defendant's proffered reasons is pretextual." *Jackson*

*v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276 (11th Cir. 2005), citing *Bass v. Bd. of*

*County Comm'rs*, 256 F.3d 1095, 1103-04 (11th Cir. 2001).  In order to show pretext, the plaintiff

must "demonstrate that the proffered reason was not the true reason for the employment decision ...

[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason

more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

In order to prove a case of discrimination, Plaintiff must prove (1) that he is a member of a protected class, (2) that he was qualified for the position sought, (3) that he was denied the position, and (4) some additional factor that would allow an inference of discrimination. *White v. Verizon South, Inc.,* 299 F. Supp.2d 1235, 1241 (M.D. Ala. 2003) citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find discrimination." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004).

"In cases involving discrete discriminatory acts, such as termination of employment, failure to promote, denial of transfer, or refusal to hire, a discrete discriminatory act occurs on the day that it happens. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate and actionable 'unlawful employment practice.'" *Id.* at 2073. The limitations period for discrete discriminatory acts begins to run when the employee receives notice of the act, not when the effects are felt. *Id.* "A prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'" *Schoenfeld v. Babbit,* 168 F.3d 1257, 1268 (11th Cir. 1999). Although Lowe's actionable discrimination claims are limited to those

which occurred within 180 days of filing his EEOC Complaint, the statute permits an employee to use the prior acts, regardless of whether they are timely, as background evidence in support of a timely claim. *Nat'l R.R. Passenger Corp.v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061 (2002).[9]

### C.    ANALYSIS OF LOWE'S DISPARATE TREATMENT CLAIMS

#### 1)    Direct Evidence of Discrimination

In the Summer of 2004, Lowe applied for an administrative position at McKee Junior High. This position would have constituted a promotion and an increase in pay. Lowe was interviewed by Principal Abrams, and advised by Abrams that Lowe was his top choice for the position.[10]  Abrams told Lowe that he intended to recommend him for the job, a statement which Abrams later denied. As has been established through the testimony of both Purcell and Barker, it is the custom and practice of the Board to hire the person recommended by the Principal. However, Abrams was not allowed to hire Lowe because, according to Abrams, he was told he had to hire a female to balance out the staff. Importantly, the person who was actually hired to fill the position was a female. Abrams' statement to Lowe that he was instructed to hire a woman to balance out the staff constitutes direct evidence of the Board's discrimination against Lowe.

In an effort to avoid the ramifications of Abrams' statement to Lowe, the Board argues that Abrams' statement is inadmissible hearsay. However, Abrams' statement to Lowe is admissible as a statement by a party opponent. "It is well settled that the Federal Rules of Evidence, not state evidence law, govern the admissibility of evidence in cases in federal courts." *City of Tuscaloosa*

---

[9]These acts are detailed in the "other acts of discrimination" section of the brief.

[10] Abrams denied this statement in his deposition testimony.

*v. Harcros Chem, Inc.*, 158 F.3d 548, 558 n10, (11th Cir. 1998) ; see FED.R.EVID.1101; *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 821 (5th Cir.1980). "Under the Federal Rules of Evidence, it is not necessary to show that an employee or agent declarant possesses 'speaking authority,' tested by the usual standards of agency law, before the statement can be admitted against the Principal; instead, it is necessary that the content of the declarant's statement concern a matter within the scope of his employment or agency." *Id.,* citing *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1565 (11th Cir. 1991); FED.R EVID. 801(d)(2)(D), 28 U.S.C.A. "A 'statement by [a] party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,' however, is deemed an admission by a party opponent and is excluded from the definition of hearsay." *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 558 n10 (11thCir.1998), citing FED.R.EVID. 801(d)(2)(D); *see Zaben v. Air Prods.& Chems, Inc.,* 129 F.3d 1453, 1456 (11th Cir. 1997). The relevant consideration, therefore, is the content of the statement and whether it was made regarding a matter within the scope of the speaker's employment. *Id.*

"It is true that courts have admitted statements of managers under Rule 801(d)(2)(D) where there is some evidence that the statements reflected some kind of participation in the employment decision or policy of the employer." *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005); see *Yates v. Rexton, Inc.,* 267 F.3d 793 (8th Cir. 2001); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087 (1st Cir. 1995). In *Yates,* [t]he Eighth Circuit held that even if these two executives did not play a role in the plaintiff's termination, their statements were admissible under Rule 801(d)(2)(D) because "'[s]ignificant involvement, either as advisor or other participant in a process leading to a challenged decision' may be sufficient to establish agency under Rule 801(d)(2)(D)." *Rowell v.*

*BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005), (quoting *Yates,* at 802, quoting *E.E.O.C. v. Watergate at Landmark Condo.,* 24 F.3d 635, 640 (4th Cir. 1994).

Abrams' statement, therefore, is admissible as it is a statement by a party opponent. Abrams made this statement to Lowe within the line and scope of his position as Principal at McKee Junior High School. Abrams' statement to Lowe directly relates to a matter which is within the line and scope of his authority. Both Barker and Purcell testified that the Principals conduct interviews and make recommendations of the candidates they would like recommended to the Board for hire. Abrams, Sikes, Starks, Owens and Purcell all testified that it is the pattern and practice of the Board that the Principals submit their recommendations to Barker. Barker is the individual who presents the recommendations to the Superintendent to be presented to the Board. Barker is also the person who advises the Principals if their recommendation was accepted or if they will be required to interview other candidates and the reasons therefor. Abrams' statement to Lowe regarding the reason given for why Lowe could not be hired is clearly within the line and scope of Abrams' position as Principal and within the scope of the hiring process. Abrams' statement, therefore, is direct evidence of the Board's gender conscious decisions and its discrimination against Lowe, and the fact that Abrams' now denies making this statement is one for the jury.

### 2)    Circumstantial Evidence of Discrimination

Lowe has established a *prima facie* case of discrimination based upon the facts that (1) he meets the requisite qualifications for the positions sought, (2) he is male, (3) he was not hired for the positions and (4) the successful candidate was a female. It was incumbent upon the Board to present a legitimate, non-discriminatory reason for not hiring Lowe. The Board has produced this burden

by stating that Lowe was not hired for the various positions because either he was not the most qualified candidate for hire or he was not recommended by the Principal.

In the hiring of 2004 by Abrams, the Board claims that the successful female candidate was better qualified than Lowe. To the contrary, Abrams told Lowe that he wanted Lowe but that he was instructed by Barker to hire a female. The Board's proffered reason is mere pretext.

