# EXHIBIT

# A

# Condensed Transcript

# Deposition of

# Melvin Alonza Lowe, III
## Volume 1

## January 3, 2006

## Melvin Lowe
### v.
## Montgomery County Board of Education, et al.

## Case No. 2:05-CV-0495



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


MELVIN LOWE,

      Plaintiff,

vs.          CASE NO. 2:05-CV-0495

MONTGOMERY COUNTY BOARD

OF EDUCATION, et al.,

      Defendants.

**2**

herein.

\*   \*   \*   \*   \*   \*   \*

APPEARANCES

Representing the Plaintiff:

    MR. WILLIAM F. PATTY
    MS. TANYA DUGAS
    Attorneys at Law
    Beers, Anderson, Jackson, Patty
     & Van Heest
    250 Commerce Street
    Suite 100
    Montgomery, Alabama 36104

Representing the Defendants:

    MRS. ELIZABETH B. CARTER
    Attorney at Law
    Hill, Hill, Carter, Franco,
     Cole & Black, P.C.
    425 South Perry Street
    Montgomery, Alabama 36104


Also present:
    Mr. Jimmy Barker

**250**

\*   \*   \*   \*   \*   \*   \*   \*


The deposition of MELVIN ALONZA LOWE,

III, was taken before Cornelia J. Baker,

Certified Court Reporter and Certified

Shorthand Reporter, as Commissioner, on

Tuesday, January 3, 2006, commencing at

approximately 9:41 a.m., in the law

offices of Beers, Anderson, Jackson,

Commerce Street, Montgomery, Alabama,

pursuant to the stipulations set forth

**3**

\*   \*   \*   \*   \*   \*   \*   \*


STIPULATIONS


It is hereby stipulated and

agreed by and between counsel

representing the parties that the

deposition of MELVIN ALONZA LOWE, III, is

taken pursuant to the Rules of Civil

Procedure, and that said deposition may

be taken before Cornelia J. Baker,

Pages 1 to 3

334.262.3332    Baker & Baker Reporting and Video Services, Inc.    334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

**4**

Certified Court Reporter, as Commissioner, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered into evidence, or used for any other purpose by either party hereto, provided by the Statute.  It is further stipulated and agreed by and between counsel representing the parties in this

case, that the filing of the deposition

of MELVIN ALONZA LOWE, III, is hereby

waived, and that said deposition may be

introduced at the trial of this case or

used in any other manner by either party

hereto provided for by the Statute,

regardless of the waiving of the filing

of same.

It is further stipulated and agreed

by and between counsel and the witness that the reading and signing of the deposition by the witness is hereby waived.

*  *  *  *  *  *  *  *

**5**

*   *   *   *   *   *   *   *

I N D E X
EXAMINATION                    PAGE

BY MRS. CARTER:          10
BY MR. PATTY:            393
BY MRS. CARTER:          401

EXHIBIT                    PAGE

Defendants' Exhibit No. 1 .......... 90
    AEA/Lowe 00383, Montgomery Public
    Schools Personnel Change Form

Defendants' Exhibit No. 2 .......... 91
    AEA/Lowe 00378-00379, 2/22/03

**6**

letter entitled Specific Letter of
Appointment, Re-Hire, to Melvin
Lowe from Jimmy Barker, and
11/12/03 letter entitled Specific
Letter of Appointment, Re-Hire
Correction, addressed to Melvin
Lowe from Jimmy Barker

Defendants' Exhibit No. 3 .......... 128
    AEA/Lowe 00336, 00362, 00363 &
    00386, 2/21/02 letter to Melvin
    Lowe from Jimmy Barker, Re: Paid
    Leave of Absence, and 3/18/02
    letter to Melvin Lowe from Jimmy
    Barker, Re: Letter of Reprimand

Defendants' Exhibit No. 4 .......... 141
    AEA/Lowe 00375, Montgomery Public
    Schools Personnel Change Form

Defendants' Exhibit No. 5 .......... 150
    8/2/04 letter to U.S. Equal
    Employment Opportunity Commission
    from Melvin Alonza Lowe, III

Defendants' Exhibit No. 6 .......... 151
    AEA/Lowe 00050-00054, 8/03/04 letter
    from Melvin Alonza Lowe, III

Defendants' Exhibit No. 7 .......... 152
    AEA/Lowe 00055-00062,
    Addendum-Complaint of Employment
    Discrimination

Defendants' Exhibit No. 8 .......... 154
    AEA/Lowe 00114, 10/11/04 Charge of
    Discrimination

Defendants' Exhibit No. 9 .......... 155
    AEA/Lowe 00115,10/11/04 letter to
    Mrs. Vanessa B. Hannah at U.S.
    Equal Employment Opportunity
    Commission from Melvin Alonza Lowe,
    III

Pages 4 to 6

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

7

Defendants' Exhibit No. 10 ......... 156
    AEA/Lowe 00131-00132,11/12/04
    Charge of Discrimination

Defendants' Exhibit No. 11 ......... 159
    Dismissal and Notice of Rights and
    Notice of Suit Rights

Defendants' Exhibit No. 12 ......... 278
    AEA/Lowe 00388-00391, Re: Highly
    Qualified Application

Defendants' Exhibit No. 13 ......... 292
    AEA/Lowe 00371, May 27, 2002 letter
    to Melvin Lowe from Clinton Carter,
    Re:  Non-Renewal of Contract

Defendants' Exhibit No. 14 ......... 292
    AEA/Lowe 00316, 6/03/02 letter to
    Mr. Jimmy Barker from Melvin Alonza
    Lowe, III

8

Defendants' Exhibit No. 19 .......... 295
    AEA/Lowe 00217, 6/22/05 e-mail to
    Carlinda Purcell from Melvin A.
    Lowe

Defendants' Exhibit No. 20 ......... 302
    AEA/Lowe 00216, 6/22/05 e-mail to
    Jimmy Barker and Carlinda Purcell
    from Melvin A. Lowe

Defendants' Exhibit No. 21 .......... 302
    AEA/Lowe 00219, Letter of
    Recommendation from Dr. James Owens

Defendants' Exhibit No. 22 ......... 303
    AEA/Lowe 00255, 6/26/05 letter to
    Mr. Barker from Melvin Alonza Lowe,
    III

Defendants' Exhibit No. 23 .......... 304
    AEA/Lowe 00302, 7/29/05 letter to
    Mr. Barker from Melvin Alonza Lowe,
    III

7

Defendants' Exhibit No. 15 ......... 293
    AEA/Lowe 00368, 5/19/04 letter to
    Mr. Melvin A. Lowe, III from
    Clinton Carter

Defendants' Exhibit No. 16 .......... 293
    AEA/Lowe 00411, 5/19/04 letter to
    Mr. Jimmy Barker from Melvin Alonza
    Lowe, III

Defendants' Exhibit No. 17 .......... 294
    AEA/Lowe 00410, 6/23/04 e-mail to
    Jimmy Barker and Carolyn M. Hicks
    from Melvin A. Lowe

Defendants' Exhibit No. 18 ......... 247
    AEA/Lowe 00374, 8/17/04 letter to
    Melvin A. Lowe from Jimmy Barker

8

Defendants' Exhibit No. 24 ......... 304
    AEA/Lowe 00309, 8/9/05 letter to
    Mr. Jimmy Baker from Melvin Alonza
    Lowe, III

Defendants' Exhibit No. 25 ......... 305
    AEA/Lowe 00419-00420, 8/25/05
    letter to Dr. James C. Owens from
    Melvin Alonza Lowe, III

Defendants' Exhibit No. 26 ......... 309
    Composite Exhibit

Defendants' Exhibit No. 27 ......... 309
    AEA/Lowe 00241-00294, Composit
    Exhibit

Defendants' Exhibit No. 28 ......... 310

Pages 7 to

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3333
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists    888.253.337

Melvin Alonza Lowe, III
January 3, 2006

9

AEA/Lowe 00220, 6/23/05 e-mail to
Jimmy Barker and Carlinda Purcell
from Melvin A. Lowe

Defendants' Exhibit No. 29 ......... 310
AEA/Lowe 00221, 6/23/05 e-mail from
Jimmy Barker to Melvin A. Lowe

Defendants' Exhibit No. 30 ......... 313
Composite Exhibit

Defendants' Exhibit No. 31 ......... 319
Composite exhibit

Defendants' Exhibit No. 32 ......... 323
Composite Exhibit

Defendants' Exhibit No. 33 ......... 324
AEA/Lowe 00151-00152, National
School Reform Conference Plan for
Presenting

Defendants' Exhibit No. 34 ......... 326

10

Lowe from Carlinda Purcell

Defendants' Exhibit No. 39 .......... 334
Composite Exhibit

Defendants' Exhibit No. 40 .......... 336
Composite Exhibit

Defendants' Exhibit No. 41 .......... 337
Resumes

Defendants' Exhibit No. 42 .......... 338
AEA/Lowe 00014, 00015, 00311,
Professional Educator Certificates

Defendants' Exhibit No. 43 .......... 339
2/4/05 letter to Dr. Carlinda
Purcell from Melvin Alonza Lowe

Defendants' Exhibit No. 44 .......... 340
2/16/05 letter to Dr. Carlinda
Purcell from Melvin Alonza Lowe

9

AEA/Lowe 00434-00440

Defendants' Exhibit No. 35 ......... 326
AEA/Lowe 00423-00433

Defendants' Exhibit No. 36 ......... 329
AEA/Lowe 00156-00159

Defendants' Exhibit No. 37 .......... 332
AEA/Lowe 00146-00147, 12/03/04
e-mail to Melvin A. Lowe from Mike
Looney, and 12/03/04 e-mail to
Melvin A. Lowe from Judith Harwood

Defendants' Exhibit No. 38 ......... 332
AEA/Lowe 00148-000150, 12/03/04
e-mail to Carlinda Purcell from
Melvin A. Lowe, 12/03/04 e-mail to
Judith Harwood from Melvin Lowe,
and 12/03/04 e-mail to Melvin A.

11

1  COURT REPORTER:  Usual
2      stipulations?
3      (Whereupon all parties
4      agreed to usual
5      stipulations.)
6  MELVIN ALONZA LOWE, III,
7  The Witness, having first been duly
8  sworn or affirmed to speak the truth,
9  the whole truth, and nothing but the
10  truth, testified as follows:
11          EXAMINATION
12  BY MRS. CARTER:
13 Q.  Hi, Mr. Lowe.  My name is Elizabeth
14      Carter.  I'm sorry I'm running a few
15      minutes late this morning.  I represent
16      the Montgomery County Board of Education
17      in a lawsuit that you've filed against
18      them.
19          And I'm sure your attorneys
20      explained this to you, but I'll be
21      taking your deposition today and asking
22      you about the claims that you're making,
23      okay?

Pages 9 to 1

12

1  A. Okay.
2  Q. I talk really fast, and the longer I go,
3    the faster I talk. So do not -- it
4    won't embarrass me if you tell me I'm
5    talking too fast, or she might tell me.
6    I've gotten better, but I still talk way
7    too fast.
8        If I ask a question that you
9    don't understand, please let me know.
10   If you need to use the restroom, if you
11   need to talk to your lawyer -- I mean,
12   it's obviously formal, because this is
13   your sworn testimony, but it's informal
14   in the sense that if you need a break or
15   you need me to clarify something, just
16   feel free to ask me, okay?
17 A. Okay.
18 Q. Please state your full name for me.
19 A. Melvin Alonza Lowe, III.
20 Q. Okay.
21 A. A-L-O-N-Z-A.
22 Q. Okay. And where do you live?
23 A. At 9536 Colleton Place, Montgomery,

13

1    Alabama, 36117.
2  Q. And who lives there with you?
3  A. I live alone.
4  Q. Okay. How long have you lived at that
5    residence?
6  A. It's going into my fifth year.
7  Q. And what's your date of birth?
8  A. May 13th, 1973.
9  Q. And what's your Social Security number?
10 A. 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.
11 Q. Are you married?
12 A. No.
13 Q. Have you ever been married?
14 A. No, I haven't.
15 Q. Tell me where you went to high school.
16 A. St. Jude -- I graduated from St. Jude
17   Catholic High School. I began my high
18   school matriculations at Jeff Davis High
19   School.
20 Q. And what year did you graduate?
21 A. May of 1991.
22 Q. And where did you go to college?
23 A. I attended Alabama State University and

14

1    Nova Southeastern University.
2  Q. What type of degree did you receive from
3    Alabama State University?
4  A. My Bachelor's, my Master's, and my
5    Specialist.
6  Q. Okay. What did you receive your
7    Bachelor's in?
8  A. Elementary Education.
9  Q. And what year did you receive that?
10 A. 1999.
11 Q. And would that have been the Spring of
12   '99?
13 A. That was Spring of '99.
14 Q. Okay. And when did you receive your
15   Master's?
16 A. 2001.
17 Q. And what did you get a Master's in?
18 A. Educational Administration and
19   Supervision.
20 Q. And did you receive any other -- oh, you
21   said you got your Education Specialist
22   degree there. How many more years after
23   your Master's degree did you have to go

15

1    to school to get your Education
2    Specialist degree?
3  A. I would have to look at the curriculum
4    and then look at the transcript to see
5    the years. It might have been maybe a
6    year and a half.
7  Q. Okay. So what year did you graduate
8    with an Education Specialist?
9  A. That was 2005.
10 Q. What month? Do you remember?
11 A. We are now January. It should have been
12   conferred, I think maybe in November.
13 Q. And what was -- is there any kind of
14   particular category that your Education
15   Specialist degree is in?
16 A. Ed Administration.
17 Q. So that just happened?
18 A. Just happened.
19 Q. The completion of it. Okay. You said
20   you went -- any other degrees or
21   special --
22 A. Nova Southeastern University with an
23   Ed.D.

Pages 12 to 15

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

16

1  Q. Okay. Hold on. Let me ask you this:
2     Are there any other degrees that you
3     received at Alabama State University --
4  A. No.
5  Q. -- that you haven't already told me
6     about?
7  A. No.
8  Q. All right. And then you went to Nova?
9  A. Nova Southeastern University.
10 Q. Is that a university that you did on
11    line or through the mail?
12 A. No. I attended campus in Atlanta,
13    Georgia, and I even had to attend campus
14    in Ft. Lauderdale, Florida.
15 Q. Where is their main campus?
16 A. They have two campuses, Ft. Lauderdale,
17    Florida, and South Miami Beach.
18 Q. Okay. Did you do some of the courses
19    through correspondence?
20 A. All of the courses were site courses,
21    except for maybe the few that had to be
22    taken on line. All courses were site
23    courses in Atlanta, Georgia.

17

1  Q. Okay. And what degrees did you receive
2     from Nova?
3  A. That's the Educational Doctorate.
4     Graduation is June -- is June of '06.
5  Q. So you're working on your Doctorate
6     there?
7  A. No. It's completed.
8  Q. So you've received a Doctorate from
9     Nova?
10 A. I graduate in June. That's when the
11    commencement ceremony is. I'm finished.
12    Everything is finished.
13 Q. Okay.
14 A. Graduation is '06 of June.
15 Q. Any other degrees you received from
16    Nova?
17 A. That is it.
18 Q. When did you start the Doctorate program
19    at Nova?
20 A. January of '04.
21 Q. Okay. I take it that you did not have
22    to have the Education Specialist degree
23    to begin your Doctorate program at Nova?

18

1  A. I only had to have a Master's.
2  Q. Okay. So those are two separate
3     programs?
4  A. The Specialist and the Doctorate?
5  Q. Yes.
6  A. Yes. As with the Master's and the
7     Bachelor's.
8  Q. Any other universities or colleges that
9     you've attended?
10 A. I'm currently enrolled at Troy State,
11    Montgomery campus.
12 Q. Okay.
13 A. To pursue a Master's of Science in adult
14    education.
15 Q. Are all of the degrees that you've
16    received and worked on up until the
17    point that you enrolled at Troy
18    involving K through twelve?
19 A. My Bachelor's certification is one
20    through six. The Master's certification
21    is P through twelve. Second endorsement
22    with double A certification with a
23    specialist, P through twelve. The

19

1     Doctorate degree is in Educational
2     Leadership with two areas of
3     specialization, Special Education
4     Administration and Technology Trends and
5     Issues. It does not hold any particular
6     certifications, because I already have
7     certification. I didn't have to apply
8     for any additional certifications.
9  Q. Okay. So your Doctorate has two
10    categories. The first was Special
11    Education Administration --
12 A. Administration as a specialization. And
13    the second is Technology Trends and
14    Issues in Education.
15 Q. Did you have to present a paper?
16 A. A dissertation.
17 Q. A dissertation. And do you have a copy
18    of that?
19 A. Sure.
20 Q. And that's already been presented?
21 A. Concept paper proposals one, two, and
22    three.
23 Q. And so now you're currently working on a

Pages 16 to 1

20

1    Master's of Science in adult education
2    at Troy?
3  A. Yes. With the Master's, I forgot to
4     tell you that it holds superintendent
5     certification.
6  Q. With your Master's degree from Alabama
7     State?
8  A. Yes. P-twelve certification
9     administration, in addition to
10    superintendent certification.
11 Q. Explain that to me. I guess when you
12    get -- or you reach a certain degree or
13    obtain a certain level of education,
14    then you can apply for certifications
15    that relate to the level of education
16    you've just completed; is that right?
17 A. With the Master's, with the
18    certification rules changing
19    periodically, when I applied for initial
20    certification with the Master's program,
21    superintendent certification was granted
22    based on the coursework that I had
23    completed.

21

1  Q. Okay. And is that something that you
2     had to apply for on top of receiving the
3     Master's degree?
4  A. It was with the Master's degree.
5  Q. Okay. So you just get that when you get
6     the Master's degree?
7  A. In education administration supervision.
8  Q. Okay. Are you certified to teach
9     Special Education?
10 A. Under an emergency certificate, I am.
11 Q. Tell me what you mean by that.
12 A. An emergency certificate, based on my
13    prior certification and teacher
14    education and my prior coursework in
15    education, I meet the requirements for
16    an emergency certificate in Special
17    Education per the State of Alabama.
18 Q. Well, if you were going to get an
19    emergency certificate, that would be if
20    they had to have you, right? I mean, in
21    an emergency situation; is that what
22    you're talking about?
23 A. That all depends on what the Human

22

1     Resources office would define as an
2     emergency situation.
3  Q. Okay. Fair enough. So you don't have,
4     sitting here today or up until this
5     point, if I understand your testimony
6     correctly, you don't have a
7     certification to teach Special Education
8     without getting an emergency
9     certification?
10 A. To teach Special Education, all I would
11    need is a teaching certificate. The
12    emergency certification would just be
13    the process of certifying me. I clearly
14    meet qualifications to -- I've never
15    applied for Montgomery County for any
16    emergency certificate in Special
17    Education.
18 Q. Okay. So my question is: Have you ever
19    been certified to teach Special
20    Education under any circumstances?
21 A. When I taught in Bullock County, they
22    were in the process of certifying me for
23    an emergency certificate in Special

23

1     Education prior to --
2  Q. Okay. Did you become -- go ahead.
3  A. -- returning to Montgomery County.
4  Q. Did you ever become certified to teach
5     Special Education at any time up until
6     today?
7  A. No.
8  Q. Okay. When you graduated in 1991, did
9     you go straight to college?
10 A. Yes, I did.
11 Q. Okay. From 1991 until the time that you
12    graduated in 1999, what type of -- tell
13    me about the jobs that you held. We're
14    not going to go back to high school, but
15    during those college years, the type of
16    jobs that you held.
17 A. I worked for Attorney Massey, W. Troy
18    Massey, for a period of four -- for four
19    years. I worked for Dr. Janice Franklin
20    at Alabama State University, who is
21    now -- she's director of the university
22    library programs. And I think I worked
23    for Columbia Regional Hospital.

Pages 20 to 23

24

1  Q. Back before they were bought by -- it's
2      escaping me -- Baptist Health?
3  A. Well, I worked at the location downtown,
4      so it's now closed.
5  Q. Yeah. What years did you work for Troy
6      Massey? You said four years?
7  A. Towards the end of completing my
8      undergraduate degree. I would have to
9      look back.
10 Q. So did you work for him part-time while
11     you were going to college?
12 A. Yes, I did.
13 Q. And what type of job responsibilities
14     did you have for Mr. Massey?
15 A. Anything from possibly running errands,
16     to sitting in on depositions for opening
17     and closing cases, preparing documents
18     for court, litigated issues and
19     concerns.
20 Q. Okay. And what about Dr. Franklin --
21     excuse me -- yeah, Dr. Franklin?
22 A. I worked as a student office assistant.
23 Q. And what about Columbia Regional

25

1      Hospital?
2  A. I worked as a registrar.
3  Q. Any other jobs you had from '91 to '99?
4  A. I constantly worked for Liz Claiborne
5      Fragrances and Cosmetics.
6  Q. And tell me about that.
7  A. Just a weekend job in the department
8      stores working in the fragrance
9      department.
10 Q. Okay. And what department stores? Is
11     that here in Montgomery?
12 A. Working for the company. I didn't work
13     for any of the local stores. I worked
14     through the local stores. Any stores
15     between Belk's; Parisian's, now
16     Dillard's; Gayfers; J.C. Penney's. Even
17     in the Birmingham area, the Macy's, the
18     Richie stores.
19 Q. Okay. What office would you report to?
20 A. With Liz Claiborne?
21 Q. Yes. I'm sorry.
22 A. We basically worked out of the corporate
23     office. My direct and immediate

26

1      supervisor was Kathy Riley (phonetic)
2      out of Birmingham, Alabama.
3  Q. Was there a corporate office for Liz
4      Claiborne in Birmingham?
5  A. No. The corporate office, I believe,
6      was in New York. I'm not certain, but I
7      believe it was in New York.
8  Q. Do you still have any check stubs or any
9      kind of financial information from being
10     paid by Liz Claiborne?
11 A. Yes.
12 Q. -- that would reflect addresses?
13 A. Through Randstad, which is a payment
14     company that processes our -- they
15     process the time verifications.
16 Q. What year did you begin working for Liz
17     Claiborne?
18 A. I would have to look back at some of
19     those stubs, because it has been an
20     extensive period.
21 Q. So do you still work for them now?
22 A. I'm still under contract.
23 Q. Okay. And tell me what that means. I

27

1      apologize for my stupidity. I'm just
2      not sure what you're talking about.
3      What do you do?
4  A. As the economy changes, if there's an
5      increase in budget allocations, we will
6      receive allocations to work X number of
7      hours in a department store. So it can
8      vary.
9  Q. And how are you contacted? So in other
10     words, you're on contract with them,
11     you're educated or versed in what you're
12     supposed to do as a representative of
13     them, and you might get a phone call
14     that says you can go work eight hours
15     selling the product in X store?
16 A. They will give a call and say, We are
17     going to try to work X number of hours
18     over X amount of months, what can you do
19     for us? How can you work? Present to
20     us a schedule.
21 Q. Okay. And that's something that you do
22     now?
23 A. I'm still under contract. Because the

Pages 24 to 27

28

1    budget has been cut severely, I haven't
2    worked in at least three or four months.
3    I would have to check my records to see
4    when was the last date that I worked.
5  **Q. But that's something you have records on**
6    **in regards to how much money you've**
7    **earned from them over --**
8  A. Oh, yes.
9  **Q. -- a certain number of years?**
10 A. Because it is filed through income tax.
11 Q. Okay.
12       MR. PATTY: Melvin, be sure
13            to let her finish her
14            question before you --
15            before you answer.
16       MRS. CARTER: Yeah, we're
17            going to get on a roll.
18            I'm sorry, I should
19            have said something
20            sooner, but I was
21            following you, so . . .
22            She'll kick me.
23

29

1    BY MRS. CARTER:
2  **Q. Any other place that you would have**
3    **generated income from '91 to '99?**
4  A. I worked for Interface Cosmetics.
5  **Q. And where is their main office?**
6  A. If I stand corrected, the main office is
7    in Long Island, New York.
8  **Q. Okay. And what did you do for them?**
9  A. I was a celebrity makeup artist.
10 **Q. Okay. And as a celebrity makeup artist,**
11   **what did you do? Did you actually apply**
12   **makeup to people?**
13 A. I traveled with the company in my area,
14   which was Atlanta, Georgia; New Orleans,
15   Louisiana; Birmingham; Montgomery;
16   Mobile.
17 **Q. And you applied makeup?**
18 A. Yes.
19 **Q. Okay. Would you do that in department**
20   **stores?**
21 A. In the department stores, or if there
22   was a celebrity event where -- that
23   Interface Cosmetics was sponsoring a

30

1    particular event, we would work out of
2    the department store.
3  **Q. And apply --**
4  A. Away from a department store.
5  **Q. Oh, I gotcha.**
6  A. On location.
7  **Q. On location. Where you would do the**
8    **makeup to the people there?**
9  A. Yes.
10 **Q. And what year -- at what time frame did**
11   **you work for Interface Cosmetics?**
12 A. I would have to go and pull my income
13   tax records, because that, too, was over
14   an extensive period of time.
15 **Q. Have you worked for Interface Cosmetics**
16   **since 1999?**
17 A. Yes. Yes, I would have to check my
18   records. I believe so.
19 **Q. And can you tell us when was the last**
20   **time you worked for them?**
21 A. I would have to check my records. The
22   company was consolidated. I don't
23   remember what year, but I would have to

31

1    check my financial records.
2  **Q. But you're not currently working for**
3    **Interface?**
4  A. No, I'm not. Nor Liz Claiborne.
5  **Q. Okay. So you're not working for Liz**
6    **Claiborne right now?**
7  A. I'm just under contract. I'm not
8    working.
9  **Q. Okay. And when you say you're under**
10   **contract for Liz Claiborne, that means**
11   **that they could work you if they needed**
12   **you or wanted to?**
13 A. Yes.
14 **Q. So you've never been terminated from**
15   **there?**
16 A. No.
17 **Q. What about Interface, have you ever been**
18   **terminated from Interface?**
19 A. No.
20 **Q. Have you ever been terminated from any**
21   **job that you held, other than we'll get**
22   **into the school board work in a minute,**
23   **but any . . .**

Pages 28 to 31

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3333
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

32

1  A. Let me reflect. Are we talking about
2     those jobs that I've just listed for you
3     during my college experiences?
4  Q. Yes. I'm not concerned with high
5     school.
6  A. No.
7  Q. Okay. Were you ever terminated from a
8     job from high school, let me ask you
9     that, when you were in high school?
10 A. I didn't work while I was in high
11    school.
12 Q. Okay. So to your knowledge, sitting
13    here today, you've never been terminated
14    from a job except for when you worked --
15 A. Not to my knowledge.
16 Q. -- for the Board?
17 A. No, ma'am.
18 Q. Okay.
19        MR. PATTY: Be sure to let
20        her finish her
21        question.
22    THE WITNESS: Yes.
23    MRS. CARTER: Yeah, I know.

33

1           It doesn't bother me,
2        but she's trying to
3        write down what I say.
4        And it will read really
5        bad if I haven't
6        finished my question
7        before you answer.
8     BY MRS. CARTER:
9  Q. Okay. Any other people that you've
10    worked for or entities that you've
11    worked for between 1991 and 1999 that
12    you haven't already told me about?
13 A. I think I've done my best to recall all
14    of those.
15 Q. All right. So when you graduated from
16    Alabama State in the Spring of '99, you
17    then made application to the Montgomery
18    County Board of Education for a teaching
19    position; is that correct?
20 A. I believe that when I graduated. I
21    can't recall. I would have to look at
22    some records to see when I made first
23    application, but it was shortly after I

34

1     graduated.
2  Q. Okay. Well, when's the first time that
3     you got a job with the Montgomery County
4     Board of Education?
5  A. My first employment with Montgomery
6     County was my first teaching assignment
7     on August of 1999.
8  Q. Okay. And you were assigned to what
9     school?
10 A. Daisy Lawrence.
11 Q. And who hired you?
12 A. (No immediate response.)
13 Q. Who did you communicate with to learn
14    that you had gotten the job in August of
15    '99?
16 A. There were actually several people
17    involved. Ms. Lois Johnson, who was
18    assistant superintendent at that time
19    over the Office of Student Support, her
20    office hired me. The particular
21    individual, there were several on the
22    interview panel. But she was over that
23    department.

35

1           And let me -- I don't know if
2        we want to count the short-term
3        substitute teaching that I did with
4        Montgomery County prior to my . . .
5  Q. Yeah, we'll get that. We'll get that.
6     I'm sorry, I should have asked about
7     that already, but . . .
8        Okay. So your first full-time
9     teaching position was -- your assignment
10    was at Daisy Lawrence, but you were
11    hired through the Student Support
12    Office?
13 A. Yes.
14 Q. And Lois hired you -- or her office
15    hired you?
16 A. Her office hired me.
17 Q. What was your position?
18 A. Classroom teacher.
19 Q. Well, what did you teach?
20 A. I taught -- it was a self-contained
21    unit. I taught grades five and six
22    regular ed and Special Ed. All
23    exceptionalities.

Pages 32 to 35

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

Melvin Alonza Lowe, etc.
January 3, 2006

36

1  Q.  What do you mean by that?
2  A.  I had students -- I had IEPs for
3      students who were ED, which at one time
4      was EC, emotionally conflicted; now ED,
5      emotional disorder.  Hearing impaired,
6      LD, and MR.  And if I recall, I think I
7      had one student who was autistic.
8  Q.  When you say -- I know a little bit
9      about self-contained classrooms, but one
10     thing I do know is that different people
11     mean different things when they say
12     self-contained.  When you say
13     self-contained, tell us what you mean.
14 A.  Self-contained is when you are teaching
15     all subjects.  You're not
16     departmentalized.  You're teaching all
17     subjects.
18 Q.  Well, did the group of students that
19     you'd teach stay with you all day?
20 A.  They remained with me all day.
21 Q.  So you got them in the morning and you
22     taught the various subjects throughout
23     the day, and they left you in the

37

1      afternoon?
2  A.  Yes.
3  Q.  And you're saying that there were
4      regular students in that class?
5  A.  I had a mix population.
6  Q.  Okay.
7  A.  I had students who were not identified
8      to receive Special Education services
9      that we would categorized as a regular
10     population, and I had students who had
11     been identified needing special
12     services.
13 Q.  Did you have any students in your class
14     that were assisted by anybody while in
15     your class, by an aide?
16 A.  Yes.  I had a full-time aide.  And when
17     I say "full-time," he remained with me
18     and the students all day.
19 Q.  And what was his name?
20 A.  Bernard King (phonetic).
21 Q.  And he's the same aide you kept
22     throughout that year?
23 A.  Yes.

38

1  Q.  I mean, you had the same aide?
2  A.  Yes.
3  Q.  Okay.  Did you teach -- when you taught
4      that year, did you teach the same
5      curriculum to all your students?
6  A.  Those students who were in grade five, I
7      taught fifth-grade curriculum for all
8      subjects.  Those students who were in
9      grade six, I taught the sixth-grade
10     curriculum for all subjects.
11 Q.  Were there students at -- did you have
12     all the fifth and sixth graders?
13 A.  No.  The fifth graders were split
14     between another teacher and myself.
15 Q.  Okay.  And then you had sixth graders?
16 A.  And I had the majority of the sixth
17     graders.
18 Q.  Okay.  And Daisy Lawrence is the
19     alternative school, correct?
20 A.  Daisy Lawrence has been a number of
21     things.  At --
22 Q.  Well, what was it the year that you
23     taught there?

39

1  A.  At that time, it was the B.E.E.P.
2      Program.  It was not referred to as the
3      Alternative Program.
4  Q.  The beat?
5  A.  B.E.E.P., B-E-E-P.  And I can't -- I'm
6      not familiar with the entire acronym.
7      The Behavioral Education Evaluation
8      Program, I think is the correct --
9  Q.  Was Daisy Lawrence in the 1999-2000
10     school year, the school where children
11     went if they got in trouble in school?
12 A.  I'm not sure what the school board's
13     intentions were.  We were advised and we
14     were told that our program offered
15     services to students who had some
16     behavioral and educational dysfunctions.
17 Q.  Well, did you have the same group of
18     students the entire year that you were
19     there?
20 A.  Some of the students were transients.
21     Some students came to us at the
22     beginning of the year.  Some students
23     migrated in during the year.

Pages 36 to 39

40

1  Q. Did you have students that you would
2     have for a certain period of time and
3     then they left your classroom?
4  A. I believe all of my students remained
5     with me.
6  Q. Okay. Who was your principal that year?
7  A. Ms. Eradean Jeter. E-A-R-D-E-A-N (sic)
8     Jeter.
9  Q. Who was the assistant principal, or was
10    there one?
11 A. We did not have an assistant principal.
12 Q. So did you answer directly to Ms. Jeter?
13 A. Yes.
14 Q. Okay. And at the end of that school
15    year, what happened?
16 A. At the end of the school year, we were
17    notified that there would be
18    restructuring of the entire program, and
19    all teachers nontenured were terminated.
20 Q. And so you received a nonrenewal notice?
21 A. Yes, I did.
22 Q. Okay. And during the course of that
23    summer, what happened? What efforts did

41

1     you make to obtain another job there?
2  A. If I stand corrected, I followed the
3     normal procedures that I had been given
4     through Human Resources to reapply to be
5     reassigned for the following year.
6  Q. And were you reassigned?
7  A. Yes.
8  Q. And where did you go?
9  A. Fitzpatrick Elementary.
10 Q. And what was your teaching assignment?
11 A. Fourth grade basic social, which was a
12    departmentalized setting.
13 Q. What does that mean?
14 A. That means I taught the basic social
15    subjects, math, science, social studies,
16    and P.E. for fourth grade students.
17 Q. Okay. So you had the same group of
18    students all year --
19 A. No.
20 Q. -- you had a fourth grade classroom?
21    Okay. Strike that.
22 A. The department -- I'm sorry.
23 Q. So you had certain subjects for the

42

1     fourth grade students?
2  A. Yes.
3  Q. Did you teach all of the fourth grade
4     students those subject?
5  A. No. I was paired with another teacher,
6     and we split our students during the
7     day.
8  Q. Okay. So you and another teacher taught
9     all of the fourth graders that you have
10    labeled the basic social classes?
11 A. In two fourth grade units, I taught the
12    basic social subjects. My pair teacher
13    taught the language art subjects. We
14    were not the only fourth grade unit in
15    the school.
16 Q. Right. I understand. Okay. So you did
17    teach all of the fourth graders the
18    basic social . . .
19 A. That were assigned to my teaching unit.
20 Q. In your unit. I gotcha.
21 A. And this was a regular education unit.
22 Q. And did you have any other teaching
23    assignments or responsibilities

43

1     throughout the course of that year?
2  A. No, I did not.
3  Q. And who was your direct supervisor?
4  A. I had two, Mr. Donnie Terry, the
5     administrative assistant, and Ms. Vera
6     Thompson, the principal.
7  Q. I'm sorry, what was the principal's
8     name?
9  A. Ms. Vera Thompson.
10 Q. Oh, Ms. Vera, okay. And she was the
11    principal?
12 A. Yes.
13 Q. At the end of that year, were you
14    nonrenewed?
15 A. No. At the end of that year, I was not
16    nonrenewed.
17 Q. What happened?
18 A. Can you -- when you say "what happened"?
19 Q. What happened -- you left Fitzpatrick
20    that year, correct? That was your only
21    year at Fitzpatrick?
22 A. Over the summer, I transferred to
23    another school.

Pages 40 to 43

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

44

1  Q.  And did you request that transfer?
2  A.  I was presented a job offer, and I
3      accepted.
4  Q.  Did you ever at any time ask to be
5      transferred from Fitzpatrick?
6  A.  During the course of that year, I
7      initiated an interest in a transfer.
8  Q.  When you say you "initiated an interest
9      in a transfer," what do you mean?
10 A.  Can you be real clear with me and ask me
11     what do I mean?  I initiated an interest
12     towards a transfer.
13 Q.  I mean, did you ask to be transferred?
14     Did you talk to Jimmy Barker or talk to
15     anybody?
16 A.  I talked -- I communicated with
17     Mr. Barker.
18 Q.  And you wanted to be transferred?
19 A.  I initiated an interest.
20 Q.  Okay.  Why did you initiate an interest
21     in being transferred?
22 A.  There was, what I thought, some
23     disharmony in the setting at

45

1      Fitzpatrick, and at that time I felt
2      that a transfer might be the solution.
3  Q.  Tell me what you mean by disharmony
4      there.  What was going on?
5  A.  There was, I think, a misunderstanding
6      between myself and the administrator.
7  Q.  And what was that misunderstanding?
8  A.  I might have or she might have
9      overexerted certain authorities that I
10     felt uncomfortable with.
11 Q.  Okay.  And tell us what you mean by
12     that.  I mean, what happened?  What
13     happened to your relationship or what
14     happened that there was a
15     misunderstanding between you?
16 A.  I just felt that she, Ms. Thompson, was
17     over exerting her authorities.
18 Q.  What did she do that made you believe
19     that or made you feel that way?
20 A.  There were a number of things, just too
21     many to call off the top of my head.
22     But there were just a number of things
23     that I felt uncomfortable with during

46

1      that year.
2  Q.  Okay.  Do you mean things that she would
3      ask you to do or times that she would
4      reprimand you?  I mean, I'm just trying
5      to get an idea of what it was she was
6      doing that made you uncomfortable.
7  A.  Her disposition.  I was uncomfortable
8      with her disposition.
9  Q.  Like in the manner that she dealt with
10     you, her mannerisms, her tone?
11 A.  Yes.  We can say that, that I was
12     uncomfortable with her tone and her
13     overall demeanor towards me.
14 Q.  Would she ever correct you or talk to
15     you about the way you were teaching, and
16     you would become unhappy with that?
17 A.  She never gave me any directives as far
18     as my teaching.
19 Q.  Did she ever ask -- did she ever correct
20     you in regards to your teaching?
21 A.  She never supervised my teaching,
22     therefore, she never was able to provide
23     me any directives towards my teaching.

47

1  Q.  Okay.  Whether or not you think she was
2      capable or should have been able to, was
3      there ever occasions where she
4      attempted, at least, to talk to you
5      about your teaching style or what you
6      were teaching?
7  A.  Well, I'm not -- I'm not saying that she
8      was incapable.  I'm just saying she
9      never.
10 Q.  Okay.  So you never had any conferences
11     with her about your job performance at
12     the school?
13 A.  We talked just as, I guess, she did with
14     other teachers.  I need your lesson
15     plans at this particular time.  I might
16     change this particular student out of
17     your room, or do you have everything you
18     need?  As far as any directives, I would
19     like to see you teach this way; I do not
20     see this; there were never any
21     communications of that sort.
22 Q.  Okay.  What did she do that you felt
23     like was exerting too much authority

**48**

1  over you?
2  A. The uncomfortableness of her exertions.
3  Some verbal communications that I didn't
4  feel were in my best interest or as far
5  as an academia concern. I didn't feel
6  they had anything to do with my
7  academic -- academia performances. That
8  made me feel uncomfortable.
9  Q. So she would say and do things around
10  you that didn't have anything to do with
11  your job performance, and you thought
12  that was inappropriate?
13 A. I'm not going to say they didn't have
14  anything to do with my job performances.
15  They did not have anything to do with my
16  job presence or my performance in the
17  capacity of a teacher.
18 Q. Okay. Tell us what it was that she
19  would say and do that made you have this
20  uncomfortableness.
21 A. To be very specific, there was an
22  incident when she asked me to conference
23  with her in her office, and she accused

**49**

1  me of keeping a disturbance among the
2  faculty.
3  Q. Okay.
4  A. I was totally clueless of what she was
5  talking about. And I felt that she was
6  using her authority as my administrator
7  in having communicated to me, You're
8  nontenured and you've had some problems
9  in the past, and I did you a favor when
10  I hired you. I was uncomfortable with
11  that statement.
12 Q. Okay. And why were you uncomfortable
13  with that?
14 A. I don't find that a normal statement
15  that you would say to an individual, You
16  had problems in your past teaching
17  assignment. Because I knew of none. I
18  didn't know of any problems. To
19  reiterate that I was nontenured, I was
20  currently aware that I was nontenured.
21  And to suggest that you did me a favor,
22  I was totally uncomfortable with that.
23 Q. Okay. Do you know whether she went out

**50**

1  on a limb or did you some favor to get
2  you the job at Fitzpatrick? Do you have
3  any awareness about how that came
4  about --
5  A. I don't see where she --
6  Q. Make sure you let me finish my question.
7  A. Yes, yes. I'm sorry.
8  Q. Okay. Do you have any awareness about
9  how that came about, about how you got
10  assigned to her school?
11 A. Ms. Vera Thompson called me at my
12  mother's home one evening after 11:00.
13  And she just asked me, Do you want to
14  teach at Fitzpatrick? Having known of
15  her, I accepted. Going out on a limb?
16  I was fully educated and certified with
17  the correct credentials to teach, so I
18  don't know what type of limb she could
19  have gone out on.
20 Q. Did you know Ms. Thompson before you
21  worked for her?
22 A. Vaguely.
23 Q. You knew of her, but --

**51**

1  A. I knew of her.
2  Q. Didn't have any kind of family
3  relationship with her?
4  A. Not at all.
5  Q. Socialize with her or anything like
6  that?
7  A. Not at all.
8  Q. You've described one conversation that
9  you felt was inappropriate or made you
10  feel uncomfortable. Tell us any other
11  conversations that occurred that were
12  like that.
13 A. That was the only conversation that I
14  was totally uncomfortable with. Any
15  other discussions that we had after that
16  had to deal with a student or a
17  conference or a field trip or something
18  of that nature. There was never
19  anything else. That was -- that was
20  somewhat of a beginning and an end.
21 Q. Okay. So when you talk about not being
22  comfortable with the authority that
23  she's exerted over you because of the

52

1   uncomfortableness you had, you're really
2   talking about that conversation?
3 A.  And prior to the demise of that
4      behavior, there were some instances
5      where I was uncomfortable when she
6      stepped -- when she entered my
7      classroom.  I'm not accustomed to
8      someone entering my classroom and not
9      speaking, especially after I've spoken
10     to you.  I'm uncomfortable when my
11     students speak to you and you don't
12     speak back, and they are then looking at
13     me wondering what is going on.  And the
14     students can sense that there is some
15     hostility here.
16           I don't appreciate, and I feel
17     uncomfortable when other teachers are
18     asked to supervise me and to report to
19     the administrator what I'm doing.  And I
20     guess out of fear of our friendship,
21     those teachers admitted to me this is
22     what I've been asked to do; I just want
23     to stay out of it.  Those were the

53

1      things that made me uncomfortable.  And
2      I was uncomfortable the entire year,
3      although there were no more direct
4      conferences that would make me -- I
5      would be able to put my finger on it.
6      But those were the scenarios that I was
7      uncomfortable with the entire year.
8 Q.  Okay.  Fair enough.  Well, who were some
9      of the teachers that told you that they
10     were asked to supervise you?
11 A.  Mr. Terry Myrick (phonetic).  He's no
12     longer in Montgomery County.  He's now
13     teaching in Georgia.  He taught next
14     door to me, who communicated that
15     Ms. Thompson asked him on several
16     occasions to let her know what was going
17     on in my room.
18 Q.  Do you know why she did that?
19 A.  Well, I don't think it's best practice.
20     I don't know why she would have done
21     that, but he verbalized to me that she
22     did it.
23 Q.  Yeah.  And I'm not questioning that.  I

54

1      guess my question to you is:  Do you
2      have an opinion, sitting here today, or
3      a belief about why she began to
4      supervise you or ask other teachers to
5      supervise you?  Do you know why?
6 A.  In my educational experiences, I've
7      never read that in best practice or in
8      supervisory management.  I've never read
9      that as being a practice.
10 Q.  So you don't know why she did that?
11 A.  No, I don't.
12 Q.  Any other teachers?
13 A.  Ms. Tonya Stevenson (phonetic).
14 Q.  And does she still teach for the school
15     system?
16 A.  I'm not sure where Ms. Stevenson is.  I
17     want to say she's out of the district as
18     well at this point.
19 Q.  Anyone else?
20 A.  Those were the only two who admitted to
21     me.  There might have been others.  I'm
22     not sure.
23 Q.  And what did they tell you exactly?

55

1      What had she asked them to do according
2      to them?
3 A.  To -- Mr. Myrick's room was right next
4      to my room.
5 Q.  Yes, sir.
6 A.  She asked him to let her know what was
7      going on in my classroom.  Tonya
8      Stevenson's room was at the other end of
9      the building.  And she just told me, I
10     think it was around Christmas, that you
11     are my friend, and I don't want you to
12     be upset with me, but you do know
13     Ms. Thompson asked me to let her know
14     what you were doing in your room, which
15     I don't understand, because your room
16     was at the other end of the building.  I
17     mean, it was just too -- I mean, you
18     taught second grade.  I taught fourth
19     grade.  Mr. Myrick taught fifth grade.
20     There was no reason we would even have
21     to collaborate unless we were possibly
22     dealing with some special needs issues
23     or some curriculum issues, which we

Pages 52 to 55

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

56

1    didn't do any of that type of planning
2    that year.
3  Q. Did you ever ask Ms. Thompson about this
4     or confront her?  Confronting might be a
5     bad word.  Did you ask her, Why do you
6     have these folks supervising me?  What's
7     the problem?
8  A. No, I didn't.  I was not in a position
9     to accost her.
10 Q. Anything else from that year that you
11    can tell us about why you had initiated
12    interest in transferring out of there?
13 A. Just the uncomfortableness with her --
14    her demeanor.
15 Q. And you, in fact, were transferred that
16    summer.  I guess you completed that
17    school year?
18 A. Yes.  And I did not receive a
19    nonrenewal.
20 Q. Right.  And then you were transferred
21    from there to Southlawn?
22 A. Middle.  Southlawn Middle School.
23 Q. Southlawn Middle School.  I guess -- is

57

1     there a Southlawn --
2  A. Southlawn Elementary.  And there's a
3     Southlawn Middle.
4  Q. Okay.  So you went to Southlawn Middle.
5     Was Tina Minott the principal then?
6  A. Yes, she was.
7  Q. And what was your teaching assignment or
8     post that year?
9  A. Middle school science, sixth grade.
10 Q. And that was something you were
11    certified to teach?
12 A. Yes.
13 Q. Okay.  Who was the assistant?  Was there
14    an assistant principal?
15 A. Yes.  Ms. Cynthia Tucker (phonetic).
16 Q. Okay.  Did you have any other -- did you
17    have any other teaching assignments or
18    posts that year?
19 A. When you say "post"?
20 Q. Yeah.  I used that word, because
21    sometimes some of the teachers, I've
22    noticed, call it post, like if you have
23    assignments where you're supposed to

58

1     have some kind of after school
2     responsibilities?
3  A. I was -- I don't even know if we used
4     the word "advisor."  We might have used
5     the word "advisor" for the dance step
6     and drill team.
7  Q. Okay.  But you worked with them whatever
8     the word was?
9  A. Yes, whatever the word they used or we
10    used.
11 Q. Is that something that you were
12    compensated for on the top of your
13    salary or that you volunteered to do?
14 A. That was a volunteer.
15 Q. Okay.  Anything else like that that you
16    can think of?
17 A. Not that year.
18 Q. Did you have any problems with Tina
19    Minott similar to what you'd had with
20    Vera Thompson?
21 A. None.  Nothing.  There were no problems.
22 Q. Okay.  So you don't feel like that she
23    ever mistreated you in any way?

59

1  A. No, I don't.
2  Q. What about with Ms. Tucker?
3  A. Oh, no -- no problem at all.
4  Q. Okay.  And let me go back quickly and
5     ask you about Donnie Terry, who was the
6     administrative assistant at Fitzpatrick.
7  A. No problems.
8  Q. No problems with him?
9  A. No problems.
10 Q. Did you ever communicate with him about
11    your problems with Ms. Thompson, or did
12    you just choose not to do that?
13 A. It wasn't in the best interest to do
14    that, and I did not.
15 Q. Okay.  So as far as having any
16    complaints or anything of that nature,
17    you would not have had any against
18    Ms. Minott or Ms. Tucker?
19 A. No.
20 Q. Okay.  Now, at the end of that year,
21    were you nonrenewed?
22 A. At the end of that year, I was
23    nonrenewed.

Melvin Alonza Lowe, III
January 3, 2006

**60**

1  Q. Okay. And that summer, did you apply
2      for other jobs with the Montgomery
3      County School System?
4  A. Yes, I did.
5  Q. Okay. Do you know what jobs you applied
6      for?
7  A. I would have to look, be provided
8      documents of what I initially applied
9      for. The first thing I did reapply for
10     was to be reassigned.
11 Q. You wanted to go back there? ·
12 A. Back there or anywhere in the system.
13 Q. Oh, I see what you're saying. Okay.
14     And if I understand correctly, that did
15     not happen at that time?
16 A. It did not happen.
17 Q. Okay. And I take it that you applied
18     with other school systems?
19 A. I did.
20 Q. Okay. And where did you get a job?
21 A. Bullock County.
22 Q. So that was for the -- keeping up with
23     this, the '02-'03 school year, you were

**61**

1      in Bullock County?
2  A. Yes, ma'am.
3  Q. And who was the superintendent that
4      year?
5  A. The superintendent that hired me was
6      Mr. Saint, S-A-I-N-T, T. Thomas.
7  Q. Okay. And what school were you assigned
8      to?
9  A. South Highlands, with an S, Elementary.
10     H-I-G-H-L-A-N-D-S.
11 Q. And what was your teaching assignment?
12 A. That year I taught sixth grade reading,
13     departmentalized.
14 Q. And tell us what you mean by
15     "departmentalized."
16 A. Departmentalized, I taught five sections
17     of sixth grade reading all day, first
18     period, second period, and so on.
19 Q. So you taught reading all day, and the
20     sixth graders came to you in shifts?
21 A. And I taught all of the sixth graders in
22     the school.
23 Q. Okay.

**62**

1  A. I was the only sixth grade reading
2      teacher.
3  Q. And these were -- you've already said
4      this, but just for clarification --
5      these were all the sixth graders; it
6      wasn't a special category or anything
7      like that?
8  A. These were all the sixth graders.
9  Q. You were the reading teacher for the
10     sixth grade?
11 A. Regular education and Special Education.
12 Q. Okay. Who was your principal?
13 A. Mr. Julius Thomas.
14 Q. And who was the vice president?
15 A. Mr. Anderson Graves.
16 Q. Did you have any problems with
17     Mr. Thomas or Mr. Graves?
18 A. No, no problems at all.
19 Q. No complaints or problems with them?
20 A. None.
21 Q. Were you nonrenewed at the end of that
22     year?
23 A. At the end of that year, yes, all

**63**

1      nontenured teachers in the entire
2      district were nonrenewed.
3  Q. Did you attempt to get another job with
4      them, with the Bullock County School
5      System after you were nonrenewed?
6  A. I did. In fact, the superintendent
7      promised, You will be back.
8  Q. And why did you not go back?
9  A. I did go back.
10 Q. To Bullock County?
11 A. Yes.
12 Q. Okay. Oh, yeah, I'm sorry.
13         So you were nonrenewed.
14     Everyone across the district was, and
15     then you got reassigned or placed back
16     into the system?
17 A. Same school.
18 Q. Same school, same job?
19 A. Same school. They just -- instead of
20     teaching reading all day, we then went
21     to -- what did we go to? I think we
22     went to a self-contained setting, and I
23     had the same students all day.

Pages 60 to 6

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.337

**64**

1 Q. For what grade?
2 A. And I taught all subjects. Sixth grade.
3 Q. So you just had a regular sixth-grade
4    class?
5 A. Yes.
6 Q. Okay. And so did you have the same
7    principal and vice principal?
8 A. The same principal. The second year
9    Ms. Harriet (phonetic) -- I can't think
10    of her last name, but we had a female
11    assistant principal.
12 Q. Same question: Did you have any
13    problems with the principal or vice
14    principal in the '03-'04 school year?
15 A. No, I did not.
16       I would -- I didn't finish
17    answering the first question. You asked
18    did I apply to anywhere else after the
19    initial -- the first nonrenewal program
20    from Bullock County.
21 Q. Yes.
22 A. I did. I reapplied to Montgomery County
23    for several positions.

**65**

1 Q. So in the summer of '03?
2 A. The summer of '03, the ending of my
3    first full year in Bullock County. To
4    reanswer your first question, I did
5    apply for teaching jobs, and I applied
6    back to Montgomery County.
7 Q. And do you have any specific memory of
8    any particular job, or were you just
9    applying with Montgomery County for any
10    teaching position you were certified?
11 A. I would have to look back at my initial
12    letters of concern or intent. To the
13    best recollection, any job with my
14    certification that would allow me
15    employment, I was seeking those jobs.
16 Q. And that was in the Summer of '03. So
17    you did not get hired by Montgomery
18    public schools that summer?
19 A. Unfortunately not.
20 Q. Okay. So you went back to Bullock
21    County for the '03-'04 school year?
22 A. Yes, I did.
23 Q. Okay. Did you get hired during the

**66**

1    course of that year by Montgomery
2    County, or did you complete the year at
3    Bullock County?
4 A. I returned to Montgomery County, if I'm
5    correct, and I would have to look at the
6    contract to make sure, in October of
7    '04. I returned to Montgomery County.
8       MR. PATTY: '03.
9 A. '03.
10       MR. PATTY: It was October
11       '03.
12 Q. Yeah. And I don't want to trick you,
13    but I don't want to put words in your
14    mouth. But I am really off.
15 A. I would have to look back at the --
16       MRS. CARTER: Let's go off
17       the Record for a
18       second.
19       (Whereupon an off-the-Record
20       discussion was held.)
21       MRS. CARTER: All right. So
22       let's go back on the
23       . Record.

**67**

1    BY MRS. CARTER:
2 Q. You were hired in the '03-'04 school
3    year to go back to your same school in
4    Bullock County?
5 A. Yes.
6 Q. To teach a self-contained sixth-grade
7    class?
8 A. Yes.
9 Q. All subjects?
10 A. Yes.
11 Q. But you actually ended up then being
12    hired late in the Montgomery County
13    School System?
14 A. Yes. I was offered an interview for a
15    position, and I returned to Montgomery
16    County.
17 Q. Okay. Was that one of the jobs you had
18    applied for that summer?
19 A. No, it was not. Because the job that I
20    returned to Montgomery County to perform
21    was a reading coach position. I had no
22    knowledge of what a reading coach was,
23    so I never applied for the position

Pages 64 to 67

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

68

1    until it was offered to me. I knew
2    nothing about a reading coach position.
3  **Q. Okay. And what school were you?**
4  A. When I returned to Montgomery County?
5  **Q. Uh-huh (affirmative response).**
6  A. Daisy Lawrence, alternative at this
7    time. It was now being given the
8    alternative title.
9  **Q. And who was your principal?**
10 A. Dr. James Owens.
11 **Q. Had you spoken directly with Dr. Clinton**
12   **Carter about coming back to the**
13   **Montgomery County School System?**
14 A. No. Dr. Carter would not talk to me.
15 **Q. Had you attempted to talk to Dr. Carter?**
16 A. Yes.
17 **Q. And what time did you attempt to talk to**
18   **him when he would not talk to you?**
19 A. I would have to go back and look at
20   my -- look at the notes. But a
21   conference was initiated to meet with
22   Dr. Carter, myself, and my mother. And
23   it was communicated that he would not

69

1    meet with either of us together. He
2    would meet with us separately.
3  **Q. Okay. I went through -- I'm not going**
4    **to promise that I read every word of**
5    **every sheet of paper, but I tried to go**
6    **through the documents that your lawyer**
7    **gave to me to help today go smoother and**
8    **so that I would know what you had. And**
9    **I didn't see any kind of notes or**
10   **anything about conferencing with**
11   **Dr. Carter. Is that something that you**
12   **have that you have not provided your**
13   **lawyer as of yet?**
14 A. No. Because I never conferenced with
15   Dr. Carter.
16 **Q. Oh, I thought you said you would have to**
17   **refer to notes regarding when --**
18 A. A date. I was going to refer to the
19   notes for a particular date when we
20   initiated a conference. But I never
21   conferenced with Mr. Carter.
22 **Q. What would you look at to tell you what**
23   **date you attempted to talk to him?**

70

1  A. I would maybe have to go back and look
2    at some documentation that I might have
3    provided EEOC to see if a date was in
4    there, when an initial conference --
5    when we tried to made an initial
6    conference. But I'm also sure that his
7    secretary would be able to go through
8    notes to see when the conference was
9    confirmed, when the call was placed for
10   an initial conference, and when the
11   conference was confirmed, and who it was
12   with. But I never met with Mr. Carter.
13   He would not meet with me.
14 **Q. Why were you attempting to conference**
15   **with Dr. Carter?**
16 A. After numerous conversations with
17   Mr. Barker and Ms. Lois Johnson, it was
18   suggested that, Melvin, you might want
19   to apologize to Mr. Carter and see if he
20   will let -- and allow you to be rehired
21   in Montgomery County. Ms. Lois Johnson
22   communicated that to both my mother and
23   myself, as well as Mr. Barker. And

71

1    Mr. Barker reaffirmed that if Dr. Carter
2    says I can hire you, I can have you in a
3    job within an hour or a couple of hours
4    as soon as he says it's okay. It's not
5    me, it's him.
6  **Q. Why did you need to apologize to him?**
7    **What would you be apologizing for?**
8  A. I would -- I still don't know. I still
9    don't know.
10 **Q. Did it have anything to do with the**
11   **incident where you were placed on**
12   **administrative leave due to the**
13   **interaction with a child while you were**
14   **at Southlawn Middle School?**
15 A. Well, I don't see why I would have to
16   apologize for something I didn't do and
17   I was not found guilty of doing. So,
18   no. I don't know if that was what was
19   intended for me to apologize for. That
20   was never communicated to me by
21   Mr. Barker, that this is an event that
22   you need to apologize for. The only
23   thing that he said, Mr. Barker felt you

Pages 68 to 7

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.333
888.253.3377              Certified Court Reporters and Certified Legal Video Specialists           888.253.337

72

1   might need to say for any embarrassments
2   or hard feelings that may be between you
3   and Mr. Carter, you might want to
4   apologize for that.
5   Q. Had you ever -- okay. Who told you
6       that, Jimmy Barker?
7   A. Jimmy Barker.
8   Q. Okay. And he said you needed to
9       apologize for embarrassment or hard
10      feelings?
11  A. Any embarrassments that I might have
12      caused the school system and any hard
13      feelings.
14  Q. And you didn't say, What embarrassment
15      and hard feelings are you talking about?
16  A. At that -- no, I did not. At that
17      point, if that's what he wanted to hear,
18      that's what I was going to say.
19  Q. Well, when you went in to apologize to
20      him, what were you going to apologize
21      for if you didn't know what it was
22      about?
23  A. I was going to apologize for any

73

1   misunderstandings or hard feelings or
2   embarrassments that I may or may not
3   have caused the school district. That's
4   provided I would have had an opportunity
5   to talk with him.
6   Q. And I understand you didn't talk to him.
7       I'm just confused about what you were
8       going to apologize for if you say,
9       sitting here today, you don't know what
10      you were supposed to have apologized
11      for?
12  A. I'm also confused. I don't know what I
13      did or didn't do that I needed to
14      apologize for.
15  Q. When did you have these conversations
16      with Jimmy Barker?
17  A. Again, I would have to look back at my
18      notes. But it was during the summer
19      before returning to Bullock County.
20  Q. It was in the Summer of '03. So you get
21      nonrenewed after Southlawn. You apply
22      and get a job in Bullock County. And
23      then after that summer, the Summer of

74

1   '03 -- or was it the summer right after
2   you got nonrenewed from Southlawn?
3   A. The summer after I was nonrenewed from
4   Southlawn, it was almost I was going in
5   circles. I would go out on interviews.
6   Nothing would materialize from that. Or
7   in one particular instance, I was
8   interviewed, and I heard the principal
9   in a conversation with Ms. Carolyn
10  Hicks. And it was stated, Well, I've
11  made my decision, but I'll just
12  interview this person, but I've already
13  made my decision. And that principal
14  even told me, I'm not going to hire you,
15  because you're too educated. I think
16  your concentrations need to be toward
17  administration, and I just can't have
18  you on my faculty. And that was
19  Mr. Michael Linhart (phonetic), who is
20  now assistant superintendent of
21  curriculum instruction, K through six.
22  Q. Where was he a principal?
23  A. He was principal at E.D. Nixon

75

1   Elementary.
2   Q. And he said he could not hire you
3       because you were too educated?
4   A. He said -- Mr. Linhart's words were in
5   the area, You're too educated. You're
6   very intelligent. I think you need to
7   concentrate on trying to get an
8   administrative position, because I think
9   that's where your focus is. But I'm not
10  going to be able to hire you.
11  Q. Anybody else that you interviewed with
12      that summer that you can tell us about?
13  A. If I stand corrected, he was the only
14  one.
15  Q. That interviewed you that summer?
16  A. That interviewed me. And that was the
17  day before school was to open. That
18  summer I had been given the runaround
19  about receiving interviews, what jobs
20  were available. I was even told that --
21  Mr. Barker informed my mother and I that
22  Ms. Hicks checked with seven principals
23  and none of them wanted Melvin.

Pages 72 to 75

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists         888.253.3377

**76**

1 Q. Okay. I'm looking at something that you
2 gave to EEOC that said that Mr. Barker
3 informed you that Ms. Hicks said that in
4 the Summer of '03, which would have been
5 after you worked in Bullock County a
6 year. So let's look at the Summer of
7 '02. Can you think of anything
8 else from that -- or do you think --
9 A. The Summer of '02, I could not get an
10 interview. That was after Southlawn, if
11 I stand corrected with these years. I
12 could not get an interview for anything.
13 Q. And what is your testimony today as to
14 why you could not get an interview?
15 A. Well, you have a series of events that
16 cause you to put certain events into a
17 proper perspective. After Southlawn,
18 when I received the nonrenewal, it was a
19 total surprise, because my relationship
20 with Ms. Minott allowed me to know who
21 was receiving nonrenewals. And I was
22 not one of her select persons to receive
23 a nonrenewal. I was, in fact, in her

**77**

1 office, and I was asked to leave because
2 there was a delivery. And my nonrenewal
3 came that day. And she called me in,
4 and she was crying. And she said,
5 Melvin, you know I didn't do this,
6 because you knew who was getting the
7 nonrenewals. She said, And you know I
8 have to give it to you. And it was a
9 nonrenewal. And that was -- I felt that
10 that right there was -- and I'm more
11 positive now than ever before, that was
12 the first notation of some
13 discriminatory practice and possibly
14 retaliation.
15 Q. Okay. So you believe that being
16 nonrenewed in the Spring or Summer of
17 2002, after you left Southlawn, that
18 that was the first act of discrimination
19 against you?
20 A. Yes, I do. And my reason for thinking
21 that and feeling that way, when the
22 principal communicated to me that I did
23 not issue a nonrenewal notice for you,

**78**

1 what else am I to think, that the
2 principals initiate -- excuse me -- who
3 you want to return and who you do not
4 want to return. And I clearly knew. We
5 sat down. I clearly knew who was
6 provided -- who was to be given a
7 nonrenewal. Just as I sat with her on
8 numerous occasions and did teacher
9 evaluations, I knew.
10 Q. Okay. So your evidence that that was
11 discriminatory is that Tina Minott, the
12 principal, was not the one who asked for
13 your nonrenewal?
14     MR. PATTY: Object to the
15     form.
16     Go ahead.
17 A. To answer your question, Ms. Minott told
18 me very clearly on several occasions --
19 Q. Mr. Lowe.
20 A. Yes.
21 Q. I'm not questioning that she told you
22 that. It's your testimony --
23 A. Okay.

**79**

1 Q. -- and I'm with you.
2 A. Yes.
3 Q. My question is: Is that the evidence
4 that you have that it was discriminatory
5 to nonrenew you at this Spring or Summer
6 of 2002?
7     MR. PATTY: Object to the
8     form.
9     Go ahead.
10 A. That is in a series of events that have
11 lead me to feel that I have been
12 discriminated against and retaliated
13 against. That is in a series. That is
14 among other events.
15 Q. Okay. Well, I thought you said that was
16 the first. Tell me what --
17 A. That was the -- yes, ma'am, I'm sorry.
18 Q. Okay. Hang on. Let me finish my
19 question.
20 A. Yes. Your question?
21 Q. And I'm not trying -- I mean, that's
22 what I need to know, because we're going
23 through some background stuff, and we're

80

1    really not quite finished doing that.
2    But obviously, to me, the coconut today
3    is your claims and what you believe was
4    discriminatory. And one of the things I
5    need to try to do is weed out or focus
6    in on what employment actions that you
7    are saying were discriminatory or
8    retaliatory against you.
9         And my question is, first of
10   all: Am I clear that you believe that
11   being nonrenewed that year was an act of
12   discrimination and/or retaliation
13   against you?
14 A.  Yes, I do.
15 Q.  And was that the first time that you
16   believe that you had been discriminated
17   against or retaliated against?
18 A.  That is one of the first events. That
19   is the first event that I can almost
20   without a shadow of a doubt say yes,
21   this was direct discrimination and
22   retaliation. As far as being the first,
23   that is the first in a series.

81

1  Q.  Right. And we'll get to that. And
2    maybe I should ask the question a
3    different way: You worked for them the
4    first year at Daisy Lawrence?
5  A.  Yes.
6  Q.  Was there anything that occurred that
7    year or your nonrenewal at the end of
8    that year that you maintain here today
9    was retaliatory or discriminatory?
10 A.  No, I do not. In fact, Ms. Johnson
11   clearly communicated to me, We are --
12   and this is public record --
13   restructuring Daisy Lawrence, and all of
14   the nontenured teachers are being
15   terminated, pink-slipped.
16        MR. PATTY: Liz, when we get
17        to a good point, it's
18        been an hour and five
19        minutes, so let's take
20        a break.
21        MRS. CARTER: Okay. Let me
22        kind of get though
23        this --

82

1         MR. PATTY: Sure.
2         MRS. CARTER: -- so I don't
3         get confused about it.
4         MR. PATTY: Right.
5  BY MRS. CARTER:
6  Q.  Okay. And so the answer is no, there
7    was no discrimination or retaliation
8    that you're aware of that occurred at
9    the end of that first year that you
10   taught?
11 A.  No, there was not.
12 Q.  Okay. So then you teach the next year
13   at Fitzpatrick. Do you believe that
14   anything that occurred to you during the
15   course of that year was discriminatory
16   or retaliatory towards you?
17 A.  To answer that, I did not get a pink
18   slip.
19 Q.  Okay. Anything else that you'd like to
20   tell us about today that you believe was
21   retaliatory or discriminatory against
22   you in regards to your job at
23   Fitzpatrick?

83

1  A.  To answer that again, my only sole
2    purpose at that time was to teach. I
3    did not get -- Ms. Thompson did not
4    issue me a pink slip.
5  Q.  So the answer is no, there's --
6  A.  So no, I was free and clear that year.
7  Q.  And then you get transferred to
8    Southlawn, and you work with Tina
9    Minott. I think you've testified you
10   had a good year there?
11 A.  Yes.
12 Q.  But at the end of that year, you were
13   nonrenewed?
14 A.  Yes, I was.
15 Q.  And Ms. Minott represented to you that
16   that was not her doing?
17 A.  Exactly.
18 Q.  And based on that, you felt like
19   something was wrong or that something --
20   I don't know what your testimony was,
21   but that that wasn't normal, that she
22   didn't request your nonrenewal, but that
23   you were yet nonrenewed, correct?

Pages 80 to 8

84
1  A. Yes.
2  Q. And so it's your testimony that you feel
3     like that was an act of discrimination
4     or retaliation when you were nonrenewed
5     in the Spring of 2002?
6  A. It was both discrimination and
7     retaliation.
8  Q. Okay. And what type of discrimination
9     against you was it?
10 A. When you --
11       MR. PATTY: Object to the
12       form.
13       But go ahead.
14 A. Look at best practice. And the
15    authorities there are provided, the
16    administrators in Montgomery County as
17    with other districts, but we're talking
18    about Montgomery County. If the
19    principal did not order the nonrenewal,
20    is this normal practice for whatever
21    reasons, nonrenewals are given without
22    the sanctions of the administrator.
23 Q. Okay. And I think that I understand

85
1     your testimony, that you did not find
2     that to be best practice or normal
3     practice. How is that discriminatory
4     against you? How is that discrimination
5     against you?
6  A. Do you do this with all of your
7     employees?
8  Q. I know. What form of discrimination was
9     it?
10 A. Well --
11       MR. PATTY: Object to the
12       form.
13       Go ahead.
14 A. You didn't do it to all of the other
15    nontenured black male teachers at
16    Southlawn or at large in the district.
17 Q. So do you believe it was race
18    discrimination and sex discrimination
19    based on your race and your sex?
20 A. Yes.
21 Q. Were there other black male nontenured
22    employees in the district who were not
23    treated like that?

86
1  A. Yes, there were. In fact, there was one
2     that I taught next door to who was a
3     nontenured, African-American --
4     Afro-American male, who the
5     administrator did not request a
6     termination for. And he did not get
7     one. Mr. Pedro Lewis (phonetic).
8     Taught the same subject, same grade that
9     I taught, different subject. Less years
10    of experience and less education than I.
11 Q. So you were treated differently than
12    somebody who was just like you as far as
13    your race and your sex?
14 A. Yes.
15 Q. What about retaliation? What type of
16    retaliation are you talking about?
17 A. Retaliation can take on a number of
18    hats. Some of the retaliation I denoted
19    was my position with Mr. Barker, my
20    position with Clinton Carter. And you
21    did not mention, but I have to give you
22    the background for the foreground, there
23    was an incident that took place at

87
1     Southlawn. I was -- I don't want to use
2     the word "victorious," but I was
3     successful in proving my innocence. I
4     did not voice the opinion that
5     Mr. Barker positioned me nor the school
6     board investigator or the indirect
7     position of Mr. Carter. Because I did
8     not do that, I am denoting that all of
9     those factors played into the
10    retaliation of me being given a
11    nonrenewal outside the sanctions of the
12    principal at the end of that year.
13 Q. Because you felt like that because --
14    that you had been successful over them
15    in some type of investigation regarding
16    allegations of misconduct against you?
17 A. And some allegations with a particular
18    student, yes.
19 Q. That a student made against you?
20 A. Yes, that a student made against me.
21 Q. And you felt like they were retaliating
22    against you because of that?
23 A. Well, they didn't do this with

88

1    everybody. All of the other teachers
2    who were nontenured, including the ones
3    that were on faculty who were of male
4    gender and of Afro-American dissent,
5    this did not take place with them.
6  Q. At that point in your career, had you
7     ever made a complaint of race
8     discrimination or sex discrimination to
9     the school system?
10 A. No, I had not.
11 Q. Had you ever gone to the EEOC and made
12    the kind of complaint at that point in
13    your career, in the Spring of 2000? I'm
14    saying spring. I guess by then it was
15    Summer of 2000.
16 A. No. No, I did not.
17 Q. Okay.
18         MRS. CARTER: All right.
19            Let's -- if you want to
20            stop now, that's fine.
21         (Whereupon a brief recess
22            was taken.)
23

89

1      BY MRS. CARTER:
2   Q. We got a little off track talking about
3      the claims. Let's back up for a second,
4      if you don't mind, Mr. Lowe, and finish
5      your history. Because you came -- you
6      went to Bullock -- you started Bullock
7      County, but we finally figured out that
8      you came back to Montgomery County in
9      October of 2003, went to Daisy Lawrence
10     Alternative School where Dr. Owens was
11     the principal?
12 A. Yes, we did stop there.
13 Q. So you taught the '03-'04 school year as
14    a teacher at Daisy Lawrence?
15 A. I did not teach.
16 Q. Okay. What did you do?
17 A. I was the reading coach.
18 Q. Reading coach. Okay. Why do you say
19    that you were a reading coach as opposed
20    to a teacher?
21 A. Dr. Owens interviewed me for a reading
22    coach position. He informed central
23    office that he wanted to hire me as the

90

1    reading coach, which was a position he
2    had available. That was the reason I
3    was allowed to leave Bullock County,
4    because I was returning as a reading
5    coach. And that is the job that I
6    performed.
7  Q. How do you know what Dr. Owens told
8     central office?
9  A. I was present when he communicated to
10    Ms. Hicks.
11 Q. By phone?
12 A. By phone. By speakerphone.
13 Q. Let me show you what we'll mark as
14    Defense Exhibit 1. And it's titled
15    Montgomery Public Schools Personnel
16    Change Form. I'm going to put this
17    where there's -- it's kind of blurred
18    where that's been filled in there. And
19    this looks to be the personnel action
20    sheet they fill out when they get a hire
21    or they have them for nonrenewals or
22    when they're transferred. Are you
23    familiar with that document?

91

1           (Whereupon Defendants'
2             Exhibit No. 1 was marked
3             for identification and
4             attached hereto.)
5         (Witness reviewed document.)
6  A. I've heard of such, but I've never seen
7     it. Well, when I say I've never seen
8     it, I saw it in the documents that
9     Attorney Patty received. I was never
10    informed that any such was being done.
11    And, of course, a correction, because
12    I'm not a female. But I've never seen
13    this.
14 Q. Okay. I'm going to show you what I'll
15    staple as two documents and label as
16    Defense Exhibit 2, which is the Specific
17    Letter of Appointment dated in October,
18    and it says for re-hire. And then
19    you'll see on the second letter, and
20    I'll hand this to you in a second, where
21    it says Re-hire Correction Letter. And
22    it looks like to me they were correcting
23    that this first one inadvertently said

Pages 88 to 9

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.337

92

1    you were part-time. When you came back
2    in October of 2003, you were a
3    full-time?
4  A. I brought that to their attention.
5  Q. Okay. And then, I guess they corrected
6    that then; is that right?
7  A. Let me look at this.
8  Q. Yeah, just take a look at those two
9    letters.
10        (Whereupon Defendants'
11        Exhibit No. 2 was marked
12        for identification and
13        attached hereto.)
14        (Witness reviewed
15        documents.)
16 A. This is. Because I remember I brought
17    it to their attention that I was not
18    part-time, that I was full-time. I
19    still reiterated that I am a reading
20    coach and not a teacher.
21 Q. But both of those letters have you
22    positioned as a teacher?
23 A. Uh-huh (affirmative response).

93

1  Q. Do you maintain that there would be a
2    salary difference if you had been a
3    reading coach?
4  A. Yes, I do.
5  Q. Okay. And what's the difference in that
6    salary?
7  A. There's an extra month of employment
8    that reflects a different salary. The
9    jobs for reading coaches are advertised
10    as ten-month positions, as with teacher
11    positions are advertised as nine-month
12    positions. There is clearly a salary
13    differentiation in work terms.
14 Q. Because it's a ten-month contract?
15 A. Yes, ma'am.
16 Q. Okay. But you would agree with me that
17    the documents which are reflected in
18    your personnel file regarding what your
19    job assignment was, do not reflect that
20    it was a reading coach position?
21        MR. PATTY: Object to the
22        form.
23 Q. Or the two -- the three documents that

94

1    you're looking at now?
2  A. Re-ask your question.
3  Q. That these documents do not reflect that
4    you were hired that year as a reading
5    coach?
6  A. No, they do not reflect that.
7  Q. Okay. At the end of the 2003-2004
8    school year, were you nonrenewed?
9  A. Yes, I was.
10        And may I go back to
11    re-answer -- to finish answering your
12    question about the documents reflecting
13    me being employed as a reading coach?
14    They reflect that because they were --
15    when I say "they were," it was advised
16    that they reflect this. As opposed to
17    stating reading coach for the job that I
18    did, it was advised that the reason
19    those letters state teacher --
20 Q. It says teaching position.
21 A. Teaching position.
22 Q. Yes, sir.
23 A. Mr. Carter advised Mr. Barker, because

95

1    Mr. Barker told me, that you will only
2    be -- Mr. Carter said, You will only be
3    a teacher in this school district. And
4    I think I have that in some of the EEOC
5    documents.
6  Q. Well, we're going to go through that.
7  A. Yes, ma'am.
8  Q. Mr. Barker told you that Dr. Carter
9    said, You will only be a teacher in this
10    school system?
11 A. In this school district. This was after
12    Mr. Barker assured me and my mother that
13    I can get you -- I can get you hired as
14    soon as Dr. Carter -- Mr. Carter says
15    it's okay. I can get you hired in an
16    hour or a couple of hours. And he was
17    the -- Mr. Barker, was the person who
18    positioned me with, I can get you in a
19    reading coach job. I didn't know what a
20    reading coach job was, but it was a job.
21        And then the next thing after
22    Dr. Owens offered me the job,
23    interviewed me, as he interviewed, I

**96**

1  think, three other woman for the same
2  position for reading coach, until I got
3  to central office, they're telling me,
4  Oh, no, it was a mistake.  You are not
5  going -- it's a teaching position.
6  When I again questioned
7  Mr. Barker, I said, This is not what
8  Dr. Owens interviewed me for.  This is
9  not the agreement that you had with the
10  superintendents in Bullock County for
11  releasing me.  Well, Melvin, it's just
12  simple, Mr. Carter says you're only
13  going to be a teacher in this school
14  district.
15  So that is the reason the
16  contracts and the appointment letters
17  have teacher on it.  That is the reason
18  the contract that Mr. Barker -- I'm
19  probably sure you have -- that I had to
20  sign has teacher or tutor-teacher on it,
21  because that was the ulterior motive
22  that manifested once after I was advised
23  to resign, and we're going to hire you,

**97**

1  and the superintendents agree on what
2  the title was.
3  And when I got here to
4  Montgomery County, there was a big
5  cross-up.  And my back was against the
6  wall, because I didn't have a job.  I
7  did what I was told to do by the
8  authorities who make those decisions,
9  and I didn't have a job.
10  Q.  So if you had only had a teaching -- if
11  **you had known it was just a teaching**
12  **job, would you not have left Bullock**
13  **County?**
14  A.  I would have remained in Bullock County,
15  because I would have been doing the same
16  thing.  And if it were a teaching job,
17  according to Alabama law, after the
18  first forty-five days of your contract
19  beginning, at the beginning of your
20  contract, you can only be released from
21  that contract if the superintendent
22  allows it, because you are being
23  promoted or going to a job of higher

**98**

1  status.  The ten-month reading coach job
2  was of that caliber.
3  And it was communicated
4  between Mr. Barker and Mr. Lee Arthur
5  Ballard, who was, and still is, the
6  Assistant Superintendent in Bullock
7  County, as with the Superintendent in
8  Bullock County, along with Attorney
9  Theron Stokes, who was present and --
10  give me a second.  He's now one of the
11  new UniService directors.  I'm trying to
12  think of his name right now.  He's
13  UniService director --
14  Q.  I don't know who you're talking about.
15  A.  -- or works with Ms. Ann Sippial.  The
16  new one, Darrell --
17  Q.  I know his name and can't call it.
18  MR. PATTY:  Darrell
19  Singfield.
20  A.  Darrell Singfield (phonetic).  All of
21  those, they were there when I resigned.
22  They knew the reason I was resigning.
23  They knew into --

**99**

1  Q.  **So is it your testimony, Mr. Lowe, that**
2  **that was all a trick for you, and that**
3  **we did all of that and went and got you**
4  **the job back in Montgomery?  And then**
5  **after getting here, that we**
6  **committed some kind of fraud or**
7  **something about that?**
8  A.  I don't know if it was a trick, but the
9  evidence shows that when I returned to
10  Montgomery County, what was
11  communicated -- the job I interviewed
12  for, the job that I was offered, the job
13  that central office knew that Dr. Owens
14  had offered me, the job that Mr. Barker
15  communicated to Bullock County that
16  Mr. Lowe would be coming back to, none
17  of that materialized when I got back to
18  Montgomery County.  So I don't know if
19  you want to call it trickery or what you
20  want to call it, but my contract did not
21  reflect reading coach.
22  Q.  **Why did the Montgomery County School**
23  **System bring you back after the school**

Pages 96 to 99

334.262.3332    Baker & Baker Reporting and Video Services, Inc.    334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

---

**100**

1  year had started?  Were you still trying
2  to get a job here?
3  A. Yes.
4  Q. And you wanted to come back to this
5    school system?
6  A. Yes, I did.  Because this is where I
7    live, and I pay my taxes in Montgomery
8    County.
9  Q. Did you ever have any communication with
10   Dr. Carter when you asked for him to
11   give you a second chance and let you
12   come back here?
13 A. I never asked Mr. Carter to give me a
14   second chance, because I never had the
15   opportunity to talk to him.
16 Q. So you've never had any kind of
17   conversations with Dr. Carter?
18 A. I can testify today I've never had any
19   conversations with Mr. Carter or
20   acknowledgments, other than in church
21   I'll say hi.  I never met with, spoke
22   with, communicated verbally, written
23   communications with Mr. -- Dr. Clinton

---

**101**

1    Carter.
2  Q. Did your mother ever speak to him on
3    your behalf?
4  A. Yes, she did.
5  Q. Okay.  And did your mother ask him to
6    give you a second chance after you had
7    been nonrenewed, after Southlawn?
8  A. My mother asked Mr. Carter to consider
9    allowing me to be rehired.  The second
10   chance, she never communicated a second
11   chance.  Because a second chance for
12   what?  But to allow me to be rehired.
13   Because Mr. Barker and Ms. Lois Johnson
14   indicated that it was all up to
15   Mr. Carter.  And Mr. Barker said that if
16   he lets up, Melvin, I can do it.  But if
17   he doesn't, you know, I don't know.  You
18   know, I don't know why he doesn't like
19   you, but if he says I can hire you, I
20   can hire you.
21 Q. And the conversation you're talking
22   about would have happened in the Summer
23   of '03 after you taught in Bullock

---

**102**

1    County for a year?
2  A. It was during the summer.  I'd have to
3    look back and see.  I don't mean to get
4    rough with you.  I need to see what the
5    dates --
6  Q. I don't think you're being rough.
7  A. -- you know, because the dates are kind
8    of running back to back.
9  Q. Okay.  We'll go -- because your --
10 A. But it was before I came back to
11   Montgomery County.
12 Q. Okay.
13 A. It was that summer before.  Right
14   before --
15 Q. And that was in '03, I believe.  That's
16   why I'm suggesting.
17 A. Yes.  Yes, I'm thinking it is.
18 Q. Okay.  All right.  So according to Lois
19   Johnson and Jimmy Barker, and you don't
20   remember the exact dates, but it would
21   have been that summer, you were kind of
22   being told, the issues with Dr. Carter,
23   you've got to make amends with

---

**103**

1    Dr. Carter.  And at some point during
2    that time, isn't it true that your
3    mother went to speak to Dr. Carter on
4    your behalf, and you weren't present for
5    that meeting?
6  A. Yes, ma'am, that is true.  She went to
7    speak with him.  Because he said that he
8    would not speak with us together, so
9    therefore, my mother elected to go.  A
10   second conference was never extended
11   towards me, because Mr. Carter stated
12   that he would call Mr. Barker and tell
13   Mr. Barker to see what he could do.
14 Q. After your mother spoke with
15   Dr. Carter --
16 A. After, yes, ma'am.
17 Q. -- he was going to talk to Mr. Barker
18   and see what he could do?
19 A. Mr. Carter, after conversing with my
20   mother, said that he would call
21   Mr. Barker and tell Mr. Barker to see
22   what he could do.
23 Q. Meaning placing you in a job somewhere?

Melvin Alonza Lowe, III
January 3, 2006

104

1  A. Hopefully, that's what it meant, yes.
2  **Q. I mean, isn't it fair to say then, when**
3     **your mother left that meeting, that**
4     **Dr. Carter basically said, I'm going to**
5     **try to work something out for him?**
6  A. We were under the assumption that those
7     were his intentions.
8  **Q. And they did? And that is the fall that**
9     **you came back to Montgomery public**
10    **schools? Aside from what you believed**
11    **your job should have been or whatever,**
12    **that's the fall that you got brought**
13    **back as an employee into the school**
14    **system?**
15 A. I will not say that it was an immediate
16    action, because after that initial
17    conference, I still had not received any
18    interviews. I only received one
19    interview, which was with Mr. Michael
20    Linhart the day before school was to
21    open.
22 **Q. And you've told us what he said.**
23 A. So there was -- I mean, as far as you

105

1     would think, if he said I'm going to
2     call Mr. Barker, and Mr. Barker having
3     already promised me and my mother I can
4     do it within an hour or a couple of
5     hours, can get you somewhere. And
6     Mr. Barker was the person who made
7     mention of a reading coach position.
8     Mr. Barker never mentioned a teaching
9     position until I returned to Montgomery
10    County in October.
11          When I questioned him why are
12    you telling me I have to accept this
13    tutor-teacher, teacher-tutor, reading
14    teacher position, when you first
15    mentioned to me a reading coach
16    position. And that was during the
17    summer.
18          And then we went August,
19    September, and October. I didn't hear
20    from any of you-all, and you-all did not
21    hear from me. Then when Dr. Owens
22    interviews me for a reading coach
23    position, after interviewing four women

106

1     before me, and he calls Ms. Hicks, and
2     says, Ms. Hicks, I want Melvin Lowe as
3     my reading coach. Mr. -- Dr. Owens
4     advised me, Go ahead and resign from
5     Bullock County. I placed my
6     resignation. Before my resignation was
7     accepted, the superintendents, both
8     Mr. Keith Stewart and Mr. Lee Ballard,
9     both talked with Mr. Barker repeatedly,
10    more than once, to assure that I was
11    returning as a reading coach, which is
12    clarified by posted announcements as a
13    ten-month position, which the salary is
14    different from a nine-month teaching
15    position. Mr. Barker confirmed this.
16    Dr. Carter asked Mr. Barker, go back and
17    make sure he did not have any problems
18    in Bullock County. Because Mr. Lee
19    Arthur Ballard communicated with my
20    mother and I. He said, Hold on, I
21    have -- Barker is on this line. Hold on
22    and let me get finished with him.
23    Clicked back over. I just told him that

107

1     Carter wanted to know were there any
2     problems. Melvin, they're still trying
3     not to hire you, but Barker knows that
4     the only reason we're releasing you
5     after the first forty-five days is
6     because this is a promotion for you.
7     This is the only reason, because now we
8     have to apply to the state department
9     for additional funds to fund another
10    teaching unit, because your salary has
11    already started.
12 **Q. Well, you didn't keep getting paid by**
13    **Bullock County, did you?**
14 A. No. But the -- I'm sorry.
15 **Q. That's okay.**
16 A. When you said I didn't get -- I wasn't
17    continuously paid by Bullock County, no,
18    I wasn't. The funds stopped at the end
19    of that particular pay period and the
20    days that had exasperated by my
21    working -- but because the funds had
22    been allocated by the state for a
23    particular teacher unit, to bring

108

1   another teacher in after the first
2   forty-five days, special permission has
3   to be approved from the state
4   department. That is the reason the
5   superintendents had to really make sure
6   that we know the reason we're releasing
7   him. Because then other teachers would
8   want to leave their contract to go to
9   another county during the school year
10   after the first forty-five days, which
11   is not the practice of school districts.
12   It's only when a job is presented as a
13   promotion.
14 **Q. You've told us about that summer and**
15   **having conversations with Lois Johnson**
16   **and Jimmy Barker, and I guess words to**
17   **the effect of, You need to apologize to**
18   **Dr. Carter or made amends with**
19   **Dr. Carter. And you've said -- I think**
20   **I've understood your testimony to be**
21   **that you don't know what they were**
22   **talking about? Yes or no?**
23 A. Yes and no. I understood what they were

109

1   saying. They wanted me to apologize.
2   But as far as understanding for what?
3 **Q. Yes. That's what I mean.**
4 A. Okay. Yes, ma'am. I wanted to make --
5   you know, to have it clear. For what,
6   Lois Johnson could never give me -- she
7   didn't even try to say you need to
8   apologize for stepping on his toes.
9   Mr. Barker never said you need to
10   apologize for spilling your Coke in his
11   lap. You just need to apologize, you
12   know, just for any embarrassment or any
13   hard feelings that you may have caused
14   the school district or between you and
15   him.
16 **Q. Did you ever for any period of time**
17   **believe that your problem with**
18   **Dr. Carter was the issues you had had at**
19   **Southlawn with the student complaint?**
20 A. Yes, I did. After the pink slip
21   notification was issued to me, and
22   Ms. Minott was not allowed to rehire me
23   that particular year after she stated, I

110

1   want to hire you; they won't let me hire
2   you. I could clearly see that it was
3   retaliation.
4       And it was also some
5   retaliation because years past my mother
6   had -- she filed an EEOC complaint
7   through AEA. AEA litigated some
8   complaints she had towards employment
9   discrimination with the same school
10   district while Mr. Carter, at that time,
11   I think was the associate
12   superintendent. All of these were
13   factors that caused me to think and
14   still feel very strongly that this is
15   some retaliation.
16       And then this has been
17   communicated to me since then, which
18   further validates your premise was not
19   invalid; it was very valid. Because
20   there have been several individuals
21   since that will state when they look at
22   you, they see your mother. That's why
23   people don't want to hire him, and

111

1   that's the problem Melvin is having.
2   So, yes. Yes, I do.
3 **Q. Okay. So when you were nonrenewed and**
4   **you were not hired back and you went to**
5   **Bullock County that year, and then we**
6   **get into the next summer about the**
7   **conversations that went on with the**
8   **superintendent, between your mother, or**
9   **your conversation with Barker and**
10   **Johnson, it's your testimony that all of**
11   **that happened, in part, because of the**
12   **complaint against you at Southlawn, but**
13   **also, in part, because of your mother**
14   **suing the school board in the past?**
15       MR. PATTY: Object to the
16       form.
17       Go ahead and
18       answer.
19 A. Yes and no. Yes, out of retaliation
20   because Mother filed a grievance against
21   the school board in years past. Not for
22   what happened at Southlawn, because what
23   happened at Southlawn, I was vindicated.

112

1    I was not found guilty. I was targeted
2    because of my disposition that I took
3    with Mr. Barker, one of the
4    investigators, one of the lawyers that I
5    had at that time. And Mr. Carter did
6    not agree with my position. I did not
7    admit to doing what I knew I did not do.
8  Q. Well, that's what I meant, just
9    something to do with that complaint?
10 A. Yes.
11 Q. I didn't mean that --
12 A. Yes. But I just wanted to be able to
13   elaborate and lay everything for you.
14 Q. Well, what evidence do you have that
15   being nonrenewed at Southlawn, and then
16   these issues about being hired back
17   later, what evidence do you have that
18   that had anything to do with your
19   mother?
20       MR. PATTY: Object to the
21       form.
22           Go ahead and
23           answer.

113

1  A. It has been -- it has been communicated
2    to me on more than one occasion.
3    Dr. Owens communicated to me once that
4    the problems you're having in lieu of
5    this lawsuit, prior to the lawsuit, you
6    know, they don't like your mother. You
7    know, your mother filed her grievances.
8    Ms. Lois Johnson has communicated this
9    more than once. And my mother walked in
10   on a conversation that Mr. Barker was
11   having with a particular individual, and
12   I was the topic, that his problem is
13   he's just like her, and his reputation
14   supersedes him. People know what he's
15   going to do and what he's going to say
16   before he gets there. He's just like
17   her. And she walked in on this
18   conversation.
19 Q. How do you know that Jimmy Barker saying
20   that you're just like your mother had
21   anything to do with her filing a
22   lawsuit? What if it had to do with
23   other characteristics or personality

114

1    traits about you?
2  A. Repeat that question.
3  Q. How do you know that his comment, that
4    you're just like your momma, had
5    anything to do with her filing a lawsuit
6    as opposed to you just being like your
7    mother in other ways, good, bad, or
8    ugly, whether it be work habits,
9    personality traits? I mean, how did she
10   know what he was talking about?
11 A. Well, when you look at the issues before
12   us, if it wasn't an issue, why did he
13   even bring it up? Why would he and
14   others constantly communicate it? If it
15   was just a situation or a circumstance
16   or just a passing incident, why do you
17   keep making a mention of it? Why are
18   you equating the problems that I'm
19   having to a past situation that Mother
20   experienced? Why is that a constant
21   correlation?
22 Q. Well, was Jimmy Barker talking about a
23   past situation or experience that she

115

1    had, or was he just talking about your
2    mother?
3  A. No. He was talking about her and a past
4    situation.
5  Q. All right. What did he say? Because
6    that wasn't your testimony. So tell me
7    what he said about a past situation.
8  A. He said that the problems that Melvin is
9    having is that he is just like his
10   mother. His personality and the
11   reputation supersedes him. He's just
12   like her. When people see him, they see
13   her.
14 Q. Okay. Anything else that he said, that
15   she walked in on, that you believe is
16   evidence in regards to retaliation for
17   her prior activity?
18       MR. PATTY: Object to the
19       form.
20           You can go ahead
21           and answer.
22 A. Seemingly, to me, that would be enough.
23   I mean, this is just not an everyday

Pages 112 to 11

334.262.3332                                    334.262.333
888.253.3377                                    888.253.337
Baker & Baker Reporting and Video Services, Inc.
Certified Court Reporters and Certified Legal Video Specialists

**116**

1  conversation.
2  Q. And I appreciate your opinion about
3    that.
4  A. Okay. I understand.
5  Q. But I'm here to get all of the
6    information you've got.
7  A. Yes, ma'am. Yes, ma'am.
8  Q. So I need to know anything else that he
9    has said during that conversation that
10    she walked in on or any other time --
11  A. Okay.
12  Q. -- that you believe Jimmy Barker has
13    said something to you, or he has said
14    something to somebody else that was
15    later related to you --
16  A. Yes, I can.
17  Q. -- that he commented on your mother.
18  A. Yes. Dr. Owens -- and I do have that
19    documented -- informed me, because I
20    even provided it to Dr. Purcell, the
21    conversation that Dr. Owens had with me,
22    and he told me, he said, Melvin, I'm
23    having to defend you. I'm having to

**117**

1  defend hiring you the first time. I'm
2  having to defend you being here every
3  day. And I said, To who? Who have I
4  killed, murdered, molested, or raped?
5  What have I done? You know, Jimmy
6  Barker, they don't like you. He's
7  always talking about your situation with
8  your mother. You're just like your
9  mother. You filing this lawsuit. Your
10  mother filing her lawsuit. See, Melvin,
11  you shouldn't have done all of that.
12  You shouldn't drive that Mercedes, and
13  you shouldn't live in that house that
14  you live in. You shouldn't wear the
15  type of clothes that you wear. You need
16  to get you a little truck. See, people
17  don't like these things. And, you know,
18  they feel that you were born with a
19  silver spoon in your mouth. And, you
20  know, Brother Lowe, I just think maybe,
21  you know, you might need to just leave
22  the school district and maybe wait four
23  or five years, because Jimmy Barker will

**118**

1  be gone, Carter is already gone, and
2  this new Dr. Purcell won't be here.
3  Because, Brother Lowe, you know, you and
4  your momma, they're not going to let up
5  on you.
6      Now, this was communicated to
7  me my last year at Daisy Lawrence by
8  Dr. Owens. And I was very offended.
9  And I felt that there are some more
10  retaliations that are going to occur
11  from this, and I almost begged for help.
12  And I put it to Dr. Purcell's attention,
13  you know, that this is more than, you
14  know, too much to say to someone
15  repeatedly. This is after Lois Johnson
16  had said at least twice, you know,
17  Melvin's problem, Mary, is you. Every
18  time they look at him, they see you and
19  all that you've done in the past. You
20  know, that registers. You know how
21  Carter feels about you, Mary. Melvin is
22  just like you. And I'm not saying it's
23  right or wrong, but Mary, I'm just

**119**

1  telling you. You know, and this has
2  just been communicated over and over,
3  which you can't help but look at it and
4  say, Well, okay, if it's not true, let's
5  look at the treatment that he has
6  gotten. He has gotten some very rotten
7  treatment, so there might be some
8  validity to some of this, if not all of
9  it.
10  Q. When Dr. Owens was talking to you about
11    this, was he saying that Jimmy Barker
12    said these things to him, or was he
13    telling you how he, Dr. Owens, felt?
14  A. Dr. Owens told me that Mr. Barker said
15    this to him the previous day.
16  Q. Did Mr. Barker say anything to Jimmy
17    Owens -- excuse me, to Dr. Owens about
18    your previous -- you filing any kind of
19    lawsuit or your mother filing any kind
20    of lawsuit or charges?
21  A. Yes. Dr. Owens made mention of all of
22    it. Because at that point, I didn't
23    even know Dr. Owens knew about my mother

Pages 116 to 11

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.253.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.337

120

1    filing a lawsuit. I hadn't -- I mean, I
2    don't know how he would have known it,
3    because it wasn't like it was public
4    knowledge. And when he communicated to
5    me and said Mr. Barker, I told myself
6    Barker had to tell him, because who else
7    would have told him? I surely didn't
8    tell him.
9  **Q. Well, did he tell you that, or did you**
10   **think that Barker told him?**
11 A. He told me Barker told him, and that the
12   reason Daisy Lawrence was being closed,
13   it had something to do with all of the
14   complaints from the teachers. And then,
15   Brother Lowe, as he calls me, Brother
16   Lowe, you filed your lawsuit. And
17   Brother Lowe, I mean, you kind of
18   brought all of this on yourself. I
19   don't know what you're going to do.
20 **Q. I understand that --**
21 A. Yes, yes.
22 **Q. -- Dr. Owens said that to you. But did**
23   **he tell you that Jimmy Barker said --**

121

1  A. Yes, he did.
2  **Q. -- Melvin Lowe brought this on himself**
3    **because of his lawsuit, or words to that**
4    **effect?**
5  A. Yes. Yes, Dr. Owens said that. Because
6    he constantly made sure that I
7    understood, Brother Lowe, this is not
8    me; you know, I hired you. I'm just
9    telling you what he told me.
10 **Q. Okay. So those are the two times your**
11   **mother walks in on a conversation with**
12   **Mr. Barker, and you've told us about**
13   **that. You've told us about what**
14   **Dr. Owens said that Jimmy Barker said.**
15   **Any other -- and I know you've talked**
16   **about Lois Johnson, but let's stick on**
17   **Jimmy Barker so I can cover it. Any**
18   **other conversations that you've had with**
19   **Barker or that's been relayed to you**
20   **that he allegedly said about your**
21   **lawsuits?**
22 A. Those were the only ones that I'm aware
23   of. Now, if there were others, I

122

1    wouldn't know. But these are the ones
2    that --
3  **Q. That's all I'm asking for is what you**
4    **know.**
5  A. -- I can say I was there or it was said
6    to me, or, as I said before, I was
7    there.
8  **Q. Okay. All right. Any conversations**
9    **where Dr. Carter has said that to you or**
10   **to anybody else that was relayed to you?**
11 A. Again, Mr. Carter -- Dr. Carter and I
12   have never, ever talked.
13 **Q. Has Dr. Carter ever said anything to**
14   **anybody that was then relayed to you**
15   **that mentioned your mom's past**
16   **grievances or lawsuits and any lawsuit**
17   **of yours? Was Dr. Carter still the**
18   **superintendent when you initially sued?**
19 A. No.
20 **Q. I can't even remember. He wasn't?**
21 A. No.
22 **Q. Dr. Purcell was the superintendent by**
23   **then, okay. Any conversations like**

123

1    **that?**
2  A. There was a conversation that Dr. Carter
3    had with a person not associated with
4    the school district that related to my
5    teaching at Southlawn, that later
6    provided me with the premise that he's
7    discussing you with other people and he
8    has a problem with you.
9  **Q. And he was talking to this person about**
10   **your teaching at Southlawn?**
11 A. He was talking to this individual about
12   the incident that happened, and that he
13   didn't blame me, he would have slapped
14   the shit out of that child, too. Which
15   I was highly outraged, because I did not
16   hit the child. And I resent the fact
17   that it was communicated outside of the
18   central office to other individuals who
19   could or could not have been
20   impressionable at that time towards me.
21 **Q. Who did he tell that to?**
22 A. Mr. Bill Mann (phonetic), who's a
23   salesperson at Buckelew's Clothing for

Pages 120 to 123

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3333
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

124

1    Men.
2  Q. Okay. But has anybody relayed any
3    conversations where he talked about your
4    mother's past grievances or your
5    lawsuits? I guess you hadn't filed one
6    at the time he was there —
7  A. No.
8  Q. — so let's focus on your mother. Okay.
9      All right. I mean, when your
10   mother went in to talk to him, what did
11   your mother tell you that Dr. Carter
12   said?
13 A. Mother told me they had a conversation
14   about their children and how you want
15   the best for your children. And Mom
16   talked to him about how hard that her
17   and my father worked to educate us, my
18   brother and I, and things of that nature
19   and that there's a lot of maturity that
20   has taken place with Melvin. There's a
21   lot more maturity to take place. And I
22   just need you, if you will, to consider
23   allowing him to be rehired. And the

125

1    conversation, her meeting, her
2    conference with him, it wasn't even an
3    hour. It was not even an hour. She
4    said it was very, you know, polite, and
5    it was — she said when she left and
6    she — we talked. We were both under
7    the assumption that, you know, if what
8    Barker said was true about he can get
9    you hired in an hour or a couple of
10   hours, you know, you're getting ready to
11   come back to Montgomery County.
12 Q. So did you feel like at that point that
13   Dr. Carter did a favor for you or did
14   something to help you out? He certainly
15   could have said no, correct?
16 A. I want to go on the Record and say, when
17   you're doing what's right and what's
18   fair and what you do to all employees, a
19   favor shouldn't have anything to do with
20   it. If allowing me to be rehired was a
21   practice that you followed with all
22   employees, wonderful. But if it was a
23   special consideration you were having to

126

1    give to me for whatever reason, I don't
2    see where I should consider that as a
3    favor. We can count it as a
4    professional courtesy, but I won't go on
5    Record and say it was a favor.
6  Q. Okay. That's fair enough, Mr. Lowe.
7  A. Thank you.
8  Q. Let's clarify this for the Record: I
9    understand that you deny that you hit a
10   child at Southlawn, but it's true, is it
11   not, that those allegation were made
12   against you, and that was not the first
13   time that a student had complained about
14   your treatment of them?
15 A. Now, that is not true.
16 Q. Okay. So you would say that was the
17   first time?
18 A. The first time I ever had a complaint,
19   written or oral, that a child alleged
20   that I hit he or she or it was this
21   Southlawn incident. I have never been
22   reprimanded by a principal, a site
23   administrator, or a central office

127

1    administrator of any misconduct,
2    verbally or physically, towards a child.
3  Q. When you were at Daisy Lawrence the
4    first time, was there ever an incident
5    where you were accused of paddling
6    children without permission?
7  A. No.
8  Q. Okay.
9  A. And may I go on Record to finish
10   answering your question. I said no,
11   because I never from Ms. Jeter or a
12   central office person or any other
13   person in authority or capacity ever
14   chastened me, because I never did such
15   without the sanctions of a parent and/or
16   an administrator, never.
17 Q. So if someone said that there was an
18   issue with you paddling children without
19   permission at Daisy Lawrence, you would
20   just say that's not true?
21 A. They never — it was never communicated
22   to me, yes, ma'am. No, so that's not
23   true.

Pages 124 to 12?

128

1  Q. Okay.  What about at Fitzpatrick, were
2     you ever accused of an incident
3     regarding physically handling a child or
4     being overly physical with a child?
5  A. No.  And I can elaborate on the
6     Fitzpatrick situation.  There was a
7     situation when I physically removed a
8     child from a seat in the lunchroom.  And
9     Ms. Thompson never reprimanded me,
10    because she was present when I moved the
11    child.  I picked the child up and moved
12    the child.  And I went to her and told
13    her what happened and the reason I moved
14    him.  And I even phoned the parents, the
15    father and informed him of what I did
16    and why I did it.  No, there was never
17    any reprimand, verbally or written, that
18    I inappropriately handled a child.
19 Q. And I wasn't asking if you were
20    reprimanded, I was just trying to --
21 A. Yes, ma'am.
22 Q. So if there was -- if there is any kind
23    of information regarding the handling of

129

1     a child at Fitzpatrick, you would know
2     what they were referring to, but you
3     would just disagree that you handled the
4     situation inappropriately?
5  A. I know exactly.
6  Q. What they're referring to?
7  A. What they're referring to.
8  Q. Okay.  So when you went your third year
9     to Southlawn, and if you'll look at the
10    documents that are marked as Defense
11    Exhibit 3 and glance over those, I
12    believe that these are the documents
13    that refer to the incident that we've
14    been referring to?
15         (Whereupon Defendants'
16          Exhibit No. 3 was marked
17          for identification and
18          attached hereto.)
19         (Witness reviewed
20          documents.)
21 A. Yes.
22 Q. I guess my question to you is that
23    regardless of what your position is as

130

1     to whether or not that you acted
2     inappropriately, it's certainly
3     undisputed that a child said you did,
4     and there was an investigation, and you
5     were actually suspended as a result of
6     it, correct?
7  A. Yes.  With pay, yes.
8  Q. Okay.  And the year that you were
9     nonrenewed followed this Southlawn year?
10 A. Yes, it did.
11 Q. Okay.  And you were then told that you
12    needed to apologize or made amends with
13    Dr. Carter to get a job back with the
14    school system, and your mother went on
15    your behalf to speak with him, and after
16    that conference, you were eventually
17    hired back in the Fall of 2003; is that
18    correct?
19 A. I need to answer that in detail.
20 Q. Okay.
21 A. With those charges that took place at
22    Southlawn, those are charges that when
23    you read what Mr. Barker scribed, they

131

1     were unfounded.  And I was found, not
2     only by the investigation of the school
3     board, but the City of Montgomery found
4     me not guilty and dismissed those
5     charges.  And I was placed back in my
6     position as a teacher, not only at the
7     request of the central office, but the
8     principal requested that I return.
9  Q. But -- I'm sorry.  Go ahead.  I
10    apologize.
11 A. At the end of the year, that school
12    term, the nonrenewal came from
13    central -- well, all of them are
14    generated out of the central office, but
15    Ms. Tina Minott did not issue one for
16    me.  My termination letter came the day
17    after all of the other teachers'
18    termination letters came.  And she
19    admitted to me on several -- on more
20    than one occasion, Melvin, I didn't do
21    this.
22         Even after I got the
23    nonrenewal and I applied following the

Pages 128 to 131

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

Melvin Alonza Lowe III
January 3, 2006

132

1    procedures to be rehired at Southlawn
2    Middle, she then again cried on my
3    shoulder. And she said, Melvin, they
4    won't let me rehire you.
5        Ms. Minott wrote me letters of
6    recommendation for other school
7    districts to attain employment. I then
8    went to Bullock County, because I had no
9    other choice. I was forced. I couldn't
10   gain employment in Montgomery County.
11       And when I returned to
12   Montgomery County, it was a year and
13   some months after I was retaliated
14   against and also discriminated against
15   with the nonrenewal, the pink slip. My
16   mother spoke to Dr. Carter on my behalf,
17   because he would not meet with us
18   together.
19 Q. Why didn't you meet with him by
20   yourself?
21 A. Well, when we initially asked for a
22   conference and he said that he wouldn't
23   meet with us together, Mother was then

133

1    the first person they offered a
2    conference to. And then after Mother
3    met with him, I was never extended a
4    conference.
5  Q. Is it fair to say that during your
6    career with Montgomery public schools,
7    that your Mother often made
8    communications with people for you or on
9    your behalf or with you?
10 A. My Mother does or did and will do what
11   any other mother would do. She
12   communicated with persons with reference
13   to me, my brother, for whatever reason
14   needed.
15 Q. Let's look at this real quick, because I
16   want to clarify something.
17 A. Okay.
18 Q. This letter actually says that the
19   findings were inconclusive as to Count
20   I. That Count II was verified, which is
21   where you were accused of using
22   profanity and demeaning language in
23   addressing students. And I'm not asking

134

1    you to say you did that.
2  A. Yes.
3  Q. But that the conclusions of the
4    investigation says that it found you did
5    that, and that you were suspended for
6    five days. And these documents reflect
7    that you signed an agreement that as
8    part of your punishment, there was going
9    to be this letter of reprimand in your
10   file and a five-day suspension?
11 A. Yes, ma'am.
12 Q. And so, I mean, do you disagree with
13   that's what the resolution of this was?
14   I mean, you're saying that you were
15   found clear and put back to work. I
16   didn't see any documentation where this
17   was undone or changed. It appears to me
18   that you were given a letter of
19   reprimand and a five-day suspension for
20   your conduct in that incident.
21 A. To answer that, you can't unchange the
22   charges. The charges are -- I mean,
23   it's documented with the city that the

135

1    charges were thrown out of city court.
2    That merely suggests that an
3    investigation -- in my terminology, was
4    suggesting that an investigation was
5    done, and that on two of the charges, we
6    were inconclusive. That's a nice way of
7    saying, we think you did it, but we
8    can't prove you did it. The last charge
9    is saying that we feel that you did it,
10   and we have evidence and we have some
11   tangible documentation that you did do
12   it. The only thing, me signing that, is
13   agreeing to that going into my personnel
14   folder and accepting the five-day
15   suspension. I did not admit to any of
16   that.
17 Q. Do you disagree that there were
18   witnesses that said you acted like that
19   towards the children?
20 A. I still disagree.
21 Q. Okay. So you just believe that those
22   witnesses gave false information?
23 A. The witnesses -- because an -- the

Pages 132 to 135

136

```
 1    initial investigation was conducted --
 2    it was conducted by Ms. Tina Minott.
 3    And she communicated to me, Melvin, I
 4    think you will be back to work the next
 5    week.  Then when that investigation did
 6    not satisfy Mr. Carter, he then had
 7    Mr. Barker to reinvestigate, which was
 8    where you had conflicting stories with
 9    the students.
10 Q. Do you agree that as the superintendent,
11    that he would be -- that he would take
12    allegations like this very seriously and
13    that he would make sure there was a
14    thorough investigation?  Do you disagree
15    with how he handled that?
16 A. I disagree.  And being that I'm also
17    certified in administration and I know
18    policy and procedure, I disagree with --
19    if you have your competent administrator
20    that you appointed and placed in the
21    school as the instructional leader, and
22    you ask -- that person provided you with
23    an investigation, it just appears odd
```

137

```
 1    that you would then on the same breath
 2    order another investigation.  And then
 3    when you order another investigation,
 4    your findings are a little different on
 5    two -- I mean, the same on two of the
 6    charges, but a little bit different on
 7    the other.
 8        And I asked that, because
 9    during that same incident, there was a
10    female teacher, a white female teacher
11    at Harrison Elementary School who was
12    found guilty, who admitted to slamming a
13    child's head on a desk.  One
14    investigation was done by the principal,
15    and that teacher was placed on leave, as
16    I, brought back off of leave, but that
17    teacher did not receive a nonrenewal at
18    the end of the year.  That teacher was
19    advised the same as I was, to admit to
20    what you did.  But in my situation, I
21    was advised, Just admit to what you did.
22    And, Melvin, just let them curse you --
23    let Mr. Carter and Dr. Barker curse you
```

138

```
 1    and yell at you and, you know, it will
 2    be over with.  Now, this was the advice
 3    I was given --
 4 Q. Did Dr. Carter and Mr. Barker curse and
 5    yell at you about this?
 6 A. Well, I think if they'd been given the
 7    opportunity, they might.  Dr. Carter --
 8 Q. Okay.  That's not my question.
 9 A. No.  No, they did not.
10 Q. Okay.  Thank you.
11 A. Mr. -- may I finish?  I'm sorry.
12        MR. PATTY:  Were you
13            finished with
14            your . . .
15        THE WITNESS:  No.  I wasn't
16            finished with it.
17 Q. And go ahead.  I apologize.  I just
18    heard that and wanted to get a
19    clarification of --
20 A. Under the advice of the attorney that I
21    had at that time --
22 Q. Who was your attorney?
23 A. Attorney Brenton Dean.
```

139

```
 1 Q. Okay.  Go ahead.
 2        MR. PATTY:  Don't get into
 3            what Brenton Dean's
 4            told you.
 5        THE WITNESS:  Oh, okay.
 6        MRS. CARTER:  Yeah, I
 7            didn't --
 8 A. Okay.  Well, there was --
 9 Q. I've never heard of that person.
10 A. It was a similar, very similar
11    situation, an altercation with a
12    student.  But the outcome, she was not
13    nonrenewed at the end of the year; I
14    was.
15 Q. Okay.  So the bottom line is that you
16    just disagree with how they handled
17    that?
18        MR. PATTY:  Object to the
19            form.
20 A. Yes.
21 Q. All right.  Let me back up for a second
22    and get something that we don't have
23    here on the Record:  After the 2003-2004
```

Pages 136 to 139

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

140

1     school year, which is your first year
2     back at Daisy Lawrence -- or back in the
3     school system and you're at Daisy
4     Lawrence?
5  A. I'm listening. I'm just having to
6     calculate in my head, so yes, yes.
7  Q. Okay. We'll figure it out eventually.
8  A. I was trying to look over there, but --
9     okay.
10 Q. We've almost worked through this. After
11    that year, you were nonrenewed, correct?
12 A. Yes.
13 Q. So in the Spring of 2004?
14 A. May, yes.
15 Q. Okay. And do you know if it was --
16          MR. PATTY: Melvin --
17          THE WITNESS: We need to
18          look back at that.
19          MR. PATTY: I think there
20          was -- hold on just a
21          second. I think there
22          was an attempt, but I
23          don't think it

141

1          actually --
2          MRS. CARTER: Right. That's
3          right. And I
4          understand that. And I
5          was about to get into
6          that. So I might be
7          using the wrong word.
8     BY MRS. CARTER:
9  Q. There was an attempt -- I mean, as I
10    understand it, and this might be the
11    easiest way to do it, and you tell me if
12    I'm wrong, is that there was an attempt
13    to nonrenew you, but actually because of
14    the massive nonrenewals that year, did
15    not get on the Board minutes. And so
16    you were actually placed back in your
17    same position as if you had never been
18    nonrenewed, because the nonrenewal was
19    never effectuated through the school
20    board voting. Did I say that about
21    right?
22 A. You said it right, but it's true and not
23    true. No, everything you said was true.

142

1     I did not go back into the same
2     position.
3  Q. Okay. Let me show you what I've marked
4     as Defense Exhibit 4.
5          (Whereupon Defendants'
6          Exhibit No. 4 was marked
7          for identification and
8          attached hereto.)
9          (Witness reviewed document.)
10 A. Okay. And the reason I said I did not
11    go back in the same position, I am
12    categorizing the position as far as the
13    job that I was charged or tasked,
14    T-A-S-K-E-D, to do. The first year at
15    Daisy Lawrence, I was on paper hired to
16    do one thing, but I was tasked and
17    evaluated doing something else. The
18    second year, I was tasked to do
19    something else, still in opposition to
20    what was on the contract.
21 Q. Okay. Look at Defense Exhibit 4 for me.
22    And it says there that you're being
23    placed back at the -- it says same

143

1     position as last year, and it says
2     teacher-tutor. Is that what this
3     document states?
4  A. That's what this document states. But
5     to finish this statement, the first time
6     I saw this was when it was presented to
7     Attorney Patty. I don't know when they
8     did this. I don't know when this took
9     place.
10 Q. So is it your testimony that you were
11    not a teacher-tutor that last year you
12    worked there?
13 A. To be honest, as I have been, and not
14    sarcastic, that second year, I was more
15    confused than what I did the first year.
16    I don't know what I was the second year.
17 Q. Well --
18 A. Let me -- can I explain that so you
19    won't -- so you're not lost?
20 Q. Yes, please.
21 A. The school only had a population of
22    students the entire year of no more than
23    maybe twenty-five students. I did not

Pages 140 to 14

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.337

144

1  have any students to teach. The
2  prescribed curriculum for reading
3  intervention that we were to implement
4  never materialized. It never
5  manifested. There was never any full
6  implementation of the program. It was
7  communicated to me that part of your
8  punishment, Brother Lowe, is I got to
9  move you. I have to. I've got to move
10 you out of the front office, where my
11 office was. I was moved into a
12 classroom, which I set up like a
13 classroom, slash, an office. And what
14 did I do every day all day?
15 Q. I don't know.
16 A. I don't either. That is -- I mean,
17    that's just how humiliating -- the first
18    year was whatever it was, but the second
19    year was very humiliating.
20 Q. Isn't that partly because your job no
21    longer existed at the school which is
22    why they tried to -- one of the reasons
23    they tried to nonrenew you. And then

145

1    when they messed up your nonrenewal and
2    had to put you back at work, there,
3    quite frankly, wasn't an exact job for
4    you to go into? Wasn't that part of the
5    problem?
6  A. That could have been. It was never
7    relayed to me that way.
8  Q. Did you get paid?
9  A. I did. But I was being paid to perform
10   a particular duty. And what I thought I
11   was supposed to do was what I did the
12   previous year, which was I was the
13   reading coach.
14       When the curriculum changed, I
15   still knew what to do. I knew the
16   program, because I had implemented that
17   program the prior summer in the summer
18   program. And I made complaints to the
19   central office, the students are not
20   being serviced. And I think a lot of
21   that, my complaints to the central
22   office, we need the material, the
23   students are not being serviced, I'm not

146

1  going to turn this -- I'm not going to
2  lie about this assessment. You know, a
3  lot of that I feel played into some of
4  the other -- the string of retaliations.
5        Because the second year with
6  twenty-five students, we never received
7  the curriculum, the teachers were never
8  trained on the program. I was certified
9  to train them. I was never given an
10 opportunity to train them. And it
11 was -- you know, what did I do, anything
12 Dr. Owens asked me to do, but it wasn't
13 teaching and instruction. And the
14 central office was very aware of this,
15 because I communicated this to quite a
16 few people. All of the superintendents
17 knew.
18 Q. Did you ever talk to Jimmy Barker about
19    what was going on there the last year?
20 A. I talked to Mr. Jimmy Barker, Ms. Lois
21    Johnson, Mr. Mike Looney. I even
22    conferenced with Dr. Purcell.
23 Q. Daisy Lawrence is gone now, right?

147

1  A. The building is still there, but the
2    program that it housed --
3  Q. That's what I mean.
4  A. Yes, ma'am.
5  Q. In the summer between -- in the Summer
6    of '04, before you started that last
7    year, just to give you your bearings,
8    the summer before your last year with
9    the school system --
10 A. Gotcha.
11 Q. -- did you have any conversations with
12    Jimmy Barker or Mike Looney or Carolyn
13    Hicks or Lois Johnson, any of those
14    people, about what your placement was
15    going to be or where you were going to
16    go or what jobs you wanted to work, as
17    opposed to going back to Daisy Lawrence,
18    any of those conversations -- any
19    conversations with those people? Excuse
20    me.
21 A. Yes. May I elaborate on those
22    conversations?
23 Q. Yes, yes.

148

1  A.  The conversations stemmed anywhere from,
2     will I be going back to Daisy Lawrence;
3     what is the outcome of some of these
4     other jobs I have applied for; what are
5     the outcomes of some of these jobs that
6     I have interviewed for.  So the
7     conversations were -- yes.  They were
8     very direct with specific meaning, with
9     specific concern.  And they were lengthy
10    in some situations.
11 Q.  Do you know on -- do you know when
12    anybody with the Montgomery public
13    school system would have learned that
14    you'd filed an EEOC charge?
15 A.  The first person who mentioned it to me,
16    and it blew me out of the water that
17    this person would know about it -- my
18    mother, of course, knew.  When Dr. Owens
19    mentioned to me that Mr. Barker informed
20    him of what I did -- now, Dr. Owens
21    didn't tell me when he mentioned it.  He
22    said, Brother Lowe, you didn't think I
23    knew that.  I was knocked out of the

149

1     water, because I had not mentioned that
2     under directions of AEA.  That had not
3     been communicated to anyone.
4  Q.  And was that during your last year of
5     teaching there?
6  A.  That was that last year.
7  Q.  So the first you would have known about
8     Montgomery public schools knowing, is
9     Dr. Owens telling you during your last
10    year of school there?
11 A.  That he knew.
12 Q.  That he knew.  How many weeks or months
13    into the school year before you had that
14    conversation with him?
15 A.  As you go back and look at one of those
16    documents with the e-mail I sent to
17    Dr. Purcell, it was -- the day we
18    received the pink slip notifications at
19    Daisy Lawrence, it was -- I don't want
20    to say the wrong thing.  It was either
21    the day before or the day after.  It was
22    right there.  It was --
23 Q.  So it was at the end of your last --

150

1  A.  The end of that last year.  It was
2     either the day before or the day after.
3     I would have to look back at the notes,
4     but it was right there.
5  Q.  But you had actually filed something at
6     the beginning of, I guess, the Summer of
7     '04?
8  A.  Those were grievances, AEA grievances, I
9     believe.  They were on the PR&R form.
10           MR. PATTY:  Yeah, but
11              that -- she's talking
12              about something you
13              filed with Montgomery
14              County, not something
15              you filed with AEA.
16           THE WITNESS:  I would have
17              to look at the dates.
18           MR. PATTY:  Yeah.
19 A.  I would have to look at the dates.
20 Q.  Okay.  That's fine.
21 A.  I'm sorry.
22 Q.  Let me show you what I'll mark as
23    Defense Exhibit 5, and ask if that's a

151

1     copy of what you sent to the EEOC?
2         (Whereupon Defendants'
3            Exhibit No. 5 was marked
4            for identification and
5            attached hereto.)
6         (Witness reviewed document.)
7  A.  This is --
8           MR. PATTY:  It's about
9              12:15, so we're about
10             five minutes away from
11             being an hour into it.
12           MRS. CARTER:  Okay.  Let me
13             mark this stuff real
14             quickly.
15           MR. PATTY:  Yeah.
16           MRS. CARTER:  That way I'll
17             be thinking about it
18             while I'm gone, and
19             then we'll go.
20           MR. PATTY:  Yeah.
21 A.  This is it, yes, ma'am.
22 Q.  Is that the first thing you sent to them
23    as far as the substance of what your

Pages 148 to 15

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.333
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists         888.253.337

152

1    complaint would be?
2  A. Let me look back at this. I know I sent
3     them a complaint. And then I think I
4     did an addendum. If you let me see
5     that.
6  Q. Yeah. I was going to say, let me show
7     you. It might be easier for me to show
8     you what I have, and then you can kind
9     of put it together for us. Defense --
10 A. Well, I'm going along with the dates.
11    This is the August 2nd.
12 Q. Yeah. Defense Exhibit 6 is August 3rd.
13          (Whereupon Defendants'
14           Exhibit No. 6 was marked
15           for identification and
16           attached hereto.)
17          (Witness reviewed document.)
18 A. This is the 3rd.
19 Q. I had several August 3rds, but I think
20    they're exactly alike. And then I had
21    another one that says, Addendum-
22    Complaint of Employment Discrimination
23    that I'll mark as Defense Exhibit 7.

153

1          (Whereupon Defendants'
2           Exhibit No. 7 was marked
3           for identification and
4           attached hereto.)
5          (Witness reviewed
6           documents.)
7  A. Okay.
8  Q. Grievance previously filed -- oh, that's
9     why this is dated that. It says
10    grievance --
11 A. Previously filed. That was the
12    addendum. Right here, I think I blind
13    copied that to someone, and that's the
14    reason the date is different. I know
15    exactly who I blind copied this to. On
16    the second date --
17 Q. So those two documents are the same?
18 A. These are the same.
19         MR. PATTY: 5 and 6 are the
20           same.
21 A. August 2nd and August 3rd are the same.
22    One has EEOC's date on it -- I mean,
23    address. This one does not.

154

1  Q. I gotcha.
2         MR. PATTY: For the Record,
3           Exhibit 5 and Exhibit 6
4           are the same document.
5  A. Are the same documents.
6  Q. The substance of them are the same. The
7     addresses are different or whatever;
8     they were sent on different dates?
9  A. Yes.
10 Q. And then the next document I'll show you
11    is Defense Exhibit 7. And it's not
12    dated that I can tell, but it says that
13    it's an addendum to a previously filed
14    grievance on August 3rd, 2004?
15 A. It is.
16 Q. So that would have been the next
17    document you filed?
18 A. Yes, ma'am.
19 Q. All right. Then let me show you what
20    I'll mark as Defense Exhibit 8. And
21    this appears to be an actual EEOC charge
22    or on the EEOC charge form, or typical
23    forms, dated October 11th of 2004, that

155

1     you have signed?
2  A. Yes.
3  Q. Is that the first one of those that you
4     signed?
5  A. I believe so, because in August,
6     September, October -- yes.
7  Q. Is Defense Exhibit 8 something that
8     somebody at the EEOC drafted for you
9     after you sent them this information
10    that's in 5, 6, and 7?
11         (Whereupon Defendants'
12          Exhibit No. 8 was marked
13          for identification and
14          attached hereto.)
15         (Witness reviewed document.)
16 A. I'm assuming that's how it works,
17    because I had not spoken to anyone until
18    after this was mailed. And the same day
19    I got a call, did you receive it? It
20    was in the mail.
21 Q. Okay. So you sent them Exhibit 5 and
22    then updated it with Exhibit 7. And
23    then at some point you were sent Defense

Pages 152 to 155

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

Marvin Aldoza Lewis
January 3, 2006

156

1    Exhibit 8 to execute or to sign?
2  A. And there was one -- there was -- they
3     sent me one and there was some errors in
4     it. And then they went back and amended
5     it with some corrections. So I'm going
6     to see all copies, if you don't mind.
7  Q. Yeah. I'm going to give it to you. Let
8     me show you what's been marked as
9     Defense Exhibit 9. Is that a letter
10    that you wrote to them?
11         (Whereupon Defendants'
12         Exhibit No. 9 was marked
13         for identification and
14         attached hereto.)
15         (Witness reviewed document.)
16 A. Yes.
17 Q. And did you write that letter in
18    response to what they had --
19 A. After I received this, I then had to go
20    back and provide clarity when I wrote
21    the letter on October 11, which is
22    Exhibit No. 9.
23 Q. And when he says "after I received

157

1     this," he's pointing to Defense Exhibit
2     8.
3  A. 8.
4  Q. And so you got Defense Exhibit 8, and
5     you went back and you sent them a letter
6     adding --
7  A. Yes.
8  Q. -- some more detail or clarifying
9     things?
10 A. Clarity, yes, ma'am.
11 Q. And then I have what I'll mark as
12    Defense Exhibit 10, which is another
13    EEOC charge that's dated November 12th
14    of '04. If you'll take a look at that
15    for me.
16         (Whereupon Defendants'
17         Exhibit No. 10 was marked
18         for identification and
19         attached hereto.)
20         (Witness reviewed document.)
21 A. This is where they made -- added the
22    corrections to it.
23 Q. Is that where they corrected or added

158

1     things?
2  A. Yes, they added some things.
3  Q. And you re-executed that?
4  A. Yes.
5  Q. You signed it?
6  A. Yes, ma'am.
7  Q. Okay. Did you sign any other EEOC
8     charge, that you know of? And I'm not
9     talking about information you might have
10    sent them along the way, but any other
11    document that looks like Defense Exhibit
12    8 or 9?
13 A. To the best of my recollection, no,
14    ma'am.
15 Q. Okay. So once they got this fixed and
16    you signed it, that was your charge, and
17    you haven't filed anything like this
18    since, like Defense Exhibit 10?
19 A. None other than having charges amended,
20    but that came through my lawyer. I did
21    not send anything else to EEOC
22    independently or sign anything else
23    independently outside of these two

159

1     documents.
2  Q. Yeah. And I think your lawyer amended
3     your complaint, and we'll get into all
4     that later, but that was -- that's not
5     something that would have gone through
6     the EEOC?
7  A. No.
8  Q. All right.
9         MRS. CARTER: All right.
10        Let's take a lunch
11        break, if you guys want
12        to. I think that we'll
13        be able to move faster
14        after lunch.
15        (Whereupon a lunch break was
16        taken.)
17        (Jimmy Barker now present.)
18 BY MRS. CARTER:
19 Q. All right. When we took the break, we
20    were marking, I think, some EEOC
21    documents. And I didn't mark this one,
22    which was the dismissal and notice of
23    right to sue letter that I've marked as

160

1  Defense Exhibit 11. Does that look like
2  a copy of what you received from the
3  EEOC at the conclusion of their
4  investigation?
5       (Whereupon Defendants'
6        Exhibit No. 11 was marked
7        for identification and
8        attached hereto.)
9       (Witness reviewed document.)
10 A. It is.
11 Q. Okay. In looking back -- let me go back
12    first quickly and ask you a couple of
13    things about your employment history.
14    First of all, you made mention that you
15    had substitute teached for the school
16    system before you got your first
17    full-time job in 1999?
18 A. I did.
19 Q. Okay. And tell me what years you
20    substituted.
21 A. It was just a short period. It was in
22    the year of '99.
23 Q. That spring?

161

1  A. Maybe April and May. It was a short
2     period right after an internship.
3  Q. And did you have any problems with that
4     or were there any issues?
5  A. No.
6  Q. Okay. I noticed that on -- and I'm
7     going to refer to the second EEOC
8     charge, if that's okay, since this was
9     the corrected version or the latest
10    version. And it says in the first
11    sentence that you have sought employment
12    and tenure with this employer since
13    1997, and that you have been denied the
14    opportunity to obtain employment within
15    your area of certification or to obtain
16    tenure. And just for clarification,
17    were there times that you tried to get a
18    job in '97 or '98 that you were not
19    allowed to get a job that you claim were
20    discrimination or retaliation?
21 A. We can site that as a technicality with
22    the date. Because I did not apply for
23    anything until I was certified in 1999.

162

1  Q. Okay. And so you think maybe that
2     should say May of '99?
3  A. It should say May of '99.
4  Q. Okay. And that's fine. I just wanted
5     to make sure there was nothing I should
6     ask you about.
7  A. Okay.
8  Q. Okay. So we're talking about May of
9     '99? In the Summer of 1999, which was
10    the first year you would have had your
11    certification, you applied, you got a
12    job. Were there other school districts
13    that you got a job with -- I mean that
14    you got a job offer from?
15 A. In 1999, no. I did not apply to any
16    other school district.
17 Q. Okay. So you only applied with
18    Montgomery?
19 A. Only Montgomery County.
20 Q. What about the Summer of 2000, for the
21    2000-2001 school year?
22 A. That was the very next year? Just
23    Montgomery County.

163

1  Q. You didn't apply with other school
2     districts?
3  A. No.
4  Q. What about for the '01-'02 school year?
5     And just to give you your bearings,
6     that's the summer that you transferred
7     from Fitzpatrick to Southlawn.
8  A. Just Montgomery County.
9  Q. Okay. And then after you left
10    Southlawn, you became nonrenewed that
11    year; we know you got a job in Bullock
12    County?
13 A. Macon County and Elmore County. And
14    there might have been a host of others.
15    I think I have some notations of the
16    different school districts I applied if
17    I could thumb back through here. Yeah,
18    here they are. Macon, Dallas.
19 Q. Okay. And you're referring to Defense
20    Exhibit 7?
21 A. Yes.
22 Q. It's the second page of this document,
23    and the numbers are -- the numbering of

Pages 160 to 163

Melvin Monza Lowe, III
January 3, 2006

**164**

1    the document is at the top right-hand
2    corner. And it states here -- well,
3    this looks to be a complete listing of
4    everybody that you at this point had
5    interviewed with. And what you've done
6    is named the person and the school, and
7    then indicated whether you were hired or
8    not, if it was a Montgomery County
9    school position, and then for other
10   counties -- for Bullock County, you also
11   named the person and the job. But then
12   for these other counties, you've just
13   listed counties to be Macon, Dallas,
14   Selma City, Lee County, Autauga County,
15   Elmore County, and Tuskegee University.
16   And you've indicated that in every one
17   of those circumstances you were offered
18   a job. Are you talking about -- and
19   this letter might tell us this -- are
20   you talking about that Summer of 2003 --
21   excuse me -- of 2002 when you got the
22   job with Bullock County?
23 A.  The last -- right after Southlawn, that

**165**

1    summer.
2 Q.  Right. Right after -- that's what I'm
3    talking about. After Southlawn, that
4    would be the Summer where you had
5    interviewed for all these jobs?
6 A.  Yes.
7 Q.  Okay. I don't want to confuse you.
8    This letter is dated in August of '04.
9    So I guess I'm trying to figure out if
10   there are any --
11 A.  This is when I sent the addendum to
12   EEOC.
13 Q.  Yes, sir.
14 A.  This is when it was --
15 Q.  I think actually that this is the date
16   that you reflect in your previous one.
17 A.  Yeah, the previous one was previously
18   filed.
19 Q.  I don't think that Defense Exhibit 7
20   actually has a date, but, I mean, I
21   guess we could assume it followed it at
22   some point.
23 A.  7, okay.

**166**

1 Q.  And just so you'll know where I'm
2    headed, I'm trying to ascertain what
3    jobs you interviewed for the Summer of
4    '02 after you were nonrenewed from
5    Southlawn. I'm trying to ascertain what
6    jobs you interviewed for that summer as
7    opposed to the next summer. So maybe
8    the best way to ask it is: The summer
9    before you got hired with Bullock
10   County, that during that summer when
11   you're looking for a job, you've been
12   nonrenewed; you're looking for a job --
13 A.  The first -- I don't mean to cross
14   you -- the first summer?
15 Q.  Yes, sir.
16 A.  All of these. That last summer, I only
17   went back to Macon County.
18       MR. PATTY: All right. So
19       that's --
20 Q.  Okay. So let's peg that down.
21       MR. PATTY: Yeah, let's
22       get -- clarified it.
23 Q.  So after you were nonrenewed from

**167**

1    Southlawn -- and I know it's from public
2    schools, but I'm using the name of the
3    school so we can keep the time frame in
4    our head. After you're nonrenewed from
5    Southlawn, you interviewed -- on Defense
6    Exhibit 7, No. 3 lists A through O. And
7    it's your testimony that those are all
8    of the positions or places where you
9    would have interviewed to get a job?
10 A.  Yes, they are.
11 Q.  Okay. And in looking at this, this says
12   the places that you were -- that you've
13   interviewed with Dr. James Singleton at
14   Davis Elementary School and you were not
15   hired?
16 A.  I was not.
17 Q.  And what position were you interviewed
18   for?
19 A.  A teacher position.
20 Q.  And do you claim any type of
21   discrimination or retaliation in regards
22   to not being hired in that job?
23 A.  Mr. Singleton just stated that I had a

Pages 164 to 167

168

1    poor interview, and I was disrespectful
2    in the interview.
3 Q. Okay.
4            MR. PATTY:  Did you ask the
5                question, did these
6                show places he had
7                interviewed since
8                Southlawn?
9            MRS. CARTER:  Yeah.  And I
10               can already tell that
11               we're wrong, because
12               he's listed places that
13               he worked before.
14           MR. PATTY:  Right.
15           MRS. CARTER:  I'm just going
16               to buzz through them
17               real quick.
18           MR. PATTY:  It says May
19               1997, is what it says
20               on 3.  It says these
21               are people I've talked
22               to or interviewed since
23               May of 1997.

169

1    BY MRS. CARTER:
2 Q. Well, and I'm going to assume that when
3    you refer to '97 throughout Defense
4    Exhibit 7, that you mean '99.
5            MR. PATTY:  Right.
6 A. '99.
7            MR. PATTY:  Okay.
8 Q. I guess I should have clarified that,
9    but I was just going to assume it after
10   what you'd told us.
11 A. Okay.
12 Q. Do you remember then what summer you
13    interviewed with Dr. James Singleton?
14 A. That was in '99, because I had just
15    gotten certified.
16 Q. Okay.  And he said you had a poor
17    interview?
18 A. And was disrespectful in the interview.
19 Q. Okay.  Do you have -- so that was when
20    you first got hired then.  I guess that
21    that is not one of the jobs in which you
22    claim discrimination or retaliation?
23 A. You can call it what it is.  Just

170

1    nothing manifested.  I didn't get the
2    job.
3 Q. Okay.  Well, throughout your deposition
4    I'm going to want to know
5    specifically --
6 A. Okay.
7 Q. -- what jobs you're talking about that
8    were adverse --
9 A. Okay.
10 Q. -- employment actions.  Because we've
11    got a whole lot of jobs here that we've
12    got to weed through.
13 A. Okay.
14 Q. And so if there's anything in particular
15    to any of these jobs, here's your chance
16    to articulate that.
17 A. Okay.
18 Q. So do you have any reason to believe
19    that Dr. James Singleton not hiring you
20    was discriminatory or retaliatory?
21 A. No, not that particular job.
22 Q. All right.  What about Mrs. Lilli --
23 A. Lillian Sanders?

171

1 Q. -- Lillian Sanders?
2 A. Mrs. Sanders offered me the job and
3    actually sent me back down to the
4    central office to fill out my paperwork.
5    And she called me in the car and told me
6    not to go.
7 Q. Okay.  What summer was this?
8 A. '99.
9 Q. So that was the summer before you
10    started working, too?
11 A. Yes.
12 Q. And then she called you in the car and
13    told you not to go down to central
14    office?
15 A. Yes.
16 Q. And is there anything you're claiming
17    there that was retaliatory or
18    discriminatory?
19 A. She later told me that Mrs. Hicks
20    talked -- she told me and my mother that
21    Mrs. Hicks, Carolyn Hicks, talked her
22    out of hiring me.
23 Q. In 1999?

Pages 168 to 171

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

172

1 A. In 1999.
2 Q. And did she tell you why Mrs. Hicks
3    talked her out of it?
4 A. No. She just said, I don't want you-all
5    mad with me, but Mrs. Hicks talked me
6    out of hiring you.
7 Q. And you don't know why?
8 A. No, I don't.
9 Q. All right. C says Mr. Vince Johnson.
10    He's indicated as currently principal of
11    Goodwin Junior High School. It says you
12    completed your elementary internship
13    under him and that he did not hire you.
14    What summer was that?
15 A. Summer of 1999.
16 Q. And you interviewed for a teaching
17    position?
18 A. Yes.
19 Q. Did he recommend that you be hired?
20 A. I don't know what he did. He told me
21    that he had to hire a white female on
22    one occasion. Then he told me he had to
23    hire a male on another occasion.

173

1    Nevertheless, I didn't get hired.
2 Q. In the summer -- did you interview with
3    him more than once in the Summer of '99?
4 A. No, it was just that once.
5 Q. Mr. Johnson not hiring you -- well, and
6    your lawyer can help me clarify this.
7    In 1999, you ultimately got a teaching
8    job, so I guess my question is: Do you
9    have a complaint of discrimination or
10    retaliation regarding any of the jobs
11    you would have interviewed for and not
12    awarded?
13 A. Some of these circumstances are in the
14    sequence of the event that I've alleged
15    that led up to where we are now.
16    Constantly going through interviews,
17    everybody pulling some red tape at the
18    last minute why they can't hire you,
19    which leads to there's a reason. Based
20    on what I've always been told more
21    recently, you know, your problem is
22    because your mother filed her complaint
23    and you're just like her, and these are

174

1    some of the repercussions of your
2    association toward your mother or with
3    your mother. These are some of the
4    string of events that lead me to where
5    we are now.
6 Q. And I just --
7 A. Initially -- I'm sorry. Initially, you
8    don't want to look at it as that, but
9    when you look at the frequency of the
10    events.
11 Q. Well, I guess -- I mean, you were
12    ultimately hired that year. So I guess
13    I'm just trying to understand. I don't
14    know whether there would be -- I mean,
15    I'm just trying to understand whether
16    your lawsuit is about some job at some
17    other school that you didn't get in '99.
18    Can you clarify that or . . .
19       MR. PATTY: Well, I mean --
20       MRS. CARTER: It's a little
21          bit unclear because of
22          the way his EEOC charge
23          was. And I don't want

175

1          to be harassing, but I
2          don't want to not ask
3          about something and
4          then find out that this
5          involves all kinds of
6          stuff I never
7          questioned him about.
8       MR. PATTY: Yeah. I mean, I
9          think the best way to
10          pursue that, because
11          he's not a lawyer, is
12          to just ask him about
13          the jobs, and say, you
14          know, about the
15          circumstances of those
16          particular jobs. I
17          know in the Complaint
18          we identified a very
19          specific job.
20       MRS. CARTER: Right.
21       MR. PATTY: And then in this
22          document, he also
23          identifies some -- some

Pages 172 to 175

**176**

```
1        different jobs like in
2        No. 7 and 9 or
3        something like that.
4            MRS. CARTER: I know.  And
5        that's what I was
6        focusing on.  I just
7        didn't know -- I mean,
8        and we can do that, and
9        we can --
10           MR. PATTY: I think it's
11       very difficult for him.
12       I think what he's
13       trying to tell you is
14       it's very difficult.
15       You know, you go -- he
16       goes to the job and
17       these circumstances
18       happen.  Then the
19       things he is told later
20       make him feel like
21       there's something else
22       going on.  So I -- I
23       mean, he can just tell
```

**177**

```
1        you what the facts are
2        about it.  And then I
3        guess we have to figure
4        out from there about
5        the -- or what he knows
6        about it or --
7            MRS. CARTER: Well, I just
8        want him to be clear
9        based on his position
10       today, regardless of
11       whether you're a lawyer
12       or not, on whether
13       you're making a
14       discrimination claim or
15       retaliation claim about
16       any job we talk about.
17       I mean, you either know
18       that or not, whether
19       you're making that
20       claim, regardless of
21       what that means or what
22       the evidence might be,
23       whether you feel like,
```

**178**

```
1        for example, that
2        Mr. Vince Johnson did
3        not hire you in
4        retaliation for
5        something.  Because I
6        need to know --
7            MR. PATTY: I think
8        there's -- let me back
9        up.  I think there's
10       other ways to do that.
11       I think you do it
12       through a -- you do it
13       through a contention
14       interrogatory or
15       whatever.  But I don't
16       know that -- I mean,
17       I'm just saying, he's
18       going to answer
19       whatever factually he
20       knows about all these
21       cases.  He can also
22       give you --
23           MRS. CARTER: I'll just have
```

**179**

```
1        to ask every one of the
2        questions I would ask
3        for every single job,
4        but we might be here a
5        week.
6            MR. PATTY: But he can give
7        you an opinion as to,
8        I'm sure, what he knows
9        or what he's learned or
10       what he thinks and all
11       of that.  But, I mean,
12       it's very difficult for
13       a layperson to say I
14       have evidence of this
15       or evidence of that.  I
16       mean, I think he's
17       trying to work through
18       it as best he can.
19           MRS. CARTER: I don't think
20       that he's not being
21       cooperative.  I was
22       just trying to clarify
23       to make this easier.
```

Pages 176 to 179

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

180

1 And if we can't do it
2 like that and y'all
3 don't want to reach
4 some kind of agreement
5 about what jobs he's
6 complaining about, then
7 we'll just . . .
8 MR. PATTY: Just wait for a
9 question.
10 MRS. CARTER: Yeah, let me
11 ask a question.
12 BY MRS. CARTER:
13 Q. Do you have any evidence that
14 Mr. Johnson didn't hire you because of
15 your mother's grievance or claim?
16 MR. PATTY: Object to the
17 form.
18 MRS. CARTER: And I just
19 want to say for the
20 Record to clarify that
21 we're not -- that based
22 on -- just because I'm
23 asking these questions,

181

1 that we're not
2 conceding that she had
3 a claim or lawsuit,
4 because I was unable to
5 find any evidence of
6 that. So we can get
7 into that later. But
8 for the purposes of
9 this deposition, I
10 should have said that
11 earlier.
12 You know, it's my
13 understanding that's
14 your position, so I'll
15 ask you questions based
16 on that assumption.
17 BY MRS. CARTER:
18 Q. Do you have any evidence that
19 Mr. Johnson didn't offer you a job for
20 that reason?
21 A. To answer that question as best as I
22 can, those items there are just to
23 provide, as I said, the background

182

1 for --
2 Q. We're going to get a little tougher
3 since we're going to play like this.
4 A. Okay.
5 Q. My question is: Do you have any
6 evidence that Vince Johnson did not hire
7 you or did not offer you a job because
8 your mother has ever filed a claim
9 against the school?
10 MR. PATTY: Object to the
11 form.
12 A. Not with Vince Johnson. He never
13 communicated that to me.
14 Q. And that's fine. I just want to -- I
15 want to ask you about it if you do.
16 A. Okay.
17 Q. All right. Mrs. Teresa Goodson, when
18 did you interview with her?
19 A. That was also the Summer of '99.
20 Q. Okay. And you interviewed for a
21 teaching job there, I guess?
22 A. Yes.
23 Q. And did she -- did you have any

183

1 communications with her about why you
2 were not hired?
3 A. No. The interview didn't start
4 favorably, and it didn't end favorably.
5 Q. Okay. Do you have any evidence that
6 that interview -- that she didn't give
7 you a job because of your mother?
8 A. No.
9 Q. Do you have any evidence that she didn't
10 give you a job because of your race or
11 your sex?
12 MR. PATTY: Object to the
13 form.
14 A. No. Because I'm not alleging that in
15 that. That addendum doesn't even --
16 it's not even suggesting that, so, no.
17 Q. What are you alleging in this addendum?
18 A. I'm alleging that those items there are
19 showing a pattern where I have been
20 overlooked for various jobs from my
21 initial interest in Montgomery County
22 until now.
23 Q. Well, let me ask you this: In regards

184

1    to the jobs with James Singleton,
2    Lillian Sanders, Vince Johnson, and
3    Teresa Goodson in the Summer of '99, in
4    regards to any of those four jobs we've
5    just discussed, do you know who the
6    other candidates were that were
7    interviewing for teaching positions?
8  A. I would have no -- no knowledge of that.
9  Q. Okay. So it's fair to say then that you
10   don't have any idea about their
11   qualifications or how well their
12   interviews went or things of that
13   nature?
14 A. I'm not privileged to have that
15   information.
16 Q. Okay. The next one is Dr. Joy Myrick,
17   who at that time was the Director of
18   Special Education, Student Support, and
19   it says you were hired. What job were
20   you hired with Special Education?
21 A. That was my first appointment at Daisy
22   Lawrence. Ms. -- well, now, Dr. Myrick,
23   Stan Cox, and Ms. Lois Johnson were the

185

1    three that I mentioned earlier who
2    interviewed me. And as far as who hired
3    me, all three were kind of involved with
4    the interview and the recommendation
5    when I first was assigned to --
6  Q. Okay. So that was that first job you
7    were talking about?
8  A. Yes.
9  Q. Okay. And so Mr. Stan Cox is the next
10   one. Is that the same job?
11 A. Yes.
12 Q. Okay. And then Vera Thompson at
13   Fitzpatrick Elementary School. It says
14   hired. That was the next summer?
15 A. Yeah.
16 Q. And so you would have interviewed with
17   her and then been hired at that school?
18 A. Well, she hired me.
19 Q. Okay.
20 A. We didn't interview.
21 Q. Okay. You didn't have an interview with
22   her?
23 A. No.

186

1  Q. Okay. Linda Sexton at Vaughn Road
2    Elementary School, not hired. When did
3    you interview with her?
4  A. That was during the Summer of 1999. And
5    I need to add some information to that.
6    That particular interview was total
7    confusion. I was at the central office
8    to see Ms. Johnson, and Stan -- Mr. Cox,
9    and Ms. Myrick. And Mr. Barker tracked
10   me down and said, Melvin, did you know
11   you had an interview with Ms. Sexton.
12   And I said, No, I didn't. So we kind of
13   went back and forth. Ms. Hicks said you
14   did. I said, Well, I'm telling you
15   nobody ever called me. When I got into
16   Ms. Hicks' office, I mean, it was just
17   like boom, boom, boom. I mean, the
18   documentation from the little
19   questionnaire that they fill out from
20   the interview was there. But nothing --
21   nothing developed from that.
22 Q. Okay. Did you interview with
23   Ms. Sexton?

187

1  A. I did.
2  Q. Okay. You said Ms. Hicks' office. Did
3    you mean Carolyn Hicks, or did you mean
4    to say Ms. Sexton?
5  A. Ms. Carolyn -- we interviewed in
6    Ms. Carolyn Hicks' office with Ms. Hicks
7    and Ms. Sexton.
8  Q. I gotcha. Okay.
9  A. And the reason I said about the
10   confusion, I never received a phone call
11   or notification that I had that
12   appointment. I was on my way to see
13   Ms. Johnson, Ms. Cox, and Ms. Myrick.
14 Q. Do you allege that in the Summer of
15   1999, that Linda Sexton did not
16   recommend you for a position based on
17   your race or sex?
18 A. I think Ms. Hicks influenced that
19   decision.
20 Q. Okay. Do you contend in this lawsuit
21   that Linda Sexton did not recommend you
22   based on your race or sex?
23 A. I don't know if the recommendation was

188

1  made or denied or if it was influenced.
2  **Q. Okay. Do you contend in this lawsuit**
3  **that you didn't get a job with Linda**
4  **Sexton or her school because of your**
5  **race or your sex?**
6  A. I'm saying I didn't get the job.
7  **Q. Do you contend that it was because of**
8  **your race or your sex?**
9        MR. PATTY: Object to the
10       form.
11 **Q. Is that one of the claims that you're**
12 **making?**
13 A. I would have no knowledge at this point.
14 **Q. Okay. Do you contend that you didn't**
15 **get a job with Linda Sexton because of**
16 **your mom or your mom's lawsuit or claim?**
17 A. I would allege that.
18 **Q. Okay. And what evidence do you have**
19 **that you were not given a job at Vaughn**
20 **Road Elementary School because of your**
21 **mother's claim?**
22 A. Because that interview was held with
23   Ms. Hicks, as opposed to any of my other

189

1  interviews, and because of a statement
2  Ms. Hicks made about my initial
3  interview with her, that I was very
4  belligerently arrogant, I took over the
5  interview, and he's just like his
6  mother; and nobody's going to hire him.
7  That is my reason for feeling that that
8  particular job with Ms. Sexton, that she
9  was influenced.
10 **Q. I gotcha.**
11 A. Ms. Sexton later communicated to me,
12   Melvin, what happened? I thought you
13   wanted to come to Vaughn Road with me.
14 **Q. When did Ms. Hicks tell somebody that**
15 **you were arrogant, took over the**
16 **interview, and just like your mother?**
17 A. She made that statement to one of the
18   secretaries in Human Resources, who
19   relayed that message to my mother.
20 **Q. And who's that secretary?**
21 A. The secretary that relayed it to my
22   mother was Ms. Bessie Townsend
23   (phonetic).

190

1  **Q. Betsy?**
2  A. Bessie Townsend.
3  **Q. And she told your mother, who told you?**
4  A. That Ms. Patricia Holden (phonetic) said
5    that that's what Carolyn Hicks stated.
6        MR. PATTY: It's . . .
7        MRS. CARTER: I know. I
8        just realized I skipped
9        a step.
10 BY MRS. CARTER:
11 **Q. Okay. Bessie Townsend told your mother**
12 **that Pat . . .**
13 A. Stated that Ms. Hicks stated that I was
14   belligerently arrogant during the
15   interview, that I took over the
16   interview, and that's why nobody is
17   going to hire him, because he's just
18   like his mother.
19 **Q. Okay. And what evidence do you have**
20 **that that comment had to do with your**
21 **mom filing a claim?**
22        MR. PATTY: Object to the
23        form.

191

1        Go ahead.
2  A. Well, she hadn't murdered or killed
3    anybody, so I mean, why would she keep
4    making mention of something, quote, just
5    like her. I mean, is that in a negative
6    manner, positive manner? But when you
7    constantly repeat it over and over,
8    negative connotations kind of tend to
9    cap it.
10 **Q. Okay. The next one is Tina Minott, and**
11 **you were actually hired by Tina Minott?**
12 A. Yes.
13 **Q. The next one is Bullock County, so I**
14 **guess now we've skipped forward to the**
15 **Summer of '02?**
16 A. Yes.
17 **Q. And Julius Thomas was the principal,**
18 **Keith Stewart, the superintendent, Lee**
19 **Ballard, the assistant superintendent,**
20 **and Saint T. Thomas, the superintendent,**
21 **and then Ms. Octavia Miles. When you**
22 **refer to all of those people, you're**
23 **talking about the one job you got,**

Pages 188 to 19

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.337

192

1    right?
2  A.  That was those persons on the interview
3     team, yes, ma'am.
4  Q.  And then the second year that you went
5     back to Bullock County -- and just going
6     back to refresh my memory now that we've
7     got this laid out -- you actually
8     interviewed for jobs in Montgomery
9     County, didn't initially get one, so you
10    started the '03-'04 school year in
11    Bullock County?
12 A.  I only had one interview that summer.
13    If my records serve correct, I only had
14    the one interview which was with
15    Mr. Linhart the day before school
16    started.
17 Q.  The day before school started.  Okay.
18    Had you applied for other jobs that
19    summer?
20 A.  I would have to look back at my
21    documentation.  I'm almost certain that
22    I had.
23 Q.  Okay.  Tell me what jobs you applied for

193

1     in the Summer of '03 that you did not
2     receive, that you believe was based on
3     discrimination or retaliation.
4  A.  Let me ask Johnny Patty.
5          THE WITNESS:  What's the
6             first date?
7          MR. PATTY:  Well, you can
8             ask her if you want to
9             see a document, but --
10         THE WITNESS:  Okay.
11         MR. PATTY:  To refresh your
12            recollection.  But I
13            can't give you dates.
14         THE WITNESS:  Okay.
15         MRS. CARTER:  I was just
16            waiting for him to
17            answer.
18 A.  Summer of -- what summer?
19 Q.  Here we are.  We are in the summer where
20    this document picks up.  I was thinking
21    we were a year off.  Do you want to
22    refer to --
23 A.  It's the same, 6 and 7 are the same.

194

1  Q.  5 and 6, I think.
2  A.  5 and 6 are the same.
3  Q.  All right.  I'm going to look at 5 and
4     you look at 6.
5  A.  Look at 6.
6  Q.  But we're looking -- if we realize we're
7     looking at something different, we'll
8     stop.
9  A.  Okay.
10 Q.  Now we're in the Summer of '03.  You
11    began the '03-'04 school year in Bullock
12    County, but this is talking about the
13    jobs that you would have applied for
14    that summer, which is after you had been
15    in Bullock County for a year, and now
16    you're applying to come back to
17    Montgomery?
18 A.  If my memory serves me correct and my
19    documentation stands, the summer after
20    Southlawn, I didn't apply for anything.
21    When I went to Bullock County the first
22    time, if my memory and my documentation
23    serves me correctly, I didn't apply for

195

1     anything.
2  Q.  And that's what I was trying to clarify.
3  A.  I think there might be one documentation
4     where I asked to be reassigned, but as
5     far as a string of job listings -- if I
6     stand to be corrected --
7          MR. PATTY:  You mean,
8             reassigned to
9             Southlawn?
10         THE WITNESS:  Or --
11 Q.  I will tell you that I believe, if my
12    memory serves me correctly, that you
13    sent one letter asking to be reassigned
14    to Southlawn, and then I didn't see any
15    other evidence that you --
16 A.  Well, see, that's -- like I say,
17    possibly that one.
18         MR. PATTY:  Okay.
19 Q.  So then you taught there a year.  So now
20    we're up to speed up until the Summer of
21    '03?
22 A.  Yes.
23 Q.  Where you've been at Bullock County for

Pages 192 to 19!

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.333
888.253.3377            Certified Court Reporters and Certified Legal Video Specialists            888.253.3377

196

1    a year, and you've started applying for
2    jobs with the Montgomery County Board of
3    Education?
4 A. Yes.
5 Q. And you look at Document 6, and I'll
6    look at Document 5. And it says that on
7    August 31st of 2003, you applied for the
8    administrative assistant position at
9    Crump Elementary and Brewbaker Junior
10   High School and that you never got an
11   interview; is that correct?
12 A. Yes, it is.
13 Q. Do you claim that their failure for you
14   to be awarded one of those jobs was
15   based on discrimination and/or
16   retaliation?
17 A. It's both. And I didn't even receive an
18   interview. So we have to go back to not
19   even receiving an interview.
20 Q. Okay.
21 A. I didn't receive an interview or the
22   possibility of attaining either one of
23   those positions.

197

1 Q. Okay. Tell me, do you know whether or
2   not all applicants received an interview
3   for those jobs?
4 A. Well, I have no way of knowing that.
5 Q. So you don't know who out of the
6   applicant pull was interviewed for those
7   positions?
8 A. No, I don't.
9 Q. Okay. What evidence do you have that
10   you weren't interviewed for those
11   positions based on your race?
12         MR. PATTY: Object to the
13           form.
14 A. Again, this is showing a series of
15   events leading to the last couple of
16   incidents that were very -- that were
17   more vivid than these.
18 Q. Okay. And that's fine. And we'll get
19   there, but I have to --
20 A. Okay. I understand.
21 Q. Your attorney will explain to you. I
22   have to trudge through it.
23         What evidence do you have that

198

1    you didn't get either one of those jobs
2    or get interviewed for those jobs
3    because of your race?
4         MR. PATTY: Object to the
5           form.
6 A. Well, it kind of stopped with me not
7   even getting an interview.
8 Q. That's what I said, that you weren't
9   interviewed for those jobs because of
10   your race?
11         MR. PATTY: Object to the
12           form.
13 Q. What evidence do you have?
14 A. I'm not even clear on -- what evidence
15   do I have? I don't have any. I'm just
16   showing a frequency of the events that
17   lead up to the current events.
18 Q. Okay. Do you know who was awarded the
19   job that you wanted at Crump Elementary?
20 A. I would have to go back through
21   personnel minutes to see who was
22   afforded that job.
23 Q. So sitting here today, you don't know

199

1    who got that job?
2 A. I couldn't call all of these off the top
3   of my head.
4 Q. So do you know, sitting here today, what
5   the qualifications were of that person?
6 A. Not off the top -- that's privileged
7   information. I wouldn't have that.
8 Q. Do you know what the race or the sex was
9   of that person?
10 A. Not without looking at the personnel
11   minutes.
12 Q. All right. What about at Brewbaker
13   Junior High School, who got that job?
14 A. I'm not sure. I would have to look at
15   the personnel minutes.
16 Q. So sitting here today then, do you
17   maintain that you were more qualified
18   than either of those two individuals?
19 A. In some instances, I probably would have
20   been.
21 Q. Okay. And I understand that. But do
22   you maintain or can you tell us here
23   today that you were more qualified than

200

1    those two individuals?
2  A. I would have to know who those persons
3     were and then rank their qualifications
4     to mine.
5  Q. Well, when you sent this letter on
6     August 2nd saying that you had been --
7     that you were a victim, or you don't use
8     the word "victim," but the
9     discriminatory practice of racial and
10    gender discrimination, what jobs on this
11    document were you referring to?
12 A. We can go through a series of them.
13    When I sent this in, I either
14    had already reviewed or had reviewed the
15    personnel report to see if it
16    was either -- I can almost tell you
17    there were not that many black men, and
18    there probably were not that many black
19    women. And the documents will prove it.
20    If we go back to the personnel report --
21 Q. When you say "not that many" -- I
22    apologize, I'm not sure what -- not that
23    many meaning in reference to the jobs

201

1     that are on here?
2  A. When you look on here, the ones that I
3     did list who -- you know, the white
4     female or white person received that
5     job, just rule out there was a white
6     person, it wasn't a black one. It was a
7     white female. It wasn't a black female.
8  Q. Well, do you feel like that if it was a
9     white person, that that means you
10    automatically were discriminated against
11    based on your race?
12 A. No, I'm not. That would be a factor.
13    If I was, that would be an additional
14    factor.
15 Q. The September 1st, 2003, it says you
16    applied for Educational Specialist,
17    Educational Technology Professional
18    Development Program Coordinator, in
19    Title I School-wide Instructional
20    Assistant position. Did you group those
21    together because they're similar in --
22    and excuse my ignorance -- but like
23    they're similar in type or . . .

202

1  A. They were -- and if I stand corrected, I
2     think they were advertised at the same
3     time.
4  Q. Okay. Oh, for that date. I gotcha.
5     And you were not granted an interview
6     for any of those positions?
7  A. No, I wasn't.
8  Q. Is it your testimony that you had the
9     qualifications and certifications to
10    fill any of those positions?
11 A. Yes, it is.
12 Q. Okay. Do you know, sitting here today,
13    who was awarded those positions?
14 A. I would have to look at the personnel
15    minutes. Because if you look at the
16    year on here -- I would have to go back
17    and look at the personnel minutes. But
18    whatever I was looking at when I wrote
19    this, it was substantial enough for me
20    to be able to validate this.
21 Q. Well, let me ask you this: Were there
22    any jobs that you applied for that
23    summer that you didn't include in this

203

1     letter?
2  A. No. Because all of the jobs I applied
3     for, I sent them certified mail. So all
4     of them are listed.
5  Q. Okay. So every job that you would have
6     applied for that summer, you have in
7     some way reflected on this document?
8  A. Yes. All of those where -- that I
9     qualified for.
10 Q. So is it fair to say then, that you have
11    included every job on this claim of
12    discrimination that you applied for,
13    regardless of who was awarded the
14    position?
15 A. Every job that's on here is every job
16    that I applied for that I met the
17    qualifications.
18 Q. So is it your testimony that you should
19    have been given any of the jobs you
20    applied for over the person who was
21    actually awarded the position?
22        MR. PATTY: Object to the
23        form.

Pages 200 to 20

204

1  A.  I could have been given the opportunity
2      to interview.
3  Q.  Okay.  Well, do you know -- in looking
4      at No. 2, September 1st, 2003, do you
5      know who determined who would be
6      interviewed for those positions?
7  A.  I would assume, according to best
8      practice, that would be a decision from
9      Human Resources.
10 Q.  What do you mean when you say "according
11     to best practice"?
12 A.  You have best practice procedures in any
13     organization, what you would define as
14     the most logical, most ethically sound
15     premise to base your decision.  So when
16     I say best practice, the best possible
17     approach would have come from Human
18     Resources to make those decisions of who
19     we screen for interviews and who we
20     interview.
21 Q.  Okay.  Well, aside from what you think
22     the best practice is, do you know,
23     sitting here today, who determined or

205

1      who ascertained what people would be
2      interviewed for the educational
3      specialist or these other jobs that are
4      listed here?
5  A.  That's a Human -- it's supposed to be a
6      Human Resource issue.
7  Q.  Do you know who actually conducted the
8      interviews?
9  A.  I was not afforded the interview, so I
10     wouldn't know who interviewed.  I'm just
11     assuming that it would be Human
12     Resources or their decision.
13 Q.  Do you know if all applicants were
14     afforded an interview, or there were
15     some applicants, along with you, who
16     were not awarded an interview?
17 A.  I wouldn't have any -- I wouldn't have
18     that information.
19 Q.  And you can't, sitting here today,
20     compare your qualifications with any of
21     the people who got these jobs?
22 A.  Some of the people that don't have the
23     educational background that I, and

206

1      that's one of the qualification when you
2      start ranking.  Some of them I would
3      know.  Others, I would not.  But if
4      there's a set system that you're using,
5      it's not a problem.
6  Q.  Do you know what qualities or
7      characteristics the Board was looking
8      for when they hired the positions you've
9      listed here in No. 2?
10 A.  None other than what's listed on the job
11     announcement.
12 Q.  No. 3 says you applied for the
13     administrative assistant position at
14     Robert E. Lee High School and that you
15     were never given an interview?
16 A.  That is correct.
17 Q.  Do you know who was given that job?
18 A.  I don't know.
19 Q.  Do you know the race of that person?
20 A.  I don't know.
21 Q.  Do you know the sex of that person?
22 A.  I don't know.  I want to say -- and I
23     may stand corrected, the person that

207

1      reports may defend this -- I want to say
2      a white female received that position.
3  Q.  You're just basing that on memory?
4  A.  From personnel reports, yes.
5  Q.  Do you know what your qualifications
6      were compared to her?
7  A.  I was either in the process of
8      completing my Specialist or had
9      completed it or -- I was certified.  I
10     clearly met the qualifications.
11 Q.  Okay.  In the Summer of 2003, had you
12     ever been in an administrative position
13     anywhere?
14 A.  No.
15 Q.  In the Summer of 2003, had you ever
16     worked in a high school?
17 A.  No.
18 Q.  No. 4 says September the 17th, 2003,
19     that you applied for an Education
20     Specialist position in the Office of
21     Student and Community Services, that you
22     didn't receive an interview, and that
23     Susan Terrell received the position.

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377            Certified Court Reporters and Certified Legal Video Specialists            888.253.3377

208

1   What is --
2   A. Yes.
3   Q. That's a female, I guess.
4   A. White female, yes.
5   Q. White female. Do you know anything
6      about her qualifications?
7   A. No, I don't.
8   Q. Do you know how they decided who would
9      be interviewed for the position?
10  A. No, I don't.
11  Q. Do you know whether all applicants were
12     interviewed, other than yourself?
13  A. No, I don't.
14  Q. Did you list this Education Specialist
15     position -- is that different than the
16     one you've listed two spaces up?
17  A. It's a different one, yes. Different
18     department, yes.
19  Q. I'm sorry. Did I already ask you this:
20     Do you know what Susan Terrell's
21     qualifications are?
22  A. You did. And I told you I don't know.
23  Q. Okay. I'm sorry. No. 5, September

209

1      17th, 2003, you applied for a teacher
2      position at Brewbaker Intermediate
3      School. It says you interviewed, but
4      that you received negative verbal
5      feedback from the administrator during
6      the interview? Tell me what happened
7      there.
8   A. Ms. Debra Clark (phonetic) interviewed
9      me. She told me that she didn't think
10     that I would work out at Brewbaker. She
11     said, I think you're geared towards
12     something in administration, and,
13     Melvin, you need to keep working on
14     that. We ended -- the interview didn't
15     take thirty minutes. Later that
16     afternoon, Ms. Virginia Browder notified
17     my mother that Ms. Clark said she wasn't
18     going to hire Melvin, because she didn't
19     want her students beat.
20  Q. So based on that information, was it
21     your feeling that she didn't want to
22     hire you because of the allegations
23     against you at Southlawn?

210

1   A. Well, when you look at those
2      allegations, that should have been
3      privileged information. How did
4      everybody have knowledge of that?
5   Q. I understand that. But did you feel
6      that's what she was talking about when
7      she made that comment?
8   A. Possibly.
9   Q. Did she make any comment about your race
10     or your sex?
11  A. No.
12  Q. Did she make any comment about your
13     mom's prior claim against the school
14     board?
15  A. No.
16  Q. Looking at the next one, September
17     17th, 2003, you applied for a teacher
18     position at McKee, and you never
19     received an interview. Who was the
20     principal at McKee that year?
21  A. Ms. Lillian Sanders.
22  Q. And she did not interview you?
23  A. No. This was when she clarified to me

211

1      and my mother that, I don't want you-all
2      mad at me, but Ms. Hicks talked me out
3      of hiring Melvin. But she was at --
4   Q. Okay. You told me that was in 1999.
5      Did that happen again or are you --
6   A. No. This was when she told us what
7      happened in 1999.
8   Q. Okay. Okay, I'm sorry. So in 2003, you
9      didn't interview with her, but you had a
10     conversation?
11  A. She ran into us at the mall. And this
12     is what she told us, the reason that
13     when I applied for this job. Because I
14     even faxed my information to the school
15     to her. And she communicated this to me
16     during the Summer of '03.
17  Q. And what did she say again?
18  A. She just said that, I don't want y'all
19     mad with me, but Ms. Hicks kinda talked
20     me out of hiring Melvin when I was at
21     Hayneville Road.
22  Q. And I think you've already told us what
23     Ms. Hicks allegedly said to her; is that

212

1    correct?
2  A.  I don't know what Ms. Hicks said to her,
3      but Ms. Sanders said she talked her out
4      of hiring her.
5  Q.  The next one says June 3rd -- 30th,
6      excuse me, 2003, you submitted a letter
7      of reactivation of my employment
8      application for positions with
9      Montgomery County Public Schools, and
10     you never received an interview.  Tell
11     me what you mean by that.
12 A.  I want to say that is where I sent a
13     letter asking to get my file to be
14     reactivated and positioned for
15     interview.  And it never took place.  I
16     never received any interviews.
17 Q.  That's the summer that you didn't
18     receive any interviews until you
19     interviewed the day before school
20     started?
21 A.  Yes.
22 Q.  Okay.  And is it your contention here
23     that you were not interviewed during

213

1      that summer, up until that day, because
2      of your race or sex?
3  A.  Yes.
4  Q.  Okay.  And tell me, if you would, what
5      evidence you have that you were not
6      given interviews during the course of
7      that summer because of your race or your
8      sex?
9          MR. PATTY:  Object to the
10             form.
11 A.  What other reason?  I mean, you have a
12     string of jobs here that I didn't even
13     get an interview for, so what other
14     reason?  I mean, I'm throwing that as a
15     rhetorical, but what other reason?  I
16     was certified.  I wasn't a convict.
17 Q.  Did you ever feel like it was because of
18     what happened at Southlawn or the other
19     schools?
20 A.  No.  Because what happened at Southlawn
21     was privileged information.  It was not
22     public knowledge.  And as far as --
23 Q.  At least one of these other teachers

214

1      knew about it; did they not?
2  A.  One of the other teachers where?
3  Q.  One of the teachers we just talked about
4      you said told somebody that she didn't
5      hire you because she didn't want you to
6      beat up her students?
7  A.  That was the principal.
8  Q.  Oh, excuse me.  One of the other
9      principals, excuse me.
10 A.  The principal.  Now, how they knew about
11     it, I'm puzzled with that myself.  And
12     as far as what happened at any other
13     schools, what I said earlier, I never
14     got any letters of reprimand, any verbal
15     reprimands, so who was saying all of
16     this, and where is it coming from?
17     Everybody knows more about it than me,
18     and I was the one who was there.
19 Q.  Okay.  On No. 8, it says for clarity and
20     explanation for the above, at this
21     particular time you had accepted a
22     teaching job in Bullock County.  It says
23     that under the direction of your

215

1      attorney, Julian McPhillips, that you
2      applied for all of the above-listed
3      positions via certified mail.  And at
4      the beginning of the school year for
5      2003-2004, that you returned to Bullock
6      County.  And then October of 2004, was
7      interviewed for a reading coach position
8      in Montgomery County at Daisy Lawrence
9      Elementary Alternative School.
10         Was Mr. McPhillips helping you
11     draft this information at the time?
12 A.  I was under his advice.
13 Q.  Okay.  That's fair enough.  It says the
14     school board at the rate of pay as a
15     tutor-teacher hired you.  However, you
16     were assigned and performed reading
17     coach duties.  And the salary matrix for
18     reading coaches is greater than that of
19     a teacher and a tutor-teacher.  And I
20     know that before lunch we already talked
21     about that a good bit.  And, I guess I
22     want for clarification, you to tell me,
23     if you can, who told you that you were

334.262.3332
888.253.3377

Baker & Baker Reporting and Video Services, Inc.
Certified Court Reporters and Certified Legal Video Specialists

334.262.333
888.253.337

216

1    going to be a reading coach, every
2    person that told you that.
3    A. Dr. Owens was the person who positioned
4       me about the reading coach position. He
5       was the one who interviewed me about the
6       reading coach position. And Mr. Barker
7       was the first person who ever told me
8       anything about a reading coach position.
9          Reading coach positions was a
10      new concept to instruction. And I knew
11      nothing about a reading coach when I was
12      in Bullock County.
13   Q. At the time that you actually got the
14      job and began to be paid for the job,
15      you understood, though, that it wasn't a
16      reading coach position, correct?
17   A. Once I got back to Mr. Barker's office
18      to sign the contract --
19   Q. Right.
20   A. -- it was clear that it was changed, and
21      it wasn't a reading coach position.
22   Q. So at the time that you signed your
23      contract and began that job, you

217

1    understood you were not in a reading
2    coach position?
3    A. Even to the point when I got back to
4       Daisy Lawrence, when I was still tasked
5       with those responsibilities from the
6       school and from central office to
7       perform reading coach duties.
8    Q. So then, this correspondence to the EEOC
9       picks up in May of 2004. So during the
10      '03-'04 school year, it's your
11      contention that you performed the duties
12      of a reading coach?
13   A. Yes, it is.
14   Q. How do you know that your duties were
15      specifically what a reading coach would
16      do if you didn't know anything about
17      what a reading coach did?
18   A. Well, I read -- okay. When you were
19      tasked to go to all of the meetings with
20      the reading coaches, attend the
21      leadership meetings with the reading
22      coaches and the principals; when you
23      perform the same duties as other reading

218

1    coaches; and when you don't have a
2    homeroom as all classroom teachers do;
3    when you provide the assessment data to
4    the office of curriculum instruction;
5    when the assistant superintendent of
6    curriculum instruction identifies you as
7    a reading coach when he requests that
8    you go to payroll and get your finances
9    worked out, because you're supposed to
10   be a reading coach; I mean, you kinda
11   say, okay -- and then, you know what you
12   were interviewed for; you know what the
13   four women before you were interviewed
14   for by Dr. Owens, so you kind of know.
15   I mean, then the communication between
16   Bullock County and Montgomery County,
17   what he was being released out of his
18   teaching contract to come to Montgomery
19   County for, you know, you kind of hear
20   it so much, you know what reading coach
21   sounds like.
22   Q. Were there any other teacher-tutors who
23      attended reading coach meetings?

219

1    A. No.
2    Q. How do you know?
3    A. All persons in the reading coach
4       meetings were clearly identified as
5       reading coaches, because the majority of
6       them were white women who were already
7       on the ten-month contract. And then the
8       few black women who were reading
9       coaches, they were on ten-month
10      contracts. I was the only male being
11      paid as a teacher-tutor or tutor-teacher
12      when I was performing reading coach
13      duties and attending the meetings. I
14      even attended some meetings with my
15      principal and other principals and their
16      reading coaches.
17   Q. Is it your contention that you were
18      treated like that because of your sex?
19   A. Treated like what?
20   Q. That you were given reading coach
21      responsibilities, but not paid like one?
22         MR. PATTY: Object to the
23         form.

Pages 216 to 219

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

220

1  A. Any male or female could perform reading
2     coach duties if they were competent.
3  Q. Yes, sir. I'm sorry. I probably asked
4     a bad question.
5         Is it your contention that you
6     were given a reading coach job, but
7     actually paid as a teacher-tutor or
8     tutor-teacher because you were a male?
9  A. No. Because I was Melvin Lowe.
10 Q. Okay. So in regards to that particular
11    job or treatment, you believe it was
12    because of who you were?
13        MR. PATTY: Object to the
14           form.
15 Q. And what did you mean by that?
16 A. Mr. Barker was the first person who
17    mentioned to me and my mother about a
18    reading coach position. I didn't know
19    anything about it.
20 Q. Okay. My --
21 A. Okay, go ahead.
22 Q. I think at this point that I really
23    understand --

221

1  A. Okay.
2  Q. -- what your position is about the fact
3     that you were acting as a reading coach
4     or being a reading coach and not paid as
5     one or given a job as one. I gotcha on
6     that.
7         I want to talk about, now, you
8     know, why you believe that happened and
9     what evidence you have to support that.
10    You've said it was not about your sex,
11    that it was about the fact that you were
12    Melvin Lowe. And my question is: What
13    do you mean by that?
14 A. Well, it's both. Mr. Barker told me
15    when I asked him, when I got ready to
16    sign my contract, This says you want me
17    to put on here tutor-teacher or reading
18    tutor, whatever the contract has. And I
19    said, This is not what Dr. Owens
20    interviewed me for. Mr. Barker said,
21    Well, Melvin, you followed the wrong
22    procedures, you know we don't operate
23    like that. It's a reading tutor. And I

222

1     mean, we went back and forth, because I
2     knew what I was told and what I
3     interviewed for. And then it finally
4     came up when Mr. Barker said, up to the
5     previous summer, that Mr. Carter said
6     you're only going to be a classroom
7     teacher.
8  Q. So that is when -- you were having this
9     conversation with Jimmy Barker about why
10    your contract says one thing --
11 A. Why am I asked to put something else on
12    this contract other than what Dr. Owens
13    told Ms. Hicks. He wanted me for his
14    reading coach. And Mr. Barker and
15    Mr. Ballard worked out the arrangements
16    in Bullock County. Everybody knew what
17    I was coming back to Montgomery County
18    for.
19 Q. And so it was in this conversation with
20    Jimmy Barker that he said to you that
21    Dr. Carter said you would never be
22    anything but a teacher in this --
23 A. All you're going to be in a classroom

223

1     teacher.
2  Q. All you're going to be is a classroom
3     teacher. And it was during that
4     conversation that Mr. Barker told you
5     that?
6  A. Yes.
7  Q. Okay. What did you say in response to
8     that?
9  A. What could I say? My back was against
10    the wall. I had already resigned from
11    Bullock County. I think I told
12    Mr. Barker, you know, I'm already off
13    payroll for two or three days or however
14    many days it was. I had to accept it.
15 Q. Were you making more or less money in
16    Montgomery County than you were in
17    Bullock County?
18 A. When I came back to Montgomery County,
19    being that the school year had already
20    started, I would have been making less,
21    being on a nine-month contract, coming
22    back to a nine-month contract. Because
23    the fiscal year had started, my money

Pages 220 to 22

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.333
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists      888.253.337

224

```
1    had already started being prorated.
2         Well, what would have
3    justified that, had I gone into a
4    ten-month contract, the moneys would
5    have panned out over the time that I
6    would have worked, the two weeks after
7    school, as opposed to two weeks before
8    school and two weeks after school to
9    make up another month.  I was making
10   less than I would have in Bullock
11   County, number one, because I was still
12   on the nine-month contract; two, because
13   the school year had already started and
14   moneys has already been prorated that I
15   had worked before in Bullock County.
16 Q.  Well, what was your yearly salary that
17     year in Bullock County?
18 A.  I would have to go back and look at
19     income tax.  I want to say -- I don't
20     want to speculate.  It was in the 30s.
21 Q.  Did you have any conversations with
22     Mr. Barker that summer, during the
23     course of that summer, or at the time
```

225

```
1      that you actually got hired back by
2      Montgomery County, that had anything to
3      do with you not getting a job because of
4      your race?
5  A.  Now, you're talking about after we
6      worked that full year that I was back?
7  Q.  During that summer when you weren't
8      getting interviews, except with Mike
9      Linhart and at the time that you
10     actually got the position where you said
11     you conversed with Mr. Barker about --
12 A.  I don't recall having too many
13     conversations with anybody at central
14     office that summer.
15 Q.  Okay.  Well, that was my question:  Had
16     you talked to Mr. Barker about your race
17     or your sex or your momma's lawsuit that
18     summer, or your momma's claim?
19 A.  No.  None of that information, you know,
20     arose during any of those limited
21     conversations.  Because that first
22     summer, I didn't have too much contact
23     with --
```

226

```
1  Q.  That's fine.
2  A.  Okay.
3  Q.  Okay.  And what about with Carolyn
4      Hicks?
5  A.  Absolutely not.
6  Q.  Okay.  What about with Dr. Carter?
7  A.  Mr. Carter, again, never agreed or never
8      met with me.
9  Q.  What about with anybody else, anybody
10     that you can tell us about, sitting here
11     today, that gave you information that
12     you weren't interviewed during that
13     summer or that you were treated poorly
14     about your position as a reading coach
15     as opposed to a teacher, because of your
16     race, your sex, or your momma's prior
17     claim against the school?
18 A.  I mean, you're going -- we kinda look
19     like we're flipping.  Because, see, when
20     I first told -- when I'm telling you,
21     no, we had limited conversations, I'm
22     talking about that first summer after
23     Southlawn.  What -- you're not talking
```

227

```
1    about that summer.  You're talking about
2    this last summer?
3  Q.  Yes, sir.  I'm talking about the summer
4      after you worked for a year, so I'm --
5  A.  That's when I -- you're talking about
6      the full year --
7           MR. PATTY:  She's talking
8               about the Summer of
9               2003, is what I
10              understood.
11          MRS. CARTER:  Yeah, that's
12              what --
13 A.  After I worked the full year back for
14     Montgomery County?
15 Q.  Because I understand --
16          MR. PATTY:  No, she
17              didn't -- full year in
18              Bullock County, and you
19              were trying to come
20              back.
21 A.  Oh, no, absolutely not.  Absolutely not.
22     I didn't have --
23 Q.  I think we're talking about the same
```

228

1    summer, but I'm not --
2 A. Now I think we are.
3 Q. Okay.
4 A. Okay. No, absolutely not.
5 Q. Because if I understand your testimony
6    right, the Summer of 2002, after you
7    were nonrenewed, you didn't really apply
8    for jobs or have communications with
9    folks here --
10 A. Huh-uh (negative response). That's what
11    I said. It was limited.
12 Q. -- you went on to Bullock County?
13 A. Uh-huh (affirmative response).
14 Q. We're now in the next summer where you
15    did apply for these jobs that we just
16    went over.
17 A. Okay. I got confused with these
18    summers. Okay. Now, yes. Let me make
19    sure I'm answering the right thing.
20    Because these summers are throwing me
21    off. Because I'm referring to them as
22    one after the full year, and we're not
23    talking about the full year. You were

229

1    talking about before then. Okay.
2 Q. I'm talking about you taught in Bullock
3    County the '02-'03 school year --
4 A. Uh-huh (affirmative response).
5 Q. -- and then the Summer of '03, you
6    applied for all these jobs.
7 A. Okay.
8 Q. It's part of your claim. You didn't get
9    them or didn't get interviewed for them.
10 A. Oh, no, I didn't talk to anybody.
11 Q. Okay. That summer --
12 A. Uh-huh (affirmative response).
13 Q. -- did you have a conversation with
14    Mr. Barker or Dr. Carter or anybody else
15    up there, or any teacher or principal,
16    that gave you any information that the
17    reason you weren't interviewed for these
18    jobs or given these jobs was because of
19    your race, your sex, or your mom's
20    claims against the school?
21 A. No. I was advised not to have any
22    contact with anyone.
23 Q. Okay. And you were represented by

230

1    counsel at that point?
2 A. Yes.
3 Q. And then, I would ask the same questions
4    about, not the summer, but now we're at
5    the time where you're actually getting
6    the position; you're getting the job.
7    You're talking to Mr. Barker; there's
8    this conversation between y'all, because
9    you believe you're supposed to be
10    getting a reading coach position; and
11    he's saying to you that's not the job --
12 A. Uh-huh (affirmative response).
13 Q. -- during that conversation or during
14    that time period in October, did you
15    have conversations with anybody who gave
16    you any information that any of this
17    stuff had occurred because of your race,
18    your sex, or the claims that your
19    momma --
20 A. Not in October --
21        MR. PATTY: Objection. Go
22            ahead.
23 A. Not in -- to answer your question, not

231

1    in October. Later on in the year --
2 Q. Okay.
3 A. -- it began -- I started being
4    communicated to. You know, this is the
5    reason why X, Y, and Z.
6 Q. Okay. And let's get that and go through
7    it.
8 A. Okay.
9 Q. What is the first indication or evidence
10    that you had that what had happened to
11    you in the Summer of '03, in regards to
12    jobs and interviewing, had to do with
13    your race, your sex, or your mom's
14    claims against the school?
15 A. The first incident, Lois -- Ms. Lois
16    Johnson communicated to me and my
17    mother.
18 Q. Okay. Do you remember when that was?
19    Was that in the '03-'04 school year,
20    your first year back at Montgomery
21    County?
22 A. Huh-uh (negative response). It was
23    that -- it was over that summer.

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.337

232

1  Q.  It was that next summer.  So you came
2      back that year, had that issue about the
3      reading coach position and --
4  A.  Then during that summer --
5  Q.  Okay.  And I don't mean to be talking so
6      much --
7  A.  Okay.
8  Q.  -- but it's just going to mess us up
9      later, and we'll have to redo all of
10     this if we find out later that we're in
11     the wrong summer.
12 A.  Okay.
13 Q.  You taught that summer under Dr. -- that
14     school year under Dr. Owens at Daisy
15     Lawrence?
16 A.  Yes.
17 Q.  You don't remember anything significant
18     happening during the course of that year
19     that you would consider information or
20     evidence about your case?
21         MR. PATTY:  Object to the
22             form.
23 Q.  In and of itself --

233

1  A.  But, you know, now I've got my summers
2      straight.  When you said that first --
3      after that first full year where I
4      served as a reading coach, and then the
5      nonrenewal came, and there was a big --
6  Q.  Summer of '04.
7  A.  Uh-huh (affirmative response) -- a big
8      stipulation about it didn't go before
9      the Board, this, that, and the -- that
10     was when Dr. Owens began communicating
11     to me, Lois Johnson began communicating
12     to me, Melvin, your problem is
13     because your momma filed her grievance
14     or her lawsuit, and you're just like
15     her, and when people look at Mary, they
16     see you, and that's the problem.
17         And then on the second
18     incident, I don't even know if I had
19     that noted, my mother walked in on a
20     conversation with Mr. Barker and Ann
21     Carol Sippial in a conversation and
22     eluded to, you know, he's just like her,
23     and his personality supersedes her, and

234

1      that's part of the problem.
2          Then Dr. Owens, over the
3      summer, kept -- the same thing, saying
4      to me over and over again, that this is
5      the reason, you know, you're having
6      these problems.  And just over and over
7      and over.
8          I then began -- I'm sorry.
9  Q.  Okay.  Go ahead.  Go ahead.
10 A.  -- to talk to Mr. Barker when I
11     started -- that summer, I noticed that
12     certain jobs were being filled that had
13     not been advertised, certain people
14     didn't have certain certifications, and
15     they were acting in such capacities.
16     And we then started trying to see -- I
17     thought Mr. Barker was trying to help me
18     secure a position.  And then I started
19     getting maybe more than one, but one in
20     particular, recommendation for a
21     position, for an administrative
22     assistant's position at McKee Junior
23     High.

235

1  Q.  Okay.  Let me stop you right there.
2  A.  Okay.  And go back.
3  Q.  Let me stop you.  I think that we're on
4      the same page now to kind --
5  A.  I think so, finally.
6  Q.  -- to kind of move forward with this,
7      which is better for us to work it out
8      now.
9          So we're in the Summer of '04,
10     you've completed that year, and they
11     attempt to nonrenew you?
12 A.  Yes.
13 Q.  But they don't get it right, and so you
14     don't get nonrenewed, and you end up
15     getting reassigned back at Daisy
16     Lawrence.  But during that summer, you
17     applied for other jobs?
18 A.  Yes.
19 Q.  And these are the ones that are on here?
20 A.  Yes.
21 Q.  Okay.
22         MR. PATTY:  When you get to
23             a point, we've been

236

1     about an hour or so,
2     just -- I don't -- I'm
3     just saying when you
4     get to a good spot.
5     MRS. CARTER: Okay. Gosh,
6     we're never going to
7     get done with this
8     deposition. Time is
9     flying.
10    BY MRS. CARTER:
11  Q. Okay. So then there's a list of jobs
12    here from '04, which I guess kind of
13    immediately proceeded when you sent this
14    letter, because you initially started
15    your EEOC process --
16  A. Yes.
17  Q. -- I guess, in the late Summer of '04.
18    So the jobs you've listed here, I want
19    to run down them real quickly.
20    May 14th, 2004, you applied
21    for an administrative assistant
22    position -- oh, I guess there were
23    several positions --

237

1  A. Yes.
2  Q. -- like that open that year, and you did
3    not get an interview for any of them?
4  A. No, I did not.
5  Q. Do you know who interviewed?
6  A. No, I don't.
7  Q. Do you know if all applicants
8    interviewed?
9  A. I wouldn't know.
10 Q. Okay. June 4, 2004, Education
11   Specialist of Office of Curriculum and
12   Instruction. You were never
13   interviewed, and two women filled the
14   position?
15 A. Yes.
16 Q. Were they black or white?
17 A. Two white women.
18 Q. Okay. Do you know who all interviewed
19   for the position?
20 A. I want to say -- I won't speculate.
21   Probably nobody but those two.
22 Q. Okay. Do you know?
23 A. No, I don't.

238

1  Q. Okay. Do you know who made the decision
2    of who would be recommended for those
3    positions?
4  A. It should have been a Human Resource
5    issue or recommendation.
6  Q. Okay. Do you know who made the
7    recommendation, that that's who the
8    board hired, or made the recommendation
9    to Mr. Barker?
10 A. I would assume it would have been a
11   Human Resource decision.
12 Q. Okay. Applied for the position of
13   Title I Educational Specialist in
14   Professional Development. A woman
15   filled the position. Same question: Do
16   you know her qualifications?
17 A. No, I don't.
18 Q. Do you know who else interviewed for
19   that job?
20 A. No, I don't.
21 Q. Do you know who selected who would be
22   interviewed?
23 A. No, I don't. I assume it was a Human

239

1    Resource decision.
2  Q. You don't know who participated in the
3    interview with her?
4  A. No, I don't.
5  Q. All right. June 11th, 2004, Title I
6    Program Evaluator. You never received
7    an interview and the position has not
8    been filled?
9  A. At that time, I was instructed this
10   position had not been filled.
11 Q. Okay. But you weren't given an
12   interview?
13 A. No, I wasn't.
14 Q. After you wrote this, did they fill the
15   job?
16 A. I don't know. I would have to look at
17   personnel minutes.
18 Q. Do you know why the job wasn't filled at
19   the time?
20 A. I have no idea.
21 Q. Do you know who made the decision of who
22   to interview?
23 A. I'm assuming it was a personnel issue.

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

240

1  Q. June 24th, 2004. Title I Teacher-Tutor.
2     Skills Lab at Houston Hill Junior High
3     School. And it says that you were never
4     interviewed. Do you know who chose the
5     people that would be interviewed?
6  A. I don't know. But the principal,
7     Mr. Cochran (phonetic), told me that he
8     had already filled the position. And
9     when he filled the position, I didn't
10    elaborate too much. But I went to
11    Mr. Cochran. The job announcement
12    hadn't even come out yet. I just kind
13    of caught wind that it's going to come
14    out tomorrow, and you're telling me
15    you've already filled the position.
16 Q. Okay. Do you think the fact that
17    Mr. Cochran had already filled that
18    position had anything to do with you?
19 A. It would have had to do with anybody,
20    black, white, Indian, if you didn't have
21    an opportunity to actively participate
22    in the interview process.
23 Q. All right. June 25th, 2004, applied

241

1     for the position of System Reading
2     Specialist at the Office of Curriculum
3     and Instruction. You were interviewed
4     for that job. Who interviewed you?
5  A. Teresa Nichols. Teresa Jackson. I want
6     to say -- and I may stand corrected,
7     but, I guess, the interview panel would
8     have to be poled -- I want to say
9     Margaret Allen. And I know Mr. Barker
10    sat in on that interview, because we
11    had -- at this point, he and I were
12    having some serious discussions about
13    these jobs. And he told me, I'm going
14    to sit in on yours. And he sat in on my
15    interview.
16 Q. Mr. Barker did?
17 A. Yes. And we talked after the interview.
18    Because Mr. Barker showed me, and we
19    discussed the four women who were being
20    given -- the recommendation were given
21    to him, to whom he was going to
22    recommend to the superintendent.
23 Q. To be hired in the position?

242

1  A. To be hired for two positions that were
2     advertised. But you were hiring four.
3     And all were women, two white and two
4     black.
5  Q. Okay. And in your conversations with
6     him, did he share with you why you were
7     not recommended for those jobs?
8  A. And I asked him, because --
9  Q. And he had nothing to offer?
10 A. The reading -- the system-wide reading
11    coach positions were new, as were the
12    reading coach positions being new, so
13    what more qualifications would any of
14    those persons have had, other than
15    practical teaching experiences? Because
16    knowledge of the special curriculum for
17    the interventions, we all started
18    learning and fumbling and making the
19    trial-and-error mistakes at the same
20    time.
21 Q. Do you know how you interviewed as
22    compared to the other individuals or how
23    well your interview went as compared to

243

1     them?
2  A. Well, I knew questions that were going
3     to be asked. So I think I would have
4     known how to prepare for those
5     questions.
6  Q. And my only question is: Do you know
7     how you did in comparison to the people
8     that were awarded the job?
9  A. The only thing I can say is I knew all
10    the information and I still know all the
11    information.
12 Q. Okay. When you had this big
13    conversation with -- first of all, did
14    Mr. Barker sit in on this interview
15    because you wanted him to?
16 A. No. I think we had been talking about
17    me and some of these other jobs that I
18    had not gotten. And he told me, I'm
19    going to sit in on yours. Because I
20    think I had communicated to him, I'm
21    being blocked somewhere. And he sat in
22    on mine.
23       But the question I had, I know

244

1  personnel makes the decision on the
2  interview panel.  But one of those
3  persons at that time was retired from
4  the school system.  And all of those
5  women were conducting those interviews.
6  No representative from Human Resources,
7  other than when Mr. Barker sat in on
8  mine.  And I didn't feel comfortable
9  with that, a recommendation given to you
10 to make a recommendation to the
11 superintendent, when you or your office
12 should have been the one conducting the
13 interview to be able to answer to what
14 he said or what he didn't say.
15 **Q.  Well, that's just really your opinion,**
16 **right --**
17 A. Yeah.
18 **Q. -- about who's doing the interview?**
19 A. But when we look at better practice and
20    Best practice and policy and procedure.
21 **Q. Okay.  That's fine.  The next one was**
22 **for System-wide Math Specialist.  And**
23 **you were interviewed.  Who interviewed**

245

1  **for that job?**
2  A. I can't -- I'd have to go back.  I can't
3    even recall who interviewed me for that
4    position, but it wasn't anybody from
5    Human Resources.
6  **Q. Do you know who got the job?**
7  A. I'd have to go back and look at the
8    personnel minutes.
9  **Q. So you can't tell us about their**
10 **qualifications as compared to yours?**
11 A. Well, I know one was a white woman.
12 **Q. Do you know what her qualifications were**
13 **compared to yours?**
14 A. No, I don't.
15 **Q. Let's go to the next one, Title I**
16 **School-wide Instructional Assistant at**
17 **various school locations.  Were the**
18 **Title I School-wide Instructional**
19 **Assistants interviewed at the variation**
20 **schools, or was that done in central**
21 **office?**
22 A. It was some confusion about that,
23    because one interview I took part in, we

246

1  were told that we were interviewing for
2  administrative assistants at various
3  schools and SIA positions.  Then we came
4  back, and we had this separate -- there
5  were separate interviews for the SIA
6  positions.  So, I mean, it was kind of
7  like you interviewed twice.  But on this
8  one here, the second time, I never
9  interviewed.
10 **Q. And do you know who got that job, those**
11 **jobs?**
12 A. I don't even know how many it was.  No,
13    I don't.
14 **Q. The next one says that you've applied**
15 **for the District Resource/Attendance**
16 **Officer of Office of Student and**
17 **Community Services, and that you didn't**
18 **get an interview?**
19 A. At the time I wrote this, I didn't get
20    an interview.  But I did interview.
21 **Q. Who did you interview with?**
22 A. Mr. Barker and Lois Johnson.
23 **Q. And were you recommended for the**

247

1  **position?**
2  A. To my knowledge, the position hasn't
3    been filled.
4  **Q. Do you know why it hasn't been filled?**
5  A. No, I don't.  Ms. Johnson just
6    communicated to me, she said, Melvin,
7    you had an excellent interview.  And
8    from my mother, she said, I don't know
9    where you get your smarts from, which
10   was an insult, because it could possible
11   be innate capability.  But she said that
12   Mr. Carter said that they weren't going
13   to fill the position at that time.
14 **Q. Okay.  Do you know whether that's true**
15 **or not?**
16 A. Whether what is true?
17 **Q. Whether it was just an executive**
18 **decision to not fill the position at**
19 **that time.**
20 A. Well, that's what she told me.  I have
21   no way of knowing if it was true or not,
22   unless the position has been filled or
23   hasn't.

Pages 244 to 247

248

1  Q.  Okay.  And then No. 18 kind of goes into
2     the issue where it says that you had
3     received a nonrenewal.  And then you
4     were told by numerous people that the
5     nonrenewal was a mistake, because it
6     wasn't approved by the Board, and that
7     you would be replaced in the school
8     system.  And at that particular time,
9     you were assigned a lead reading coach
10    position for the summer reading camp.
11    Is that what position you held that
12    summer, was the lead reading coach
13    position?
14          (Whereupon Defendants'
15           Exhibit No. 18 was marked
16           for identification and
17           attached hereto.)
18 A.  Yes.
19 Q.  And were you paid for that job?
20 A.  Yes, I was.
21 Q.  And who hired you to be the lead reading
22    coach?
23 A.  Mr. Mike Looney and Teresa Nichols.

249

1  Q.  Okay.  And you performed that job?
2  A.  That Summer of '04.
3  Q.  Of '04?
4  A.  Yes.
5  Q.  Before you came back for your final year
6     in '04-'05?
7  A.  Yes.  And this was the summer when I
8     questioned Mr. Barker about certain
9     principal -- summer school principal
10    positions for -- see, at this point, we
11    were having ongoing conversations.
12    There were such persons as Denita
13    Easterling, who served as summer school
14    principal, who wasn't even certified.
15    Because she was borrowing information
16    from me to get certified.  And she was
17    interviewing for administrative
18    positions, and she wasn't certified.
19    This was also during the time when I
20    questioned Mr. Barker about jobs that
21    other persons were being recommended for
22    and being hired in and the announcement
23    never surfaced.  And I said, Well, how

250

1     it was Mr. Looney made this -- I said,
2     But when was the job posted, and when
3     did the interviews take place?  And --
4  Q.  Who were the people that you say got --
5  A.  Karen Vann is one.  Karen Vann --
6  Q.  You don't know what I'm going to ask.
7  A.  Oh, I'm sorry.  I'm just --
8  Q.  I was going to say --
9  A.  Okay.
10 Q.  -- who were the people that you say who
11    got jobs that were not qualified or not
12    certified in those fields?
13 A.  At the time that -- when I interviewed
14    for one of the group interviews for
15    administrative assistant and SIA, a
16    Denita Easterling is one individual in
17    particular, a black female, who
18    interviewed, who was in the process of
19    getting certified in administration.
20    And she was allowed that summer to act
21    as a summer school principal, and she
22    was not certified.
23 Q.  Did you interview for a summer school

251

1     principal position?
2  A.  They were never advertised.  And when I
3     questioned Mr. Looney about it,
4     Mr. Looney directed me to Ms. Johnson,
5     Sophia Johnson, who was the principal of
6     that school a full year.  And
7     Ms. Johnson suggested that Mr. Barker
8     referred Denita Easterling to her.  And
9     I said, Well, are you-all aware that
10    she's not even certified in
11    administration, but she's your summer
12    school principal?  And the reason I had
13    such a hands-on working relationship
14    with her, there was an issue with a
15    child and some records we had to get
16    from Daisy Lawrence, and I would come
17    from Southlawn, as lead reading coach,
18    to Daisy Lawrence across the street to
19    drop this information.  And it just
20    began to be a slap in the face, because
21    I never knew the summer school positions
22    were available.
23        The second one, Karen Vann,

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.337

252

1 she went from a classroom teacher to a
2 reading coach and then to assistant
3 reading coach and then a reading
4 specialist. And I said, Mr. Barker,
5 where is this advertised, because I
6 would have liked to -- when Teresa
7 Jackson left, the next thing we know
8 Karen Vann is in the position. In fact,
9 Karen told me in a sarcastic tone. And
10 I'm asking, Well, when was it posted,
11 and when can -- or why can't people
12 interview for it? So those are two in
13 particular, one black female and one
14 white female.
15            MR. PATTY: It's been an
16            hour and fifteen
17            minutes now.
18            MRS. CARTER: All right.
19            That's fine.
20            (Whereupon a brief recess
21            was taken.)
22 BY MRS. CARTER:
23 Q. I asked you before we took a break about

253

1 **any jobs -- or there's two categories of**
2 **things, and instead of going line per**
3 **line for this, I read this a little bit**
4 **more, Defense Exhibit 5. The two**
5 **things, from what I can tell that you're**
6 **saying, in addition to the specific jobs**
7 **that you have listed here, another of**
8 **your complaint was that there were**
9 **people getting jobs that you believe**
10 **weren't even posted, so you didn't know**
11 **to interview for them. An example you**
12 **gave was Karen Mann getting kind of**
13 **promoted through the ranks, so to speak,**
14 **in the reading specialist category --**
15 **might not be the right word.**
16            **Can you give me any other**
17 **examples of individuals who you felt**
18 **like were receiving promotions or**
19 **getting jobs that you think, you know,**
20 **that you would have interviewed for, but**
21 **you didn't know that the job was open,**
22 **that wasn't properly posted?**
23 A. You just answered it. If it wasn't a

254

1 job I was not interested in or qualified
2 for, I would have not -- I wouldn't
3 know. These were just jobs that I would
4 have been interested in. And then I was
5 working closely with this person, and
6 when this person kind of leaked it out,
7 you know, then a red flag went up.
8 **Q. This is Karen Vann we're talking about?**
9 A. Yes.
10 **Q. Okay. Are there any other examples like**
11     **that that you can give me?**
12 A. Well, like I gave with Denita
13     Easterling.
14 **Q. And I'm going to get to her, because --**
15 A. Okay.
16 **Q. -- I kind of considered her in a**
17     **different category, which was somebody**
18     **who had gotten a job that you say she**
19     **wasn't qualified for --**
20 A. Right.
21 **Q. -- or that she didn't have the**
22     **certification for.**
23            **So right now I want to limit**

255

1     **my question to -- just so that we're**
2     **able to properly address these issues --**
3     **to any other examples you can give of**
4     **people who received jobs that is your**
5     **testimony were not properly posted?**
6 A. Those are the only two that I say again
7     that I would have been interested in,
8     therefore, I know of. There might be
9     others.
10 **Q. And so the second that you're referring**
11     **to is Denita Easterling, who got a**
12     **summer camp principal job before she was**
13     **certified, and then hired as an**
14     **administrative assistant at T.S. Morris**
15     **with Sophia as an Assistant**
16     **Administrator for the fall. Now, didn't**
17     **Ms. Easterling get her certification**
18     **that summer before school started in the**
19     **fall?**
20 A. I'm assuming she finished it. When, I
21     don't know.
22 **Q. Okay. I thought you said here --**
23 A. But at the time -- let me go back to

256

1    where we're referring to.
2            (Witness reviewed document.)
3            (An off-the-Record
4            discussion was held.)
5            MRS. CARTER: All right. We
6        can get back on.
7    BY MRS. CARTER:
8    Q. The questions that I was asking you
9        about also came from Defense Exhibit 7
10       where you supplemented to the EEOC to
11       give them some more specific examples.
12       And you gave the example of Karen Vann,
13       which you had testified about, and also
14       Ms. Easterling. Would you like to refer
15       to that for me to ask you some more
16       questions? That's what I was getting my
17       questions from. And I'm showing you
18       page 4 of Defense Exhibit 7.
19   A. Okay.
20   Q. Oh, that's where I was getting that from
21       that she had her certification in July
22       of 2004.
23   A. That's what she told me.

257

1    Q. Okay. So what you're saying is you
2        don't really know?
3    A. I'm telling you that's what she told me.
4    Q. Okay. Just to wrap up with Defense
5        Exhibit 5, you say in here at the bottom
6        of the second page, that in making this
7        claim of race and gender discrimination,
8        that the majority of the individuals who
9        have filled the positions listed above,
10       that we just went over --
11   A. Uh-huh (affirmative response).
12   Q. -- are either of the opposite race or
13       gender or are not qualified. Have you
14       already given me any information you
15       have about these individuals, sitting
16       here today?
17   A. All that I'm able to.
18   Q. Right. Okay. And I know that other
19       information might exist somewhere, but I
20       just mean that you can provide to me.
21   A. Uh-huh (affirmative response).
22   Q. Okay. All right. And looking back at
23       Defense Exhibit 7, we stopped here at J

258

1    when we were going over jobs you had
2    been interviewed for. And I'm going to
3    pick back up where we are, but real
4    quickly just wanted to say: Can you
5    tell us what jobs you were offered in
6    Macon County?
7    A. I was offered a teaching job in Macon
8        County.
9    Q. And who offered you that job?
10   A. In fact, that was a Special Education.
11       Ms. Fannie Adams (phonetic).
12   Q. And why did you turn it down?
13   A. Because I had gotten the job in Bullock
14       County. See, those jobs, actually they
15       were not calling me saying you've got
16       the job; we're going to give you the
17       job. It was very close to school
18       starting, and I was going into Bullock
19       County at that time.
20   Q. You had already gotten the job in
21       Bullock County when you got offered a
22       job in --
23   A. See, I went on a string of interviews.

259

1    Q. Let me finish.
2    A. Go ahead.
3    Q. Did you already have your job in Bullock
4        County when you got the call offering
5        you a job in Macon County?
6    A. Yes.
7    Q. So at that point, it was a non-issue for
8        you?
9    A. Yes.
10   Q. All right. Dallas County Board of
11       Education, who offered you a job from
12       there?
13   A. Now, let me get myself together on
14       these. Dallas County and Selma City,
15       they're so close.
16   Q. I know.
17   A. One school system offered me a teaching
18       job. And the other school district
19       offered me -- one was elementary, one
20       was early childhood. And I would have
21       to really -- I'd almost have to send to
22       the school district --
23   Q. Dr. Carter is the superintendent at

Pages 256 to 259

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

260

1   **Selma City.**
2   A.  At Selma City.  He was elementary.
3   **Q.  And Wayne May (phonetic) --**
4   A.  And Wayne May, he used to be -- I'm
5       sorry.  You go ahead.
6   **Q.  Let me finish.  And Wayne May is the**
7       **superintendent of Dallas County.  Is**
8       **that --**
9   A.  Dallas County was early childhood.
10  **Q.  I'm sorry.**
11  A.  I'm sorry.  Okay.  Go ahead.
12          MR. PATTY:  Let her finish
13          all the way with it.
14          THE WITNESS:  Okay.
15          MR. PATTY:  Then stop, put a
16          period on it.
17          MRS. CARTER:  And then you
18          can give him a chance
19          to object.
20      BY MRS. CARTER:
21  **Q.  And I was just telling you their names,**
22      **if that helped to jog your memory.**
23  A.  It did.  It did.

261

1   **Q.  So do you recall now what job offer you**
2       **got from Dallas County?**
3   A.  Dallas County is with Carter.  Am I
4       correct?
5   **Q.  No.  Dallas County is Wayne May.**
6   A.  Wayne May was an early childhood
7       position.  And Selma City was -- that's
8       Mr. Carter.
9   **Q.  Uh-huh (affirmative response).**
10  A.  That was an elementary position.
11  **Q.  And who offered -- was it the**
12      **superintendent's that offered you the**
13      **jobs for those two schools?**
14  A.  Yes.
15  **Q.  And was the reason that you didn't take**
16      **either one of those jobs because you had**
17      **already accepted an offer at Bullock**
18      **County?**
19  A.  Bullock County.
20  **Q.  Very good.  All right.  What about Lee**
21      **County?**
22  A.  Lee County I was offered half-day
23      assistant principal and half-day Special

262

1    Ed teacher.
2   **Q.  And who offered you that job?**
3   A.  I want to say his name was Mr. McCuller
4       (phonetic).  I would -- if I could see a
5       directory for the school district, I
6       could tell you exactly who it was.
7   **Q.  Autauga County?**
8   A.  Classroom teacher.  That was fourth
9       grade.  I remember that specifically.
10  **Q.  Who offered you the job?  Was it**
11      **somebody out of HR, Dene Cleveland?**
12  A.  It wasn't Dene Cleveland.  I've
13      interviewed with her, but I also
14      interviewed at the school.  The
15      assistant principal's name was
16      Ms. Pierce.  I can't think of what the
17      principal's name was.
18  **Q.  I know where it is.**
19  A.  It was the middle school.
20  **Q.  Yeah, it's the middle school.**
21      Okay.  Elmore County, who
22      offered you a job from there?
23  A.  This is another person's name I can't

263

1   remember.  She's no longer in HR.
2   **Q.  Carolyn McGalliard?**
3   A.  McGalliard.  But it was a fourth grade
4       position.
5           MRS. CARTER:  Off the
6           Record.
7           (Whereupon an off-the-Record
8           discussion was held.)
9   **Q.  A fourth grade position?**
10  A.  Yes.
11  **Q.  And Tuskegee University?**
12  A.  Assessment Coordinator in the School of
13      Education or College of Education,
14      Education Department.
15  **Q.  Who offered that?**
16  A.  Dr. Binford (phonetic).
17  **Q.  And all of these jobs, you had already**
18      **accepted a job at Bullock County?**
19  A.  I was in Bullock County.
20  **Q.  And what about Tuskegee University, was**
21      **that not a higher paying job than your**
22      **Bullock County job?**
23  A.  It was less.

264

```
1   Q.  Okay.  And with all of these counties,
2       we're talking about that Summer of '02
3       when you got a job in Bullock County.
4       You didn't reapply with these systems
5       other years?
6   A.  No.
7   Q.  Okay.  You've supplied us some
8       information here about your claims, and
9       I'm going to quickly go through.  Some
10      of it you've already testified about,
11      which we'll acknowledge and pass on.
12          You say that Mr. Barker, the
13      assistant superintendent of Human
14      Resources, informed your mother that
15      Dr. Carter said I will only be a teacher
16      in this school system in Summer of 2003?
17  A.  Yes.
18  Q.  And you've already told us about that?
19  A.  Yes.
20  Q.  You also say that in the Summer and Fall
21      of 2003, that Mr. Barker informed your
22      mother that Carolyn Hicks said that she
23      mentioned your name to seven principals
```

265

```
1       with reference to employment, and they
2       all refused to hire you?
3   A.  Yes.
4   Q.  Okay.  We haven't talked about that yet.
5       Tell me about that conversation.  Did
6       your mother relay that to you?
7   A.  She did.
8   Q.  And this is a conversation your mother
9       allegedly had with Jimmy Barker?
10  A.  Yes.
11  Q.  Okay.  And what did you understand this
12      to mean, that Carolyn was referring your
13      name to seven principals, and they
14      wouldn't hire you?
15  A.  That's the only thing I could, yes.
16  Q.  Okay.  And do you know why -- if that's
17      true, why those seven principals didn't
18      want to hire you?
19  A.  No, I don't.
20  Q.  Okay.  The next says that Ms. Johnson
21      states her position, told your mother
22      that the problem with your -- Melvin --
23      employment was that when people/admini-
```

266

```
1       strators view Melvin, they see Mary
2       Lowe, and they aren't favorable about
3       hiring him at that point.
4   A.  That is true.
5   Q.  And that she made that -- Ms. Johnson
6       made that communication to your mother
7       in July of '04?
8   A.  Yes.  That was the first time she made
9       the statement.
10  Q.  Okay.  And that was going to be my
11      question that we have not clarified yet
12      from my little notes here:  That's the
13      first time Lois Johnson said something
14      like that -- and I think we were getting
15      into that before the break -- which was
16      the Summer of '04, which is what this
17      document reflects?
18  A.  That was the first time she said it to
19      Mother.
20  Q.  Did she ever say that to you?
21  A.  She said it to me once.
22  Q.  Okay.  And what did she say?
23  A.  She just -- and this was in her office
```

267

```
1       one afternoon during the first year at
2       Daisy Lawrence.  And she said -- she
3       said, Melvin, she said, you know the
4       problem you're having, she said, you
5       know when people look at your momma,
6       they look at you.  She said, You know,
7       that's what we always say, you know, he
8       is Mary.  And --
9   Q.  And this is -- I'm sorry, when did you
10      say she said that to you?
11  A.  This was the first -- my first full year
12      at Daisy Lawrence, back at Daisy
13      Lawrence.
14  Q.  Back in '99?
15  A.  No.  The first full year after
16      Southlawn.
17  Q.  When you came back.  You're saying back.
18      I'm sorry.
19  A.  This was on -- and I don't even have the
20      date.  But it was during that school
21      year one afternoon in her office.
22  Q.  When they look at you, they look at your
23      momma?
```

Pages 264 to 267

268

1  A. They see Mary.
2  Q. They see your momma. Anything else that
3     Ms. Johnson has said directly to you of
4     that nature?
5  A. No.
6  Q. Anything else that Ms. Johnson has said
7     to your mother of that nature, that your
8     mother subsequently relayed to you?
9  A. This last year that I was at Daisy
10    Lawrence, Ms. Johnson made that
11    statement again to my mother, and it
12    kinda got hot. It was heated at that
13    time.
14 Q. Did you put down the statements -- at
15    the time that you wrote this document,
16    Defense Exhibit 7, did you put down the
17    statements of anything said like that,
18    to the best of your recollection?
19 A. Are you asking did I do this at a later
20    date?
21 Q. No. I asked a horrible question.
22       When you wrote Defense Exhibit
23    7, did you relate -- because these

269

1     statements that we just asked you about,
2     there were three of them. Did you
3     reflect what was actually said during
4     those alleged conversations, to the best
5     of your ability or memory, at that time?
6  A. Yes.
7  Q. Okay. Any other -- Summer of '04,
8     Ms. Johnson said something to your
9     mother; during the school year of
10    '04-'05, Ms. Johnson said something to
11    your mother --
12 A. Yes.
13 Q. -- and then you've told us about the
14    time Ms. Johnson said something to you?
15 A. Yes.
16 Q. Those are three occasions that I'm
17    recalling.
18 A. Yes.
19 Q. Any other time that you can think of
20    that Ms. Johnson said anything about
21    your mother to you or to your mother?
22 A. Right before -- while Mr. Carter was
23    still superintendent, right before I

270

1     came back to Montgomery County, I was
2     still in Bullock County. My mother
3     called Ms. Johnson, it may have been on
4     a Saturday or a Sunday, to ask her what
5     did she think she needed to do to help
6     me get back in Montgomery County.
7  Q. So that would have been the Summer of
8     '03, then?
9  A. Yes. And they had a long conversation.
10    And Momma -- my Mother told me, she
11    said, Melvin, Lois just said that you
12    know how people sometimes get back at
13    your children, you know, get back at you
14    through your children. And she just
15    told me what we needed to do. At that
16    time, my mother informed me, she said,
17    Well, I'm just telling you Melvin and I
18    are going to see if we can sit with
19    Mr. Barker and talk to Mr. Barker and
20    see if we can -- whatever we need to
21    work out, can we work it out? That was
22    the first time my mother and Ms. Johnson
23    had a conversation, to my knowledge,

271

1     about any of these proceedings. And
2     then we have two to me, then three to
3     Momma, then four to her again, the
4     fourth time something else said.
5  Q. Oh, oh, oh, I thought you were saying
6     three times -- yeah. Okay. Any other
7     that you can think of today?
8  A. No, that is it. That is all that I'm
9     aware of.
10 Q. Okay. And I asked you about Mr. Barker,
11    and you told me that he said -- first
12    that your mother walked in on a
13    conversation he was having with Ann
14    Sippial, where he said words to the
15    effect that he's just like his momma,
16    his reputation --
17 A. His personality supersedes him.
18 Q. His personality supersedes him. And
19    that allegedly occurred also in the
20    Summer of '03, I think. I'm not trying
21    to change your testimony.
22 A. Yes.
23 Q. It'll speak for itself. I might be

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

272

1    getting that wrong.
2  A. Yes. You're right.
3  Q. Oh, is that right? Okay.
4       And then the second thing that
5    you said about Mr. Barker is that
6    Dr. Owens told you that Jimmy Barker
7    said, Melvin's problem is his momma; you
8    drive a Mercedes. What else? Tell us
9    about that conversation.
10 A. Dr. Owens conveyed to me that, Melvin,
11   you were born with a silver spoon in
12   your mouth, and these people resent
13   that. And you shouldn't have let your
14   momma buy you that Mercedes. You should
15   buy you a little truck. And you're
16   living where you live, the type of
17   clothes that you wear. And you might
18   consider waiting until four to five
19   years after Mr. Barker has retired and
20   possibly Dr. Purcell is gone and some of
21   the Board members are out of the way
22   before they take you seriously.
23 Q. Okay. Was Dr. Owens telling you that

273

1    was his opinion, or that was something
2    that Jimmy Barker said?
3  A. He was telling me that was the opinion.
4  Q. That that was the opinion from who?
5  A. Well, he told me Mr. Barker said it.
6  Q. And I'm sorry. I'm not trying to catch
7    you, but did he say that Mr. Barker said
8    the things about you need to buy a truck
9    and things like that, or had Mr. Barker
10   said some things that gave Dr. Owens the
11   opinion that you should do those things?
12 A. Those are the opinions that Dr. Owens
13   conveyed based on his conversation that
14   he told me he had with Mr. Barker.
15 Q. Do you know then specifically what was
16   said between Jimmy Barker and Dr. Owens?
17 A. None other than what Dr. Owens conveyed
18   to me.
19 Q. Did he convey anything specific that
20   Mr. Barker had said to him?
21 A. Dr. Owens just started the conversation
22   by telling me, Brother Lowe, I had to
23   really defend you today. And then I

274

1    asked him, Defend me about what and for
2    what? And then he went into all of
3    this.
4  Q. Okay. So you're not exactly sure what
5    was said in their conversation?
6         MR. PATTY: Object to the
7    form.
8  A. I'm just telling you that -- I'm telling
9    you what Dr. Owens told me. I wasn't a
10   fly on the wall. That's just -- that's
11   what he told me.
12 Q. Okay. And I'm not trying to be
13   difficult, I promise. And I might just
14   be getting confused. But I'm trying to
15   ascertain what he said Mr. Barker said
16   or what he was just saying. Like
17   Dr. Owens was saying -- was he the one
18   saying you shouldn't drive a Mercedes
19   and things of that nature, as opposed to
20   did he tell you that he was repeating
21   something that Jimmy Barker allegedly
22   said to him?
23        MR. PATTY: Object to the

275

1         form.
2  Q. And I'm sorry if I'm not --
3  A. He told me that he had to defend me
4    today. And he talked with Mr. Barker,
5    and these are some of the things that,
6    Brother Lowe, you need to do. Because
7    these are the opinions that are out
8    there about you, and this is why people
9    don't take you seriously as far as the
10   jobs that I was trying to attain.
11   That's what he told me.
12 Q. Okay. Dr. Owens told you that at what
13   time, in your first or second year at
14   Daisy Lawrence after you came back?
15 A. That was the second year.
16 Q. Oh, I'm sorry. You've already -- that
17   was either right before or right after
18   you got pink-slipped you said?
19 A. It was either a day before or a day
20   after.
21 Q. You said that already, okay.
22        Okay. We've talked about Lois
23   Johnson, we've talked about Dr. Carter,

276

1    and we've talked about Jimmy Barker.
2    Well, let me back up and give you an
3    opportunity. Those are the two things
4    you had told me Mr. Barker had allegedly
5    said that related to your mother in any
6    way. Those are the two incidents. Do
7    you have any that you've remembered now
8    or anything you want to add to that?
9 A.   Those still stand.
10 Q.  Okay. Anybody else? Anybody else that
11    made comments to that effect in relation
12    to your mother that we have not
13    discussed, which I guess would involve
14    Dr. Owens? Anybody else?
15 A.  Who made statements to me about, I
16    guess, some of the difficulties that I
17    was having, what they stemmed from?
18 Q.  Yeah. That's fair.
19 A.  No.
20 Q.  Okay. Let me look real quickly. We've
21    talked about Karen Vann and Denita
22    Easterling.
23           Okay. No. 9 -- we only have

277

1    one copy of this, so we'll share.
2 A.   Okay.
3 Q.   On Defense Exhibit 7, No. 9, it says:
4    It has been brought to my attention that
5    my name, among others, has been issued
6    to school administrators as not being
7    certified in teaching with reference to
8    reading instruction. When you say your
9    name, among others, just for
10    clarification, you believe that there
11    was a list or something that had your
12    name on it and other people's names on
13    it, and it was being circulated to the
14    schools?
15 A.  Dr. Owens told me he received some
16    information from Human Resources that
17    said I was not certified.
18 Q.  Not certified in reading instruction?
19 A.  Not certified to teach reading.
20 Q.  And when did he tell you that?
21 A.  That was somewhere in that second year.
22 Q.  But you were already teaching reading at
23    his school, according to you; is that

278

1    correct?
2 A.   I was never teaching reading. I was
3    serving as the reading coach. I never
4    had a class role. I never had a
5    classroom full of students.
6 Q.   Did you inquire as to what the problem
7    was in regards to your certification?
8 A.   I did.
9 Q.   And what did you find out?
10 A.  I found out that I was certified and
11    highly qualified.
12 Q.  Is this regarding the highly qualified
13    issue? Is this the same thing as being
14    highly qualified?
15 A.  HQ?
16 Q.  Because I had some documents, and I'll
17    be glad to show them here to you. We'll
18    mark this as Defense Exhibit --
19 A.  What are you asking me? Are you asking
20    me -- what are you asking me?
21 Q.  Is the certification to teach reading
22    instruction the same issue as whether or
23    not you are highly qualified?

279

1 A.   It wasn't to me. I don't know if the
2    school or Dr. Owens had it confused or
3    was making an issue about it. I knew
4    that it was certified and I knew that I
5    was highly qualified.
6 Q.   Let me show you what I've marked as
7    Defense Exhibit 12, and ask you if these
8    are the documents that you recall being
9    exchanged regarding that issue?
10           (Whereupon Defendants'
11           Exhibit No. 12 was marked
12           for identification and
13           attached hereto.)
14           (Witness reviewed document.)
15 A.  Yes.
16 Q.  Okay. Look at that last document for
17    me. Is that something where your hours
18    or something are registered?
19 A.  This is the four-by-four that the state
20    department in most schools use to --
21 Q.  For the highly-qualified calculation?
22 A.  To correlate with No Child Left Behind
23    stipulation.

Pages 276 to 27

334.262.3332                Baker & Baker Reporting and Video Services, Inc.              334.262.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.337

280

1  Q. Okay. It says here that you spoke on
2     the phone, and I guess this is from
3     Sandra Pugh —
4  A. Yes.
5  Q. — about your highly qualified status as
6     a reading coach or as administrator, and
7     she explains that highly qualified does
8     not apply to those areas, but that she
9     reviewed you Class B elementary
10    certification, and that you needed
11    twelve semester hours, and that you were
12    three hours shy of that; is that
13    correct?
14 A. Three hours shy in what area?
15 Q. That you were three hours shy in math to
16    be considered highly qualified for
17    elementary ed.
18 A. And at the time she quoted that, the
19    course was clearly taken, because before
20    I could come back to Montgomery County,
21    Ms. Hicks required me to get a statement
22    from Alabama State that I did take that
23    extra math class.

281

1  Q. Well, is this your response e-mail to
2     her where you acknowledge that you are
3     three hours shy in math? And I'm just
4     trying to —
5         (Witness reviewed document.)
6  A. I have completed the missing three hours
7     in math. I would like to have a copy —
8     yeah, I've completed that class. I was
9     just letting her know it was — it
10    should have been in the personnel folder
11    somewhere. Because before I could — I
12    was rehired back to Montgomery County.
13    I had to get a statement from the
14    registrar's office at Alabama State that
15    I had taken that additional class.
16 Q. But at some point, you needed the hours,
17    because you say here that you are aware
18    of the needed class hours; is that
19    correct?
20 A. I was aware of her stating that I needed
21    it. It was clearly aware of that. But
22    at the time I wrote that, I already had
23    it. I had it before I came back.

282

1  Q. Were you satisfied with her explanation
2     as to why there wasn't a letter in your
3     file regarding highly qualified?
4  A. Not really.
5  Q. You just disagreed that the state
6     department didn't require that for your
7     category that you were teaching in?
8  A. Well, I refuted that, because I know
9     what Dr. Owens told me. And he wasn't
10    making it up, that it —
11 Q. So the answer is yes, you just disagreed
12    that you needed one in your file?
13 A. I disagreed.
14 Q. Okay. And No. 10 on Defense Exhibit 7,
15    it says you questioned Mr. Barker about
16    your name being given to him regarding a
17    recommendation for you to be an
18    administrative assistant at McKee Junior
19    High School. Do you mean by that, that
20    it was your understanding that the
21    principal asked for you to be hired?
22 A. Mr. Barker told me that Mr. Abrams asked
23    for me. And Mr. Abrams told me he asked

283

1     for me.
2  Q. Bobby Abrams (phonetic)?
3  A. Bobby Abrams. And Mr. Looney was aware
4     that Bobby Abrams asked for me. Because
5     Mr. Looney said if there's a problem
6     when you see Mr. Barker, come back to
7     me. If you want Melvin Lowe, you can
8     have him.
9  Q. Who told him that?
10 A. Mr. Looney. Because in that same
11    conversation that I had with Mr. Barker,
12    Mr. Barker told me that Mr. Carter
13    said — Mr. Barker told me I had a good
14    interview, and that Mr. Carter said that
15    you will either be in one of the —
16    you'll either be an administrator or you
17    will either be in one of these reading
18    positions. I rest — I took rest,
19    because I assumed that to be true. And
20    when —
21 Q. Dr. Carter said that?
22 A. That's what Mr. Barker said he said.
23 Q. So this was the year after he said you

Pages 280 to 28[3]

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.333[2]
888.253.3377              Certified Court Reporters and Certified Legal Video Specialists              888.253.337[7]

284

1    would only ever be a teacher?
2  A. Yes.
3  Q. Okay.
4  A. There was some disbelief, but Mr. Barker
5     told me that's what he said.
6  Q. What was the job that Bobby Abrams was
7     recommending you to take?
8  A. Administrative assistant.
9  Q. It had nothing to do with Special
10    Education?
11 A. That comes later. That's the next year.
12 Q. Okay.
13 A. May I finish?
14 Q. Go ahead. Yes, I apologize.
15 A. And Mr. Abrams told me that Mr. Barker
16    told him that he'd have to hire a
17    female.
18 Q. That he had to hire a female for the
19    administrative assistant position at
20    McKee?
21 A. Yes.
22 Q. Did a female get that job?
23 A. Yes.

285

1  Q. Did you ever talk to Mr. Barker about
2     it?
3  A. I don't think I did, not after that.
4  Q. Okay. Because this again is in the
5     Summer of '04.
6        All right. And then you go on
7     to talk about the limited number of
8     black men in leadership or
9     administrative positions. And I would
10    just ask in general to any of these
11    statistics or anything that y'all
12    provided, do you have any information,
13    sitting here today, where a white
14    individual was hired over a black
15    individual who was less qualified than
16    the black applicant?
17        MR. PATTY: Object to the
18           form.
19 A. You would have to poll the rubrics, the
20    assessment rubrics that were used to
21    weigh one applicant against another.
22 Q. I'm just asking --
23 A. Okay.

286

1  Q. -- if you can tell me about today an
2     example of where a white applicant was
3     hired where you believe or have
4     information that the black applicant had
5     better qualifications?
6        MR. PATTY: Object to the
7           form.
8           Go ahead.
9  Q. In any of these positions that you're
10    referring to?
11 A. I would have to know what qualifications
12    were in the rubric, the assessment
13    rubric, or whatever form of assessment
14    was being used. And then I could
15    balance it out and then say, Well, look,
16    this is the reason I feel this way.
17 Q. Is your statement here, then, that you
18    just believe there's discriminatory
19    practice, because there should be more
20    black people in these positions you've
21    listed?
22 A. When you survey each department and you
23    look at who holds the leadership

287

1     positions, it's evident.
2  Q. You say in the next paragraph that
3     Dr. Carter told Mr. Barker in June of
4     2003, that you would be in a reading
5     position or administrative position for
6     the upcoming school year. And that
7     Mr. Barker told you that your interviews
8     were excellent, and that he had heard a
9     lot of great things regarding your
10    knowledge of curriculum and instruction,
11    and thus, the implementation of
12    policy/procedures in an educational
13    administration?
14 A. Yes, that is true.
15 Q. When did Mr. Barker tell you that?
16 A. That was during the summer, that last
17    summer right after Mr. Abrams informed
18    me that he made a recommendation for me
19    for the Assistant Principal's
20    position -- administrative assistant's
21    position at McKee. And that was right
22    before Mr. Abrams came back to tell me
23    that Mr. Barker said he would have to

Pages 284 to 28

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.333
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.337

Melvin Alonza Lowe, III
January 3, 2006

288

1   hire a female. That was what Mr. Barker
2   told me shortly after we had the large
3   group of interviews.
4   **Q. And Mr. Barker was a part of those**
5   **interviews?**
6   A. Yes.
7   **Q. And then through the course of your next**
8   **few paragraphs of this document, it**
9   **appears that you are addressing the**
10  **issue of your assignment to Daisy**
11  **Lawrence that last year and whether you**
12  **should have been assigned there and what**
13  **your job duties were?**
14  A. Yes.
15  **Q. And so I guess my question was: Have**
16  **you told us -- I think you testified**
17  **about that earlier. Is there anything**
18  **that you would like to add to that in**
19  **regards to your assignment at Daisy**
20  **Lawrence that last year or what your**
21  **job --**
22          MR. PATTY: Object to the
23              form.

289

1   A. What are you asking me in particular?
2          THE WITNESS: What did you
3              say?
4          MR. PATTY: I just said
5              object to form.
6          THE WITNESS: I'm sorry.
7   BY MRS. CARTER:
8   **Q. Is there any other complaint that you**
9   **make regarding your last year at Daisy**
10  **Lawrence, other than the fact that you**
11  **say you didn't have anything to do and**
12  **the kids weren't being taught?**
13  A. Well, what I -- I said the teachers --
14  the students were not being taught the
15  curriculum, the prescribed curriculum
16  that was supposed to take place for the
17  implementation in the -- in the
18  alternative unit. In the alternative
19  program, the phonics reading program, I
20  implemented that program the prior
21  summer as lead reading coach, therefore,
22  I knew the program and the semantics of
23  the program. I communicated to many

290

1   central office personnel that we do not
2   have the curriculum. The teachers have
3   not received the training. What are we
4   to do all year with these students?
5   They are not receiving any type of
6   reading instruction. Nor am I still
7   being paid as a reading coach, but I'm
8   still tasked with doing all of the
9   assessments that all of the reading
10  coaches take part in.
11  **Q. You say you were the lead reading coach.**
12  **Who were the other reading coaches?**
13  A. I would the lead reading coach at
14  Southlawn. Karen Vann --
15  **Q. At Southlawn?**
16  A. Southlawn Elementary.
17          MR. PATTY: He said summer
18              of -- I'm sorry. He
19              said Summer of 2004?
20          THE WITNESS: Yeah.
21          MR. PATTY: 4?
22          THE WITNESS: No, 3 -- 4.
23          MR. PATTY: 4.

291

1   A. I was the lead reading coach. Karen
2   Vann was the other reading coach. Karen
3   Vann was the -- she was the second
4   reading coach.
5   **Q. It was just the two of y'all?**
6   A. Yes. Well, Karen Vann was only there
7   one week before summer school started.
8   And the week that summer school ended, I
9   was there the entire summer.
10  **Q. Okay.**
11  A. She participated in Special Development.
12  I didn't.
13  **Q. Okay. On down on No. 18, it says as a**
14  **point of interest your Powerpoint**
15  **presentation has been on the web. Tell**
16  **me about that.**
17  A. I was allowed to attend a professional
18  development workshop in Atlanta.
19  **Q. When was that?**
20  A. I would have to actually look back and
21  see what dates. I want to say it was in
22  October, 23rd and 24th. I'd have to
23  look back at the notes. And when I came

Pages 288 to 291

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

292

1  back from the inservice, I developed,
2  according to best practice, some type of
3  tangible documentation that would
4  support the means for me having
5  attended. I developed a Powerpoint
6  presentation. I presented it to Sharon
7  Sewell (phonetic) and Mike Looney just
8  as a follow-up.
9          And we were scheduled to sit
10  and discuss the outcome, because I did
11  recommend part of that program to be
12  used with the alternative schools. In a
13  meeting for reading coaches and
14  principals, Mr. Looney asked me to share
15  some words on the presentation. And
16  then he informed me that it was placed
17  on the web page, and it has been on the
18  web page since March 24th of '04
19  identifying me as the reading coach for
20  the alternative school.
21  Q. Is it '04 or '03?
22  A. '04. And as of yesterday, it's still on
23  the web page.

293

1  Q. I just want to mark a couple of things
2  real quickly. Do you recognize that as
3  the document where you were nonrenewed
4  in 2002?
5          (Whereupon Defendants'
6          Exhibit No. 13 was marked
7          for identification and
8          attached hereto.)
9          (Witness reviewed document.)
10  A. Yes.
11  Q. That's marked as Defense Exhibit 13.
12          This is a letter dated
13  June 3rd, 2002. Is this the document
14  where you asked to be reinstated at
15  Southlawn, that you earlier referred to?
16          (Whereupon Defendants'
17          Exhibit No. 14 was marked
18          for identification and
19          attached hereto.)
20          (Witness reviewed document.)
21  A. Yes, it is.
22  Q. This is Defense Exhibit 15. Is this the
23  document where at the end of the 2004 --

294

1  excuse me, 2003-2004 school year you
2  were nonrenewed or there was an attempt
3  to nonrenew you by the Board?
4          (Whereupon Defendants'
5          Exhibit No. 15 was marked
6          for identification and
7          attached hereto.)
8          (Witness reviewed document.)
9  A. Yes.
10  Q. And I guess before that was corrected,
11  this is a letter dated May 19th, 2004.
12  Is this the correspondence where you
13  asked to be reinstated or interviewed
14  for other positions?
15          (Whereupon Defendants'
16          Exhibit No. 16 was marked
17          for identification and
18          attached hereto.)
19          (Witness reviewed document.)
20  A. Yes, it is.
21  Q. What I'll mark as Defense Exhibit 17 is
22  an e-mail from you dated June 23, 2004,
23  to Jimmy Barker and Carolyn Hicks where

295

1  you're asking to interview for teaching
2  positions or lead positions; is that
3  correct?
4          (Whereupon Defendants'
5          Exhibit No. 17 was marked
6          for identification and
7          attached hereto.)
8          (Witness reviewed document.)
9  A. Yes, it is.
10  Q. And then in August of 2004, is this a
11  Letter of Appointment stating that you
12  will be a teacher-tutor at Daisy
13  Lawrence Alternative School?
14  A. Yes, it is.
15  Q. And that was for the '05 -- excuse me,
16  '04-'05 school year, correct?
17  A. Yes.
18  Q. And in the Spring of 2005, you were
19  nonrenewed?
20  A. Yes.
21  Q. Let me mark Defense Exhibit 19, and ask
22  if you can tell me what this is, please,
23  sir.

Pages 292 to 29

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.337

**296**

```
 1        (Whereupon Defendants'
 2            Exhibit No. 19 was marked
 3            for identification and
 4            attached hereto.)
 5        (Witness reviewed document.)
 6  A.  This was a communication I sent to
 7      Dr. Purcell asking for her help to be
 8      reassigned and reemployed in Montgomery
 9      County over the Summer of '05.
10  Q.  Did you receive a response from her to
11      this e-mail?
12  A.  She called me.
13  Q.  Okay.  And did you have -- were you
14      there?  Did she leave you a message, or
15      did you actually --
16  A.  We talked.
17  Q.  Okay.  And what did y'all talk about?
18  A.  I asked her -- I just kind of gave her a
19      briefing, because I had -- we've talked.
20      And I asked her what could she do to
21      help me.  And she told me that she could
22      see if there was anything she could do
23      to help.
```

**297**

```
 1  Q.  On this document, it says that Dr. Owens
 2      told you on May 19th, 2005, that Jimmy
 3      Barker said that you were not liked by
 4      the school system and you should have
 5      never filed your lawsuit?
 6  A.  That is true.
 7  Q.  Dr. Owens told you that Jimmy Barker
 8      said that?
 9  A.  Yes.
10  Q.  Okay.  Because you had not told us about
11      that earlier.  And it might be that I
12      just limited my question to the time
13      period, and I apologize.
14  A.  Okay.
15        MR. PATTY:  Object to that.
16        I think he did mention
17        that -- that the very
18        first time you asked
19        him about that
20        conversation, he said
21        he -- that Barker had
22        said that he shouldn't
23        have filed his lawsuit.
```

**298**

```
 1        MRS. CARTER:  Okay.  Maybe
 2        so.
 3     THE WITNESS:  I think I did.
 4     MR. PATTY:  We've covered
 5        this conversation twice
 6        before, I think.
 7     THE WITNESS:  Yeah.  I'm
 8        almost certain that I
 9        did.
10  BY MRS. CARTER:
11  Q.  It's just confusing, because sometimes
12      when -- and I don't mean this bad, but
13      sometimes when you refer to summers or
14      dates, they've been -- but I think we
15      have it all clear now.
16        And this is not the
17      conversation we discussed earlier.  It
18      can't be, because of when you said that
19      happened.  And so I guess -- I mean,
20      have you had more than one conversation
21      with Dr. Owens where he told you that
22      Mr. Barker had said words to that
23      effect?
```

**299**

```
 1  A.  We have.
 2  Q.  So this would just be another one here
 3      that you're reflecting in this
 4      correspondence?
 5  A.  Yes, the more recent.
 6  Q.  Because this correspondence or this
 7      conversation would have followed your
 8      EEOC charge being filed and your lawsuit
 9      being filed?
10  A.  Exactly.
11  Q.  Okay.  The earlier conversation with
12      Dr. Owens was at a time when necessarily
13      Mr. Barker might not have known you had
14      filed an EEOC charge; is that fair to
15      say?
16  A.  No, it's not.
17  Q.  In the Summer of '04?  Okay.  I don't
18      think you had filed your EEOC charge by
19      the Summer of '04, but I apologize if
20      I'm wrong.
21  A.  Can I go back and readdress that?
22        MR. PATTY:  If you need to
23        clarify it, I
```

Pages 296 to 299

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.337

300

1          mean . . .
2  Q. I mean, I might be reflecting on
3      something in your testimony that's
4      incorrect. I was just trying to place
5      this together in my head so that I
6      didn't reask a million questions. But
7      it looks like to me that this would have
8      been another set --
9  A. The EEOC complaint was filed in . . .
10 Q. Your letters were sent in August of '04,
11     and the Complaint was filed in October
12     of '04.
13          MR. PATTY: Yeah. I was
14          thinking that y'all had
15          discussed this one.
16          Two previous times
17          there was a discussion
18          about a conversation
19          after the EEOC and
20          after the lawsuit was
21          filed.
22          MRS. CARTER: We were
23          talking about his first

301

1          year back with
2          Dr. Owens.
3  A. But to clarify that Mr. Barker didn't
4      know about the EEOC complaint, when
5      Dr. Owens positioned me knowing about
6      it, he told me Mr. Barker told him about
7      it.
8  Q. And you did tell me about that and at
9      the end of this school year when you
10     were pink-slipped. And you're right.
11     And we might be talking about two
12     different things, because we have
13     discussed that before.
14 A. Okay.
15 Q. And I just want to clarify: I guess it
16     would be within that conversation, then,
17     that he told you that Mr. Barker said
18     words to the effect that you shouldn't
19     have filed your lawsuit?
20 A. Yes.
21 Q. Okay. Did you and the superintendent,
22     during that phone conversation that
23     followed this e-mail, did y'all discuss

302

1      the fact that you had filed a lawsuit or
2      that Mr. Barker had allegedly said this
3      to Dr. Owens?
4  A. Dr. Purcell knew of that in January.
5  Q. That's not my question.
6  A. I'm sorry. Okay.
7  Q. My question is: When you talked to her
8      on the phone, did you discuss your
9      lawsuit? I'm not saying she didn't know
10     about it. I just want to know if you
11     talked to her about it during the phone
12     call that you say followed this
13     letter -- or this e-mail?
14 A. We did not talk about the lawsuit in our
15     conversation after this e-mail. We
16     talked about the lawsuit in January
17     before it was filed, so she knew of
18     everything surrounding. But after this
19     conversation, no, it wasn't necessary to
20     bring up the lawsuit again, because she
21     clearly had been served at that time.
22 Q. Okay. I'm going to show you what I'll
23     mark as Defense Exhibit 20, and ask if

303

1      that is -- if you recognize that as an
2      e-mail that you sent to Mr. Barker and
3      copied Dr. Purcell with?
4          (Whereupon Defendants'
5          Exhibit No. 20 was marked
6          for identification and
7          attached hereto.)
8          (Witness reviewed document.)
9  A. I do.
10 Q. Okay. Let me show you what I'll mark as
11     Defense Exhibit 21, and ask you what
12     this is and how it came about?
13          (Whereupon Defendants'
14          Exhibit No. 21 was marked
15          for identification and
16          attached hereto.)
17          (Witness reviewed document.)
18 A. This is a letter of recommendation from
19     Dr. Owens that he provided me. After my
20     lawsuit was filed, he then suggested to
21     me that a number of reasons I probably
22     wouldn't be able to get a job back in
23     Montgomery County based on conversations

Pages 300 to 303

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

304

1    he had with Mr. Barker, and he had to
2    constantly defend his position for
3    hiring me. Therefore, Dr. Owens took it
4    upon himself to write me a letter of
5    recommendation to get a job somewhere
6    else. Because, I guess, the tone was
7    set that you won't be working here.
8  Q. Okay.
9        MRS. CARTER: There's
10           nothing on here that's
11           privileged. I just
12           realized that this fax
13           is to you.
14       (Whereupon an off-the-Record
15        discussion was held.)
16  BY MRS. CARTER:
17  Q. All right, 22. Could you please tell us
18    what that is, Defense Exhibit 22?
19       (Whereupon Defendants'
20        Exhibit No. 22 was marked
21        for identification and
22        attached hereto.)
23       (Witness reviewed document.)

305

1  A. This is a letter that I sent to
2    Mr. Barker on June 26th of '05, asking
3    him to accept my curriculum vitae in
4    review for different postings in
5    Montgomery County in reference to a job
6    announcement on the 25th of May.
7  Q. And what about Defense Exhibit 23?
8       (Whereupon Defendants'
9        Exhibit No. 23 was marked
10        for identification and
11        attached hereto.)
12       (Witness reviewed document.)
13  A. This went along with an interview for
14    assistant reading coaches. I think I
15    sent this to Mr. Barker just to kind of
16    outline some things that I had done in
17    the area of reading instruction.
18  Q. And what about Defense Exhibit 24?
19       (Whereupon Defendants'
20        Exhibit No. 24 was marked
21        for identification and
22        attached hereto.)
23       (Witness reviewed document.)

306

1  A. This was a letter of interest or intent
2    asking for an interview for System-wide
3    Instructional Assistant positions.
4  Q. What about Defense Exhibit 25?
5       (Whereupon Defendants'
6        Exhibit No. 25 was marked
7        for identification and
8        attached hereto.)
9       (Witness reviewed document.)
10  A. This was after I interviewed with
11    Dr. Owens for his reading coach position
12    that was available at Patterson
13    Elementary. This is what I gave him
14    during the interview on some things that
15    I had done in the area of reading
16    instruction and some professional
17    development that I participated in.
18  Q. So you re-interviewed with him that
19    summer for the reading coach position
20    for the 2005-2006 school year?
21  A. Yes.
22  Q. Do you know whether he recommended you
23    for the job?

307

1  A. Yes, he did.
2  Q. And did you have any communication with
3    him about why you did not receive the
4    job?
5  A. Yes, I did.
6  Q. And what did he say to you?
7  A. It was a string of events. He first
8    told me he had to talk to Mr. Barker.
9    After he told me he talked to
10    Mr. Barker, it was still up in the air,
11    because Mr. Barker had to communicate
12    with Connie Mizell, who interviewed me
13    for the position. And when I approached
14    Mr. Barker, Mr. Barker told me that
15    Connie Mizell said I had a poor
16    interview.
17  Q. Mr. Barker said you had a poor
18    interview?
19  A. He said that Connie Mizell stated I had
20    a poor interview.
21  Q. Okay.
22  A. That's who interviewed me. And we kept
23    going back and forth until Dr. Owens

Pages 304 to 307

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

308

1    finally positioned the school board
2    again and told me that Ms. Carla
3    Winborne told him, You're going to have
4    to pick somebody else, because we're not
5    hiring Melvin Lowe.
6  Q. Carla Winborne told Dr. Owens that?
7  A. Yes.
8  Q. And what is Carla Winborne's position?
9  A. She, I think, is an AA Specialist, a
10    Human Resource Specialist in Human
11    Resources.
12 Q. And do you know why she said she was not
13    going to hire you or that the school
14    board wasn't going to hire you?
15 A. I don't know.  She told me that --
16    Dr. Owens told me that's what she told
17    him, that they, whoever "they" the
18    pronoun is, that they were not going to
19    hire me and to pick somebody else.
20 Q. Let me show you what I've made kind of
21    as a composite exhibit instead of going
22    to each one of these individually, and
23    what I would characterize as what

309

1    appears to me to be correspondence that
2    you had with central office or various
3    principals in regards to jobs that you
4    were interested in, administrative
5    positions, coaching positions.  And if
6    you want to flip through that and make
7    sure I characterized that right.
8  A. No coaching positions.  Reading coach.
9  Q. I mean -- that's what I meant to say.
10    I'm sorry.  Hey, my dad's a football
11    coach, so I made a slip on that.  All
12    right?
13 A. Right here what you have are the e-mail
14    communications for the principals that I
15    was unable to contact via fax.
16 Q. And we're fixing to mark that.  But what
17    I'll mark as Defense Exhibit 27, it
18    looks like to me -- and if we've made a
19    mistake, it was on accident -- it seems
20    to be verification of good transmission
21    to the various school locations where
22    you sent faxes.  So what you're telling
23    us is if we compared 27 to 26, a lot of

310

1    these e-mails are to people that the
2    faxes didn't go through on?
3            (Whereupon Defendants'
4            Exhibit Nos. 26 and 27
5            were marked for
6            identification and
7            attached hereto.)
8  A. Or didn't have a fax number available.
9  Q. Or didn't have a fax number available,
10    okay.  We'll get --
11 A. Might I add that Ms. Winborne advised me
12    to do this and keep the documentation.
13 Q. Ms. Winborne, who is the person that
14    told Dr. Owens, We're not going to hire
15    him?
16 A. Yes.
17 Q. And she told you to keep good
18    documentation about your communication
19    with the different schools?
20 A. Yes.
21 Q. I'm going to put this aside so it
22    doesn't get scrambled.  I'm not
23    going to refer to it again.  It's just

311

1    to note . . .
2            Okay.  Let me show you what
3    we'll mark as Defense Exhibit 28.  That
4    appears to be an e-mail from you to
5    Jimmy Barker on June 23rd, 2005.  Tell
6    us about that e-mail, please, sir.
7            (Whereupon Defendants'
8            Exhibit No. 28 was marked
9            for identification and
10            attached hereto.)
11            (Witness reviewed document.)
12 A. This -- this was where I sent this
13    communication to Mr. Barker suggesting
14    to him, for whatever reason, if there
15    had been any uncommunicated
16    disagreements, I still need you to work
17    with me as far as securing employment in
18    this school district.
19 Q. And what about this Defense Exhibit 29
20    from Mr. Barker?
21            (Whereupon Defendants'
22            Exhibit No. 29 was marked
23            for identification and

Pages 308 to 31

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.337

312

1       attached hereto.)
2       (Witness reviewed document.)
3  A. This was after Dr. Purcell and
4     Mr. Barker spoke to the entire faculty
5     at Daisy Lawrence about the school being
6     closed due to reorganization and funding
7     and some deficiencies in those areas.
8     The question was posed by a teacher,
9     Will everyone be placed?  And
10    Dr. Purcell stated that everyone will be
11    placed, however, tenured people would
12    have first choice and they will be
13    placed first.  And Mr. Barker seconded
14    that.  Which is my reason in here I
15    revisited -- I'm not putting words in
16    your mouth, but this is what she said.
17    And everybody has been placed, tenured
18    and nontenured, except Melvin Lowe, and
19    I need some help.  And this was where he
20    provide me with his explanation.
21 Q. Now, Defense Exhibit 19 refers to a
22    woman by the name of Zara Brown, who you
23    say in here was not reassigned?

313

1  A. At this particular time, we were the
2     only two from Daisy Lawrence who had not
3     been reassigned.
4  Q. Was she eventually reassigned?
5  A. Yes.
6  Q. Okay.  And where did she go?
7  A. Chisholm Elementary.
8  Q. Okay.  So to your knowledge, after that
9     overhaul -- because you don't disagree,
10    do you, that in the Spring of '05, there
11    was an overhaul of Daisy Lawrence, the
12    system, the school?
13 A. It was.
14 Q. Right.  And so tenured people from that
15    school had to be placed somewhere, and
16    then all nontenured people were
17    nonrenewed, and then an attempt to place
18    them somewhere.  It's just your position
19    that you were the only person that
20    didn't get reassigned somewhere; is that
21    correct?
22 A. Exactly.
23 Q. Okay.  So your Complaint -- I don't mean

314

1     to put words in your mouth -- would your
2     Complaint then not be -- it's not about
3     the nonrenewal so much as not
4     reassigning you somewhere?
5        MR. PATTY:  Object to the
6        form.
7        Go ahead.
8  A. The nonrenewal was just a process.  Not
9     assigning me anywhere was the action.
10 Q. Let me show you Defense Exhibit 30.
11    This seems to be an application for a
12    summer school program, what a blank
13    application looks like, and then the
14    general information on the program of
15    2005.  Is part of your claim that you
16    were also discriminated against by not
17    getting the summer school job in the
18    year of 2005?
19        (Whereupon Defendants'
20        Exhibit No. 30 was marked
21        for identification and
22        attached hereto.)
23        (Witness reviewed document.)

315

1  A. Yes.
2  Q. Do you have any jobs in particular that
3     you allege to have not received in the
4     Summer of 2005 as a result of race or
5     sex in retaliation, and, I guess, now
6     retaliation for the lawsuit that you
7     filed, the EEOC charge lawsuit?
8  A. Yes.
9  Q. Okay.  What particular jobs in the
10    summer school program do you make that
11    claim about?
12 A. In the summer school program, or in the
13    entire program?  Now, summer school
14    program is one.  There are four others.
15 Q. What do you mean?  I'm sorry, I don't --
16 A. This was the first after the lawsuit was
17    filed and Daisy Lawrence was closed.
18 Q. Right.  And that's where I want us to go
19    now --
20 A. Okay.
21 Q. -- is the grouping of jobs --
22 A. During that summer.
23 Q. Right.  In each summer job and then

334.262.3332
888.253.3377
Baker & Baker Reporting and Video Services, Inc.
Certified Court Reporters and Certified Legal Video Specialists
334.262.3332
888.253.3377

316

1    we'll talk about the fall jobs.
2  A.  I didn't even get an interview, didn't
3    even get placed.  And with this
4    particular assignment, who better
5    qualified than I who started with the
6    initial reading programs, who went
7    through all of the intensive training,
8    all of the professional development
9    training, whatever you want to call it,
10   who implemented the program at one
11   school, implemented the second program
12   at a summer school site, who knew the
13   program back and forth, who had provided
14   the documentations, along with all of
15   the other reading coaches to central
16   office, who had provided a Powerpoint
17   presentation for whatever reason, be it
18   good or bad, was placed on the web page
19   that sited my competencies.  I wasn't
20   allowed to teach or serve as a reading
21   coach for the summer reading program,
22   when the prior summer, I served as the
23   lead reading coach.  It just seemed real

317

1    odd that after the lawsuit was filed and
2    then two grievances filed on Mr. Barker,
3    that all of this just happened by
4    coincidence.
5  Q.  What do you mean by "grievances filed on
6    Mr. Barker"?
7  A.  I filed two grievances with AEA.  One
8    having to do with retaliation on
9    professional development.  And I'll have
10   to look back and see what the other one
11   was.  Not being afforded an opportunity
12   to participate in professional
13   development.
14 Q.  Was that something that you did -- I'm
15   not sure even how that process works,
16   and I apologize.  But is that something
17   he would have known about, or would it
18   have been mediated or worked out with
19   him?  How does that work?
20 A.  He knew about it, because he mentioned
21   it to me.
22 Q.  Well, I'm not saying he didn't.
23 A.  Okay.

318

1  Q.  I'm just kind of -- I guess I'm not
2    exactly sure what you're talking about.
3  A.  AEA felt that because all of this was
4    getting ready to take place, that would
5    tie into this.  It was all a joint.
6        MR. PATTY:  He seeks the
7           UniServe or whoever's
8           assistant to intervene,
9           and the UniServe person
10          would make the contact.
11       MRS. CARTER:  Would
12          intervene, right.
13       MR. PATTY:  Right.
14       MRS. CARTER:  Right.  That's
15          what I thought.
16 BY MRS. CARTER:
17 Q.  And so then, because you went on and
18   filed with the EEOC, or whatever, that
19   kind of, I guess, usurps that process or
20   whatever --
21       MR. PATTY:  I think the EEOC
22          was already filed when
23          the leave issue came

319

1           up.  I think the leave
2           issue he's referring to
3           was October of --
4        MRS. CARTER:  Yeah, we're
5           about to get into that.
6        MR. PATTY:  Okay.
7  BY MRS. CARTER:
8  Q.  Okay.  And that's what I'm going to do.
9    If I can, just to give you a game plan
10   of where we're headed --
11       MRS. CARTER:  Let's go off
12          the Record for a
13          second.
14       (Whereupon an off-the-Record
15          discussion was held.)
16 BY MRS. CARTER:
17 Q.  All right.  I'm going to mark as a
18   composite exhibit, Defense Exhibit 31.
19   And I do not mean to represent that
20   these are all the postings for any job
21   you've applied for, but simply that
22   these are the ones that your lawyer
23   supplied me that you had in regards to

Pages 316 to 31

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.337

320

1    job postings. So if you want to just
2    flip through there and see if that looks
3    accurate to review. Those are the job
4    postings that you had copies of.
5         (Whereupon Defendants'
6         Exhibit No. 31 was marked
7         for identification and
8         attached hereto.)
9         (Witness reviewed
10        documents.)
11 A. These are they.
12 Q. Did you supply copies of every job
13    posting that you had?
14 A. All of those that I applied for or was
15    interested in and was unable to apply.
16 Q. All right. So that's what this is, are
17    the postings, Defense Exhibit 31?
18 A. Uh-huh (affirmative response).
19 Q. Okay. I have a stack of documents here,
20    and I'm not sure how to mark them,
21    because some of them seem to be
22    repetitive to me. But it regards the
23    incident where you requested

321

1    professional leave -- I mean,
2    professional development time or leave
3    to go on professional development to
4    speak or to present at Nova in October
5    of 2004. Do you know what I'm talking
6    about?
7  A. Correction. That was to present at the
8     national -- what is that? Yeah, the
9     National Schools for Reform Conference.
10    It was not Nova. I don't want anyone to
11    think that it had anything to do with my
12    doctorial program.
13 Q. Oh, it was sponsored by Nova.
14 A. It was sponsored.
15 Q. Okay. That's where I got it. Well, I
16    wasn't trying to throw you a curve ball.
17 A. I know you're not.
18 Q. And I think that some of this stuff is
19    just repetitive, but tell me -- I'll try
20    to flip through real quick -- tell me
21    about that. I mean, you requested to go
22    for this professional development, and I
23    guess you did not hear back initially;

322

1    is that fair to say?
2  A. I requested to go. I held a verbal
3     conversation with Mike Looney, who
4     encouraged me to go, along with Judy
5     Wardoff (phonetic) and Linda Sexton, who
6     encouraged me to go. I compiled my
7     information, filed it with Dr. Owens.
8     Dr. Owens approved it. If you look at
9     the date of when I gave it to him and
10    how long it sat before I was notified
11    that I would not be allowed to, as
12    opposed to some of the other
13    professional development activities from
14    other persons in the same school who
15    applied to go different places and the
16    turnaround time. When I asked
17    Mr. Barker, Why was mine denied by you
18    and all of my other professional
19    development activities had been approved
20    by Carol Hicks, but like all of mine all
21    of a sudden are being denied by you,
22    Mr. Barker told me that Mr. Looney said
23    that he didn't see where a classroom

323

1    teacher was sufficient enough to present
2    at a national conference, which
3    conflicts with what Mr. Looney provided
4    me in a written e-mail.
5  Q. Okay. So you feel like this was some
6     type of retaliation or discrimination --
7  A. Yes, I do.
8  Q. -- the way you were treated about this
9     professional development?
10 A. Yes, I do. And being that I had
11    communicated with Dr. Purcell about it,
12    and she even felt that it was a
13    wonderful opportunity to have
14    representation from Montgomery County at
15    this event.
16 Q. How did it come about that you were
17    asked to present? Did you ask them if
18    you could present?
19 A. I received the correspondence in the
20    mail. And I did, I initially registered
21    as a presenter. And everything from
22    there began to develop. And they asked
23    me to send in a scoping sequence of what

324

1    I was going to present.  I did, which
2    you see my itinerary and everything that
3    is listed that I was going to present,
4    the time framing --
5  Q.  **Yeah.  Let me show you, this is Defense**
6    **Exhibit 32, which is just a grouping of**
7    **documents that seems to be -- and I know**
8    **some of it is repetitive, but I was just**
9    **scared not to mark it all -- I guess in**
10   **regards to who you corresponded with,**
11   **where you have the program, a copy of**
12   **the program, your application, your**
13   **request to speak.  The request to speak**
14   **was dated in October, and it says, Dear**
15   **Colleague.  It seemed to be they were**
16   **responding to a request from you.  And**
17   **that's what I was asking is:  Did you**
18   **request?**
19             (Whereupon Defendants'
20             Exhibit No. 32 was marked
21             for identification and
22             attached hereto.)
23             (Witness reviewed

325

1             documents.)
2  A.  After I received this in the mail, I
3    then applied to present.
4  Q.  **Okay.  And you're referring to what**
5    **I would call the brochure?**
6  A.  The brochure.
7  Q.  **So then you make application to present,**
8    **and then you get this October letter**
9    **that says, I'm writing to invite you to**
10   **present a Best Practice Workshop?**
11 A.  Yes.
12 Q.  **Okay.  Tell me what Defense Exhibit 33**
13   **is.**
14             (Whereupon Defendants'
15             Exhibit No. 33 was marked
16             for identification and
17             attached hereto.)
18             (Witness reviewed document.)
19 A.  This is the itinerary of what I would
20   present, how long -- I mean, just
21   basically the flow of my presentation.
22   Who, what, when, and where.  My target
23   audience.  How long I'm going to take.

326

1    Even breaking down the expenditures and
2    what I would need in order to present.
3  Q.  **Who did you give -- who did you prepare**
4    **that for?**
5  A.  Did I -- I don't know.  I know
6    Dr. Purcell got a copy.
7  Q.  **I mean, I guess what I mean by**
8    **that is --**
9  A.  This was for me to be able to validify
10   what I was doing.  And then I also
11   provided -- I think I gave Dr. Owens a
12   copy of this, Mr. Looney, and
13   Dr. Purcell, to show that everything I'm
14   doing is well thought, well planned.
15   And they even had a copy of what I was
16   going to present in case there was a
17   problem with it, to critique it.  But
18   one of the items I was going to present
19   was the presentation that's still on the
20   web page, because those are still some
21   active curricular components that are in
22   place in Montgomery County and other
23   school districts.

327

1  Q.  **Let me show you what I'll mark as**
2    **Defense Exhibit 34 and Defense Exhibit**
3    **35.  And if you could, tell me what**
4    **these are.**
5             (Whereupon Defendants'
6             Exhibit Nos. 34 and 35
7             were marked for
8             identification and
9             attached hereto.)
10            (Witness reviewed
11            documents.)
12 A.  35 is a presentation that I designed for
13   the workshop, the presentation.  And
14   this has to deal with all of the
15   programs that we're now using in
16   Montgomery County before the initial
17   inception of the reading interventions.
18         The second one, Exhibit 35,
19   this is the actual presentation.  Like I
20   said, of '04, March 24th of '04, that is
21   on the web page that I was going to also
22   present.  Because I had three fragmented
23   areas.

Pages 324 to 327

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

328

1  Q.  So you developed all this material?
2  A.  Yes.
3  Q.  Okay.  Did you take it from anything?
4      Like what did you take this from?
5  A.  That's my own development.
6  Q.  Okay.  I guess I was just seeing quotes
7      and stuff.  I didn't know.
8  A.  The quotes are coming from persons who
9      I'm pulling information, authorities in
10     reading education or authorities in
11     research and development.
12 Q.  I'm going to show you two other
13     documents that I'm not going to mark.
14     It looks to me to be a different copy in
15     a different form of Defense Exhibits 34
16     and 35, which are much easier to read;
17     is that accurate?
18 A.  This one here is not even in here.  This
19     one here, one, two, and three are
20     different.  This one here,
21     Accountability That's Accountable, it's
22     this one here.  It's just in --
23 Q.  A different format?

329

1  A.  -- a worksheet form.
2  Q.  Okay.  Well, let's get rid of that.
3      Then this one is a separate one?
4  A.  All three of these are different.
5  Q.  Okay.  I did not catch that.  All right.
6  A.  This one has to deal with Harcourt --
7      implementation for Harcourt and
8      interventions at an early -- childhood
9      interventions.  This has to deal with
10     total accountability with your reading
11     programs, from using two major
12     assessments and reading programs.  And
13     this one here has to deal with a
14     successful implementation that is in
15     place in Montgomery County to show other
16     school districts of similar populations
17     what will and what won't work.  And all
18     of those are identified in this document
19     here, Exhibit 33, with the amount of
20     time that I'm going to spend on each
21     presentation, the number of copies that
22     I plan on disseminating.  I mean,
23     everything from top to bottom.  And

330

1      Mr. Looney said fine.
2  Q.  Do you have a better copy of this, like
3      if we had to get our hands on a better
4      copy of this?
5  A.  If I don't have it on disk with me right
6      now, I can easily pull it up.  I do have
7      it.
8  Q.  Okay.  Oh, yeah, I don't mean right now.
9      And when I say "this," I meant Defense
10     Exhibit 36.
11         (Whereupon Defendants'
12          Exhibit No. 36 was marked
13          for identification and
14          attached hereto.)
15         THE WITNESS:  You might have
16          a better copy.  You
17          know, you may have a
18          larger copy.  But I can
19          easily do one.
20 Q.  When you say Mr. Looney, is that who you
21     first had to go through?  What was the
22     process that you had to go through?  You
23     spoke to Mr. Looney and he said, Go for

331

1      it; it sounds good?
2  A.  And then I wrote the initial request and
3      presented it to Dr. Owens.
4  Q.  Is it common for a teacher to take off
5      time like this and get this kind of
6      expenses to go present at a conference?
7  A.  I've seen it in other districts, and I'm
8      almost certain that it has been done in
9      our district.
10 Q.  Can you give me any examples of anybody
11     who's allowed to go off on a trip like
12     this to present that works in our
13     district?
14 A.  I would actually have to sit and go --
15     that's privileged information.  I would
16     have to actually go and look through
17     some of the professional development.
18     But it wasn't something that was so
19     farfetched, because Mr. Looney would
20     have said nay or yea.  And he said yea.
21 Q.  So who put the kibosh on it?  Who said
22     no?
23 A.  Mr. Barker.

Pages 328 to 33

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.337

332

1 Q. Okay. And how do you know that? Did
2    you talk to him about it?
3 A. He told me that -- after receiving the
4    notice where it was declined, he then
5    told me that Mr. Looney said that he
6    didn't see where a classroom teacher was
7    sufficient enough to present and
8    represent the school district at a
9    national conference, which I said
10    contradicts what he told me and e-mailed
11    me.
12 Q. Contradicts what Mr. Looney told you and
13    e-mailed you?
14 A. Contradicts what Mr. Barker said
15    Mr. Looney said.
16 Q. Okay. I've got -- let's see. Let me
17    see if I can find it real quick. I have
18    a copy of an e-mail that Mr. Looney sent
19    you when you inquired of him or asked
20    for his help. Is there more than one
21    e-mail that you know of?
22 A. No, there was just the one, I believe.
23 Q. Okay. Were there any other occasions

333

1    that you were denied professional
2    development opportunities that you think
3    was discriminatory or retaliatory
4    against you?
5 A. Yes. I would have to look at the
6    request.
7 Q. Before we get to that, let me show you
8    what I've marked as Defense Exhibit 37.
9    Is this the e-mail that you have been
10    referring to from Mike Looney?
11        (Whereupon Defendants'
12        Exhibit No. 37 was marked
13        for identification and
14        attached hereto.)
15        (Witness reviewed document.)
16 A. It is.
17 Q. And I'll show you what I've marked as
18    Defense Exhibit 38. And is this an
19    e-mail where you shared the information
20    and what had transpired regarding your
21    request with Dr. Purcell?
22        (Whereupon Defendants'
23        Exhibit No. 38 was marked

334

1        for identification and
2        attached hereto.)
3        (Witness reviewed document.)
4 A. It is.
5 Q. And it says here on the third page of
6    this exhibit that there's an
7    acknowledgment that she received the
8    communication. Did you receive an
9    e-mail back from her or a phone call
10    from her, or either or neither?
11 A. No, we didn't talk after this. I just
12    got the acknowledgment that she received
13    it.
14 Q. Okay. Before I make this an exhibit,
15    let me show you some other documents and
16    ask if this is the other professional
17    development that you might be referring
18    to?
19        (Witness reviewed document.)
20 A. This is one of them, I believe, yes.
21 Q. And this is a request that was denied,
22    the documents you're looking at?
23 A. Yes. And this was a free one.

335

1 Q. Do all the documents that you're looking
2    at refer to that professional
3    development request?
4        (Witness reviewed document.)
5 A. Yes.
6 Q. We'll make that Exhibit 39.
7        (Whereupon Defendants'
8        Exhibit No. 39 was marked
9        for identification and
10        attached hereto.)
11 Q. Who said no to that one?
12 A. This one here, Dr. Owens approved. But
13    then he came back and told me that he
14    couldn't approve it, because Mr. Barker
15    said it wasn't in line with my job
16    description.
17 Q. Do people's request for professional
18    development get approved or disapproved
19    based on certain factors regarding
20    whether it fits in their job
21    description?
22 A. As with all. As with all.
23 Q. I mean, that's the common practice; is

Pages 332 to 335

336

1  that correct?
2  A. Yes. Let me go back and mention
3  something. If you notice on all of the
4  other ones -- you might have them
5  somewhere else -- Carol Hicks approved
6  everybody's, even the principals,
7  Dr. Owens, professional development.
8  Mine were the only ones not approved by
9  Mr. Barker, that were declined by
10  Mr. Barker.
11 Q. How do you know that?
12 A. His signature was on them.
13 Q. How do you know he didn't disapprove
14  others?
15 A. There were -- I received at Daisy
16  Lawrence a stack of professional
17  development from persons at my school,
18  all who had been approved by Carolyn
19  Hicks and approved by Dr. Owens. And
20  they were always mine that were declined
21  by Mr. Barker. And I think I provided
22  that.
23 Q. Let me show you what I'll mark as

337

1  Defense Exhibit 40 and make a composite
2  exhibit. These are your evaluations
3  that I found on you. And the first one,
4  I've marked it, was blank. I'm not sure
5  why there was a blank one. I don't see
6  any marking on it anywhere. But y'all
7  turned it over to us, so I'm going to
8  keep it in there. And then I tried to
9  keep it in chronological order.
10  I just wanted to get these
11  marked and then just ask you if that
12  looks accurate or there's anything you
13  think that's missing, based on your
14  review today. I'm sure you don't have
15  them memorized.
16  (Whereupon Defendants'
17  Exhibit No. 40 was marked
18  for identification and
19  attached hereto.)
20  (Witness reviewed
21  documents.)
22 A. I'm just looking at the school year.
23  This looks like all of them. It looks

338

1  like all of them.
2  Q. Okay. And that's Defense Exhibit 40.
3  And let me show you what I'll
4  mark as Defense Exhibit 41. And this is
5  a stack of your resumes. And I think
6  that the majority of them have a date of
7  when they were updated, but the first
8  few don't.
9  Would you look through that
10  stack for me and just confirm that that
11  is a stack of your resumes? And then
12  after you have an opportunity to do
13  that, I wanted you to see if you could
14  tell us the date of the first few copies
15  of that resume.
16  (Whereupon Defendants'
17  Exhibit No. 41 was marked
18  for identification and
19  attached hereto.)
20  (Witness reviewed
21  documents.)
22 A. If I don't have the date at the bottom
23  of it, I don't know what date.

339

1  Q. That's fine. Just if you know.
2  A. Okay. I don't know if I don't have the
3  date on the bottom of it.
4  Q. Do you think these first few in this
5  stack of Defense Exhibit 41 would have
6  preceded the others? Because the others
7  looked a little longer, so I assume --
8  A. Yeah. Yeah, the lengthier ones are the
9  more current.
10 Q. Okay.
11 A. But the dates on them up there are
12  October, July, February, yes. February,
13  May, yeah.
14 Q. Okay. Let me show you what I'll mark as
15  Defense Exhibit 42, and ask you if these
16  are an accurate depiction of your
17  certifications, and if anything is
18  missing, what?
19  (Whereupon Defendants'
20  Exhibit No. 42 was marked
21  for identification and
22  attached hereto.)
23 A. This is an older copy. I just, as of

334.262.3332    Baker & Baker Reporting and Video Services, Inc.    334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

**340**

1    January 1st, reapplied for an upgrade
2    of my certifications. So these are
3    accurate as to date. As soon as I
4    receive the new one, it will be updated.
5 Q. Okay. But as of the last day that you
6    worked for the Board, these would be
7    accurate?
8 A. Yes.
9 Q. Okay. Let me just mark these real
10    quick.
11        All right. Let me show you
12    what I'll mark as Defense Exhibit 43,
13    which appears to be correspondence to
14    Dr. Carlinda Purcell dated February 4th,
15    2005, from you, and ask if that's
16    correct?
17        (Whereupon Defendants'
18        Exhibit No. 43 was marked
19        for identification and
20        attached hereto.)
21        (Witness reviewed document.)
22 A. Yes.
23 Q. And then Defense Exhibit 44,

**341**

1    correspondence dated February 16th,
2    2005, to Dr. Purcell?
3        (Whereupon Defendants'
4        Exhibit No. 44 was marked
5        for identification and
6        attached hereto.)
7 A. Yes.
8 Q. Defense Exhibit 45 is correspondence
9    dated April 16th, 2005, to Dr. Purcell;
10    is that correct?
11        (Whereupon Defendants'
12        Exhibit No. 45 was marked
13        for identification and
14        attached hereto.)
15        (Witness reviewed document.)
16 A. Yes.
17 Q. Defense Exhibit 46, correspondence dated
18    April 10th, 2005, from you to
19    Dr. Purcell?
20 A. Yes.
21        (Whereupon Defendants'
22        Exhibit No. 46 was marked
23        for identification and

**342**

1        attached hereto.)
2        (Witness reviewed document.)
3 A. Yes.
4 Q. Look at those for me real quick. Do you
5    have knowledge of any other letters that
6    you've mailed to her that are like that,
7    or e-mailed? I think we've looked at
8    two e-mails to her today, and then we
9    have those correspondence.
10        (Witness reviewed document.)
11 A. There is one missing, but it doesn't
12    have anything to do with any of this.
13 Q. It doesn't?
14 A. Uh-huh (affirmative response).
15 Q. Okay. When would that have been sent to
16    her, and what did it have to do with?
17 A. I think you have it.
18 Q. I actually didn't get a copy of any of
19    these letters from you guys, so I didn't
20    know if that meant you had not
21    maintained copies of them or might not
22    have sent them to me because I sent them
23    to you.

**343**

1 A. The only other one was making mention
2    of -- I had to solicit a person to
3    mentor me towards the end of my
4    doctorial program. And I had -- I sent
5    a letter to her right after she was
6    appointed as superintendent.
7 Q. So when Dr. Purcell was appointed
8    superintendent, before she got here, you
9    sent her correspondence asking her to be
10    your mentor; is that correct?
11 A. Yes.
12 Q. Have you ever been told by anybody that
13    Dr. Purcell was the person who did not
14    want to hire you in a position?
15 A. No.
16 Q. Do you have any information one way or
17    the other as to whether Dr. Purcell is
18    of the opinion that you should not be
19    employed with the Montgomery County
20    Board of Education?
21 A. No.
22 Q. Do you know anything about the school
23    board members and any of their opinions

Pages 340 to 343

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.3333
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

344

```
 1    as to whether or not you should be
 2    employed?
 3 A.  No.
 4 Q.  Have you ever had any conversations with
 5    any of the school board members about
 6    your employment or your nonrenewal with
 7    the Board?
 8 A.  No.
 9 Q.  Have you ever been told, or has your
10    mother or anyone else been told, that
11    told it to you, anything that the school
12    board has said about your employment for
13    any of these jobs that would relate to
14    your race, your age -- excuse me, your
15    race or your sex?
16 A.  No.
17 Q.  Have you ever been told by anybody that
18    the Board has said anything about your
19    lawsuit or your mom's charges against
20    the Board?
21 A.  No.
22 Q.  When did your mom make charges against
23    the Board?
```

346

```
 1 A.  There was one.
 2 Q.  And what was that?
 3 A.  It was an administrative assistant's
 4    position, I think at Houston Hill.  And
 5    some kind of way it was twisted that the
 6    job wasn't available or you were not
 7    supposed to interview.  It was some --
 8    he and Mr. Barker had some dialogue
 9    about it.  Later to find out a principal
10    said to me, Well, I wanted to hire him.
11    I didn't know you from him.  I just saw
12    the last name.  I wanted to hire him.
13    When I found out who he was, I wanted to
14    hire him, but, you know, they told me I
15    had to hire somebody else.
16 Q.  Was he ever given any information that
17    that was because of his mother?
18 A.  If it's been said to him, he hasn't
19    relayed it to us.
20 Q.  Okay.  Has he had a successful career
21    with the Board?
22 A.  It could have been better.
23 Q.  In what way?
```

345

```
 1 A.  I would -- I really don't know.  I
 2    was -- I was, I think, maybe in
 3    elementary or junior high school.  It's
 4    been awhile.
 5 Q.  It's been a long time ago, hasn't it?
 6    In fact, your mom is still employed with
 7    the Board, isn't she?
 8 A.  Yes.
 9 Q.  And your brother, Marvin, is employed
10    with the Board?
11 A.  Yes.
12 Q.  And what is his job?
13 A.  He's Director of Guidance at Jeff Davis
14    High School.
15 Q.  Okay.  Is he of the opinion that he has
16    suffered retaliation as a result of his
17    relationship with your mother?
18 A.  Yes.
19 Q.  He does?  Are there jobs that he has not
20    received, that he believes he deserved,
21    because of his relationship with your
22    mother -- I say relationship -- because
23    of his mother?
```

347

```
 1 A.  It could have been better.
 2 Q.  And what do you mean by that?
 3 A.  There have been jobs that he has applied
 4    for that he possibly could have
 5    attained.
 6 Q.  Do you have any idea about the
 7    qualifications of the people who did get
 8    those jobs?
 9 A.  No, I don't.
10 Q.  Has he gained tenure with the Board?
11 A.  Yes, he has.
12         MRS. CARTER:  All right.
13            Let's take a short
14            break.
15         (Whereupon a brief recess
16            was taken.)
17      BY MRS. CARTER:
18 Q.  In looking at your amended Complaint or
19    your Complaint, because some of my
20    questions will come from your Complaint.
21    It appears that the initial claim that
22    you make -- well, it doesn't appear in
23    your lawsuit that you allege that you
```

348

1  were nonrenewed in 2002 based on
2  discrimination or retaliation. And
3  you've testified today that that is part
4  of your lawsuit. So I'll just ask if
5  you've already told us everything about
6  any evidence or information you have
7  that you were nonrenewed at the end of
8  your Southlawn tenure as a result of
9  discrimination or retaliation?
10 A. Ask that again.
11 Q. Is there any other information or
12    evidence that you haven't already told
13    us that you were nonrewed after teaching
14    at Southlawn because of discrimination
15    or retaliation?
16 A. No, there's no new information.
17 Q. Okay. Because in looking at your
18    Complaint, it says that in the Summer of
19    2003, that you sought positions and were
20    eventually hired as a reading coach, and
21    then it goes into the details that we've
22    already kind of hashed out regarding
23    that position not really being a reading

349

1  coach position. So that kind of seems
2  to be the first job or complaint that
3  you have in regards to your lawsuit.
4        Let me ask you this: Aren't
5  there nine-month reading coach positions
6  that are paid the same as a teacher?
7 A. I haven't seen any announcements that
8    say nine-month reading coach.
9 Q. Isn't it true that the reading coach
10    position at Daisy Lawrence was funded
11    through the school budget and was a
12    nine-month position?
13 A. I don't know where it was funded from.
14 Q. So you don't know one way or the other?
15 A. Not about that one in particular. I
16    mean, why would that one be any
17    different? I mean, that's the reason
18    I'm saying I don't know. I don't know.
19 Q. Well, let me say this to you: In
20    fairness to you, I represent that there
21    are two types of reading coach
22    positions. They're based on where
23    they're funded or how they're funded.

350

1 A. Okay.
2 Q. And there are nine-month reading coach
3    positions. And if I am wrong about
4    that, I apologize. But I believe that
5    to be the case. Assuming I'm right,
6    which might be a leap of faith, but
7    assuming I'm right, do you know whether
8    or not the reading coach position that
9    you thought you were supposed to be
10    getting at Daisy Lawrence was a
11    nine-month position or a ten-month
12    position?
13 A. Dr. Owens told me it was ten months.
14 Q. Okay.
15 A. Because we even discussed my work terms
16    to work out the additional month.
17 Q. Have you communicated with Keith
18    Stewart, Saint Thomas, or Lee Ballard
19    about testifying on your behalf
20    regarding the communications that were
21    made with them?
22 A. No.
23 Q. Okay. Do you intend to seek them out as

351

1  witnesses in your case? I mean, and
2  your lawyer can --
3        MR. PATTY: Object to the
4            form.
5  BY MRS. CARTER:
6 Q. And I just mean is that something that
7    you've contemplated, because I wanted to
8    ask you what you thought they would
9    offer, any conversations you've had with
10    them?
11        THE WITNESS: That would be
12            your call.
13 Q. That's not something you've decided yet
14    then. That's fair enough.
15        All right. The next thing in
16    your Complaint is that you applied for a
17    position at McKee Junior High School,
18    and the principal asked for you to be
19    hired in the position, and that the
20    superintendent and management of the
21    Board at that time refused to hire you.
22    Is that where Bobby Abrams recommended
23    you for the Vice-Principal position that

Pages 348 to 35

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.333
888.253.3377            Certified Court Reporters and Certified Legal Video Specialists        888.253.337

352

1    you've already testified about?
2  A.  Yes.
3  Q.  Okay.  Is there any information that you
4      have regarding that position that you
5      have not already told us about that
6      would indicate you were not hired
7      because of your sex, your race, or
8      because of retaliation?
9  A.  No.
10 Q.  And when we're referring to retaliation
11     at this point, I assume that it's
12     retaliation for your mother's claims,
13     because at that point you had not filed
14     a charge?
15 A.  Exactly.
16 Q.  What information do you have about your
17     qualifications as it relates to the
18     qualifications of the individual that
19     was placed in that job?
20 A.  For . . .
21 Q.  The administrative assistant position at
22     McKee in the Fall of 2004?
23 A.  Mr. Abrams initially selected me, so

353

1      that would identify that he felt my
2      qualifications outranked or outweighed
3      this other person.
4  Q.  Okay.
5  A.  And --
6  Q.  Do you personally know what her -- it
7      was a female, correct?
8  A.  Yes.
9  Q.  Do you personally know what her
10     qualifications were?
11 A.  No, I don't.
12 Q.  Do you know whether she'd ever been an
13     administrative assistant in a school
14     system before?
15 A.  I don't know.
16 Q.  Okay.  You further allege that after
17     having filed your charge, that you were
18     not granted professional development
19     even though your principal approved the
20     leave, correct?
21 A.  Yes.
22 Q.  And it's your belief that if Mike Looney
23     was asked, he would say that he agreed

354

1      that you should go on this professional
2      development?
3  A.  Yes.
4  Q.  Are you speaking here in particular
5      about the October 2004 request -- or I
6      guess both, because you had another one
7      before this was filed?
8  A.  Yes.
9  Q.  And then February 2005?
10 A.  Yes.
11 Q.  In Paragraph 9, it says that in one
12     instance the Montgomery County Board of
13     Education hired an administrative
14     assistant over you, who was not
15     currently certified in administration as
16     Lowe was.  Are you talking about Denita
17     Easterling?
18 A.  Yes.
19 Q.  And you've told us all about that?
20 A.  Yes.
21 Q.  It says here that the problem was that
22     the superintendent and management of the
23     Board would not allow you to take jobs

355

1      that you were recommended for.  Were you
2      recommended for that position that
3      Ms. Easterling got at T.S. Morris?
4  A.  No.  It was never advertised.  I didn't
5      know anything about it until after she
6      was in it.
7  Q.  Okay.  That's what I thought.
8          Okay.  Are you referring to
9      anything else, any other job there that
10     year when you say that they would not
11     let you take jobs that principals were
12     recommending you for, other than the job
13     with Bobby Abrams?
14 A.  There might have been others, but I
15     don't know about them.  There might have
16     been other requests for me that I don't
17     know about.
18 Q.  Okay.  At some point in October of this
19     past year, your Complaint in this case
20     was amended to allege that you have now
21     suffered retaliation for your EEOC
22     charge and lawsuit; is that correct?
23 A.  Yes.

Pages 352 to 35

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.337

356

1  Q.  And it states that you received a
2     nonrenewal notice of your employment in
3     May 2005, and that you were told by your
4     supervisor that you'd made a mistake in
5     filing your lawsuit; is that correct?
6  A.  Yes.
7  Q.  And you've already told us about that?
8  A.  Yes.
9  Q.  I don't want you to rehash that, but
10    you're talking about there when
11    Dr. Owens told you what Jimmy Barker
12    allegedly said?
13 A.  Yes.
14 Q.  And you also refer to in there where
15    Superintendent Purcell allegedly told a
16    group of people that everybody would
17    receive positions.  And it's your
18    contention that everybody did receive
19    positions from Daisy Lawrence except for
20    you?
21 A.  The Board minutes support that, yes.
22 Q.  You also allege that Superintendent
23    Purcell told you that she would follow

357

1     the recommendations of principals, but
2     that no principal had asked to hire you.
3     And I asked this question, and I could
4     have misunderstood you:  But I thought I
5     understood you to say that you actually
6     didn't have communications with
7     Dr. Purcell after you were nonrenewed in
8     2005.  Did I misunderstand that?
9  A.  We -- we did talk.
10 Q.  And I might have misunderstood.
11 A.  We did communicate.
12 Q.  Okay.  I guess it was something else
13    that you didn't talk to her afterwards.
14    Okay.  I apologize.
15       Tell me about the
16    conversations you had with Dr. Purcell
17    after you were nonrenewed in 2005.
18 A.  It was a brief conversation, but
19    Dr. Purcell told me that she did not
20    have a practice of dipping in other
21    departments.  She would allow those
22    department heads to manage their
23    departments.  And that was the gist of

358

1     it.  And she didn't see where it was
2     anything she could do to help me.
3  Q.  Oh, that's when she said, I don't think
4     there's anything I can do to help you?
5  A.  Yes.
6  Q.  Yeah, you did tell me that.  I
7     apologize.
8        Anything else said in that
9     conversation that you can remember?
10 A.  That's all.
11 Q.  Okay.  Your Complaint goes on to say
12    that during the Summer of 2005, you
13    repeatedly applied for positions
14    throughout the system, and that you were
15    interviewed by four principals who each
16    indicated in the interview that they
17    wished to hire you, and that the
18    Defendants blocked that process.  And I
19    just want to go through what each four
20    of those jobs are, if you would, please.
21 A.  The first one was a Special Ed teaching
22    position at Lee High School.  And the
23    interview was real quick.  Mr. Sikes

359

1     (phonetic) asked me was I available to
2     teach, could I teach Special Education.
3     And he told me that a friend recommended
4     me to him, and he was waiting -- I've
5     been waiting for two weeks for you to
6     call me, and do you want science or
7     English?  And I told him, I said, Well,
8     let me take the English since I've
9     taught science at secondary level.  And
10    he told me to go and see Mr. Barker.
11       He then called me that
12    afternoon, early evening, and he assured
13    me, Don't you do anything until you see
14    Mr. Barker.  I still want you over here.
15    I need you to go and see Mr. Barker.
16    Don't do anything, but see Mr. Barker.
17 Q.  Okay.  Did you not tell me earlier that
18    you're not certified to teach Special
19    Education?
20 A.  I am eligible for emergency
21    certification.  I can't say I'm not
22    certified, because I do qualify for
23    certification.  We have just never

Pages 356 to 35

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.337

360

```
1    applied for certification.
2  Q. Okay.  And I understand that.  My
3     question is:  At that time, were you
4     presently certified to teach Special
5     Education?
6  A. No.  I did not hold an endorsement in
7     Special Education.
8  Q. Okay.  Did Mr. Sikes -- that's David
9     Sikes, right?
10 A. Yes.
11 Q. Did Mr. Sikes ever tell you why he could
12    not give you the job?
13 A. No.  He avoided me.  Because he was
14    fully aware that we would have to apply
15    for an emergency certificate.  Because I
16    had all of the coursework and everything
17    from an accredited institution that we
18    were going to go through.  He clearly
19    knew everything and was satisfied with
20    it.
21 Q. All right.  What was the second job?
22 A. The second one was --
23 Q. And it doesn't have to be in
```

361

```
1     chronological order.  I just want to get
2     the four.
3  A. -- with Mr. Quesha Starks at BTW Magnet.
4     And after the interview with me -- we
5     had a very lengthy interview -- she
6     called me late one evening to tell me
7     that she was getting ready to make her
8     recommendation, and I need to get your
9     phone numbers, because -- and I need to
10    give you my phone numbers, because we
11    will be working closely together next
12    year.  And I need to be able to get in
13    touch with you after, you know, the
14    Board meeting.  But I'm getting ready to
15    make my recommendation, and I just have
16    one other interview I need to conduct
17    over the phone.  But I've already made
18    my decision, and I'm getting ready to
19    call Ms. Hicks with my recommendation.
20 Q. Did she tell you that she was going to
21    recommend you?
22 A. Why would she call me to tell me that --
23 Q. Did she tell you that she was going to
```

362

```
1    recommend you?
2  A. No.  She suggested that we would work
3     closely together next year, and I need
4     to be able to get in touch with you
5     after the Board meets, and we need to
6     get in touch with each other.
7  Q. And she still had an interview to do?
8  A. She had a phone interview that she said
9     she was going to do.  But she had
10    already made up her mind on who she was
11    recommending.
12 Q. Do you know how that phone interview
13    went or whether she changed her mind
14    after she had the phone interview?
15 A. She interviewed my brother.
16 Q. On the phone?
17 A. Yes.
18 Q. Okay.  And did you have any
19    communications with her about whether
20    she recommended you for the job?
21 A. She avoided me.  After the announcement
22    came out, she avoided me.
23 Q. What was the third job?
```

363

```
1  A. Mr. Abrams had -- at McKee Junior High,
2     I think it was a Special Ed, a B.I.P.
3     unit, Behavior Intervention Program
4     unit.  And he asked me -- we
5     interviewed.  And after we had
6     interviewed, he told me -- it was like
7     this, I'm going to call you the next
8     day.  When he called me, he was kind of
9     upset, because he said, Melvin, why
10    didn't you tell me you changed your
11    mind?  I said, What are you talking
12    about?  I didn't change my mind.
13    Ms. Hicks said that she spoke with you
14    and you just didn't want it, you changed
15    your mind, and I had to pick somebody
16    else.
17       And, you know, we went back to
18    the initial incident.  And I said to
19    myself, Bobby -- Mr. Abrams, the same
20    thing again, you know, I didn't tell you
21    that, just like when you told me before
22    you recommended me.  And Mr. Barker told
23    me that he had a recommendation.  And
```

334.262.3332    Baker & Baker Reporting and Video Services, Inc.    334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

364

1    then nothing happened.
2  Q. Did you have conversations with Jimmy
3     Barker about the fact that you did not
4     have a Special Education certification
5     in conjunction with Bobby Abrams wanting
6     to hire you for that position?
7  A. We had that conversation earlier. I
8     don't remember when we had it. Because
9     Ms. Hicks interjected to tell me that I
10    didn't qualify for -- and I contradicted
11    her with the State Department. And I
12    clearly do meet the requirements. And I
13    do have the coursework, shy of three
14    courses, to be certified in Special
15    Education, shy of an internship. I even
16    gave Mr. Barker the same information
17    that I gave Mr. Sikes, with the courses
18    on an accredited section of approved
19    schools curriculum, the courses that
20    came from all of my transcripts.
21    Mr. Barker said, Well, Melvin, these
22    courses don't read a prefix with Special
23    Education. But they don't have to.

365

1     Certain courses will read prefixes, the
2     others will not.
3  Q. Okay. Let me ask you this.
4  A. Okay.
5  Q. Have you even completed, sitting here
6     today, the classes that you have to take
7     to be certified in Special Education?
8  A. Yes. The additional three, no.
9  Q. Okay. So you would still today -- and
10    I'm not talking about emergency
11    circumstances --
12 A. Uh-huh (affirmative response).
13 Q. -- but today you would have to complete
14    additional coursework to get your
15    certification in Special Education?
16 A. If somebody offered me a job.
17 Q. Did you ever tell Jimmy Barker that you
18    were certified in Special Education, you
19    just needed to get --
20 A. I already told him -- oh, I'm sorry.
21 Q. -- that you just needed to get him the
22    paperwork?
23 A. No. I always told Mr. Barker I'm

366

1     eligible for the emergency certificate.
2     It never came up.
3  Q. Did Mr. Barker ever say fine, with you
4     being a Special Ed teacher for
5     Mr. Abrams, but you've got to be
6     certified in the position?
7  A. We didn't talk, I don't think, after the
8     situation with Mr. Abrams. After Carol
9     Hicks told Mr. Abrams that I changed my
10    mind, I don't think I talked to
11    Mr. Barker after that.
12 Q. So your conversations with Mr. Barker
13    about your Special Education
14    certification, based on your testimony,
15    would have been related to Sikes,
16    Principal Sikes?
17 A. Yes.
18 Q. Okay. What was the fourth job?
19 A. Dr. Owens, at Patterson, interviewed me
20    for the reading coach position, grades
21    four through six. And after I
22    interviewed with -- I interviewed with
23    Connie Mizell, Sherry Dice (phonetic),

367

1     and Sharon Sewell initially. And then
2     Dr. Owens called me and said, you know,
3     I've got your name on the list, you've
4     been cleared to interview for reading
5     coach positions. He called me in about
6     maybe two days. I thought it would have
7     been the first, but he called me two
8     days later to tell me that, I'm going to
9     go ahead and send in I want you. And we
10    were sitting back, you know,
11    anticipatory that everything would
12    unveil. And the problem was, Dr. Owens
13    kept saying he needed to talk to
14    Mr. Barker, he couldn't get in touch
15    with Mr. Barker.
16         Finally, because the school
17    year was constantly moving ahead, Dr.
18    Owens talked to Carla Winborne, who
19    said -- before he talked to Carla
20    Winborne, Ms. Mizell positioned him with
21    two women to hire. And after he didn't
22    select either one of those women and
23    kept submitting my name, it was then the

Pages 364 to 36

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.337

368

1    statement, Well, you had a poor
2    interview. I've been doing -- I'm
3    sorry.
4  Q. Go ahead. I apologize. I was just
5    breathing.
6  A. You had a poor interview. I had been
7    doing this job for the past two years.
8    I hardly believe I had a poor interview.
9    And then I wrote a dissertation on
10   reading instruction. I don't think I
11   had a poor interview with something as
12   competent as I would have been with it.
13 Q. Were you ever told by Dr. Owens that
14   Mr. Barker had explained to him that you
15   had to go through the interview process
16   with curriculum instruction, who rates
17   the interviewees and then sends them out
18   to the schools?
19 A. We did that.
20 Q. And you went through that process?
21 A. Yes.
22 Q. After being told that you had to go
23   through it? He sent you back through

369

1    that process, correct?
2  A. No. I went through the process first,
3    and then I was sent to Dr. Owens.
4  Q. Okay. All right. Do you know whether
5    the people who interviewed you at
6    curriculum instruction, whether they
7    rated you high or recommended you to the
8    principals for hire?
9  A. Mr. Barker told me that Connie Mizell
10   stated I had a poor interview which --
11 Q. Was she one of the people that
12   interviewed you?
13 A. Yes.
14 Q. Do you know whether or not Dr. Purcell
15   had determined that principals were not
16   going to hire reading coaches unless
17   they were strongly recommended out of
18   the curriculum and instruction interview
19   process?
20 A. I would have no idea what Dr. Purcell
21   said to the administrative staff.
22 Q. Do you know whether anybody who
23   interviewed you with curriculum and

370

1    instruction based their rating process
2    on your race or sex?
3  A. I have no idea.
4  Q. Do you know whether anybody who was
5    rating you in curriculum and instruction
6    knew that your mother had ever filed a
7    claim?
8  A. I have no idea of knowing.
9  Q. Do you know whether the people who rated
10   you or interviewed you with curriculum
11   and instruction knew that you had filed
12   a lawsuit?
13 A. One individual knew.
14 Q. Okay. And who was that?
15 A. Sharon Sewell.
16 Q. She was one of the people that
17   interviewed you?
18 A. Yes.
19 Q. And how many people were interviewing
20   you?
21 A. Three.
22 Q. She was one of three?
23 A. Yes.

371

1  Q. How do you know Ms. Sewell knew?
2  A. She communicated to me that she knew,
3    because she had discussed her legal
4    situation with me.
5  Q. She communicated to you that she knew
6    about your lawsuit. Was she negative
7    about it?
8  A. No.
9  Q. Did she have her own lawsuit?
10 A. I don't know if she had a lawsuit. I
11   know she was in some -- it was some
12   legal combatery (sic).
13 Q. Do you know whether or not she
14   communicated to the two other
15   interviewers that you had a lawsuit?
16 A. I don't know.
17 Q. So she never made you feel like or
18   indicated to you that she looked
19   negatively on the fact that you had a
20   lawsuit?
21 A. She never discussed it. We never had a
22   discussion.
23 Q. Did Bobby Abrams know you had a lawsuit?

Pages 368 to 371

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3333
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

372

1  A. I didn't tell him.
2  Q. Did you discuss it with him?
3  A. No.
4  Q. Did he ever indicate to you that he was
5     told he couldn't hire you because of
6     your lawsuit?
7  A. No.
8  Q. There was, I guess, a female, you said,
9     got that job -- oh, no, no, that was the
10    year before.
11 A. Yes.
12 Q. Do you know who got the Special
13    Education job?
14 A. No, I don't.
15 Q. Okay. What was the job at BTW Magnet
16    with Ms. --
17 A. Administrative assistant.
18 Q. Administrative assistant. Do you know
19    who got that job?
20 A. No, I don't.
21 Q. So you don't know their race or sex?
22 A. No.
23 Q. What about David Sikes. Who got that

373

1     Special Ed job?
2  A. I don't know.
3  Q. Did Mr. Sikes talk to you about your
4     lawsuit?
5  A. He didn't know -- if he knew about it,
6     he didn't mention it to me.
7  Q. Okay. Did he ever tell you that's why
8     he couldn't hire you?
9  A. He avoided me. He didn't have any other
10    discussions with me.
11 Q. Are there any other jobs that you
12    would have -- that you could have been
13    hired for in the -- for the fall 2005,
14    for the school year that we're in now,
15    upon which you base your claim? Those
16    are the four jobs that you reference in
17    your lawsuit as it relates to the jobs
18    that you didn't get that summer?
19 A. Yes.
20 Q. There are other jobs?
21 A. No, those are the -- those are the ones.
22 Q. Those are the four, okay.
23       Have you told me about any

374

1     conversations that you personally have
2     had with anybody that would reflect that
3     you're being nonrenewed or not getting
4     additional jobs with the Board had to do
5     with your lawsuit?
6  A. No more than we've already discussed.
7  Q. Okay. And I know we've talked about
8     Dr. Owens. And have you told me about
9     any conversation or anything that you
10    can remember, sitting here today, where
11    reference to your mother was made?
12 A. None other than the ones we have
13    mentioned.
14 Q. Okay. Have there been any conversations
15    that you have not told us about where a
16    person was placed in a job, instead of
17    you, that regarded your race or where
18    you were told we needed a white person
19    in that job or anything of that nature?
20 A. None other than those we've already
21    discussed.
22 Q. Okay. And refresh my memory. There was
23    one occasion that I remember where I

375

1     think you've said in something written
2     that Mr. Barker or somebody said that a
3     white person had to be hired. Was there
4     more than one time that that happened?
5  A. I don't recall being called by race.
6  Q. Was it female?
7  A. That a female had to be hired.
8  Q. A female, okay. The incident in regards
9     to a female having to be hired, was that
10    where Bobby Abrams said he wanted you as
11    his administrative assistant, and Jimmy
12    Barker allegedly told Bobby that he had
13    to hire a female?
14 A. Yes.
15 Q. Were there any other occasions that you
16    know of where a woman got the job
17    instead of you, and you were told or
18    heard that that happened because the
19    person was a female?
20 A. No.
21 Q. Where have you worked since you were
22    nonrenewed in May of 2005?
23 A. I've done some consulting, but no

Pages 372 to 37

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.337

376

1    full-time work.
2 **Q. Where have you consulted?**
3 A. For the Southern Women's Leadership
4    Development Institute, SWLDI.
5 **Q. Southern Women's --**
6 A. Women's Leadership Development
7    Institute. And Exploratorium Academy.
8 **Q. I apologize. Is that one name like and**
9    **Exploratorium Academy, or is that a**
10   **different entity?**
11 A. That's a different entity.
12 **Q. Okay. What have you done for Southern**
13   **Women's Leadership Development**
14   **Institute?**
15 A. Program planning, development policy,
16   development policy implementation.
17 **Q. Where is that located? What is it?**
18 A. It's right across the street from the
19   train building, close to the old Union
20   Station.
21 **Q. And who runs it?**
22 A. Doris Crenshaw (phonetic).
23 **Q. And what type of program planning do you**

377

1    **do for them?**
2 A. It's a whole list of things. We just
3    got finished with the fiftieth
4    celebration of the bus boycott movement.
5    We're looking -- right now, we're
6    focusing on a ten-city tour, starting in
7    Jefferson County. And then some grant
8    writing.
9 **Q. Are you compensated for your work with**
10   **them?**
11 A. At this point, no.
12 **Q. Okay. And just to be clear, and I'm**
13   **asking you this for your damages**
14   **purposes, and I'm sure your lawyer will**
15   **explain that to you: Have you received**
16   **any money from this institution for your**
17   **time that you've given them or the work**
18   **you're doing for them?**
19 A. One small payment.
20 **Q. And when was that, and how much was it?**
21 A. This is January? November.
22 **Q. November of '95 you were paid how much**
23   **money?**

378

1 A. $750.
2        MS. DUGAS: 95? You said
3        November of '95.
4        THE WITNESS: What did I --
5        MRS. CARTER: Well, do you
6        have a problem with
7        that?
8            And you answered,
9        so you're not paying
10       attention.
11       THE WITNESS: What did I
12       say? Try 2005.
13       MRS. CARTER: We knew what
14       we were talking about.
15 BY MRS. CARTER:
16 **Q. In November of 2005, you were paid $750.**
17   **What about, is there any other moneys**
18   **you've been paid from them?**
19 A. No.
20 **Q. Okay. What about -- did you say the**
21   **Exploratorium Academy?**
22 A. Yes.
23 **Q. And where is that located?**

379

1 A. It's here in Montgomery down Wares Ferry
2    Road.
3 **Q. And what is that?**
4 A. It's a private high school.
5 **Q. Oh, okay. And what are you doing for**
6    **them?**
7 A. Right now, I'm just doing some
8    consulting, serving as their academic
9    officer for curriculum and
10   accreditation. I secured their
11   accreditation. I'm realigning their
12   curriculum. And some grant writing.
13 **Q. And what are you paid for those**
14   **services?**
15 A. A very small amount.
16 **Q. Okay. And what is that?**
17 A. $400.
18 **Q. $400 how often?**
19 A. This is January. September was the
20   last -- I got a check they paid me in
21   August and September.
22 **Q. 400 in August, and 400 in September.**
23       **What other jobs did you apply**

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

380

```
1     for after being nonrenewed in May of
2     2005?
3  A. I haven't.
4  Q. You didn't apply with other school
5     systems?
6  A. No.
7  Q. And why not?
8  A. For fear of negative feedback from
9     Montgomery County.
10 Q. You mean, Montgomery County saying
11    negative things about you?
12 A. Yes, or lack thereof.
13 Q. What do you mean?
14 A. Not being able to secure a favorable
15    recommendation.
16 Q. Did you try? I mean, did you go out and
17    talk to any superintendents or any other
18    systems at all?
19 A. I applied to the state department. That
20    was it.
21 Q. Do you have any information that
22    Montgomery County supplied negative
23    recommendations on you to the state
```

381

```
1     department?
2  A. I don't even know if the state
3     department has contacted them.
4  Q. All right. Any other way that you've
5     earned money since you left there?
6  A. No.
7  Q. Do you have any plans to apply with
8     other school districts?
9     THE WITNESS: Do I have to
10       answer that?
11       MR. PATTY: Yeah.
12 A. No.
13 Q. Have you done any teaching since you
14    left there?
15 A. Teaching as in a K-12 setting?
16 Q. In any setting, a college setting, a
17    K-12 setting, in any setting?
18 A. I did -- I closed a semester at
19    Trenholm.
20 Q. What does that mean?
21 A. I finished -- the instructor was out
22    ill, and I finished the semester.
23 Q. Of what kind of class?
```

382

```
1  A. Computer science, CIS 106, I believe --
2     or 146.
3  Q. How did you know about that job?
4  A. This person got in touch with me.
5  Q. And how much were you paid to do that?
6  A. This person just kind of paid me
7     out-of-pocket for the rest of the
8     semester. Per night.
9  Q. And how long was that?
10 A. Six class sessions.
11 Q. And how much did he pay you?
12 A. $400.
13 Q. Per session?
14 A. Huh-uh (negative response).
15 Q. Total?
16 A. Total.
17 Q. Any other way that you've earned money
18    since you left the Board in May of 2005?
19 A. No.
20 Q. When did you receive your last paycheck
21    from the Board?
22 A. I want to say it was June. It might
23    have been -- I don't know. I've
```

383

```
1     forgotten now. I'd have to look back
2     and see.
3  Q. June or July?
4  A. June, July. It was July.
5  Q. Because the new contracts would have
6     started in August?
7  A. August.
8  Q. Okay. So just so I'm clear: Have you
9     told us every way that you've earned
10    money since you left?
11 A. Do you count unemployment? I mean, I
12    guess that's earned money. I mean,
13    that's just like a given. You can put
14    unemployment.
15 Q. Okay. So you do draw unemployment?
16 A. Yes.
17 Q. Do you still draw it now?
18 A. Yes.
19 Q. Has the unemployment office sent you out
20    on interviews to apply with other
21    schools or anything like that?
22 A. They have asked me what have I done.
23 Q. And what did you tell him?
```

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.333
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists    888.253.337

384

1  A.  I have placed applications.  That's all
2     I can do.
3  Q.  Have you placed applications with other
4     schools?
5  A.  Not school systems.  I have placed
6     applications, like I said, with the
7     state department and some of the local
8     colleges.
9  Q.  Have you been on any interviews with
10    local colleges?
11 A.  Yes.
12 Q.  Who have you interviewed with?
13 A.  Faulkner.
14 Q.  And when did you interview with
15    Faulkner?
16 A.  It was either in October -- I think it
17    was late September or early October.
18 Q.  And for what type of job?
19 A.  Adjunct teaching.
20 Q.  And who did you interview with?
21 A.  Dr. Claudia Nesbit (phonetic).
22 Q.  And did you get the job?
23 A.  Yes.

385

1  Q.  And what did you teach?
2  A.  I will be teaching reading in the
3     content area.  Reading in the content
4     area.
5  Q.  What does that mean?
6  A.  It's a secondary reading instructional
7     course.
8  Q.  And you'll be teaching --
9  A.  It's a methods course.
10 Q.  And you'll be teaching college-age
11    students?
12 A.  Yes.
13 Q.  And when do you start that job?
14 A.  Next -- next week.  The semester starts,
15    I think, next week.
16 Q.  Is that a full-time position or just one
17    class?
18 A.  Just one class.  And I just thought --
19    Northcentral University.
20 Q.  Okay.
21 A.  You want the name of the course or
22    just . . .
23 Q.  That's fine.  That your teaching?

386

1  A.  I probably will get some students next
2     week.  I have taught it.  I'll probably
3     get some more students next week.  I
4     won't know until the -- you know, until
5     next week turns around.
6  Q.  Well, where is that school located?
7  A.  That's in Prescott, Arizona.  I teach on
8     line.
9  Q.  And how are you compensated for that?
10 A.  Per student.
11 Q.  And how much is that?
12 A.  Two fifty per student.
13 Q.  And what do you teach?
14 A.  I teach in the doctorial programs to
15    Ph. and Ed.D. programs in ed leadership.
16    Specialization is Curriculum and
17    Instructional Leadership, is the program
18    that I teach in.  That's not the class.
19 Q.  How much are you going to be paid by
20    Faulkner?
21 A.  A very small amount.  That's if the
22    class makes.
23 Q.  "If the class makes," what does that

387

1     mean?
2  A.  If there are at least five to seven
3     students.
4  Q.  And what would --
5  A.  And right now, I only have three that
6     are postings on my live tech.
7  Q.  And if they don't, then you're not going
8     to have a job with them?
9  A.  Yes, that's correct.
10 Q.  What are you going to get paid if you do
11    teach for them?
12 A.  If I do teach from the month of January
13    through May, I will be receiving less
14    than $1,200 at the end of May.  A very
15    small amount.
16 Q.  Less than $1,200?
17 A.  After it's taxed.  That's for the whole
18    semester.  Not per month, for the entire
19    semester.
20 Q.  And it's your testimony that you don't
21    intend to apply with other school
22    districts in the future?
23 A.  Montgomery is where I live and pay my

Pages 384 to 387

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

388

1    taxes. No, I don't plan on applying
2    with those school districts.
3  **Q. What other ways, other than financially,**
4    **do you claim that you've been damaged?**
5        THE WITNESS: You want me to
6        go down the list?
7        MR. PATTY: Whatever you
8        think -- you think.
9  A. My medical insurance is out.
10 **Q. Did you do COBRA?**
11 A. Huh-uh (negative response), I did the --
12   no, that was way -- that was up there.
13 **Q. Expensive?**
14 A. I did the least expensive one that only
15   covers hospitalization. I have endured
16   a tremendous financial hardship. I've
17   had to apply for food stamps. I have
18   become totally dependent on my family.
19   I have relinquished a lot of items that
20   I otherwise would have kept, such as a
21   china service, jewelry, pieces of
22   clothing. I have come in contact with
23   two legal notices where I'm not able to

389

1    pay a debt that I owe. I have had to
2    position my family to sell some real
3    estate in order for me to be able to not
4    go into default on my student loans and
5    pay my mortgage. And I provided
6    Attorney Patty with that this morning.
7        Physically, as far as health
8    is concerned, everything from chest
9    pains to headaches to weight gain. The
10   constant fear of unconsciously
11   suppressing a lot of this and having a
12   stroke or a massive heart attack. My
13   father died at the age of 51 with a
14   massive heart attack, so I think about
15   it all of the time. My mother has been
16   hospitalized twice having to take on
17   these pressures of my finances and my
18   well-being. It has been extremely
19   agonizing.
20 **Q. Your mother's been in the hospital**
21   **twice --**
22 A. Yes.
23 **Q. -- because of your situation?**

390

1  A. Stress.
2  **Q. So she's been in the hospital since May**
3    **of 2005?**
4  A. Yes.
5  **Q. Had she ever been in the hospital for**
6    **stress before?**
7  A. The only time my mother was in the
8    hospital was when she delivered me and
9    my brother. That was it.
10 **Q. Any other way that you've been damaged?**
11   **Have you seen a psychiatrist or a**
12   **counselor?**
13 A. No, I haven't.
14 **Q. Have you seen your physician and sought**
15   **any type of medication that you had not**
16   **been taking before?**
17 A. I haven't seen him officially because of
18   the insurance issue, but he has seen me.
19   And he's constantly on me, Melvin, you
20   are bigger than you have ever been.
21 **Q. They tell me that, too.**
22 A. Yeah. I mean, but -- I mean, I know it,
23   and I can feel it. You are bigger than

391

1    you've ever been, and you can see it.
2    You need to come in and -- you know, the
3    constant thing is, you know, you
4    remember what happened with your daddy.
5        Professionally, the
6    humiliation of being viewed -- I won't
7    say incompetent, I don't think anybody
8    views me as being incompetent, but
9    difficult or any type of slander where
10   anybody would not want to employ me,
11   that has been tremendous.
12       The frustrations of having to
13   pay back or be held accountable for a
14   student loan of over a hundred thousand
15   for my doctorial program and not being
16   able to practice with it. Being plagued
17   with a graduation fee that I'm looking
18   at. I don't know how in the world I'm
19   going to pay that. That's $2,000. I
20   mean, I've been from one extremity to
21   another.
22 **Q. At no time during this that you've**
23   **suffered, have you thought about calling**

392

1    **Lee Ballard or Keith Stewart at Bullock**
2    **County and asking for a job?**
3  A.  I don't think at this point I should
4     have to start running all over again,
5     because I don't think I did anything
6     wrong.  And this is where I pay my
7     taxes.  This is where I finance my home.
8     And I just don't see -- where am I going
9     to have some stability?  I was here for
10    three years, left, came back.  I mean,
11    it really has to stop, so no.  And then
12    when you look at the commuting and what
13    it does to my automobile, no.
14 Q.  **And what do you drive?**
15 A.  A foreign car, a Mercedes.
16 Q.  **Is it just harder on commuting on that**
17    **type of car?**
18 A.  It's expensive.  Gas escalated.  And
19    then there's more of a service fee when
20    you're putting more miles on your car.
21    It can get up there.  I've experienced
22    it before.
23        And I forgot to -- I've even

393

1     exasperated or exhausted my retirement.
2     It's -- it is of no more.  And there was
3     no splurging.  It was strictly for the
4     necessities of meeting that household
5     every month.
6  Q.  **Anything else that you can tell us about**
7     **in regards to your damages?**
8  A.  I don't even know how you would look at
9     humiliation, just one untruth after
10    another and one merry-go-round after
11    another.  I don't even know how you
12    could even -- how you could tabulate,
13    even look at putting a measurement on
14    that.
15 Q.  **What is your mom's job with the school**
16    **system?**
17 A.  Attendance officer.
18 Q.  **And she works for Lois Johnson?**
19 A.  For Student Support or Student Services.
20    The name changed.
21 Q.  **And how long has she been in that**
22    **position?**
23 A.  It's been over ten years.  It might be

394

1     just at eleven.
2        MRS. CARTER:  All right.  If
3     y'all will give us a
4     minute, or I can leave.
5     It doesn't matter.
6        MR. PATTY:  Yeah.  I just
7     have a couple of
8     follow-ups.  Do you
9     want me to do that real
10    quick?
11       MRS. CARTER:  Sure.
12       MR. PATTY:  And that way --
13       MRS. CARTER:  Sure.  I'll be
14    looking at my stuff.
15       MR. PATTY:  Yeah.  There may
16    be something that
17    you'll want to come
18    back and ask.
19       EXAMINATION
20    BY MR. PATTY:
21 Q.  **Mr. Lowe, you have a -- and I don't know**
22    **if you mentioned this when you were**
23    **going over your degrees -- you have an**

395

1     **Ed.S./AA certification degree with a**
2     **concentration in Special Ed**
3     **collaborative training, if I said that**
4     **right?**
5  A.  Collaborative teaching.
6  Q.  **Collaborative teaching?**
7  A.  Most of my extra coursework and
8     electives were Special Ed classes.  And
9     I just filed at the state department for
10    that upgrade on my certificate.
11 Q.  **Okay.  All right.  So that was in the**
12    **Fall of 2004 when you obtained that**
13    **degree that I just --**
14 A.  It was prolonged.  So I just filed -- I
15    just sent the state department
16    information for the upgrade.
17 Q.  **But did you have the degree in the Fall**
18    **of 2004?**
19 A.  I think I had completed it.  We were in
20    a university problem, but it was
21    completed.
22 Q.  **And that was with Alabama State?**
23 A.  Yes.

Pages 392 to 395

396

1 Q. Now, you were asked questions about your
2    job as a reading coach in October of
3    2003, and I think you've testified you
4    performed the duties of a reading coach
5    after being brought to Daisy Lawrence in
6    October of 2003; is that right?
7 A. Yes.
8 Q. Okay. And you were evaluated as a
9    reading coach, were you not?
10 A. Yes.
11 Q. And that was by your supervisor,
12    Mr. Owens?
13 A. Yes.
14 Q. Have you had any conversations with
15    Dr. Purcell where she has said that it's
16    the procedure or process or policy of
17    her or Montgomery Public School Systems
18    that they hire the person who's
19    recommended by the principal, that
20    that's their standard operating policy?
21        MRS. CARTER: Object to the
22           form.
23        Go ahead. I was

397

1        just objecting.
2 A. The last conversation I had with her,
3    that was what she -- that was her
4    position.
5 Q. Okay. And that you had not been
6    recommended by a principal, so,
7    therefore, you were not hired; is that
8    basically what she was telling you?
9 A. Yes.
10 Q. Now --
11 A. Her exact question was: Have you been
12    recommended? And my reply was, Yes.
13 Q. Okay. But she had previously told you
14    that people who are recommended by a
15    principal, the standard operating
16    procedures for that, that's the person
17    they choose to hire?
18        MRS. CARTER: Object to the
19           form.
20 A. Yes.
21 Q. Now, you have also been potentially out
22    of work for this -- what will be the
23    2005-2006 school year; is that right?

398

1 A. Yes.
2 Q. Do you think that's going to damage your
3    career?
4        MRS. CARTER: Object to the
5           form.
6 A. Yes.
7 Q. All right. How so?
8 A. In the event that for some estranged
9    reason I decide I'm going to leave the
10    system or leave the state, and I
11    interview as a candidate with a terminal
12    degree in leadership, I may make a good
13    interview, which I know I would, but
14    when you get ready to sit and we need to
15    look and tabulate experience and
16    financial accommodations, it might be a
17    red flag with all of these
18    qualifications, you were out of
19    employment for a year.
20        Secondly, the type of jobs
21    that I would at this point desire and
22    apply for, director, coordinator, and in
23    some districts, possibly assistant

399

1    superintendent, from my training, you
2    would initially want a recommendation or
3    some type of feedback from a central
4    office person, as opposed to your last
5    principal, who you would expect to say
6    something favorable. And I don't think
7    I'd be able to secure that from
8    Montgomery County being that a lawsuit
9    has been filed and all of the rhetoric
10    that I've been taken through. So I'm
11    just left to suffer.
12 Q. Okay. Now, you were asked about it
13    being tough on your car to commute to
14    these other places. Do you have an
15    opinion on whether it would be tough on
16    you to be driving an hour or an
17    hour-and-a-half every day somewhere?
18        MRS. CARTER: Object to the
19           form.
20 A. Yes. It would be difficult on me, as
21    well as anybody else.
22 Q. Now, since the 2004-2005 school year
23    when you stopped working, you've talked

400

1  to some superintendents, haven't you, in
2  other systems?
3        MRS. CARTER: Object to the
4        form.
5  A. Yes.
6  Q. Okay. Which ones have you talked to
7  about possible positions?
8  A. I talked to a superintendent -- I can't
9  even -- Dr. Arbee in Georgia. Al Arbee.
10 A-L-T-E-E. Last name Arbee, A-R-B-E-E.
11 I talked to -- who else did I talk to?
12 He was out of Georgia. I talked to a
13 Dr. Glenn Murphy in Dunnellon, Florida.
14 And I talked to a Dr. Karen Dyer. She's
15 not a superintendent, but she works with
16 an educational resource foundation in
17 Greensboro, North Carolina.
18 Q. What about locally? Since the end of
19 last spring, have you talked to any
20 school systems locally here, Macon,
21 Butler?
22       MRS. CARTER: Object to the
23       form. He's already

401

1        answered that.
2  A. I just -- when you start calling off the
3  specific systems, I interviewed with the
4  superintendent and a principal in Macon
5  County.
6  Q. Okay. All right. Any other systems?
7  A. No.
8  Q. Butler County?
9  A. You know, and it's tiring, and I'm
10 forgetting. Yes, I interviewed with
11 Mr. Looney in Butler County.
12 Q. Okay.
13 A. And I just -- I'm kind of forgetting.
14       MRS. CARTER: With who?
15       With Mike Looney?
16       THE WITNESS: Mr. Mike
17       Looney.
18 BY MR. PATTY:
19 Q. Any other systems you can think of? I
20 know it's 5:00, but let's . . .
21 A. Let me see, Butler -- no, that was it.
22 Q. Okay.
23 A. Butler and Macon.

402

1        MR. PATTY: That's all I
2        have.
3        MRS. CARTER: So, of course,
4        I have a few more.
5        EXAMINATION
6  BY MRS. CARTER:
7  Q. Why were you talking to Al Arbee in
8  Georgia? Were you trying to get a job?
9  A. We were actually talking about
10 graduation with no Doctorate's. And he
11 just happened to call me during the day
12 to leave a message, and I answered the
13 phone. And one conversation -- one word
14 led to another, and I just asked him, I
15 said, Well, what are the possibilities?
16 And the first thing he said, he said,
17 You know, you could probably, being that
18 you've taught in another school
19 district, with two districts, you could
20 probably come up here and get a job, but
21 what's going to mess you up is when you
22 get ready to get some type of
23 recommendation, that's going to mess you

403

1  up. Because I know you could probably
2  get one from the principal, but when you
3  think about the jobs you're going to
4  want -- some of those that were
5  available that he mentioned to me --
6  they're probably going to want to talk
7  to a higher administrator to get a feel
8  of your leadership ability.
9  Q. I mean, I'm confused. Were you trying
10 to get a job in Georgia?
11 A. Huh-uh, I wasn't trying. I mean, the
12 conversation came up. Just a what if.
13 I was not trying. Because I had not
14 applied. There's no paperwork on me on
15 any school for any school district or
16 state department in Georgia.
17 Q. Because would you leave Montgomery and
18 go to Georgia?
19 A. I'm uncomfortable with it.
20 Q. What about Florida? Why were you
21 talking to a superintendent in Florida?
22 A. A family friend who finished the Nova
23 program and got -- found -- saw my name

Pages 400 to 403

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

404

1    in the graduation announcements.  And he
2    called, and we just briefly talked.
3    But, no, I'm not comfortable with
4    entertaining that possibility either.
5  Q.  So did you make an application to get a
6    job in Florida?
7  A.  No.
8  Q.  How did it come about that you
9    interviewed in Macon County if you had
10    not applied there?
11 A.  I got a phone call from Mr. James
12    Knuckles (phonetic).  How he knew I was
13    unemployed, I don't know.  And he told
14    me to go and see Mr. Theodore Samuel
15    (phonetic) in Macon County.  I did.  The
16    interview with Mr. Samuel was quite
17    lengthy.
18 Q.  Did you get a job offer?
19 A.  We left his office and went to the
20    superintendent's office.  He was ready
21    to hire me on the spot for a reading
22    coach.
23        When we got to the

405

1    superintendent, I positioned the
2    superintendent about his Director of
3    Curriculum position that was open.  And
4    where I had already done an internship
5    and did quite an extensive bit of
6    writing for Macon County while I was on
7    the internship there.  And he just said
8    to me, Well, I want to check on some
9    things.  And I knew what that meant,
10    he'd probably check back with Montgomery
11    County or somebody in Montgomery County.
12        And I did have two follow-up
13    phone calls from the principal, who was
14    saying, Come on to work, and we'll get
15    your paperwork later.  But I couldn't
16    get caught like that, and I didn't.  And
17    nothing ever developed.  None of my
18    communications were even acknowledged
19    thereafter.
20 Q.  So you did not get a job offer from
21    them?
22 A.  Not this time, no.
23 Q.  What do you mean?  Oh, because in --

406

1  A.  The first time they had a different
2    superintendent.  At this time, no.
3  Q.  Do you know that they communicated with
4    Montgomery County?
5  A.  Well, he said let me check on some
6    things.
7  Q.  Do you know whether or not, though?
8  A.  No, I don't.
9  Q.  Okay.  What about Mike Looney, what
10    occurred, that you interviewed with in
11    Butler County?
12 A.  I sent Mr. Looney a communication asking
13    did he have any available openings.  And
14    he called me and said, Get in your car
15    and come down here.  When I met with
16    him, he said, I've got two Special Ed
17    jobs if you want them.  He gave me
18    paperwork to complete for emergency
19    certification.  He said, Give this to my
20    secretary and call me when you give it
21    to her, and we'll go from there.  The
22    drive was more than I anticipated.  I
23    didn't even fill out the application for

407

1    the emergency certification.
2        He and I did talk about some
3    administrative positions, but he told
4    me, Melvin, you know I would have hired
5    you, but the recommendations have
6    already come in, and that's kind of a
7    done deal.  He even provided me with the
8    personnel report.  He said, I want you
9    to see these.  Here it is.  It's already
10    done.  I know you've applied for them,
11    but it's already done.
12 Q.  You had already applied for what?
13 A.  Some administrator positions that he had
14    available that I saw on the web page.
15    You know, when I got down -- when I went
16    down and I talked with him, I addressed
17    them.  And he showed me the personnel
18    reports.  He said, I don't want you to
19    think, you know, I'm dodging you, but
20    these have already been . . .
21 Q.  By other people in the system, you mean?
22 A.  Yes, other people in the system.
23 Q.  So did he offer you a job?

Pages 404 to 407

408

1 A. He offered me two jobs. With Dr. Murphy
2    at the high school, and Mr. John Hill at
3    the middle school.
4 Q. And you didn't take them because of the
5    drive?
6 A. The drive.
7 Q. Anybody else that you made application
8    with? Was there any reason you didn't
9    make application like in Autauga or
10   Elmore County that were short drives?
11 A. No. What I was looking for and what I'm
12   still looking for is an administrative
13   post. And all those schools' districts
14   had to offer were teaching positions.
15   Just as with Macon County, I didn't
16   initiate an interest there, it came to
17   me. I followed suit, but I still
18   initiated an administrative post when I
19   talked to the superintendent.
20 Q. Do you know of other people in the
21   Montgomery County system that have
22   similar certifications to you that are
23   still just teachers?

409

1 A. There are probably quite a few. More
2    than we could mention today.
3 Q. Right. That have certifications to be
4    administrators and things of that
5    nature, but they've not been given those
6    type jobs yet?
7 A. Then I don't know who has applied and
8    who hasn't applied either.
9 Q. I'm confused. Your lawyer was asking
10   you some questions about this issue
11   about Special Education, and you said it
12   was a university problem. When did the
13   university -- when did you graduate or
14   get the degree for Special Education
15   from Alabama State?
16 A. I never said we had one.
17       MR. PATTY: She's talking
18         about the Ed.S./AA.
19 A. The Ed.S. and double A certification
20   is -- the double A is a certification.
21   The Ed.S is a degree.
22 Q. Right.
23 A. This is just -- this is January. We had

410

1    some problems, but it was just conferred
2    in November.
3 Q. Of 2005?
4 A. '04 -- '05, '05. The extra courses that
5    I took as electives were Special
6    Education courses --
7 Q. Right.
8 A. -- towards collaborative teaching.
9       MRS. CARTER: All right. I
10        jumped right into that.
11        If you'll give me three
12        minutes.
13      MR. PATTY: Okay.
14      (Whereupon a brief recess
15        was taken.)
16 BY MRS. CARTER:
17 Q. I'm not trying to beat a dead horse, but
18   it's real important that we're clear on
19   something and that I make sure that I
20   haven't misunderstood. Do you recall
21   ever having a conversation with Jimmy
22   Barker in the Summer of '05 about a
23   Special Education position when he said

411

1    go get me proof that you are certified
2    or that you have done the relevant
3    casework in Special Education, that's
4    what we have to have? Do you remember
5    having a conversation with him like
6    that?
7 A. No.
8 Q. Okay. Did you ever provide him with the
9    information that showed that you had
10   done the appropriate coursework in
11   Special Education or that you were
12   otherwise certified in Special
13   Education?
14 A. Yes.
15 Q. Okay. Can you provide me or tell me
16   where today that information is?
17 A. We should -- we have it, because I
18   pulled it. Because I had to give a copy
19   to Mr. Sikes.
20 Q. What is it? Like if we were looking for
21   it, what should we look for?
22 A. It's -- what I did, I e-mailed the
23   registration office at Northcentral

Pages 408 to 411

412

```
 1    University, and I applied for the
 2    Master's degree in exceptional student
 3    education. I evaluate student
 4    transcripts all the time, but I can not
 5    evaluate my own. So I took all the
 6    classes that were on the curriculum, and
 7    I took all the classes that I had from
 8    Bachelors, Master's, Specialist, and
 9    Doctorate. And the same way you cross
10    reference a course with the core
11    description is what I did. And I said
12    to Mr. Sikes, These are the courses that
13    from my accredited transcripts will
14    cross over. The only conversation
15    Mr. Barker and I had, he said, Melvin,
16    some of these classes -- or these
17    classes don't have an SPE, or Special Ed
18    prefix, which that -- with
19    certification, you may need a research
20    class. Okay?
21 Q. Okay. Here's my question Mr. Lowe:
22    What do we put our hand -- what
23    documents are you referring to? Like
```

413

```
 1    when you're telling me --
 2 A. I have it. If it's not -- it's in
 3    there. I gave Mr. Barker a copy, and I
 4    also gave Mr. Sikes a copy.
 5 Q. What is it? What does it look like?
 6 A. It is the curriculum for Exceptional
 7    Student Education and all the courses
 8    that I have taken that will cross
 9    reference those courses that will be
10    required for that Master's in
11    Exceptional Student Education. I even
12    checked with the state department in
13    Montgomery, and the curriculum is
14    approved. My courses will be approved.
15 Q. And I'm just confused about what you're
16    talking about. There was a university
17    where you took classes that you maintain
18    were classes that fell under the Special
19    Education category?
20 A. Yes.
21 Q. And you are saying here today that you
22    provided evidence or information about
23    those courses that you took?
```

414

```
 1 A. Yes.
 2 Q. And what are you going by when you say
 3    that these classes that you took
 4    qualified as the appropriate Special
 5    Education classes that the Board was
 6    looking for when determining whether you
 7    were qualified for the job?
 8 A. If they had taken those classes and
 9    applied them to the state department,
10    what they -- told them the same thing
11    that I was told, he meets -- these
12    classes will cross over. If this is the
13    school, Northcentral, that he wants to
14    go through to get the degree, and these
15    are all of the classes that he took on
16    the Bachelor's, Master's, Specialist,
17    and Doctorate level, and we say we can
18    take this class, this class, this
19    class -- if they had done that --
20    Mr. Looney was in a position to do it.
21    They even did it when I was in Bullock
22    County. They were in the process of
23    certifying me for an emergency
```

415

```
 1    certificate in Special Education.
 2 Q. Why did you have to be certified under
 3    an emergency certificate if you had the
 4    classes? I mean, when you're saying
 5    that they had to match your classes up,
 6    are you saying that you expected them to
 7    take these -- say there were nine
 8    classes -- these nine classes and count
 9    them for these other nine class that you
10    were supposed to have taken?
11 A. That is the procedure.
12 Q. And a few minutes ago when you were
13    testifying and I said, What would you do
14    if somebody wanted to offer you the job,
15    and don't you have more classes to take,
16    you said, Yes, and I'll do that and get
17    certified if somebody offers me the job?
18 A. I said nobody offered me a job.
19        MR. PATTY: He said he
20           had -- I think he
21           testified, and I don't
22           want to testify for
23           him --
```

Pages 412 to 41

416

1    MRS. CARTER: Okay.
2        Don't --
3    MR. PATTY: -- but he had
4        three class that he
5        said he had to take.
6    THE WITNESS: Three classes.
7    MRS. CARTER: Right.
8    MR. PATTY: But he could get
9        an emergency
10       certificate.
11   MRS. CARTER: And I
12       understand that.
13   MR. PATTY: Right. And that
14       he had classes that
15       would match up, as
16       well.
17   MRS. CARTER: Right.
18   BY MRS. CARTER:
19   Q. And I don't disagree with his
20       characterization of your testimony.
21   A. Right.
22   Q. And I'm not being stupid, but obviously
23       a couple of these jobs were Special Ed

417

1        jobs, and I've got to make sure that I
2        completely understand where you're
3        coming from.
4            So isn't it true that to be
5        certified in Special Education, you
6        would still have additional classes that
7        you had to take?
8    A. Me?
9    Q. Yes.
10   A. Well, at this point, I don't know.
11       Because --
12   Q. Did you testify earlier that there were
13       three additional classes --
14   A. Yes. There are three additional classes
15       on the information I gave Mr. Barker and
16       Mr. Sikes. But since that, I completed
17       the specialization in my Doctorial
18       program, which is additional -- those
19       are additional courses, so those classes
20       may cross over.
21   Q. When you say they may cross over, what
22       are you going by when you made the
23       determination that these nine -- and, of

418

1        course, I'm using the --
2    A. Uh-huh (affirmative response).
3    Q. -- that these set of classes cross over
4        for the set of classes that they're
5        looking for?
6    A. Any certification officer can evaluate
7        it. Any certification officer in any
8        school --
9    Q. Did you ever get that evaluated --
10   A. Yes.
11   Q. -- by an independent individual?
12   A. Yes.
13   Q. Who?
14   A. I had a friend of mine, Martha Pettway,
15       Dr. Martha Pettway at Alabama State
16       University. She said you would have to
17       send it through the state department to
18       get an official yes or no, but --
19   Q. Did you ever do that?
20   A. Yes.
21   Q. You sent your coursework through the
22       state department for them to do a
23       cross --

419

1    A. No. Not through the state department,
2        no. Martha Pettway doesn't work for the
3        state department.
4    Q. Here's my question.
5    A. Okay.
6    Q. Did you ever go through the state
7        department and get some kind of analysis
8        where the set of classes you had taken
9        crossed over to the set of classes that
10       they were going to look for --
11   A. No. The only thing I did with the
12       state -- okay, go ahead.
13   Q. -- crossed over for the set of classes
14       that they were looking for to determine
15       if you were qualified to teach that
16       class?
17   A. No. The only thing I did with the state
18       department was to make sure that the
19       curriculum was accredited and approved
20       by the State of Alabama since the
21       school --
22   Q. For what?
23   A. The Exceptional Student Education

Pages 416 to 419

420

1    Master's Program via Prescott --
2    Prescott, Arizona. See, the school is
3    in Prescott, Arizona, Northcentral
4    University. I dealt with the state
5    department to make sure that they would
6    approve and accept that curriculum for
7    certification in the State of Alabama.
8    **Q. For what?**
9    A. For a Master's degree in Exceptional
10   Student Education. I then sat with
11   Martha Pettway. And we took those same
12   classes that I gave Mr. Barker a copy
13   from Northcentral on the curriculum and
14   those that I typed out that were my
15   transcript, I gave to Mr. Sikes, I gave
16   to Mr. Barker and Attorney Patty has a
17   copy.
18        MRS. CARTER: I want you
19        to -- can he put his
20        hands on a copy of
21        that?
22        THE WITNESS: Yeah, he can
23        pull it. Because I

422

1        **for identification and**
2        **attached hereto.)**
3    MS. DUGAS: Is that what you
4        produced to us?
5    MRS. CARTER: Yes, that's
6        been produced to you.
7    MS. DUGAS: Okay.
8    MRS. CARTER: That was the
9        first thing we ever --
10       probably the only thing
11       we produced the first
12       time we produced
13       documents.
14   MR. PATTY: There's a -- the
15       only thing that may be
16       an issue with that is
17       there's a -- there's a
18       set of documents we
19       produced to y'all that
20       was a copy of the file
21       he was given by Ann
22       Sippial, who requested
23       his personnel file

421

1        left it with you.
2    MRS. CARTER: Because, you
3        know, I mean --
4    THE WITNESS: It was one of
5        the last things we went
6        over, or did I put it
7        back in that other
8        binder?
9    MR. PATTY: I don't know.
10   THE WITNESS: Do you want me
11       to go to the car to get
12       the other copy?
13   MR. PATTY: No.
14       (Whereupon an off-the-Record
15       discussion was held.)
16   BY MRS. CARTER:
17   **Q. I'm going to mark this as Defense**
18   **Exhibit 47. I hope I'm not messing up.**
19   **I believe this is a copy of your**
20   **personnel file. Is that what that**
21   **appears to be?**
22       **(Whereupon Defendants'**
23       **Exhibit No. 47 was marked**

423

1        before there was a
2        lawsuit. And there's
3        some differences
4        between it and that
5        that y'all produced to
6        us. Some different
7        documents in there and
8        that sort of thing. So
9        I don't know --
10   MRS. CARTER: Is it
11       something of out-
12       standing significance
13       or something I screwed
14       up on when I --
15   MR. PATTY: No, no. I mean,
16       there's more in that
17       than there is in hers.
18       So, I mean, that's the
19       only thing. I don't
20       know that he can say
21       that's his personnel
22       file, because he's been
23       given something that's

Pages 420 to 423

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

424

1    different than Ann,
2    so for whatever it's
3    worth.
4        MRS. CARTER: Did y'all turn
5        over -- see, the
6        difficulty of the
7        documents you gave me,
8        and I'm not
9        complaining, is that
10       nothing was stapled or
11       grouped.
12       MR. PATTY: Uh-huh
13       (affirmative response).
14       MRS. CARTER: And so I don't
15       know if something was
16       something he kept or
17       something that came
18       from somebody else
19       or something that --
20   (Whereupon an off-the-Record
21       discussion was held.)
22       MRS. CARTER: Back on the
23       Record.

425

1        BY MRS. CARTER:
2    Q. The bottom line, Mr. Lowe, is that you
3        maintain that when you had the
4        opportunity to get these Special
5        Education jobs, it's your position that
6        you should been allowed to be awarded
7        those positions, that you were
8        qualified?
9    A. Yes, I was.
10   Q. In your Complaint, you refer to a job
11       that I don't think I've asked you about.
12       It's right before you talk about or
13       right after you talk about the
14       administrative assistant position with
15       Bobby Abrams in 2004. It says that you
16       also had a principal wish to hire you as
17       the SIA or the Title I position, and
18       that the Board refused to allow you to
19       be promoted into that job. What
20       principal and school are you talking
21       about there? This was for an SIA or a
22       Title I position, and I don't think I've
23       asked you about that. It's probably

426

1        something that was in a grouping,
2        but . . .
3    A. I'll have to go back and look. I think
4        I know exactly which one that is, but
5        I'll have to look back through my notes.
6    Q. Tell me what you think that one is. It
7        sounds like it was in that same time
8        frame or summer --
9    A. That one was Southlawn Middle School.
10       And Tina Minott told me that there was a
11       legal issue with Pam Cloud (phonetic),
12       who was a white woman, and she had to
13       hire her.
14   Q. In '04?
15   A. If I stand corrected, yes.
16   Q. That's what it looks like it is here,
17       but I could be . . . well, to your
18       memory, did that happen the same summer
19       or about the same time that Bobby Abrams
20       was trying to hire you as administrative
21       assistant?
22   A. I believe that was the same year.
23   Q. It sounds like it in your Complaint,

427

1        okay. And tell me again what -- and
2        Tina Minott wanted to hire you?
3    A. Yes.
4    Q. And tell me what she was told.
5    A. She told me, she said, Melvin, I really
6        wanted you, she said, but there's a
7        legal issue with Pam Cloud, and I have
8        to hire her.
9    Q. Any other conversations you had with
10       anybody about that?
11   A. No.
12   Q. Do you know Pam Cloud?
13   A. Yes.
14   Q. Do you know what her qualifications
15       were?
16   A. I think she has a Specialist degree. I
17       don't know. She has to be certified in
18       administration, so I'm assuming she at
19       least has that.
20   Q. Any other jobs? Those are the ones that
21       I found in your Complaint. Any other
22       job that you can tell us about today
23       that you feel you should have received?

Pages 424 to 427

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

428

1   A. No.
2   **Q. All right.**
3           MRS. CARTER:  I'm going to
4               say I'm finished,
5               because I'm too tired
6               from thinking about it.
7           (Whereupon an off-the-Record
8               discussion was held.)
9           (The deposition of
10              MELVIN ALONZA LOWE, III,
11              concluded at 5:45 p.m.)
12
13      *  *  *  *  *  *  *  *  *  *
14          FURTHER DEPONENT SAITH NOT
15      *  *  *  *  *  *  *  *  *  *
16
17
18
19
20
21
22
23

429

Middle District of Alabama, Northern

Division; that the foregoing pages

contain a true and accurate transcription

of the examination of said witness by

counsel for the parties set out herein;

that the reading and signing of said

deposition was waived by witness and

counsel for the parties.

    I further certify that I am neither

of kin nor of counsel to the parties to

said cause, nor in any manner interested

in the results thereof.

    This the 16th day of January, 2006.


    Cornelia J. Baker
    Certified Shorthand Reporter,
    Certified Court Reporter and
    Notary Public for the
    State of Alabama

    My Commission expires 6/9/08.

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377