# EXHIBIT

# G

# DEPOSITION OF JAMES C. OWENS

## January 24, 2006

## Pages 1 through 100

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Case 2:05-cv-00495-WKW-SRW   Document 24-8   Filed 05/05/2006   Page 3 of 36

Deposition of James C. Owens                    Lowe vs. MCBOE                    January 24, 2006

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MELVIN LOWE,

    Plaintiff/Petitioner,

Vs.            CIVIL ACTION NO.
            2:05-CV-0495

MONTGOMERY COUNTY BOARD
OF EDUCATION,

    Defendant/Respondent.

* * * * * * * * * * * *

DEPOSITION OF JAMES C. OWENS, taken

pursuant to stipulation and agreement before

Patricia G. Starkie, Registered Diplomate Reporter,

CRR, and Commissioner for the State of Alabama at

Large, in the Law Offices of Hill, Hill, Carter,

Franco, Cole & Black, 425 South Perry Street,

Montgomery, Alabama, on Tuesday, January 24, 2006,

commencing at approximately 2:05 p.m.

* * * * * * * * * * * * *

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:

    William F. Patty, Esq.
    Tanya E. Dugas, Esq.
    BEERS, ANDERSON, JACKSON
    PATTY & VAN HEEST
    Attorneys at Law
    250 Commerce Street
    Montgomery, Alabama

FOR THE DEFENDANT:

    Elizabeth B. Carter, Esq.
    HILL, HILL, CARTER, FRANCO
    COLE & BLACK
    Attorneys at Law
    425 South Perry Street
    Montgomery, Alabama

ALSO PRESENT:
    Mr. Melvin Lowe
    Mr. Jimmy Barker

* * * * * * * * * * * *

EXAMINATION INDEX

JAMES C. OWENS

BY MR. PATTY . . . . . . . . . . 4

BY MS. CARTER . . . . . . . . 78

BY MR. PATTY . . . . . . . . . . 90

BY MS. CARTER . . . . . . . . . 95

BY MR. PATTY . . . . . . . . . 97

(No exhibits were marked to this deposition)

**Page 3**

1            STIPULATION

2     It is hereby stipulated and agreed by and

3 between counsel representing the parties that the

4 deposition of:

5          JAMES C. OWENS

6 is taken pursuant to the Federal Rules of Civil

7 Procedure and that said deposition may be taken

8 before Patricia G. Starkie, Registered Diplomate

9 Reporter, CRR, and Commissioner for the State of

10 Alabama at Large, without the formality of a

11 commission;

12     That objections to questions other than

13 objections as to the form of the question need not

14 be made at this time but may be reserved for a

15 ruling at such time as the said deposition may be

16 offered in evidence or used for any other purpose

17 by either party provided for by the Statute.

18     It is further stipulated and agreed by and

19 between counsel representing the parties in this

20 case that the filing of said deposition is hereby

21 waived and may be introduced at the trial of this

22 case or used in any other manner by either party

23 hereto provided for by the Statute regardless of

**Page 4**

1 the waiving of the filing of the same.

2     It is further stipulated and agreed by and

3 between the parties hereto and the witness that the

4 signature of the witness to this deposition is

5 hereby waived.

6       * * * * * * * * * * * *

7     JAMES C. OWENS,

8     The witness, after having first been duly

9 sworn to speak the truth, the whole truth and

10 nothing but the truth testified as follows:

11         EXAMINATION

12 BY MR. PATTY:

13 Q. Dr. Owens, my name is Bill Patty, and I

14    represent Mr. Lowe in this case.

15 A. Yes, sir.

16 Q. If at any time I ask a question that's

17    poorly worded or is unclear, please ask me

18    just to clarify it. I'll be happy to do

19    so. And also, at any time you need to take

20    a break, please just let me know. I'll be

21    happy to do so.

22       Could you tell me your address, please.

23 A. My address is 5737 Hyde, H-Y-D-E, Park

Page 5

1      Drive.
2    Q.  Okay.
3    A.  Montgomery 36117.
4    Q.  And what is your date of birth?
5    A.  8/22/53.
6    Q.  And if you could, please just outline, from
7        college on, your educational background.
8    A.  BS in business administration with a minor
9        in economics from Alabama State University
10       in 1974.  Teaching credentials in 1979 from
11       Alabama State University.  Master's, 1981 in
12       administration/supervision from Alabama
13       State University.  EDS in -- I want to say
14       1980 -- I can't remember the year, but from
15       Southern Christian University -- at that
16       time, it was Alabama Christian -- in
17       religious studies.  1993, paralegal studies
18       from Auburn University at Montgomery, and
19       Ph.D. from Columbus University in education
20       administration in I want to say 2000.
21   Q.  Okay.  The paralegal degree, where was
22       that?
23   A.  At AUM.

Page 6

1    Q.  AUM?
2    A.  Yes.
3    Q.  And your current certification is in --
4        teacher certification is what?
5    A.  It's administration.
6    Q.  Administration?
7    A.  Yes.
8    Q.  All right.  Could you basically outline for
9        me your work history, just post college,
10       where you've worked?
11   A.  Okay.  Let's see.  Tuskegee University
12       from -- I want to say from 1980 I'm trying
13       to say, '80 through '85.  Vice-president of
14       business affairs, and I worked in the
15       school of education.  Montgomery public
16       school system from '85 through the present.
17   Q.  Okay.
18   A.  Substitute teacher, teacher.  I taught for
19       I want to say six years, administrative
20       assistant for about 12 years, and principal
21       for six.  I think that comes up to about
22       21, 22 years.
23   Q.  Administrative assistant for 12 years?

Page 7

1    A.  Twelve years at the elementary, junior
2        high, and senior high levels.
3    Q.  Okay.  And where you taught -- the six
4        years where you taught, at what schools did
5        you teach?
6    A.  At Cloverdale Junior High School and
7        Brewbaker Junior High School.
8    Q.  What subjects did you teach?
9    A.  History.
10   Q.  Okay.  And as an administrative assistant,
11       what schools did you work at during those
12       12 years?
13   A.  Well, I started as a principal's helper at
14       Vaughn Road Elementary.  That was '90-'91,
15       part time.  And then full time at
16       Bellingrath, which was a K through nine
17       school or unit school.  And then to Lee
18       High School.  I want to say from '95
19       through 2000.
20   Q.  Are any of those three schools alternative
21       schools?
22   A.  No, sir.
23   Q.  And so you've worked at each level?

Page 8

1        Elementary, junior high and --
2    A.  College.  All levels.
3    Q.  -- high school?
4    A.  All levels.
5    Q.  All levels.  Okay.
6        All right.  Now, as a principal, what
7        schools have you been principal of?
8    A.  We had one alternative school.  That was
9        RISE High School.  That was in 2000, 2001.
10       That was located on 5th Street.  And then
11       to Daisy Lawrence Alternative.  That was
12       about four years.  And then at Paterson
13       Elementary School this year.
14   Q.  Okay.  Paterson is not an alternative
15       school?
16   A.  It is not.
17   Q.  Is Paterson on any type of state department
18       of education alert status?
19   A.  It's in School Improvement I.
20   Q.  Okay.  What's the -- I'm familiar with
21       alert, and that may be outdated now.
22   A.  Yes.
23   Q.  Alert and then the next level up.  How is

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 9

1 that done now?
2 A. Well, basically, you go in School
3 Improvement I, and then you say second year
4 school improvement, and then you can
5 actually go into state takover if you do
6 not make AYP, adequate --
7 Q. Does that mean they're one level below
8 clear status now? Is that what that --
9 A. That's correct. That means that if we meet
10 AYP for two consecutive years, then we
11 become clear.
12 Q. Okay. And two levels before takover; is
13 that right?
14 A. Pretty close.
15 Q. Okay. All right. Is Daisy Lawrence -- I
16 know that closed last school year.
17 A. Yes.
18 Q. When did you find out that Daisy Lawrence
19 was going to close?
20 A. Specifically, I want to say in May.
21 Q. Of 2004?
22 A. 2005.
23 Q. 2005. Okay. Were there some discussions

Page 10

1 leading up to you finding out in May of
2 2005 that it was going to close, or did --
3 I mean, were there some studies or
4 something going on to look at that option
5 of possibly closing it, or did -- May 2005,
6 was that a surprise to you that you got --
7 that it was going to be closed?
8 A. Well, alternative programs over the years,
9 they're always under review. So it was
10 somewhat of a surprise in May, early May
11 that I was called in a meeting with several
12 other individuals who said that this is
13 something that we may do. But like I say,
14 specifically around the 13th or the 16th,
15 somewhere in there, when Dr. Purcell and
16 Mr. Barker came out pretty much and made it
17 official to the staff.
18 Q. Okay. But it was in early May before -- it
19 was in early May when you first learned
20 that it was a possibility of the school
21 being closed?
22 A. Yes, sir.
23 Q. Okay. When Dr. Purcell and Mr. Barker came

Page 11

1 out, did they talk to you before meeting
2 with a group of teachers? Did they talk to
3 you alone or did -- did they announce it --
4 were all of y'all in there together when it
5 was first announced?
6 A. Well, basically, initially it was
7 hospitable, just offer a seat in your
8 office. Then Dr. Purcell said, would you
9 mind getting your faculty together. And I
10 did that and asked them to meet in a
11 certain room, and then Dr. Purcell spoke
12 and then Mr. Barker spoke.
13 Q. Okay. What do you remember them saying?
14 A. I was not in the room. I was right outside
15 the room. Basically, from what I can
16 remember, it's that they were telling them
17 that the school would close and that they
18 would try to place individuals next year.
19 Q. Okay. Before you had that -- before that
20 meeting took place with the group of the
21 teachers you just described, did
22 Dr. Purcell or Mr. Barker tell you what
23 they were about to go in there and meet

Page 12

1 with the teachers about? Did you have any
2 conversations preceding that meeting?
3 A. Not anything lengthy, no, sir.
4 Q. Did they tell you the school was going to
5 close?
6 A. Well, I knew at that point.
7 Q. Okay. How did you know that it was going
8 to close?
9 A. Well, basically, from a prior meeting that
10 had taken place about a week earlier.
11 Q. Okay. And what happened in that meeting?
12 A. Well, basically, had several individuals,
13 all of which I can't remember. That's kind
14 of foggy. It was about eight individuals,
15 some principals there that -- and
16 Dr. Purcell, Ms. Johnson, Lois Johnson for
17 sure, and Mr. Barker came in and Mrs. James
18 and the principal of Lanier, several
19 principals that pretty much said whether it
20 was beneficial to have it or it was not
21 beneficial to have it. That was the extent
22 of it.
23 Q. Different people expressed opinions whether

3 (Pages 9 to 12)

| Page 13 |
|---|
| 1     or not it was beneficial to have the |
| 2     school? |
| 3    A.   Yes, sir. |
| 4    Q.   Do you remember who was for having the |
| 5     school and who was against having the |
| 6     school? |
| 7    A.   Well, it was not an actual vote taken. It |
| 8     was not anything formal of that nature. It |
| 9     was kind of informal as to views were |
| 10     expressed. |
| 11   Q.   All right. Do you remember where different |
| 12     folks' views were on it? I mean, for |
| 13     instance, where was Dr. Purcell's view on |
| 14     it? |
| 15   A.   I can't speak. She didn't elaborate that |
| 16     much. |
| 17   Q.   All right. What about Mr. Barker? |
| 18   A.   The only thing he did was read some numbers |
| 19     about ADM, about our average daily |
| 20     attendance, and told me that he was -- |
| 21     would talk to me later about placements. |
| 22   Q.   About placement -- |
| 23   A.   Placement. |

| Page 14 |
|---|
| 1    Q.   -- of teachers? |
| 2    A.   Well, it wasn't very clear on that. About |
| 3     placement. |
| 4    Q.   Just about placement? |
| 5    A.   Yes. |
| 6    Q.   Okay. What else? |
| 7     What was Lois Johnson's opinion? |
| 8    A.   She didn't elaborate that much. |
| 9    Q.   Do you remember anyone who spoke negatively |
| 10     about continuing to operate the school? |
| 11   A.   No one really spoke negatively about |
| 12     continuing the school, but just a couple of |
| 13     principals saying that they would like to |
| 14     see students out of the alternative |
| 15     environment. |
| 16   Q.   Okay. |
| 17   A.   Ms. James spoke to that point. |
| 18   Q.   What was your opinion? Did you want to |
| 19     continue the school or -- |
| 20   A.   Well, I've worked with the system a good |
| 21     while. I've been alternative as well as |
| 22     traditional school, and I'm not one that |
| 23     would harbor any feelings one way or the |

| Page 15 |
|---|
| 1     other if it's for the benefit of the |
| 2     system. |
| 3    Q.   Okay. So you really didn't have a position |
| 4     one way or the other on it? |
| 5    A.   No, sir. |
| 6    Q.   Do you remember anything else said at this |
| 7     meeting? |
| 8    A.   That was the extent of it. And the only |
| 9     other thing that they mentioned, that they |
| 10     wanted to place the students in hubs, in |
| 11     buildings, other schools around the city. |
| 12   Q.   Did you and Mr. Barker ever have a |
| 13     subsequent meeting about placement? He |
| 14     said he wanted to talk to you about |
| 15     placement. Did y'all ever have another |
| 16     meeting? |
| 17   A.   No, we didn't have that. I talked to him |
| 18     via telephone I want to say in July or |
| 19     latter part of June, and he told me that |
| 20     the individuals -- the teachers had been |
| 21     placed. He said he thought I would want to |
| 22     know that. |
| 23   Q.   Did you ever have any meeting or have any |

| Page 16 |
|---|
| 1     conversation with Mr. Barker or anyone in |
| 2     administration at that point about the |
| 3     placement of Melvin Lowe? |
| 4    A.   No, sir. I didn't get into any specific |
| 5     names. |
| 6    Q.   Okay. |
| 7    A.   Because at that point I had not been |
| 8     placed, and I didn't know what any needs |
| 9     would be on my part, and I didn't know |
| 10     whether he meant everyone had been placed |
| 11     or certain individuals. We didn't get into |
| 12     those specifics. |
| 13   Q.   Okay. After this meeting, did you have any |
| 14     subsequent -- Well, after the group meeting |
| 15     with everybody, were there any additional |
| 16     meetings? Did they leave the room where |
| 17     all the teachers were? Did you talk to the |
| 18     superintendent and Mr. Barker after that? |
| 19   A.   No, sir. |
| 20   Q.   Did you have any further discussions with |
| 21     them about the closure of Daisy Lawrence? |
| 22   A.   No, sir. |
| 23   Q.   Are there any conversations with |

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 17

1    administration about the closure of Daisy
2    Lawrence that preceded that meeting we
3    haven't covered?
4    A.  No, sir.
5    Q.  All right.  And, now, when did you receive
6    your assignment to Paterson?
7    A.  It was in the latter part of -- latter part
8    of June, first part of July after I came
9    off vacation.
10   Q.  And are you a contract principal?
11   A.  I am.
12   Q.  Do you have tenure with the school system?
13   A.  As a teacher.
14   Q.  As a teacher?
15   A.  Yes, sir.
16   Q.  And as a contract principal, are you in
17   your probationary period or are you in the
18   regular contract period?
19   A.  Regular contract period.
20   Q.  The second year, third year?
21   A.  That means that you -- in probationary
22   term, contract type principalship, you
23   get -- some school systems offer one year

Page 18

1    and some offer two years.  I had a two-year
2    contract initially, I moved to three-year,
3    and the one after that should be a three to
4    five-year contract.
5    Q.  What year are you in in your three-year?
6    A.  Sixth year.  This is my sixth year, so
7    actually I'm on a new three-year term.
8    Q.  Okay.  You're in the first year of your
9    three-year term?
10   A.  Yes.  Second three-year term.
11   Q.  Okay.  Are you married?
12   A.  Yes, sir.
13   Q.  And what is your wife's name?
14   A.  Lilly Owens.  L-I-L-L --
15   Q.  What is her maiden name?
16   A.  Webster -- Williams.  Williams.
17   Q.  Okay.  And do y'all have any children in
18   the Montgomery area, south Alabama area
19   that are over the age of 19?
20   A.  Yes.
21   Q.  What are their names?
22   A.  Nyenya Webster.  N-Y-E-N-Y-A.
23   Q.  Okay.  Any others?

Page 19

1    A.  And Gwen Perry.
2    Q.  Okay.
3    A.  And Harrison Webster.
4    Q.  Okay.  And I'm asking this information for
5    the jury selection part of the case, so I'm
6    not just being curious.
7        Where are they employed?
8    A.  Channel 8, Nyenya.  Harrison is at Rheem,
9    and Gwen is at Alabama State University.
10   Q.  Okay.  And are they married?
11   A.  Gwen is married.
12   Q.  Okay.  And what is Gwen's spouse's name?
13   A.  Douglas.
14   Q.  Okay.  And where is he employed?
15   A.  At the state of Alabama.
16   Q.  What department with the state?
17   A.  He works with the legislature.
18   Q.  Okay.  Do your parents live in the south
19   Alabama or Montgomery area?
20   A.  My father is still living, yes.
21   Q.  What is his name?
22   A.  Tommy Lee Owens.
23   Q.  Okay.  Does he live in Montgomery?

Page 20

1    A.  He does.
2    Q.  Okay.  And is he employed?
3    A.  Eighty-five.
4    Q.  Didn't think so, but I had to ask.
5        Where does he live?
6    A.  He lives on Hall Street.
7    Q.  Okay.  Do your wife's parents live in
8    Montgomery or south Alabama area?
9    A.  Yes.
10   Q.  What are their names?
11   A.  Bates.  Pearline and Wilbert Bates.
12   Q.  Okay.  Are they retired?
13   A.  Yes, sir.
14   Q.  Okay.  And then do you have any brothers or
15   sisters or does your wife have any brothers
16   or sisters in the Montgomery, south Alabama
17   area?
18   A.  Yes, sir.
19   Q.  Would you give me their names.
20   A.  Yes, sir.
21   Q.  All right.
22   A.  John Calvin Owens.  Carolyn Owens.  Ethel
23   Simon, S-I-M-O-N, last name.  And Michael

Page 21

1    Owens in this area. You consider the
2    south, which -- how extensive?
3    Q. Well, I'm trying to figure out for the
4    middle district. So instead of trying to
5    list all the counties in the middle
6    district, just if you think of Elmore
7    County south.
8    A. That would be it, then.
9    Q. Okay. Could you tell me where they're
10    employed?
11    A. Okay. Michael does body and paint shop for
12    himself. John is medically retired.
13    Q. Okay.
14    A. Carolyn works -- I want to say for KIM2HM.
15    She does that water testing.
16    Q. Okay.
17    A. And Ethel, she is retired.
18    Q. Okay. Would that cover your wife's
19    siblings, too?
20    A. Okay. South. Okay. That would -- you
21    would take --
22    Q. We don't have to go as far as Mobile.
23    A. Okay. John Williams, he is a brickmason,

Page 22

1    self-employed, as is Richard Williams,
2    self-employed. Eli Williams, he's a truck
3    driver.
4    Q. Okay. If you can think of either
5    relatives' last names -- I don't want to go
6    through all cousins and everything, but
7    last names of relatives either by blood or
8    marriage just generally so we'll know kind
9    of that's in that area.
10    A. Most of my cousins, they live out of town.
11    Q. Okay. So not in this --
12    A. No, not in this area.
13    Q. What about with your wife?
14    A. She has a host of them in Ramer, and I
15    would hate to try to remember all those
16    names. Just the last names --
17    Q. Just last names.
18    A. Williams and Perrys. That would just about
19    take into account.
20    Q. Are you a member of any clubs or
21    organizations or churches in the Montgomery
22    area or south Alabama?
23    A. Yes.

