# EXHIBIT

# K

# DEPOSITION OF DR. CARLINDA PURCELL

## January 23, 2006

## Pages 1 through 113

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   NORTHERN DIVISION
4   MELVIN LOWE,
5       Plaintiff,
6   Vs.                CIVIL ACTION NO.
                       2:05-CV-0495
7   MONTGOMERY COUNTY BOARD OF
    EDUCATION; VICKIE JERNIGAN,
8   MARK LABRANCE, TOMMIE MILLER,
    MARY BRIERS, DAVE BORDEN,
9   HENRY A. SPEARS and BEVERLY ROSS,
    in their official capacities as
10  members of the Montgomery County
    Board of Education; and DR. CARLINDA
11  PURCELL, in her official capacity as
    Superintendent of the Montgomery County
12  Board of Education,
13      Defendants.
14      * * * * * * * * * * * * *
15  DEPOSITION OF DR. CARLINDA PURCELL, taken
16  pursuant to stipulation and agreement before Pamela
17  A. Wilbanks, Registered Professional Reporter and
18  Commissioner for the State of Alabama at Large, in
19  the Law Offices of Hill, Hill, Carter, Franco, Cole &
20  Black, 425 South Perry Street, Montgomery, Alabama,
21  on Monday, January 23, 2006, commencing at
22  approximately 9:10 a.m.
23      * * * * * * * * * * * * *

Page 2

1
2       APPEARANCES
3
4   FOR THE PLAINTIFF:
5   Mr. William F. Patty
    Ms. Tonya Dugas
6   BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST
    Attorneys at Law
7   250 Commerce Street
    Montgomery, Alabama 36104
8
    FOR THE DEFENDANTS:
9
    Ms. Elizabeth Carter
10  HILL, HILL, CARTER, FRANCO, COLE & BLACK
    Attorneys at Law
11  425 South Perry Street
    Montgomery, Alabama 36104
12
    ALSO PRESENT:
13
    Mr. Melvin Lowe
14  Mr. Jimmy Barker
15
16      * * * * * * * * * * * * *
17      EXAMINATION INDEX
18  BY MR. PATTY . . . . . . . . . . 4
19
        * * * * * * * * * * * * *
20
21
22
23

Page 3

PLAINTIFF'S EXHIBIT INDEX
1  1   Series of e-mails concerning Mr. Lowe and
         the National School Reform Conference    44
   2   1/24/05 response letter to Mr. Lowe from
         Dr. Purcell                              55
   3   2/4/05 letter from Mr. Lowe to Dr.
         Purcell                                  58
   4   2/16/05 letter from Mr. Lowe to Dr.
         Purcell                                  59
   5   6/22/05 e-mail correspondence from Mr.
         Lowe to Dr. Purcell regarding help
         re-assignment                            64

12
13      STIPULATION
14  It is hereby stipulated and agreed by and
15  between counsel representing the parties that the
16  deposition of DR. CARLINDA PURCELL is taken pursuant
17  to the Federal Rules of Civil Procedure and that said
18  deposition may be taken before Pamela A. Wilbanks,
19  Registered Professional Reporter and Commissioner for
20  the State of Alabama at Large, without the formality
21  of a commission, that objections to questions other
22  than objections as to the form of the question need
23  not be made at this time but may be reserved for a

Page 4

1   offered in evidence or used for any other purpose by
2   either party provided for by the Statute.
3       It is further stipulated and agreed by and
4   between counsel representing the parties in this case
5   that the filing of said deposition is hereby waived
6   and may be introduced at the trial of this case or
7   used in any other manner by either party hereto
8   provided for by the Statute regardless of the waiving
9   of the filing of the same.
10      It is further stipulated and agreed by and
11  between the parties hereto and the witness that the
12  signature of the witness to this deposition is hereby
13  waived.
14
15      * * * * * * * * * * * * *
16
17      DR. CARLINDA PURCELL
18  The witness, after having first been duly
    sworn to speak the truth, the whole truth and nothing
19  but the truth testified as follows:
20      EXAMINATION
21  BY MR. PATTY:
22
23      Q.  Please state your full name for the record.

1 (Pages 1 to 4)

Deposition of Dr. Carlinda Purcell                                                       January 23, 2006

---

**Page 5**

1  Q.  Dr. Purcell, my name is Bill Patty. I
2        represent Mr. Lowe in this case. If at any
3        time you need to take a break, please ask me
4        and we'll be happy to do it. If you need me
5        to clarify any question, I'll be happy to try
6        to do so as well.
7           Where do you live?
8  A.  At 600 Kingland (phonetic) Court in
9        Montgomery.
10  Q.  Have you lived there the entire time that
11       you've lived in Montgomery?
12  A.  No, I have not. For four months I lived at
13       the Homewood Suites.
14  Q.  I'm sorry?
15  A.  Homewood Suite Hotel, when I first arrived.
16  Q.  And then moved to Kingland Court?
17  A.  Yes.
18  Q.  Are those all the places you've lived in
19       Montgomery?
20  A.  That's correct.
21  Q.  Have you lived anywhere else in Alabama
22       before?
23  A.  No, I have not.

---

**Page 6**

1  Q.  Could you please tell me your date of birth?
2  A.  11/25/49.
3  Q.  And your educational background?
4  A.  Everything up to a doctorate degree.
5  Q.  Okay. If you could just sort of outline --
6  A.  Oh, you want me to outline it?
7  Q.  Yes.
8  A.  We won't talk about elementary and high
9       school.
10  Q.  Oh, no. Just start with --
11  A.  I went to college at Bennett College for Women
12       in Greensboro, North Carolina and got a B.A.
13       degree. From there I went to work and then
14       started work on my master's degree at Virginia
15       State University in Petersburg, Virginia and
16       worked on that degree while I was working in
17       the state of Virginia in two different school
18       districts, and then left Virginia and went to
19       Illinois to teach in that area and serve as an
20       educational diagnostician and then came back
21       to Virginia to work on my doctorate at
22       Virginia Tech.
23  Q.  What years did you get the bachelor's degree?

---

**Page 7**

1  A.  The bachelor's degree was -- I completed the
2       work on 12/31/1971, but I actually graduated
3       with my class of '72 and completed the
4       master's degree I believe in 1975 or '76 -- I
5       don't remember that one -- and finished the
6       doctorate in 1983 in June.
7  Q.  Your bachelor's degree, was it in education?
8  A.  It was in education with an emphasis on
9       special education with mental retardation.
10      The master's degree was early childhood
11      education with a focus on formal schooling,
12      the British concept of open schools, and the
13      doctorate was in administration and
14      supervision with a focus on administration and
15      specialty ed with a business cognate.
16  Q.  So you became superintendent in Montgomery
17       County when?
18  A.  On December 1, 2004.
19  Q.  Where did you work before that?
20  A.  In Cumberland County Schools in Fayetteville,
21      North Carolina as an associate superintendent
22      for curriculum and instructional services.
23  Q.  How long did you hold that position?

---

**Page 8**

1  A.  Let's just say September '02 to November '04.
2  Q.  And where did you work before that?
3  A.  Starting 12/95 until September '02 I was
4       superintendent of Warren County, North
5       Carolina.
6  Q.  And prior to that position, where were you?
7  A.  In Winston-Salem, Forsyth County Schools, July
8       1990 and stayed there until November '95.
9  Q.  What position did you have there?
10  A.  Division director for instructional support
11      services.
12  Q.  What does that position involve?
13  A.  It's everything over counseling, special
14      education, federal programs, drop-out
15      prevention. I'll have to think about the
16      people. Social workers, psychologists,
17      research and grant writing.
18  Q.  And that was Winston-Salem --
19  A.  Winston-Salem-Forsyth. It's a city/county
20      combined system.
21  Q.  And before that position, where did you work?
22  A.  In Wayne County Schools in Goldsboro, North
23      Carolina somewhere in 1987. Let's try August

---

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 9

1    of '87 until -- I guess until theyrecruited
2    me to Winston-Salem and served as director of
3    student services there with responsibilities
4    also for special education
5    Q.  And director of student services, what would
6        that involve?
7    A.  Guidance counselors, social workers,
8        psychologists and with the responsibilities
9        coupled to that with special ed also, the
10       gifted program.
11   Q.  And before that position, where did you work?
12   A.  12/84 until that time in August of '87, I was
13       in Lincoln County, North Carolina as director
14       of special education or exceptional children.
15       We called it exceptional children.  And I
16       guess that other note, you can change that to
17       exceptional children.  I'm in another state
18       now so I'm into special ed, but we called it
19       exceptional children in that state.
20   Q.  And before that position?
21   A.  An assistant professor at Delaware State
22       College in Delaware, Andover.  Let's see
23       when.  Let's try August of '83.

Page 10

1    Q.  Till '84?
2    A.  Yeah, until '84, December.
3    Q.  Have you worked any in Alabama before this job?
4    A.  No, I have not.
5    Q.  Before your position as assistant professor at
6        Delaware State, where did you work?
7    A.  I was a graduate student -- full-time graduate
8        student at Virginia Tech from 1980 in June
9        until June of '83 when I graduated.
10   Q.  From '80 to '83?
11   A.  Yeah.
12   Q.  And then before that, you were --
13   A.  I was in North Chicago, Illinois where I
14       served as a classroom teacher for -- initially
15       until I became the district diagnostician --
16       educational diagnostician.  Let's see when did
17       I leave Richmond.
18   Q.  That's fine.  Take your time.
19   A.  I guess I went to Illinois in '76, '77.  I'm
20       not sure.  I would have to go back and look at
21       a piece of paper now.  I left Richmond Public
22       Schools as a classroom teacher and went to
23       Illinois and taught and then became the

Page 11

1    district diagnostician, and the division of
2    those lines is kind of murky.
3    Q.  So roughly '76 to '80 you were a classroom
4        teacher and then district --
5    A.  Diagnostician.
6    Q.  And then before that you were where?
7    A.  It's probably easier if I say in '71 --
8        January of '71 I was in Charles City, Virginia
9        as a special ed teacher and then left there --
10       I probably need a piece of paper again to look
11       at some exact dates.  But then I went to the
12       Richmond Public Schools where I taught special
13       education and reading in the Richmond Public
14       Schools, and then I went to Illinois.  And
15       that's the extent of my job career.  Thank
16       goodness.
17   Q.  Where did you work or what did you do at
18       Charles City, Virginia?
19   A.  Special ed teacher, elementary school.
20   Q.  Have you ever been sued before?
21   A.  Well, I guess as superintendent, yes.
22   Q.  Okay.  I understand.  Where was that at?
23   A.  In Warren County, North Carolina.  Generally

Page 12

1    collectively with the board of education.
2    Q.  Was it in state or federal court?  Do you
3        remember?
4    A.  And I guess if you asked if we went to state
5        or federal court, it probably never got that
6        far, the suits that people generate but never,
7        ever get very far, so our attorneys were
8        working on them, so we never probably had one
9        except one on the dismissal of a teacher.
10   Q.  I was wondering more do you remember -- In the
11       lawsuits where you were named, do you remember
12       if there was one where -- do you remember if
13       it was in federal court or state court where
14       it was filed, not necessarily that it went to
15       trial?.
16   A.  I'm not sure.  And, again, I would have to go
17       to files to look at that, and those files I
18       don't have here.
19   Q.  What suits do you remember being filed?
20   A.  I'm thinking about a science teacher -- high
21       school science teacher.
22   Q.  Do you remember generally what the allegations
23       were?

3 (Pages 9 to 12)

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 13

1   A.   Why he was suing the district?
2   Q.   Right.
3   A.   We were moving on dismissal, and he had claims
4       of sexual harassment. That pretty much was
5       probably the largest claim. And he took
6       issues with the board members and the
7       superintendent, of course, supporting the
8       principal.
9   Q.   Who was the harasser with --
10   A.   He claimed it was the principal.
11   Q.   And any other lawsuits that you can recall?
12   A.   No.
13   Q.   Do you recall in your positions if you were
14       ever named in any kind of EEOC complaint?
15   A.   I guess the way the EEOC complaints are filed
16       and obviously name the district, there
17       probably were several of those in, I mean, my
18       special ed background and career as a director
19       administrator from 1984 up until truly I guess
20       even now. But I really don't recall specifics
21       and details about them.
22   Q.   From the time you've been employed up through
23       today, can you think of any other situations

Page 14

1       where you've been named in an EEOC complaint
2       that deals more with your actions regarding --
3   A.   Not because of my action but more because of
4       the district being named for failure to
5       provide services to children. And probably
6       here in Montgomery where we've been named --
7       We don't get all those resolved in our favor,
8       but I would say that typically my experience
9       was that we pretty much had most of them
10       resolved in favor of the school district.
11   Q.   And those were special ed complaints?
12   A.   Special ed complaints.
13       MS. CARTER: I think she might be
14       talking about OCR complaints as
15       opposed to the EE --
16       THE WITNESS: Yes. I have --
17       MS. CARTER: I realized that when
18       you started talking about --
19       THE WITNESS: Yes. Thank you.
20   A.   Scratch all that. No, I don't remember any
21       EEOC, then. Obviously we have EEOC complaints
22       here in Alabama, but I don't recall any in
23       North Carolina.

Page 15

1   Q.   Have you ever filed a lawsuit before?
2   A.   No.
3   Q.   Have you ever filed an EEOC complaint before?
4   A.   No.
5   Q.   Have you ever given a deposition before?
6   A.   No.
7   Q.   Have you ever given sworn testimony in court
8       before?
9   A.   Yes.
10   Q.   When was that?
11   A.   During the time I was superintendent in Warren
12       County. I can't tell you the exact year. I
13       should be able to -- I can't recall the year.
14   Q.   What was that concerning?
15   A.   It was a matter where we had had one of our
16       students who was on suspension and another
17       student who was out -- they were out of school
18       and they were angry with the bus driver of a
19       bus, and they shot at the bus. And the bullet
20       hit and grazed by the eye of one of our
21       students. And as a result of that and the
22       discussions that ensued, it was pretty much
23       that the child who -- I'm trying to think who

Page 16

1       did the shooting. The child who did the
2       shooting was not enrolled in our school. The
3       child suspended was our student, but the child
4       who had done the shooting seemed to have come
5       from Richmond, Virginia Public Schools but had
6       not enrolled in our schools. But the attorney
7       took the position that the grandmother had
8       come to our office and asked to enroll the
9       child.
10       Well, my staff member gave the response
11       that pretty much the child would have to have
12       a legal guardian. It did not seem that the
13       grandparent was the legal guardian. And
14       obviously my staff person just gave them the
15       paperwork and said you would have to get your
16       daughter to go to district court to get you
17       approved as the legal guardian and then we
18       would be glad to enroll. The grandmother was
19       probably not extremely literate in
20       understanding the process and procedures, but
21       she did have the paperwork. But she never
22       called her daughter. So we learned after the
23       incident that the child had been in our

4 (Pages 13 to 16)

Page 17

1    community from August to about December and
2    had never enrolled in school. And so we were
3    taken to court saying that somehow we beared
4    blame because if we had enrolled the child,
5    then this never would have happened. I'm not
6    sure that that's the case, that that's
7    factual. But I did not feel that the district
8    bared the blame and took the position that we
9    could not be responsible for every child who
10   moved into our community and had little or no
11   knowledge of their status in terms of being
12   with a legal guardian or not being with a
13   legal guardian. And we felt this was a very
14   unfortunate situation more so because the
15   child who was shot lived in the community, and
16   she was just very frustrated that her
17   neighbors could have done something like that
18   to harm the child.
19  Q. And so you gave some sworn testimony in court
20      regarding that?
21  A. Yes.
22  Q. Have you testified any other time in court?
23  A. I can't think of any other time. I guess

Page 18

1    there are cases that the districts I've worked
2    in have been involved in, but usually in a
3    supervisory capacity I've not been the one
4    that actually had to go. Some other staff
5    members went even if I was familiar with
6    cases.
7   Q. Do you have an Alabama teacher's certificate?
8   A. No, I do not.
9   Q. Have you applied for an Alabama teaching
10      certificate?
11  A. I am waiting for them to give me the
12      coursework that I need to satisfy, and I've
13      been working with Mr. Fagan --
14          THE WITNESS: Mr. Barker, is it
15      Johnson?
16  Q. Fagan Johnson, yes.
17  A. Yes.
18  Q. Do you have a North Carolina teaching
19      certificate?
20  A. Yes, I do.
21  Q. Virginia as well?
22  A. I probably have allowed the Virginia one to
23      expire.

Page 19

1   Q. What is your North Carolina certificate in?
2   A. Teaching of LD, principalship, curriculum
3      instruction I believe is on there, and
4      superintendent.
5   Q. Has your certificate ever been the subject of
6      any discipline?
7   A. No.
8   Q. With regard to the one you applied for in
9      Alabama, what is the type of certificate
10     you're applying for?
11  A. Superintendency only. And I suspect when they
12     review the paperwork, they'll give something
13     else. But it's just that I'm interested in
14     superintendency.
15  Q. The different positions you left your
16     employment that you've gone over these with
17     us, have you left those all on good terms?
18  A. I've left them all on good terms and for
19     opportunities for promotions.
20  Q. This is something we ask standard through all
21     depositions.
22         Have you ever been charged with a crime
23     other than a traffic ticket?

Page 20

1   A. No.
2   Q. Ever been in the military?
3   A. No.
4   Q. Do you have any relatives that live in
5      Montgomery County?
6   A. No.
7   Q. Are you a member of any clubs or organizations
8      in Montgomery County?
9   A. Professional organizations tied to my work.
10     The Chamber of Commerce, the Center For
11     Government out at AUM, HIPI board of
12     directors, the YMCA board, the Committee of
13     100. I think that's it.
14  Q. I should have probably made this broader, but
15     I don't know if I can list all the counties
16     that are in the middle district. But do you
17     have any relatives in Alabama?
18  A. I have no relatives in Alabama. I don't even
19     know what the middle districts are.
20  Q. I take it you're not married?
21  A. No, I'm not.
22  Q. Have you ever been married?
23  A. I have.

5 (Pages 17 to 20)

Deposition of Dr. Carlinda Purcell    January 23, 2006

Page 21

1   Q.  What was your former spouse's name?
2   A.  Edgeworth.
3   Q.  Edgeworth?
4   A.  Edgeworth was my married name.  Purcell is my
5       maiden name.
6   Q.  What was his full name?
7   A.  Ernest Devon Edgeworth.
8   Q.  And do you know where he lives now?
9   A.  He's deceased.
10  Q.  When did he pass away?
11  A.  I don't know.
12  Q.  I take it y'all must have been divorced then?
13  A.  We were divorced by then.
14  Q.  When did y'all divorce?
15  A.  1980.
16  Q.  Any other marriages?
17  A.  No.
18  Q.  Are you a member of any church in Alabama?
19  A.  Dexter Avenue King Memorial Baptist Church.
20  Q.  Do you hold any officer or leadership
21      positions at that church?
22  A.  No, I do not.
23  Q.  In my understanding from talking to your

Page 22

1       attorney, you are not being tendered as the
2       30(b)(6) witness, that Mr. Barker will be
3       answering those questions as the 30(b)(6)
4       witness, the person speaking on behalf of the
5       school to different issues.
6   A.  All right.
7   Q.  But I would like to ask you a little bit about
8       generally how the hiring process works for
9       certified personnel at the school since you've
10      been there.
11  A.  Okay.  Since I've been there and as I
12      understand how the process works is that
13      principals get an opportunity to interview
14      their staff personnel or people that they want
15      to bring onto their staff for teachers.  I'm
16      talking about teachers.  And then they make a
17      recommendation to Mr. Barker's office, and he
18      and his staff members review those
19      recommendations and look at certification
20      processes and details that's associated with
21      that.  And then they bring a recommendation to
22      me to carry to the board, and those personnel
23      recommendations are usually divided by

Page 23

1       certified and classified personnel.
2           And certainly we are employing large
3       numbers of people, and I don't sit down and
4       deal with the details of every single name,
5       but I do read them and ask Mr. Barker to tell
6       me any that are kind of stand-out issues and
7       concerns that I need to be familiar with
8       before I sign off on them.
9           If you're talking about a principal I've
10      taken the position since I've been here that I
11      want to sit at the table when we are
12      interviewing for principalships.  And then, of
13      course, for assistant principals, that's a
14      process that is still in place that was here
15      when I got here with Mr. Barker, pretty much
16      that principals, I believe-- it's either
17      seven or five -- interview that number of
18      candidates and make a recommendation of three
19      finalists to Mr. Barker's office where he
20      brings them in and shares them with me.  And
21      we discuss the recommendation, and more than
22      likely I tend to go along with the principal's
23      recommendation unless there's a concern that I

Page 24

1       have about a particular school and how to
2       balance out the strength that comes from the
3       academic background that the two people would
4       hold, especially in the elementary school.  If
5       it's a principal and assistant principal at a
6       high school, I probably would not be as
7       concerned because typically you would have a
8       multiple number of administrators, and you
9       probably are going to get almost every
10      background to balance out the academic
11      strength that they bring to that school.
12  Q.  With certified personnel, are there any other
13      hiring processes besides what you've described
14      for the principal, assistant principal and the
15      teachers?
16  A.  If you're talking about people at the central
17      office level, assistant superintendents, we
18      have an opening for an associate
19      superintendent and directors.  I am going to
20      be involved in those because they are key
21      people on our staff, so I want to know who is
22      going to compose the team.
23          When you get down to certain levels -- I

6 (Pages 21 to 24)

Page 25

1  know that Mr. Barker and his staff just
2  interviewed a person last week to be a special
3  population coordinator in the career technical
4  education area. I was involved in hiring the
5  director and I was involved in hiring the
6  assistant superintendent that that director
7  works with, but I don't feel that I need to
8  get down to the third tier of that. That's
9  going to have a couple other people
10 supervising that person, so I'm not interested
11 in going that far in the organization.
12 Q. With regard to teachers -- Let me back up.
13    Have we pretty much covered for certified
14    personnel the hiring process generally?
15       MS. CARTER: Object to form. I
16          don't know that she testified to
17          it generally other than except
18          from her perspective. Again,
19          she's not being put up as a
20          representative on that issue.
21       MR. PATTY: Sure.
22 Q. Have we covered the certified personnel hiring
23    process generally?