In addition to that position, in the Summer of 2004 and within 180 days of filing his Complaint with the EEOC, Lowe applied for the following positions: All Administrative Positions within the Montgomery Public School system, Lowe was not allowed to interview, fifteen positions were filled, **ten** of these positions were filled by **females**; Educational Specialist (Office of Curriculum and Instruction), Lowe was not allowed to interview, this position was filled by a **white female**; Title I Educational Specialist (Professional Development), Lowe was not allowed to interview and the position was filled by a **female**; Title I Program Evaluator, Lowe was not allowed to interview, and the position has never been filled; Title I Teacher Tutor (Houston Hills Junior High School), Lowe was not allowed to interview, and the position was filled by a **black female**; System Reading Specialist (Office of Curriculum and Instruction), although Lowe was interviewed, the position was filled by **two black females and a white female;** Title I System Wide Math Specialist, Lowe was interviewed; however, the three positions were filled by **two white females and a black female**; Title I Schoolwide Instructional Assistant at various locations, Lowe was not allowed to interview and the positions were filled by **three black females** and a **black male;** District Resource/Attendance Officer (Office of Student and Community Services), Lowe was interviewed for this position, however, it was never filled.

Of the thirty positions for which Lowe applied during the Summer of 2004, he was afforded the opportunity to interview for only three, and of the three interviews Lowe was actually granted, not a single male was hired to fill the positions and one of the three positions has never been filled. In **twenty-two** of the twenty-eight positions filled, a **female** was hired. In each position, Lowe was qualified through education, certification and experience for these positions. Each position involved an increase in pay and promotion. Lowe has established the *prima facie* case for each of these positions and now the Board must provide a legitimate, non-discriminatory reason for Lowe not being hired since Lowe applied for each of these positions.

The Board's response is not sufficient to rebut the *prima facie* case of Lowe. A Board may not rely upon subjective criteria to defeat the *prima facie* case of the Plaintiff unless the subjective reason is a legally sufficient, legitimate, non-discriminatory reason that is articulated clearly and with a reasonably specific factual basis to justify this objective opinion. *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000). Vague reasons which simply refer to particular exhibits are not sufficient to rebut the *prima facie* case. *Karen Jones Morris v. Wallace Community College-Selma*, 125 F.Supp.2d 1315 (S.D. Ala. 2001). The responses provided by the Board to why Lowe was not hired for these positions are vague generalizations that the others hired were qualified. (See pages 40-47 of Defendants' Brief in Support of its Motion for Summary Judgment). In each case, the Board does not claim that Lowe is unqualified, failed to apply, or that the position is not a promotion. Rather, the Board simply states that the successful applicant is qualified. The Board, in some instances, cites specifically to the individual's teaching certificate without any other facts or references. There is no explanation of why this person is better qualified and no documentation to support that claim. For instance, on page 41 of Defendants' Brief, in responding to the 10 positions filled by women in the

-32-

Summer of 2004 over Lowe, the Board refers to two Administrative Assistants who were hired and states that one is more qualified and cites to the certificates for those individuals. Again, for the Educational Specialist and Curriculum Instruction position discussed on page 41 of the Defendants' Brief, the Board cites only to the individual's teaching certificate to show that the individual was qualified for the position they were hired. For the Title I Educational Specialist position on page 46 of Defendants' Brief, there is nothing presented by the Board as to why a female was hired over Lowe for that position. Likewise, for the Title I Teaching Tutor position at Houston Hills on page 47 of Defendants' Brief, the System Reading Specialist position on page 47 of Defendants' Brief, Title I System Wide Math Specialist position on page 48 of Defendants' Brief and the Title I School Wide Instructional Assistant position on pages 42-43 of Defendants' Brief, the Board sets forth no specific reasons why these persons were more qualified or better qualified than Lowe for those positions or that there was a legitimate and non-discriminatory reason that those persons were hired over Lowe. The only information provided simply shows that the individual hired was qualified for the position.

The vague, weak, or non-existent reason proposed by the Board was insufficient to rebut Lowe's *prima facie* case. Moreover, given the Board's actions with regard to Patterson's reading coach position with Owens in the Summer of 2005, the retaliatory nature in the Summer of 2005, the EEOC Affidavit of McCloud stating that the Board made gender/race conscious decisions in hiring and promotions, the Board's contradictory and inconsistent positions about how individuals are hired and the basis for the hiring, the Board's indifferent or non-existent policy on investigating complaints like Lowe's and other materials set out herein showing discriminatory intent, summary judgment is due to be denied the Board regarding these claims. These positions were filled in the

-33-

Summer of 2004, within 180 days of Lowe's EEOC Complaint.  Lowe alleged in his EEOC Complaint and lawsuit that he was discriminated against during this period with regard to positions for which he applied.  The Defendants have addressed these positions through discovery and their Motion for Summary Judgment.  Therefore, the positions are properly before the Court in this case.

Lowe was certified for every single position for which he applied, nonetheless, he was not permitted to interview for most of the positions.  The fact that he was blocked evidences the Board's intent to keep him from being recommended by a Principal, especially considering the fact that both Purcell and Barker both testified that it is customary to hire the Principal's recommended candidate.[11]

Further evidence that the Board makes hiring decisions based upon impermissible considerations is found in the sworn EEOC statement of Pam Cloud.  Pursuant to Plaintiff's 30(b)(5) document request, Cloud alleged race discrimination against the Board and stated that she was told by administrative personnel that "the MCBE has a policy or carries out a practice of racially balancing administrative staffs at individual schools."  Cloud further stated that she was advised by Carolyn Hicks (an individual in the Human Resources Department) that "when the Principal of a school is white, MCBE attempts to fill the Administrative Assistant position with a Black applicant."  She states that she was advised by two Principals that "there is an unwritten policy to racially balance the administrative staffs of MCBE schools."  She further noted that based upon her personal observations, the racial balancing policy is carried out more with regard to schools in the

---

[11] The one time Lowe circumvented the process and obtained an interview independent of Barker's involvement, Lowe was recommended for hire by Owens, which forced the Board to create excuses to stray from the pattern and practice of accepting Principals' recommendations.

predominately "white areas" of town, whereas the schools in the predominately "black areas" tend to have both a black principal and a black administrative assistant. (Ex. "J").

Although the Board argues that the hiring decisions were based upon the relative qualifications of the applicants, when considered in light of the testimony of Pam Cloud, this is clearly pretext. The Board has a pattern and practice of making race and gender conscious decisions in an attempt to balance the staff. Abrams denies Barker's directive to hire a female influenced his recommendation and claims he did not hire Lowe because he did not feel he was the best candidate. The pretext is evidenced by the fact that Abrams recommended Lowe for the very next position, and the person who filled the administrative assistant position was in fact a female.