Page 23

1    Q. Okay.
2    A. Organizations, CLAS, AEA. Montgomery East
3    Neighborhood Association. And churchwise,
4    I'm a pastor of a church.
5    Q. What church are you a pastor of?
6    A. Second Baptist Church.
7    Q. Here in Montgomery?
8    A. Yes, sir.
9    Q. All right. Have you pastored any other
10    churches besides Second Baptist?
11    A. One, First Baptist Church in Hope Hull,
12    about five years.
13    Q. All right. When you have had to hire
14    folks for positions in your schools, what
15    process have you -- or procedure have you
16    followed in hiring teachers and certified
17    employees?
18    A. Generally there is a list of names that you
19    can select from. You call an individual
20    in. You'll set up an interview time for
21    them to come. You talk with them and you
22    basically rank them in terms of one, two,
23    or three. One in my case would be the one

Page 24

1    that I would like to have. If for some
2    reason sometimes they're employed, you
3    write in a second or third choice.
4    Q. Okay.
5    A. And then you send the recommendation to the
6    elementary person in charge of hiring at
7    central office.
8    Q. In your years as a principal, how many
9    certified employees have you hired to work
10    at your schools?
11    A. Somewhere in the neighborhood of maybe five
12    to ten.
13    Q. Okay. Have you had anybody who was --
14    A. Need to say not hired, but recommended.
15    Q. Sure. I understand.
16    A. Because the board...
17    Q. Have you had anybody who is your first
18    choice to be hired not get hired?
19    A. Well, not so much not get hired, but I
20    think someone else had employed them prior
21    to me recommending their name. I've had
22    that to happen.
23    Q. Okay. Have you had any situation where the

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 25

1  school's central office administration has
2  said, no, I understand this is your first
3  choice, but you can't hire this first
4  choice?  Not that they're employed
5  somewhere else, but we disagree and you
6  can't take this person?
7  A.  No, sir, not to my knowledge.
8  Q.  Okay.  Has it been your observation that
9     the general practice in the school system
10    has been to go with the principal's first
11    choice if that first choice is available to
12    be hired?
13          MS. CARTER:  Object to the form.
14 A.  Well, that -- I don't want to say through
15    observation.  I don't want to just be that
16    wide open with my statement.
17 Q.  Right.
18 A.  But I will say that all I can do is
19    recommend a name.  What happens at the
20    central office, I don't get into that part
21    of it.
22 Q.  Sure.  But in the past -- and I'm sure
23    you've observed what has happened with

Page 26

1     people you've tried to employ as well as
2     probably other colleagues, principals as
3     well, or when you've worked as
4     administrative assistant at other schools.
5     Has it been your experience that the people
6     who are the first choice for the principal,
7     if they are available, are the ones
8     selected?
9          MS. CARTER:  Object to the form.
10 A.  Yes, sir.
11 Q.  Now, Mr. Lowe worked with you from 2000 --
12    fall of 2003 through the 2004 school year
13    and then the 2004-2005 school year; is that
14    correct?
15 A.  That's correct.
16 Q.  And that was at Daisy Lawrence?
17 A.  Yes, sir.
18 Q.  Was that work satisfactory?
19 A.  Yes, sir.
20 Q.  Did you have opportunity to perform
21    evaluations of Mr. Lowe's work?
22 A.  Yes, sir.
23 Q.  Were those evaluations accurate in your

Page 27

1     opinion?
2  A.  Yes, sir.
3  Q.  Were those satisfactory evaluations that
4     you performed?
5  A.  Yes, sir.
6  Q.  Or did he receive a satisfactory score in
7     those observations I guess is what I should
8     say.  Did he receive a satisfactory score?
9  A.  Yes, he did.  He did.
10 Q.  And the school system has implemented an
11    evaluation process that you are to go
12    through in evaluating school personnel,
13    don't they?
14 A.  That's correct.
15 Q.  Okay.  And that's a mixture of observations
16    and your experience with them during a
17    period of -- the period of their working
18    with you; is that correct?
19 A.  Yes, sir.
20 Q.  Tell me how Mr. Lowe came to work with you
21    in 2003.
22 A.  Okay.  There were a list of names, and his
23    name was on the list for reading coaches at

Page 28

1     that time.  And I called several people in
2     to come in and interview.  Mr. Lowe finally
3     consented when I got with him, consented,
4     came in, brought his portfolio.  And I
5     talked to I want to say three or four other
6     people at that time, and he proved to be
7     the best candidate for that.
8  Q.  Okay.
9  A.  And I submitted his name in to -- I want to
10    say Ms. Hicks at the time.  And it was
11    about -- I want to say some discussion
12    there.  I'm not real sure as to what was
13    going on.  I don't know whether Mr. Lowe
14    had to at that time be released from the
15    county where he was working and something
16    in that, but anyway, there was some
17    discussion going on.  And finally he came
18    on board late -- sometime late in October
19    of that year.
20 Q.  Once a school term begins, if a teacher is
21    on contract with a school system, they
22    can't just walk away from that contract
23    during the middle of the term; is that

Page 29

1    right?
2    A.  No, sir.
3    Q.  That school system has to let them out,
4    don't they?
5    A.  Yes, sir.
6    Q.  And if they just walk away, their
7    certificate is subject to discipline, isn't
8    it?
9    A.  Well, something can happen at the state
10    level.
11    Q.  Okay.  And so Mr. Lowe's school system that
12    he was at was going to have to release him
13    from that school system in order for him to
14    take the employment here in Montgomery?
15    A.  That would be correct.
16    Q.  Now, I think you said you got a list of
17    names for individuals for a reading coach
18    position.  Was that the way that position
19    was advertised was for a reading coach
20    position?
21    A.  Well, what it was, there were great talk --
22    and you have to understand, we go to
23    meetings all the time, and terminology and

Page 30

1    names are thrown around.  The schools were
2    supposed to have a reading coach, and you
3    can get a reading coach through several
4    means.  Title I, the state actually hires
5    coaches and puts them at the schools, and
6    central office has a lot to do with it
7    now.
8        My method at that time, Mr. Lowe's
9    moneys came through the general fund.  It
10    was not Title I.  We did not have a budget
11    that was sufficient to get a reading coach
12    at Daisy Lawrence.
13    Q.  But the position that he and the others
14    were being interviewed for was for a
15    reading coach position?
16        MS. CARTER:  Object to the form.
17    A.  Yes, sir.  To my knowledge, yes, sir.
18    Q.  Okay.  And was this going to be -- did you
19    know whether or not that would be a
20    nine-month or ten-month position?
21    A.  I told him that when he went down to the
22    central office that they would talk to him
23    about the length and term of the contract.

Page 31

1    Q.  Okay.  Were you -- were you not aware at
2    the time of whether it would be a nine or
3    ten?  Is that --
4    A.  I was looking at a nine-month contract.
5    Q.  You were thinking it would be nine months?
6    A.  Yes.
7    Q.  Okay.  Did y'all discuss at that point when
8    you were interviewing Mr. Lowe whether it
9    would be nine or ten months?
10    A.  We didn't.  Like I said, again, I told him
11    when he goes down to fill out the final
12    papers, fill out the papers, they would
13    discuss it better with him.  Then that way
14    it would only be monogamous in terms of
15    answer.
16    Q.  And I looked at an evaluation you did which
17    we have in the documents of Mr. Lowe, but
18    it lists him as a reading coach.  Is that
19    the duties he performed while at Daisy
20    Lawrence?
21        MS. CARTER:  Object to the form.
22    A.  He performed reading tutor duties.  Once
23    the clarification of the title -- Mr. Lowe

Page 32

1    and I talked when he came back, once he
2    met, had met with Mr. Barker in the central
3    office or whomever he met with, and said
4    that he was hired on for a reading tutor.
5    And I asked him at that time was he
6    satisfied with that, and he said that that
7    was the reason he left the other county for
8    a reading coach.  And I thought it was,
9    too, to be honest.
10    Q.  Okay.  Mr. Lowe had said that he left the
11    other county and turned his resignation in
12    because he thought he was coming to be a
13    reading coach?
14    A.  That's correct.
15    Q.  But he told you that he -- I guess
16    subsequent to resigning from that position,
17    he goes and meets with someone at the
18    central office, and they told him, no, he's
19    going to be a reading tutor; is that right?
20    A.  Reading tutor.  Yes, that's what he
21    reported.
22    Q.  But the actual duties or the job that
23    Mr. Lowe did, was it a reading coach job?

8 (Pages 29 to 32)

Page 33

1  A.  Well, we didn't have one, and Mr. Lowe came
2      in. His duties -- he had a list of
3      students that he would tutor. That would
4      be the phase of a reading tutor, to work
5      with students that teachers have identified
6      as struggling readers. Plus, we had
7      another program there that Mr. Lowe
8      assisted with, and his duties -- and part
9      of the way that I operate as administrator,
10     as other principals helped me along, we try
11     to enhance another person's duty or bring
12     them along as a leader. And that's
13     basically what Mr. Lowe and I tried to work
14     out.
15         There was a lot of things that he knew
16     about reading already. Either he did the
17     duties or I would have to -- had to do the
18     duties, so we kind of worked together. But
19     basically, he did everything except attend
20     the meetings. He could not attend the
21     meetings when they had a reading coach
22     meeting.
23  Q.  Okay. So he basically was performing those

Page 34

1      duties of a reading coach and a reading
2      tutor, but he couldn't go to the reading
3      coach meetings?
4  A.  No.
5  Q.  Was that --
6  A.  By virtue of his title.
7  Q.  But I've accurately summarized it; is that
8      right?
9  A.  Yes.
10 Q.  Is that correct?
11         MS. CARTER:  Object to the form.
12 A.  Yes.
13 Q.  Now, do you know if the central office
14     would send him materials or e-mails as if
15     he was a reading coach?
16 A.  Yes, sir.
17 Q.  Okay.
18 A.  He would get those. He would come in, we'd
19     discuss it as to the best route to approach
20     it.
21 Q.  Did you ever speak with anyone in central
22     office or the superintendent about why they
23     would want to call him a reading tutor

Page 35

1      instead of a reading coach?
2  A.  No, sir, I never did get into that. He
3      was -- after he came back from the meeting,
4      I thought maybe it was satisfactory, what
5      they had discussed. I did not usurp
6      anyone's authority and I didn't get into
7      Mr. Lowe's affairs after that. And later I
8      think he was hired as a reading coach at
9      Southlawn Elementary, I think, or something
10     if I'm not mistaken.
11 Q.  Okay. So he did some summer duty at
12     Southlawn as a reading coach position?
13 A.  Yes, sir.
14 Q.  Okay. Did anybody -- I know you didn't
15     inquire, hey, why didn't y'all -- why did
16     y'all call him this if he's doing that, but
17     did you ever get any kind of information
18     from anyone in administration or the
19     superintendent or from human resources
20     about why he was being treated -- going to
21     be called a reading tutor rather than a
22     reading coach?
23         MS. CARTER:  Object to the form.

Page 36

1  A.  No, sir.
2  Q.  Okay. Did you have any conversations with
3      Bullock County before Mr. Lowe came over?
4      Did you talk to any of the officials there?
5  A.  No, sir.
6  Q.  In 2004-2005, did you become aware that
7      Mr. Lowe had filed an EEOC complaint
8      against the Montgomery County Board of
9      Education?
10 A.  No, sir.
11 Q.  All right. Did you ever learn that he had
12     filed an EEOC complaint?
13 A.  I did.
14 Q.  All right. When was that?
15 A.  That was late. I can't exactly remember
16     the exact date, but school was -- I can't
17     even remember whether school was in or
18     school was out, it was so late.
19 Q.  Okay. Did you ever learn during the
20     2004-2005 school year that Mr. Lowe had
21     filed a lawsuit?
22 A.  No, sir.
23 Q.  Did you ever talk to Mr. Lowe about a

9 (Pages 33 to 36)

**Page 37**

1    lawsuit that he had filed with Montgomery
2    County Board of Education or an EEOC
3    complaint?
4    A.  No.
5    Q.  Never came up?
6    A.  No, sir.
7    Q.  Did you ever discuss with Mr. Lowe that --
8    or say anything, words to the effect that
9    he should not have filed a lawsuit against
10    Montgomery County Board of Education?
11    A.  No, sir.  I would be crossing a line.  No,
12    sir.
13    Q.  Or did you ever say anything to him that
14    anyone in administration had informed you
15    that he shouldn't have filed a lawsuit --
16    A.  No, sir.
17    Q.  -- or an EEOC complaint?
18    A.  No, sir.
19    Q.  Did you ever say anything to him that you
20    felt like that there were persons in the
21    administration of the school system that
22    had negative feelings about him?
23    A.  No, sir, I don't know that.  No, sir.

**Page 38**

1    Q.  Okay.  You never relayed anything to him
2    about either Mr. Barker was -- didn't like
3    him for some reason or that some other
4    school personnel may not like him for some
5    reason?
6    A.  No, sir.
7    Q.  In 2004-2005, did Mr. Lowe apply for leave
8    to attend a conference?
9    A.  I believe it was one down in Biloxi, I
10    believe it was.
11    Q.  Yes, sir.  And -- I was going to see if I
12    could find it quickly and let you take a
13    look at it.
14        Did you approve that leave?
15    A.  Yes, sir, that's my signature.
16    Q.  That's Exhibit 13.  All right.  And what
17    date did you approve it on?
18    A.  On -- according to this, 10/18/04.
19    Q.  10/18/04?
20    A.  Yes, sir.
21    Q.  Was this leave denied?
22    A.  It was by Mr. -- I think Mr. Barker signed
23    it.

**Page 39**

1    Q.  Okay.  Did you talk to Mr. Barker about the
2    denial of the leave?
3    A.  I did.
4    Q.  All right.  Did you get an explanation for
5    the denial?
6    A.  Mr. Barker is my superior, and if he writes
7    something, if he says something, I'm going
8    to pretty much follow that.
9    Q.  Sure.  I didn't mean to imply that you were
10    questioning or challenging him on it.  I
11    was just wondering if he ever said why he
12    denied it.
13    A.  No, he didn't.
14    Q.  Okay.  I guess you felt that it was an okay
15    thing for Mr. Lowe to do if you approved it?
16    A.  Yes.
17    Q.  And this was to speak at a function, a
18    seminar.  Did you feel like Mr. Lowe was
19    knowledgeable and could present himself
20    well enough at that seminar to speak at
21    that seminar?
22    A.  Yes, sir.  I'm trying to recall.  I think
23    it was in conjunction, too, with some class

**Page 40**

1    he was taking.  I can't remember exactly
2    all of the specifics of it, but that's --
3    that's basically it.
4    Q.  Okay.  Did Mr. Lowe apply for additional
5    leave for another seminar or conference?
6    A.  Yes, sir.  That's my signature there.
7    Q.  Okay.  And you approved that leave as well?
8    A.  Yes, sir.
9    Q.  But that leave was also denied, is that
10    right, by central office?
11    A.  Yes, sir.
12    Q.  Were you ever told why that leave was
13    denied?
14    A.  No, sir.
15    Q.  Did you have any other employees request
16    professional leave and development that
17    school year?
18    A.  Yes, sir.
19    Q.  All right.  Who would normally approve
20    or -- from the central office or deny that
21    leave?
22    A.  Mr. Barker or Ms. Hicks.
23    Q.  Okay.  Did you have any other employees

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of James C. Owens                    Lowe vs. MCBOE                    January 24, 2006

Page 41

1    whose leave was denied that year?
2    A.  It's hard to remember that.  It would be
3        hard to remember it because you're
4        generally talking about 25 to 30 per year.
5    Q.  Anything stand out as you sit here today?
6    A.  No.
7    Q.  Okay.  Did you have any leave that was not
8        approved that year for you personally?
9    A.  I don't think that year, but I've had some
10       denied, yes, sir.
11   Q.  Okay.  What situations were denied for
12       leave you wanted to take, do you remember?
13       Was it to speak at conferences or --
14   A.  I think I was going to attend a workshop on
15       mediation at the bar association.
16   Q.  And that got denied?
17   A.  Yes.
18   Q.  Okay.  Any others you can think of?
19   A.  I think that that's the most recent one.
20   Q.  Did you have any discussions with Mr. Lowe
21       about the denial of these leaves?  Do you
22       recall any of that?
23   A.  Any time they would send the information

Page 42

1    back to me, I would have two methods of
2    communicating with them:  One, I would
3    xerox a copy of the request, the initial
4    request form, and tell them that it was
5    approved or denied.  If they needed a sub,
6    it was approved, they would go ahead and
7    get a sub.  If it was denied, then I would
8    just tell them they can refer that to the
9    person that basically denied it.
10   Q.  All right.  Do you recall if any leave was
11       approved for Mr. Lowe in 2004-2005?
12   A.  I can't remember.
13   Q.  Do you recall ever any employees that went
14       a whole year and didn't get any kind of
15       leave of this nature for seminars approved?
16       MS. CARTER:  That worked for his
17           school?
18       MR. PATTY:  Well, that he knows
19           of, has personal knowledge.
20   A.  A whole year?
21   Q.  Yes, sir.
22   A.  No, sir, I couldn't recall that.
23   Q.  Okay.  Did you ever receive in the pony

Page 43

1    some documents regarding Mr. Lowe and a
2    reprimand at Southlawn Middle School?
3    A.  I did.
4    Q.  How did that come about?  How did you get
5        that?  Did you request it or --
6    A.  No, sir.  I don't know.  I just opened an
7        envelope.  It was no name on it.  Just --
8    Q.  Just showed up?
9    A.  Just addressed.  That was it.
10   Q.  So you had made no request for that
11       information?
12   A.  No, sir.  I was not aware of it.
13   Q.  Was that the first you had seen of that
14       letter of reprimand?
15   A.  Yes, sir.
16   Q.  Okay.  Did that surprise you to get that,
17       something from somebody's personnel file
18       just in the mail anonymously like that?
19   A.  It's kind of unusual.
20   Q.  I wouldn't expect that happens very often,
21       right?
22       What did you do regarding that?
23   A.  We had maintained a personnel folder on the

Page 44

1    faculty, and we put that in it.
2    Q.  Okay.  Did you ask Mr. Lowe about it, I
3        mean, why were you getting this?
4    A.  I didn't get into it.  I mentioned to him,
5        but we didn't discuss it.  I didn't want to
6        hear anything concerning that.  I was just
7        interested in him doing the work that he
8        was hired to do.
9    Q.  Did you talk to anyone at human resources
10       about your receiving those documents?
11   A.  No, sir.
12   Q.  Did anyone ever come to you and say, I'm
13       the one that sent it to you?  Do you have
14       any idea who sent it to you?
15   A.  I didn't -- I didn't go parading that
16       around.  I just put it in the file and I
17       just --
18   Q.  Sure.
19   A.  -- left it there.
20   Q.  But you had not requested anything like
21       that from the central office?
22   A.  No, sir.
23   Q.  Do you remember roughly when that was that

11 (Pages 41 to 44)