Page 26

1       MS. CARTER: Same objection.
2  A. I think we have.
3  Q. Now, with regard to teachers, I think you said
4     that generally they are interviewed by their
5     principal.
6  A. Yes.
7  Q. And then the principal, who I guess they'll
8     work for, comes back and says, I want to hire
9     this particular individual. And then that
10    person goes to Mr. Barker; is that --
11 A. When the principal and their team -- Some
12    principals, if they are involved -- and
13    members of their staff -- with the interview
14    process, then they bring that recommendation
15    to Mr. Barker.
16 Q. So the principal may have a group inside his
17    own school or his or her own school that will
18    assist in coming up with someone to recommend?
19       THE WITNESS: I think that that
20          happens in some instances,
21          Mr. Barker?
22 A. In the summertime it may get to be a little
23    different. I don't know if principals have

Page 27

1  teachers and team members around.
2  Q. And then Mr. Barker would check for
3     certification issues and then bring a
4     recommendation to you then --
5  A. Yes.
6  Q. -- as who he suggests to hire?
7  A. And I don't want to leave the impression
8     Mr. Barker is checking certification issues
9     because he has a staff, and so --
10 Q. I understand.
11 A. And then, of course, he brings the
12    recommendations to me in a typed-up process.
13 Q. Can you recall since you've been here anyone
14    that has been recommended by a principal for
15    hiring of a teacher/certified position -- I'm
16    talking about everything except assistant
17    principal, principal, central office person --
18    that has been recommended by the principal but
19    has not been hired for the position?
20 A. I think I can. Ask your question again.
21 Q. I'm talking about folks -- not assistant
22    principals, not principals, not central office
23    personnel, but other certified employees. Can

Page 28

1  you think of anyone while you've worked in the
2  school system as superintendent where the
3  principal at a particular school recommended
4  to hire this employee to work at their school
5  and you did not employ that person?
6  A. Now, when I say I think I can, I guess I can't
7     really recall that I have. I guess
8     Mr. Barker -- if I can ask a question --
9        MS. CARTER: Just do the best --
10       THE WITNESS: I can't?
11       MS. CARTER: Not because we're being
12          mean. You just have to do it --
13          Just do it from your memory as
14          best you can recall.
15 A. I guess I haven't gotten involved in
16    discussions where a principal recommends a
17    name. I guess I've had employees who have
18    come and expressed concerns that they have not
19    been hired to Mr. Barker or to a board member,
20    and they've asked me to sometimes intercede.
21    And my position has always been that the
22    principal is probably going to know best who
23    can work in that building unless I know

7 (Pages 25 to 28)



Page 29

1  something that's really outstanding that would
2  say something other than that person being
3  hired. I guess I've been more involved in
4  those. And I suspect when you're in a
5  district as large as Montgomery, you can have
6  several of those kinds of cases.
7  Q.  As you sit here today, can you think of any
8  situation, though, where the principal wanted
9  to hire someone to your knowledge and you did
10  not follow that principal's recommendation to
11  hire them?
12  A.  If you're talking about a classroom teacher, I
13  can't think of one. I can think of where we
14  were involved in an assistant principal issue.
15  Q.  With the assistant principal, what was the
16  issue there?
17  A.  Well, when we hired the principal at the
18  school, I made it very clear in a post
19  conference with the principal that I would be
20  heavily involved in who the assistant
21  principal would be for that school. He
22  certainly had the opportunity to go through
23  the interview process that is put in place to

Page 30

1  interview assistant principals anyway. But as
2  a result of the interview process, he
3  recommended the three people. Mr. Barker
4  brought them in, and he just said that this --
5  Well, I guess the principal sent the word up
6  to me beforehand that he really wanted this
7  person, and Mr. Barker reminded him that you
8  recall that the superintendent said she would
9  be heavily involved in this decision for this
10  particular school.
11      And it just so happened that -- I think he
12  understood that, but it just so happened that
13  his recommendation would have been the
14  recommendation that I would have decided on
15  anyway by reviewing the paperwork and by the
16  background information that Mr. Barker shared
17  with me on the respective candidates as well
18  as the information I saw when I reviewed the
19  personnel files.
20  Q.  Well, does that mean y'all hired the person
21  the principal wanted to hire?
22  A.  Yes. But I think the principal was of the
23  opinion that if he had sent somebody else up

Page 31

1  there that I might have just taken that name
2  as well, but we had sent the message very
3  clearly beforehand.
4  Q.  But as you sit here today, can you think of
5  anyone in any situation where a principal said
6  I want to hire so-and-so for this position,
7  and you did not do it -- did not follow his
8  recommendation?
9      MS. CARTER:  Object to the form.
10  A.  I guess if I had a list of schools, I could go
11  through in my head and look at the list of
12  schools and see. That may be a question we
13  can come back to. I can't think of it right
14  now.
15  Q.  Would it be fair to say as you sit here right
16  now you can't think of any where the
17  principal --
18  A.  At this moment I cannot think of any.
19  Q.  -- where the principal wanted to hire a
20  certain person and you did not do that?
21  A.  Yeah.
22  Q.  Let me -- I don't think we're clear on the
23  record because we kind of cut in on each

Page 32

1  other.
2      As you sit here today, you cannot think of
3  any situation or any person where the
4  principal wanted to hire a person and you
5  would not hire that person?
6  A.  Right now I cannot think of any.
7  Q.  Now, do you know who the principal -- when
8  you're dealing with a certified employee, do
9  you know who the principal's recommendation is
10  before you make a decision to hire or not to
11  hire? For instance, when Mr. Barker presents
12  you a candidate, does he say, this is the
13  person that the principal wants to hire for
14  this particular position?
15  A.  Yes. Because we pretty much are looking at a
16  list of schools, names, who vacated a
17  position, whether it's a new position. So, I,
18  mean, I can see them by school, and pretty
19  much those recommendations are coming from the
20  principals.
21  Q.  Does the principal's recommendation come to
22  you -- for instance, if once the employee
23  moves to Mr. Barker -- Say the principal

8 (Pages 29 to 32)

Page 33

1    recommends this employee, and the employee
2    moves to go through the HR with Mr. Barker.
3    If Mr. Barker decides that he's not going to
4    recommend that employee, do you still -- are
5    you still told that this is somebody the
6    principal wants to hire?
7    A.    When Mr. Barker brings the names in and we sit
8          down and talk about them, he pretty much
9          raises any red flags that I need to know about
10         and tells me background and history that they
11         found, whether they can clear a certification
12         at the state department, whether they have
13         this on the person, with the No Child Left
14         Behind, whether this person is going to be
15         highly qualified as a result of having had
16         conversation with Sandra -- I forgot her last
17         name -- the person who reviews the No Child
18         Left Behind highly qualified status.  So I
19         pretty much know those when they come -- when
20         he comes in to sit and talk with me about it.
21   Q.    I probably should have asked it this way.
22         If a principal recommends an employee to
23         be hired, will you get that recommendation

Page 34

1    regardless of what Mr. Barker's office finds
2    out?
3    A.    I think after they have done the checks that
4          they have to do, I'm going to get that name.
5    Q.    You may get that name with, this is the
6          person the principal --
7    A.    With the notation.
8    Q.    Right.  This is the person the principal wants
9          to hire, but he doesn't have the
10         certification --
11   A.    Exactly.  And notations may not always be in
12         writing.  It may be verbal notations.
13   Q.    Is the principal's recommendation for a
14         particular job documented anywhere?
15   A.    It's documented when we take it to the board
16         of education.  The principal sends it up I
17         suspect in writing.  I don't go over there and
18         look, but I suspect it comes in writing or
19         through e-mail process.  And then, of course,
20         when it goes to our board, it's obviously in
21         writing with the details.
22   Q.    There's not a form per se that the principal
23         fills out to say this is the person I want to

Page 35

1    hire or not?
2    A.    I have not been involved at that level of
3          detail.
4    Q.    Mr. Lowe's EEOC file -- With Mr. Lowe's EEOC
5          complaint, did you have any involvement in the
6          investigation of that?
7    A.    Not really except passing over a few documents
8          to Mr. Barker that were communications that he
9          asked me if he could have access to or that I
10         might have e-mailed to him as well.
11   Q.    Those would have been communications between
12         Mr. Lowe and yourself?
13   A.    Yes.  And I guess it's not -- maybe the word
14         investigation -- getting prepared for the
15         investigation may not have been accurate.  I
16         guess there were points where I received
17         communication from Mr. Lowe, and I might have
18         sent them to Mr. Barker and said can you give
19         me feedback on what this is about.
20   Q.    When did you first learn that Mr. Lowe had an
21         EEOC complaint?
22   A.    I guess it was -- maybe toward the latter part
23         of last school year, the ending of the school

Page 36

1    year into the summer, early fall.  I don't
2    know the exact date.
3    Q.    The latter part of the '04-'05 school year?
4    A.    I'm into the next school year.  Maybe the
5          '04-'05, August, sometime thereafter.  Well, I
6          guess that's '05-'06 when we start school in
7          the summertime.  Somewhere in between the
8          latter part of '04-'05 and the early part of
9          '05-'06.
10   Q.    I'm distinguishing the EEOC complaint from the
11         lawsuit itself, because I know you were served
12         with a lawsuit in this case in your official
13         capacity as superintendent in May of 2005.
14         But I'm really speaking of the EEOC complaint
15         that was filed and any kind of investigation
16         that took place before that lawsuit was
17         filed.
18         Did you have any knowledge of Mr. Lowe's
19         EEOC complaint prior to that lawsuit being
20         filed?
21   A.    I think I had knowledge of it, but if you
22         asked me the dates on these, I could not tell
23         you without going back and looking in the

9 (Pages 33 to 36)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 37

1    files.
2    Q.  But in preparing the response for the school
3        board to respond to the EEOC's charge, did you
4        have any involvement in preparing that
5        response to the EEOC charge?
6    A.  Typically the way that any responses we do get
7        done is obviously my spending obviously some
8        time talking to Mr. Barker, depending
9        on who we need to involve, if it's the law
10       firm here or -- we also work with Mr. Davis,
11       another law firm -- that I obviously sit down
12       and have discussion about it.  The paperwork
13       and so forth I guess that's collected is
14       probably collected through Jimmy Barker's
15       office and then working with our attorneys to
16       finalize responses.  And depending on who
17       needs to be involved, I guess if it's a
18       special ed case and matter that Mr. Barker
19       would work with Dr. Short.  And I don't know
20       if we have a lot of other cases that are
21       coming from other places other than EEOC.
22   Q.  With regard to Mr. Lowe's charge, other than
23       sending some e-mail correspondence to

Page 38

1        Mr. Barker, do you recall any involvement you
2        had in responding to the EEOC on that charge?
3    A.  Not really in terms of actually collecting
4        data.  I suspect because of the size of the
5        system, you just usually aren't down at that
6        level of the organization.
7    Q.  When do you first remember having any
8        conversation or contact with anyone regarding
9        Mr. Lowe?
10   A.  I suspect the first time I heard of Mr. Lowe
11       was prior to coming to Montgomery when I
12       received a communication from him -- a written
13       communication.  So I suspect that would have
14       been somewhere between -- I suspect somewhere
15       between September and November of '04.
16   Q.  And what do you recall about that
17       communication?  What do you remember it being?
18   A.  Well, I received that communication in
19       Fayetteville, a bit of a congratulations about
20       coming to Montgomery, some details about his
21       pursuing a doctorate degree, and not so much
22       issues in Montgomery but some of the
23       challenges that were here and what I would

Page 39

1        face coming here, and then the request to
2        serve as a mentor.
3    Q.  Had you heard of Mr. Lowe prior to getting
4        that correspondence?
5    A.  No, I had not.
6    Q.  And what did you do after you received it
7        regarding that correspondence?
8    A.  Well, that piece of correspondence, unless it
9        was from a board of education member, went in
10       a box and file with a lot of others that I
11       felt I would appropriately deal with once I
12       got on board in Montgomery.  And that's not
13       anything negative against Mr. Lowe, but I've
14       just always taken the position, given the
15       number of jobs I've done, that I'm truly not
16       on another job until the day I arrive on that
17       job, and I can't finalize what I'm working on
18       and trying to get to the next page.  But I
19       also knew that once I got on board that --
20       again it didn't have anything to do with
21       Mr. Lowe -- I knew that the challenges in
22       Montgomery were going to be of such that I did
23       not think for several reasons that I wanted to

Page 40

1        be a mentor.  One, I wouldn't have the time.
2        And I really felt strongly in looking at my
3        own background and the mentors that I've had
4        that a person should at least meet their
5        mentors and know something about them and know
6        if there's something that that person has to
7        really offer me that I can benefit from and
8        gain some new knowledge, new skills, new ways
9        of thinking and growing.  And I just thought
10       that that was not probably good for me to
11       respond to him quickly and say, you know, I'll
12       be glad to serve as your mentor.  We had not
13       met each other.  But on the other hand also, I
14       just strongly felt there was going to be so
15       much in Montgomery to do, as I've discovered,
16       that serving as someone's mentor and not being
17       able to do that in a strong way was not
18       something I wanted to do.
19   Q.  Did you talk to anyone about Mr. Lowe after
20       receiving that correspondence?
21   A.  Not really.  I just -- I really spent little
22       time talking to people in Montgomery unless it
23       was with the attorneys negotiating the

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 41

1　contract or with board members. I strongly
2　felt that I still was on payroll and contract
3　with the Cumberland County School District and
4　owed them my allegiance and final days of work
5　there to leave a smooth transition for them.
6　Q. When you say not really, does that mean you
7　may have talked to someone in passing about
8　it?
9　A. Not really. Well, I guess let's just say no.
10　Q. All right.
11　　　　MS. CARTER: He's a lawyer so "not
12　　　　really" doesn't mean anything.
13　　　　MR. PATTY: That's right.
14　A. I can think of one person. I may have talked
15　to someone about it simply because this lady
16　was running for the board of education, which
17　obviously would have piqued my interest, as
18　far as that person being a possible candidate
19　to be on the board. I received a nice letter
20　and package from her, and I did inquire about
21　who that was. But I didn't even call that
22　person. In fact, I didn't consider her a
23　board member since she was running for the

Page 42

1　board.
2　Q. You said you called that person. You just
3　called that --
4　A. In other words, I called someone and said,
5　I've gotten this package from this person;
6　tell me a little bit about it; I see she's
7　running for the board. She sent a very warm
8　letter, but I didn't see a need to call her.
9　She wasn't on the board.
10　Q. But it wasn't about Mr. Lowe?
11　A. Oh, no. That person was just welcoming me to
12　the district.
13　Q. Okay.
14　　　When was the next time that you can recall
15　having either a conversation with Mr. Lowe or
16　contact with Mr. Lowe, some type of
17　communication with him or about him, someone
18　else contacting you about him?
19　A. Sometimes I guess -- I can't really tell you
20　when -- between the time I got here in
21　December and maybe the end of the school year,
22　if I recall. There was an e-mail that I
23　received from Mr. Lowe expressing concern that

Page 43

1　he had been given approval by Mr. Looney and
2　that approval -- to attend a conference and
3　present on behalf of the district.
4　　　And, again, Mr. Lowe still was at Daisy
5　Lawrence School at that time. And while I did
6　not get involved in the conversation, I know
7　because the request for leave and so forth
8　went through Mr. Looney through Mr. Barker
9　that the question became did Mr. Lowe need to
10　be the person presenting given his classroom
11　teaching assignment, given that Montgomery
12　Public Schools had a series of reading coaches
13　who were trained reading coaches under the
14　model that's used for the state as well as
15　Mr. Looney was also the assistant
16　superintendent for curriculum instruction and
17　was heavily involved in our reading curriculum
18　and the program in the district called
19　Literacy Efforts, and perhaps why wasn't it
20　someone who was trained who could be a
21　spokesperson for the district. And that is
22　something that's governed by policy about who
23　would be the spokesperson for the district,

Page 44

1　and so I concurred with the decision that
2　perhaps it needed to be someone else.
3　Q. Let me show you Plaintiff's Exhibit 1 and ask
4　you if this is the e-mail you're referring to.
5　　　　(Plaintiff's Exhibit 1 marked for
6　　　　identification.)
7　A. It's pretty close. I said somewhere between
8　the time I got here and --
9　　　　MS. CARTER: Two days later?
10　　　　THE WITNESS: Yeah.
11　A. Yeah. I responded to him because I typically
12　don't get involved in discussions on e-mails
13　when I don't really know the issue. But I do
14　want the person who is sending the e-mail to
15　know at least I did receive the communication,
16　and that seemed to be what I indicated.
17　Q. Now, did you talk -- in making your decision
18　to concur with the denial of the leave
19　request, did you talk to Mr. Looney about it?
20　A. I can't recall having a conversation with
21　Mr. Looney per se. The conversations took
22　place I think between Mr. Looney and
23　Mr. Barker and them apprising me of the

11 (Pages 41 to 44)

Page 45

1    conversations back and forth.
2    Q.  Mr. Barker apprising you of the conversations
3    back and forth?
4    A.  Yeah.  Between he and Mr. Looney.
5    Q.  Was it your impression that Mr. Looney based
6    on your conversations with Mr. Barker was not
7    in favor of Mr. Lowe going to the seminar?
8    A.  That's what I understand.
9    Q.  So you were not aware that Mr. Looney thought
10   it was something that Mr. Lowe could do or
11   should do?
12          MS. CARTER:  Object to the form.
13          When I say that -- I should have
14          told you.  When I say that, you
15          can still answer his question.
16          You can always answer his
17          questions unless you hear me
18          scream "don't answer that."  You
19          don't have to worry about it.
20          It's no hidden message.  It's
21          just lawyer stuff.
22   A.  Ask your question again.
23          MS. CARTER:  I'm sorry.  I messed

Page 46

1          you all up.
2    Q.  It was never communicated to you by anyone
3    that Mr. Looney was in favor of Mr. Lowe going
4    to this seminar?
5    A.  It was never communicated to me by anyone that
6    Mr. Looney was in favor?
7    Q.  Yes.
8    A.  It was communicated to me that he was not in
9    favor.
10   Q.  The opposite?
11   A.  The opposite, yeah.
12   Q.  But you never spoke directly to Mr. Looney?
13   A.  No.  And I suspect also that the staff, they
14   were pretty understanding that I was on the
15   job I guess three days there, and they were
16   not necessarily protecting me from things, but
17   they were trying to give me time to get boxes
18   unpacked and get on with an agenda that I had
19   to deal with.
20   Q.  So would it be fair to say that your
21   information that you received regarding this
22   leave denial came solely through Mr. Barker?
23   A.  I believe so.

Page 47

1    Q.  And the reason again that Mr. Lowe was not
2    allowed to go to it is what now?
3    A.  Well, the district had a series of reading
4    coaches on board, and I think this was about a
5    reading program that we were using and
6    discussing in our district.  And Mr. Looney
7    was well abreast of this area, too.  And I
8    think in any school district that I've worked
9    in that typically the people you're sending to
10   a conference to represent the district -- and
11   obviously if he was asking for leave he was
12   going to be representing Montgomery Public
13   Schools -- that it ought to be someone who is
14   familiar, who is working with the program and
15   the initiative and who can, in fact, share
16   that.  And we do have a policy to talk about
17   who is the spokesperson for the district.  And
18   on the one hand you think of that as it's the
19   superintendent or another staff that you
20   really want to be engaged in some of those
21   conversations.
22   Q.  Was it your understanding that Mr. Lowe had
23   not performed any duties in the area of being

Page 48

1    a reading coach?
2    A.  I think he had some experience in that but not
3    a district reading coach as our model has set
4    up district reading coaches.  And there are
5    some school-based reading coaches, but I'm
6    talking about district reading coaches.  Those
7    folks are heavily engaged in a lot of training
8    and experience with our state agency.
9    Q.  Did you understand that Mr. Lowe had been
10   asked to speak at this by this particular --
11   the folks putting on this particular seminar?
12          MS. CARTER:  Object to form.  You
13          can answer.
14   A.  I guess because he's writing to a
15   Mrs. Hayward and saying -- Harwood -- that he
16   regrets not being able to do that.  But that
17   in my opinion is no different than an issue
18   that we're dealing with now:  Who is the best
19   person to go to a state conference and present
20   on behalf of Montgomery Public Schools on the
21   topic of uniform wearing in schools, that
22   obviously it would have to be a person that
23   has a lot of knowledge about that.  I wouldn't

12 (Pages 45 to 48)

Page 49

1  just send anybody, and we're making a decision
2  about who is the best person, and we don't
3  really think we have a one best person, given
4  the way our board policy is structured. So
5  we'll probably send the two best people that
6  we think can cover that discussion. So I
7  don't see this as any different.
8  Q. Do you know if anybody went from Montgomery
9  Public Schools to this particular --
10 A. I'm not sure.
11 Q. -- seminar?
12    So Montgomery may not have had a
13 representative at all?
14 A. Yes. But my experiences with national
15 conferences is even when I've been approved
16 myself to speak, if you don't show up, there's
17 so much other stuff going on that one
18 presenter missing is not going to stop a major
19 conference.
20 Q. Would that look negative to Montgomery if they
21 didn't show up?
22 A. I don't think so in the big picture. You
23 know, I can remember the year I transitioned

Page 50

1  from the superintendency in Warren County to
2  go to another job, and I was on the National
3  Staff Development Council agenda, which is a
4  huge conference, a national conference. And
5  we had done some great work that I wanted to
6  share, but it was just a simple matter of just
7  saying I would love to come, but I'm in
8  transition between two jobs and I regret that
9  I won't be able to attend. All they do is
10 they're going to print a flier agenda that
11 says these topics have been deleted; there's
12 not going to be a session in this room;
13 presenter cancelled or whatever. I don't
14 think it has any reflection on the district
15 per se.
16 Q. Were you aware that his principal had approved
17 him for this seminar?
18 A. I was not aware of that, no. But, again,
19 because I've looked at what we're doing in our
20 district and the number of requests that are
21 made for attending conferences and meetings --
22 I haven't gotten down into the school level,
23 but I've put a limit on the number of days

Page 51

1  that even principals can go to conferences
2  since I've been in place. That went in place
3  the beginning of this school year. And then
4  I've also said how many meetings could they
5  attend outside the state of Alabama in terms
6  of looking at what they are attending and the
7  amount of time you're away from your school
8  and the amount of money that we don't have to
9  attend some of these conferences.
10    Now, in my mind I also say -- when people
11 say, well, what about the teachers; aren't you
12 going to do that for the teachers, I say,
13 well, if I were a principal in a building and
14 I knew I could only travel so many days, I
15 would be as principal setting some parameters
16 for my teachers if you know you've got a
17 problem with that. I'm going to control the
18 principals because that piece does report
19 directly to me. What a principal does in a
20 school -- Of course, some of these things were
21 put in place August of this school year as we
22 started the new school year. And part of that
23 came because I could look back at how many

Page 52

1  days our teachers were out of schools and so
2  forth in the beginning to figure out when is
3  it that we're teaching children if we have all
4  these absences. They are not absences
5  necessarily but they many requests for leave
6  out of the building.
7  Q. Were you aware that other leave requests for
8  seminars had been denied Mr. Lowe?
9  A. This is the one that I'm familiar with. I'm
10 not familiar with others.
11    (Brief off-the-record discussion
12    followed by a brief recess.)
13 Q. (Continuing by Mr. Patty) When Mr. Lowe
14 applied to teach this seminar, do you know if
15 there were any district level reading coaches
16 at that point?
17 A. I knew that there were district level reading
18 coaches.
19 Q. Didn't district level reading coaches come on
20 later and there were not any at that
21 particular time that Mr. Lowe wanted to go to
22 the seminar?
23 A. I don't know what they called them, but I do

13 (Pages 49 to 52)

Page 53

1  know that there was one person, because
2  earlier or later in the spring, we received a
3  report from the feds through the state
4  department. And there was someone mentioned,
5  and I raised questions about some of the
6  feedback that the feds had written in the
7  report. And that person seemed to have been
8  assigned at the central office on third floor.
9  Q.  Who was the person you believe filled that
10  position?
11  A.  I can't tell you the name. I just know that
12  there was enough concerns in there that I was
13  questioning the report itself in general and
14  how we had faired. And the feds' evaluation
15  and assessment of the district of that person
16  was a person that was said needed to be more
17  visible in the schools to help our principals
18  and teachers, but I can't recall their name.
19  Q.  Do you remember what the title was?
20  A.  I don't recall the title, but it was a
21  district-wise kind of position that should
22  have served multiple schools.
23  Q.  So you don't think it would have been called a

Page 54

1  district reading coach at that time?
2  A.  It may not have been called a district reading
3  coach, but that was the role in which they
4  were to function.
5  Q.  Do you know if Mr. Lowe was -- when the
6  reading coach position -- that program began
7  if he was one of the first people hired in the
8  school system working that program?
9  A.  I don't know that. That was before my time.
10  Q.  Do you know if he received training as a
11  reading coach?
12  A.  Don't know that.
13  Q.  Were you aware of any presentations that
14  Mr. Lowe prepared of a Power Point nature that
15  were placed on the school web site?
16  A.  Not familiar with that.
17  Q.  What do you recall -- I don't want to go back
18  over what you've told me, but is there
19  anything else that you recall Mr. Barker
20  telling you in your conversations with him
21  regarding Mr. Lowe going to the seminar?
22  A.  I can't recall anything other than what we've
23  already discussed.