The circumstances surrounding the 2004 Assistant Principal position at Thelma Smiley Morris Elementary School also suggest discriminatory animus toward Lowe. This position was not advertised and the Principal was permitted to hire a black **female**, Denita Easterling, who had served as the summer school Principal at that school (albeit while she was not certified for that position). Lowe was properly certified in admission prior to this time; however, the Board did not afford him the opportunity to interview. Rather, the Board accepted the Principal's recommendation based solely on her observation, despite the fact that the process and recommendation circumvented and was in direct contradiction to the Board's stated procedure for hire.

In November 2004, a position was posted at Southlawn Middle School for a Schoolwide Instructional Assistant. Lowe applied for the position; however, he was told by the school's Principal, Tina Minott, that she had to hire Pam Cloud,[12] a white **female**, as a result of a lawsuit Cloud had filed against the Board. Although Minott denies this statement, the timing of the

_____

[12] Referenced in previous paragraph.

September 2004, lawsuit and the November 2004, comment to Lowe creates an incredible coincidence which casts doubt on Minott's Affidavit. Minott's Affidavit states that the hiring committee interviewed applicants for this position and selected their top **two** candidates and Cloud was the top candidate. (Defendants' Ex. 37, ¶¶ 5-6). Curiously, this is yet another example of someone who did not follow the Board's purported "requirement" that three candidate names be submitted to Barker with no indication of preference as the Superintendent makes the final decision, and a clear indication of "pretext."

In the Summer of 2005, Lowe applied for and was interviewed for a special education teaching position at Lee High School with Principal Sikes. Sikes testified that Lowe had a good interview; however, he was informed by Barker that Lowe was not certified to teach special education. Lowe also applied for a special education position at McKee Junior High School during that summer. Principal Abrams interviewed Lowe and sought to hire him; however, Barker advised that Lowe was not certified for special education teaching and, therefore, not a viable candidate for the position. Barker testifies that Lowe's lack of certification was the reason he was not allowed to continue the hiring process for this position. However, unlike Easterling who was allowed to continue the hiring process while pursuing the certification, Lowe was summarily eliminated as a potential candidate.

### D.    OTHER EVIDENCE OF DISCRIMINATION

Plaintiff concedes that the allegations of discrimination that fall outside the 180 day period for an EEOC Complaint are not actionable under Title VII. However, as has been illustrated by the Supreme Court, discrete acts of discrimination that fall outside the 180 day period can be considered

by the court in order to establish background for Plaintiff's timely filed claims. *Nat'l R.R. Passenger Corp.v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061 (2002).

Lowe applied for multiple positions throughout the Summer of 2003, prior to filing his lawsuit or EEOC Complaint. However, he was not afforded the opportunity to interview for the following positions, despite the fact that he met the necessary qualifications: Administrative Assistant - Crump Elementary School, Lowe was not allowed to interview, position filled by **black female**; Administrative Assistant - Brewbaker Junior High, Lowe was not allowed to interview, position filled by **black female**; Educational Specialist, Lowe was not allowed to interview, position filled by **white female**; Educational Technology Professional Development Program Coordinator, Lowe was not allowed to interview, position filled by a **black female** and **white male**; Title I, School Wide Instructional Assistant, Lowe was not allowed to interview, position filled by **ten black females** and **three black males**; Administrative Assistant at Robert E. Lee High School, Lowe was not allowed to interview, the position was filled by a **black female**; Educational Specialist in the Office of Student and Community Services, Lowe was not allowed to interview, and the position was filled by a **white female**; Teacher - Brewbaker Intermediate School, Lowe was not allowed to interview, and the position was filled by a **black female**; Teacher - McKee Elementary School, Lowe interviewed, position was filled by a **black female**; Various Administrative Assistant positions available throughout the district, Lowe applied, but was not allowed to interview for any of these positions, these positions were filled by **seven black females**, **three white females**, and **five black males**. In June 2003, Lowe submitted a letter of intent to Barker to be reactivated in the Montgomery Public School System and to be considered for any position for which he was qualified; however, Lowe was not allowed to interview for a single position. Of the thirty-seven positions

filled, **thirty-three** were filled by females. Furthermore, as is consistent with the treatment Lowe encountered in the Summer of 2004, the positions for which males were hired were all positions for which he was not allowed to interview. Considering the number of positions that were available in the district during this period of time, and the fact that Lowe's qualifications are equal to or exceed those of every successful applicant, there is no legitimate explanation for the fact that he was not allowed to interview for any of these positions. Clearly, Defendants' proffered explanation for the treatment Lowe received is mere pretext.

Additionally, in the year following the filing of Lowe's EEOC complaint, the Board repeatedly and arbitrarily denied Lowe's professional leave requests. The fact that Lowe's requests were denied is not quite as indicative of discrimination as the fact that Barker was the individual to sign the denial. Typically, Carol Hicks is the individual who approves or denies professional leave; however, in Lowe's situation, both of his leave requests were denied by Barker. Lowe made two distinct requests for professional leave which were approved by his Principal. Regardless, Lowe was not permitted either opportunity.

After Lowe's EEOC Complaint was filed, in the Spring of 2005, Owens received unsolicited documents from Lowe's personnel file in the "pony." Owens testified that he did not know who sent the information, which contained disparaging comments about Lowe. Barker admitted that only school personnel has access to this mail system and that only persons from his office have access to an individual's personnel file. Clearly, this information was disseminated to Owens in an attempt to disparage Lowe.

### E.    RETALIATION

This Court has jurisdiction over Lowe's Title VII retaliation claim due to the fact the retaliation stems from the very allegations which formed the basis of the EEOC charge properly filed by Lowe. "In *Gupta*, the court held that there is no need to file a subsequent EEOC charge involving a retaliation claim where the claim 'grows out of an administrative charge that is properly before the court,' because the court has ancillary jurisdiction over the claims." *Hargett, III. v. Valley Fed. Sav. Bank*, 60 F.3d 754, 762 (11th Cir. 1995), citing *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. (Unit A) Aug. 1981). The rationale behind these decisions is that once the EEOC has tried to achieve a consensual resolution of the complaint, and the discrimination continues, there is minimal likelihood that further conciliation will succeed. This slim likelihood of successful conciliation does not justify forcing the victim to wait an additional 180 days to file suit. The relevant test in determining whether [appellant] was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC Complaint, or the investigation arising therefrom. *Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678, 689-90 (5th Cir. 1975). Any complaint of retaliation occurring during the time when prior EEOC complaints are pending necessarily falls within the scope of those complaints. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Furthermore, the Court has determined that a plaintiff need not win or prove the underlying claim of discrimination which prompted the protest prior to establishing retaliation, so long as plaintiff had a good faith belief that discrimination existed. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). The causal link requirement is to be interpreted broadly: "a plaintiff merely has to prove that

the protected activity and the negative employment action are not completely unrelated. *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994).