Page 45

```
1        you got those documents?  It was in his
2        first year working with you, his second
3        year?
4    A.  It was in his first year.
5    Q.  Okay.  Middle of the year, beginning, end?
6    A.  I can't remember the exact period in the
7        year, but it was -- I want to say about two
8        months after he was on board the first year.
9    Q.  Okay.  Have you had any discussions with
10       Mr. Lowe about his lawsuit or EEOC
11       complaint at all?
12   A.  No, sir.  I don't know the contents of it
13       or anything.  No, sir.
14   Q.  Okay.  And you've never said to him that
15       the board or Dr. Purcell is not going to
16       like that lawsuit or that EEOC complaint?
17   A.  No, sir.
18   Q.  Never said that he shouldn't have filed
19       it?
20   A.  No, sir.
21   Q.  Did you give Mr. Lowe a letter of
22       recommendation to --
23   A.  Yes, sir.  He has requested I want to say
```

Page 46

```
1        one or two letters of recommendation from
2        me.
3    Q.  And you wrote those?
4    A.  Of course.  Sure.
5    Q.  Okay.  Now, during the summer of 2005, did
6        you have any contacts with Mr. Lowe?
7    A.  During the summer?
8    Q.  Yes, sir, this past summer.
9    A.  Only time I talked with him is after I got
10       on board at Paterson, and I found that the
11       reading scores were low, and I found out
12       that he was not working.  I talked to him
13       to see -- to find out whether he was
14       working, and if so, would he be interested
15       in working there because I had that
16       position.  I was trying to get it approved,
17       and once I got it approved, I was going to
18       call him in for an interview.
19   Q.  Did you contact Mr. Lowe for that position?
20   A.  I did.
21   Q.  Okay.  And it was a reading coach position?
22   A.  Yes, sir.  We created one for four through
23       six.
```

Page 47

```
1    Q.  And this was a job that the duties he had
2        satisfactorily carried out for you for two
3        years; is that right?
4            MS. CARTER:  Object to the form.
5    A.  Yes.
6    Q.  Okay.  Based upon his performance in that
7        job previously, you felt like he would be a
8        good candidate for this job at Paterson?
9    A.  Yes.
10   Q.  Okay.  And tell me what happened.  Did you
11       contact him first, or did you go to the
12       board and say, I want to contact Mr. Lowe,
13       or how did that work?
14   A.  Well, first what you have to do is
15       determine your needs.  You have to go
16       through Title I.  You have to sit down with
17       the person that works with your school.
18       You go through your budgetary concerns.
19       You see whether or not you can entertain
20       the motion of having a reading coach.
21           There was three positions that I was
22       looking for at that time:  Reading coach,
23       math tutor, and a writing tutor.  Those
```

Page 48

```
1        were the primary concerns of Paterson at
2        that time.  And you have to do a hire form,
3        and from there the persons in Title I would
4        go through Dr. Gwinn, which is director,
5        and from there we have an office downtown
6        in the federal programs.  Mr. Dobbins is
7        over that.  And sometimes -- I'm not real
8        sure when it gets downtown whether it's --
9        when it's coming from Title I, whether it
10       goes through Mr. Barker or just the special
11       fund and the AR coaches.  It gets kind of
12       funny down in there where -- when it comes
13       down to that, so I don't want to go too far
14       on that one.
15   Q.  When Mr. Lowe worked with you previously,
16       y'all have to -- don't y'all have to code
17       jobs for your funds and stuff?  Don't you
18       have to code what job each employee is
19       doing so that you get the moneys back from
20       the state?
21   A.  Well, that would be done downtown.
22   Q.  Okay.  Well, did you know when Mr. Lowe
23       worked with you at Daisy Lawrence how he
```

12 (Pages 45 to 48)

Deposition of James C. Owens    Lowe vs. MCBOE    January 24, 2006

Page 49

```
 1        was coded, if he was coded a reading coach,
 2        reading tutor, teacher?  Do you know how he
 3        was coded at all?
 4   A.   No.  Once he came on board, his official
 5        title would have to be what he discussed
 6        with the person downtown.
 7   Q.   Right.
 8   A.   And it was reading tutor, and that's what
 9        that had to be.
10   Q.   But do you know how he was coded for budget
11        purposes with the school system?
12   A.   No, sir.  That would have been coming from
13        out of finance.
14   Q.   All right.  Now, let's back up or go back
15        where we were.  After you had I guess
16        gotten the positions approved, did you have
17        a reading coach, math tutor, and writing
18        tutor all approved?  All three of those
19        slots approved?
20   A.   Yes, sir.
21   Q.   And did you hire personnel for all three of
22        those slots at your school?
23   A.   Yes, sir.
```

Page 50

```
 1   Q.   Now, did you consider Mr. Lowe for the
 2        writing tutor or math tutor positions?
 3   A.   Generally, when I looked at those
 4        positions, I was looking at a part-time
 5        person that would come in.  I specifically
 6        asked about the reading coach position.
 7   Q.   Okay.  So the math tutor and writing tutor
 8        are part-time jobs?
 9   A.   Right.
10   Q.   All right.  Now, going to the reading coach
11        position, once that -- when was that
12        position approved for filling by the school
13        system?
14   A.   I want to say in September, early September.
15   Q.   In early September?
16   A.   Prior to the 15th.
17   Q.   Okay.  You say you contacted Mr. Lowe.
18        When did you contact him about filling that
19        position?
20   A.   I want to say around the 25th of August,
21        somewhere near the end of August, somewhere
22        down there at the end.
23   Q.   Did you keep a file regarding that
```

Page 51

```
 1        position, like the people you talked to,
 2        your conversations with Mr. Lowe,
 3        conversations with central office, just
 4        anything you had relative to that position?
 5   A.   I generally will keep the information that
 6        the person will bring in to me.
 7   Q.   Sure.
 8   A.   I have his folder.
 9   Q.   Okay.  Do you keep notes of your contacts?
10        Say, if you talk to Mr. Lowe or if you talk
11        to someone at central office regarding that
12        position, do you keep notes on those?
13   A.   I think only -- I contacted central office
14        once or twice, and I think I did it via
15        e-mail.
16   Q.   Would you still have copies of those
17        e-mails?
18   A.   Sure.
19   Q.   Okay.  Did you ever write the central
20        office a letter or anything regarding
21        Mr. Lowe?  Not just an e-mail, but a --
22   A.   No.
23   Q.   Okay.  So any written materials you would
```

Page 52

```
 1        have for that job would either be your
 2        e-mail that you sent to the central office
 3        or materials that a candidate might have
 4        brought in to give you?
 5   A.   Right.
 6   Q.   Okay.  You say you contacted Mr. Lowe
 7        August 25th?
 8   A.   Somewhere in that neighborhood.  The last
 9        weekend after I had looked at the budgetary
10        concerns and assessed the problems there
11        with a team of people at the school, we
12        found those would be the greatest needs and
13        the best ways to spend those moneys.
14   Q.   Did you ask the central office if they had
15        a list of people for possible -- for that
16        possible position prior to contacting
17        Mr. Lowe?
18   A.   No, I didn't.
19   Q.   Okay.  In handling personnel hirings in the
20        system before, if a principal knows about a
21        particular candidate being available or
22        someone who may be qualified for that
23        position, is there anything wrong with that
```

13 (Pages 49 to 52)

Page 53

1  principal contacting that individual to see
2  if they've got any interest in the
3  position?
4        MS. CARTER: Object to the form.
5  A.  Well, basically, what you try to do, and
6  the reason I contacted him primarily is
7  because he had worked with me previously.
8  Q.  Sure.
9  A.  And I was trying to make sure that the
10  individuals that worked with me previously
11  had a job if I could help them in any way.
12  Q.  Sure.
13  A.  And that's why I called him up.
14  Q.  Okay.  But there was nothing inappropriate
15  in your working here at Montgomery County
16  Board of Education for you to do that?
17  A.  No, sir.  Because if he was on the list
18  once, they had not taken him off the list.
19  Q.  Sure.  Okay.
20        Now, you met with -- you called
21  Mr. Lowe.  Can you tell me about that
22  conversation, what you recall.
23  A.  I just asked him, I said, are you working

Page 54

1  now?  And he said, no.  I said, well, I may
2  have something available if the board
3  approves it.  So I said, you need to get
4  your resume and any other materials.  I
5  treated him just like -- even though I had
6  worked with him, I treated him just like a
7  first-time candidate.
8  Q.  Do you know if all the other folks that
9  worked at Daisy Lawrence with you got
10  employed?
11  A.  I'm not real sure of everyone.  There was
12  one person that still had not been hired in
13  August, Mr. Brown, and I wrote the
14  superintendent a letter trying to get him
15  hired for behavior person.  I did not know
16  at the time that Mr. Lowe was not hired.
17  Q.  What position did Mr. Brown have?
18  A.  He was a behavior interventionist.
19  Q.  Is he certified?
20  A.  Yes, sir, he was certified.
21  Q.  Certified?
22  A.  Yes.  But he was ultimately hired at
23  Lanier, and that's why I couldn't --

Page 55

1  Q.  To your knowledge, is there anybody on
2  staff, that was on your staff at Daisy
3  Lawrence other than Mr. Lowe that has not
4  been rehired by the school system?
5  A.  Only one, and I ran into her lately.  She
6  works with the school system as a
7  part-time, Chastity Williams.  She was an
8  aide.  She did not get full time.  But
9  certified, I think that he may be the only
10  one that's not hired.
11  Q.  So all certified folks except for Mr. Lowe
12  got rehired; is that correct?
13  A.  To my knowledge, yes.
14  Q.  And the only person in the noncertified
15  category would be a lady who's an aide --
16  who was an aide; is that right?
17  A.  Yes.
18  Q.  And she's now working part time?
19  A.  Right.
20  Q.  Okay.  How many folks did you have work
21  with you at Daisy Lawrence?
22  A.  I want to say it was about 25.
23  Q.  Okay.  At the end of the school year, is it

Page 56

1  the practice that the principal will turn
2  in names to the superintendent of the
3  nontenured teachers that they think should
4  be renewed or nonrenewed for the upcoming
5  year?
6  A.  Yes, sir, we have such a practice.
7  Q.  If Daisy Lawrence had not closed, would you
8  have had a recommendation regarding
9  Mr. Lowe, either to nonrenew him or renew
10  him?
11  A.  I would not have offered to tender a
12  nonrenewal notice to him, no, sir.
13  Q.  You would not have nonrenewed?
14  A.  Would not have, no, sir.
15  Q.  You would not have nonrenewed him?
16  A.  No, sir.
17  Q.  Okay.  I was just trying to make sure.
18        Now, going back to -- you have a
19  meeting with -- you have a conversation
20  with Mr. Lowe, talk to him.  Do you
21  remember anything else in that conversation
22  that y'all talked about?
23  A.  No, sir, that was basically the extent of

14 (Pages 53 to 56)

Page 57

1    it. That he needed to get his resume and
2    any other materials that he wanted me to
3    consider, because he was not going to get
4    any preferential treatment. It was just a
5    matter of wanted him to have equal
6    opportunity and a chance to be employed.
7    Q. Okay. And did he get that material to you?
8    A. He did. He brought it over.
9    Q. All right. In that interim, did you look
10   at --
11       How much time lapsed with that? You
12   talked to him. Did he get the material in
13   the next day?
14   A. He got his material in within a day or two.
15   Q. Okay. In that time frame of you talking to
16   him and then getting his material in, did
17   you talk to anybody else about that
18   position?
19   A. Didn't talk to anybody else about that --
20   in that position at that time, no, sir.
21   Q. Did you talk to anybody in central office
22   about that position?
23   A. No, sir.

Page 58

1    Q. Okay. He gets his materials in to you.
2    Did he interview with you after he turned
3    his materials in?
4    A. Right. I set up an interview for him. I
5    didn't interview him the same day he
6    brought the materials in. I set up an
7    interview for him and told him I'd like to
8    talk with him, see was he still interested,
9    see had anything changed on his vitae or
10   anything of that nature. And I told him
11   that I felt he could fit in at
12   Paterson, and I recommended him down -- as
13   first on the hire form, and then I
14   recommended him down to the central office.
15   Q. Okay. So you've gotten the materials in.
16   Do you remember anything, any conversation
17   when he dropped the materials off that you
18   had with him?
19   A. No conversation. I just gave him an
20   appointment and he came back and I
21   interviewed him.
22   Q. When he came back for the appointment, you
23   conducted an interview with him?

Page 59

1    A. Yes.
2    Q. Did he do a good job on the interview?
3    A. I think, yes.
4    Q. How many people have you interviewed for
5    positions to hire?
6        MS. CARTER: Object to the form.
7    A. About five to 10.
8    Q. Have you sat in on committees before of
9    people being interviewed?
10   A. No, sir.
11   Q. So you've never had to do any other
12   committees for -- in your position as
13   administrative assistant?
14   A. Well, we did sit in on some during that
15   time, but the principal basically made the
16   recommendation.
17   Q. Sure. How many interviews do you think as
18   administrative assistant you would have
19   been involved in just in your 12 years?
20   A. Hard to say.
21   Q. A bunch?
22       MS. CARTER: Object to the form.
23   A. Yes.

Page 60

1    Q. A bunch, a lot of them?
2    A. Just sit in on them, yes, sir, and listen
3    to the candidate. But the principal made
4    the --
5    Q. Sure. Okay. And did Mr. Lowe do a good
6    job in his interview with you?
7    A. I say he did.
8    Q. Okay. And after that interview, did you
9    make a recommendation to the central office
10   to hire Mr. Lowe?
11   A. To central office, yes, sir.
12   Q. You said there's a form you fill out?
13   A. Hire form, yes, sir. That's with Title I.
14   You have to do that prior to make sure that
15   the budgetary concerns are in order before
16   you can hire a person.
17   Q. Okay. And you say it has a place to list
18   as your first preference?
19   A. No, not on the hire form. The hire form
20   you put the person's name down that you
21   would like to hire.
22   Q. Okay. Did you submit any other names at
23   that time except for Mr. Lowe's?

15 (Pages 57 to 60)

Page 61

1   A. No, not at that time.
2   Q. All right. At the time you submitted
3      Mr. Lowe's name, had you interviewed
4      anybody else?
5   A. I hadn't interviewed anyone else. I had a
6      couple of people in mind, but I hadn't
7      interviewed them yet. And when I sent his
8      nomination in, Mr. Barker ultimately called
9      me and said that he would like for me to
10      talk to some other candidates. Of course,
11      I was cordial. I said sure.
12   Q. Okay.
13   A. And I was sent three names -- not real sure
14      whose name was on the e-mail, but sent
15      three candidates. I contacted them
16      personally or my secretary contacted them,
17      and from there we scheduled them to be
18      interviewed.
19   Q. Did Mr. Barker tell you why you needed to
20      talk to these other three candidates?
21   A. No, not to my knowledge, he didn't. He
22      just said that he wanted me to talk to some
23      more candidates.

Page 62

1   Q. When you were having the --
2      Now, to get the reading coach position
3      approved, you couldn't do that on your own,
4      right?
5   A. No, sir.
6   Q. Somebody --
7   A. The board has to approve all personnel
8      action.
9   Q. Once that position was approved, did
10      anybody instruct you that you had to go
11      through any special process or unique
12      process for hiring reading coaches?
13         MS. CARTER: Object to the form.
14   A. No, sir.
15   Q. When you hired Mr. Lowe and interviewed him
16      before back in 2003, did anybody tell you
17      when you -- that you needed to go through
18      any kind of special process to interview
19      and hire reading coaches?
20         MS. CARTER: Object to the form.
21   A. No, sir.
22   Q. Okay. And have you hired any other -- have
23      you hired reading coaches before this or --

Page 63

1      have you had any other reading coaches
2      besides these two positions that you've
3      hired?
4   A. Well, the reading coach actually is a new
5      position.
6   Q. Okay.
7   A. It's -- I mean, it's only been out maybe
8      three or four years in this area.
9   Q. Okay.
10   A. So it's not something that's been long
11      standing.
12   Q. Okay. Did anyone at any point tell you
13      that in order to hire a reading coach, a
14      reading coach must have a certain rating or
15      ranking from a committee?
16   A. No, sir.
17   Q. Okay. All you were told by Mr. Barker was,
18      here, talk to these three other candidates?
19   A. Not by him specifically. Ms. Mizelle would
20      be tendering some names.
21   Q. Okay.
22   A. She tendered some names, three of them.
23   Q. Okay. So Mr. Barker told you that

Page 64

1      Ms. Mizelle would be tendering some names
2      to you?
3   A. Yes.
4   Q. Okay. Did you feel like anything that you
5      did in that process up to that point was
6      inappropriate or wrong?
7   A. No, sir.
8         MS. CARTER: Or what?
9         MR. PATTY: Or wrong.
10   Q. Did you feel like anything that you were
11      doing in interviewing Mr. Lowe and
12      recommending his name was out of line with
13      what your experiences had been in the
14      Montgomery school system?
15         MS. CARTER: Object to the form.
16   A. Well, you know, a little bit. Generally,
17      you know, didn't get that much static
18      behind it. You either do it and they --
19      meaning the board -- approves it. The
20      person you send the name in to, they would
21      tender it up to the superintendent, the
22      superintendent then would put it on the
23      personnel action, the board vote it up or

16 (Pages 61 to 64)

Page 65

1  down.
2  Q.  Okay.  So normally you would submit a name
3      like Mr. Lowe's, and he would go to the
4      board and the board would vote it up or
5      down, basically, is how it worked; is that
6      correct?
7  A.  That's correct.
8  Q.  And in this situation, instead, you got
9      told you need to talk to these other
10     people; is that right?
11 A.  That's correct.
12 Q.  And Connie Mizelle would let you know --
13         MS. CARTER:  Can you answer
14             out loud?  I'm sorry.  I don't
15             want to stare at you when
16             you're talking, and I can't
17             hear what you're saying.
18         THE WITNESS:  I'm sorry.
19 Q.  Three additional names that you got from
20     Connie Mizelle were -- Strike that.
21         The three names you got from Connie
22     Mizelle, was Mr. Lowe's name in that list?
23 A.  His name was not in that list.

Page 66

1  Q.  All right.  Did they mention Mr. Lowe in
2      that list of three names at all?
3  A.  No, sir.
4  Q.  When you got that list, did you interview
5      those three people?
6  A.  Yes, sir.
7  Q.  And did you subsequent to interviewing
8      those three people make a recommendation as
9      to who you wanted to hire?
10 A.  Yes, sir.
11 Q.  All right.  Who did you recommend?
12 A.  I recommended Mr. Lowe again.
13 Q.  Okay.  And was that based upon your years
14     of experience and training and work as a
15     principal and administrative assistant that
16     you felt like he was the best candidate for
17     that job?
18         MS. CARTER:  Object to the form.
19 A.  Yes, sir.  In looking at the material that
20     was brought and the questions that had been
21     put forth, I thought he was.
22 Q.  And based upon the interviews you
23     conducted, was that part of your

Page 67

1  consideration?
2  A.  Yes, that was.  Yes.
3  Q.  Now, after you made -- Did you make that
4      recommendation in writing?  Was it an
5      additional form that you submitted?
6  A.  E-mail.
7  Q.  E-mail?
8  A.  Yes.
9  Q.  Did you say in that e-mail, I want to -- I
10     still would like to hire Mr. Lowe, or what
11     did you --
12 A.  I can't remember the exact wording, but
13     Mr. Lowe was the first choice.  And I think
14     subsequent to that, I said that my second
15     choice would be another person.
16 Q.  Okay.  Who was your second choice, do you
17     remember?
18 A.  Yes.
19 Q.  Who was that?
20 A.  Ms. Freeny.
21 Q.  Ms. Freeny.
22         Now, in this e-mail that you sent, did
23     you put your first and second choice in

Page 68

1  that e-mail or did you just put Mr. Lowe
2  and then later gave them Ms. Freeny's
3  name?
4  A.  I want to think that I put both on the --
5      I'm not absolutely sure on that.
6  Q.  Okay.  Would you still have that e-mail, do
7      you think?
8  A.  I think, yes.
9  Q.  Now, what was the response you received
10     from that e-mail?
11 A.  I didn't get a response.  It was a few
12     weeks, couple of weeks.
13 Q.  Did you make inquiries about what was going
14     on?
15 A.  I called to Ms. Winborne and called
16     Mr. Barker once or twice.  And after
17     about -- I want to say a couple of weeks, I
18     went down just to see where we were because
19     time was of essence, especially with your
20     student population.  And I didn't talk to
21     Mr. Barker, but I talked to Ms. Winborne.
22     She works with the elementary.  And she
23     didn't elaborate, but she just said -- I

17 (Pages 65 to 68)

Page 69

1  just asked the question, well, will I be
2  able to hire Mr. Lowe? And she said no.
3  And I just left the office and just pursued
4  my second choice.
5  Q.  Did she give you any explanation why you
6  couldn't hire Mr. Lowe?
7  A.  No, she didn't offer any comment, and I
8  didn't press her on it. I was just
9  thankful that she saw me when I came. I
10  came down kind of unannounced, just to see
11  what...
12  Q.  All right. And did you ever get an
13  explanation from administration why you
14  couldn't hire Mr. Lowe?
15  A.  No, sir.
16  Q.  Okay. Do you know of any reason why you
17  couldn't hire Mr. Lowe?
18        MS. CARTER: Object to the form.
19  A.  No, sir.
20  Q.  Do you have any opinion why you were not
21  allowed to hire Mr. Lowe?
22  A.  That's subjective, and I just don't want to
23  get into that.