Page 55

1  Q.  Now, did you talk to Mr. Lowe directly after
2  that?
3  A.  I can't recall having a direct conversation
4  with him.
5  Q.  Let me show you what I've marked as
6  Plaintiff's Exhibit 2 and ask you if this is
7  some correspondence you sent to Mr. Lowe.
8       (Plaintiff's Exhibit 2 marked for
9       identification.)
10  A.  Yes, I did send this. This was trying to
11  catch up on correspondence that I had received
12  when I was still back in Fayetteville from
13  different people.
14       MS. CARTER: If I may explain for
15       the record for clarification,
16       Dr. Purcell recalled that
17       Mr. Lowe had written that letter
18       before she came, but she couldn't
19       find it nor could she find her
20       response. But she knew she had
21       gotten the letter and he had
22       testified about it. So she went
23       on her computer and just printed

Page 56

1  this out. So this isn't "the"
2  copy obviously. We wanted to
3  be --
4       MR. PATTY: Right.
5       MS. CARTER: We didn't intend for
6       this to be a production of what
7       was sent to him, but they printed
8       out from her computer the letter
9       that was drafted to him.
10  Q.  Other than it doesn't have your signature on
11  it, do you recall if anything else was
12  different from what you see as Exhibit 2 and
13  what was sent to Mr. Lowe?
14  A.  What was sent to him was on formal
15  letterhead.
16  Q.  Sure.
17  A.  And my signature was on it, but this is what I
18  sent.
19  Q.  The substance of the letter was there. The
20  typed part, what you actually wrote, was
21  there?
22  A.  Yes.
23  Q.  And did you get any response back from

14 (Pages 53 to 56)

Page 57

1       Mr. Lowe regarding that letter?
2    A.  I can't recall that there was a response
3       specific about this. I recall there may have
4       been another e-mail from Mr. Lowe, but I don't
5       think it was specifically about this piece.
6    Q.  Do you recall having a meeting with Mr. Lowe
7       in January of 2005?
8    A.  I can't recall the details of having -- what
9       that meeting may have been about. I do know
10      that there was meeting. I don't even recall
11      the time. There was a meeting where he
12      stopped in my office one day and asked for an
13      appointment. He brought some materials. I
14      can remember them being in a blue notebook.
15      And in that blue notebook, I remember
16      Goldenrod sheets of paper with perhaps a focus
17      on at-risk children or programs and services
18      that he was sharing with me. I don't remember
19      the details of the notebook.
20   Q.  Tell me everything that you can remember of
21      your conversation with him then, what he said
22      and what you said.
23   A.  I really can't recall that conversation.

Page 58

1    Q.  Okay.
2    A.  I know he wanted me to look at that notebook
3       because it was some information he gathered
4       and thought some of that could be helpful for
5       our children. And regrettably in my
6       transition from the hotel to the house, I
7       misplaced that notebook in moving out of the
8       hotel room. So I can't even say where that is
9       exactly.
10   Q.  Do you recall Mr. Lowe telling you during that
11      meeting that he had filed an EEOC complaint?
12   A.  I don't recall that.
13   Q.  When is your next time that you either had
14      some communication with Mr. Lowe or had
15      communication with a third party about
16      Mr. Lowe after that?
17   A.  Frankly, I can't recall exactly when that
18      could have been, but it looked like there was
19      another communication that Mr. Lowe sent me.
20   Q.  Let me show you what I'll mark as Plaintiff's
21      Exhibit 3 and ask if you recall receiving that
22      document.
23          (Plaintiff's Exhibit 3 marked for

Page 59

1          identification.)
2    A.  I recall seeing this before, and I can't
3       really say whether this was associated with
4       the blue notebook or not, but I do recall
5       seeing that.
6    Q.  Let me show you what I've marked as Exhibit 4,
7       and it's dated February 16, 2005. Do you
8       recall this document?
9          (Plaintiff's Exhibit 4 marked for
10         identification.)
11   A.  Uh-huh (positive response). I recall seeing
12      it now that I see it.
13   Q.  So you did receive Exhibit 4?
14   A.  Uh-huh (positive response). And, in fact,
15      it's noted file, Daisy Lawrence. That is my
16      writing.
17   Q.  Where it says file, Daisy Lawrence, that's
18      your writing?
19   A.  Yes.
20   Q.  Just for the record, the uh-huhs are difficult
21      for her to take down --
22   A.  Yes.
23   Q.  So you did receive Exhibit 4?

Page 60

1    A.  Yes.
2    Q.  And in this letter do you recall -- it's dated
3       February 16, 2005. Do you remember if you
4       would have received this letter before or
5       after your meeting with Mr. Lowe?
6    A.  Let me look at it again. I'm not sure of
7       that, and I asked to look at it again because
8       sometimes -- usually I will put the date that
9       I write something, and I was looking to see if
10      it was there. I can't recall that.
11   Q.  Do you keep a notebook or calendar or
12      something that will show who you meet with
13      each day?
14   A.  That's pretty typical unless an appointment is
15      made at the very last minute or something
16      happens on the same day. It may not be
17      recorded. But pretty much things that are
18      scheduled prior to are noted.
19   Q.  Do you keep notes of the meetings that you
20      have?
21   A.  Sometimes I do and sometimes I don't.
22   Q.  Have you looked to see if you have any notes
23      of your meeting with Mr. Lowe in 2005?

Page 61

1   A.   I probably don't have any notes with Mr. Lowe
2        in 2005.
3   Q.   Do you have anything that would document when
4        you met with him on your calendar?
5   A.   I would have to go back and look at the
6        calendar -- I did not look at it -- my
7        calendar or my secretary.
8   Q.   And this letter, Plaintiff's Exhibit 4, says
9        that Mr. Lowe wants to speak with you. It
10       says, it's urgent I speak with you regarding
11       legal pressures that have been placed on me
12       regarding my employment discrimination suit.
13            Does this refresh your recollection of
14       whether he had mentioned anything to you about
15       an EEOC complaint or a discrimination claim?
16  A.   Until I saw it there, I did not recall the
17       actual date.
18  Q.   Does that refresh your recollection if he
19       mentioned it in your meeting with you?
20  A.   I can't remember the nature of the
21       conversation, but I'm sure if he had a meeting
22       that it was centered around that letter.
23  Q.   After you received Plaintiff's Exhibit 4, what

Page 62

1        did you do regarding what had been
2        communicated to you in this document?
3   A.   I am not sure that I did anything, yeah.
4   Q.   So did you talk to Mr. Barker about
5        Plaintiff's Exhibit 4?
6   A.   Typically what happens with cases we receive
7        is that perhaps maybe once every couple of
8        weeks, either Mr. Barker or Ms. Linda
9        Robinson, my chief of staff, we sit and review
10       cases. But they are pretty much taking notes
11       and taking the details of what I want to
12       happen with cases or positions I think the
13       district should take.
14  Q.   And those would be notes that -- Who would
15       keep those notes who would be writing those
16       notes and where would they be kept?
17  A.   I may write general little notes in the margin
18       of a case and say passed on to Linda Robinson,
19       passed on to Mr. Barker. And we have them in
20       my office filed alphabetically in a file, but
21       Ms. Robinson probably has her system and
22       Mr. Barker has his system of filing.
23  Q.   Where you wrote file, Daisy Lawrence --That's

Page 63

1        S-C-H. What does that --
2   A.   School.
3   Q.   Where did this piece of paper go then? What
4        happened to it after you received it?
5   A.   That piece that -- All of our schools have a
6        file, and so typical issues that are
7        associated with a school also get filed in a
8        school file, but there also could be another
9        file where information is filed as well. We
10       just have double copies of things.
11  Q.   Do you recall speaking with Mr. Barker about
12       this letter at all?
13  A.   I don't recall that.
14  Q.   Did you talk to Mr. Lowe about this letter at
15       all?
16  A.   Not sure. But if there's an EEOC case, I am
17       certain that at some point Mr. Barker and I
18       may have had a conversation about it because
19       we discuss those cases when they come in.
20  Q.   What about -- I'm just trying to make sure
21       I've covered everything. You don't remember
22       speaking to anyone about this particular
23       letter once it came in?

Page 64

1   A.   I can't recall the details. But, like I said,
2        when we get EEOC cases, Mr. Barker and I will
3        typically talk about them because they are
4        usually a personnel matter and/or Linda
5        Robinson, if they were special ed cases more
6        or less and not EEOC cases.
7   Q.   What is the significance of the March 8, 3:30
8        notation on the letter?
9   A.   I'm not sure what that is, and I looked at it
10       and I thought it might have been my
11       administrative assistant's handwriting, but
12       I'm not sure that's even hers. I'm not sure
13       what that is. It could be that if she
14       scheduled an appointment -- I'm not sure whose
15       writing.
16  Q.   Did you have any other communications after
17       that letter with Mr. Lowe that you recall or
18       communications with third parties about
19       Mr. Lowe that you recall?
20  A.   There seemed to be some e-mail communication.
21  Q.   Let me show you what I marked as Exhibit 5 and
22       ask you if this is the next e-mail
23       communication you recall regarding Mr. Lowe.

16 (Pages 61 to 64)

Page 65

1      (Plaintiff's Exhibit 5 marked for
2         identification.)
3  A.  I recall this one, that it came in.
4  Q.  Do you recall -- Between Plaintiff's Exhibit 4
5     and Plaintiff's Exhibit 5, do you recall any
6     e-mail communication regarding Mr. Lowe?
7  A.  I can't recall any.
8  Q.  Do you recall any verbal communication
9     regarding Mr. Lowe or with Mr. Lowe between
10    Plaintiff's Exhibit 4 and 5?
11  A.  And I can't recall any of those.
12  Q.  Let me take you to a conference that was held
13    at Daisy Lawrence in the spring of 2005. Do
14    you recall going to Daisy Lawrence and
15    speaking with them about -- to the staff there
16    about the plans for the school?
17  A.  Yes. If you're talking about that, I do
18    recall that meeting -- Mr. Barker and I went
19    over -- and specifically talking to Mr. Lowe.
20    Per se. I didn't have a conversation with
21    him -- I didn't go to the school with that
22    purpose in mind. I went to the school with
23    the purpose of talking to the entire faculty

Page 66

1    and staff and asked Dr. Owens to convene his
2    staff in a location that would hold all them
3    and that they could still have oversight of
4    the children because school was still in
5    session but felt it was important to address
6    the issues of the closing of the school with
7    the personnel involved.
8  Q.  And what did you tell the faculty and staff
9    about the closing of the school?
10  A.  That all personnel who were certified would be
11    reassigned and Mr. Barker would work through
12    those assignments based upon vacancies in
13    other locations. In addition, that assistance
14    would be provided to them through Mr. Adams,
15    our operations director, to relocate and move
16    their items and belongings and that we were
17    going to make this a smooth transition. I
18    probably espoused my views that young children
19    typically in an alternative setting needed to
20    be integrated back into a traditional school
21    setting and not separated, and that was the
22    reason for the move. I recall talking a
23    little bit about the savings of monies that

Page 67

1    were going to be involved. We had a very
2    small number of students with a multiple
3    number of faculty.
4     I think then after that maybe some of the
5    staff might have come and asked me questions
6    one on one.
7  Q.  Did you talk to Mr. Lowe one on one?
8  A.  I think Mr. Lowe did come up and ask questions
9    one on one as well as a couple other people.
10  Q.  What do you recall about your conversations
11    with him?
12  A.  I can't recall specific conversation, but
13    probably just reiterating the fact that the
14    certified personnel would be addressed and
15    reassigned and any other concerns would have
16    to come through Mr. Barker's office in terms
17    of reassignment.
18  Q.  And did you talk to any -- What do you recall
19    about the one-on-one conversations with other
20    persons there at the meeting? Do you remember
21    who you talked to or any of the substance of
22    those conversations?
23  A.  Pretty much I think when people came and asked

Page 68

1    those questions, those who were not classroom
2    teachers, what would happen to them if they
3    were certified and/or had tenure in the
4    district, I told them a position would be not
5    necessarily created for them, but we would
6    look and do our very best to reassign all
7    those who were certified tenured individuals
8    as well as those who were classified and
9    tenured.
10  Q.  So you had -- you said that the people who
11    were classified tenured you would try to
12    reassign those --
13  A.  As well, yes.
14  Q.  And do you recall who -- Do you recall if all
15    the certified employees were reassigned?
16  A.  I'm going to sit here and say I don't know all
17    the people who were at Daisy Lawrence. I
18    guess the four people who stand out in my mind
19    who were reassigned are those three
20    individuals who are the teachers of the new
21    alternative sites that we have at three
22    different elementary schools and a counselor
23    who was reassigned. I do recall those four,

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 69

1  and I don't know them all by name, but I
2  recall that because I visited those programs
3  to make sure they were working as we intended
4  for them to work.
5  Q.  But do you recall any certified employees at
6  Daisy Lawrence who did not get reassigned?
7  A.  I can't think of any.
8  Q.  Well, obviously Mr. Lowe didn't get
9  reassigned, right?  You're aware of that, that
10  he did not get reassigned?
11  A.  Well, I indicated to you earlier we said
12  certified and tenured personnel.
13  Q.  Well, now, were there any certified personnel,
14  whether they were tenured or not tenured,
15  other than Mr. Lowe that did not get
16  reassigned to your knowledge?
17  A.  I don't recall.
18  Q.  How many nontenured certified personnel were
19  at the school?  Do you know?
20  A.  I don't recall the exact number.  It was a
21  staff I guess of twelve to thirteen people
22  totally.  I may be wrong on that number.
23  Q.  How many positions -- How many job openings

Page 70

1  were there this summer for Montgomery Public
2  Schools for teachers?
3  A.  I don't know.  I'm going to defer to
4  Mr. Barker on that one.
5  Q.  And I meant certified teachers.  I didn't mean
6  classified employees.  But do you remember how
7  many teacher positions were available?
8  A.  Absolutely not.  I know that we entered the
9  school year going into the hiring season as
10  well as coming out of the major hiring season,
11  that we were going to start the school year
12  off with a deficit in the number of science
13  and math teachers that we needed and spent
14  time addressing that with our principals in
15  terms of how to handle that.
16  Q.  How many employees -- certified employees are
17  there in the school system?
18  A.  There are 4200 employees.  I would say about
19  twenty-six or twenty-seven hundred of them are
20  certified and others are support personnel.
21  Q.  Do you know if a position was offered to
22  Mr. Lowe for employment this past summer?
23  A.  If you're talking about a position offered to

Page 71

1  him through approval of the board, I don't
2  think so.
3  Q.  Did you recommend him for any position with
4  the school system?
5  A.  I have not taken a recommendation to the board
6  I don't think with Mr. Lowe's name on it.
7  Q.  Have you received a recommendation for him?
8  A.  Through Mr. Barker's office a recommendation
9  might have been received, yes.
10  Q.  Which position?  Do you recall?
11  A.  It probably was at Paterson Elementary.
12  Q.  And who was the principal there?
13  A.  The new principal was Mr. -- Dr. Owens, who
14  was moved from Daisy Lawrence over to
15  Paterson.
16  Q.  And what was the position for?
17  A.  In the area of reading, reading coach.
18  Q.  And that was a position that Mr. Lowe had
19  worked in before?
20      MS. CARTER:  Object to form.
21      THE WITNESS:  Is that one I answer?
22      MS. CARTER:  Yes.
23      (Brief off-the-record discussion.)

Page 72

1  A.  It may have been a similar position but one
2  that I certainly had concerns about in terms
3  of the overall makeup of that particular
4  school.
5  Q.  So Dr. Owens wanted to hire Mr. Lowe this
6  summer for a reading coach position.  Was
7  Mr. Lowe certified for that position?
8  A.  I'm not sure necessarily about certified for
9  the position as much as it seemed that that
10  recommendation from Dr. Owens had come outside
11  of the process that the district used.  We
12  have an elementary person who is pretty much
13  coordinating the whole efforts of the reading
14  initiative in our district under the
15  supervision of Mr. Lynheart (phonetic) who is
16  our assistant superintendent, and they had a
17  process of screening people through that
18  committee.  And there was already a pool, and
19  that one seemed to have come from outside the
20  pool without going through the screening
21  committee, and that was the concern.
22  Q.  Was the screening committee just for reading
23  coaches?

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 73

1    A.  That's pretty much what they were in place
2        for.
3    Q.  When was the committee -- when did it start
4        being used for -- When did reading coaches
5        start being hired through that committee?
6    A.  I'm going to have to defer to Mr. Barker to
7        answer that, but I do know that's the process
8        and he's going to have to give you the date.
9        I don't know exactly when it went in place,
10       but there was a screening process.
11   Q.  Is there any other committee used with
12       certified personnel besides reading coaches?
13           MS. CARTER:  For teaching-type
14           positions?
15           MR. PATTY:  Certified personnel,
16           yeah.
17   A.  When you said screening committee, you mean
18       that is in lieu of the actual other processes
19       we have in place?  I think the reading coaches
20       is the only one.
21   Q.  And generally you told me that when a
22       principal recommends an employee and that
23       employee is properly certified, the practice

Page 74

1        has been for that employee to be hired; is
2        that right?
3            MS. CARTER:  Object to form.
4    A.  That is typical -- That is what I said, but
5        also if you know a little bit about what's
6        going on around the country in terms of
7        literacy coaches and reading coaches, most
8        districts also have in place -- And this
9        screening process is not atypical to the one
10       that I just left in Cumberland County that we
11       put in place, but I would say that ours was a
12       little bit more rigid than --
13   Q.  When did -- This committee, do they keep notes
14       of their interviews?
15   A.  I'm sure they must keep something, but I'm not
16       sure about the details because they have to
17       then, I suspect, make a recommendation back
18       through Mr. Lynheart and/or Dr. Thomas down to
19       Mr. Barker.
20   Q.  And did Mr. Lowe not go through the committee
21       as your understanding or did he not just --
22   A.  It was my understanding he did not go through
23       the committee and there were other people that

Page 75

1        might have been in the pool and had not been
2        given an opportunity.
3    Q.  So your understanding is that he had not gone
4        through the interviewing process with this
5        committee?
6    A.  That's my understanding.  And, quite frankly,
7        Dr. Owens may not have been as a new principal
8        at that school aware of that screening process
9        because he had been in an alternative school.
10   Q.  Well, since this was somebody Dr. Owens
11       wanted, was Mr. Lowe told to go back and go
12       through the screening committee --
13   A.  I'm not sure what was communicated to him.
14   Q.  Let me back up again.
15           Do you know if Mr. Lowe is certified for
16       that position or that he had the certification
17       for it?
18   A.  I'm not sure.  I would need to look at the
19       file.
20   Q.  Were you told if he was qualified for that
21       position?
22           MS. CARTER:  Object to form.
23   A.  I was told that there were other applicants

Page 76

1        who had far more experience and
2        qualifications -- not experience but
3        qualifications than he did, and so they went
4        through the process.
5    Q.  I'm just asking do you know if he was -- is it
6        your understanding he was qualified for that
7        position, though?
8            MS. CARTER:  Object to form.
9    A.  Is it my understanding that ...
10   Q.  That Mr. Lowe was qualified for the position.
11           MS. CARTER:  Same objection.
12   A.  I'm going to defer on that one to Mr. Barker.
13   Q.  So you don't know?
14   A.  I don't know because I don't sit and
15       absolutely look at every file.
16   Q.  Now, who is on the committee that would have
17       been screening the reading coaches?
18   A.  Ms. Connie Mizell is the person who would
19       coordinate that, and I'm not sure of who she
20       had on the committee per se.
21   Q.  Has Ms. Mizell been placed on administrative
22       leave within the last year?
23   A.  I can't recall.

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 77

1    Q.  Are you aware of any allegations against
2        Ms. Mizell of any kind of racial
3        discrimination or hostile environment based on
4        race?
5    A.  I remember conversations about it.
6    Q.  What was that?
7    A.  That there may have been some concerns, and
8        I'm not so much sure if it was that as that it
9        was Ms. Mizell was a principal at one of our
10       schools, and there may have been lots of
11       involvement in that school that she had
12       formerly been a principal in.
13   Q.  Could you explain a little bit more than
14       that? I don't understand.
15   A.  Well, I think typically it's when you're in a
16       position, you don't want to have people
17       constantly back in that position dibbling and
18       dabbling in a school. And it seemed that she
19       had had some involvement in that school about
20       personnel.
21   Q.  What was the allegation made against her that
22       was of a racial nature?
23   A.  I'm not sure of the details so much being

Page 78

1        racial as some other things, and I'm going to
2        let Mr. Barker -- because he has sat in on
3        that and it was at the administrative level,
4        and it was not anything that has been actually
5        filed I don't think.
6    Q.  Do you know when that allegation came up?
7    A.  That seemed to have come up within, I would
8        say, the early fall of this school year.
9    Q.  Fall of 2005?
10   A.  Yes. 2005. Maybe late fall.
11   Q.  Are you aware of any other positions that a
12       principal recommended to hire Mr. Lowe and he
13       was not hired in the summer of 2005?
14   A.  I can't recall any.
15   Q.  Tell me again, in making-- Who would be the
16       decisionmaker of whether or not Mr. Lowe was
17       hired in the summer of 2005?
18           MS. CARTER: Object to form.
19   A.  In regard to which position?
20   Q.  Well, the one position you say you were aware
21       that he had been recommended by the principal
22       for.
23   A.  The only discussion that I've been involved in

Page 79

1        and know something about is Paterson. And
2        there have been other situations I guess that
3        have come up in discussion since all of this
4        has been going on, but I'm not familiar with
5        the details of all those. But the details of
6        Paterson I've really been more familiar with.
7    Q.  Who would have made the decision on Paterson?
8           MS. CARTER: Object to form.
9    A.  The final decision itself still rested -- came
10       through Mr. Barker and others involved, but it
11       was pretty much my feelings because I've had
12       conversations with teachers in that building,
13       conversation with the last principal who was
14       there, conversation with volunteers who were
15       extremely concerned our most
16       needed children in the district were not
17       receiving the quality and the caliber of
18       personnel that they needed that other schools
19       were receiving and asked that I certainly be
20       aware of that as we placed new leadership
21       there as we looked at that school, and
22       probably that the school was not performing at
23       a high level and so we needed the most

Page 80

1        qualified people there we could place.
2    Q.  And when was it you took that type of concern
3        with Paterson?
4    A.  Probably in March '05 I want to say. The
5        principal retired quite suddenly. She was an
6        only child, and her father was very ill and
7        she needed to go home. And we placed an
8        interim person there. And as we came to the
9        end of the school year, then we had to assign
10       a principal. And it was in between that time
11       that I met with teachers, teachers who shared
12       with me that many people thought that perhaps
13       because of the way Paterson looked and what
14       perceptions people had, that there were
15       teachers who were very committed to wanting to
16       be in that school but they just needed the
17       right people there to help them to do the work
18       that they were very much committed to doing.
19       They didn't want to go to other schools, but
20       they felt they could have success with this
21       population of children.
22           The principal shared some of the concerns
23       as she was leaving quite suddenly to resign,

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 81

1   and then we have some active volunteers in
2   that school who likewise shared concerns that
3   there was potential there with the children
4   but only if we had a very highly qualified
5   staff to come in and do some of the things in
6   the areas they needed to have focused on.
7       So as a superintendent, I would take
8   interest in any school that you hear those
9   kind of concerns as well as the fact the
10  school is on the state school improvement list
11  along with several of our others.
12  Q.  And to that end, you ended up hiring Dr. Owens
13  to be the principal of the school?
14  A.  At that point where we were in the school
15  year, we had to assign individuals who had
16  tenure, and so Dr. Owens was that person.  And
17  then I certainly was concerned that other
18  people added to that building would be highly
19  qualified.
20  Q.  You wanted -- I'm sure you -- Dr. Owens is a
21  contract principal, right?
22  A.  Yes.
23  Q.  And when you made your assignment of him to

Page 82

1   that school, then I take it you wanted to make
2   sure you had who you felt like was the best
3   principal of that school given your concerns
4   for that school?
5   A.  The best principal that we could place there
6   and/or the best principal or person that we
7   could assign to that school and have all
8   personnel assigned who were entitled to
9   positions.
10  Q.  Is there anything with regard to Dr. Owens
11  that would negatively impact your opinion as
12  to his judgment for personnel that he wanted
13  to hire?
14  A.  I don't know a lot about all of the individual
15  principals in the district.  I'm still
16  learning them.  I recall reviewing his PEPE
17  evaluation, and that seemed to have had the
18  required score to continue on as a principal.
19  Q.  So you don't know anything that would -- does
20  that mean that you don't know anything that
21  would lead you to have a negative opinion as
22  to his ability or his opinions of who to hire
23  for his school?