To establish a *prima facie* case of retaliation "a plaintiff must show that (1) [he] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998). "After a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse employment actions." *Id.*, citing *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). "If the defendant offers legitimate reasons, the plaintiff must respond by showing that the employer's reasons are a pretext for retaliation." *Id.*

Lowe filed an EEOC Complaint on August 2, 2004, an official EEOC charge on November, 15, 2004 and this lawsuit in April, 2005, alleging discriminatory animus on the part of the Board, his employer, and others due to his gender. Lowe provided a detailed addendum to his charge outlining the basis for his contention and the many instances in which he felt that he had been treated differently due to his race and gender.

Purcell, Barker and the Board first received notice of Lowe's charge in the Spring of 2005. This coincides directly with the closing of Daisy Lawrence. Following the school closing, every certified teacher from Daisy Lawrence was subsequently placed in another school. Lowe is the only individual, tenured and non-tenured, certified and non-certified, who was not placed in another school and rehired by the Board. Throughout the Summer of 2005, Lowe applied for numerous positions with the Board and continuously reiterated his strong desire to work within the Montgomery Public School System and his willingness to accept any available position. Barker

admitted that there were 200-250 positions for hire for the 2005-06 school year. Yet, despite the vast number of applications Lowe has submitted, he has only been allowed to interview for four positions and has yet to be offered a job.

The Board, however, contends the fact that Lowe was not hired does not evidence its discriminatory animus because there is a rational, legitimate explanation for the fact that the Board was unable to find a placement for Lowe among 250 openings. Purcell testified that Lowe was not hired for the 2005-06 school year because no Principal recommended him for hire. However, Lowe was recommended for hire. Owens repeatedly requested Lowe be hired as the reading coach for Patterson Elementary and his requests were repeatedly and summarily denied without explanation. However, Owens' testimony clearly establishes that Purcell's stated reason is pretext.

Based upon Board policy, as established by the somewhat conflicting testimony of Barker and Purcell, the Board typically accepts the recommendation of the Principal for teaching positions and the only involvement by Barker at that level is to ensure the candidates are properly certified. Owens, Abrams, Sikes and Starks all testified that in their experience as Principals, they have never once been denied their recommended candidate for a teaching position, unless the teacher was either not certified or had already accepted a position elsewhere. All four Principals testified that it is customary that they submit one name, sometimes three, to Barker and that they have always gotten their top choice approved for hire. Owens also testified that the process of recommendation and approval by the Central Office usually takes only a couple of days.

Owens commented that the response he received to his recommendation of Lowe was strange in that it seemed to be contrary to the custom and practice of hiring that had been established by the Board. Despite the fact that Lowe was not applying for an Assistant Principal position, Barker was

actively involved in the selection process, far beyond certification verification. Purcell testified that Owens' recommendation of Lowe should have been presented to the Board, considering Lowe had the necessary certification.

However, in later testimony, Purcell states a new basis for not hiring Lowe. Owens' recommendation of Lowe was ineffective and the Board could not place Lowe in that position because it was a reading coach position which is treated differently than other teaching positions. Purcell testified that Lowe was not hired as Patterson's reading coach because he did not go through the screening process of the reading coach hiring committee. Barker testified that Lowe was interviewed by the committee, but that Lowe was not highly recommended by the committee. Lowe, on the other hand, has never testified that he was interviewed by this "reading committee." The only committee interview Lowe references was for the position of Systemwide Instructional Assistant. Lowe has never been interviewed by a separate "reading committee." Furthermore, Owens still knew nothing about this committee three years after Barker claims to have explained to Owens that Lowe's committee interview was the reason for his non-hire. There is no indication that if Owens were to hire a reading coach this summer he would know any more about this purported committee than he did last summer.

Barker and Purcell claim that this reading coach hiring committee has been established since 2003 and that every reading coach in the Montgomery Public School System is required to go through this hiring process. They further testified that although there is no written documentation regarding this hiring requirement, the Principals are fully aware of it. However, of the four Principals deposed, not one knew anything about this committee three years after this process had allegedly been implemented.

The Board claims that Patterson was an "at-risk" school which required Barker and Purcell to take a more active role in the hiring process. Purcell testified that although Owens had prior experience as a Principal, there was concern because this was his first foray into a traditional school. Purcell testified that it was imperative that Owens' assistant be a person with a very strong academic background, and the successful candidate's fifteen years of teaching experience would bolster Owens' weakness. However, Lowe was not applying to be Owens' Assistant Principal, in which case, this argument by Purcell might be credible or even plausible. Rather, he was seeking to be the reading coach, a position for which he was both qualified and trained. A position which he had successfully performed for this very Principal for two years.

Barker seems to suggest that Lowe was not highly recommended by this screening committee and, therefore, not suitable for the position at an "at-risk" school. Owens has never been given any indication that Patterson had an "at-risk" status which warranted different considerations with regard to teacher placement. No one has ever told Owens that the reason Lowe was not approved was due to this "at-risk" status or because he did not come highly recommended by the committee. Owens was never told that the three additional candidates Barker asked him to consider were individuals who were screened and who the committee highly recommended. All Owens has ever been told with regard to the hiring of Lowe is "no."

Barker admits that the committee takes notes and that there is documentation of the meetings and the candidates' scores; however, to this date, nothing has been produced which could corroborate Barker's testimony. If these documents did in fact exist, it would seem to be incumbent upon the Board to produce them as some indication that Lowe was in fact, deemed to be "not highly recommended" thereby giving some credence to the many explanations he was denied the position.

It is also worth noting that although the Defendant has deemed Lowe unsuitable for every certified position available in its district for the 2005-06 school year, including acting as a reading coach to other teachers, the Board continues to offer Lowe's instructional presentation under the "Curriculum and Instruction/Direct Instruction" Link, on the official website for the Montgomery Public Schools. Lowe's PowerPoint presentation has been present on the Board's website for quite some time and there continues to be a link to it as a guide for other teachers within the district. This is the very same presentation Lowe prepared and planned to present at the National Conference for which he was denied leave.