Page 70

1  Q.  Well --
2  A.  Not to my knowledge, I --
3  Q.  Sure. And it may not be admissible into
4  evidence, but I can -- it's discovery, and
5  if you have an opinion, I'd like to know
6  what you think the reason was.
7  A.  I really don't know.
8  Q.  Okay. Was the delay in getting a response
9  back from the board about your choice of
10  Mr. Lowe unusual?
11  A.  It was. Generally you can make your
12  recommendation today, and maybe tomorrow or
13  the next day, the person can actually come
14  on board.
15  Q.  Had you ever had somebody that they just
16  tell you no, you can't hire this person?
17        MS. CARTER: Object to the form.
18  A.  No, sir.
19  Q.  All right. How did you pursue your second
20  choice?
21  A.  I made -- via e-mail. I made a
22  recommendation, and it was about -- I want
23  to say a week or so, maybe less

Page 71

1  afterwards. I talked to Ms. Winborne, and
2  she e-mailed me back. I had her first name
3  wrong. It's Eleanor. I had Brenda instead
4  of Eleanor. And once she found that out, I
5  said thank you through e-mail, and she
6  contacted Ms. Freeny and about two weeks
7  after they found a replacement -- two to
8  three weeks, and she joined the staff.
9  Q.  Okay. Was school ongoing while you were
10  waiting for a response?
11  A.  Yes, sir.
12  Q.  Okay. Was school ongoing when you put in
13  to hire Mr. Lowe?
14  A.  Yes, sir.
15  Q.  Okay. How long had school started up when
16  you first requested -- I guess maybe a
17  better question would be, when did your
18  school year begin this year?
19  A.  Around the first -- around the 10th -- I
20  want to say around the 10th of August. And
21  it was about -- like I say, about the 25th
22  before I contacted them. The budgeting
23  process took priority there, to make sure

Page 72

1  that we could do what I wanted to do and
2  the others on the committee. So it was
3  about two weeks after school -- two to
4  three weeks after school had started.
5  Q.  Okay. And you've told me that it's a
6  school that needs improvement in reading;
7  is that right?
8  A.  Yes, sir.
9  Q.  So it was very important and vital that you
10  get this position filled quickly, wasn't it?
11  A.  Yes, sir.
12  Q.  And you certainly I imagine wanted to have
13  the best person you could have there with
14  that position, didn't you?
15        MS. CARTER: Object to the form.
16  A.  Yes, sir.
17  Q.  After you had indicated you would take
18  Ms. Freeny --
19  A.  Yes.
20  Q.  -- how long did it take for her to be
21  approved?
22        MS. CARTER: Object to the form.
23        Asked and answered.

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

**Page 73**

1  Q.  Go ahead.
2  A.  You have -- she was already employed by the
3      board, so you're talking about two to three
4      weeks.
5  Q.  Okay.  How long did it take her to come on
6      board as a reading coach?
7  A.  Two to three weeks.  She was holding down a
8      teaching slot at another school, and they
9      had to advertise her position first before
10     she could be released.
11 Q.  All right.  Did they let you know, though,
12     when she was cleared to be hired for that
13     position after you said, okay, I'll take
14     Ms. Freeny if I can't have Mr. Lowe?
15 A.  Well, my conversation with Ms. Winborne,
16     that she would be hired.
17 Q.  Okay.
18 A.  I didn't know a specific date.
19 Q.  Okay.  You just -- you were just told that
20     she would get it.  I guess immediately
21     after you said, I'll take Ms. Freeny if I
22     can't have Mr. Lowe, you were told, okay,
23     Ms. Freeny would be hired?  Is it basically

**Page 74**

1      how --
2  A.  Not quite that way.
3  Q.  Okay.
4  A.  I had to send the name in, so you're
5      talking about two or three days afterwards.
6  Q.  Okay.
7  A.  And that she would contact Ms. Freeny to
8      see if she was still interested in the
9      job.
10 Q.  So it was in two or three days after you
11     said you'd take Ms. Sweeney that you were
12     told she would be hired?
13 A.  Not that she would be hired, but that she
14     would contact her to see if she was still
15     interested in the job.  Because you're
16     looking at maybe three weeks in between
17     that.
18 Q.  Okay.  How long after Ms. Sweeney said she
19     was interested and would take the job was
20     it that she was -- that you were told that
21     she would be hired?
22 A.  As soon as possible.
23 Q.  Okay.

**Page 75**

1      MS. CARTER:  What's her name?
2      THE WITNESS:  Eleanor Sweeney --
3      Freeny.
4      MR. PATTY:  Freeny.  I'm sorry.
5      MS. CARTER:  Freeny.  Well, I
6      started reading something, and
7      I thought we were either on a
8      different job --
9      MR. PATTY:  I'm sorry.
10 A.  Eleanor Freeny.
11 Q.  All right.  Have you ever had someone that
12     you hired who had to obtain an emergency
13     certificate or alternative certificate?
14 A.  No, sir.
15 Q.  Okay.  Never had that come up?
16 A.  No, sir.  I wouldn't do that.  No, sir.
17 Q.  Did anyone try to say anything directly to
18     you to try to dissuade you from hiring
19     Mr. Lowe?
20 A.  No, sir.
21 Q.  Just told you, you can't hire him?
22     MS. CARTER:  Object to the form.
23     I don't think he testified

**Page 76**

1      that he was told that.
2      THE WITNESS:  No.
3  Q.  You couldn't hire him.
4      MS. CARTER:  Object to the form.
5      I don't think he testified to
6      that either.
7  A.  No.  I just asked again whether I could
8      hire Mr. Lowe, and she said no, and that
9      was it.
10 Q.  Okay.  You asked if you could hire
11     Mr. Lowe.  She said no.  Okay.  Did
12     anybody -- other than that comment, did
13     anyone try to dissuade you from hiring
14     Mr. Lowe?
15 A.  No, sir.
16 Q.  Okay.  Has anyone at the board ever
17     expressed any -- with administration --
18     any negative feelings about Mr. Lowe to
19     you?
20 A.  Not to my knowledge, no, sir.
21 Q.  Okay.  Do you think you were qualified to
22     make the decision about whether or not to
23     hire Mr. Lowe for the reading coach?

19 (Pages 73 to 76)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 77

1           MS. CARTER:  Object to the form.
2    A.   I wouldn't approach it in that way.  It has
3         to do with the chain of command, and you
4         have to make your recommendation.
5    Q.   Sure.
6    A.   And the central office through Mr. Barker's
7         office can make adjustments.
8    Q.   Okay.  And I guess I'm -- I understand
9         that chain of command, and I'm not really
10        asking who has the authority.  But in doing
11        what you were doing, in making interviews
12        and making decisions about what employees
13        to recommend for hiring, do you feel like
14        your experience and training and your work
15        in the school system, you had the
16        qualifications to make that kind of
17        recommendation?
18           MS. CARTER:  Object to the form.
19    A.  Only thing I can say is inherent with the
20        authority as principal, you can make
21        recommendations for personnel.
22    Q.  Sure.
23    A.  But whether they be hired or not...

Page 78

1    Q.   I understand.  I understand.
2         Have you ever been told by Mr. Barker
3         or anyone in human resources that you
4         needed to hire a woman?
5    A.   No, sir.
6    Q.   Have you ever been told that you needed to
7         have more diversity in your staff or get
8         more women involved in your staff, you had
9         too many men, anything like that?
10   A.   No, sir.
11           MR. PATTY:  I may be just about
12        done.
13           MS. CARTER:  Take a little break?
14        (Brief recess.)
15           EXAMINATION
16   BY MS. CARTER:
17   Q.   Dr. Owens, when you were the principal at
18        Daisy Lawrence, did you have more women or
19        male teachers there?
20   A.   Had more female teachers.
21   Q.   Okay.  You wouldn't have needed to hire
22        women to balance your staff, would you?
23   A.   No.

Page 79

1    Q.   If you were trying to balance or the
2         Montgomery public school was trying to
3         balance, they would have told you to hire
4         men?
5           MR. PATTY:  Object to the form.
6    A.   More men.
7    Q.   But you were never told that you had to
8         hire one gender or another under any
9         circumstance; is that correct?
10           MR. PATTY:  Object to the form.
11   A.   That's correct.
12   Q.   I think Mr. Patty asked you about this.  Is
13        it your recollection that you never were
14        told by Jimmy Barker that the reason that
15        you needed to re-interview candidates was
16        because Mr. Lowe had not been highly
17        recommended out of the committee?
18           MR. PATTY:  Object to the form.
19   A.   That's correct.
20   Q.   You just don't remember that?
21   A.   I do not remember him saying that.
22   Q.   Do you know for a fact that he didn't tell
23        you that, or are you just saying you don't

Page 80

1         remember that conversation?
2           MR. PATTY:  Object to the form.
3    A.   I just don't remember that part of the
4         conversation.
5    Q.   Okay.  Did you communicate with Mr. --
6         Mr. Barker was the person who told you
7         that you needed to talk to additional
8         people, correct?
9    A.   That's correct.
10   Q.   But he's not the person who gave you the
11        names of those people to talk to?
12   A.   I can't be sure who sent the e-mail out.  I
13        don't want to say that -- I don't think his
14        name was on it.  I believe it was Connie
15        Mizelle.
16   Q.   Okay.  And she forwarded the names of
17        individuals?
18   A.   Via e-mail.
19   Q.   So it's your testimony that you just don't
20        know where they got those three names of
21        people, then?
22           MR. PATTY:  Object to the form.
23   Q.   Those three names?  That there was no

20 (Pages 77 to 80)

Page 81

1  communication with you about who those
2  people were?
3  A. No. I didn't know either one until I
4  interviewed them.
5  Q. And just to be clear or so I'm clear, when
6  you recommended -- when you initially
7  recommended Mr. Lowe, you didn't interview
8  anybody else for the job?
9  A. That's correct.
10  Q. And you did not have any communication with
11  the office of curriculum and instruction
12  about individuals that had been interviewed
13  for coaching positions?
14  A. No, ma'am.
15  Q. Okay. So you had -- so I guess at that
16  point, isn't it fair to say that you didn't
17  know whether Melvin Lowe had even been
18  interviewed by them?
19      MR. PATTY: Object to the form.
20  A. Well, his name was on a list. Reading
21  coaches were interviewed, and his name had
22  not been taken off the list
23  Q. From the year before?

Page 82

1  A. Yes, ma'am.
2  Q. Okay. All right. Is it correct that
3  professional development budgets are based
4  on per school? For example, if I worked
5  for you as a teacher and I get to go on a
6  professional development trip, it comes out
7  of that school's budget?
8  A. That's correct.
9  Q. And is it also true that that budget is
10  based on the number of teachers the school
11  has?
12  A. That's correct.
13  Q. And is it fair to say that Daisy Lawrence
14  had a very, very small staff of teachers
15  compared to other schools?
16  A. Right. That would be around 13 or 14
17  certified staff.
18  Q. Okay. I want to show you what's been
19  marked by the plaintiff's attorney or by
20  Mr. Lowe's attorney as Plaintiff's Exhibit
21  5.
22      MS. CARTER: I'll represent on the
23  record that during the break,

Page 83

1  I showed Mr. Owens that
2  Plaintiff's Exhibit 5 and
3  asked him to review it.
4  Q. When I showed you that exhibit during the
5  break, is that the first time you had ever
6  seen that e-mail?
7  A. It is.
8  Q. Okay. And this e-mail is dated June 22nd,
9  2005; is that correct?
10  A. 22nd, yes, 2005.
11  Q. And in your review of this e-mail, were
12  there any statements made by Mr. Lowe in
13  this e-mail about you or about
14  conversations he had with you that you
15  believe are untrue?
16  A. Yes. I don't know why they are there, but,
17  you know, they are. It's a written
18  communication.
19  Q. Did you ever tell him that he was never
20  going to have a chance in the school system
21  unless he got rid of his Mercedes and
22  changed his dress code?
23  A. No, ma'am.

Page 84

1  Q. Did you ever tell him that you had been
2  told by Mr. Barker or anybody else that he
3  was not going to be hired back in the
4  school system because he filed his lawsuit?
5  A. No, ma'am.
6  Q. Did you ever tell Mr. Lowe that Daisy
7  Lawrence was closed because of him?
8  A. No, ma'am.
9  Q. Did you tell him that he had caused your
10  career to suffer?
11  A. No, ma'am.
12  Q. Did you ever have any conversations with
13  Mr. Lowe wherein you questioned his
14  credibility or self-worth to him?
15  A. No, ma'am. I think he's a very nice
16  person.
17  Q. Okay. In reviewing this e-mail, sitting
18  here today, are you surprised that he said
19  these things about you?
20  A. Somewhat, yes, ma'am.
21  Q. If you had been aware that he had written
22  these things on June 22nd, 2005, with the
23  opinion that they are untrue, would that

Page 85

1   have affected your decision to recommend
2   him for the job as reading coach?
3      MR. PATTY: Object to the form.
4   A.   It would have stained it somewhat, yes,
5   ma'am.
6   Q.   Do you know anything that you've ever done
7   to Mr. Lowe to make him say things about
8   you that were not true?
9   A.   No, ma'am.
10   Q.   Did you ever have any conflict with him?
11   A.   No, ma'am.
12   Q.   And just to be clear on the record today,
13   have you ever had any conversations with
14   him about his lawsuit or telling him that
15   his lawsuit had messed up his career in any
16   way with Montgomery public schools?
17   A.   No, ma'am.
18   Q.   You've testified that after you recommended
19   Melvin Lowe that you had not interviewed
20   anybody else, and that you were then told
21   you had to interview some other people. I
22   think your testimony is you believed that
23   Connie Mizelle sent you those three names;

Page 86

1   is that correct?
2   A.   That's correct.
3   Q.   Do you know, sitting here today, whether
4   it's -- whether or not it's true that those
5   three names were people that ranked very
6   high during the interviews for reading
7   coaches?
8      MR. PATTY: Object to the form.
9   Q.   I mean, do you know one way or the other?
10   A.   I couldn't be sure of that.
11   Q.   When you hired -- when you went to
12   Paterson this year and hired a reading
13   coach, is it correct that this is the first
14   school that you've been principal of or
15   worked at that was hiring a reading coach?
16      MR. PATTY: Object to the form.
17   A.   If we hold true to that Mr. Lowe's position
18   at Daisy Lawrence was a reading tutor, then
19   that statement would be true.
20   Q.   Okay. Well, is there any question that
21   Mr. Lowe was hired as a reading tutor?
22   A.   Not now. It wasn't after he left the
23   central office. I think that was clear.

Page 87

1   Q.   And let's be clear on the time line about
2   that. You -- and we're skipping back to
3   the fall of 2003. You interviewed
4   Mr. Lowe, and after the interview he went
5   to central office; is that correct?
6   A.   That's correct.
7   Q.   When he came back from central office, is
8   that when he told you that the position
9   they were offering was a tutor position?
10      MR. PATTY: Object to the form.
11   Q.   I'm sorry. Did I say it wrong?
12   A.   A reading tutor position.
13   Q.   Okay. Is that when he told you that?
14      MR. PATTY: Object to the form.
15   A.   Yes.
16   Q.   And did you ask him if he was okay with
17   that or if he was going to accept the job
18   under those circumstances?
19   A.   Right. I asked him that at that time.
20   Q.   And did he say yes, he was going to take
21   the job?
22      MR. PATTY: Object to the form.
23   A.   He worked.

Page 88

1   Q.   Okay. So in your mind, from that day
2   forward, was there any question that his
3   contract with Montgomery public schools was
4   for a reading tutor position?
5      MR. PATTY: Object to the form.
6   A.   I brought closure to it after he started to
7   work, yes, as a reading tutor.
8   Q.   Okay. You've said that he performed the
9   duties of a reading coach or some of the
10   duties --
11   A.   Yes, ma'am.
12   Q.   -- as a reading coach in your school?
13   A.   Yes, ma'am.
14   Q.   How were you aware of what reading coaches
15   were doing in other schools?
16   A.   Well, basically, by the nature of the job.
17   If you regulate a person being a teacher
18   tutor, they will only tutor certain
19   students that the teachers have found to be
20   struggling. Mr. Lowe had developed and
21   worked direct instruction, interventionist
22   funding for reading, and he was actually
23   able to assist the teachers. And that's

22 (Pages 85 to 88)

Deposition of James C. Owens                                                Lowe vs. MCBOE                                        January 24, 2006

---

Page 89

1    how you draw the distinction between a
2    reading tutor and a reading coach.
3  Q.  Okay.  Was he required to do that while he
4    worked for your school?
5        MR. PATTY:  Object to the form.
6  A.  He did -- he performed those duties and
7    e-mails, whatever the school needed.  If he
8    did not do it, then I had to do it.  That's
9    the way it worked.
10 Q.  What was your average student attendance
11   the last year Daisy Lawrence was open?
12 A.  The last year, Daisy Lawrence enrollment
13   peaked at about I want to say about 55 or
14   60.
15 Q.  So any given day, you would have 55 or 60
16   students there?
17 A.  Well, that's not the way that alternative
18   school works.  There are students coming in
19   and going out.
20 Q.  Okay.  So on a day, what did y'all
21   average -- during that last school year,
22   average a day for student attendance?
23 A.  The first part of the year, you're

Page 90

1    talking about maybe 35, 40, and the
2    latter months you're talking about --
3    February, March, just say March and
4    April when the talk began to swirl about
5    closing, we were averaging somewhere
6    between 13 and 15 because a lot of them had
7    been -- had exited the program after
8    December.
9  Q.  Okay.  Bill might have already asked you
10   this.  If he did, I apologize.  Did you
11   know Mr. Lowe's mom or anything about a
12   lawsuit she's ever filed against the school
13   system?
14 A.  No, ma'am.
15 Q.  That's it.
16        EXAMINATION
17 BY MR. PATTY:
18 Q.  Did anybody ever tell you anything about
19   needing to contact a curriculum and
20   instruction committee about reading coach
21   interviews?
22 A.  Mr. Barker contacted me and told me to
23   contact Ms. Mizelle.