Page 83

1   A.  I'm not sure that it's a negative opinion, but
2   I think principals who are typically in
3   alternative schools have not had the full
4   array of programs to work with and as detailed
5   programs to work with as principals in
6   traditional grade level structured schools.
7   So perhaps that concern only, and becoming
8   familiar with the full curriculum that
9   probably was not a total part of an
10  alternative school setting and also the size
11  of the schools.  While Paterson is not a large
12  school -- I mean, we're talking about a school
13  that while it had a multiple number of
14  children, at any given time you're talking
15  about maybe 25, 30 kids in the building at one
16  time versus 200 plus kids.
17      MS. CARTER:  You said Paterson, and
18      I think when you meant 25 kids
19      you're talking about Daisy
20      Lawrence.
21  A.  Daisy Lawrence, yes.  I'm sorry.
22  Q.  I guess my question is this:  Is there any
23  reason or what would be the reason, other than

Page 84

1   this about the committee selection process,
2   for not giving the deferment to a principal
3   like Dr. Owens when he wanted to hire
4   Mr. Lowe?
5   A.  I suspect mainly that if you had a process in
6   place like that for screening a reading coach
7   in the district and you ignore the process
8   that we wouldn't just be sitting here dealing
9   with this issue today.  We would be dealing
10  with some other issues from people who feel
11  they have just been ignored and have not gone
12  through the process, and they are very
13  familiar with the fact that the structure is
14  in place for the hiring and recommendation
15  process -- recommendation and then hiring.
16  Q.  But my question is, is there anything about
17  Dr. Owens that is unique to him that would --
18  that you would not give his opinion as to who
19  to hire the same weight as another principal?
20      MS. CARTER:  Other than what she's
21      already testified to?
22      MR. PATTY:  Well, that's what I'm
23      trying to get.

21 (Pages 81 to 84)



Page 85

1  A.  No. I pretty much said it. I had the
2      feedback from teachers, from the volunteers in
3      that school that are very committed and their
4      concerns about wanting to create the kind of
5      school that the children there deserved. And
6      so I think that when you have a school like
7      that that you will tend to dibble and dabble
8      to some extent as the superintendent. At the
9      end of the day, the ownership is going to be
10     on my shoulder whether we can pull that school
11     out of the situation it's in, so I need to
12     have some concerns and interest in it.
13 Q.  These communications with teachers, though,
14     that wasn't about Dr. Owens, was it?
15 A.  The communication with teachers?
16 Q.  You said you had some communication -- I'm
17     sorry. Not with teachers but with people
18     about the type of school they wanted to create
19     and everything. But that wasn't indicative of
20     Dr. Owens?
21 A.  No, that wasn't about Dr. Owens, but obviously
22     that weighed into my decisions.
23 Q.  Well, I guess I'm just not -- would there be

Page 86

1      anything about Dr. Owens that would discount
2      the weight you would give his opinion versus
3      another principal in the school regarding
4      hiring an employee?
5          MS. CARTER: Object to the form.
6          Other than what she's already
7          testified to about him being at
8          the alternative school?
9          MR. PATTY: Well, don't --
10         MS. CARTER: Well, that was her
11         testimony. I'm not giving --
12         MR. PATTY: No.
13         MS. CARTER: That's what she
14         testified about, and you keep
15         asking her the same question.
16         MR. PATTY: No, I don't -- I don't
17         think I've gotten a direct answer
18         to it. And if I get one, then
19         that's fine, but I don't think I
20         have yet.
21         MS. CARTER: I mean, I object to
22         that. You may not have gotten
23         the answer you wanted, but I

Page 87

1      think she explained. But okay.
2      The testimony is what it is.
3          MR. PATTY: Can you read it back?
4      (Off-the-record discussion)
5      (The immediately preceding question
6          was read back by the court
7          reporter)
8          MS. CARTER: Object to form.
9  A.  There are 38 schools in our district on -- in
10     school improvement, and 33 of those schools
11     are Title I schools. So anything that comes
12     up in those 33 probably more than those other
13     five, because they are not in the same
14     predicament, I'm going to have some concerns
15     and some involvement of what happens in
16     there. The training that principals go to,
17     they can choose some of it. But if I see some
18     of it that is going to benefit them and they
19     need to go to it, those kind of things I am
20     going to be involved in.
21 Q.  I get that you would have more involvement in
22     those schools. You say that schools that are
23     trouble schools you have more involvement, but

Page 88

1      I'm trying to see if there's anything personal
2      to Dr. Owens that makes his judgment as a
3      principal on hiring an employee or
4      recommending to hire an employee carry less
5      weight than any other principal in the system.
6          MS. CARTER: Object to form.
7  A.  No different than what I would have with those
8      other 33 and, for that matter, I guess all 60
9      of them.
10 Q.  That's fair.
11     Who was hired instead of Melvin Lowe for
12     the position at Paterson?
13 A.  I don't recall the name of the person.
14 Q.  Do you recall if they were white, black, male,
15     female?
16 A.  I don't know the person's name. I don't know
17     what they look like. If they walked in here
18     right now, I couldn't tell you who they are.
19 Q.  Lady? Man?
20 A.  I don't know the answer to that, but I do know
21     we followed the process that had been put in
22     place.
23 Q.  If you don't know who it is, how do you know

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 89

1       they are more qualified?
2   A.  Because hopefully if they went through the
3       process and Ms. Mizell, who is highly
4       qualified to do the work that she's doing, has
5       given a recommendation to Mr. Barker,
6       hopefully it cleared the hurdles that they go
7       through in personnel to bring a recommendation
8       to me.
9   Q.  So you're basically going again on what
10      Mr. Barker tells you?
11   A.  Many of the personnel that we put in place is
12      pretty much that because I'm not involved down
13      at that level except that I do want to know
14      that the processes and procedures have been
15      put in place. And if we have deviated from
16      it, I want to know it before I take a
17      recommendation in to the board to say this one
18      kind of came out of the framework.
19   Q.  Did you ask -- So, again, with regard to this
20      position at Paterson, you relied on what
21      Mr. Barker had informed you had occurred in
22      the hiring process?
23   A.  Yes.

Page 90

1   Q.  Did Mr. Barker have a recommendation of which
2      way you should go, that you should go with
3      this person from Mizell's committee or that
4      you should go with Mr. Lowe?
5   A.  The name he brought to me was probably coming
6      out of the committee because that was the
7      structure put in place.
8   Q.  But you testified earlier he mentioned
9      something about Mr. Lowe being recommended.
10   A.  That was before we went back and followed the
11      procedure that had been put in place, which
12      was the screening process.
13   Q.  Do you recall if Mr. Barker recommended not to
14      hire Mr. Lowe when he spoke to you about it?
15   A.  Mr. Barker's statement to me was not to not
16      hire Mr. Lowe. It was that we had not gone
17      through the process and procedure, and we
18      could not justify not going through the
19      required process that had been already
20      established.
21   Q.  Now, let me ask you -- I'm trying to
22      understand the time line. Mr. Barker comes
23      with Mr. Lowe's name and says he's

Page 91

1       recommended, but they haven't gone through
2       this process. After that conversation, is
3       that when the interviews took place and then
4       these names were generated from Mizell?
5   A.  Yes. Because we went back through the
6      process.
7   Q.  Now, how long a time frame is that that that
8      took place?
9   A.  I have no idea.
10   Q.  Is it one name, two names, three names that
11      come out?
12   A.  I'm not sure of that either.
13   Q.  And do you know if there's anything that --
14      document-wise that that committee creates to
15      show the criteria that they use or to show how
16      the person responded to that criteria?
17   A.  I suspect there is, but I'm going to defer to
18      Mr. Barker for that.
19   Q.  So the committee would have met, then, after
20      Mr. Lowe had asked to have this position and
21      after you were aware that Dr. Owens wanted him
22      for that position? Then the committee has
23      this interview process?

Page 92

1       MS. CARTER: Object to form.
2   A.  Yeah. That's what I said a few minutes back.
3   Q.  Do you know if Mr. Lowe was informed of that
4      screening process that was going to take place
5      or how that was to take place?
6   A.  I'm not sure but I would think so.
7   Q.  How many conversations do you think you had
8      with Mr. Barker regarding that position?
9   A.  I would probably say no more than two or
10      three.
11   Q.  Do you remember any e-mails or notes made
12      regarding those conversations?
13   A.  I'm not sure.
14   Q.  And would you have -- did you talk to
15      Dr. Owens about who he wanted to hire?
16   A.  No, I did not have that conversation directly
17      with him.
18   Q.  Did Mr. Barker relate to you about talking to
19      Dr. Owens?
20   A.  I think he did share that he had spoken with
21      Dr. Owens and said we had to go through the
22      process.
23   Q.  And anything else you remember he said that

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 93

1      Dr. Owens had told him?
2    A.  I can't recall anything.
3    Q.  How do principals become aware of the
4        screening process for these reading coaches?
5    A.  I would suspect our traditional principals
6        have long been familiar with the process. And
7        when I say long been familiar with the
8        process, as long as if their schools qualified
9        for such a position, they knew that position
10       was in place. And I guess that goes back to
11       what I was saying before, that a principal who
12       is in a larger school who has a full access
13       and array of programs versus one who has been
14       in a smaller school who may not have taken
15       advantage of the whole process. And I think
16       that's where we help principals understand the
17       details from our role in central office.
18   Q.  You were certainly aware at the time that
19       Mr. Owens -- that Mr. Lowe had filed an EEOC
20       complaint and a lawsuit at the time this was
21       going on; is that correct?
22           MS. CARTER:  Object to form.
23   A.  Yes.  From documentation.

Page 94

1    Q.  Did you and Mr. Barker discuss that?
2    A.  I don't remember that -- I don't recall that
3        being attached to the lawsuit and EEOC.
4    Q.  Mr. Owens -- Lowe had written you -- we've
5        identified Plaintiff's Exhibit 5 -- in June
6        22, 2005.  That's an e-mail you received,
7        isn't it?
8    A.  Yes.  As I said, I recalled the format and the
9        way it looked, but I didn't deal with the
10       details in here -- I mean, at the table right
11       now.  I didn't deal with the details.  I'll
12       look back at it.
13   Q.  You recall receiving Plaintiff's Exhibit 5,
14       right?
15   A.  I recall that.
16   Q.  In this e-mail Mr. Lowe talks about how he's
17       had a conversation with Dr. Owens who has told
18       him that basically because of his lawsuit he's
19       going to not be treated fairly with the school
20       system.
21           What did you do upon receiving this letter
22       to make sure that this wasn't true?
23   A.  I probably didn't respond to that in terms of

Page 95

1        making sure it wasn't true.  I think those are
2        Dr. Owens' statements to him, and I don't
3        think that anybody at central office had any
4        intent of dealing with that at that level.
5        Those are just one person's perception in my
6        opinion.
7    Q.  Let me ask you this:  Did you interview
8        Dr. Owens after Plaintiff's Exhibit 5?
9    A.  Interview him?
10   Q.  Yes.  Did you talk to Dr. Owens after
11       Plaintiff's Exhibit 5 to see --
12   A.  No, I did not.
13   Q.  -- where he was coming from with these
14       statements?
15   A.  No.
16   Q.  Did you talk to Mr. Barker about Plaintiff's
17       Exhibit 5?
18   A.  I recall I think sharing that with Mr. Barker
19       but not having a detailed discussion.  I
20       suspect -- I don't recall anything, but I
21       suspect because there are other people who
22       have complaints and cases with the system that
23       I would like to believe that we aren't just

Page 96

1        doing what Dr. Owens is suggesting there.
2        We're just dealing with the issue.
3    Q.  What is the process or procedure involved when
4        you received a complaint like Plaintiff's
5        Exhibit 5 that a principal is saying allegedly
6        to an employee that he's not going to be
7        treated fairly by central office and the
8        administration because of his filing a lawsuit
9        and EEOC complaint?
10   A.  I don't recall if Mr. Barker dealt with it,
11       but I did not deal with it because, again as I
12       indicated, it's a perception of one person.
13       It's not in my opinion a factual perception.
14   Q.  Right.  I understand your testimony is you
15       didn't do anything regarding Plaintiff's
16       Exhibit 5; is that right?
17   A.  Yes.
18   Q.  Now, I'm trying to get -- what is the
19       procedure and the policy of the school for
20       handling a complaint like Plaintiff's Exhibit
21       5?
22   A.  I suspect --
23           MS. CARTER:  Object to form.

24 (Pages 93 to 96)

Page 97

1   A.  Once I talk to Mr. Barker, it's pretty much a
2       situation I would expect him to kind of deal
3       with, if he felt that there wasan issue there
4       to be dealt with.  And I'm not sure that that
5       one raised to the level of real concern for
6       me.  It was a perception of a principal, and
7       I'm not sure it was accurate.  But I think you
8       could get into a lot of other details if you
9       begin to respond to every perception.
10  Q.  Well, you would agree with me if you take what
11      Mr. Lowe is saying Dr. Owens is saying is
12      true, he's claiming that Mr. Barker has some
13      animosity toward Mr. Lowe.  It says, to
14      convince me Mr. Barker isill with me and in
15      efforts of showing me I've got too far,
16      Dr. Owens -- And it goes on and on and on.
17          The school system doesn't have any
18      procedure in place that if a complaint is made
19      about a central office hiring that they will
20      have some investigation of that complaint?
21          MS. CARTER:  Object to form.
22  A.  Well, I think that I've outlined what the
23      central office process is for hiring, and

Page 98

1       that's what we do.
2   Q.  I'm talking about more of what's the process
3       of the school system or procedure or policy of
4       the school system to handle a complaint that
5       involves treatment by a principal and by
6       central office staff.
7   A.  Well, that letter did not come to me as a
8       grievance.  I suspect if it had come in the
9       form of a grievance, wewould have gone
10      through the grievance procedure and process.
11      But it did not come to me in the form of a
12      grievance.
13  Q.  But you have a complaint where an employee of
14      the school system is saying I've been told I'm
15      going to be retaliated against because I filed
16      a lawsuit, which is an EEOC lawsuit.  Areyou
17      telling me that there's really not a process
18      or procedure in place with the school system
19      to handle that kind of complaint?
20          MS. CARTER:  Just for the record, we
21          would object to his reference as
22          an employee at that time, but go
23          ahead.

Page 99

1   A.  Again, I think it's a perception.  It wasn't
2       sent to me as a formal grievance.  And I don't
3       know -- I guess now that you've raised that
4       issue, I'm not sure if you're not an employee
5       if you have a right to the process of
6       grievance under the policy.
7   Q.  Well, I'm not really asking you about a
8       grievance per se, but is there a policy or
9       procedure that if an employee or former
10      employee is providing you with information
11      saying that he's going to be retaliated
12      against because of filing a lawsuit because of
13      what the central office people are going to
14      do -- I mean, you don't have any kind of way
15      of addressing that?
16  A.  The board does not have a policy to deal with
17      all the perceptions that people have.
18  Q.  What about complaints?  This is a complaint
19      about retaliation in the filing of an EEOC
20      lawsuit.  Are you telling me the board does
21      not have a policy --
22  A.  They have a grievance process, but I don't
23      think that came in the form of a grievance.

Page 100

1       And I could have followed the grievance
2       process if it had been sent as such.
3   Q.  Are you telling me if they just receive a
4       complaint that someone is being retaliated
5       against on the basis of filing an EEOC lawsuit
6       that the board has no process for that?
7          MS. CARTER:  Object to form.
8   A.  Based on policies that I'm familiar with --
9       and I am familiar with the grievance
10      process -- I'll defer to Mr. Barker if there's
11      a complaint process as such.
12  Q.  So you don't know?
13          MS. CARTER:  Object to form.
14  A.  I'm not familiar with one that exists, a
15      complaint process.
16  Q.  Did you ever tell Mr. Lowe that he needed to
17      file a formal grievance?
18  A.  No, I did not.
19  Q.  Did you respond to Mr. Lowe at all regarding
20      this letter?
21  A.  No, I did not.
22  Q.  And so your only action with it was to talk to
23      Mr. Barker about it; is that right?

25 (Pages 97 to 100)

Page 101

1   A.  I think the only time that I might have
2       responded to him on e-mail -- that didn't
3       come -- Let me look at that again, please.
4           I don't know how it was sent.  I don't
5       know if I recall it was on e-mail.  It looks
6       like it came off the e-mail system, but I
7       don't recall responding to that.  And, again,
8       my process of responding to people with
9       e-mails unless I sit and type a response is
10      just acknowledge that I received it, and I
11      can't recall about that one.
12  Q.  So your only action with regard to Plaintiff's
13      Exhibit 5 was to give it to Mr. Barker or talk
14      to Mr. Barker about it?
15  A.  Yes.
16  Q.  How many times would you have talked to
17      Mr. Barker about it?
18  A.  I can't recall that.
19  Q.  Do you know if there's any notes or
20      documentation of those conversations?
21  A.  I'm not sure.  I would have to look.
22  Q.  What do you recall, if anything, of those
23      conversations with Mr. Barker?

Page 102

1   A.  Sometimes those conversations are as basic as
2       would you look into this; would you get back
3       to me on this.  But I would have to look and
4       see if there were notes on Exhibit 5.
5   Q.  Did you ever follow up with Mr. Barker
6       regarding Plaintiff's Exhibit 5?
7   A.  I can't recall.
8   Q.  Do you remember Mr. Barker ever reporting back
9       to you about Plaintiff's Exhibit 5?
10  A.  I'm not sure specifically about Plaintiff's
11      Exhibit 5 as much as the bigger process, which
12      was the process for going through an interview
13      process for the coaching position -- reading
14      coach position.
15  Q.  Were you ever advised through counsel Mr. Lowe
16      had complained that he was being cut off from
17      positions through the central office
18      administration?  I'm not saying that
19      lawyer-client --
20          MS. CARTER:  I was going to say.
21          When you said counsel, do you
22          mean --
23          MR. PATTY:  No.  I'll make it

Page 103

1           plainer.
2   Q.  I wrote a letter to Spud back in the early
3       fall, August, and said that Mr. Lowe was
4       having problems because he was being
5       recommended for positions by principals or
6       principals had been wanting to hire him but he
7       was not getting hired at these spots, and he
8       felt like somebody was blocking him in the
9       central office.
10          Were you ever made aware of that
11          complaint?
12  A.  I think Mr. Barker said something about
13      that to that effect.  But, of course, the
14      recommendations come down from principals, so
15      it wouldn't have come from central office.
16  Q.  Well, central office would have been the block
17      for the hiring that Dr. Owens wanted to hire,
18      right?
19          MS. CARTER:  Object to form.
20  A.  Well, the fact that they had not used the
21      process that was in place was the real block.
22  Q.  But that was through central office, right?
23  A.  That was through central office, but they had

Page 104

1       gone outside the procedure.
2   Q.  Were you aware that Mr. Abrams wanted to hire
3       Mr. Lowe for a position?
4           MS. CARTER:  Object to form.
5   A.  I was not familiar with that until this
6       discussion getting ready for this week, so I
7       wasn't familiar with that.
8           MS. CARTER:  She's talking about
9           what I told her her claims were.
10          MR. PATTY:  I don't want to get
11          into -- Don't tell me what your
12          lawyer said to you.
13  Q.  What about Ms. Starks?  Were you ware that
14      Ms. Starks wanted to hire Mr. Lowe for a
15      position?
16  A.  I can't recall that was ever a conversation
17      with me either.
18  Q.  Or Mr. Sikes?
19  A.  Not familiar with that as a case either.
20  Q.  Following -- Other than what we've talked
21      about, do you recall any other discussions
22      this summer regarding Mr. Lowe?
23  A.  None that I can think of.

26 (Pages 101 to 104)

Page 105

1  Q.  Did it concern you that an employee at the
2      school or former employee at the school,
3      however you want to say it, was telling you
4      that his principal and supervisor had informed
5      him he was going to be retaliated against for
6      filing his lawsuit?
7  A.  His supervisor?
8  Q.  Yeah. His principal had told him he was going
9      to be retaliated against by administration for
10     filing his lawsuit.
11 A.  Again, I guess I'm back to perception that's
12     stated in this letter, and --
13 Q.  Well, unless you investigate it, you don't
14     know whether it's perception or truth, do you?
15         MS. CARTER: Object to form.
16 A.  I do not sense that the people in our HR
17     department would have retaliated against
18     people.
19 Q.  That would be, again, a perception instead of
20     investigation; is that right?
21         MS. CARTER: Object to form.
22 A.  But I'm in close contact with them every day,
23     and I don't sense that.

Page 106

1  Q.  But you did not do any investigation into
2      Plaintiff's Exhibit 5?
3         MS. CARTER: Object to form.
4  A.  Again, I guess it didn't come as a grievance
5      or as a formal complaint.
6  Q.  Well, it's a complaint, isn't it?
7  A.  Well, I mean --
8         MS. CARTER: You've told her it's a
9         complaint like 30 times now. And
10        then you said, well, maybe it's
11        not a complaint; how did you
12        respond to it. But anyway I
13        think she's testified that she
14        turned it over to Mr. Barker and
15        she didn't do anything. I don't
16        think she's trying to be
17        dishonest about it.
18 Q.  But you would agree with me that he's
19     complaining about his treatment at the school
20     system, right?
21         MS. CARTER: Object to form.
22 A.  I've answered that one. It's a perception of
23     Dr. Owens regarding what he said to Mr. Lowe.