The Board offers a legitimate, non-discriminatory, non-retaliatory reason for its refusal to accept Owens' recommendation and hire Lowe; however, this reason is clearly pretext as evidenced here. This hiring, coupled with the conflicting and ever-changing explanations provided by Barker and Purcell, and the fact that Owens' statements of retaliation made immediately after service of the complaint came to fruition in the Summer of 2005, demonstrate the Board's offered reason for not hiring Lowe mere pretext, thereby creating a jury question rendering summary judgment improper.

## III.    SECTION 1983

"A local government body, such as the School Board in this case, is liable under §1983 'when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury..." *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "A plaintiff can establish §1983 liability by identifying that she has been deprived of constitutional rights by either an express policy or a 'widespread practice that, although not authorized by written

law or express municipal policy, is so permanent and well settled as to constitute a custom and usage with the force of law.' *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)." *Cuesta v. Sch. Bd. of Miami Dade County, Florida*, 285 F.3d 962, 966 (11th Cir. 2002). Yet, even in the absence of a written policy or custom, the local government may be found liable for "a single act or decision of a municipal official with final policymaking authority in the area of the act or decision." *Cuesta* at 968, citing *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996).

A § 1983 claim is governed by a two-year statute of limitations period. *Lufkin v. McCallum* 956 F.2d 1104, 1106 (11th Cir.), *cert denied,* 506 U.S. 917 (1992); *Anderson-Free v. Steptoe,* 970 F.Supp.945, 953 (M.D. Ala. 1997). The continuing violation doctrine applies to actions brought under § 1983. *Thigpen v. Bibb County Sheriff's Dep't.*, 223 F.3d 1231, 1243 (11th Cir. 2000). Because this action was filed on April 27, 2005, Plaintiff's action is timely with respects to all claims which occurred prior to April 27, 2003.

A party that has no power to actually terminate an employee might still be liable for the ultimate termination if the recommendation directly resulted in the employee's discharge. One way for the Plaintiff to show causation is to demonstrate that "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Tucker v. Talladega City Schools,* 2006 WL 688967 at 7 (11th Cir., Mar.20, 2006), citing *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999). "If the decisionmaker did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between the [plaintiffs'] protected activities and their subsequent termination would remain intact.

-45-

In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir.1998).

Pursuant to Alabama law, the Superintendent is granted the exclusive power to nominate for appointment all "regular employees of the board" as well as to "assign them to their positions, transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause, and recommend them for dismissal." *Hamilton v. Montgomery County Bd of Educ.*, 122 F.Supp.2d 1273, 1285 (M.D. Ala. 2000) citing ALA.CODE § 16-9-23 (1975). "The superintendent is exclusively responsible for making personnel recommendations, and the board of education is exclusively responsible for acting upon them." *Id.* "The Montgomery County Board of Education is the 'decisionmaker' that either accepts or rejects that recommendation." *Id.* However, if the Board, through the Superintendent, accepts a personnel decision based upon a discriminatory motive, the Board can be held liable. The Court stated, that "[a] discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Hamilton v. Montgomery County Bd of Educ.*, 122 F.Supp.2d 1273, 1280 (M.D. Ala. 2000), citing *Stimpson* at 1331 citing *Zaklama v. Mt. Sinai Med. Center,* 842 F.2d 291, 294 (11th Cir.1998). However, the court also found that there must be a direct causal connection between the recommendation and the actions of the Board. *Id.*

Furthermore, Alabama courts have established that "an interview committee's decision not to recommend a particular candidate could qualify as an adverse employment decision" for the

purposes of a § 1983 claim. *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1286 (M.D. Ala. 2000)

In the instant case, it has been clearly established through the testimony of Barker and Purcell that Barker asserts a great deal of influence over the personnel recommendations. Purcell admitted that because the Board employs such a large number of people, she does not sit down and handle the details with every name and every hire. She reads the list submitted to her by Barker and asks him to alert her to any issues or concerns that stand out before she signs off on his list. Purcell stated that she cannot think of a situation in which she did not hire the person recommended by the Principal. But, she also admitted that she relies on Barker to indicate to her who the Principals recommend. She does not get involved beyond that point. Purcell takes Barker's word as to the recommendations and whether there are any issues of concern and presents the recommendations to the Board.

The Board has shown repeated and deliberate indifference to the discriminatory actions of Barker and to the violation of constitutional and state law. On December 3, 2004, Lowe sent an email to Defendant Purcell advising that Barker had denied his request for professional leave to present at a National School Reform Conference. Lowe informed Purcell that he suspected this denial was Barker's retaliation against Lowe for filing both his EEOC charge and his lawsuit. Purcell ignored the allegations against Barker and failed to respond in any way to Lowe's email. On February 16, 2005, Lowe wrote Purcell requesting a private conference to discuss the pressures being placed upon him due to the lawsuit he had filed against the Board. Purcell again ignored Lowe's plea and did nothing to investigate his Complaint. On June 22, 2005, Lowe again emailed Purcell a third time requesting her intervention. He advised that he was experiencing great difficultly securing a job and was advised by Owens that Barker, through the Central Office, was blocking him

from being placed in a position in retaliation for his filing an EEOC Complaint and lawsuit. Purcell admits that she received the email and also that she did nothing to investigate the allegations contained therein. Purcell testified that she does not investigate all employee complaints and that she handed the email to Barker to investigate the allegations made by Lowe against Barker. Yet, she also testified that official Board policy with regard to grievances pertaining to the Human Resources Department requires the that she, as the Superintendent, conduct an investigation. She justified her failure to act by claiming Lowe's plea was not a grievance as he failed to use that magic word. Purcell admitted she never followed up with Barker or conducted any sort of investigation of her own after handing him Lowe's email. In August 2005, counsel for Lowe wrote to counsel for the Defendant Board to advise that Lowe was having difficulty being placed. The letter indicated that Lowe had been recommended for different positions by Principals who wanted to hire him but was not being hired and Lowe felt that someone at the Central Office was blocking his placement. Purcell admits that she was aware of that letter and that she and Barker may have discussed it. But she just did not get a "sense" that the people working in the Human Resources Department would have retaliated against anyone.