Page 91

1  Q.  Yes, but before that had anybody told you
2    that?
3  A.  No, sir.
4  Q.  Okay.  And Ms. Freeny.  Where had she
5    worked prior to coming to work with you as
6    reading coach?
7  A.  Brewbaker Intermediate School.
8  Q.  And what was her position there?
9  A.  She was a classroom teacher.
10 Q.  What did she teach?
11 A.  Basic social.
12 Q.  All right.  Was it a block type thing where
13   she was teaching basic social to different
14   grades, or was it -- did she have one grade
15   or do you know?
16 A.  A school that size, you're probably going
17   to be departmentalized probably.
18 Q.  All right.  And do you know if she had
19   taught reading before?
20 A.  Yes, sir.
21 Q.  All right.  Where had she taught that?
22 A.  At --
23 Q.  Brewbaker?

Page 92

1  A.  -- Brewbaker, yes, sir.
2  Q.  Do you know how long she had taught
3    reading?
4  A.  She told me she had been teaching reading a
5    long time.  Exact number of years, I
6    couldn't say.
7  Q.  Okay.  Was she teaching reading, though, at
8    the time she moved from Brewbaker to your
9    school?
10 A.  Yes, sir.  All teachers are reading
11   teachers in that block.  We have a block of
12   time.
13 Q.  Okay.  Would she be -- would it be a
14   self-contained class she was teaching
15   or --
16 A.  Well, that depends on the assessment and
17   the placement of students.
18 Q.  All right.  Had she been through any
19   reading coach training program as far as
20   you know?
21 A.  Not to my knowledge.
22 Q.  And what was her last degree, highest
23   degree?

23 (Pages 89 to 92)

Deposition of James O. Owens          Lowe vs. MCBOE          January 24, 2006

Case 2:05-cv-00495-WKW-SRW          Document 24-8          Filed 05/05/2006          Page 26 of 36

Page 93

1   A.   She has a master's degree.
2   Q.   What's it in, do you know?
3   A.   Elementary education.
4   Q.   And where is that degree from?
5   A.   I can't remember that.
6   Q.   All right. Do you remember her
7        certification?
8   A.   Her certification was in elementary
9        education.
10  Q.   Teaches elementary ed?
11  A.   Right.
12  Q.   And do you remember if it was K through 12
13       or just K through six?
14  A.   I think it's K through six. Sometimes you
15       can get reading that would go up to maybe
16       ninth grade in elementary school.
17  Q.   Okay. And how long had she worked as a
18       teacher?
19  A.   Nineteen years.
20  Q.   And how long had she worked in this
21       particular system?
22  A.   Nineteen.
23  Q.   Nineteen? She's always been in

Page 94

1        Montgomery?
2   A.   Yes.
3   Q.   Okay. Did you know her prior to this, her
4        coming on board with you?
5   A.   No, sir.
6   Q.   Do you know if she had worked in any
7        reading coach position prior to her coming
8        to work for you at Paterson?
9   A.   No, sir. That was one of the questions I
10       asked them during the interview. No.
11  Q.   Do you know if her master's degree would
12       have any specialized courses regarding
13       reading?
14  A.   No, sir.
15  Q.   Do you know --
16       MS. CARTER: No, it doesn't, or
17            no, you don't know?
18       THE WITNESS: I'm not sure of
19            that.
20  Q.   Do you know if she has any specialized
21       reading training or course work or --
22  A.   Other than working at a school, teaching
23       reading, no, sir.

Page 95

1   Q.   Other than on-the-job training, so to
2        speak?
3   A.   Right.
4   Q.   Okay. Had she ever had a position where
5        she would have dealt with teachers in the
6        type -- in a role similar to what a reading
7        coach does?
8   A.   No, sir.
9   Q.   Okay. That's all I have.
10       MS. CARTER: I remembered what I
11            forgot to ask him.
12            EXAMINATION
13  BY MS. CARTER:
14  Q.   You testified that some stuff was --
15       something was mailed to you about a
16       reprimand that Melvin got at Southlawn, and
17       it was just in an envelope?
18  A.   Yes.
19  Q.   Is that right? And it just showed up?
20  A.   Yes.
21  Q.   Was it mailed to you at school?
22  A.   At school.
23  Q.   Okay. What did it contain? What was it?

Page 96

1        Was it just a copy of his reprimand or was
2        there additional information?
3   A.   Just a copy of the reprimand.
4   Q.   Do you have any idea where it came from?
5   A.   No, I do not.
6   Q.   Do you know if it was a mad parent who
7        was mad that Melvin got a job back with
8        MPS?
9   A.   I certainly hope that a parent wouldn't
10       have that, but I --
11  Q.   Do you know?
12  A.   I have no earthly idea where it came
13       from.
14  Q.   Do you know if it was from a teacher?
15  A.   I have no earthly idea.
16  Q.   Okay. Did anybody ever tell you that
17       somebody in HR sent that to you?
18  A.   No, ma'am.
19  Q.   And that came to you a couple months after
20       he started back work with you at Daisy
21       Lawrence, right?
22  A.   About two months. The first -- not after
23       he started back work, but that year, the

24 (Pages 93 to 96)

Deposition of James C. Owens                    Lowe vs. MCBOE                        January 24, 2006

---

Page 97

```
        first year.
 2   Q.  In the 2003-2004 school year?
 3   A.  School term.  That's correct.
 4   Q.  Okay.  Has Mr. Freeny done a good job this
 5       year?
 6   A.  She's worked well, yes.
 7   Q.  I don't have anything else.
 8               EXAMINATION
 9   BY MR. PATTY:
10   Q.  I think in my examination of you,
11       Dr. Owens, you said that these reprimand
12       letters came through the pony?
13   A.  The pony.  That's the mail, school.  That's
14       the mail.
15   Q.  That's the school mail, right?
16   A.  That's correct.
17   Q.  Okay.  So the school -- employees use the
18       pony, don't they?
19   A.  Yes, sir.
20   Q.  Okay.  That's not for just the general
21       public to use?
22   A.  No, sir, it's not.
23   Q.  Okay.  And are parents generally given
```

---

Page 98

```
 1       access to people's personnel files?
 2   A.  No, sir.
 3   Q.  Are they generally given people's reprimand
 4       letters?
 5   A.  No, sir.
 6   Q.  That's something that's supposed to be
 7       maintained in the human resource
 8       department?
 9   A.  Files, yes, sir.
10   Q.  And it's supposed to be confidential?
11   A.  Confidential.
12   Q.  Okay.  That's all.
13
14
15        * * * * * * * * * * * *
16        FURTHER DEPONENT SAITH NOT
17        * * * * * * * * * * * *
18
19
20
21
22
23
```

---

Page 99

```
 1           REPORTER'S CERTIFICATE
 2   STATE OF ALABAMA:
 3   MONTGOMERY COUNTY:
 4       I, Patricia G. Starkie, Registered
 5   Diplomate Reporter, CRR, and Commissioner for the
 6   State of Alabama at Large, do hereby certify that I
 7   reported the deposition of:
 8               JAMES C. OWENS
 9   who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12               MELVIN LOWE,
13               Plaintiff,
14               Vs.
15               MONTGOMERY COUNTY BOARD
16               OF EDUCATION, et al.,
17               Defendants.
18               In The U.S. District Court
19               For the Middle District of Alabama
20               Northern Division
21               Case Number 2:05-CV-0495
22   on January 24, 2006.
23       The foregoing 98 computer printed pages
```

---

Page 100

```
 1   contain a true and correct transcript of the
 2   examination of said witness by counsel for the
 3   parties set out herein.  The reading and signing of
 4   same is hereby waived.
 5       I further certify that I am neither of kin
 6   nor of counsel to the parties to said cause nor in
 7   any manner interested in the results thereof.
 8       This 31st day of January 2006.
 9
10
11
                 _____
12               Patricia G. Starkie, Registered
                 Diplomate Reporter, CRR, and
                 Commissioner for the State
13               of Alabama at Large
14
15
16
17
18
19
20
21
22
23
```

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Case 2:05-cv-00495-WKW-SRW     Document 24-8     Filed 05/05/2006     Page 28 of 36

Deposition of James C. Owens                Lowe vs. MCBOE                              January 24, 2006

Page 1

| A | | | | |
|---|---|---|---|---|
| **able** 69:2 88:23 | **after** 4:8 16:13,14,18 | 75:17 78:9 85:6 | **AYP** 9:6,10 | **best** 28:7 34:19 52:13 |
| **about** 6:20,21 8:12 | 17:8 18:3 35:3,7 45:8 | 90:11,18 97:7 | | 66:16 72:13 |
| 11:23 12:1,10,14 | 46:9 49:15 52:9 58:2 | **anyway** 28:16 | **B** | **better** 31:13 71:17 |
| 13:17,19,19,21,22 | 60:8 67:3 68:16 71:7 | **apologize** 90:10 | **B** 2:8 | **between** 3:3,19 4:3 |
| 14:2,4,10,11 15:13 | 72:3,4,17 73:13,21 | **APPEARANCES** 2:1 | **back** 32:1 35:3 42:1 | 74:16 89:1 90:6 |
| 15:14 16:2,21 17:1 | 74:10,18 85:18 86:22 | **apply** 38:7 40:4 | 48:19 49:14,14 56:18 | **Bill** 4:13 90:9 |
| 22:13,18 23:12 28:11 | 87:4 88:6 90:7 96:19 | **appointment** 58:20,22 | 58:20,22 62:16 70:9 | **Biloxi** 38:9 |
| 30:23 33:16 34:22 | 96:22 | **approach** 34:19 77:2 | 71:2 84:3 87:2,7 96:7 | **birth** 5:4 |
| 35:20 36:23 37:22 | **afterwards** 71:1 74:5 | 96:20,23 | 96:20,23 | **bit** 64:16 |
| 38:2 39:1 41:4,21 | **again** 31:10 66:12 76:7 | **approve** 38:14,17 | **background** 5:7 | **Black** 1:18 2:9 |
| 43:4 44:2,10 45:7,10 | **against** 13:5 36:8 37:9 | 40:19 62:7 | **balance** 78:22 79:1,3 | **block** 91:12 92:11,11 |
| 50:6,18 52:20 53:21 | 90:12 | **approved** 39:15 40:7 | **Baptist** 23:6,10,11 | **blood** 22:7 |
| 55:22 56:22 57:17,19 | **age** 18:19 | 41:8 42:5,6,11,15 | **bar** 41:15 | **board** 1:8 24:16 28:18 |
| 57:22 59:7 68:13,17 | **agreed** 3:2,18 4:2 | 46:16,17 49:16,18,19 | **Barker** 2:13 10:16,23 | 36:8 37:2,10 45:8,15 |
| 70:9,22 71:6,21,21 | **agreement** 1:14 | 50:12 62:3,9 72:21 | 11:12,22 12:17 13:17 | 46:10 47:12 49:4· |
| 72:3 73:3 74:5 76:18 | **ahead** 42:6 73:1 | **approves** 54:3 64:19 | 15:12 16:1,18 32:2 | 53:16 54:2 62:7 |
| 76:22 77:12 78:11 | **aide** 55:8,15,16 | **approximately** 1:20 | 38:2,22 39:1,6 40:22 | 64:19,23 65:4,4 70:9 |
| 79:12 81:1,12 83:13 | **al** 99:16 | **April** 90:4 | 48:10 61:8,19 63:17 | 70:14 73:3,6 76:16 |
| 83:13 84:19 85:7,14 | **Alabama** 1:2,16,19 2:6· | **AR** 48:11 | 63:23 68:16,21 78:2 | 94:4 99:15 |
| 87:1 89:13,13 90:1,2 | 2:11 3:10 5:9,11,12 | **area** 18:18,18 19:19 | 79:14 80:6 84:2 | **body** 21:11 |
| 90:4,11,18,20 95:15 | ·5:16 18:18 19:9,15 | 20:8,17 21:1 22:9,12 | 90:22 | **both** 68:4 |
| 96:22· | 19:19 20:8,16 22:22 | 22:22 63:8 | **Barker's** 77:6 | **break** 4:20 78:13 82:23 |
| **absolutely** 68:5 | 99:2,6,19 100:13 | **around** 10:14 15:11 | **based** 47:6 66:13,22 | 83:5 |
| **accept** 87:17 | **alert** 8:18,21,23 | 30:1 44:16 50:20 | 82:3,10 | **Brenda** 71:3 |
| **access** 98:1 | **allowed** 69:21 | 71:19,19,20 82:16 | **basic** 91:11,13 | **Brewbaker** 7:7 91:7,23 |
| **according** 38:18 | **alone** 11:3 | **asked** 11:10 32:5 50:6 | **basically** 6:8 9:2 11:6 | 92:1,8 |
| **account** 22:19 | **along** 33:10,12 | 53:23 69:1 72:23 | 11:15 12:9,12 23:22 | **brickmason** 21:23 |
| **accurate** 26:23 | **already** 33:16 73:2 | 76:7,10 79:12 83:3 | 33:13,19,23 40:3 | **Brief** 78:14 |
| **accurately** 34:7 | 90:9 | 87:19 90:9 94:10 | 42:9 53:5 56:23 | **bring** 33:11 51:6 |
| **action** 1:7 62:8 64:23 | **alternative** 7:20 8:8,11 | **asking** 19:4 77:10 | 59:15 65:5 73:23 | **brothers** 20:14,15 |
| **actual** 13:7 32:22 | 8:14 10:8 14:14,21 | **assessed** 52:10 | 88:16 | **brought** 28:4 52:4 57:8 |
| **actually** 9:5 18:7 30:4 | 75:13 89:17 | **assessment** 92:16 | **Bates** 20:11,11 | 58:6 66:20 88:6 |
| 63:4 70:13 88:22 | **always** 10:9 93:23 | **assignment** 17:6 | **become** 9:11 36:6 | **Brown** 54:13,17 |
| **additional** 16:15 40:4 | **ANDERSON** 2:4 | **assist** 88:23 | **BEERS** 2:4 | **BS** 5:8 |
| 65:19 67:5 80:7 96:2 | **announce** 11:3 | **assistant** 6:20,23 7:10 | **before** 1:14 3:8 9:12 | **budget** 30:10 49:10 |
| **address** 4:22,23 | **announced** 11:5 | 26:4 59:13,18 66:15 | 10:18 11:1,19,19 | 82:7,9 |
| **addressed** 43:9 | **anonymously** 43:18 | **assisted** 33:8 | 36:3 52:20 59:8 | **budgetary** 47:18 52:9 |
| ·**adequate** 9:6 | **another** 15:15 33:7,11 | **association** 23:3 41:15 | 60:15 62:16,23 71:22 | 60:15 |
| **adjustments** 77:7 | 40:5 67:15 73:8 79:8 | **attend** 33:19,20 38:8 | 73:9 81:23 91:1,19 | **budgeting** 71:22 |
| **ADM** 13:19 | **answer** 31:15 65:13 | 41:14 | **began** 90:4 | **budgets** 82:3 |
| **administration** 5:8,20 | **answered** 72:23 | **attendance** 13:20 89:10 | **begin** 71:18 | **buildings** 15:11 |
| 6:5,6 16:2 17:1 25:1 | **anybody** 24:13,17 | 89:22 | **beginning** 45:5 | **Bullock** 36:9 |
| 35:18 37:14,21 69:13 | 35:14 55:1 57:17,19 | **attorney** 82:19,20 | **begins** 28:20 | **bunch** 59:21 60:1 |
| 76:17 | 57:21 61:4 62:10,16 | **Attorneys** 2:5,10 | **behavior** 54:15,18 | **business** 5:8 6:14 |
| **administration/super...** | 76:12 81:8 84:2 | **Auburn** 5:18 | **behind** 64:18 | |
| 5:12 | 85:20 90:18 91:1 | **August** 50:20,21 52:7 | **being** 10:21 19:6 30:14 | C |
| **administrative** 6:19,23 | 96:16 | 54:13 71:20 | 35:20 52:21 59:9· | **C** 1:13 2:16 3:5 4:7 |
| 7:10 26:4 59:13,18 | **anyone** 14:9 16:1 34:21 | **AUM** 5:23 6:1 | 88:17 | 99:8 |
| 66:15 | 35:18 37:14 44:9,12 | **authority** 35:6 77:10 | **believe** 38:9,10 80:14 | **call** 23:19 34:23 35:16 |
| **administrator** 33:9 | 61:5 63:12 75:17 | 77:20 | 83:15 | 46:18 |
| **admissible** 70:3 | 76:13,16 78:3 | **available** 25:11 26:7 | **believed** 85:22 | **called** 10:11 28:1 35:21 |
| **advertise** 73:9 | **anyone's** 35:6 | 52:21 54:2 | **Bellingrath** 7:16 | 53:13,20 61:8 68:15 |
| **advertised** 29:19 | **anything** 12:3 13:8 | **average** 13:19 89:10,21 | **below** 9:7 | 68:15 |
| **AEA** 23:2 | 15:6 37:8,13,19 38:1 | 89:22 | **beneficial** 12:20,21 | **Calvin** 20:22 |
| **affairs** 6:14 35:7 | 41:5 44:6,20 45:13 | **averaging** 90:5 | 13:1 | **came** 10:16,23 12:17 |
| **affected** 85:1 | 51:4,20 52:23 56:21 | **aware** 31:1 36:6 43:12 | **benefit** 15:1 | 17:8 27:20 28:4,17 |
| | 58:9,10,16 64:4,10 | 84:21 88:14 | **besides** 23:10 63:2 | 30:9 32:1 33:1 35:3 |
| | | **away** 28:22 29:6 | | |

36:3 37:5 49:4 58:20
58:22 69:9,10 87:7
96:4,12,19 97:12
**candidate** 28:7 47:8
52:3,21 54:7 60:3
66:16
**candidates** 61:10,15,20
61:23 63:18 79:15
**career** 84:10 85:15
**Carolyn** 20:22 21:14
**carried** 47:2
**Carter** 1:7 2:8,9,18,20
25:13 26:9 30:16
31:21 34:11 35:23
42:16 47:4 53:4 59:6
59:22 62:13,20 64:8
64:15 65:13 66:18
69:18 70:17 72:15,22
75:1,5,22 76:4 77:1
77:18 78:13,16 82:22
94:16 95:10,13
**case** 3:20,22 4:14 19:5
23:23 99:21
**category** 55:15
**cause** 100:6
**caused** 84:9
**central** 24:7 25:1,20
30:6,22 32:2,18
34:13,21 40:10,20
44:21 51:3,11,13,19
52:2,14 57:21 58:14
60:9,11 77:6 86:23
87:5,7
**certain** 11:11 16:11
63:14 88:18
**certainly** 72:12 96:9
**certificate** 29:7 75:13
75:13 99:1
**certification** 6:3,4 93:7
93:8
**certified** 23:16 24:9
54:19,20,21 55:9,11
82:17
**certify** 99:6 100:5
**chain** 77:3,9
**challenging** 39:10
**chance** 57:6 83:20
**changed** 58:9 83:22
**Channel** 19:8
**charge** 24:6
**Chastity** 55:7
**children** 18:17
**choice** 24:3,18 25:3,4
25:11,11 26:6 67:13
67:15,16,23 69:4
70:9,20
**Christian** 5:15,16