Page 107

1  Q.  What do you think -- If Mr. Lowe was not
2      trying to get you to take some action to
3      assist him regarding Plaintiff's Exhibit 5,
4      what do you perceive the purpose of that
5      letter to be?
6         MS. CARTER: Object to form.
7  A.  I sense that Mr. Lowe was concerned and just
8      wanted to express these concerns.
9  Q.  But would there be any other purpose he would
10     have in sending you Exhibit 5 other than he
11     was trying to make his complaint and get you
12     to take some action on it?
13 A.  Other than what I said, I'm not sure of his
14     true intent.
15 Q.  Do you know if Lowe was ever to your knowledge
16     considered for any position after the -- after
17     the decision was to move -- After the decision
18     was to close Daisy Lawrence, was Mr. Lowe ever
19     considered for any position anywhere else in
20     the school system to your knowledge?
21 A.  I'm not sure.
22 Q.  How long did it take before the other
23     employees from Daisy Lawrence were reassigned?

Page 108

1  A.  I suspect that it took a while. I guess the
2      last person that I recall being assigned was
3      Mrs. Zara Brown, and that one seemed to have
4      occurred right up till the opening of school.
5      But I'll defer to Mr. Barker to give the exact
6      details on it, but it just seemed that I
7      recall that when we looked around and asked
8      the question had all tenured -- certified
9      tenured people been assigned, that that might
10     have been one of the last ones. And we may
11     not have had as much of a concern per se
12     inasmuch as she would not have been a
13     classroom teacher and had to get a classroom
14     set up but a counselor in a school. So we
15     very much wanted to get teachers in place as
16     soon as possible so they could get their rooms
17     ready for the opening of school.
18 Q.  Was Zara Brown tenured or nontenured?
19 A.  She's a tenured employee, I believe.
20 Q.  And your testimony is that -- Have you ever
21     spoken to Dr. Owens about Mr. Lowe or his
22     lawsuit?
23 A.  No, I have not. Probably the only

27 (Pages 105 to 108)

Page 109

```
 1    conversation I've had with Dr. Lowe was --
 2    Dr. Owens was at the closing of the school and
 3    the entry into Paterson.
 4  Q.  When was the decision made to close Daisy
 5    Lawrence?  Do you remember?
 6  A.  I don't remember when.  Somewhere between
 7    December 1 when I arrived and June.
 8  Q.  Was it a committee that made this
 9    recommendation as part of a plan, or how was
10    that done?
11  A.  I involved staff members to help me look at
12    the overall data on the school, the concerns
13    we had and about young children being
14    separated, the cost of operating a facility
15    with so few children.  So obviously other
16    staff members were involved, and a
17    presentation was done at the board meeting --
18    not at the board meeting but a work committee
19    meeting of the board before we actually moved
20    into it.
21  Q.  Do you remember Mr. Lowe speaking with you in
22    the summer of 2005 about being blocked from
23    positions?  Do you remember any conversation
```

Page 110

```
 1    with him about that?
 2  A.  No more than the conversation we've already
 3    had and what's contained in letters.
 4  Q.  Do you remember ever telling Mr. Lowe that the
 5    principal must recommend someone for a job and
 6    he hadn't been recommended by anyone?
 7  A.  I don't recall that specifically, no.
 8  Q.  Have you talked to Starks, Sikes or Abrams
 9    about Mr. Lowe, whether they wanted to hire
10    him?
11  A.  No, I've not spoken to any of them about this
12    matter.
13  Q.  Are there -- These meetings when you decided
14    to close Daisy Lawrence, are there notes of
15    those meetings, minutes, the different
16    meetings that would have taken place, the
17    committees of the board or the board?
18  A.  I'm sure there are, yes.
19  Q.  Who would have made the decision not to renew
20    Mr. Lowe's contract after working at Daisy
21    Lawrence?
22  A.  Who would have done what, now?
23  Q.  Who would have made the decision not to renew
```

Page 111

```
 1    Mr. Lowe's contract in the spring of 2005?
 2  A.  Well, part of that was made probably with the
 3    tenured versus nontenured positions in the
 4    district.
 5  Q.  Do you know if Mr. Lowe has highly qualified
 6    status in any positions?
 7  A.  I'm going to defer to Mr. Barker on that.
 8  Q.  So that's no?  Does that mean no, you don't
 9    know?
10  A.  Yeah.  You don't know what 2600 employees
11    have.
12        MS. CARTER:  Let's take a short
13        break.
14        (Brief recess.)
15        MR. PATTY:  We're through.
16        (Deposition concluded at
17        approximately 11:45 a.m.)
18
         * * * * * * * * * * * *
19
         FURTHER DEPONENT SAITH NOT
20
         * * * * * * * * * * * *
21
22        REPORTER'S CERTIFICATE
23  STATE OF ALABAMA:
```

Page 11

```
 1  MONTGOMERY COUNTY:
 2      I, Pamela A. Wilbanks, Registered
 3  Professional Reporter and Commissioner for the State
 4  of Alabama at Large, do hereby certify that I
 5  reported the deposition of:
 6        DR. CARLINDA PURCELL
 7  who was first duly sworn by me to speak the truth,
 8  the whole truth and nothing but the truth, in the
 9  matter of:
10        MELVIN LOWE,
11        Plaintiff,
12        Vs.
13        MONTGOMERY COUNTY BOARD OF
14        EDUCATION; VICKIE JERNIGAN,
15        MARK LABRANCE, TOMMIE MILLER,
16        MARY BRIERS, DAVE BORDEN,
17        HENRY A. SPEARS and BEVERLY ROSS,
18        in their official capacities as
19        members of the Montgomery County
20        Board of Education; and DR. CARLINDA
21        PURCELL, in her official capacity as
22        Superintendent of the Montgomery
23        County
```

28 (Pages 109 to 112)

Page 113

1    Board of Education,
2    Defendants.
3    In The U.S. District Court
4    For the Middle District of Alabama
5    Northern Division
6    2:05-CV-0495
7    on Monday, January 23, 2006.
8        The foregoing 112 computer printed pages
9    contain a true and correct transcript of the
10   examination of said witness by counsel for the
11   parties set out herein. The reading and signing of
12   same is hereby waived.
13       I further certify that I am neither of kin
14   nor of counsel to the parties to said cause nor in
15   any manner interested in the results thereof.
16       This 3rd day of February, 2006.
17
18
19
20
         Pamela A. Wilbanks, Registered
21       Professional Reporter and
         Commissioner for the State
22       of Alabama at Large.
23

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Dr. Carlinda Purcell   January 23, 2006

Page 1

**A**

ability 82:22
able 15:13 40:17 48:16 50:9
about 6:8 8:15 12:20 13:21 14:14,18 17:1 22:7,16 23:9 24:1,16 27:16,21 29:12 33:8 33:9,20 35:19 37:8 37:12 38:16,19,20 40:5,19 41:7,15,20 42:6,10,17,18 43:22 44:19 45:19 47:4,16 48:6,23 49:2 51:11 53:5 55:22 57:3,5,9 58:15 61:14 62:4 63:11,14,18,20,22 64:3,18 65:15,16,17 66:9,23 67:10,19 70:18,23 72:2,8 74:5 74:16 77:5,19 79:1 82:14 83:12,15,19 84:1,16 85:4,14,18 85:21 86:1,7,14 90:9 90:14 92:15,18 94:16 95:16 97:19 98:2 99:7,18,19 100:23 101:11,14,17 102:9 102:10 103:12 104:8 104:13,21 106:17,19 108:21 109:13,22 110:1,9,11
Abrams 104:2 110:8
abreast 47:7
absences 52:4,4
absolutely 70:8 76:15
academic 24:3,10
access 35:9 93:12
accurate 35:15 97:7
acknowledge 101:10
action 1:6 14:3 100:22 101:12 107:2,12
actions 14:2
active 81:1
actual 61:17 73:18
actually 7:2 18:4 38:3 56:20 78:4 109:19
Adams 66:14
added 81:18
addition 66:13
address 66:5
addressed 67:14
addressing 70:14 99:15
administration 7:13,14 96:8 102:18 105:9
administrative 64:11 76:21 78:3

administrator 13:19
administrators 24:8
advantage 93:15
advised 102:15
after 4:17 16:22 34:3 39:6 40:19 55:1 58:16 60:5 61:23 63:4 64:16 67:4 91:2 91:19,21 95:8,10 107:16,16,17 110:20
again 11:10 12:16 25:18 27:20 39:20 43:4 45:22 47:1 50:18 60:6,7 75:14 78:15 89:9,19 96:11 99:1 101:3,7 105:11 105:19 106:4
against 39:13 77:1,21 98:15 99:12 100:5 105:5,9,17
agency 48:8
agenda 46:18 50:3,10
agree 97:10 106:18
agreed 3:13 4:3,10
agreement 1:16
ahead 98:23
Alabama 1:2,18,20 2:7 2:11 3:19 5:21 10:3 14:22 18:7,9 19:9 20:17,18 21:18 51:5 111:23 112:4 113:4 113:22
allegation 77:21 78:6
allegations 12:22 77:1 75:9 83:3,10 86:8
allegedly 96:5
allegiance 41:4
allowed 18:22 47:2
almost 24:9
along 23:22 81:11
alphabetically 62:20
already 54:23 72:18 84:21 86:6 90:19 110:2
alternative 66:19 68:21 75:9 83:3,10 86:8
always 28:21 34:11 39:14 45:16
amount 51:7,8
ANDERSON 2:6
Andover 9:22
and/or 64:4 68:3 74:18 82:6
angry 15:18
animosity 97:13
another 9:17 15:16 37:11 39:16 47:19 50:2 57:4 58:19 63:8

84:19 86:3
answer 45:15,16,18 48:13 71:21 73:7 86:17,23 88:20
answered 106:22
answering 22:3
anybody 49:1,8 95:3
anyone 27:13 28:1 31:5 38:8 40:19 46:2,5 63:22 110:6
anything 39:13,20 41:12 54:19,22 56:11 61:3,14 62:3 78:4 82:10,19,20 84:16 86:1 87:11 88:1 91:13 92:23 93:2 95:20 96:15 101:22 106:15
anyway 30:1,15 106:12
anywhere 5:21 34:14 107:19
APPEARANCES 2:2
applicants 75:23
applied 18:9 19:8 52:14
applying 19:10
appointment 57:13 60:14 64:14
apprising 44:23 45:2
appropriately 39:11
approval 43:1,2 71:1
approved 16:17 49:15 50:16
approximately 1:22 111:17
area 6:19 25:4 47:7,23 71:17
areas 81:6
around 27:1 61:22 74:6 108:7
array 83:4 93:13
arrive 39:16
arrived 5:15 109:7
asked 12:4 16:8 28:20 33:21 35:9 36:22 48:10 57:12 60:7 66:1 67:5,23 79:19 91:20 108:7
asking 47:11 76:5 86:15 99:7
assessment 53:15
assign 80:9 81:15 82:7
assigned 53:8 82:8 108:2,9
assignment 43:11 81:23
assignments 66:12

assist 26:18 107:3
assistance 66:13
assistant 9:21 10:5 23:13 24:5,14,17 25:6 27:16,21 29:14 29:15,20 30:1 43:15 72:16
assistant's 64:11
associate 7:21 24:18
associated 22:20 59:3 63:7
attached 94:3
attend 43:2 50:9 51:5,9
attending 50:21 51:6
attorney 16:6 22:1
attorneys 2:6,10 12:7 37:15 40:23
atypical 74:9
at-risk 57:17
August 8:23 9:12,23 17:1 36:5 51:21 103:3
AUM 20:11
available 70:7
Avenue 21:19
aware 45:9 50:16,18 52:7 54:13 69:9 75:8 77:1 78:11,20 79:20 91:21 93:3,18 103:10 104:2
away 21:10 51:7
a.m 1:22 111:17

**B**

bachelor's 6:23 7:1,7
back 6:20 10:20 25:12 26:8 31:13 36:23 45:1,3 51:23 54:17 55:12 56:23 61:5 66:20 74:17 75:11,14 77:17 87:3,6 90:10 91:5 92:2 93:10 94:12 102:2,8 103:2 105:11
background 6:3 13:18 24:3,10 30:16 33:10 40:3
balance 24:2,10
Baptist 21:19
bared 17:8
Barker 2:14 18:14 22:2 23:5,15 25 21:16 26:15,21 27:2,8 28:19 28:19 30:3,7,16 32:11,23 33:2,3,7 35:8,18 37:8,18 38:1 43:8 44:23 45:2,6

46:22 54:19 62:4,8 62:19,22 63:11,17 64:2 65:18 66:11 70:4 73:6 74:19 76:12 78:2 79:10 89:5,10,21 90:1,13 90:22 91:18 92:8,18 94:1 95:16,18 96:10 97:1,12,14 100:10,23 101:13,14,17,23 102:5,8 103:12 106:14 108:5 111:7
Barker's 22:17 23:19 34:1 37:14 67:16 71:8 90:15
based 45:5 66:12 77:3 100:8
basic 102:1
basically 89:9 94:18
basis 100:5
beared 17:3
became 7:16 10:15,23 43:9
become 93:3
becoming 83:7
BEERS 2:6
before 1:16 3:17 5:22 7:19 8:2,21 9:11,20 10:3,5,12 11:6,20 15:1,3,5,8 23:8 32:10 36:16 54:9 55:18 59:2 60:4 71:19 89:16 90:10 93:11 107:22 109:19
beforehand 30:6 31:3
began 54:6
begin 97:9
beginning 51:3 52:2
behalf 22:4 43:3 48:20
Behind 33:14,18
being 12:19 14:4 17:11 17:12 22:1 25:19 28:11 29:2 36:19 38:17 40:16 41:18 47:23 48:16 57:14 73:4,5 77:23 86:7 90:9 94:3 100:4 102:16 103:4 108:2 109:13,22
believe 7:4 19:3 23:16 46:23 53:9 95:23 108:19
belongings 66:16
benefit 40:7 87:18
Bennett 6:11
besides 24:13 73:12
best 28:9,14,22 48:18

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 2

---

49:2,3,5 68:6 82:2,5
82:6
between 3:14 4:4,11
35:11 36:7 38:14,15
42:20 44:7,22 45:4
50:8 65:4,9 80:10
109:6
BEVERLY 1:9 112:17
big 49:22
bigger 102:11
Bill 5:1
birth 6:1
bit 22:7 38:19 42:6
66:23 74:5,12 77:13
black 1:20 2:10 88:14
blame 17:4,8
block 103:16,21
blocked 109:22
blocking 103:8
blue 57:14,15 59:4
board 1:7,10,12 12:1
13:6 20:11,12 22:22
28:19 34:15,20 37:3
39:9,12,19 41:1,16
41:19,23 42:1,7,9
47:4 49:4 71:1,5
89:17 99:16,20 100:6
109:17,18,19 110:17
110:17 112:13,20
113:1
BORDEN 1:8 112:16
box 39:10
boxes 46:17
break 5:3 111:13
brief 52:11,12 71:23
111:14
BRIERS 1:8 112:16
bring 22:15,21 24:11
26:14 27:3 89:7
brings 23:20 27:11
33:7
British 7:12
broader 20:14
brought 30:4 57:13
90:5
Brown 108:3,18
building 28:23 51:13
52:6 79:12 81:18
83:15
bullet 15:19
bus 15:18,19,19
business 7:15
B.A 6:12

---

**C**

calendar 60:11 61:4,6
61:7

---

caliber 79:17
call 41:21 42:8
called 9:15,18 16:22
42:2,3,4 43:18 52:23
53:23 54:2
came 6:20 46:22 51:23
55:18 63:23 65:3
67:23 78:6 79:9 80:8
89:18 99:23 101:6
cancelled 50:13
candidate 32:12 41:18
candidates 23:18 30:17
capacities 1:9 112:18
capacity 1:11 18:3
36:13 112:21
career 11:15 13:18
25:3
CARLINDA 1:10,15
3:15 4:16 112:6,20
Carolina 6:12 7:21 8:5
8:23 9:13 11:23
14:23 18:18 19:1
carry 22:22 88:4
Carter 1:19 2:9,10
14:13,17 25:15 26:1
28:9,11 31:9 41:11
44:9 45:12,23 48:12
55:14 56:5 71:20,22
73:13 74:3 75:22
76:8,11 78:18 79:8
83:17 84:20 86:5,10
86:13,21 87:8 88:6
92:1 93:22 96:23
97:21 98:20 100:7,13
102:20 103:19 104:4
104:8 105:15,21
106:3,8,21 107:6
111:12
case 4:4,6 5:2 17:6
36:12 37:18 62:18
63:16 104:19
cases 18:1,6 29:6 37:20
62:6,10,12 63:19
64:2,5,6 95:22
catch 55:11
cause 113:14
Center 20:10
centered 61:22
central 24:16 27:17,22
53:8 93:17 95:3 96:7
97:19,23 98:6 99:13
102:17 103:9,15,16
103:22,23
certain 24:23 31:20
63:17
certainly 23:2 29:22
72:2 79:19 81:17

---

93:18
certificate 18:7,10,19
19:1,5,9 111:22
certification 22:19 27:3
27:8 33:11 34:10
75:16
certified 22:9 23:1
24:12 25:13,22 27:23
32:8 66:10 67:14
68:3,7,15 69:5,12,13
69:18 70:5,16,20
72:7,8 73:12,15,23
75:15 108:8
certify 112:4 113:13
challenges 38:23 39:21
Chamber 20:10
change 9:16
charge 37:3,5,22 38:2
charged 19:22
Charles 11:8,18
check 27:2
checking 27:8
checks 34:3
Chicago 10:13
chief 62:9
child 15:23 16:1,3,3,9
16:11,23 17:4,9,15
17:18 33:13,17 80:6
childhood 7:10
children 9:14,15,17,19
14:5 52:3 57:17 58:5
66:4,18 79:16 80:21
81:3 83:14 85:5
109:13,15
choose 87:17
church 21:18,19,21
City 11:8,18
city/county 8:19
Civil 1:6 3:16
claim 11:5 61:15
claimed 13:10
claiming 97:12
claims 13:3 104:9
clarification 55:15
clarify 5:5
class 7:3
classified 23:1 68:8,11
70:6
classroom 10:14,22
11:3 29:12 43:10
68:1 108:13,13
clear 29:18 31:22 33:11
cleared 89:6
clearly 31:3
close 44:7 105:22
107:18 109:4 110:14
closing 66:6,9 109:2

---

clubs 20:7
coach 48:1,3 54:1,3,6
54:11 71:17 72:6
84:6 102:14
coaches 43:12,13 47:4
48:4,5,6 52:15,18,19
72:23 73:4,12,19
74:7,7 76:17 93:4
coaching 102:13
cognate 7:15
Cole 1:19 2:10
collected 37:13,14
collecting 38:3
collectively 12:1
college 6:11,11 9:22
combined 8:20
come 16:4,8 28:18
31:13 32:21 33:19
50:7 52:19 63:19
67:5,8,16 72:10,19
78:7 79:3 81:5 91:11
98:7,8,11 101:3
103:14,15 106:4
comes 24:2 26:8 33:20
34:18 87:11 90:22
coming 26:18 32:19
37:21 38:11,20 39:1
70:10 90:5 95:13
commencing 1:21
Commerce 2:7 20:10
commission 3:20
Commissioner 1:18
3:18 112:3 113:21
committed 80:15,18
85:3
committee 20:12 72:18
72:21,22 73:3,5,11
73:17 74:13,20,23
75:5,12 76:16,20
84:1 90:3,6 91:14,19
91:22 109:8,18
committees 110:17
communicated 46:2,5
46:8 62:2 75:13
communication 35:17
38:12,13,17,18 42:17
44:15 58:14,15,19
64:20,23 65:6,8
85:15,16
communications 35:8
35:11 64:16,18 85:13
community 17:1,10,15
complained 102:16
complaining 106:19
complaint 13:14 14:1
15:3 35:5,21 36:10
36:14,19 58:11 61:15

---

93:20 96:4,9,20
97:18,20 98:4,13,19
99:18 100:4,11,15
103:11 106:5,6,9,11
107:11
complaints 13:15 14:11
14:12,14,21 95:22
99:18
completed 7:1,3
compose 24:22
computer 55:23 56:8
113:8
concept 7:12
concern 23:23 42:23
72:21 80:2 83:7 97:5
105:1 108:11
concerned 24:7 79:15
81:17 107:7
concerning 3:2 15:14
concerns 23:7 28:18
53:12 67:15 72:2
77:7 80:22 81:2,9
82:3 85:4,12 87:14
107:8 109:12
concluded 111:16
concur 44:18
concurred 44:1
conference 3:2 29:19
43:2 47:10 48:19
49:19 50:4,4 65:12
conferences 49:15
50:21 51:1,9
congratulations 38:19
Connie 76:18
consider 41:22
considered 107:16,19
constantly 77:17
contact 38:8 42:16
105:22
contacting 42:18
contain 113:9
contained 110:3
continue 82:18
Continuing 52:13
contract 41:1,2 81:21
110:20 111:1
control 51:17
convene 66:1
conversation 33:16
38:8 42:15 43:6
44:20 55:3 57:21,23
61:21 63:18 65:20
67:12 79:13,14 91:2
92:16 94:17 104:16
109:1,23 110:2
conversations 44:21
45:1,2,6 47:21 54:20

---

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

67:10,19,22 77:5
79:12 92:7,12 101:20
101:23 102:1
convince 97:14
coordinate 76:19
coordinating 72:13
coordinator 25:3
copies 63:10
copy 56:2
correct 5:20 93:21
113:9
correspondence 3:8
37:23 39:4,7,8 40:20
55:7,11
cost 109:14
Council 50:3
counsel 3:14 4:4
102:15,21 113:10,14
counseling 8:13
counselor 68:22 108:14
counselors 9:7
counties 20:15
country 74:6
County 1:7,10,11 7:17
7:20 8:4,7,22 9:13
11:23 15:12 20:5,8
41:3 50:1 74:10
112:1,13,19,23
couple 25:9 62:7 67:9
coupled 9:9
course 13:7 23:13
27:11 34:19 51:20
103:13
coursework 18:12
court 1:1 5:8,16 12:2,5
12:13,13 15:7 16:16
17:3,19,22 87:6
113:3
cover 49:6
covered 25:13,22 63:21
create 85:4,18
created 68:5
creates 91:14
crime 19:22
criteria 91:15,16
Cumberland 7:20 41:3
74:10
curriculum 7:22 19:2
43:16,17 83:8
cut 31:23 102:16

D
dabble 85:7
dabbling 77:18
Daisy 43:4 59:15,17
62:23 65:13,14 68:17
69:6 71:14 83:19,21