Lowe attempted in every manner possible to get the attention of the Superintendent of Schools, Dr. Carlinda Purcell. He sent pleas and letters via mail, email and even tried to set up a personal conference with the Board appointed individual who is supposed to handle these complaints. Not only did this Board-designated individual ignore Lowe's complaints, she also ignored those of Lowe's attorney. Purcell's inaction shows a blatant indifference to the constitutional violations occurring under her leadership. She cannot claim ignorance, because she was made aware of the allegations against Barker. Yet, she did nothing. She continued to allow

Barker and the Central Office to block Lowe from obtaining placement within the Montgomery Public School System. Neither she nor the Board can claim that they were unaware of the activities of Barker; they were put on notice on multiple occasions. Purcell's act of ignoring the complaints, of failing to investigate the allegations against Barker and the Board's acts of continuing to rubber stamp Barker's recommendations for positions throughout the district manifest their consent and a ratification of Barker's behavior. (Additionally, the Board has designated Barker as its 30(b)(6) corporate representative for the purposes of this litigation. The Board has chosen Barker to speak and act on its behalf as a binding representative.)

### A.    FIRST AMENDMENT VIOLATION

The First Amendment protects the right to petition the government for redress of grievances. The Amendment states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble; and petition the government for a redress of grievances.

U.S. CONST. Amend I. Although the term "petition" is not defined in the Constitution, the Supreme Court has interpreted this clause to include the right of access to the court system stating, "the right of access to the courts is but one aspect of the right to petition. *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

"To establish a First Amendment violation under §1983, an employee must show that: (1) the speech involved a matter of public concern; (2) the employees' free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action." *Cook v. Gwinnett County School Dist,*

-49-

414 F.3d 1313, 1318 (11th Cir. 2005). "The burden then shifts to the employer to show (4) that it would have made the same decision even absent the protected speech." *Id.* The first two factors are questions of law, commonly referred to as the *Pickering/Connick* test. *Id.* The latter two are questions of fact that go to 'whether the alleged adverse employment action was in retaliation for the protected speech.'" *Id.*

There is a split of authority among the circuits with regard to whether the petition clause of the First Amendment is subject to the *Pickering/Connick* analysis. The Supreme Court has not ruled on this issue and the Eleventh Circuit has not clearly established whether the "public concern" analysis required for a violation of the right to "speech" is also required for a violation of the "right to petition." Logic would dictate that government retaliation for filing a petition violates the literal language of the Petition Clause which forbids "abridging ⋯ the right of the people ⋯ to petition the government for a redress of grievances."

In *California Motor*, the Supreme Court stated "we conclude that it would be destructive of rights of association and of petition to hold that groups with common interest, may not, without violating antitrust laws, use the channels and procedures of state and federal agencies and **courts to advocate their causes and points of view respecting resolution of their business and economic interests** vis-a-vis their competitors." *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511-12, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)(emphasis added). Thus, the Petition Clause itself is not generally limited to matters of "public concern" as described in the *Connick* case but includes the petitioner's private business interests.

In *San Filippo v. Bongiovanni,* 30 F.3d 424 (3rd Cir. 1994), the Third Circuit addressed the issue of whether the right to Petition Clause is subject to the public concern analysis applicable to

"speech." That court noted that "San Filippo's expressive conduct was not limited to speech. It included the filing of both lawsuits, and also a grievance under a collective bargaining agreement, against the University and University officials, *activities that implicate the Petition Clause rather than the free speech clause, of the First Amendment.*" *Id.* at 434-35 (emphasis added). The court held that the plaintiff need only establish that the lawsuit is not frivolous in order to establish a *prima facie* case. *Id.*

The First Amendment protects an individual against retaliation for filing a lawsuit because it invokes an individual's constitutional right to petition the government for redress of grievances. *Anderson v. Davila*, 125 F.3d 148, 161-63 (3rd Cir. 1997).

Lowe filed an EEOC charge alleging discrimination and retaliation by the Board on November 15, 2004. This lawsuit was initiated on April 27, 2005 and Defendants received service of same on May 2, 2005. On May 18, 2005, Lowe received his non-renewal letter from Daisy Lawrence. On May 19, 2005, Owens told Lowe that he should not have filed his lawsuit and that Barker ..." Lowe is the only employee of Daisy Lawrence at the time of its closure who was not rehired by the Board. Every other employee whether tenured or non-tenured, certified or not-certified, was placed in another school. The Board was well aware of Lowe's strong desire to be re-employed as evidenced by his repeated emails to that extent and the fact that he applied for every available position for which he was qualified. Yet, despite there being 250 positions for hire that summer, Lowe was not recommended for hire for a single job. Additionally, Lowe was only allowed to interview for four of the available jobs that summer.

The Board gives conflicting and multiple reasons for why Lowe was not hired. Purcell claimed Lowe was not recommended by a Principal, which is the Board policy and practice as

established by the testimony of Purcell, Barker, Owens, Abrams, Sikes and Starks. No other Principal has ever been denied their choice, until Owens chose Lowe.

Purcell later claims that Lowe was not hired because he circumvented the required hiring committee. There is absolutely no evidence that this "reading committee" actually exists. None of the four Principals who were deposed had any awareness of this committee three years after its alleged inception. Owens has never been told that placement of a reading coach required committee approval. There have been no documents which would support the existence of this purported "reading committee." The Board has not produced minutes referencing the committee, committee guidelines or requirements, committee reports or findings or any other person, outside Purcell and Barker, to even state an awareness of the committee.

Barker claimed that Lowe was interviewed by this committee, but the reason he was not hired is because he did not come highly recommended. Barker and Purcell claim that there was a concern because Patterson had an "at-risk" status, which required placement of only a highly qualified reading coach. Barker testified that Lowe's recommendation was "recommended with concern." Again, the pretext is demonstrated by the fact that Lowe has not been interviewed by the reading committee. He was interviewed for a completely separate hiring committee which was required for Assistant Principal positions. Lowe passed the interview and his name was released for hiring. (List of Approved Teachers for Hire, attached hereto as Ex. "Z"). It would also seem unusual for a recommendation from an "administrative assistant" hiring committee whether high or low, to be dispositive of a reading coach as the two jobs require completely different qualifications and skills.

Owens has never been given a reason why Lowe was not hired and has never heard of this committee or the need for a highly recommended candidate. There have been no documents

produced which would support the existence of this committee. The only answer Owens has ever been given is "no" when asked if he could hire Lowe.

Clearly, the reasons given by the Board for not hiring Lowe are pretext for the fact that he was not hired in direct retaliation for the EEOC Complaint and lawsuit filed, as such, summary judgment as to Lowe's First Amendment claim pursuant to Section 1983 is due to be denied.