**church** 23:4,5,6,11
**churches** 22:21 23:10
**churchwise** 23:3
**circumstance** 79:9
**circumstances** 87:18
**city** 15:11
**Civil** 1:7 3:6
**clarification** 31:23
**clarify** 4:18
**CLAS** 23:2
**class** 39:23 92:14
**classroom** 91:9
**clear** 9:8,11 14:2 81:5,5
85:12 86:23 87:1
**cleared** 73:12
**close** 9:14,19 10:2
11:17 12:5,8
**closed** 9:16 10:7,21
56:7 84:7
**closing** 10:5 90:5
**closure** 16:21 17:1 88:6
**Cloverdale** 7:6
**clubs** 22:20
**coach** 29:17,19 30:2,3
30:11,15 31:18 32:8
32:13,23 33:21 34:1
34:3,15 35:1,8,12,22
46:21 47:20,22 49:1
49:17 50:6,10 62:2
63:4,13,14 73:6
76:23 85:2 86:13,15
88:9,12 89:2 90:20
91:6 92:19 94:7 95:7
**coaches** 27:23 30:5
48:11 62:12,19,23
63:1 81:21 86:7
88:14
**coaching** 81:13
**code** 48:16,18 83:22
**coded** 49:1,1,3,10
**Cole** 1:18 2:9
**colleagues** 26:2
**college** 5:7 6:9 8:2
**Columbus** 5:19
**come** 23:21 28:2 34:18
43:4 44:12 50:5
70:13 73:5 75:15
**comes** 6:21 48:12 82:6
**coming** 32:12 48:9
49:12 89:18 91:5
94:4,7
**command** 77:3,9
**commencing** 1:20
**comment** 69:7 76:12
**Commerce** 2:6
**commission** 3:11
**Commissioner** 1:16 3:9

99:5 100:12
**committee** 63:15 72:2
79:17 90:20
**committees** 59:8,12
**communicate** 80:5
**communicating** 42:2
**communication** 81:1
81:10 83:18
**compared** 82:15
**complaint** 36:7,12 37:3
37:17 45:11,16
**computer** 99:23
**concerning** 44:6
**concerns** 47:18 48:1
52:10 60:15
**conducted** 58:23 66:23
**conference** 38:8 40:5
**conferences** 41:13
**confidential** 98:10,11
**conflict** 85:10
**conjunction** 39:23
**Connie** 65:12,20,21
80:14 85:23
**consecutive** 9:10
**consented** 28:3,3
**consider** 21:1 50:1 57:3
**consideration** 67:1
**contact** 46:19 47:11,12
50:18 74:7,14 90:19
90:23
**contacted** 50:17 51:13
52:6 53:6 61:15,16
71:6,22 90:22
**contacting** 52:16 53:1
**contacts** 46:6 51:9
**contain** 95:23 100:1
**contents** 45:12
**continue** 14:19
**continuing** 14:10,12
**contract** 17:10,16,18
17:19,22 18:2,4
28:21,22 30:23 31:4
88:3
**conversation** 16:1
53:22 56:19,21 58:16
58:19 73:15 80:1,4
**conversations** 12:2
16:23 36:2 51:2,3
83:14 84:12 85:13
**copies** 51:16
**copy** 42:3 96:1,3
**cordial** 61:11
**correct** 9:9 26:14,15
27:14,18 29:15 32:14
34:10 55:12 65:6,7
65:11 79:9,11,19
80:8,9 81:9 82:2,8,12

83:9 86:1,2,13 87:5,6
97:3,16 100:1
**counsel** 3:3,19 100:2,6
**counties** 21:5
**county** 1:8 21:7 28:15
32:7,11 36:3,8 37:2
37:10 53:15 99:3,15
**couple** 14:12 61:6
68:12,17 96:19
**course** 46:4 61:10
94:21
**courses** 94:12
**Court** 1:19 99:2
**cousins** 22:6,10
**cover** 21:18
**covered** 17:3
**created** 46:22
**credentials** 5:10
**credibility** 84:14
**crossing** 37:11
**CRR** 1:16 3:9 99:5
100:12
**curious** 19:6
**current** 6:3
**curriculum** 81:11
90:19

---

**D**

**daily** 13:19
**Daisy** 8:11 9:15,18
16:21 17:1 26:16
30:12 31:19 48:23
54:9 55:2,21 56:7
78:18 82:13 84:6
86:18 89:11,12 96:20
**date** 5:4 36:16 38:17
73:18
**dated** 83:8
**day** 57:13,14 58:5
70:13 88:1 89:15,20
89:22 100:8
**days** 74:5,10
**dealt** 95:5
**December** 90:8
**decision** 76:22 85:1
**decisions** 77:12
**DEFENDANT** 2:7
**Defendants** 99:17
**Defendant/Responde...**
1:9
**degree** 5:21 92:22,23
93:1,4 94:11
**delay** 70:8
**denial** 39:2,5 41:21
**denied** 38:21 39:12
40:9,13 41:1,10,11
41:16 42:5,7,9

**deny** 40:20
**department** 8:17 19:16
98:8
**departmentalized**
91:17
**depends** 92:16
**DEPONENT** 98:16
**deposition** 1:13 2:23
3:4,7,15,20 4:4 99:7
**described** 11:21
**determine** 47:15
**developed** 88:20
**development** 40:16
82:3,6
**different** 12:23 13:11
75:8 91:13
**Diplomate** 1:15 3:8
99:5 100:12
**direct** 88:21
**directly** 75:17
**director** 48:4
**disagree** 25:5
**discipline** 29:7
**discovery** 70:4
**discuss** 31:7,13 34:19
37:7 44:5
**discussed** 35:5 49:5
**discussion** 28:11,17
**discussions** 9:23 16:20
41:20 45:9
**dissuade** 75:18 76:13
**distinction** 89:1
**district** 1:1,2 21:4,6
99:18,19
**diversity** 78:7
**Division** 1:3 99:20
**Dobbins** 48:6
**documents** 31:17 43:1
44:10 45:1
**doing** 35:16 44:7 48:19
64:11 77:10,11 88:15
**done** 9:1 48:21 78:12
85:6 97:4
**Douglas** 19:13
**down** 30:21 31:11 38:9
47:16 48:12,13 50:22
58:12,14 60:20 65:1
65:5 68:18 69:10
73:7
**downtown** 48:5,8,21
49:6
**Dr** 4:13 10:15,23 11:8
11:11,22 12:16 13:13
45:15 48:4 78:17
97:11
**draw** 89:1
**dress** 83:22

Deposition of James C. Owens    Lowe vs. MCBOE    January 24, 2006

Page 3

Drive 5:1
driver 22:3
dropped 58:17
Dugas 2:4
duly 4:8 99:9
during 7:11 27:16
  28:23 36:19 46:5,7
  59:14 82:23 83:4
  86:6 89:21 94:10
duties 31:19,22 32:22
  33:2,8,17,18 34:1
  47:1 88:9,10 89:6
duty 33:11 35:11

**E**

E 2:4
each 7:23 48:18
earlier 12:10
early 10:10,18,19
  50:14,15
earthly 96:12,15
East 23:2
economics 5:9
ed 93:10
EDS 5:13
education 1:8 5:19
  6:15 8:18 36:9 37:2
  37:10 53:16 93:3,9
  99:16
educational 5:7
EEOC 36:7,12 37:2,17
  45:10,16
effect 37:8
eight 12:14
Eighty-five 20:3
either 3:17,22 22:4,7
  33:16 38:2 52:1 56:9
  64:18 75:7 76:6 81:3
elaborate 13:15 14:8
  68:23
Eleanor 71:3,4 75:2,10
elementary 7:1,14 8:1
  8:13 24:6 35:9 68:22
  93:3,8,10,16
Eli 22:2
Elizabeth 2:8
Elmore 21:6
emergency 75:12
employ 26:1
employed 19:7,14 20:2
  21:10 24:2,20 25:4
  54:10 57:6 73:2
employee 48:18
employees 23:17 24:9
  40:15,23 42:13 77:12
  97:17
employment 29:14

end 45:5 50:21,22
  55:23
enhance 33:11
enough 39:20
enrollment 89:12
entertain 47:19
envelope 43:7 95:17
environment 14:15
equal 57:5
especially 68:19
Esq 2:3,4,8
essence 68:19
et 99:16
Ethel 20:22 21:17
evaluating 27:12
evaluation 27:11 31:16
evaluations 26:21,23
  27:3
even 36:17 54:5 81:17
ever 15:12,15,23 34:21
  35:17 36:11,19,23
  37:7,13,19 39:11
  40:12 42:13,23 44:12
  51:19 69:12 70:15
  75:11 76:16 78:2,6
  83:5,19 84:1,6,12
  85:6,10,13 90:12,18
  95:4 96:16
everybody 16:15
everyone 16:10 54:11
everything 22:6 33:19
evidence 3:16 70:4
exact 36:16 45:6 67:12
  92:5
exactly 36:15 40:1
examination 2:15 4:11
  78:15 90:16 95:12
  97:8,10 100:2
example 82:4
except 33:19 55:11
  60:23
exhibit 38:16 82:20
  83:2,4
exhibits 2:23
exited 90:7
expect 43:20
experience 26:5 27:16
  66:14 77:14
experiences 64:13
explanation 39:4 69:5
  69:13
expressed 12:23 13:10
  76:17
extensive 21:2
extent 12:21 15:8 56:23
e-mail 51:15,21 52:2
  61:14 67:6,7,9,22

68:1,6,10 70:21 71:5
  80:12,18 83:6,8,11
  83:13 84:17
e-mailed 71:2
e-mails 34:14 51:17
  89:7

**F**

F 2:3
fact 79:22
faculty 11:9 44:1
fair 81:16 82:13
fall 26:12 87:3
familiar 8:20
far 21:22 48:13 92:19
father 19:20
February 90:3
federal 3:6 48:6
feel 39:18 64:4,10
  77:13
feelings 14:23 37:22
  76:18
felt 37:20 39:14 47:7
  58:11 66:16
female 78:20
few 68:11
figure 21:3
file 43:17 44:16 50:23
filed 36:7,12,21 37:1,9
  37:15 45:18 84:4
  90:12
files 98:1,9
filing 3:20 4:1
fill 31:11,12 60:12
filled 72:10
filling 50:12,18
final 31:11
finally 28:2,17
finance 49:13
find 9:18 38:12 46:13
finding 10:1
first 4:8 10:19 11:5
  17:8 18:8 23:11
  24:17 25:2,3,10,11
  26:6 43:13 45:2,4,8
  47:11,14 58:13 60:18
  67:13,23 71:2,16,19
  73:9 83:5 86:13
  89:23 96:22 97:1
  99:9
first-time 54:7
fit 58:11
five 23:12 24:11 59:7
five-year 18:4
foggy 12:14
folder 43:23 51:8
folks 13:12 23:14 54:8

55:11,20
follow 39:8
followed 23:16
follows 4:10
foregoing 99:23
forgot 95:11
form 3:13 25:13 26:9
  30:16 31:21 34:11
  35:23 42:4 47:4 48:2
  53:4 58:13 59:6,22
  60:12,13,19,19 62:13
  62:20 64:15 66:18
  67:5 69:18 70:17
  72:15,22 75:22 76:4
  77:1,18 79:5,10,18
  80:2,22 81:19 85:3
  86:8,16 87:10,14,22
  88:5 89:5
formal 13:8
formality 3:10
forth 66:21
forward 88:2
forwarded 80:16
found 46:10,11 52:12
  71:4,7 88:19
four 8:12 28:5 46:22
  63:8
frame 57:15
Franco 1:18 2:9
Freeny 67:20,21 71:6
  72:18 73:14,21,23
  74:7 75:3,4,5,10 91:4
  97:4
Freeny's 68:2
from 5:6,9,10,12,14,18
  5:19 6:12,12,16 7:18
  11:15 12:9 23:19
  26:11 28:14,22 29:13
  32:16 35:3,18,19
  40:20 43:17 44:21
  46:1 48:3,5,9,19
  49:12 61:17 63:15
  65:19,21 68:10 69:13
  70:9 75:18 76:13
  81:23 87:7 88:1 92:8
  93:4 96:4,13,14
full 7:15 55:8
function 39:17
fund 30:9 48:11
funding 88:22
funds 48:17
funny 48:12
further 3:18 4:2 16:20
  98:16 100:5

**G**

G 1:15 3:8 99:4 100:11

gave 58:19 68:2 80:10
gender 79:8
general 25:9 30:9
  48:10 97:20
generally 22:8 23:18
  41:4 50:3 51:5 64:16
  70:11 97:23 98:3
gets 48:8,11 58:1
getting 11:9 44:3 57:16
  70:8
give 20:19 45:21 52:4
  69:5
given 89:15 97:23 98:3
go 9:2,5 11:23 21:22
  22:5 25:10 27:11
  29:22 34:2 42:6
  44:15 47:11,15,18
  48:4,13 49:14 62:10
  62:17 65:3 73:1 82:5
  93:15
goes 31:11 32:17 48:10
going 9:19 10:2,4,7
  12:4,7 28:13,17
  29:12 30:18 32:19
  35:20 38:11 39:7
  41:14 45:15 46:17
  50:10 56:18 57:3
  68:13 83:20 84:3
  87:17,20 89:19 91:16
good 14:20 47:8 59:2
  60:5 97:4
gotten 49:16 58:15
grade 91:14 93:16
grades 91:14
great 29:21
greatest 52:12
group 11:2,20 16:14
guess 27:7 32:15 39:14
  49:15 71:16 73:20
  77:8 81:15
Gwen 19:1,9,11
Gwen's 19:12
Gwinn 48:4

**H**

Hall 20:6
handling 52:19
happen 24:22 29:9
happened 12:11 25:23
  47:10
happens 25:19 43:20
happy 4:18,21
harbor 14:23
hard 41:2,3 59:20
Harrison 19:3,8
hate 22:15
having 4:8 13:4,5 47:20

62:1
hear 44:6 65:17
HEEST 2:5
help 53:11
helped 33:10
helper 7:13
her 18:15 55:5 69:8
  71:2 72:20 73:5,9
  74:14 75:1 91:8
  92:22 93:6,8 94:3,3,7
  94:11
hereto 3:23 4:3
hey 35:15
Hicks 28:10 40:22
high 7:2,2,6,7,18 8:1,3
  8:9 86:6
highest 92:22
highly 79:16
Hill 1:17,17 2:9,9
him 15:17 28:3 29:12
  29:13 30:21,22 31:10
  31:13,18 32:5,18
  34:14,23 35:16 37:13
  37:19,22 38:1,3,4
  39:10 44:4,7 45:14
  46:9,12,18 47:11
  50:18 53:6,13,18,23
  54:5,6,6,14 56:9,10
  56:12,15,20 57:5,12
  58:12,14,18,19,21,23
  62:15 63:19 75:21
  76:3 79:21 83:3,19
  84:1,7,9,14 85:2,7,10
  85:14,14 87:16,19
  95:11
himself 21:12 39:19
hire 23:13 25:3 48:2
  49:21 58:13 59:5
  60:10,13,16,19,19,21
  62:19 63:13 66:9
  67:10 69:2,6,14,17
  69:21 70:16 71:13
  75:21 76:3,8,10,23
  78:4,21 79:3,8
hired 24:9,14,18,18,19
  25:12 32:4 35:8 44:8
  54:12,15,16,22 55:10
  62:15,22,23 63:3
  73:12,16,23 74:12,13
  74:21 75:12 77:23
  84:3 86:11,12,21
hires 30:4
hiring 23:16 24:6 62:12
  75:18 76:13 77:13
  86:15
hirings 52:19

history 6:9 7:9
hold 86:17
holding 73:7
honest 32:9
hope 23:11 96:9
hospitable 11:7
host 22:14
HR 96:17
hubs 15:10
Hull 23:11
human 35:19 44:9 78:3
  98:7
Hyde 4:23
H-Y-D-E 4:23

**I**

idea 44:14 96:4,12,15
identified 33:5
imagine 72:12
immediately 73:20
implemented 27:10
imply 39:9
important 72:9
improvement 8:19 9:3
  9:4 72:6
inappropriate 53:14
  64:6
INDEX 2:15
indicated 72:17
individual 23:19 53:1
individuals 10:12
  11:18 12:12,14 15:20
  16:11 29:17 53:10
  80:17 81:12
informal 13:9
information 19:4 35:17
  41:23 43:11 51:5
  96:2
informed 37:14
inherent 77:19
initial 42:3
initially 11:6 18:2 81:6
inquire 35:15
inquiries 68:13
instance 13:13
instead 21:4 35:1 65:8
  71:3
instruct 62:10
instruction 81:11 88:21
  90:20
interest 53:2
interested 44:7 46:14
  58:8 74:8,15,19
  100:7
interim 57:9
Intermediate 91:7
interventionist 54:18

88:21
interview 23:20 28:2
  46:18 58:2,4,5,7,23
  59:2 60:6,8 62:18
  66:4 81:7 85:21 87:4
  94:10
interviewed 30:14
  58:21 59:4,9 61:3,5,7
  61:18 62:15 81:4,12
  81:18,21 85:19 87:3
interviewing 31:8
  64:11 66:7
interviews 59:17 66:22
  77:11 86:6 90:21
introduced 3:21
involved 59:19 78:8

**J**

JACKSON 2:4
James 1:13 2:16 3:5
  4:7 12:17 14:17 99:8
January 1:19 99:22
  100:8
Jimmy 2:13 79:14
job 32:22,23 47:1,7,8
  48:18 52:1 53:11
  59:2 60:6 66:17 74:9
  74:15,19 75:8 81:8
  85:2 87:17,21 88:16
  96:7 97:4
jobs 48:17 50:8
John 20:22 21:12,23
Johnson 12:16,16
Johnson's 14:7
joined 71:8
July 15:18 17:8
June 15:19 17:8 83:8
  84:22
junior 7:1,6,7 8:1
jury 19:5
just 4:18,20 5:6 6:9
  11:7,21 14:4,12 19:6
  21:6 22:8,16,17,18
  25:15 28:22 29:6
  39:11 42:8 43:6,7,8,9
  43:18 44:6,16,17
  48:10 51:3,21 53:23
  54:5,6 56:17 57:4
  58:19 59:19 60:2
  61:22 68:1,18,23
  69:1,3,3,8,10,22
  70:15 73:19,19 75:21
  76:7 78:11 79:20,23
  80:3,19 81:5 85:12
  90:3 93:13 95:17,19
  96:1,3 97:20

**K**

K 7:16 93:12,13,14
keep 50:23 51:5,9,12
KIM2HM 21:14
kin 100:5
kind 12:13 13:9 22:8
  33:18 35:17 42:14
  43:19 48:11 62:18
  69:10 77:16
knew 12:6 33:15
know 4:20 9:16 12:7
  15:22 16:8,9 22:8
  28:13 30:19 34:13
  35:14 37:23 43:6
  45:12 48:22 49:2,10
  54:8,15 64:16,17
  65:12 69:16 70:5,7
  73:11,18 79:22 80:20
  81:3,17 83:16,17
  85:6 86:3,9 90:11
  91:15,18 92:2,20
  93:2 94:3,6,11,15,17
  94:20 96:6,11,14
knowledge 25:7 30:17
  42:19 55:1,13 61:21
  70:2 76:20 92:21
knowledgeable 39:19
knows 42:18 52:20