107:18,23 109:4
110:14,20
data 38:4 109:12
date 6:1 36:2 60:8
61:17 73:8
dated 59:7 60:2
dates 11:11 36:22
daughter 16:16,22
DAVE 1:8 112:16
Davis 37:10
day 39:16 57:12 60:13
60:16 85:9 105:22
113:16
days 41:4 44:9 46:15
50:23 51:14 52:1
deal 23:4 39:11 46:19
94:9,11 96:11 97:2
99:16
dealing 32:8 48:18 84:8
84:9 95:4 96:2
deals 14:2
dealt 96:10 97:4
deceased 21:9
December 7:18 10:2
17:1 42:21 109:7
decided 30:14 110:13
decides 33:3
decision 30:9 32:10
44:1,17 49:1 79:7,9
107:17,17 109:4
110:19,23
decisionmaker 78:16
decisions 85:22
Defendants 1:13 2:8
113:2
defer 70:3 73:6 76:12
91:17 100:10 108:5
111:7
deferment 84:2
deficit 70:12
degree 6:4,13,14,16,23
7:1,4,7,10 38:21
Delaware 9:21,22 10:6
deleted 50:11
denial 44:18 46:22
denied 52:8
department 33:12 53:4
105:17
depending 37:8,16
DEPONENT 111:19
deposition 1:15 3:15,17
4:5,12 15:5 111:16
112:5
depositions 19:21
described 24:13
deserved 85:5
detail 35:3

detailed 83:4 95:19
details 11:21 22:20
23:4 34:21 38:20
57:8,19 62:11 64:1
74:16 77:23 79:5,5
93:17 94:10,11 97:8
108:6
Development 50:3
deviated 89:15
Devon 21:7
Dexter 21:19
diagnostician 6:20
10:15,16 11:1,5
dibble 85:7
dibbling 77:17
different 6:17 19:15
22:5 26:23 48:17
49:7 55:13 56:12
68:22 88:7 110:15
difficult 59:20
direct 55:3 86:17
directly 46:12 51:19
55:12 92:16
director 8:10 9:2,5,13
13:18 25:5,6 66:15
directors 20:12 24:19
discipline 19:6
discount 86:1
discovered 40:15
discrimination 61:12
61:15 77:3
discuss 23:21 63:19
94:1
discussed 54:23
discussing 47:6
discussion 37:12 49:6
52:11 71:23 78:23
79:3 87:4 95:19
104:6
discussions 15:22
28:16 44:12 104:21
dishonest 106:17
dismissal 12:9 13:3
distinguishing 36:10
district 1:1,2 10:15
11:1,4 13:1,16 14:4
14:10 16:16 17:7
20:16 29:5 41:3
42:12 43:3,18,21,23
47:3,6,8,10,17 48:3,4
48:6 50:14,20 52:15
52:17,19 53:15 54:1
54:2 62:13 68:4
72:11,14 79:16 82:15
84:7 87:9 111:4
113:3,4
districts 6:18 18:1

20:19 74:8
district-wise 53:21
divided 22:23
division 1:3 8:10 11:1
113:5
divorce 21:14
divorced 21:12,13
doctorate 6:4,21 7:6,13
38:21
document 58:22 59:8
61:3 62:2
documentation 93:23
101:20
documented 34:14,15
documents 35:7
document-wise 91:14
doing 50:19 80:18 89:4
96:1
done 16:4 17:17 34:3
37:7 39:15 50:5
109:10,17 110:22
double 63:10
down 23:3 24:23 25:8
33:8 37:11 38:5
50:22 59:21 74:18
89:12 103:14
Dr 1:10,15 3:4,5,6,8,15
4:16 5:1 37:19 55:16
66:1 71:13 72:5,10
74:18 75:7,10 81:12
81:16,20 82:10 84:3
84:17 85:14,20,21
86:1 88:2 91:21
92:15,19,21 93:1
94:17 95:2,8,10 96:1
97:11,16 103:17
106:23 108:21 109:1
109:2 112:6,20
drafted 56:9
driver 15:18
drop-out 8:14
Dugas 2:5
duly 4:17 112:7
during 15:11 58:10
duties 47:23

E
each 31:23 40:13 60:13
earlier 53:2 69:11 90:8
early 7:10 36:1,8 78:8
103:2
easier 11:7
ed 7:15 9:9,18 11:9,19
13:18 14:11,12 37:18
64:5
Edgeworth 21:2,3,4,7
education 1:7,10,12 7:7

7:8,9,11 8:14 9:4,14
11:13 12:1 25:4
34:16 39:9 41:16
112:14,20 113:1
educational 6:3,20
10:16
EE 14:15
EEOC 13:14,15 14:1
14:21,21 15:3 35:4,4
35:21 36:10,14,19
37:5,21 38:2 58:11
61:15 63:16 64:2,6
93:19 94:3 96:9
98:16 99:19 100:5
EEOC's 37:3
effect 103:13
efforts 43:19 72:13
97:15
either 4:2,7 23:16
42:15 58:13 62:8
91:12 104:17,19
elementary 6:8 11:19
24:4 68:22 71:11
72:12
Elizabeth 2:9
emphasis 7:8
employ 28:5
employed 13:22
employee 28:4 32:8,22
33:1,1,4,22 73:22,23
74:1 86:4 88:3,4 96:6
98:13,22 99:4,9,10
105:1,2 108:19
employees 27:23 28:17
68:15 69:5 70:6,16
70:16,18 107:23
111:10
employing 23:2
employment 19:16
61:12 70:22
end 42:21 80:9 81:12
85:9
ended 81:12
ending 35:23
engaged 47:20 48:7
enough 53:12
enroll 16:8,18
enrolled 16:2,6 17:2,4
ensued 15:22
entered 70:8
entire 5:10 65:23
entitled 8:23
entry 109:3
environment 77:3
Ernest 21:7
especially 24:4
espoused 66:18

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 4

established 90:20
evaluation 53:14 82:17
even 13:20 18:5 20:18
  41:21 49:15 51:1
  57:10 58:8 64:12
ever 11:20 12:7 13:14
  15:1,3,5,7 19:5,22
  20:2,22 100:16 102:5
  102:8,15 103:10
  104:16 107:15,18
  108:20 110:4
every 17:9 23:4 24:9
  62:7 76:15 97:9
  105:22
everything 6:4 8:13
  27:16 57:20 63:21
  85:19
evidence 4:1
exact 11:11 15:12 36:2
  69:20 108:5
exactly 34:11 58:9,17
  73:9
examination 2:17 4:20
  113:10
except 12:9 25:17
  27:16 35:7 89:13
exceptional 9:14,15,17
  9:19
Exhibit 3:1 44:3,5 55:6
  55:8 56:12 58:21,23
  59:6,9,13,23 61:8,23
  62:5 64:21 65:1,4,5
  65:10 94:5,13 95:8
  95:11,17 96:5,16,20
  101:13 102:4,6,9,11
  106:2 107:3,10
exists 100:14
expect 97:2
experience 14:8 48:2,8
  76:1,2
experiences 49:14
expire 18:23
explain 55:14 77:13
explained 87:1
express 107:8
expressed 28:18
expressing 42:23
extent 11:15 85:8
extremely 16:19 79:15
eye 15:20
e-mail 3:8 34:19 37:23
  42:22 44:4,14 57:4
  64:20,22 65:6 94:6
  94:16 101:2,5,6
e-mailed 35:10
e-mails 3:2 44:12 92:11
  101:9

F

F 2:5
face 39:1
facility 109:14
fact 41:22 47:15 59:14
  67:13 81:9 84:13
  103:20
factual 17:7 96:13
faculty 65:23 66:8 67:3
Fagan 18:13,16
failure 14:4
fair 31:15 46:20 88:10
faired 53:14
fairly 94:19 96:7
fall 36:1 78:8,9,10
  103:3
familiar 18:5 23:7
  47:14 52:9,10 54:16
  79:4,6 83:8 84:13
  93:6,7 100:8,9,14
  104:5,7,19
far 12:6,7 25:11 41:18
  76:1 97:15
father 80:6
favor 14:7,10 45:7 46:3
  46:6,9
Fayetteville 7:20 38:19
  55:12
February 59:7 60:3
  113:16
federal 3:16 8:14 12:2
  12:5,13
feds 53:3,6,14
feedback 35:19 53:6
  85:2
feel 17:7 25:7 84:10
feelings 79:11
felt 17:13 39:11 40:2
  40:14 41:2 66:5
  80:20 82:2 97:3
  103:8
female 88:15
few 35:7 92:2 109:15
figure 52:2
file 35:4 39:10 59:15,17
  62:20,23 63:6,8,9
  75:19 76:15 100:17
filed 12:14,19 13:15
  15:1,3 36:15,17,20
  58:11 62:20 63:7,9
  78:5 93:19 98:15
files 12:17,17 30:19
  37:1
filing 4:5,9 62:22 96:8
  99:12,19 100:5 105:6
  105:10
filled 53:9

fills 34:23
final 41:4 79:9
finalists 23:19
finalize 37:16 39:17
find 55:19,19
finds 34:1
fine 10:18 86:19
finished 7:5
firm 37:10,11
first 4:17 5:15 35:20
  38:7,10 54:7 112:7
five 23:17 87:13
flags 33:9
flier 50:10
floor 53:8
focus 7:11,14 57:16
focused 81:6
folks 27:21 48:7,11
follow 29:10 31:7 102:5
followed 52:12 88:21
  90:10 100:1
Following 104:20
follows 4:19
foregoing 113:8
forgot 33:16
form 3:21 25:15 31:9
  34:22 45:12 48:12
  71:20 74:3 75:22
  76:8 78:18 79:8 86:5
  87:8 88:6 92:1 93:22
  96:23 97:21 98:9,11
  99:23 100:7,13
  103:19 104:4 105:15
  105:21 106:3,21
  107:6
formal 7:11 56:14 99:2
  100:17 106:5
formality 3:19
format 94:8
former 21:1 99:9 105:2
formerly 77:12
Forsyth 8:7
forth 37:13 43:7 45:1,3
  52:2
found 33:11
four 5:12 68:18,23
frame 91:7
framework 89:18
Franco 1:19 2:10
frankly 58:17 75:6
from 3:3,5,6,8 6:13
  10:8,10 13:19,22
  16:5 17:1 21:23 24:2
  25:18 28:13 32:19
  35:17 36:10 37:21
  38:12 39:9 40:7
  41:20 42:5,23 46:16

49:8 50:1 51:7 53:3
  55:12 56:8,12,23
  57:4 58:6 71:14
  72:10,19 84:10 85:2
  85:2 89:15 90:3 91:4
  93:17,23 95:13
  102:16 103:14,15
  107:23 109:22
frustrated 17:16
full 4:22 21:6 83:3,8
  93:12
full-time 10:7
function 54:4
further 4:3,10 111:19
  113:13

G

gain 40:8
gathered 58:3
gave 16:10,14 17:19
general 53:13 62:17
generally 11:23 12:22
  22:8 25:14,17,23
  26:4 73:21
generate 12:6
generated 91:4
getting 35:14 39:3
  103:7 104:6
gifted 9:10
give 18:11 19:12 35:18
  46:17 73:8 84:18
  86:2 101:13 108:5
given 15:5,7 39:14 43:1
  43:10,11 49:3 75:2
  82:3 83:14 89:5
giving 84:2 86:11
glad 16:18 40:12
go 10:20 12:16 16:16
  18:4 23:22 29:22
  31:10 33:2 34:17
  47:2 48:19 50:2 51:1
  52:21 54:17 61:5
  63:3 65:21 74:20,22
  75:11,11 80:7,19
  87:16,19 89:6 90:2,2
  90:4 92:21 98:22
goes 26:10 34:20 93:10
  97:16
going 24:9,19,22 25:9
  25:11 28:22 33:3,14
  34:4 36:23 39:22
  40:14 45:7 46:3
  47:12 49:17,18 50:10
  50:12 51:12,17 54:21
  65:14 66:17 67:1
  68:16 70:3,9,11
  72:20 73:6,8 74:6

76:12 78:1 79:4 85:9
  87:14,18,20 89:9
  90:18 91:17 92:4
  93:21 94:19 96:6
  98:15 99:11,13
  102:12,20 105:5,8
  111:7
Goldenrod 57:16
Goldsboro 8:22
gone 19:16 75:3 84:11
  90:16 91:1 98:9
  104:1
good 19:17,18 40:10
goodness 11:16
gotten 28:15 42:5
  50:22 55:21 86:17,22
governed 43:22
Government 20:11
grade 83:6
graduate 10:7,7
graduated 7:2 10:9
grandmother 16:7,18
grandparent 16:13
grant 8:17
grazed 15:20
great 50:5
Greensboro 6:12
grievance 98:8,9,10,12
  99:2,6,8,22,23 100:1
  100:9,17 106:4
group 26:16
growing 40:9
guardian 16:12,13,17
  17:12,13
guess 9:1,16 10:19
  11:21 12:4 13:15,19
  17:23 26:7 28:6,7,15
  28:17 29:3 30:5
  31:10 35:13,16,22
  36:6 37:13,17 41:3
  42:19 46:15 48:14
  68:18 69:21 79:2
  83:22 85:23 88:8
  93:10 99:3 105:11
  106:4 108:1
Guidance 9:7

H

hand 40:13 47:18
handle 70:15 98:4,19
handling 96:20
handwriting 64:11
happen 62:12 68:2
happened 17:5 30:11
  30:12 63:4
happens 26:20 60:16
  62:6 87:15

happy 5:4,5
harasser 13:9
harassment 13:4
harm 17:18
Harwood 48:15
having 4:17 33:15 38:7
  42:15 44:20 55:3
  57:6,8 95:19 103:4
Hayward 48:15
head 31:11
hear 45:17 81:8
heard 38:10 39:3
heavily 29:20 30:9
  43:17 48:7
HEEST 2:6
held 65:12
help 3:8 53:17 80:17
  93:16 109:11
helpful 58:4
HENRY 1:9 112:17
her 1:11 16:22 17:16
  25:18 26:17 33:16
  41:20,22 42:8 55:19
  55:23 56:8 59:21
  62:21 77:21 80:6
  86:10,15 104:9 106:8
  112:21
hereto 4:7,11
hidden 45:20
high 6:8 12:20 24:6
  79:23
highly 33:15,18 81:4,18
  89:3 111:5
Hill 1:19,19 2:10,10
him 30:7 35:10 38:12
  40:11 42:17,17,18
  44:11 50:17 54:20
  55:4 56:7,9,14 57:21
  61:4 65:21 67:11
  71:1,3,7 75:13 81:23
  84:17 86:7 91:21
  92:17 93:1 94:18
  95:2,9 97:2 101:2
  103:6,8 105:5,8
  107:3 110:1,10
HIPI 20:11
hire 26:8 27:6 28:4
  29:9,11 30:21 31:6
  31:19 32:4,5,10,11
  32:13 33:6 34:9 35:1
  72:5 78:12 82:13,22
  84:3,19 88:4 90:14
  90:16 92:15 103:6,17
  104:2,14 110:9
hired 27:19 28:19 29:3
  29:17 30:20 33:23
  54:7 73:5 74:1 78:13

78:17 88:11 103:7
hiring 22:8 24:13 25:4
  25:5,14,22 27:15
  70:9,10 81:12 84:14
  84:15 86:4 88:3
  89:22 97:19,23
  103:17
history 33:10
hit 15:20
hold 7:23 21:20 24:4
  66:2
home 80:7
Homewood 5:13,15
hopefully 89:2,6
hostile 77:3
hotel 5:15 58:6,8
house 58:6
HR 33:2 105:16
huge 50:4
hundred 70:19
hurdles 89:6

I
idea 91:9
identification 44:6 55:9
  59:1,10 65:2
identified 94:5
ignore 84:7
ignored 84:11
ill 80:6 97:14
Illinois 6:19 10:13,19
  10:23 11:14
immediately 87:5
impact 82:11
important 66:5
impression 27:7 45:5
improvement 81:10
  87:10
inasmuch 108:12
incident 16:23
INDEX 2:17 3:1
indicated 44:16 69:11
  96:12
indicative 85:19
individual 26:9 82:14
individuals 68:7,20
  81:15
information 30:16,18
  46:21 58:3 63:9
  99:10
informed 89:21 92:3
  105:4
initially 10:14
initiative 47:15 72:14
inquire 41:20
inside 26:16
instance 32:11,22

instances 26:20
instead 88:11 105:19
instruction 19:3 43:16
instructional 7:22 8:10
integrated 66:20
intend 56:5
intended 69:3
intent 95:4 107:14
intercede 28:20
interest 41:17 81:8
  85:12
interested 19:13 25:10
  113:15
interim 80:8
interview 22:13 23:17
  26:13 29:23 30:1,2
  91:23 95:7,9 102:12
interviewed 25:2 26:4
interviewing 23:12
  75:4
interviews 74:14 91:3
introduced 4:6
investigate 105:13
investigation 35:6,14
  35:15 36:15 97:20
  105:20 106:1
involve 8:12 9:6 37:9
involved 18:2 24:20
  25:4,5 26:12 28:15
  29:3,14,20 30:9 35:2
  37:17 43:6,17 44:12
  66:7 67:1 78:23
  79:10 87:20 89:12
  96:3 109:11,16
involvement 35:5 37:4
  38:1 77:11,19 87:15
  87:21,23
involves 98:5
issue 25:20 29:14,16
  44:13 48:17 84:9
  96:2 97:3 99:4
issues 13:6 22:5 23:6
  27:3,8 38:22 63:6
  66:6 84:10
items 66:16

J
JACKSON 2:6
January 1:21 11:8 57:7
  113:7
JERNIGAN 1:7
  112:14
Jimmy 2:14 37:14
job 10:3 11:15 34:14
  39:16,17 46:15 50:2
  69:23 110:5
jobs 39:15 50:8

Johnson 18:15,16
judgment 82:12 88:2
July 8:7
June 7:6 10:8,9 94:5
  109:7
just 6:5,10 8:1 16:14
  17:16 19:13 25:1
  28:9,12,13 30:4,11
  30:12 31:1 38:5
  39:14 40:9,14,21
  41:9 42:2,11 45:21
  49:1 50:6,6 53:11
  55:23 59:20 63:10,20
  67:13 72:22 74:10,21
  76:5 80:16 84:8,11
  85:23 95:5,23 96:2
  98:20 100:3 101:10
  107:7 108:6
justify 90:18

K
keep 60:11,19 62:15
  74:13,15 86:14
kept 62:16
key 24:20
kids 83:15,16,18
kin 113:13
kind 11:2 13:14 23:6
  31:23 36:15 53:21
  77:2 81:9 85:4 87:19
  89:18 97:2 98:19
  99:14
kinds 29:6
King 21:19
Kingland 5:8,16
knew 39:19,21 51:14
  52:17 55:20 93:9
know 20:15,19 21:8,11
  24:21 25:1,16 26:23
  28:22,23 32:7,9 33:9
  33:19 36:2,11 37:19
  40:5,5,11 43:6 44:13
  44:15 49:8,23 51:16
  52:14,23 53:1,11
  54:5,9,10,12 57:9
  58:2 68:16 69:1,19
  70:3,8,21 73:7,9 74:5
  75:15 76:5,13,14
  78:6 79:1 82:14,19
  82:20 88:16,16,20,20
  88:23,23 89:13,16
  91:13 92:3 99:3
  100:12 101:4,5,19
  105:14 107:15 111:5
  111:9,10
knowledge 17:11 29:9
  36:18,21 40:8 48:23

69:16 107:15,20

L
LABRANCE 1:8
  112:15
lady 41:15 88:19
large 1:18 3:19 23:2
  29:5 83:11 112:4
  113:22
larger 93:12
largest 13:5
last 25:2 33:16 35:23
  60:15 76:22 79:13
  108:2,10
late 78:10
later 44:9 52:20 53:2
latter 35:22 36:3,8
law 1:19 2:6,10 37:9,11
Lawrence 43:5 59:15
  59:17 62:23 65:13,14
  68:17 69:6 71:14
  83:20,21 107:18,23
  109:5 110:14,21
lawsuit 15:1 36:11,12
  36:16,19 93:20 94:3
  94:18 96:8 98:16
  99:12,20 100:5 105:6
  105:10 108:22
lawsuits 12:11 13:11
lawyer 41:11 45:21
  104:12
lawyer-client 102:19
LD 19:2
lead 82:21
leadership 21:20 79:20
learn 35:20
learned 16:22
learning 82:16
least 40:4 44:15
leave 10:17 27:7 41:5
  43:7 44:18 46:22
  47:11 52:5,7 76:22
leaving 80:23
left 6:18 10:21 11:9
  19:15,17,18 33:13,18
  74:10
legal 16:12,13,17 17:12
  17:13 61:11
less 64:6 88:4
let 3:3,5,6 41:19
  42:8 55:17,21 56:8
  56:19 57:1 60:2,4
letter 3:3,5,6 41:19

Deposition of Dr. Carlinda Purcell                                                                                      January 23, 2006