### B.   FOURTEENTH AMENDMENT

The Equal Protection Clause prohibits intentional discrimination on the basis of race or gender, or in retaliation for exercising one's constitutional rights in opposition to racial or gender discrimination. *Hamilton v. Montgomery County Bd of Educ.*, 122 F.Supp.2d 1273, 1280 (M.D. Ala. 2000), see *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *see also Donnellon v. Freuhauf Corp.,* 794 F.2d 598, 600 (11th Cir. 1986). Intentional race or gender discrimination in the workplace is a clearly established violation of federally protected rights. *See Yeldell v. Cooper Green Hospital, Inc.*, 956 F.2d 1056, 1064 (11th Cir. 1992). The same is true for gender discrimination under the Fourteenth Amendment. Once the plaintiff establishes that the defendant intended to discriminate, the defendant cannot avail himself of qualified immunity. *See Mencer v. Hammons*, 134 F.3d 1066, 1070-71 (11th Cir. 1998); *Reeves v. Thigpen*, 879 F.Supp. 1153, 1174-75 (M.D. Ala. 1995).

To establish intentional discrimination under the Equal Protection clause through § 1983, the plaintiff follows the same proof avenues available under Title VII, 42 U.S.C. § 2000e. *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959, 962 (5th Cir. 1981); *Reeves v. Thigpen*, 879 F.Supp. at 1174-76. This includes establishing a *prima facie* case of discrimination under *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248

(1981); *Reeves v. Thigpen*, 879 F.Supp. at 1153. Where the plaintiff establishes her *prima facie* case and thereafter rebuts the defendant's articulation of a legitimate reason for the adverse act, the plaintiff can then show the articulated reason was pretextual. If she does this, then defendants are not entitled to qualified immunity. *Reeves v. Thigpen, Id.* at 1176.

A defendant's violation of its own policy is evidence that its articulated reason is a pretext for unlawful discrimination. *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1108 (11ᵗʰ Cir. 2001); *Armindo v. Padlocker, Inc.,* 209 F.3d 1319, 1321 (11ᵗʰ Cir. 2000); *Clark v. Bd. of Educ.,* 717 F.2d 525, 528 (11ᵗʰ Cir. 1983). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's articulated justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanders Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000). Summary judgment under such circumstances is improper unless the plaintiff's evidence supporting his *prima facie* case and undermining the employer's articulated reason is so weak and so unsupported by other evidence of discrimination, or the employer's evidence that no discrimination occurred is so strong, that "no rational factfinder could conclude that the action was discriminatory." *Id.*[13]

### 1.   DISCRIMINATION

Lowe applied for multiple positions throughout the Summer of 2003 (within the two year statute of limitations for this claim). Lowe was not allowed to interview for a single position that became available that summer, despite the fact that he met and often far exceeded the requisite

---

[13] Although *Reeves* was decided under the FRCP 50(a) Motion, the same principles apply to motions for summary judgment. *Chapman v. Al Trans.*, 229 F.3d 1012, 1025 (11th Cir. 2000)(en banc).

qualifications. There is no question of the Board's awareness of Lowe's interest in securing employment. Nonetheless, of the thirty-seven candidates hired, thirty-three were female. This pattern was repeated in the Summer of 2004, during which Lowe applied for the thirty different positions with the Board. Of these thirty positions, Lowe was allowed to interview for only three. Furthermore, of the three he was allowed to interview, not one resulted in the placement of a black male.[14] The Board's discriminatory intent is made clear by the pattern and practice of hiring females over males -- as evidenced by the fact that only six men were hired for thirty positions. By blocking Lowe prior to the interview process, the Board can effectively prevent Lowe from being recommended by a Principal which would require the Board to articulate a legitimate reason for not hiring Lowe.

In the Summer of 2004, Lowe applied for an Administrative Assistant position at McKee and was told by Principal Abrams that Lowe would be recommended for hire. However, Abrams later told Lowe that he was told that he had to hire a female to balance the staff. Despite the fact Abrams claimed he did not recommend Lowe nor did he feel Lowe was qualified to hold the position, he attempted to hire Lowe for the very next available position at his school.[15] Abrams' denial evidences pretext.

Lowe was not even given the opportunity to apply for an administrative position at Thelma Smiley Morris School because the Principal was permitted to hire a female, Denitta Easterling, who

---

[14] See listing of positions and applicants hired in Section II, C(2); Section II, D.

[15] The EEOC complaint filed by Pam Cloud further evidences the Board's intent to discriminate and the fact that it is the Board's policy and practice to make race and gender conscious decisions.

had served as the summer school Principal at that school (albeit while she was not certified for that position.) The Board did not give Lowe the opportunity to interview for this position and continued to accept the Principal's recommendation despite the fact that this individual had circumvented the Board's prescribed policy. The Board permitted her to continue the interview process for hire while still in the process of obtaining her certification. (Lowe, however, was prevented from continuing in the process by Barker for the two special education positions due to the fact that he did not have his certification at the time).

However, in the Summer of 2005, Lowe applied for and was interviewed for a special education teaching position at Lee High School with Principal Sikes and at McKee Junior High with Principal Abrams. Both Sikes and Abrams testified that Lowe had a good interview and they sought to hire him. However, both also testified that when they called the Board to inquire about Lowe's certification, they were told that he was not certified and, therefore, not a viable candidate. Unlike Easterling's experience at Thelma Smiley, Lowe's interview process stopped at that point.

Lowe also applied for, was interviewed and was recommended for hire by Owens in the Summer of 2005. However, the Board refused to accept Owens' recommendation and offered multiple, conflicting reasons for denying Owens' recommendation. The Board hired a white female to fill this position. This argument is set out fully herein at Section II, E.

The position for which Lowe applied at Southlawn Middle School is another example of the Board's discriminatory animus in that the Principal told Lowe she had to hire this female due to her lawsuit. Furthermore, the Principal stated that the successful female candidate was one of two recommendations, which again is contrary to the Board's purported policy of requiring Principals to submit three names for hire.

-56-

Of the thirty positions for which Lowe applied during the Summer of 2004, he was only allowed to interview for three, and of the three interviews Lowe actually granted, not a single male was hired to fill the positions and one of the three positions has never been filled. A **female** was hired for **twenty-two** positions. In each position Lowe was qualified through education, certification and experience for these positions. Each position involved an increase in pay and promotion. (This argument is discussed more fully in Section II, C (2).

Additionally, the information brought to light by Cloud's sworn EEOC Complaint supports Lowe's contention that the Board illegally makes race and gender conscious hiring decisions.