**L**

lady 55:15
Lanier 12:18 54:23
lapsed 57:11
Large 1:17 3:10 99:6
  100:13
last 9:16 20:23 22:5,7
  22:16,17 52:8 89:11
  89:12,21 92:22
late 28:18,18 36:15,18
lately 55:5
later 13:21 35:7 68:2
latter 15:19 17:7,7 90:2
Law 1:17 2:5,10
Lawrence 8:11 9:15,18
  16:21 17:2 26:16
  30:12 31:20 48:23
  54:9 55:3,21 56:7
  78:18 82:13 84:7
  86:18 89:11,12 96:21
lawsuit 36:21 37:1,9,15
  45:10,16 84:4 85:14
  85:15 90:12
leader 33:12
leading 10:1
learn 36:11,19
learned 10:19
leave 16:16 38:7,14,21

39:2 40:5,7,9,12,16
  40:21 41:1,7,12
  42:10,15
leaves 41:21
Lee 7:17 19:22
left 32:7,10 44:19 69:3
  86:22
legislature 19:17
length 30:23
lengthy 12:3
less 70:23
let 4:20 29:3 38:12
  65:12 73:11
letter 43:14 45:21
  51:20 54:14
letters 46:1 97:12 98:4
let's 6:11 49:14 87:1
level 7:23 8:23 9:7
  29:10
levels 7:2 8:2,4,5 9:12
like 10:13 14:13 24:1
  31:10 37:20 38:2,4
  39:18 43:18 44:20
  45:16 47:7 51:1 54:5
  54:6 58:7 60:21 61:9
  64:4,10 65:3 66:16
  67:10 70:5 71:21
  77:13 78:9
Lilly 18:14
line 37:11 64:12 87:1
list 21:5 23:18 27:22,23
  29:16 33:2 52:15
  53:17,18 60:17 65:22
  65:23 66:2,4 81:20
  81:22
listen 60:2
lists 31:18
little 64:16 78:13
live 19:18,23 20:5,7
  22:10
lives 20:6
living 19:20
located 8:10
Lois 12:16 14:7
long 63:10 71:15 72:20
  73:5 74:18 92:2,5
  93:17,20
look 10:4 38:13 57:9
looked 31:16 50:3 52:9
looking 31:4 47:22
  50:4 66:19 74:16
lot 30:6 33:15 60:1
  90:6
loud 65:14
low 46:11
Lowe 1:5 2:13 4:14
  16:3 26:11 27:20

Case 2:05-cv-00495-WKW-SRW    Document 24-8    Filed 05/05/2006    Page 32 of 36

Deposition of James C. Owens                    Lowe vs. MCBOE                    January 24, 2006

Page 5

28:2,13 31:8,17,23
32:10,23 33:1,7,13
36:3,7,20,23 37:7
38:7 39:15,18 40:4
41:20 42:11 43:1
44:2 45:10,21 46:6
46:19 47:12 48:15,22
50:1,17 51:2,10,21
52:6,17 53:21 54:16
55:3,11 56:9,20 60:5
60:10 62:15 64:11
66:1,12 67:10,13
68:1 69:2,6,14,17,21
70:10 71:13 73:14,22
75:19 76:8,11,14,18
76:23 79:16 81:7,17
83:12 84:6,13 85:7
85:19 86:21 87:4
88:20 99:12
**Lowe's** 26:21 29:11
30:8 35:7 60:23 61:3
65:3,22 82:20 86:17
90:11
**L-I-L-L** 18:14

_____

**M**

**mad** 96:6,7
**made** 3:14 10:16 43:10
59:15 60:3 67:3
70:21,21 83:12
**maiden** 18:15
**mail** 43:18 97:13,14,15
**mailed** 95:15,21
**maintained** 43:23 98:7
**make** 9:6 53:9 56:17
60:9,14 66:8 67:3
68:13 70:11 71:23
76:22 77:4,7,16,20
85:7
**making** 77:11,12
**male** 78:19
**manner** 3:22 100:7
**many** 24:8 55:20 59:4
59:17 78:9
**March** 90:3,3
**marked** 2:23 82:19
**marriage** 22:8
**married** 18:11 19:10
19:11
**master's** 5:11 93:1
94:11
**material** 57:7,12,14,16
66:19
**materials** 34:14 51:23
52:3 54:4 57:2 58:1,3
58:6,15,17
**math** 47:23 49:17 50:2

50:7
**matter** 57:5 99:11
**may** 3:7,14,15,21 8:21
9:20 10:1,5,10,10,13
10:18,19 38:4 52:22
54:1 55:9 70:3 78:11
**maybe** 24:11 35:4 63:7
70:12,23 71:16 74:16
90:1 93:15
**ma'am** 81:14 82:1
83:23 84:5,8,11,15
84:20 85:5,9,11,17
88:11,13 90:14 96:18
**mean** 9:7 10:3 13:12
39:9 44:3 63:7 86:9
**meaning** 64:19
**means** 9:9 17:21 30:4
**meant** 16:10
**mediation** 41:15
**medically** 21:12
**meet** 9:9 11:10,23
**meeting** 10:11 11:1,20
12:2,9,11 15:7,13,16
15:23 16:13,14 17:2
33:22 35:3 56:19
**meetings** 16:16 29:23
33:20,21 34:3
**meets** 32:17
**Melvin** 1:5 2:13 16:3
81:17 85:19 95:16
96:7 99:12
**member** 22:20
**men** 78:9 79:4,6
**mention** 66:1
**mentioned** 15:9 44:4
**Mercedes** 83:21
**messed** 85:15
**met** 32:2,2,3 53:20
**method** 30:8
**methods** 42:1
**Michael** 20:23 21:11
**middle** 1:2 21:4,5
28:23 43:2 45:5
99:19
**might** 52:3 90:9
**mind** 11:9 61:6 88:1
**minor** 5:8
**mistaken** 35:10
**mixture** 27:15
**Mizelle** 63:19 64:1
65:12,20,22 80:15
85:23 90:23
**Mobile** 21:22
**mom** 90:11
**moneys** 30:9 48:19
52:13
**monogamous** 31:14

**Montgomery** 1:8,19
2:6,11 5:3,18 6:15
18:18 19:19,23 20:8
20:16 22:21 23:2,7
29:14 36:8 37:1,10
53:15 64:14 79:2
85:16 88:3 94:1 99:3
99:15
**months** 31:5,9 45:8
90:2 96:19,22
**more** 61:23 78:7,8,18
78:20 79:6
**most** 22:10 41:19
**motion** 47:20
**moved** 18:2 92:8
**MPS** 96:8
**much** 10:16 12:19
13:16 14:8 24:19
39:8 57:11 64:17
**must** 63:14

_____

**N**

**name** 4:13 18:13,15
19:12,21 20:23 24:21
25:19 27:23 28:9
43:7 60:20 61:3,14
64:12,20 65:2,22,23
68:3 71:2 74:4 75:1
80:14 81:20,21
**names** 16:5 18:21
20:10,19 22:5,7,16
22:16,17 23:18 27:22
29:17 30:1 56:2
60:22 61:13 63:20,22
64:1 65:19,21 66:2
80:11,16,20,23 85:23
86:5
**nature** 13:8 42:15
58:10 88:16
**near** 50:21
**need** 3:13 4:19 24:14
54:3 65:9
**needed** 42:5 57:1 61:19
62:17 78:4,6,21
79:15 80:7 89:7
**needing** 90:19
**needs** 16:8 47:15 52:12
72:6
**negative** 37:22 76:18
**negatively** 14:9,11
**neighborhood** 23:3
24:11 52:8
**neither** 100:5
**never** 35:2 37:5 38:1
45:14,18 59:11 75:15
79:7,13 83:19
**new** 18:7 63:4

**next** 8:23 11:18 57:13
70:13
**nice** 84:15
**nine** 7:16 31:2,5,9
**Nineteen** 93:19,22,23
**nine-month** 30:20 31:4
**ninth** 93:16
**nomination** 61:8
**noncertified** 55:14
**nonrenew** 56:9
**nonrenewal** 56:12
**nonrenewed** 56:4,13,15
**nontenured** 56:3
**normally** 40:19 65:2
**Northern** 1:3 99:20
**notes** 51:9,12
**nothing** 4:10 53:14
99:10
**notice** 56:12
**number** 82:10 92:5
99:21
**numbers** 13:18
**Nyenya** 18:22 19:8
**N-Y-E-N-Y-A** 18:22

_____

**O**

**Object** 25:13 26:9
30:16 31:21 34:11
35:23 47:4 53:4 59:6
59:22 62:13,20 64:15
66:18 69:18 70:17
72:15,22 75:22 76:4
77:1,18 79:5,10,18
80:2,22 81:19 85:3
86:8,16 87:10,14,22
88:5 89:5
**objections** 3:12,13
**observation** 25:8,15
**observations** 27:7,15
**observed** 25:23
**obtain** 75:12
**October** 28:18
**off** 17:9 53:18 58:17
81:22
**offer** 11:7 17:23 18:1
69:7
**offered** 3:16 56:11
**offering** 87:9
**office** 11:8 24:7 25:1,20
30:6,22 32:3,18
34:13,22 40:10,20
44:21 48:5 51:3,11
51:13,20 52:2,14
57:21 58:14 60:9,11
69:3 77:6,7 81:11
86:23 87:5,7
**Offices** 1:17

**official** 10:17 49:4
**officials** 36:4
**often** 43:20
**okay** 5:2,21 6:11,17 7:3
7:10 8:5,14,20 9:12
9:15,23 10:18,23
11:13,19 12:7,11
14:6,16 15:3 16:6,13
18:8,11,17,23 19:2,4
19:10,12,14,18,23
20:2,7,12,14 21:9,11
21:13,16,18,20,20,23
22:4,11 23:1 24:4,13
24:23 25:8 27:15,22
28:8 29:11 30:18
31:1,7 32:10 33:23
34:17 35:11,14 36:2
36:19 38:1 39:1,14
39:14 40:4,7,23 41:7
41:11,18 42:23 43:16
44:2 45:5,9,14 46:5
46:21 47:6,10 48:22
50:7,17 51:9,19,23
52:6,19 53:14,19
55:20,23 56:17 57:7
57:15 58:1,15 60:5,8
60:17,22 61:12 62:22
63:6,9,12,17,21,23
64:4 65:2 66:13
67:16 68:6 69:16
70:8 71:9,12,15 72:5
73:5,13,17,19,22
74:3,6,18,23 75:15
76:10,11,16,21 77:8
78:21 80:5,16 81:15
82:2,18 83:8 84:17
86:20 87:13,16 88:1
88:8 89:3,20 90:9
91:4 92:7,13 93:17
94:3 95:4,9,23 96:16
97:4,17,20,23 98:12
**once** 28:20 31:22 32:1
46:17 49:4 50:11
51:14 53:18 62:9
68:16 71:4
**one** 8:8 9:7 14:11,22,23
15:4 17:23 18:3
23:11,22,23,23 33:1
38:9 41:19 42:2
44:13 46:1,22 48:14
54:12 55:5,10 79:8
81:3 86:9 91:14 94:9
**ones** 26:7
**ongoing** 71:9,12
**only** 13:18 15:8 31:14
46:9 51:13 55:5,9,14
63:7 77:19 88:18

_____

on-the-job 95:1
open 25:16 89:11
opened 43:6
operate 14:10 33:9
opinion 14:7,18 27:1
  69:20 70:5 84:23
opinions 12:23
opportunity 26:20 57:6
option 10:4
order 29:13 60:15
  63:13
organizations 22:21
  23:2
other 3:12,16,22 10:12
  15:1,4,9,11 23:9 26:2
  26:4 28:5 32:7,11
  33:10 38:3 40:15,23
  54:4,8 55:3 57:2
  59:11 60:22 61:10,20
  62:22 63:1,18 65:9
  76:12 82:15 85:21
  86:9 88:15 94:22
  95:1
others 18:23 30:13
  41:18 72:2
out 9:18 10:1,16 11:1
  14:14 21:3 22:10
  29:3 31:11,12 33:14
  36:18 41:5 46:11,13
  47:2 49:13 60:12
  63:7 64:12 65:14
  71:4 79:17 80:12
  82:6 89:19 100:3
outdated 8:21
outline 5:6 6:8
outside 11:14
over 10:8 18:19 36:3
  48:7 57:8
Owens 1:13 2:16 3:5
  4:7,13 18:14 19:22
  20:22,22 21:1 78:17
  83:1 97:11 99:8
own 62:3

———————————
P
———————————
pages 99:23
paint 21:11
papers 31:12,12
parading 44:15
paralegal 5:17,21
parent 96:6,9
parents 19:18 20:7
  97:23
Park 4:23
part 7:15 15:19 16:9
  17:7,7,8 19:5 25:20
  33:8 55:18 66:23

80:3 89:23
particular 52:21 93:21
parties 3:3,19 4:3
  100:3,6
party 3:17,22
part-time 50:4,8 55:7
past 25:22 46:8
pastor 23:4,5
pastored 23:9
Paterson 8:12,14,17
  17:6 46:10 47:8 48:1
  58:12 86:12 94:8
Patricia 1:15 3:8 99:4
  100:11
Patty 2:3,5,17,19,21
  4:12,13 42:18 64:9
  75:4,9 78:11 79:5,10
  79:12,18 80:2,22
  81:19 85:3 86:8,16
  87:10,14,22 88:5
  89:5 90:17 97:9
peaked 89:13
Pearline 20:11
people 12:23 26:1,5
  28:1,6 51:1 52:11,15
  59:4,9 61:6 65:10
  66:5,8 80:8,11,21
  81:2 85:21 86:5
people's 98:1,3
per 41:4 82:4
perform 26:20
performance 47:6
performed 27:4 31:19
  31:22 88:8 89:6
performing 33:23
period 17:17,18,19
  27:17,17 45:6
Perry 1:18 2:10 19:1
Perrys 22:18
person 24:6 25:6 42:9
  47:17 49:6 50:5 51:6
  54:12,15 55:14 60:16
  64:20 67:15 70:13,16
  72:13 80:6,10 84:16
  88:17
personal 42:19
personally 41:8 61:16
personnel 27:12 38:4
  43:17,23 49:21 52:19
  62:7 64:23 77:21
  98:1
persons 37:20 48:3
person's 33:11 60:20
phase 33:4
Ph.D 5:19
place 11:18,20 12:10
  15:10 60:17

placed 15:21 16:8,10
placement 13:22,23
  14:3,4 15:13,15 16:3
  92:17
placements 13:21
Plaintiff 2:2 99:13
plaintiff's 82:19,20
  83:2
Plaintiff/Petitioner 1:6
please 4:17,20,22 5:6
Plus 33:6
point 12:6 14:17 16:2,7
  31:7 63:12 64:5
  81:16
pony 42:23 97:12,13,18
poorly 4:17
population 68:20
portfolio 28:4
position 15:3 29:18,18
  29:20 30:13,15,20
  32:16 35:12 46:16,19
  46:21 50:6,11,12,19
  51:1,4,12 52:16,23
  53:3 54:17 57:18,20
  57:22 59:12 62:2,9
  63:5 72:10,14 73:9
  73:13 86:17 87:8,9
  87:12 88:4 91:8 94:7
  95:4
positions 23:14 47:21
  49:16 50:2,4 59:5
  63:2 81:13
possibility 10:20
possible 52:15,16 74:22
possibly 10:5
post 6:9
practice 25:9 56:1,6
preceded 17:2
preceding 12:2
preference 60:18
preferential 57:4
present 2:12 6:16
  39:19
press 69:8
pretty 9:14 10:16 12:19
  39:8
previously 47:7 48:15
  53:7,10
primarily 53:6
primary 48:1
principal 6:20 8:6,7
  12:18 17:10,16 24:8
  26:6 52:20 53:1 56:1
  59:15 60:3 66:15
  77:20 78:17 86:14
principals 12:15,19
  14:13 26:2 33:10

principalship 17:22
principal's 7:13 25:10
printed 99:23
prior 12:9 24:20 50:16
  52:16 60:14 91:5
  94:3,7
priority 71:23
probably 26:2 91:16,17
probationary 17:17,21
problems 52:10
procedure 3:7 23:15
process 23:15 27:11
  62:11,12,18 64:5
  71:23
professional 40:16 82:3
  82:6
program 33:7 90:7
  92:19
programs 10:8 48:6
proved 28:6
provided 3:17,23
public 6:15 79:2 85:16
  88:3 97:21
Purcell 10:15,23 11:8
  11:11,22 12:16 45:15
Purcell's 13:13
purpose 3:16
purposes 49:11
pursuant 1:14 3:6
pursue 70:19
pursued 69:3
put 44:1,16 60:20
  64:22 66:21 67:23
  68:1,4 71:12
puts 30:5
p.m 1:20

———————————
Q
———————————
qualifications 77:16
qualified 52:22 76:21
question 3:13 4:16 69:1
  71:17 86:20 88:2
questioned 84:13
questioning 39:10
questions 3:12 66:20
  94:9
quickly 38:12 72:10
quite 74:2

———————————
R
———————————
Ramer 22:14
ran 55:5
rank 23:22
ranked 86:5
ranking 63:15
rather 35:21
rating 63:14

read 13:18
readers 33:6
reading 27:23 29:17,19
  30:2,3,11,15 31:18
  31:22 32:4,8,13,19
  32:20,23 33:4,16,21
  34:1,1,2,15,23 35:1,8
  35:12,21,22 46:11,21
  47:20,22 49:1,2,8,17
  50:6,10 62:2,12,19
  62:23 63:1,4,13,14
  72:6 73:6 75:6 76:23
  81:20 85:2 86:6,12
  86:15,18,21 87:12
  88:4,7,9,12,14,22
  89:2,2 90:20 91:6,19
  92:3,4,7,10,19 93:15
  94:7,13,21,23 95:6
  100:3
real 28:12 48:7 54:11
  61:13
really 14:11 15:3 70:7
  77:9
reason 24:2 32:7 38:3,5
  53:6 69:16 70:6
  79:14
recall 39:22 41:22
  42:10,13,22 53:22
receive 17:5 27:6,8
  42:23
received 68:9
receiving 44:10
recent 41:19
recess 78:14
recollection 79:13
recommend 25:19
  66:11 77:13 85:1
recommendation 24:5
  45:22 46:1 56:8
  59:16 60:9 66:8 67:4
  70:12,22 77:4,17
recommendations
  77:21
recommended 24:14
  58:12,14 66:12 79:17
  81:6,7 85:18
recommending 24:21
  64:12
record 82:23 85:12
refer 42:8
regarding 43:1,22
  50:23 51:11,20 56:8
  94:12
regardless 3:23
Registered 1:15 3:8
  99:4 100:11
regular 17:18,19

Deposition of James C. Owens                    Lowe vs. MCBOE                    January 24, 2006

regulate 88:17
rehired 55:4,12
relative 51:4
relatives 22:5,7
relayed 38:1
release 29:12
released 28:14 73:10
religious 5:17
remember 5:14 11:13
  11:16 12:13 13:4,11
  14:9 15:6 22:15
  36:15,17 40:1 41:2,3
  41:12 42:12 44:23
  45:6 56:21 58:16
  67:12,17 79:20,21
  80:1,3 93:5,6,12
remembered 95:10
renew 56:9
renewed 56:4
replacement 71:7
reported 32:21 99:7
Reporter 1:15 3:9 99:5
  100:12
REPORTER'S 99:1
represent 4:14 82:22
representing 3:3,19
reprimand 43:2,14
  95:16 96:1,3 97:11
  98:3
request 40:15 42:3,4
  43:5,10
requested 44:20 45:23
  71:16
required 89:3
reserved 3:14
resignation 32:11
resigning 32:16
resource 98:7
resources 35:19 44:9
  78:3
response 68:9,11 70:8
  71:10
results 100:7
resume 54:4 57:1
retired 20:12 21:12,17
review 10:9 83:3,11
reviewing 84:17
re-interview 79:15
Rheem 19:8
Richard 22:1
rid 83:21
right 6:8 8:6 9:13,15
  11:14 13:11,17 17:5
  20:21 23:9,13 25:17
  29:1 32:19 34:8
  36:11,14 38:16 39:4
  40:10,19 42:10 43:21