Page 6

| | | | | |
|---|---|---|---|---|
| 61:8,22 63:12,14,23 | 82:14 97:8 | margin 62:17 | met 40:13 61:4 80:11 | must 21:12 74:15 110:5 |
| 64:8,17 94:21 98:7 | lots 77:10 | mark 1:8 58:20 112:15 | 91:19 | myself 49:16 |
| 100:20 103:2 105:12 | love 50:7 | marked 44:5 55:5,8 | middle 1:2 20:16,19 | |
| 107:5 | Lowe 1:4 2:13 3:2,3,5,6 | 58:23 59:6,9 64:21 | 113:4 | **N** |
| letterhead 56:15 | 3:8 5:2 35:12,17,20 | 65:1 | might 14:13 31:1 35:10 | name 4:22 5:1 13:16 |
| letters 110:3 | 38:9,10 39:3,13,21 | marriages 21:16 | 35:17 64:10 67:5 | 21:1,4,5,6 23:4 28:17 |
| let's 8:1,23 9:22,23 | 40:19 42:10,15,16,23 | married 20:20,22 21:4 | 71:9 75:1 101:1 | 31:1 33:17 34:4,5 |
| 10:16 41:9 111:12 | 43:4,9 45:7,10 46:3 | MARY 1:8 112:16 | 108:9 | 53:11,18 69:1 71:6 |
| level 24:17 35:2 38:6 | 47:1,22 48:9 52:8,13 | master's 6:14 7:4,10 | military 20:2 | 88:13,16 90:5,23 |
| 50:22 52:15,17,19 | 52:21 54:5,14,21 | materials 57:13 | MILLER 1:8 112:15 | 91:10 |
| 78:3 79:23 83:6 | 55:1,7,17 56:13 57:1 | math 70:13 | mind 51:10 65:22 | named 12:11 13:14 |
| 89:13 95:4 97:5 | 57:4,6 58:10,14,16 | matter 15:15 37:18 | 68:18 | 14:1,4,6 |
| levels 24:23 | 58:19 60:5,23 61:1,9 | 50:6 64:4 88:8 | minute 60:15 | names 32:16 33:7 91:4 |
| lieu 73:18 | 63:14 64:17,19,23 | 110:12 112:9 | minutes 92:2 110:15 | 91:10,10 |
| like 17:17 22:7 58:18 | 65:6,9,9,19 67:7,8 | may 3:17,22 4:6 26:16 | misplaced 58:7 | national 3:2 49:14 50:2 |
| 64:1 82:2 84:3,6 85:6 | 69:8,15 70:22 71:18 | 26:22 31:12 34:5,11 | missing 49:18 | 50:4 |
| 88:17 95:23 96:4,20 | 72:5,7 74:20 75:11 | 34:12 35:15 36:13 | Mizell 76:18,21 77:2,9 | nature 54:14 61:20 |
| 101:6 103:8 106:9 | 75:15 76:10 78:12,16 | 41:7,14 49:12 54:2 | 89:3 91:4 | 77:22 |
| likely 23:22 | 84:4 88:11 90:4,9,14 | 55:14 57:3,9 60:16 | Mizell's 90:3 | necessarily 12:14 46:16 |
| likewise 81:2 | 90:16 91:20 92:3 | 62:17 63:18 69:22 | model 43:14 48:3 | 52:5 68:5 72:8 |
| limit 50:23 | 93:19 94:4,16 97:11 | 72:1 75:7 77:7,10 | moment 31:18 | need 3:21 5:3,4 11:10 |
| Lincoln 9:13 | 97:13 100:16,19 | 86:22 93:14 108:10 | Monday 1:21 113:7 | 18:12 23:7 25:7 33:9 |
| Linda 62:8,18 64:4 | 102:15 103:3 104:3 | maybe 35:13,22 36:4 | money 51:8 | 37:9 42:8 43:9 75:18 |
| line 90:22 | 104:14,22 106:23 | 42:21 62:7 67:4 | monies 66:23 | 85:11 87:19 |
| lines 11:2 | 107:1,7,15,18 108:21 | 78:10 83:15 106:10 | Montgomery 1:7,10,11 | needed 44:2 53:16 |
| list 20:15 31:10,11 | 109:1,21 110:4,9 | mean 13:17 28:12 | 1:20 2:7,11 5:9,11,19 | 66:19 70:13 79:16,18 |
| 32:16 81:10 | 111:5 112:10 | 30:20 32:18 41:6,12 | 7:16 14:6 20:5,8 29:5 | 79:23 80:7,16 81:6 |
| literacy 43:19 74:7 | Lowe's 35:4,4 36:18 | 70:5 73:17 82:20 | 38:11,20,22 39:12,22 | 100:16 |
| literate 16:19 | 37:22 71:6 90:23 | 83:12 86:21 94:10 | 40:15,22 43:11 47:12 | needs 37:17 |
| little 17:10 22:7 26:22 | 110:20 111:1 | 99:14 102:22 106:7 | 48:20 49:8,12,20 | negative 39:13 49:20 |
| 40:21 42:6 62:17 | Lynheart 72:15 74:18 | 111:8 | 70:1 112:1,13,19,22 | 82:21 83:1 |
| 66:23 74:5,12 77:13 | | meant 70:5 83:18 | months 5:12 | negatively 82:11 |
| live 5:7 20:4 | **M** | meet 40:4 60:12 | more 12:10 14:2,3 | negotiating 40:23 |
| lived 5:10,11,12,18,21 | made 3:22 20:14 29:18 | meeting 57:6,9,10,11 | 17:14 23:21 29:3 | neighbors 17:17 |
| 17:15 | 50:21 60:15 77:21 | 58:11 60:5,23 61:19 | 53:16 64:5 74:12 | neither 113:13 |
| lives 21:8 | 79:7 81:23 92:11 | 61:21 65:18 67:20 | 76:1 77:13 79:6 | never 12:5,6,8 16:21 |
| location 66:2 | 97:18 103:10 109:4,8 | 109:17,18,19 | 87:12,21,23 89:1 | 17:2,5 46:2,5,12 |
| locations 66:13 | 110:19,23 111:2 | meetings 50:21 51:4 | 92:9 98:2 110:2 | new 32:17 40:8,8,8 |
| long 7:23 91:7 93:6,7,8 | maiden 21:5 | 60:19 110:13,15,16 | most 14:9 74:7 79:15 | 51:22 68:20 71:13 |
| 107:22 | mainly 84:5 | Melvin 1:4 2:13 88:11 | 79:23 | 75:7 79:20 |
| look 10:20 11:10 12:17 | major 49:18 70:10 | 112:10 | move 66:15,22 107:17 | next 36:4 39:18 42:14 |
| 22:19 31:11 34:18 | make 22:16 23:18 | member 16:10 20:7 | moved 5:16 17:10 | 58:13 64:22 |
| 49:20 51:23 58:2 | 32:10 63:20 66:17 | 21:18 28:19 39:9 | 71:14 109:19 | nice 41:19 |
| 60:6,7 61:5,6 68:6 | 69:3 74:17 82:1 | 41:23 | moves 32:23 33:2 | None 104:23 |
| 75:18 76:15 88:17 | 94:22 102:23 107:11 | members 1:10 13:6 | moving 13:3 58:7 | nontenured 69:18 |
| 94:12 101:3,21 102:2 | makes 88:2 | 18:5 22:18 26:13 | much 13:4 14:9 15:22 | 108:18 111:3 |
| 102:3 109:11 | makeup 72:3 | 27:1 41:1 109:11,16 | 16:11 23:15 25:13 | North 6:12 7:21 8:4,22 |
| looked 50:19 58:18 | making 44:17 49:1 | 112:19 | 32:15,19 33:8,19 | 9:13 10:13 11:23 |
| 60:22 64:9 79:21 | 78:15 95:1 | Memorial 21:19 | 38:21 40:15 49:17 | 14:23 18:18 19:1 |
| 80:13 94:9 108:7 | male 88:14 | memory 28:13 | 60:17 62:10 67:23 | Northern 1:3 113:5 |
| looking 32:15 36:23 | Man 88:19 | mental 7:9 | 72:9,12 73:1 77:8,23 | notation 34:7 64:8 |
| 40:2 51:6 60:9 | manner 4:7 113:15 | mentioned 53:4 61:14 | 79:11 80:18 85:1 | notations 34:11,12 |
| looks 101:5 | many 51:4,14,23 52:5 | 61:19 90:8 | 89:12 97:1 102:11 | note 9:16 |
| Looney 43:1,8,15 44:19 | 69:18,23,23 70:7,16 | mentor 39:2 40:1,12,16 | 108:11,15 | notebook 57:14,15,19 |
| 44:21,22 45:4,5,9 | 80:12 89:11 92:7 | mentors 40:3,5 | multiple 24:8 53:22 | 58:2,7 59:4 60:11 |
| 46:3,6,12 47:6 | 101:16 | message 31:2 45:20 | 67:2 83:13 | noted 59:15 60:18 |
| lot 37:20 39:10 48:7,23 | March 64:7 80:4 | messed 45:23 | murky 11:2 | notes 60:19,22 61:1 |

62:10,14,15,16,17
74:13 92:11 101:19
102:4 110:14
**nothing** 4:18 112:8
**November** 8:1,8 38:15
**number** 23:17 24:8
39:15 50:20,23 67:2
67:3 69:20,22 70:12
83:13
**numbers** 23:3

_____
**O**

**object** 25:15 31:9 45:12
48:12 71:20 74:3
75:22 76:8 78:18
79:8 86:5,21 87:8
88:6 92:1 93:22
96:23 97:21 98:21
100:7,13 103:19
104:4 105:15,21
106:3,21 107:6
**objection** 26:1 76:11
**objections** 3:20,21
**obviously** 13:16 14:21
16:14 34:20 37:7,7
37:11 41:17 47:11
48:22 56:2 69:8
85:21 109:15
**occurred** 89:21 108:4
**OCR** 14:14
**off** 23:8 70:12 101:6
102:16
**offer** 40:7
**offered** 4:1 70:21,23
**office** 16:8 22:17 23:19
24:17 27:17,22 34:1
37:15 53:8 57:12
62:20 67:16 71:8
93:17 95:3 96:7
97:19,23 98:6 99:13
102:17 103:9,15,16
103:22,23
**officer** 21:20
**Offices** 1:19
**official** 1:9,11 36:12
112:18,21
**off-the-record** 52:11
71:23 87:4
**Oh** 6:6,10 42:11
**okay** 6:5 11:22 22:11
42:13 58:1 87:1
**once** 32:22 39:11,19
62:7 63:23 97:1
**one** 7:5 12:8,9,12 15:15
15:20 18:3,22 19:8
29:13 40:1 41:14
47:18 49:3,17 52:9

53:1 54:7 57:12 65:3
67:6,6,7,7,9,9 70:4
71:21 72:1,19 73:20
74:9 76:12 77:9
78:20 83:15 86:18
89:17 91:10 93:13
95:5 96:12 97:5
100:14 101:11
106:22 108:3,10
**ones** 108:10
**one-on-one** 67:19
**only** 19:11 51:14 73:20
78:23 80:6 81:4 83:7
100:22 101:1,12
108:23
**onto** 22:15
**open** 7:12
**opening** 24:18 108:4,17
**openings** 69:23
**operating** 109:14
**operations** 66:15
**opinion** 30:23 48:17
82:11,21 83:1 84:18
86:2 95:6 96:13
**opinions** 82:22
**opportunities** 19:19
**opportunity** 22:13
29:22 75:2
**opposed** 14:15
**opposite** 46:10,11
**organization** 25:11
38:6
**organizations** 20:7,9
**other** 3:20 4:1,7,9 9:16
13:11,23 17:22,23
18:4 19:23 21:16
24:12 25:9,17 27:23
29:2 32:1 37:20,21
37:21,22 40:13,13
42:4 49:17 52:7
54:22 56:10 64:16
66:13 67:9,15,19
69:15 73:11,18 74:23
75:23 78:1,11 79:21
79:18 80:19 81:17
83:23 84:10,20 86:6
87:12 88:5,8 95:21
97:8 104:20,21 107:9
107:10,13,22 109:15
**others** 39:10 52:10
70:20 79:10 81:11
**ought** 47:13
**out** 15:17,17 20:11
24:2,10 34:2,23 52:1
52:2,6 56:1,8 58:7
68:18 70:10 85:11
89:18 90:6 91:11

113:11
**outline** 6:5,6
**outlined** 97:22
**outside** 51:5 72:10,19
104:1
**outstanding** 29:1
**over** 8:13 19:16 34:17
35:7 54:18 65:19
71:14 106:14
**overall** 72:3 109:12
**oversight** 66:3
**owed** 41:4
**Owens** 66:1 71:13 72:5
72:10 75:7,10 81:12
81:16,20 82:10 84:3
84:17 85:14,20,21
86:1 88:2 91:21
92:15,19,21 93:1,19
94:4,17 95:2,8,10
96:1 97:11,16 103:17
106:23 108:21 109:2
**own** 26:17,17 40:3
**ownership** 85:9

_____
**P**

**package** 41:20 42:5
**page** 39:18
**pages** 113:8
**Pamela** 1:16 3:17
112:2 113:20
**paper** 10:21 11:10
57:16 63:3
**paperwork** 16:15,21
19:12 30:15 37:12
**parameters** 51:15
**part** 35:22 36:3,8,8
51:22 56:20 83:9
109:9 111:2
**particular** 24:1 26:9
28:3 30:10 32:14
34:14 48:10,11 49:9
52:21 63:22 72:3
**parties** 3:14 4:4,11
64:18 113:11,14
**party** 4:2,7 58:15
**pass** 21:10
**passed** 62:18,19
**passing** 35:7 41:7
**past** 70:22
**Paterson** 71:11,15 79:1
79:6,7 80:3,13 83:11
83:17 88:12 89:20
109:3
**Patty** 2:5,6,18 4:21 5:1
25:21 41:13 52:13
56:4 73:15 84:22
86:9,12,16 87:3

102:23 104:10
111:15
**payroll** 41:2
**people** 8:16 12:6 22:14
23:3 24:3,16,21 25:9
30:3 40:22 47:9 49:5
51:10 54:7 55:13
67:9,23 68:10,17,18
69:21 72:17 74:23
77:16 80:1,12,14,17
81:18 84:10 85:17
95:21 99:13,17 101:8
105:16,18 108:9
**PEPE** 82:16
**per** 34:22 44:21 50:15
65:20 76:20 99:8
108:11
**perceive** 107:4
**perception** 95:5 96:12
96:13 97:6,9 99:1
105:11,14,19 106:22
**perceptions** 80:14
99:17
**performed** 47:23
**performing** 79:22
**perhaps** 43:19 44:2
57:16 62:7 79:15
80:12 83:7
**Perry** 1:20 2:11
**person** 16:14 22:4 25:2
25:10 26:10 27:17
28:5 29:2 30:7,20
31:20 32:3,4,5,13
33:13,14,17 34:6,8
34:23 40:4,6 41:14
41:18,22 42:2,5,11
43:10 44:14 48:19,22
49:2,3 53:1,7,9,15,16
72:12 76:18 80:8
81:16 82:6 88:13
90:3 91:16 96:12
108:2
**personal** 88:1
**personnel** 22:9,14,22
23:1 24:12 25:14,22
27:23 30:19 64:4
66:7,10 67:14 69:12
69:13,18 70:20 73:12
73:15 77:20 79:18
82:8,12 89:7,11
**persons** 67:20
**person's** 88:16 95:5
**perspective** 25:18
**Petersburg** 6:15
**phonetic** 58:2 72:15
**picture** 49:22
**piece** 10:21 11:10 39:8

51:18 57:5 63:3,5
**piqued** 41:17
**place** 23:14 29:23
36:16 44:22 51:2,2
51:21 73:1,9,19 74:8
74:11 80:1 82:5 84:6
84:14 88:22 89:11,15
90:7,11 91:3,8 92:4,5
93:10 97:18 98:18
103:21 108:15
110:16
**placed** 54:15 61:11
76:21 79:20 108:7
**places** 5:18 37:21
**plainer** 103:1
**Plaintiff** 1:5 2:4 112:11
**Plaintiff's** 3:1 44:3,5
55:6,8 58:20,23 59:9
61:8,23 62:5 65:1,4,5
65:10 94:5,13 95:8
95:11,16 96:4,15,20
101:12 102:6,9,10
106:2 107:3
**plan** 109:9
**plans** 65:16
**please** 4:22 5:3 6:1
101:3
**plus** 83:16
**point** 52:16 54:14
63:17 81:14
**points** 35:16
**policies** 100:8
**policy** 43:22 47:16 49:4
96:19 98:3 99:6,8,16
99:21
**pool** 72:18,20 75:1
**population** 25:3 80:21
**position** 7:23 8:6,9,12
8:21 9:11,20 10:5
16:7 17:8 23:10
27:15,19 28:21 31:6
32:14,17,17 39:14
53:10,21 71:3,10,16
71:18 72:1,6,7,9
75:16,21 76:7,10
77:16,17 78:19,20
88:12 89:20 91:20,22
92:8 93:9,9 102:13
102:14 104:3,15
107:16,19
**positions** 13:13 19:15
21:21 62:12 69:23
70:7 73:14 78:11
82:9 102:17 103:5
109:23 111:3,6
**positive** 59:11,14

possible 41:18 108:16
post 29:18
potential 81:3
Power 54:14
practice 73:23
preceding 87:5
predicament 87:14
prepared 35:14 54:14
preparing 37:2,4
present 2:12 43:3
  48:19
presentation 109:17
presentations 54:13
presenter 49:18 50:13
presenting 43:10
presents 32:11
pressures 61:11
pretty 13:4 14:9 15:22
  16:11 23:15 25:13
  32:15,18 33:8,19
  44:7 46:14 60:14,17
  62:10 67:23 72:12
  73:1 79:11 85:1
  89:12 97:1
prevention 8:15
principal 13:8,10 23:9
  24:5,5,14,14 25:9,7
  26:11,16 27:14,17,17
  27:18 28:3,16,22
  29:8,14,15,17,19,21
  30:5,21,22 31:5,17
  31:19 32:4,7,13,23
  33:6,22 34:6,8,16,22
  50:16 51:13,15,19
  71:12,13 73:22 75:7
  77:9,12 78:12,21
  79:13 80:5,10,22
  81:13,21 82:3,5,6,18
  84:2,19 86:3 88:3,5
  93:11 96:5 97:6 98:5
  105:4,8 110:5
principals 22:13 23:13
  23:16 26:12,23 27:22
  27:22 30:1 32:20
  51:1,18 53:17 70:14
  82:15 83:2,5 87:16
  93:3,5,16 103:5,6,14
principalship 19:2
principalships 23:12
principal's 23:22 29:10
  32:9,21 34:13
print 50:10
printed 55:23 56:7
  113:8
prior 8:6 36:19 38:11
  39:3 60:18
probably 11:7,10 12:5

12:8 13:5,17 14:5
  16:19 18:22 20:14
  24:6,9 28:22 33:21
  37:14 40:10 49:5
  61:1 62:21 66:18
  67:13 71:11 79:22
  80:4 83:9 87:12 90:5
  92:9 94:23 108:23
  111:2
problem 51:17
problems 103:4
procedure 13:16 90:11
  90:17 96:3,19 97:18
  98:3,10,18 99:9
  104:1
procedures 16:20
  89:14
process 16:20 22:8,12
  23:14 25:14,23 26:14
  27:12 29:23 30:2
  34:19 72:11,17 73:7
  73:10 74:9 75:4,8
  76:4 84:1,5,7,12,15
  88:21 89:3,22 90:12
  90:17,19 91:2,6,23
  92:4,22 93:4,6,8,15
  96:3 97:23 98:2,10
  98:17 99:5,22 100:2
  100:6,10,11,15 101:8
  102:11,12,13 103:21
processes 22:20 24:13
  73:18 89:14
production 56:6
Professional 1:17 3:18
  20:9 112:3 113:21
professor 9:21 10:5
program 9:10 43:18
  47:5,14 54:6,8
programs 8:14 57:17
  69:2 83:4,5 93:13
promotions 19:19
properly 73:23
protecting 46:16
provide 14:5
provided 4:2,8 66:14
providing 99:10
psychologists 8:16 9:8
Public 10:21 11:12,13
  16:5 43:12 47:12
  48:20 49:9 70:1
pull 85:10
Purcell 1:11,15 3:4,5,7
  3:8,15 4:16 5:1 21:4
  55:16 112:6,21
purpose 4:1 65:22,23
  107:4,9
pursuant 1:16 3:15

pursuing 38:21
put 25:19 29:23 50:23
  51:21 60:8 74:11
  88:21 89:11,15 90:7
  90:11
putting 48:11

### Q

qualifications 76:2,3
qualified 33:15,18
  75:20 76:6,10 80:1
  81:4,19 89:1,4 93:8
  111:5
quality 79:17
question 3:21 5:5 27:20
  28:8 31:12 43:9
  45:15,22 83:22 84:16
  86:15 87:5 108:8
questioning 53:13
questions 3:20 22:3
  45:17 53:5 67:5,8
  68:1
quickly 40:11
quite 75:6 80:5,23

### R

race 77:4
racial 77:2,22 78:1
raised 53:5 97:5 99:3
raises 33:9
read 23:5 87:3,6
reading 11:13 43:12,13
  43:17 47:3,5 48:3,14
  48:5,6 52:15,17,19
  54:1,2,6,11 71:17,17
  72:6,13,22 73:4,12
  73:19 74:7 76:17
  84:6 93:4 102:13
  113:11
ready 104:6 108:17
real 97:5 103:21
realized 14:17
really 13:20 28:7 29:1
  30:6 35:7 36:14 38:3
  40:2,7,21,21 41:6,9
  41:12 42:19 44:13
  47:20 49:3 57:23
  59:3 79:6 98:17 99:7
reason 47:1 66:22
  83:23,23
reasons 39:23
reassign 68:6,12
reassigned 66:11 67:15
  68:15,19,23 69:6,9
  69:10,16 107:23
reassignment 67:17
recall 13:11,13,20

14:22 15:13 27:13
  28:7,14 30:8 38:1,16
  42:14,22 44:20 53:18
  53:20 54:17,19,22
  55:3 56:11 57:2,3,6,8
  57:10,23 58:10,12,17
  58:21 59:2,4,8,11
  60:2,10 61:16 63:11
  63:13 64:1,17,19,23
  65:3,4,5,7,8,11,14,18
  66:22 67:10,12,18
  68:14,14,23 69:2,5
  69:17,20 71:10 76:23
  78:14 82:16 88:13,14
  90:13 93:2 94:2,13
  94:15 95:18,20 96:10
  101:5,7,11,18,22
  102:7 104:16,21
  108:2,7 110:7
recalled 55:16 94:8
receive 44:15 59:13,23
  62:6 100:3
received 35:16 38:12
  38:18 39:6 41:19
  42:23 46:21 53:2
  54:10 55:11 60:4
  61:23 63:4 71:7,9
  94:6 96:4 101:10
receiving 40:20 58:21
  79:17,19 94:13,21
recess 52:12 111:14
recollection 61:13,18
recommend 26:18 33:4
  71:3 110:5
recommendation 22:17
  22:21 23:18,21,23
  26:14 27:4 29:10
  30:13,14 31:8 32:9
  32:21 33:23 34:13
  71:5,7,8 72:10 74:17
  84:14,15 89:5,7,17
  90:1 109:9
recommendations
  22:19,23 27:12 32:19
  103:14
recommended 27:14
  27:18 28:3 30:3
  78:12,21 90:9,13
  91:1 103:5 110:6
recommending 88:4
recommends 28:16
  33:1,22 73:22
record 4:22 31:23
  55:15 59:20 98:20
recorded 60:17
recruited 9:1
red 33:9

reference 98:21
referring 44:4
reflection 50:14
Reform 3:2
refresh 61:13,18
regard 19:8 25:12 26:3
  37:22 78:19 82:10
  89:19 101:12
regarding 3:8 14:2
  17:20 38:8 39:7
  46:21 54:21 57:1
  61:10,12 62:1 64:23
  65:6,9 86:3 92:8,12
  96:15 100:19 102:6
  104:22 106:23 107:3
regardless 4:8 34:1
Registered 1:17 3:18
  112:2 113:20
regret 50:8
regrets 48:16
regrettably 58:5
reiterating 67:13
relate 92:18
relatives 20:4,17,18
relied 89:20
relocate 66:15
remember 7:5 12:3,10
  12:11,12,19,22 14:20
  38:7,17 49:23 53:19
  57:14,15,18,20 60:3
  61:20 63:21 67:20
  70:6 77:5 92:11,23
  94:2 102:8 109:5,6
  109:21,23 110:4
reminded 30:7
renew 110:19,23
report 51:18 53:3,7,13
  reported 112:5
reporter 1:17 3:18 87:7
  112:3 113:21
REPORTER'S 111:22
reporting 102:8
represent 5:2 47:10
representative 25:20
  49:13
representing 3:14 4:4
  47:12
request 39:1 43:7
  44:19
requests 50:20 52:5,7
required 42:18 90:19
research 8:17
reserved 3:22
resign 80:23
resolved 14:7,10
respective 30:17
respond 37:3 40:11

94:23 97:9 100:19
106:12
**responded** 44:11 91:16
101:2
**responding** 38:2 101:7
101:8
**response** 3:3 16:10
37:2,5 55:20 56:23
57:2 59:11,14 101:9
**responses** 37:6,16
**responsibilities** 9:3,8
**responsible** 17:9
**rested** 79:9
**result** 15:21 30:2 33:15
**results** 113:15
**retaliated** 98:15 99:11
100:4 105:5,9,17
**retaliation** 99:19
**retardation** 7:9
**retired** 80:5
**review** 19:12 22:18
62:9
**reviewed** 30:18
**reviewing** 30:15 82:16
**reviews** 33:17
**re-assignment** 3:9
**Richmond** 10:17,21
11:12,13 16:5
**right** 13:2 22:6 31:13
31:15 32:6 34:8
41:10,13 56:4 69:9
74:2 80:17 81:21
88:18 94:10,14 96:14
96:16 99:5 100:23
103:18,22 105:20
106:20 108:4
**rigid** 74:12
**Robinson** 62:9,18,21
64:5
**role** 54:3 93:17
**room** 50:12 58:8
**rooms** 108:16
**ROSS** 1:9 112:17
**roughly** 11:3
**Rules** 3:16
**running** 41:16,23 42:7

_____

**S**

**SAITH** 111:19
**same** 4:9 26:1 60:16
76:11 84:19 86:15
87:13 113:12
**Sandra** 33:16
**sat** 78:2
**satisfy** 18:12
**savings** 66:23
**saw** 30:18 61:16