### 2.    RETALIATION

Lowe filed his EEOC Complaint alleging race and gender discrimination on November 15, 2004 and filed this suit on April 27, 2005. Within two weeks of the Board's receipt of service of this suit, Lowe was non-renewed. Lowe was the only Daisy Lawrence employee, certified or not, that was not placed in another school after the closing and was not rehired by the Board. Barker encouraged Lowe to continue to apply for positions with the Board and indicated that he would try to help Lowe secure placement. Barker ensured Lowe would not be hired by only allowing Lowe to interview for four of the 200-250 positions posted by the Board. By blocking Lowe prior to the interview process, the Board can effectively prevent Lowe from being recommended by a Principal which would require the Board to articulate a legitimate reason for not hiring Lowe.

Of the four interviews Lowe was given in 2005, all four Principals told Lowe that they intended to recommend him for hire to Barker. However, only Owens stood by this statement and affirmed it in his deposition testimony. Abrams denies that Barker persuaded him from hiring Lowe by instructing Abrams to hire a female to balance out the staff. Abrams again attempted to hire

-57-

Lowe with respect to a special education position; however, Barker informed Abrams that Lowe was not available for hire because he was not properly certified to teach special education. Sikes also testified that Lowe had a good interview and he sought to recommend Lowe for hire until Barker informed him that Lowe was not properly certified. However, the lack of certification did not stop Denita Easterling from continuing in the employment process to secure the administrative position at Thelma Smiley Morris while awaiting certification.

Furthermore, the Board argues that Lowe was not a viable candidate because he did not possess the proper special education certification. The Board further argues that although Lowe claims he is eligible for emergency special education certification, he has yet to seek such certification himself. However, as the Board is well aware, an individual is unable to obtain emergency special education certification on their own behalf without the authorizing/supporting signature of a school board. Lowe attempted to ascertain from the Alabama State Department of Education whether he was eligible for an emergency certificate; however, he was advised that the requisite paperwork had to be authorized by whichever school required the certificate. However, it is acknowledged by the Board that Lowe's doctoral degree which will be conferred in June, 2006, is in special education.

### 3. DISPARATE PAY

"Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situation and that there is no rational basis for the difference in treatment." *Ex parte Cathy McCord-Baugh*, 894 So.2d 679, 683 (Ala. 2004); see *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989). "In

doing so, we have explained that the purpose of the equal protection clause of the Fourteenth
Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary
discrimination, whether occasioned by express terms of a statute or by its improper execution
through duly constituted agents." *Id.* citing *Sioux City Bridge Co., supra,* at 445 (quoting *Sunday
Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352 (1918).

In order to establish a claim for the violation of federal equal protection to a class of one, the
plaintiff need only show that he has been "intentionally treated differently from others similarly
situated and that there is no rational basis for the difference in treatment. *Ex parte McCord-Baugh,*
at 686, *citing Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073.

In the instant matter, the Board has treated Lowe differently for the sole purpose of
discriminating against him. Lowe interviewed and was recommended for a position as a reading
coach at Daisy Lawrence by Owens. However, unbeknownst to either Lowe or Owens, the Board
arbitrarily determined that Lowe's position would be a teacher-tutor. The Board continued to pay
Lowe as a teacher-tutor for the period of his contract and again the following year when the contract
was automatically renewed due to the Board's error. The setting of Lowe's salary as a teacher-tutor
was done intentionally, arbitrarily, capriciously and irrationally in an effort to discriminate against
Lowe. Other reading coaches were paid reading coach salaries. Lowe was similarly situated to other
reading coaches in that he performed all the duties of a reading coach, attended the meetings held
especially for reading coaches, was evaluated by his Principal as a reading coach and continues to
get emails from the Board directed exclusively to reading coaches. Nevertheless, for some irrational
and wholly arbitrary reason, Lowe was not compensated as a reading coach. The Board's actions

in paying Lowe less than other reading coaches are not rationally related to any legitimate government interest.

Defendants have offered no evidence to establish that this disparate treatment served a legitimate government interest and, as such, summary judgment as to Plaintiff's Fourteenth Amendment claim brought pursuant to 42 U.S.C. § 1983 is due to be denied.

## IV.    STATE LAW CLAIM

The Alabama Supreme Court has held that a Board of Education is not legally required to follow any prescribed policies or procedures absent procedures self-imposed by Board adoption. *Belcher v. Jefferson County Bd. of Educ.,*474 So.2d 1063, 1068 (Ala. 1985) *citing Walker County Bd. of Educ. v. Walker County Educ. Assoc.,* 431 So.2d 948 (Ala. 1983). "The public- school board's adoption of policies and procedures, known to and relied upon by an employee may, under appropriate facts, give rise to implied, contractual terms of employment between the school board and the employee. *McCord-Baugh v. Birmingham City Bd. of Educ.,* 894 So.2d 672, 677 (Ala.Civ.App. 2002) (reversed in part on other grounds). Furthermore, Alabama courts have held that a school-board employee had a cognizable suit against the board for failure to follow its sick leave policy, holding, "when the school board adopted the sick leave policy and published notice of that policy to its employees, the policy became specifically enforceable under the doctrine of *Belcher v. Jefferson County Bd. of Educ.,* 474 So.2d 1063 (Ala. 1985)." *McCord-Baugh* at 677.

The Board has adopted policies with regard to the positions of "reading coach" and "teacher-tutor." According to Barker, a reading coach is distinctive from a teacher-tutor and has distinct characteristics, responsibilities and compensation. The Board policy is to pay persons who perform

-60-

reading coach duties a certain amount of money. Lowe performed the duties of and was evaluated as a reading coach but was not paid as such.

However, Lowe performed the duties of a reading coach. Owens testified that Lowe performed all of the duties of a reading coach. Lowe testified that he attended meetings for reading coaches and continues to receive emails from the Board directed solely to "reading coaches." nonetheless, the Board clings tight to its contention that Lowe was a teacher-tutor.

## CONCLUSION

Based upon the foregoing, Plaintiff Melvin A. Lowe, respectfully requests this Court deny

Defendants' Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED**, this the 5th day of May, 2006.

**WILLIAM F. PATTY (PAT038)**
Attorney for Plaintiff Melvin Lowe

**OF COUNSEL:**
BEERS, ANDERSON, JACKSON,
   PATTY & VAN HEEST, P.C.
P.O. Box 1988
Montgomery, AL 36102-1988
334-834-5311 (phone)
334-834-5362 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT has been served upon all parties to this action by depositing a copy of same in the U.S. Mail, postage prepaid, addressed as follows:

James R. Seale, Esq.
HILL, HILL, CARTER, FRANCO, COLE & BLACK
P. O. Box 116
Montgomery, AL 36101-0116

on this the 5th day of May, 2006.

**OF COUNSEL**