47:3 49:7,14 50:9,10
52:5 55:16,19 57:9
58:4 61:2 62:4 65:10
66:1,11 69:12 70:19
72:7 73:11 75:11
82:2,16 87:19 91:12
91:18,21 92:18 93:6
93:11 95:3,19 96:21
97:15
RISE 8:9
Road 7:14
role 95:6
room 11:11,14,15
  16:16
roughly 44:23
route 34:19
Rules 3:6
ruling 3:15

                S
SAITH 98:16
same 4:1 58:5 100:4
sat 59:8
satisfactorily 47:2
satisfactory 26:18 27:3
  27:6,8 35:4
satisfied 32:6
saw 69:9
saying 11:13 14:13
  65:17 79:21,23
says 39:7
scheduled 61:17
school 6:15,16 7:6,7,17
  7:17,18 8:3,8,9,13,15
  8:19 9:2,4,16 10:20
  11:17 12:4 13:2,5,6
  14:10,12,19,22 17:12
  17:23 25:9 26:12,13
  27:10,12 28:20,21
  29:3,11,13 36:16,17
  36:18,20 37:21 38:4
  40:17 42:17 43:22
  47:17 49:11,22 50:12
  52:11 55:4,6,23
  64:14 71:9,12,15,18
  72:3,4,6 73:8 77:15
  79:2 82:4,10 83:20
  84:4 86:14 88:12
  89:4,7,18,21 90:12
  91:7,16 92:9 93:16
  94:22 95:21,22 97:2
  97:3,13,15,17
schools 7:4,11,20,21
  8:7 15:11 23:14
  24:10 26:4 30:1,5
  82:15 85:16 88:3,15
school's 25:1 82:7

score 27:6,8
scores 46:11
seat 11:7
second 9:3 17:20 18:10
  23:6,10 24:3 45:2
  67:14,16,23 69:4
  70:19
secretary 61:16
see 6:11 14:14 38:11
  46:13 47:19 53:1
  58:8,9 68:18 69:10
  74:8,14
seen 43:13 83:6
select 23:19
selected 26:4
selection 19:5
self-contained 92:14
self-employed 22:1,2
self-worth 84:14
seminar 39:18,20,21
  40:5
seminars 42:15
send 24:5 34:14 41:23
  64:20 74:4
senior 7:2
sent 44:13,14 52:2 61:7
  61:13,14 67:22 80:12
  85:23 96:17
September 50:14,14,15
set 23:20 58:4,6 100:3
several 10:11 12:12,18
  28:1 30:3
shop 21:11
show 82:18
showed 43:8 83:1,4
  95:19
siblings 21:19
signature 4:4 38:15
  40:6
signed 38:22
signing 100:3
similar 95:6
Simon 20:23
sir 4:15 7:22 10:22 12:3
  13:3 15:5 16:4,19,22
  17:4,15 18:12 20:13
  20:18,20 23:8 25:7
  26:10,17,19,22 27:2
  27:5,19 29:2,5 30:17
  30:17 34:16 35:2,13
  36:1,5,10,22 37:6,11
  37:12,16,18,23,23
  38:6,11,15,20 39:22
  40:6,8,11,14,18
  41:10 42:21,22 43:6
  43:12,15 44:11,22
  45:12,13,17,20,23

46:8,22 49:12,20,23
53:17 54:20 56:6,12
56:14,16,23 57:20,23
59:10 60:2,11,13
62:5,14,21 63:16
64:7 66:3,6,10,19
69:15,19 70:18 71:11
71:14 72:8,11,16
75:14,16,16,20 76:15
76:20 78:5,10 91:3
91:20 92:1,10 94:5,9
94:14,23 95:8 97:19
97:22 98:2,5,9
sisters 20:15,16
sit 41:5 47:16 59:14
  60:2
sitting 84:17 86:3
situation 24:23 65:8
situations 41:11
six 6:19,21 7:3 46:23
  93:13,14
sixth 18:6,6
size 91:16
skipping 87:2
slot 73:8
slots 49:19,22
small 82:14
social 91:11,13
some 9:23 10:3 12:15
  13:18 17:23 18:1
  24:1 28:11,16 35:11
  38:3,3,4 39:23 41:9
  43:1 59:14 61:10,22
  63:20,22 64:1 85:21
  88:9 95:14
somebody 62:6 70:15
  96:17
somebody's 43:17
someone 24:20 32:17
  51:11 52:22 75:11
something 10:4,13
  28:15 29:9 35:9 39:7
  39:7 43:17 54:2
  63:10 75:6 95:15
  98:6
sometime 28:18
sometimes 24:2 48:7
  93:14
somewhat 10:10 84:20
  85:4
somewhere 10:15
  24:11 25:5 50:21,21
  52:8 90:5
soon 74:22
sorry 65:14,18 75:4,9
  87:11
south 1:18 2:10 18:18

19:18 20:8,16 21:2,7
  21:20 22:22
Southern 5:15
Southlawn 35:9,12
  43:2 95:16
speak 4:9 13:15 34:21
  39:17,20 41:13 95:2
  99:9
special 62:11,18
specialized 94:12,20
specific 16:4 73:18
specifically 9:20 10:14
  50:5 63:19
specifics 16:12 40:2
spend 52:13
spoke 11:11,12 14:9,11
  14:17
spouse's 19:12
staff 10:17 55:2,2 71:8
  78:7,8,22 82:14,17
stained 85:4
stand 41:5
standing 63:11
stare 65:15
Starkie 1:15 3:8 99:4
  100:11
started 7:13 71:15 72:4
  75:6 88:6 96:20,23
state 1:16 3:9 5:9,11,13
  8:17 9:5 19:9,15,16
  29:9 30:4 48:20 99:2
  99:6 100:12
statement 25:16 86:19
statements 83:12
STATES 1:1
static 64:17
status 8:18 9:8
Statute 3:17,23
still 19:20 51:16 54:12
  58:8 67:10 68:6 74:8
  74:14
stipulated 3:2,18 4:2
stipulation 1:14 3:1
Street 1:18 2:6,10 8:10
  20:6
Strike 65:20
struggling 33:6 88:20
student 68:20 89:10,22
students 14:14 15:10
  33:3,5 88:19 89:16
  89:18 92:17
studies 5:17,17 10:3
stuff 48:17 95:14
sub 42:5,7
subject 29:7
subjective 69:22
subjects 7:8

submit 60:22 65:2
submitted 28:9 61:2
  67:5
subsequent 15:13
  16:14 32:14 66:7
  67:14
Substitute 6:18
suffer 84:10
sufficient 30:11
summarized 34:7
summer 35:11 46:5,7,8
superintendent 16:18
  34:22 35:19 54:14
  56:2 64:21,22
superior 39:6
supposed 30:2 98:6,10
sure 12:17 24:15 25:22
  25:22 28:12 39:9
  44:18 46:4 48:8 51:7
  51:18 53:8,9,12,19
  54:11 56:17 59:17
  60:5,14 61:11,13
  68:5 70:3 71:23 77:5
  77:22 80:12 86:10
  94:18
surprise 10:6,10 43:16
surprised 84:18
Sweeney 74:11,18 75:2
swirl 90:4
sworn 4:9 99:9
system 6:16 14:20 15:2
  17:12 25:9 27:10
  28:21 29:3,11,13
  37:21 49:11 50:13
  52:20 55:4,6 64:14
  77:15 83:20 84:4
  90:13 93:21
systems 17:23
S-I-M-O-N 20:23

**T**
take 4:19 21:21 22:19,
  25:6 29:14 38:12
  41:12 72:17,20 73:5
  73:13,21 74:11,19
  78:13 87:20
taken 1:13 3:6,7 12:10
  13:7 53:18 81:22
taking 40:1
takover 9:5,12
talk 11:1,2 13:21 15:14
  16:17 23:21 29:21
  30:22 36:4,23 39:1
  44:9 51:10,10 56:20
  57:17,19,21 58:8
  61:10,20,22 63:18
  65:9 68:20 80:7,11

90:4
talked 15:17 28:5 32:1
  46:9,12 51:1 56:22
  57:12 68:21 71:1
talking 41:4 57:15
  65:16 73:3 74:5 90:1
  90:2
Tanya 2:4
taught 6:18 7:3,4 91:19
  91:21 92:2
teach 7:5,8 91:10
teacher 6:4,18,18 17:13
  17:14 28:20 49:2
  82:5 88:17 91:9
  93:18 96:14
teachers 11:2,21 12:1
  14:1 15:20 16:17
  23:16 33:5 56:3
  78:19,20 82:10,14
  88:19,23 92:10,11
  95:5
Teaches 93:10
teaching 5:10 73:8
  91:13 92:4,7,14
  94:22
team 52:11
telephone 15:18
tell 4:22 11:22 12:4
  21:9 27:20 42:4,8
  47:10 53:21 61:19
  62:16 63:12 70:16
  79:22 83:19 84:1,6,9
  90:18 96:16
telling 11:16 85:14
ten 24:12 31:3,9
tender 56:11 64:21
tendered 63:22
tendering 63:20 64:1
tenure 17:12
ten-month 30:20
term 17:22 18:7,9,10
  28:20,23 30:23 97:3
terminology 29:23
terms 23:22 31:14
testified 4:10 75:23
  76:5 85:18 95:14
testimony 80:19 85:22
testing 21:15
thank 71:5
thankful 69:9
their 18:21 20:10,19
  24:21 27:17 29:6
thereof 100:7
thing 13:18 15:9 39:15
  77:19 91:12
things 33:15 84:19,22
  85:7

think 6:21 20:4 21:6
  22:4 24:20 29:16
  35:8,9 38:22 39:22
  41:9,14,18,19 51:13
  51:14 55:9 56:3 59:3
  59:17 67:13 68:4,7,8
  70:6 75:23 76:5,21
  79:12 80:13 84:15
  85:22 86:23 93:14
  97:10
thinking 31:5
third 17:20 24:3
though 54:5 73:11 92:7
thought 15:21 32:8,12
  35:4 66:21 75:7
three 7:20 18:3 23:23
  28:5 47:21 49:18,21
  61:13,15,20 63:8,18
  63:22 65:19,21 66:2
  66:5,8 71:8 72:4 73:3
  73:7 74:5,10,16
  80:20,23 85:23 86:5
three-year 18:2,5,7,9
  18:10
through 6:13,16 7:16
  7:19 22:6 25:14
  26:12 27:12 30:3,9
  46:22 47:16,18 48:4
  48:10 62:11,17 71:5
  77:6 92:18 93:12,13
  93:14 97:12
thrown 30:1
time 3:14,15 4:16,19
  5:16 7:15,15 23:20
  28:1,6,10,14 29:23
  30:8 31:2 32:5 41:23
  46:9 47:22 48:2
  54:16 55:8,18 57:11
  57:15,20 59:15 60:23
  61:1,2 68:19 83:5
  87:1,19 92:5,8,12
title 30:4,10 31:23 34:6
  47:16 48:3,9 49:5
  60:13
today 41:5 70:12 84:18
  85:12 86:3
together 11:4,9 33:18
told 13:20 15:19 30:21
  31:10 32:15,18 40:12
  58:7,10 63:17,23
  65:9 72:5 73:19,22
  74:12,20 75:21 76:1
  78:2,6 79:3,7,14 80:6
  84:2 85:20 87:8,13
  90:22 91:1 92:4
Tommy 19:22
tomorrow 70:12

town 22:10
traditional 14:22
training 66:14 77:14
  92:19 94:21 95:1
transcript 100:1
treated 35:20 54:5,6
treatment 57:4
trial 3:21
tried 26:1 33:13
trip 82:6
truck 22:2
true 82:9 85:8 86:4,17
  86:19 100:1
truth 4:9,9,10 99:9,10
  99:10
try 11:18 22:15 33:10
  53:5 75:17,18 76:13
trying 6:12 21:3,4
  39:22 46:16 53:9
  54:14 56:17 79:1,2
Tuesday 1:19
turn 56:1
turned 32:11 58:2
Tuskegee 6:11
tutor 31:22 32:4,19,20
  33:3,4 34:2,23 35:21
  47:23,23 49:2,8,17
  49:18 50:2,2,7,7
  86:18,21 87:9,12
  88:4,7,18,18 89:2
Twelve 7:1
twice 51:14 68:16
two 9:10,12 18:1 23:22
  42:1 45:7 46:1 47:2
  57:14 63:2 71:6,7
  72:3,3 73:3,7 74:5,10
  96:22
two-year 18:1
type 8:17 17:22 91:12
  95:6

**U**
ultimately 54:22 61:8
unannounced 69:10
unclear 4:17
under 10:9 79:8 87:18
understand 24:15 25:2
  29:22 77:8 78:1,1
unique 62:11
unit 7:17
UNITED 1:1
University 5:9,11,13,15
  5:18,19 6:11 19:9
unless 83:21
until 81:3
untrue 83:15 84:23
unusual 43:19 70:10

upcoming 56:4
use 97:17,21
used 3:16,22
usurp 35:5
U.S 99:18

**V**
vacation 17:9
VAN 2:5
Vaughn 7:14
very 14:2 43:20 72:9
  82:14,14 84:15 86:5
via 15:18 51:14 70:21
  80:18
Vice-president 6:13
view 13:13
views 13:9,12
virtue 34:6
vitae 58:9
vital 72:9
vote 13:7 64:23 65:4
Vs 1:7 99:14

**W**
waiting 71:10
waived 3:21 4:5 100:4
waiving 4:1
walk 28:22 29:6
want 5:13,20 6:12,19
  7:18 9:20 14:18
  15:18,21 21:14 22:5
  25:14,15 28:5,9,11
  34:23 44:5 45:7,23
  47:12 48:13 50:14,20
  55:22 65:15 67:9
  68:4,17 69:22 70:22
  71:20 80:13 82:18
  89:13
wanted 15:10,14 41:12
  57:2,5 61:22 66:9
  72:1,12
wasn't 14:2 72:10
  86:22
water 21:15
way 14:23 15:4 29:18
  31:13 33:9 53:11
  74:2 77:2 85:16 86:9
  89:9,17
ways 52:13
Webster 18:16,22 19:3
week 12:10 70:23
weekend 52:9
weeks 68:12,12,17 71:6
  71:8 72:3,4 73:4,7
  74:16
well 7:13 9:2 10:8 11:6
  12:6,9,12 13:7 14:2

14:20,21 16:14 21:3
24:19 25:14 26:1,3
29:9,21 33:1 39:20
40:7 42:18 47:14
48:21,22 53:5 54:1
59:14 63:4 64:16
69:1 70:1 73:15 75:5
81:20 86:20 88:16
89:17 92:16 97:6
**went** 30:21 42:13 68:18
86:11 87:4
**were** 2:23 9:23 10:3
11:4,16,23 13:9,12
16:15,17 26:23 27:3
27:22 29:21 30:1,14
31:1,1,5,8 37:20 39:9
40:12 41:11 44:3
46:11 48:1 49:15
62:1 63:17 64:10
65:20 68:18 69:20
71:9 73:19,22 74:11
74:20 75:7 76:21
77:11 78:17 79:1,7
79:13 81:2,21 83:11
85:8,20 86:5 87:9
88:14,15 90:5
**we'll** 22:8
**we're** 87:2
**while** 14:21 31:19 71:9
89:3
**whole** 4:9 42:14,20
99:10
**wide** 25:16
**wife** 20:15 22:13
**wife's** 18:13 20:7 21:18
**Wilbert** 20:11
**William** 2:3
**Williams** 18:16,16
21:23 22:1,2,18 55:7
**Winborne** 68:15,21
71:1 73:15
**witness** 4:3,4,8 65:18
75:2 76:2 94:18
100:2
**woman** 78:4
**women** 78:8,18,22
**wondering** 39:11
**worded** 4:17
**wording** 67:12
**words** 37:8
**work** 6:9 7:11 24:9
26:18,21 27:20 33:4
33:13 44:7 47:13
55:20 66:14 77:14
88:7 91:5 94:8,21
96:20,23
**worked** 6:10,14 7:23

14:20 26:3,11 33:18
42:16 48:15,23 53:7
53:10 54:6,9 65:5
82:4 86:15 87:23
88:21 89:4,9 91:5
93:17,20 94:6 97:6
**working** 27:17 28:15
45:2 46:12,14,15
53:15,23 55:18 94:22
**works** 19:17 21:14
47:17 55:6 68:22
89:18
**workshop** 41:14
**wouldn't** 43:20 75:16
77:2 78:21 96:9
**write** 24:3 51:19
**writes** 39:6
**writing** 47:23 49:17
50:2,7 67:4
**written** 51:23 83:17
84:21
**wrong** 52:23 64:6,9
71:3 87:11
**wrote** 46:3 54:13

_____
**X**
_____
**xerox** 42:3

_____
**Y**
_____
**year** 5:14 8:13 9:3,16
11:18 17:20,20,23
18:5,6,6,8 26:12,13
28:19 36:20 40:17
41:1,4,8,9 42:14,20
45:2,3,4,5,7,8 55:23
56:5 71:18,18 81:23
86:12 89:11,12,21,23
96:23 97:1,2,5
**years** 6:19,20,22,23 7:1
7:4,12 8:12 9:10 10:8
18:1 23:12 24:8 47:3
59:19 63:8 66:13
92:5 93:19
**y'all** 11:4 15:15 18:17
31:7 35:15,16 48:16
48:16 56:22 89:20

_____
**1**
_____
**10** 59:7
**10th** 71:19,20
**10/18/04** 38:18,19
**12** 6:20,23 7:12 59:19
93:12
**13** 38:16 82:16 90:6
**13th** 10:14
**14** 82:16
**15** 90:6

**15th** 50:16
**16th** 10:14
**19** 18:19
**1974** 5:10
**1979** 5:10
**1980** 5:14 6:12
**1981** 5:11
**1993** 5:17

_____
**2**
_____
**2:05** 1:20
**2:05-CV-0495** 1:7
99:21
**2000** 5:20 7:19 8:9
26:11
**2001** 8:9
**2003** 26:12 27:21 62:16
87:3
**2003-2004** 97:2
**2004** 9:21 26:12
**2004-2005** 26:13 36:6
36:20 38:7 42:11
**2005** 9:22,23 10:2,5
46:5 83:9,10 84:22
**2006** 1:19 99:22 100:8
**21** 6:22
**22** 6:22
**22nd** 83:8,10 84:22
**24** 1:19 99:22
**25** 41:4 55:22
**25th** 50:20 52:7 71:21
**250** 2:6

_____
**3**
_____
**30** 41:4
**31st** 10:8
**35** 90:1
**36117** 5:3

_____
**4**
_____
**4** 2:17
**40** 90:1
**425** 1:18 2:10

_____
**5**
_____
**5** 82:21 83:2
**5th** 8:10
**55** 89:13,15
**5737** 4:23

_____
**6**
_____
**60** 89:14,15

_____
**7**
_____
**78** 2:18

_____
**8**
_____

**8** 19:8
**8/22/53** 5:5
**80** 6:13
**85** 6:13,16

_____
**9**
_____
**90** 2:19 7:14
**91** 7:14
**95** 2:20 7:18
**97** 2:21
**98** 99:23