**saying** 17:3 48:15 50:7
93:11 96:5 97:11,11
98:14 99:11 102:18
**says** 26:8 50:11 59:17
61:8,10 90:23 97:13
**scheduled** 60:18 64:14
**school** 3:2 6:9,17 11:19
12:21 14:10 15:17
16:2 17:2 22:5,9 24:1
24:4,6,11 26:17,17
28:2,3,4 29:18,21
30:10 32:18 35:23,23
36:3,4,6 37:2 41:3
42:21 43:5 47:8
50:22 51:3,7,20,21
51:22 54:8,15 63:2,7
63:8 65:16,21,22
66:4,6,9,20 69:19
70:9,11,17 71:4 72:4
75:8,9 77:11,18,19
78:8 79:21,22 80:9
80:16 81:2,8,10,10
81:13,14 82:1,3,4,7
82:23 83:10,12,12
85:3,5,6,10,18 86:3,8
87:10 93:12,14 94:19
96:19 97:17 98:3,4
98:14,18 105:2,2
106:19 107:20 108:1
108:14,17 109:2,12
**schooling** 7:11
**schools** 7:12,20 8:7,22
10:22 11:12,14 16:5
16:6 31:10,12 32:16
43:12 47:13 48:20,21
49:9 52:1 53:17,22
63:5 68:22 70:2
77:10 79:18 80:19
83:3,6,11 87:9,10,11
87:22,22,23 93:8
**school-based** 48:5
**science** 12:20,21 70:12
**score** 82:18
**Scratch** 14:20
**scream** 45:18
**screening** 72:17,20,22
73:10,17 74:9 75:8
75:12 76:17 84:6
90:12 92:4 93:4
**se** 34:22 44:21 50:15
65:20 76:20 99:8
108:11
**season** 70:9,10
**secretary** 61:7
**see** 9:22 10:16 31:12
32:18 42:6,8 49:7
56:12 59:12 60:9,22

87:17 88:1 95:11
102:4
**seeing** 59:2,5,11
**seem** 16:12
**seemed** 16:4 44:16 53:7
64:20 72:9,19 77:18
78:7 82:17 108:3,6
**selection** 84:1
**seminar** 45:7 46:4
48:11 49:11 50:17
52:14,22 54:21
**seminars** 52:8
**send** 49:1,5 55:10
**sending** 37:23 44:14
47:9 107:10
**sends** 34:16
**sense** 105:16,23 107:7
**sent** 30:5,23 31:2 35:18
42:7 55:7 56:7,13,14
56:18 58:19 99:2
100:2 101:4
**separated** 66:21 109:14
**September** 8:1,3 38:15
**series** 3:2 43:12 47:3
**serve** 6:19 39:2 40:12
**served** 9:2 10:14 36:11
53:22
**services** 7:22 8:11 9:3,5
14:5 57:17
**serving** 40:16
**session** 50:12 66:5
**set** 48:3 108:14 113:11
**setting** 51:15 66:19,21
83:10
**seven** 23:17
**several** 13:17 29:6
39:23 81:11
**sexual** 13:4
**share** 47:15 50:6 92:20
**shared** 30:16 80:11,22
81:2
**shares** 23:20
**sharing** 57:18 95:18
**sheets** 57:16
**shooting** 16:1,2,4
**short** 37:19 111:12
**shot** 15:19 17:15
**shoulder** 85:10
**show** 44:3 49:16,21
55:5 58:20 59:6
60:12 64:21 91:15,15
**showing** 97:15
**sign** 23:8
**signature** 4:12 56:10
56:17
**significance** 64:7
**signing** 113:11

**Sikes** 104:18 110:8
**similar** 72:1
**simple** 50:6
**simply** 41:15
**since** 22:9,11 23:10
27:13 41:23 51:2
75:10 79:3
**single** 23:4
**sit** 23:3,11 29:7 31:4,15
32:2 33:7,20 37:11
62:9 68:16 76:14
101:9
**site** 54:15
**sites** 68:21
**sitting** 84:8
**situation** 17:14 29:8
31:5 32:3 85:11 97:2
**situations** 13:23 79:2
**size** 38:4 83:10
**skills** 40:8
**small** 67:2
**smaller** 93:14
**smooth** 41:5 66:17
**social** 8:16 9:7
**solely** 46:22
**some** 11:11 17:19 18:4
26:11,20 37:7,23
38:20,22 40:8 42:16
47:20 48:2,5 50:5
51:9,15,20 53:5 55:7
57:13 58:3,4,14
63:17 64:20 67:4
77:7,19 78:1 80:22
81:1,5 84:10 85:8,12
85:16 87:14,15,17,17
97:12,20 107:2,12
**somebody** 30:23 33:5
75:10 103:8
**somehow** 17:3
**someone** 26:18 29:9
41:7,15 42:4,17
43:20 44:2 47:13
53:4 100:4 110:5
**someone's** 40:16
**something** 17:17 19:12
19:20 29:1,2 40:5,6
40:18 43:22 45:10
60:9,12,15 74:15
79:1 90:9 103:12
**sometime** 36:5
**sometimes** 28:20 42:19
60:8,21,21 102:1
**somewhere** 8:23 36:7
38:14,14 44:7 109:6
**soon** 108:16
**sorry** 5:14 45:23 83:21
85:17

**sort** 6:5
**South** 1:20 2:11
**so-and-so** 31:6
**speak** 4:18 48:10 49:16
61:9,10 112:7
**speaking** 22:4 36:14
63:11,22 65:15
109:21
**SPEARS** 1:9 112:17
**special** 7:9 8:13 9:4,9
9:14,18 11:9,12,19
13:18 14:11,12 25:2
37:18 64:5
**specialty** 7:15
**specific** 57:3 67:12
**specifically** 57:5 65:19
102:10 110:7
**specifics** 13:20
**spending** 37:7
**spent** 40:21 70:13
**spoke** 46:12 90:14
**spoken** 92:20 108:21
110:11
**spokesperson** 43:21,23
47:17
**spots** 103:7
**spouse's** 21:1
**spring** 53:2 65:13
111:1
**Spud** 103:2
**staff** 16:10,14 18:4
22:14,15,18 24:21
25:1 26:13 27:9
46:13 47:19 50:3
62:9 65:15 66:1,2,8
67:5 69:21 81:5 98:6
109:11,16
**stand** 68:18
**standard** 19:3
**stand-out** 23:6
**Starks** 104:13,14 110:8
**start** 6:10 36:6 70:11
73:3,5
**started** 6:14 14:18
51:22
**Starting** 8:3
**state** 1:18 3:19 4:22
6:15,17 9:17,19,21
10:6 12:2,4,13 33:12
43:14 48:8,19 51:5
53:3 81:10 111:23
112:3 113:21
**stated** 105:12
**statement** 90:15
**statements** 95:2,14
**STATES** 1:1
**status** 17:11 33:18

Deposition of Dr. Carlinda Purcell

January 23, 2006

Page 10

| | | | | |
|---|---|---|---|---|
| 111:6 | 64:14 69:3 72:8 | 29:12 70:7 108:13 | 44:22 47:4,8,18 48:2 | topic 48:21 |
| **Statute** 4:2,8 | 74:15,16 75:13,18 | **teachers** 22:15,16 | 49:3,6,22 50:14 | **topics** 50:11 |
| **stayed** 8:8 | 76:19 77:8,23 81:20 | 24:15 25:12 26:3 | 53:23 57:5 62:12 | **total** 83:9 |
| **still** 23:14 33:4,5 41:2 | 82:2 83:1 91:12 92:6 | 52:1 53:18 68:2,20 | 67:4,8,23 69:7 71:2,6 | **totally** 69:22 |
| 43:4 45:15 55:12 | 92:13 94:22 95:1 | 70:2,5,13 79:12 | 73:19 77:15 78:5 | **toward** 35:22 97:13 |
| 66:3,4 79:9 82:15 | 97:4,7 99:4 101:21 | 80:11,11,15 85:2,13 | 83:2,18 85:6 86:17 | **traditional** 66:20 83:6 |
| **stipulated** 3:13 4:3,10 | 102:10 107:13,21 | 85:15,17 108:15 | 86:19 87:1 92:6,7,20 | 93:5 |
| **stipulation** 1:16 3:12 | 110:18 | **teacher's** 18:7 | 93:15 95:1,3,18 97:7 | **traffic** 19:23 |
| **stop** 49:18 | **suspect** 19:11 29:4 | **teacher/certified** 27:15 | 97:22 99:1,23 101:1 | **trained** 43:13,20 |
| **stopped** 57:12 | 34:17,18 38:4,10,13 | **teaching** 18:9,18 19:2 | 103:12 104:23 | **training** 48:7 54:10 |
| **Street** 1:20 2:7,11 | 38:14 46:13 74:17 | 43:11 52:3 | 106:13,16 107:1 | 87:16 |
| **strength** 24:2,11 | 84:5 91:17 93:3 | **teaching-type** 73:13 | **thinking** 12:20 40:9 | **transcript** 113:9 |
| **strong** 40:17 | 95:20,21 96:22 98:8 | **team** 24:22 26:11 27:1 | **third** 25:8 53:8 58:15 | **transition** 41:5 50:8 |
| **strongly** 40:2,14 41:1 | 108:1 | **Tech** 6:22 10:8 | 64:18 | 58:6 66:17 |
| **structure** 84:13 90:7 | **suspended** 16:3 | **technical** 25:3 | **thirteen** 69:21 | **transitioned** 49:23 |
| **structured** 49:4 83:6 | **suspension** 15:16 | **tell** 6:1 15:12 23:5 | **Thomas** 74:18 | **travel** 51:14 |
| **student** 9:3,5 10:7,8 | **sworn** 4:18 15:7 17:19 | 36:22 42:6,19 53:11 | **though** 29:8 76:7 85:13 | **treated** 94:19 96:7 |
| 15:17 16:3 | 112:7 | 57:20 66:8 78:15 | **thought** 40:9 45:9 58:4 | **treatment** 98:5 106:19 |
| **students** 15:16,21 67:2 | **system** 8:20 28:2 38:5 | 88:18 100:16 104:11 | 64:10 80:12 | **trial** 4:6 12:15 |
| **stuff** 45:21 49:17 | 54:8 62:21,22 70:17 | **telling** 54:20 58:10 | **three** 23:18 30:3 46:15 | **trouble** 87:23 |
| **subject** 19:5 | 71:4 88:5 94:20 | 98:17 99:20 100:3 | 68:19,21 91:10 92:10 | **true** 94:22 95:1 97:12 |
| **substance** 56:19 67:21 | 95:22 97:17 98:3,4 | 105:3 110:4 | **through** 13:22 19:20 | 107:14 113:9 |
| **success** 80:20 | 98:14,18 101:6 | **tells** 33:10 89:10 | 29:22 31:11 33:2 | **truly** 13:19 39:15 |
| **suddenly** 80:5,23 | 106:20 107:20 | **tend** 23:22 85:7 | 34:19 37:14 43:8,8 | **truth** 4:18,18,19 |
| **sued** 11:20 | **S-C-H** 63:1 | **tendered** 22:1 | 46:22 53:3 66:11,14 | 105:14 112:7,8,8 |
| **suggesting** 96:1 | | **tenure** 68:3 81:16 | 67:16 71:1,8 72:17 | **try** 5:5 8:23 9:23 68:11 |
| **suggests** 27:6 | **T** | **tenured** 68:7,9,11 | 72:20 73:5 74:18,20 | **trying** 15:23 39:18 |
| **suing** 13:1 | **table** 23:11 94:10 | 69:12,14,14 108:8,9 | 74:22 75:4,12 76:4 | 46:17 55:10 63:20 |
| **suit** 61:12 | **take** 5:3 10:18 20:20 | 108:18,19 111:3 | 79:10 84:12 89:2,7 | 84:23 88:1 90:21 |
| **Suite** 5:15 | 21:12 34:15 59:21 | **terms** 17:11 19:17,18 | 90:17,18 91:1,5 | 96:18 106:16 107:2 |
| **Suites** 5:13 | 62:13 65:12 81:7 | 38:3 51:5 67:16 | 92:21 98:10 102:12 | 107:11 |
| **suits** 12:6,19 | 82:1 89:16 92:4,5 | 70:15 72:2 74:6 | 102:15,17 103:22,23 | **turned** 106:14 |
| **summer** 36:1 70:1,22 | 97:10 107:2,12,22 | 94:23 | 111:15 | **twelve** 69:21 |
| 72:6 78:13,17 104:22 | 111:12 | **testified** 4:19 17:22 | **ticket** 19:23 | **twenty-seven** 70:19 |
| 109:22 | **taken** 1:15 3:15,17 17:3 | 25:16 55:22 84:21 | **tied** 20:9 | **twenty-six** 70:19 |
| **summertime** 26:22 | 23:10 31:1 39:14 | 86:7,14 90:8 106:13 | **tier** 25:8 | **two** 6:17 24:3 44:9 49:5 |
| 36:7 | 71:5 93:14 110:16 | **testimony** 15:7 17:19 | **till** 10:1 108:4 | 50:8 91:10 92:9 |
| **superintendency** 19:11 | **taking** 62:10,11 | 86:11 87:2 96:14 | **time** 3:22 5:3,10 9:12 | **type** 19:9 42:16 80:2 |
| 19:14 50:1 | **talk** 6:8 33:8,20 40:19 | 108:20 | 10:18 13:22 15:11 | 85:18 101:9 |
| **superintendent** 1:11 | 44:17,19 47:16 55:1 | **Thank** 11:15 14:19 | 17:22,23 37:8 38:10 | **typed** 56:20 |
| 7:16,21 8:4 11:21 | 62:4 63:14 64:3 67:7 | **their** 1:9 17:11 22:14 | 40:1,22 42:14,20 | **typed-up** 27:12 |
| 13:7 15:11 19:4 | 67:18 92:14 95:10,16 | 22:15 26:4,11,13 | 43:5 44:8 46:17 51:7 | **typical** 60:14 63:6 74:4 |
| 24:19 25:6 28:2 30:8 | 97:1 100:22 101:13 | 28:4 40:4 53:18 | 52:21 54:1,9 57:11 | **typically** 14:8 24:7 |
| 36:13 43:16 47:19 | **talked** 41:7,14 67:21 | 66:16 74:14 85:3 | 58:13 70:14 80:10 | 37:6 44:11 47:9 62:6 |
| 72:16 81:7 85:8 | 101:16 104:20 110:8 | 93:8 108:16 112:18 | 83:14,16 90:22 91:7 | 64:3 66:19 77:15 |
| 112:22 | **talking** 14:14,18 21:23 | **thereof** 113:15 | 93:18,20 98:22 101:1 | 83:2 |
| **superintendents** 24:17 | 22:16 23:9 24:16 | **things** 46:16 51:20 | **times** 101:16 106:9 | |
| **supervising** 25:10 | 27:16,21 29:12 37:8 | 60:17 63:10 78:1 | **title** 53:19,20 87:11 | **U** |
| **supervision** 7:14 72:15 | 40:22 48:6 65:17,19 | 81:5 87:19 | **today** 13:23 29:7 31:4 | **Uh-huh** 59:11,14 |
| **supervisor** 105:4,7 | 65:23 66:22 70:23 | **think** 8:15 13:23 14:13 | 32:2 84:9 | **uh-huhs** 59:20 |
| **supervisory** 18:3 | 83:12,14,19 92:18 | 15:23 17:23 20:13 | **told** 33:5 45:14 54:18 | **under** 43:13 72:14 99:6 |
| **support** 8:10 70:20 | 98:2 104:8 | 26:2,3,19 27:20 28:1 | 68:4 73:21 75:11,20 | **understand** 11:22 |
| **supporting** 13:7 | **talks** 94:16 | 28:6 29:7,13,13 | 75:23 93:1 94:17 | 22:12 27:10 45:8 |
| **sure** 10:20 12:16 17:6 | **taught** 10:23 11:12 | 30:11,22 31:4,13,16 | 98:14 104:9 105:8 | 48:9 77:14 90:22 |
| 25:21 49:10 56:16 | **teach** 6:19 52:14 | 31:18,22 32:2,6 34:3 | 106:8 | 93:16 96:14 |
| 60:6 61:21 62:3 | **teacher** 10:14,22 11:4,9 | 36:21 39:23 41:14 | **TOMMIE** 1:8 112:15 | **understanding** 16:20 |
| 63:16,20 64:9,12,12 | 11:19 12:9,20,21 | | **Tonya** 2:5 | 21:23 46:14 47:22 |

Deposition of Dr. Carlinda Purcell

~74:21,22 75:3,6 76:6
76:9
understood 30:12
unfortunate 17:14
uniform 48:21
unique 84:17
UNITED 1:1
University 6:15
unless 23:23 28:23 39:8
40:22 45:17 60:14
101:9 105:13
unpacked 46:18
until 8:3,8 9:1,1,12
10:2,9,15 13:19
39:16 61:16 104:5
urgent 61:10
use 91:15
used 4:1,7 43:14 72:11
73:4,11 103:20
using 47:5
usually 18:2 22:23 38:5
60:8 64:4
U.S 113:3

**V**
vacancies 66:12
vacated 32:16
AN 2:6
.erbal 34:12 65:8
versus 83:16 86:2
93:13 111:3
very 12:7 17:13,16
29:18 31:2 42:7
60:15 67:1 68:6 80:6
80:15,18 81:4 84:12
85:3 108:15
VICKIE 1:7 112:14
views 66:1
Virginia 6:14,15,17,18
6:21,22 10:8 11:8,18
16:5 18:21,22
visible 53:17
visited 69:2
volunteers 79:14 81:1
85:2
Vs 1:6 112:12

**W**
waiting 18:11
waived 4:5,13 113:12
waiving 4:8
walked 88:17
want 6:6 22:14 23:11
24:21 26:8 27:7 31:6
34:23 44:14 47:20
/4:17 62:11 77:16
80:4,19 89:13,16

104:10 105:3
wanted 29:8 30:6,21
31:19 32:4 39:23
40:18 50:5 52:21
56:2 58:2 72:5 75:11
81:20 82:1,12 84:3
85:18 86:23 91:21
92:15 103:17 104:2
104:14 107:8 108:15
110:9
wanting 80:15 85:4
103:6
wants 32:13 33:6 34:8
61:9
ware 104:13
warm 42:7
Warren 8:4 11:23
15:11 50:1
wasn't 42:9,10 43:19
85:14,19,21 94:22
95:1 99:1 104:7
way 13:15 33:21 37:6
40:17 49:4 80:13
90:2 94:9 99:14
Wayne 8:22
ways 40:8
wearing 48:21
web 54:15
week 25:2 104:6
weeks 62:8
weighed 85:22
weight 84:19 86:2 88:5
welcoming 42:11
well 5:6 11:21 16:10
18:21 29:17 30:5,17
30:20 31:2 35:10
36:5 38:18 39:8 41:9
43:14 47:3,7 51:11
51:13 63:9 67:9 68:8
68:13 69:8,11,13
70:10 75:10 77:15
78:20 81:9 84:22
85:23 86:9,10 97:10
97:22 98:7 99:7
103:16,20 105:13
106:6,7,10 111:2
went 6:11,13,18 10:19
10:22 11:11,14 12:4
12:14 18:5 39:9 43:8
49:8 51:2 55:22
65:18,22 73:9 76:3
89:2 90:10 91:5
were 8:6 10:12 11:3,6
12:7,11,23 13:3,13
13:17 14:11 15:17,18
17:2 21:13 29:14
35:8,16 36:11 38:23

39:22 43:13 45:9
46:14,15,17 47:5
50:16 51:13,20 52:1
52:7,15,17,20 54:4
54:13,15 64:5 66:10
66:16 67:1 68:1,3,7,8
68:11,15,17,19 69:3
69:13,14,18 70:1,7
70:11 73:1 74:23
75:20,23 78:20 79:14
79:16,19 80:14,15,18
81:14 82:8 88:14
91:4,21 93:18 102:4
102:15 103:10 104:2
104:9,13 107:23
109:16
we'll 5:4 49:5
we're 28:11 31:22
48:18 49:1 50:19
52:3 83:12 96:2
111:15
we've 14:6 54:22 94:4
104:20 110:2
while 6:16 28:1 43:5
83:11,13 108:1
white 88:14
whole 4:18 72:13 93:15
112:8
Wilbanks 1:17 3:17
112:2 113:20
William 2:5
Winston-Salem 8:7,18
9:2
Winston-Salem-Fors...
8:19
witness 4:11,12,17
14:16,19 18:14 22:2
22:4 26:19 28:10
44:10 71:21 113:10
Women 6:11
wondering 12:10
word 30:5 35:13
words 42:4
work 6:13,14,21 7:2,19
8:2,21 9:11 10:6
11:17 20:9 26:8 28:4
28:23 37:10,19 41:4
50:5 66:11 69:4
80:17 83:4,5 89:4
109:18
worked 6:16 10:3 18:1
28:1 47:8 71:19
workers 8:16 9:7
working 6:16 12:8
18:13 37:15 39:17
47:14 54:8 69:3
110:20

works 22:8,12 25:7
worry 45:19
wouldn't 40:1 48:23
84:8 103:15
write 60:9 62:17
writing 8:17 34:12,17
34:18,21 48:14 59:16
59:18 62:15 64:15
written 38:12 53:6
55:17 94:4
wrong 69:22
wrote 56:20 62:23
103:2

**Y**
yeah 10:2,11 31:21
44:10,11 45:4 46:11
62:3 73:16 92:2
105:8 111:10
year 15:12,13 35:23
36:1,3,4 42:21 49:23
51:3,21,22 70:9,11
76:22 78:8 80:9
81:15
years 6:23
YMCA 20:12
young 66:18 109:13
y'all 21:12,14 30:20

**Z**
Zara 108:3,18

**0**
02 8:1,3
04 8:1 36:3,5,8 38:15
05 36:3,5,6,8,9 80:4
06 36:6,9

**1**
1 3:2 7:18 44:3,5 109:7
1/24/05 3:3
100 20:13
11/25/49 6:2
11:45 111:17
112 113:8
12/31/1971 7:2
12/84 9:12
12/95 8:3
16 59:7 60:3
1975 7:4
1980 10:8 21:15
1983 7:6
1984 13:19
1987 8:23
1990 8:8

**2**

2 3:3 55:6,8 56:12
2/16/05 3:6
2/4/05 3:5
2:05-CV-0495 1:6
113:6
200 83:16
2004 7:18
2005 36:13 57:7 59:7
60:3,23 61:2 65:13
78:9,10,13,17 94:6
109:22 111:1
2006 1:21 113:7,16
22 94:6
23 1:21 113:7
25 83:15,18
250 2:7
2600 111:10

**3**
3 3:5 58:21,23
3rd 113:16
3:30 64:7
30 83:15 106:9
30(b)(6) 22:2,3
33 87:10,12 88:8
36104 2:7,11
38 87:9

**4**
4 2:18 3:6 59:6,9,13,23
61:8,23 62:5 65:4,10
4200 70:18
425 1:20 2:11
44 3:2

**5**
5 3:8 64:21 65:1,5,10
94:5,13 95:8,11,17
96:5,16,21 101:13
102:4,6,9,11 106:2
107:3,10
55 3:4
58 3:5
59 3:7

**6**
6/22/05 3:8
60 88:8
600 5:8
64 3:9

**7**
71 11:7,8
72 7:3
76 7:4 10:19 11:3
77 10:19